Rosemary M. Rivas (State Bar No. 209147)
Email: rrivas@zlk.com
**LEVI & KORSINSKY, LLP**
44 Montgomery Street, Suite 650
San Francisco, California 94104
Telephone: (415) 291-2420
Facsimile: (415) 484-1294

*Counsel for Individual and Representative Plaintiff*
*David C. Weston*

[*Additional Counsel listed on signature block.*]

## UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAVID C. WESTON, on behalf of himself and all others similarly situated,<br><br>     Plaintiff,<br><br>v.<br><br>PG&E CORPORATION, ANTHONY F. EARLEY, JR., JASON P. WELLS, GEISHA J. WILLIAMS, CHRISTOPHER P. JOHNS, DINYAR B. MISTRY, and DAVID S. THOMASON,<br><br>     Defendants. | Case No. 3:18-cv-03509<br><br>**CLASS ACTION**<br><br>**COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAW**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff David C. Weston ("Plaintiff") alleges the following based upon the investigation of counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by PG&E Corporation ("PG&E" or the "Company"), as well as regulatory filings and reports, securities analyst reports and advisories by the Company, press releases and other public statements issued by the Company, and media reports about the Company. Plaintiff believes that additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a federal securities class action on behalf of all investors who purchased or otherwise acquired PG&E common stock between April 29, 2015, and June 8, 2018, inclusive (the

"Class Period").

2.       This is a class action brought by Plaintiff, on behalf himself and all others similarly situated, against Defendants for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

## JURISDICTION AND VENUE

3.       The federal law claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. § 78j(b) and § 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5, as well as under the common law.

4.       This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

5.       This Court has jurisdiction over each Defendant named herein because each Defendant either conducts business in and maintains operations in this District or is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District Court permissible under traditional notions of fair play and substantial justice.

6.       Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act because many of the false and misleading statements were made in or issued from this District.

## PARTIES

7.       Plaintiff David C. Weston purchased PG&E common stock as set forth herein and in his certification filed herewith.

8.       PG&E is a California corporation with its principal executive offices located at 77 Beale Street, P.O. Box 770000 San Francisco, California 94177.  PG&E mainly operates through its wholly-owned subsidiary Pacific Gas and Electric Company ("Pacific Gas Electric" or the "Utility").  PG&E trades on the New York Stock Exchange ("NYSE") under the ticker symbol "PCG."

9.       Defendant Anthony F. Earley, Jr. ("Earley") was the President, Chairman of the Board of Directors, and Chief Executive Officer ("CEO") of the Company until March 1, 2017, when he

became Executive Chair of the Board of PG&E.

10. Defendant Jason P. Wells ("Wells") was the Senior Vice President and Chief Financial Officer ("CFO") of the Company from January 1, 2016, to the end of the Class Period.

11. Defendant Geisha J. Williams ("Williams") was the President of the Electric operations at Pacific Gas and Electric from the beginning of the Class Period until March 1, 2017, when she became CEO and President of PG&E.

12. Defendant Christopher P. Johns ("Johns") was the President of Pacific Gas and Electric from the beginning of the Class Period to December 31, 2015.

13. Defendant Dinyar B. Mistry ("Mistry") was the Vice President and Controller of PG&E and the Vice President, CFO, and Controller of Pacific Gas and Electric until June 1, 2016. Additionally, Mistry became the Senior Vice President, Human Resources of PG&E on March 1, 2016.

14. Defendant David S. Thomason ("Thomason") was the Vice President, CFO, and Controller of Pacific Gas and Electric from June 1, 2016 to the end of the Class Period.

15. Defendants in paragraphs 9-14 above are collectively referred to herein as the "Individual Defendants."

16. PG&E and the Individual Defendants are collectively referred to as "Defendants."

**CONTROL PERSON ALLEGATIONS**

17. By reason of the Individual Defendants' positions as executive officers with the Company, the Individual Defendants possessed the power and authority to control the contents of PG&E's quarterly reports, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions with the Company, and their access to material, non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and

1    misleading.  The Individual Defendants are liable for the false statements pleaded herein.

2                          **SUBSTANTIVE ALLEGATIONS**

3    **Background**

4          18.    PG&E was incorporated in California in 1995 as a holding company whose primary

5    operating subsidiary is Pacific Gas and Electric, a public utility operating in northern and central

6    California.  The Company generates revenues mainly through the sale and delivery of electricity and

7    natural gas to customers.

8    **Material Misrepresentations and Omissions**

9          19.    At all relevant times, PG&E's Media Relations department maintained a news website

10   named Currents[1] providing news, information, and commentary about PG&E's activities, including

11   the delivery of electricity and the operation, maintenance, and safety of the Company's electric

12   services.   Throughout the website, PG&E repeatedly touts the safety of its network and the

13   Company's proactivity in fighting wildfire risk.

14         20.    The Class Period begins on April 29, 2015, when, during a conference call to discuss

15   the Company's financial and operating results for the first fiscal quarter ended March 31, 2015 ("Q1

16   2015 Conf. Call"), Defendant Johns, former President of PG&E's wholly-owned subsidiary Pacific

17   Gas & Electric, assured investors of the Company's commitment to "***[step] up vegetation***

18   ***management activities to mitigate wildfire risk.***"  (Emphasis added.)

19         21.    On February 18, 2016, PG&E filed a Form 10-K with the SEC announcing the

20   Company's financial and operating results for the fiscal fourth quarter and fiscal year ended

21   December 31, 2015 ("2015 10-K"), which was signed and certified under the Sarbanes-Oxley Act of

22   2002 by the Individual Defendants.  Therein, PG&E stated in pertinent part:

23              ***Throughout 2015, the Utility upgraded several critical substations and re-***
               ***conducted a number of transmission lines to improve maintenance and system***
24             ***flexibility, reliability and safety***.   The Utility expects to undertake various
               additional transmission projects over the next several years to upgrade and expand
25             the capacity of its transmission system to accommodate system load growth, secure
               access to renewable generation resources, replace aging or obsolete equipment and
26             improve system reliability.  The Utility also has taken steps to improve the physical
               security of its transmission substations and equipment.
27

28   _____

     [1] http://www.pgecurrents.com/, last accessed on June 11, 2018 at 4:00 pm ET.

\*        \*        \*

In 2015, the Utility continued to deploy its Fault Location, Isolation, and Service Restoration circuit technology which involves the rapid operation of smart switches to reduce the duration of customer outages.  Another 83 circuits were outfitted with this equipment, bringing the total deployment to 700 of the Utility's 3200 distribution circuits.  The Utility also installed or replaced 20 distribution substation transformer banks to improve reliability and provide capacity to accommodate growing demand.  ***The Utility plans to continue performing work to improve the reliability and safety of its electricity distribution operations in 2016.***

\*        \*        \*

In addition, the Utility obtains permits, authorizations, and licenses in connection with the construction and operation of the Utility's generation facilities, electricity transmission lines, natural gas transportation pipelines, and gas compressor station facilities.  The Utility also periodically obtains permits, authorizations, and licenses in connection with distribution of electricity and natural gas that grant the Utility rights to occupy and/or use public property for the operation of the Utility's business and to conduct certain related operations.  The Utility has franchise agreements with approximately 300 cities and counties that permit the Utility to install, operate, and maintain the Utility's electric and natural gas facilities in the public streets and highways.  In exchange for the right to use public streets and highways, the Utility pays annual fees to the cities and counties.  In most cases, the Utility's franchise agreements are for an indeterminate term, with no expiration date.

Emphasis added.

22.    On February 16, 2017, PG&E filed a Form 10-K with the SEC announcing the Company's financial and operating results for the fiscal fourth quarter and fiscal year ended December 31, 2016 ("2016 10-K"), which was signed and certified under the Sarbanes-Oxley Act of 2002 by the Individual Defendants. Therein, PG&E stated in pertinent part:

***Throughout 2016, the Utility upgraded several critical substations and re-conductored a number of transmission lines to improve maintenance and system flexibility, reliability and safety.***  The Utility expects to undertake various additional transmission projects over the next several years to upgrade and expand the capacity of its transmission system to secure access to renewable generation resources and replace aging or obsolete equipment and improve system reliability. The Utility also has taken steps to improve the physical security of its transmission substations and equipment.

\*        \*        \*

The Utility's operations are subject to extensive federal, state and local laws and requirements relating to the protection of the environment and the safety and health of the Utility's personnel and the public.  These laws and requirements relate to a broad range of activities, including the remediation of hazardous and radioactive substances; the discharge of pollutants into the air, water, and soil; the reporting and reduction of $CO_2$ and other GHG emissions; the transportation, handling, storage and disposal of spent nuclear fuel; and the environmental impacts of land use,

COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAW

including endangered species and habitat protection.

Emphasis added.

23.     The statements in paragraphs 20-22 above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) PG&E had failed to maintain electricity transmission and distribution networks in compliance with safety requirements and regulations promulgated under state law; (ii) consequently, PG&E was in violation of state law regulation; (iii) PG&E's electricity networks would cause numerous wildfires in California; and (iv) as a result of the foregoing, Defendants' statements about the Company's business and operations were materially false and misleading at all relevant times.

**The Truth Begins to Emerge**

24.     On or about October 8, 2017, numerous wildfires started in California, burning at least 245,000 acres and devastating properties in Sonoma, Mendocino, Lake, Santa Rosa, Napa, Humboldt, Butte, and Solano counties.

25.     On or about October 11, 2017, various news outlets reported that Californian authorities and officials were looking at whether PG&E's power lines had caused fires.  Notably, on October 13, 2018, Reuters reported the following:

> Oct 13 (Reuters) - Shares of PG&E PCG.N fell for the third straight day on Friday on investor concerns the company may have to pay damages after authorities suggested power lines toppled by strong winds may have sparked the worst wildfire in California's history.
>
> Flames erupted on Sunday night, gaining strength over the week. The exact cause of the disaster is under investigation. (Full Story)
>
> Shares of the California-based utility fell as much as 13 percent on Friday to $56.32 on the New York Stock Exchange.
>
> "While it is too early to determine the utility's responsibility, it is possible that shareholders will bear responsibility for some damages," RBC Capital Markets analyst Shelby Tucker said, cutting her price target on the company's stock by $2 to $68.
>
> The analyst said even if the company is insured for damages, it would still be financially responsible for harm to property and could be sued for damages.

COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAW

"The extent of damages possible under negligence are far higher since they include personal injury damages, among others," Tucker said.

PG&E has been investigated by California's department of forestry and fire protection earlier too.

According to media reports, a 2015 investigation found that a power line operated by the utlity ignited fires that burned more than 70,000 acres.

Shares of PG&E have fallen nearly 20 percent since Wednesday, when officials said electric wires knocked down by winds could have caused the fire.

The utility's shares were trading at $59.33 on late Friday morning.

26.     The same day, PG&E filed a Form 8-K with the SEC announcing an investigation of the fires ("October 2017 Press Release"). Therein, the Company stated in relevant part:

### Investigation of Northern California Fires

Since October 8, 2017, several catastrophic wildfires have started and remain active in Northern California. The causes of these fires are being investigated by the California Department of Forestry and Fire Protection (Cal Fire), including the possible role of power lines and other facilities of Pacific Gas and Electric Company's (the "Utility"), a subsidiary of PG&E Corporation.

It currently is unknown whether the Utility would have any liability associated with these fires.  The Utility has approximately $800 million in liability insurance for potential losses that may result from these fires.  If the amount of insurance is insufficient to cover the Utility's liability or if insurance is otherwise unavailable, PG&E Corporation's and the Utility's financial condition or results of operations could be materially affected.

27.     As a result of this news and these disclosures, the stock price declined from a close of $69.15 per share of PG&E common stock on October 11, 2017, to a close of $53.43 per share on October 16, 2017, *a drop of approximately 22.7 percent*.

28.     On December 20, 2017, PG&E issued a press release, also attached as exhibit 99.1 to the Form 8-K filed with the SEC announcing the suspension of its cash dividend ("December 2017 Press Release"). Therein, PG&E stated in pertinent part:

### PG&E Announces Suspension of Dividend, Citing Uncertainty Related to Causes and Potential Liabilities Associated with Northern California Wildfires

**SAN FRANCISCO, Calif.**—PG&E Corporation (NYSE: PCG) today announced that its Board of Directors has determined to suspend the quarterly cash dividend on the Corporation's common stock, beginning with the fourth quarter of 2017, citing uncertainty related to causes and potential liabilities associated with the extraordinary October 2017 Northern California wildfires.

COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAW

In addition, the Board of Directors of the Corporation's utility subsidiary, Pacific Gas and Electric Company, determined to suspend the dividend on the utility's preferred stock, beginning with the three-month period ending Jan. 31, 2018, citing the same uncertainty.

No causes have yet been identified for any of the unprecedented wildfires, which continue to be the subject of ongoing investigations.

However, California is one of the only states in the country in which courts have applied inverse condemnation to events caused by utility equipment. This means that if a utility's equipment is found to have been a substantial cause of the damage in an event such as a wildfire – even if the utility has followed established inspection and safety rules – the utility may still be liable for property damages and attorneys' fees associated with that event.

"After extensive consideration and in light of the uncertainty associated with the causes and potential liabilities associated with these wildfires as well as state policy uncertainties, the PG&E boards determined that suspending the common and preferred stock dividends is prudent with respect to cash conservation and is in the best long-term interests of the companies, our customers and our shareholders," said PG&E Corporation Chair of the Board Richard C. Kelly.

"We fully recognize the importance of dividends and intend to revisit the issue as we get more clarity. In the meantime, PG&E is committed to working with state policymakers to address the negative investment environment that strict liability under inverse condemnation is creating for California's utilities. This ultimately hurts our customers and the state. The company also remains committed to supporting recovery and rebuilding efforts by those communities that were impacted by these devastating fires," he said.

29.     On this news, the stock price declined from a close of $51.12 per share of PG&E common stock on December 20, 2017, to a close of $44.50 per share on December 21, 2017, *a drop of approximately 12.95 percent*.

**Additional Misstatements**

30.     On February 9, 2018, PG&E filed a Form 10-K with the SEC announcing the Company's financial and operating results for the fiscal fourth quarter and fiscal year ended December 31, 2017 ("2017 10-K"), which was signed and certified under the Sarbanes-Oxley Act of 2002 by the Individual Defendants.  Therein, PG&E stated in pertinent part:

PG&E Corporation's and the Utility's financial condition, results of operations, liquidity, and cash flows could be materially affected by potential losses resulting from the impact of the multiple wildfires that spread through Northern California, including Napa, Sonoma, Butte, Humboldt, Mendocino, Del Norte, Lake, Nevada, and Yuba Counties, as well as in the area surrounding Yuba City, beginning on October 8, 2017 (the "Northern California wildfires").  According to the Cal Fire California Statewide Fire Summary dated October 30, 2017, at the peak of the wildfires, there were 21 major wildfires in California that, in total, burned over 245,000 acres, resulted in 43 fatalities, and destroyed an estimated 8,900 structures. Subsequently, the number of fatalities increased to 44.

COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAW

The Utility incurred $219 million in costs for service restoration and repair to the Utility's facilities (including $97 million in capital expenditures) through December 31, 2017 in connection with these fires. While the Utility believes that such costs are recoverable through CEMA, its CEMA requests are subject to CPUC approval. The Utility's financial condition, results of operations, liquidity, and cash flows could be materially affected if the Utility is unable to recover such costs.

The fires are being investigated by Cal Fire and the CPUC, including the possible role of the Utility's power lines and other facilities. The Utility expects that Cal Fire will issue a report or reports stating its conclusions as to the sources of ignition of the fires and the ways that they progressed. The CPUC's SED also is conducting investigations to assess the compliance of electric and communication companies' facilities with applicable rules and regulations in fire impacted areas. According to information made available by the CPUC, investigation topics include, but are not limited to, maintenance of facilities, vegetation management, and emergency preparedness and response. Various other entities, including fire departments, may also be investigating certain of the fires. (For example, on February 3, 2018, it was reported that investigators with the Santa Rosa Fire Department had completed their investigation of two small fires that reportedly destroyed two homes and damaged one outbuilding and had concluded that the Utility's facilities, along with high wind and other factors, contributed to those fires.) It is uncertain when the investigations will be complete and whether Cal Fire will release any preliminary findings before its investigation is complete.

As of January 31, 2018, the Utility had submitted 22 electric incident reports to the CPUC associated with the Northern California wildfires where Cal Fire has identified a site as potentially involving the Utility's facilities in its investigation and the property damage associated with each incident exceeded $50,000. The information contained in these reports is factual and preliminary, and does not reflect a determination of the causes of the fires. The investigations into the fires are ongoing.

If the Utility's facilities, such as its electric distribution and transmission lines, are determined to be the cause of one or more fires, and the doctrine of inverse condemnation applies, the Utility could be liable for property damage, interest, and attorneys' fees without having been found negligent, which liability, in the aggregate, could be substantial and have a material adverse effect on PG&E Corporation and the Utility. (See "The doctrine of inverse condemnation, if applied by courts in litigation to which PG&E Corporation or the Utility are subject, could significantly expand the potential liabilities from such litigation and materially negatively affect PG&E Corporation's and the Utility's financial condition, results of operations, and cash flows" below.) In addition to such claims for property damage, interest and attorneys' fees, the Utility could be liable for fire suppression costs, evacuation costs, medical expenses, personal injury damages, and other damages under other theories of liability, including if the Utility were found to have been negligent, which liability, in the aggregate, could be substantial and have a material adverse effect on PG&E Corporation and the Utility. Further, the Utility could be subject to material fines or penalties if the CPUC or any other law enforcement agency brought an enforcement action and determined that the Utility failed to comply with applicable laws and regulations.

31.     The statements in paragraphs 30 above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the

COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAW

Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) PG&E had failed to maintain electricity transmission and distribution networks in compliance with safety requirements and regulations promulgated under state law; (ii) consequently, PG&E was in violation of state law regulation; (iii) PG&E's electricity networks would cause numerous wildfires in California; and (iv) as a result of the foregoing, Defendants' statements about the Company's business and operations were materially false and misleading at all relevant times.

**The Truth Continues to Emerge**

32.     On May 25, 2018, the California Department of Forestry and Fire Protection issued a press release announcing the cause of four wildfires in Butte and Nevada counties ("May 2018 Press Release"), stating in relevant part:

### CAL FIRE Investigators Determine Cause of Four Wildfires in Butte and Nevada Counties

Sacramento – After extensive and thorough investigations, CAL FIRE investigators have determined that four Northern California wildfires in last year's October Fire Siege were caused by trees coming into contact with power lines. The four fires, located in Butte and Nevada counties, are the first fire investigations from last October to be completed.

CAL FIRE investigators were dispatched to the fires last year and immediately began working to determine their origin and cause. The Department continues to investigate the remaining 2017 fires, both in October and December, and will release additional reports as they are completed.

The October 2017 Fire Siege involved more than 170 fires and charred more than 245,000 acres in Northern California. More than 11,000 firefighters from 17 states helped battle the blazes.

Below is a summary of the four completed investigations:

- The La Porte Fire, in Butte County, started in the early morning hours of Oct. 9 and burned a total of 8,417 acres, destroying 74 structures. There were no injuries to civilians or firefighters. CAL FIRE has determined the fire was caused by tree branches falling onto PG&E power lines. CAL FIRE investigators determined there were no violations of state law related to the cause of this fire.

- The McCourtney Fire, in Nevada County, started the evening of Oct. 8 and burned a total of 76 acres, destroying 13 structures. There were no injuries to civilians or firefighters. CAL FIRE has determined the fire was caused by a tree falling onto PG&E power lines. ***The investigation found evidence that PG&E allegedly failed to remove a tree from the proximity of a power line, in violation of the state Public Resources Code section 4293***.

**COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAW**

- The Lobo Fire, in Nevada County, started the evening of Oct. 8 and burned a total of 821 acres, destroying 47 structures. There were no injuries to civilians or firefighters. ***CAL FIRE has determined the fire was caused by a tree contacting PG&E power lines. The investigation found evidence that Public Resources Code section 4293, which requires adequate clearance between trees and power lines, was allegedly violated***.

- The Honey Fire, in Butte County, started in the early morning hours of Oct. 9 and burned a total of 76 acres. There were no injuries to civilians or firefighters and no structures were destroyed. ***CAL FIRE has determined the fire was caused by an Oak branch contacting PG&E power lines. The investigation found evidence that Public Resources Code 4293, which requires adequate clearance between trees and power lines, was allegedly violated***.

The McCourtney, Lobo, Honey investigations have been referred to the appropriate county District Attorney's offices for review.

Emphasis added.

33. On this news, the stock price declined from a close of $44.66 per share of PG&E common stock on May 25, 2018, to a close of $42.34 per share on May 29, 2018, ***a drop of approximately 5.19 percent***.

34. On June 8, 2018, after the market close, the California Department of Forestry and Fire Protection issued another press release announcing the cause of twelve wildfires in Mendocino, Humboldt, Butte, Sonoma, Lake, and Napa Counties ("June 2018 Press Release"), stating in relevant part:

**CAL FIRE Investigators Determine Causes of 12 Wildfires in Mendocino, Humboldt, Butte, Sonoma, Lake, and Napa Counties**

**Sacramento** – After extensive and thorough investigations, CAL FIRE investigators have determined that 12 Northern California wildfires in the October 2017 Fire Siege were caused by electric power and distribution lines, conductors and the failure of power poles.

The October 2017 Fire Siege involved more than 170 fires and burned at least 245,000 acres in Northern California. About 11,000 firefighters from 17 states and Australia helped battle the blazes.

CAL FIRE investigators were dispatched to the fires last year and immediately began working to determine their origin and cause. CAL FIRE investigators continue to investigate the remaining 2017 fires, both in October and December, and will release additional reports as they are completed. The cause of four Northern California fires were released on May 25.

Below is a summary of the findings from the 12 completed investigations:

The **Redwood Fire**, in Mendocino County, started the evening of Oct. 8 and burned a total of 36,523 acres, destroying 543 structures. There were nine civilian fatalities and no injuries to firefighters. CAL FIRE has determined the fire started in two locations and was caused by tree or parts of trees falling onto PG&E power lines.

The **Sulphur Fire**, in Lake County, started the evening of Oct. 8 and burned a total of 2,207 acres, destroying 162 structures. There were no injuries. CAL FIRE investigators determined the fire was caused by the failure of a PG&E owned power pole, resulting in the power lines and equipment coming in contact with the ground.

The **Cherokee Fire**, in Butte County, started the evening of Oct. 8 and burned a total of 8,417 acres, destroying 6 structures. There were no injuries. CAL FIRE investigators have determined the cause of the fire was a result of tree limbs coming into contact with PG&E power lines.

The **37 Fire**, in Sonoma County, started the evening of Oct. 9 and burned a total of 1,660 acres, destroying 3 structures. There were no injuries. CAL FIRE investigators have determined the cause of the fire was electrical and was associated with the PG&E distribution lines in the area.

The **Blue Fire**, in Humboldt County, started the afternoon of Oct. 8 and burned a total of 20 acres. There were no injuries. CAL FIRE investigators have determined a PG&E power line conductor separated from a connector, causing the conductor to fall to the ground, starting the fire.

The Norrbom, Adobe, Partrick, Pythian and Nuns fires were part of a series of fires that merged in Sonoma and Napa counties. These fires started in the late-night hours of Oct. 8 and burned a combined total of 56,556 acres, destroying 1355 structures. There were three civilian fatalities.

> CAL FIRE investigators determined the **Norrbom Fire** was caused by a tree falling and coming in contact with PG&E power lines.

> CAL FIRE investigators determined the **Adobe Fire** was caused by a eucalyptus tree falling into a PG&E powerline.

> CAL FIRE investigators determined the **Partrick Fire** was caused by an oak tree falling into PG&E powerlines.

> CAL FIRE investigators determined the **Pythian Fire** was caused by a downed powerline after PG&E attempted to reenergize the line

> CAL FIRE investigators determined the **Nuns Fire** was caused by a broken top of a tree coming in contact with a power line.

The **Pocket Fire**, in Sonoma County, started the early morning hours of Oct. 9 and burned a total of 17,357 acres, destroying 6 structures. There were no injuries. CAL FIRE has determined the fire was caused by the top of an oak tree breaking and coming into contact with PG&E power lines.

The **Atlas Fire**, in Napa County, started the evening of Oct. 8 and burned a total of 51,624 acres, destroying 783 structures. There were six civilian fatalities. CAL FIRE investigators determined the fire started in two locations. At one location, it was determined a large limb broke from a tree and came into contact with a PG&E power line. At the second location, investigators determined a tree fell into the same line.

COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAW

*CAL FIRE's investigations have been referred to the appropriate county District Attorney's offices for review in eight of the 12 fires – Sulphur, Blue, Norrbom, Partrick, Pythian, Adobe, Pocket and Atlas – due to evidence of alleged violations of state law.*

Emphasis added.

35.    On this news, the stock price declined from a close of $41.45 per share of PG&E common stock on June 8, 2018, to a close of $39.76 per share on June 11, 2018, *a drop of approximately 4.03 percent*.

## LOSS CAUSATION AND ECONOMIC LOSS

36.    During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the Company's stock price, and operated as a fraud or deceit on acquirers of the Company's common stock.  As detailed above, when the truth about PG&E's misconduct and its lack of operational and financial controls was revealed, the value of the Company's common stock declined precipitously as the prior artificial inflation no longer propped up its stock price.  The decline in PG&E's share price was a direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market.  The timing and magnitude of the common stock price decline negates any inference that the loss suffered by Plaintiff and other members of the Class was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to the Defendants' fraudulent conduct.  The economic loss, *i.e.*, damages, suffered by Plaintiff and other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the Company's stock price and the subsequent significant decline in the value of the Company's share price when Defendants' prior misrepresentations and other fraudulent conduct was revealed.

37.    At all relevant times, Defendants' materially false and misleading statements or omissions alleged herein directly or proximately caused the damages suffered by Plaintiff and other Class members.  Those statements were materially false and misleading through their failure to disclose a true and accurate picture of PG&E's business, operations, and financial condition, as alleged herein.  Throughout the Class Period, Defendants publicly issued materially false and misleading statements and omitted material facts necessary to make Defendants' statements not false

or misleading, causing PG&E's common stock to be artificially inflated.  Plaintiff and other Class members purchased PG&E's common stock at those artificially inflated prices, causing them to suffer the damages complained of herein.

### SCIENTER ALLEGATIONS IN SUPPORT OF EXCHANGE ACT VIOLATIONS

38.     Collectively, the following factual allegations strongly support an inference of scienter on the part of Defendants.  Further, Defendants' actions, intentions, and deliberate reckless conduct are imputed to the Company as a matter of law.  Because of their key roles in the Company, the Individual Defendants caused PG&E to act in the manner it did and perpetuate the material misrepresentations and omissions it made throughout the Class Period.  Defendants acted with the requisite intent to establish liability under the Exchange Act.  Their conduct with respect to PG&E's statements was intentionally misleading and/or reckless with regard to the risk of investors being misled.

39.     For the reasons stated above, the factual allegations strongly support an inference of scienter on the part of Defendants.

### PRESUMPTION OF RELIANCE; FRAUD-ON-THE-MARKET

40.     At all relevant times, the market for PG&E common stock was an efficient market for the following reasons, among others:

        a)  PG&E common stock met the requirements for listing, and were listed and actively traded on the NYSE, a highly efficient market;

        b)  During the Class Period, PG&E common stock was actively traded, demonstrating a strong presumption of an efficient market;

        c)  As a regulated issuer, PG&E filed with the SEC periodic public reports during the Class Period;

        d)  PG&E regularly communicated with public investors via established market communication mechanisms;

        e)  PG&E was followed by securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of brokerage firms during the Class Period.  Each of these reports was publicly

available and entered the public marketplace; and

  f) Unexpected material news about PG&E was rapidly reflected in and incorporated into the Company's stock price during the Class Period.

  41. As a result of the foregoing, the market for PG&E common stock promptly digested current information regarding PG&E from all publicly available sources and reflected such information in PG&E's stock price.  Under these circumstances, all purchasers of PG&E common stock during the Class Period suffered similar injury through their purchase of PG&E's common stock at artificially inflated prices, and a presumption of reliance applies.

  42. Alternatively, reliance need not be proven in this action because the action involves omissions and deficient disclosures.  Positive proof of reliance is not a prerequisite to recovery pursuant to a ruling of the United States Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972).  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered the omitted information important in deciding whether to buy or sell the subject security.  Here, the facts withheld are material because an investor would have considered the Company's actual net losses and adequacy of internal controls over financial reporting when deciding whether to purchase and/or sell stock in PG&E.

## NO SAFE HARBOR; INAPPLICABILITY OF BESPEAKS CAUTION DOCTRINE

  43. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the material misrepresentations and omissions alleged in this Complaint.

  44. To the extent certain of the statements alleged to be misleading or inaccurate may be characterized as forward-looking, they were not identified as "forward-looking statements" when made and no meaningful cautionary statements were made identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

  45. Defendants are also liable for any false or misleading "forward-looking statements" pleaded because, at the time each "forward-looking statement" was made, the speaker knew the "forward-looking statement" was false or misleading and the "forward-looking statement" was authorized and/or approved by an executive officer of PG&E who knew that the "forward-looking

statement" was false.   Alternatively, none of the historic or present-tense statements made by Defendants were assumptions underlying or relating to any plan, projection or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by the Defendants expressly related to or stated to be dependent on those historic or present-tense statements when made.

## CLASS ACTION ALLEGATIONS

46.     Plaintiff brings this action on behalf of all individuals and entities who purchased or otherwise acquired PG&E common stock on the public market during the Class Period, and were damaged, excluding the Company, the Defendants and each of their immediate family members, legal representatives, heirs, successors or assigns, and any entity in which any of the Defendants have or had a controlling interest (the "Class").

47.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, PG&E common stock was actively traded on the New York Stock Exchange.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by PG&E or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.  As of April 24, 2018, PG&E had 516,427,502 outstanding shares of common stock. Upon information and belief, these shares are held by thousands if not millions of individuals located geographically throughout the country and possibly the world.   Joinder would be highly impracticable.

48.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' respective wrongful conduct in violation of the federal laws complained of herein.

49.     Plaintiff has and will continue to fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities

litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

50.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

a)  whether the federal securities laws were violated by Defendants' respective acts as alleged herein;

b)  whether Defendants acted knowingly or with deliberate recklessness in issuing false and misleading financial statements;

c)  whether the price of PG&E common stock during the Class Period was artificially inflated because of Defendants' conduct complained of herein; and

d)  whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

51.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to redress the wrongs done to them individually.  There will be no difficulty in the management of this action as a class action.

## COUNT I

### Violation of Section 10(b) and Rule 10b-5 Against All Defendants

52.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

53.    During the Class Period, Defendants carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (1) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (2) cause Plaintiff and other members of the Class to purchase PG&E common stock at artificially inflated prices.  In furtherance of this unlawful scheme, plan, and course of conduct, each of the Defendants took the actions set forth herein.

54.    Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue

statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for PG&E common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.  All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

55.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations, and future prospects of PG&E as specified herein.

56.    These Defendants employed devices, schemes, and artifices to defraud while in possession of material adverse non-public information, and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of PG&E's value and performance and continued substantial growth, which included the making of, or participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about PG&E and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices, and a course of business that operated as a fraud and deceit upon the purchasers of PG&E common stock during the Class Period.

57.    The Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (1) the Individual Defendants were high-level executives, directors, and/or agents at the Company during the Class Period and members of the Company's management team or had control thereof; (2) each Individual Defendant, by virtue of his or her responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development, and reporting of the Company's financial condition; (3) each Individual Defendant enjoyed significant personal contact and familiarity with the other Individual Defendants and was advised of and had access to other members of the Company's management team, internal reports, and other data and information about the Company's finances, operations, and sales at all

relevant times; and (4) each Individual Defendant was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

58.    Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.   Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing PG&E's operating condition and future business prospects from the investing public and supporting the artificially inflated price of its common stock.   As demonstrated by Defendants' overstatements and misstatements of the Company's financial condition throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

59.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of PG&E's common stock was artificially inflated during the Class Period.   In ignorance of the fact that market prices of PG&E's publicly-traded common stock was artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the common stock trades, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired PG&E's common stock during the Class Period at artificially high prices and were or will be damaged thereby.

60.    At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity and believed them to be true.   Had Plaintiff and the other members of the Class and the marketplace known the truth regarding PG&E's financial results, which was not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their PG&E common stock, or, if they had acquired such common stock during the Class Period, they would not have done so at the artificially inflated prices that they paid.

61.     By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

62.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's common stock during the Class Period.

63.     This action was filed within two years of discovery of the fraud and within five years of Plaintiff's purchase of the Company's common stock giving rise to the cause of action.

## COUNT II

**Violation of Section 20(a) of the Exchange Act Against the Individual Defendants**

64.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

65.     The Individual Defendants acted as controlling persons of PG&E within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, agency, ownership, and contractual rights, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Plaintiff contends are false and misleading.  The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to have been misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or to cause the statements to be corrected.

66.     In particular, each of these defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

67.     As set forth above, PG&E and the Individual Defendants each violated Section 10(b) and Rule 10b-5 promulgated thereunder, by their acts and omissions as alleged in this Complaint.

68.     By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

69.     This action was filed within two years of discovery of the fraud and within five years of Plaintiff's purchase of the Company's common stock giving rise to the cause of action.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment as follows:

a)      Determining that this action is a proper class action, certifying Plaintiff as class representative under Federal Rule of Civil Procedure 23, and Plaintiff's counsel as class counsel;

b)      Awarding compensatory damages in favor of Plaintiff and the other members of the Class against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

c)      Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

d)      Granting extraordinary equitable and/or injunctive relief as permitted by law; and

e)      Such other and further relief as the Court may deem just and proper.

### JURY TRIAL DEMANDED

Plaintiff hereby demands a jury trial.

Dated: June 12, 2018                    **LEVI & KORSINSKY, LLP**

                                        By: /s/ *Rosemary M. Rivas*
                                        Rosemary M. Rivas
                                        44 Montgomery Street, Suite 650
                                        San Francisco, CA 94104
                                        Telephone: (415) 291-2420
                                        Facsimile: (415) 484-1294

                                        Eduard Korsinsky (to be admitted *pro hac vice*)
                                        30 Broad Street, 24th Floor
                                        New York, NY 10004
                                        Tel: (212) 363-7500
                                        Fax: (212) 363-7171
                                        Email:ek@zlk.com

                                        *Counsel for Individual and Representative*
                                        *David C. Weston*



LEVI&KORSINSKY LLP

30 Broad Street, 24th
Floor
New York, NY 10004
T:212-363-7500
F:212-363-7171
www.zlk.com

**CERTIFICATION OF NAMED PLAINTIFF PURSUANT TO FEDERAL SECURITIES
LAWS**

I, David C. Weston, duly certify and say, as to the claims asserted under the federal
securities laws, that:

1. I have reviewed the complaint and authorized its filing.

2. I did not purchase the security that is the subject of this action at the direction of
plaintiff's counsel or in order to participate in this private action.

3. I am willing to serve as a representative party on behalf of the class, including
providing testimony at deposition and trial, if necessary.

4. My transaction(s) in PG&E Corporation which are the subject of this litigation
during the class period set forth in the complaint are set forth in the chart attached hereto.

5. Within the last 3 years, I have not sought to serve nor have I served as a class
representative in any federal securities fraud case.

6. I will not accept any payment for serving as a representative party on behalf of the
class beyond the Plaintiff's pro rata share of any recovery, except as ordered or approved by the
court, including any award for reasonable costs and expenses (including lost wages) directly
relating to the representation of the class.

I certify under penalty of perjury under the laws of the United States of America that
the foregoing is true and correct. Executed this June 12, 2018.


 Name: David C. Weston

Signed:

**SCHEDULE A**

**David C. Weston**
**Transactions in PG&E Corporation (PCG) Common Stock**
**Class Period: April 29, 2015 and June 8, 2018, inclusive**

| Date of Transaction | Buy (B) or Sell (S) | Quantity | Price ($) |
|---|---|---|---|
| 9/27/2017 | B | 1,000 | 68.7500 |
| 10/13/2017 | S | (1,000) | 57.9612 |
| 10/17/2017 | B | 100 | 70.0000 |