STEPHEN P. BLAKE (SBN 260069)
SIMPSON THACHER & BARTLETT LLP
2475 Hanover Street
Palo Alto, CA 94304
Telephone: (650) 251-5000
Facsimile: (650) 251-5002
Email: sblake@stblaw.com

JONATHAN K. YOUNGWOOD (SBN 350373)
NICHOLAS S. GOLDIN (*pro hac vice*)
SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, NY 10017
Telephone: (212) 455-2000
Facsimile: (212) 455-2502
Email: jyoungwood@stblaw.com
      ngoldin@stblaw.com

*Attorneys for Director Defendants*
*(listed on signature pages)*

NEAL A. POTISCHMAN (SBN 254862)
DAVIS POLK & WARDWELL LLP
1600 El Camino Real
Menlo Park, California 94025
Telephone: (650) 752-2000
Facsimile:  (650) 752-2111
Email: neal.potischman@davispolk.com

CHARLES S. DUGGAN (*pro hac vice*)
DANA M. SESHENS (*pro hac vice*)
CRAIG T. CAGNEY (*pro hac vice*)
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800
Email: charles.duggan@davispolk.com
      dana.seshens@davispolk.com
      craig.cagney@davispolk.com

*Attorneys for Underwriter Defendants*
*(listed on signature pages)*

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| IN RE PG&E CORPORATION SECURITIES LITIGATION | Case No. 5:18-cv-03509-EJD |
| | **DIRECTOR AND UNDERWRITER DEFENDANTS' RENEWED MOTION TO DISMISS** |
| | Hon. Edward J. Davila |
| | Date: February 27, 2025 |
| | Time: 9:00 a.m. |
| | Courtroom: 4 |

**NOTICE OF MOTION AND MOTION**

TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE that, on February 27, 2025 at 9:00 a.m., or as soon thereafter as the matter may be heard in Courtroom 4, 280 South 1st Street, San Jose, California 95113, before the Honorable Edward J. Davila, the Director Defendants[1] and Underwriter Defendants[2] will move the Court for an order dismissing the Third Amended Consolidated Class Action Complaint as to them.

This motion is based upon this Notice of Motion and the accompanying Memorandum of Points and Authorities, the Request for Judicial Notice filed herewith, the concurrently filed declaration and exhibits, other materials in the record, argument of counsel, and such other matters as the Court may consider.

The Director Defendants and Underwriter Defendants also join in the Motion to Dismiss Third Amended Consolidated Class Action Complaint filed by the Officer Defendants Anthony F. Earley, Jr., Patrick M. Hogan, Christopher P. Johns, Julie M. Kane, Dinyar B. Mistry, Nickolas Stavropoulos, David S. Thomason, and Geisha J. Williams (the "Officer Defendants' Motion to

---

[1] Barbara L. Rambo, Lewis Chew, Fred J. Fowler, Richard C. Kelly, Roger H. Kimmel, Richard A. Meserve, Forrest E. Miller, Maryellen C. Herringer, Barry Lawson Williams, Rosendo G. Parra, Anne Shen Smith, and Eric D. Mullins.

[2] Barclays Capital Inc., BNP Paribas Securities Corp., Morgan Stanley & Co. LLC, MUFG Securities Americas, Inc., The Williams Capital Group, L.P. (n/k/a Siebert Williams Shank & Co., LLC), Citigroup Global Markets Inc., J.P Morgan Securities LLC, Merrill Lynch, Pierce, Fenner & Smith Incorporated (n/k/a BofA Securities, Inc.), Mizuho Securities USA LLC, Goldman, Sachs & Co., LLC, RBC Capital Markets, LLC, Wells Fargo Securities, LLC, BNY Mellon Capital Markets, LLC, TD Securities (USA) LLC, C.L. King & Associates, Inc., Great Pacific Securities, CIBC World Markets Corp., SMBC Nikko Securities America, Inc., U.S. Bancorp Investments, Inc., Mischler Financial Group, Inc., Blaylock Van, LLC, Samuel A. Ramirez & Company, Inc., and MFR Securities, Inc. (but not Lebenthal & Co. LLC, which has not appeared here).

Dismiss") to the extent that the Officer Defendants' Motion to Dismiss is relevant to the Securities

Act claims asserted against the Director Defendants and the Underwriter Defendants.

SIMPSON THACHER & BARTLETT LLP

*/s/ Stephen P. Blake*
Stephen P. Blake (SBN 260069)
2475 Hanover Street
Palo Alto, CA 94304
Telephone: (650) 251-5000
Facsimile: (650) 251-5002
Email: sblake@stblaw.com

Jonathan K. Youngwood (SBN 350373)
Nicholas S. Goldin (*pro hac vice*)
425 Lexington Avenue
New York, NY 10017
Telephone: (212) 455-2000
Facsimile: (212) 455-2502
Email: jyoungwood@stblaw.com
      ngoldin@stblaw.com

*Attorneys for Director Defendants Barbara L. Rambo, Lewis Chew, Fred J. Fowler, Richard C. Kelly, Roger H. Kimmel, Richard A. Meserve, Forrest E. Miller, Maryellen C. Herringer, Barry Lawson Williams, Rosendo G. Parra, Anne Shen Smith and Eric D. Mullins.*

DAVIS POLK & WARDWELL LLP

*/s/ Neal A. Potischman*
Neal A. Potischman (SBN 254862)
1600 El Camino Real
Menlo Park, California 94025
Telephone: (650) 752-2000
Facsimile: (650) 752-2111
Email: neal.potischman@davispolk.com

Charles S. Duggan (*pro hac vice*)
Dana M. Seshens (*pro hac vice*)
Craig T. Cagney (*pro hac vice*)
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800

2

1

Email: charles.duggan@davispolk.com
dana.seshens@davispolk.com
craig.cagney@davispolk.com

2

*Attorneys for Underwriter Defendants
Barclays Capital Inc., BNP Paribas Securities
Corp., Morgan Stanley & Co. LLC, MUFG
Securities Americas, Inc., The Williams
Capital Group, L.P. (n/k/a Siebert Williams
Shank & Co., LLC), Citigroup Global Markets
Inc., J.P Morgan Securities LLC, Merrill
Lynch, Pierce, Fenner & Smith Incorporated
(n/k/a BofA Securities, Inc.), Mizuho Securities
USA LLC, Goldman, Sachs & Co., LLC, RBC
Capital Markets, LLC, Wells Fargo Securities,
LLC, BNY Mellon Capital Markets, LLC, TD
Securities (USA) LLC, C.L. King & Associates,
Inc., Great Pacific Securities, CIBC World
Markets Corp., SMBC Nikko Securities
America, Inc., U.S. Bancorp Investments, Inc.,
Mischler Financial Group, Inc., Blaylock Van,
LLC, Samuel A. Ramirez & Company, Inc.,
and MFR Securities, Inc. (but not Lebenthal &
Co. LLC, which has not appeared in this
action)*

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

3

# TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................................................... 1

I.     FACTUAL BACKGROUND ................................................................................ 3

    A.     The Parties ................................................................................................ 3

    B.     PG&E's Offerings And Wildfire Disclosures .......................................... 3

        1.     The 2014 Shelf Registration. ........................................................ 3

        2.     The March 2016 Notes Offering ................................................... 2

        3.     The December 2016 Notes Offering .............................................. 4

        4.     The 2017 Shelf Registration ......................................................... 4

        5.     The March 2017 Notes Offering ................................................... 4

        6.     North Bay Fires And PG&E's Subsequent Disclosures ................ 5

        7.     The April 2018 Exchange Offer .................................................... 6

II.    PROCEDURAL BACKGROUND ......................................................................... 6

ARGUMENT ................................................................................................................... 7

I.     PLAINTIFFS ALLEGE NO MATERIAL MISTATEMENT OR OMISSION .................... 7

    A.     *Edison* And *Hawaii Electric* Demonstrate That The Complaint Should Be Dismissed. ........................................................................................ 7

    B.     The TAC Should Be Dismissed Under Federal Securities Pleading Standards. ........ 9

    C.     PG&E Disclosed That Its Wildfire Risk and Safety Deficiencies Had Already Materialized ................................................................................ 10

    D.     PG&E Warned That Its Safety Violations Increased Present And Future Wildfire Risk ............................................................................................ 13

    E.     Plaintiffs Fail To Plead That PG&E Statements Related To Wildfire Safety Practices Were Materially False Or Misleading ............................ 15

    F.     PG&E's Disclosures Became Even More Robust After The North Bay Fires ......... 19

    G.     Item 303 And Item 503 Do Not Require Any Additional Disclosures .................... 23

II.   PLAINTIFFS' CLAIMS BASED ON THE 2016 OFFERINGS MUST BE DISMISSED BECAUSE PLAINTIFFS LACK STANDING ........................................................ 24

    A.   Plaintiffs Lack Standing As To The March 2016 Notes Offering Because No Plaintiff Relied On The Offering Documents. ........................................... 24

    B.   Plaintiffs Lack Standing For The Claims Based On The December 2016 Notes Offering Because No Named Plaintiff Purchased Any Notes Traceable To That Offering. ................................................................................. 25

    C.   Claims Against The Director Defendants Based On The March And December 2016 Offerings Must Be Dismissed Because The Alleged Misrepresentations Post-Date The Effective Date Of The 2014 Shelf Registration Statement ............... 27

III.  PLAINTIFFS' SECURITIES ACT CLAIMS BASED ON THE 2016 AND 2017 NOTES OFFERINGS ARE TIME-BARRED ........................................................ 28

IV.   PLAINTIFFS' CLAIMS BASED ON THE 2018 EXCHANGE OFFER FAIL AS A MATTER OF LAW BECAUSE SECTION 11 DOES NOT APPLY TO PRIVATE OFFERINGS ............................................................................................... 33

V.   PLAINTIFFS FAIL TO STATE A SECTION 15 CLAIM .................................. 34

CONCLUSION ......................................................................................................... 1

    

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Barnes v. Edison International*,
  2021 WL 2325060 (C.D. Cal. Apr. 27, 2021), *aff'd*, 2022 WL 822191
  (9th Cir. Mar. 18, 2022) ............................................................................................ passim

*Batwin v. Occam Networks, Inc.*,
  2008 WL 2676364 (C.D. Cal. July 1, 2008) .........................................................................34

*Belodoff v. Netlist, Inc.*,
  2009 WL 1293690 (C.D. Cal. Apr. 17, 2009) .......................................................................16

*Bhangal v. Hawaiian Elec. Indus.*,
  2024 WL 4505465 (N.D. Cal. Oct. 15, 2024)....................................................................2, 10

*Brody v. Transitional Hosp. Corp.*,
  280 F.3d 997 (9th Cir. 2002) ................................................................................................9

*City of Brockton Ret. Sys. v. Avon Prod., Inc.*,
  2014 WL 4832321 (S.D.N.Y. Sept. 29, 2014).....................................................................21

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech. Inc.*,
  856 F.3d 605 (9th Cir. 2017) ..............................................................................................22

*City of Roseville Employees Ret. Sys. v. EnergySolutions, Inc.*,
  814 F. Supp. 2d 395 (S.D.N.Y. 2011)..................................................................................23

*Diehl v. Omega Protein Corp.*,
  339 F. Supp. 3d 153 (S.D.N.Y. 2018) .................................................................................21

*Employees. Ret. Sys. v. Embraer S.A.*,
  2018 WL 1725574 (S.D.N.Y. Mar. 30, 2018) .....................................................................21

*FDIC v. Countrywide Fin. Corp.*,
  2012 WL 5900973 (C.D. Cal. Nov. 21, 2012)......................................................................24

*Felarca v. Birgeneau*,
  2014 WL 7140262 (N.D. Cal. Dec. 12, 2014) .....................................................................32

*Gaines v. Haughton*,
  645 F.2d 761 (9th Cir. 1981) ..............................................................................................16

*Golub v. Gigamon Inc.*,
  372 F. Supp. 3d 1033 (N.D. Cal. 2019) ..............................................................................22

*Greenberg v. Sunrun Inc.*,
  233 F. Supp. 3d 764 (N.D. Cal. 2017) .................................................................................16

*Hertzberg v. Dignity P'ners, Inc.*,
  191 F.3d 1076 (9th Cir. 1999) ............................................................................................26

*Hildes v. Arthur Andersen LLP*,
  734 F.3d 854 (9th Cir. 2013) ...................................................................34

*In re Bare Escentuals, Inc. Sec. Litig.*,
  745 F. Supp. 2d 1052 (N.D. Cal. 2010) ...........................................11, 34

*In re BP p.l.c. Sec. Litig.*,
  843 F. Supp. 2d 712 (S.D. Tex. 2012) ..............................................14, 18

*In re CarLotz, Inc. Sec. Litig.*,
  667 F. Supp. 3d 71 (S.D.N.Y. 2023) .........................................................34

*In re Century Aluminum Co. Sec. Litig.*,
  729 F.3d 1104 (9th Cir. 2013) ...........................................................25, 26

*In re Countrywide Fin. Corp. Mortg.-Backed Sec. Litig.*,
  932 F. Supp. 2d 1095 (C.D. Cal. 2013) .............................................27, 31

*In re Eargo Sec. Litig.*,
  656 F. Supp. 3d 928 (N.D. Cal. 2023) ......................................................11

*In re Facebook, Inc. Sec. Litig.*,
  477 F. Supp. 3d 980 (N.D. Cal. 2020) ......................................................16

*In re Gen. Elec. Co. Sec. Litig.*,
  856 F. Supp. 2d 645 (S.D.N.Y. 2012) .......................................................17

*In re Levi Strauss & Co. Sec. Litig.*,
  527 F. Supp. 2d 965 (N.D. Cal. 2007) ......................................................33

*In re LifeLock, Inc. Sec. Litig.*,
  690 F. App'x 947 (9th Cir. 2017) ..............................................................16

*In re Lions Gate Entm't Corp. Sec. Litig.*,
  165 F. Supp. 3d 1 (S.D.N.Y. 2016)............................................................21

*In re Petrobras Sec. Litig.*,
  116 F. Supp. 3d 368 (S.D.N.Y. 2015) .......................................................25

*In re PG&E Corp.*, No. 19-30088-DM
  (Bankr. N.D. Cal. Sept. 18, 2024) (ECF No. 14342)................................34

*In re PG&E Corp.*, No. 19-30088-DM
  (Bankr. N.D. Cal. Sept. 18, 2024) (ECF No. 14593)........................ passim

*In re Plains All Am. Pipeline L.P. Sec. Litig.*,
  307 F. Supp. 3d 583 (S.D. Tex. 2018) ...............................................18, 19

*In re Progenity, Inc. Sec. Litig.*,
  2023 WL 219345 (S.D. Cal. Jan. 13, 2023) .............................................23

*In re Refco, Inc. Sec. Litig.*,
  503 F. Supp. 2d 611 (S.D.N.Y. 2007)........................................................33

*In re Rocket Fuel, Inc. Sec. Litig.*,
  2015 WL 9311921 (N.D. Cal. Dec. 23, 2015) ..........................................23

iv

*In re Stac Elecs. Sec. Litig.,*
  89 F.3d 1399 (9th Cir. 1996) ...................................................................11, 12, 18

*In re Syntex Corp. Sec. Litig.,*
  95 F.3d 922 (9th Cir. 1996) .................................................................................32

*In re VeriFone Sec. Litig.,*
  11 F.3d 865 (9th Cir. 1993) .................................................................................22

*In re Verifone Sec. Litig.,*
  2016 WL 1213666 (N.D. Cal. Mar. 29, 2016) .....................................................20

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices & Prods. Liab. Lit.,*
  258 F. Supp. 3d 1037 (N.D. Cal. 2017) ...............................................................16

*In re Zynga Inc. Sec. Litig.,*
  2014 WL 721948 (N.D. Cal. Feb. 25, 2014) ........................................................24

*LC Capital Partners, LP v. Frontier Ins. Grp.,*
  318 F.3d 148 (2d Cir. 2003) .................................................................................31

*Lierboe v. State Farm Mutual Automobile Ins. Co.,*
  350 F.3d 1018 (9th Cir. 2003) .............................................................................24

*Lee v. Ernst & Young, LLP,*
  294 F.3d 969 (8th Cir. 2002) ...............................................................................25

*Louisiana-Pacific Corp. v. ASARCO, Inc.,*
  5 F.3d 431 (9th Cir. 1993) ...................................................................................32

*Mallen v. Alphatec Holdings, Inc.,*
  861 F. Supp. 2d 1111 (S.D. Cal. 2012), *aff'd sub nom. Fresno Cnty.*
  *Emps.' Ret. Ass'n v. Alphatec Holdings, Inc.,* 607 F. App'x 694 (9th Cir.
  2015) .....................................................................................................................15

*Markette v. XOMA Corp,*
  2017 WL 4310759 (N.D. Cal. Sept. 28, 2017) .....................................................22

*Mehedi v. View, Inc.,*
  2023 WL 3592098 (N.D. Cal. May 22, 2023) ......................................................26

*Mosco v. Motricity, Inc.,*
  649 F. App'x 526 (9th Cir. 2016) .........................................................................23

*Nuveen Mun. High Income Opp'y Fund v. City of Alameda,*
  730 F.3d 1111 (9th Cir. 2013) .............................................................................14

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund,*
  575 U.S. 175 (2015) ....................................................................................11, 12, 18

*Plumley v. Sempra Energy,*
  2017 WL 2712297 (S.D. Cal. June 20, 2017) ..................................................18, 19

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.,*
  759 F.3d 1051 (9th Cir. 2014) .............................................................................13

*Primo v. Pac. Biosciences of Cal., Inc.*,
   940 F. Supp. 2d 1105 (N.D. Cal. 2013) .................................................................34

*Retail Wholesale & Dep't Store Union Loc. 338 Ret. Fund v. Hewlett-Packard Co.*,
   845 F.3d 1268 (9th Cir. 2017) ...........................................................................17

*Rubke v. Capitol Bancorp Ltd.*,
   551 F.3d 1156 (9th Cir. 2009) ...............................................................9, 11, 13

*See In re Countrywide Fin. Corp. Sec. Litig.*,
   588 F. Supp. 2d 1132 (C.D. Cal. 2008) ............................................................26

*Shwarz v. United States,*
   234 F.3d 428 (9th Cir. 2000) ...........................................................................17

*Silverstrand Invs. v. AMAG Pharm., Inc.*,
   707 F.3d 95 (1st Cir. 2013) ..............................................................................24

*Slack Techs. LLC v, Pirani*,
   598 U.S. 759 (2023) .....................................................................................25, 34

*Thomas v. Magnachip Semiconductor Corp.*,
   167 F. Supp. 3d 1029 (N.D. Cal. 2016) ................................................28, 31, 32

*Weiss v. Amkor Tech., Inc.*,
   527 F. Supp. 2d 938 (D. Ariz. 2007) ...............................................................20

*Weston Fam. P'ship LLP v. Twitter, Inc.*,
   29 F.4th 611 (9th Cir. 2022). .............................................................................9

*Willner v. Manpower Inc.*,
   2014 WL 2939732 (N.D. Cal. June 30, 2014) .................................................33

*Wochos v. Tesla, Inc.*,
   985 F.3d 1180 (9th Cir. 2021) ..........................................................................20

*Ziolkowski v. Netflix*,
   2018 WL 4587515 (N.D. Cal. Sept. 25, 2018) ................................................23

## Statutes

15 U.S.C. § 77k...........................................................................................9, 24, 28

## Rules

Fed. R. Civ. P. 15(c) ...........................................................................................32

Fed. R. Civ. P. 9(b) ............................................................................................11

## Regulations

17 C.F.R. § 229.303 ............................................................................................23

17 C.F.R. § 229.503 ............................................................................................24

vi

17 C.F.R. § 230.430B ...................................................................................................................27

**Other Authorities**

SEC Release Nos. 33–8591, 34–52056, 70 Fed. Reg. 44722, 44774 (Aug. 3, 2005) .........................................................................................................................28

## MEMORANDUM OF POINTS AND AUTHORITIES

## INTRODUCTION

Pacific Gas and Electric Company (together with PG&E Corporation, "PG&E") is an electric and gas utility that transmits inherently hazardous electrical current across thousands of miles of California terrain. Plaintiffs are investors in three PG&E public note offerings in March 2016, December 2016, and March 2017 (the "Notes Offerings") and purchasers of privately issued PG&E notes that were exchanged for public notes in April 2018 (the "Exchange Offer") (collectively, the "Offerings"). Although PG&E never missed a payment on these notes, Plaintiffs assert claims under Sections 11 and 12 of the Securities Act of 1933, to recover for temporary drops in the notes' trading prices around the time that PG&E filed for bankruptcy.

Plaintiffs allege that the Offering Documents concealed risks that materialized in the devastating October 2017 North Bay Fires and November 2018 Camp Fire that were ignited by PG&E's equipment and caused fatalities and widespread damage. This lawsuit is not about PG&E's liability for these tragic fires. Instead, it is about whether PG&E *misled investors* about its wildfire risks in violation of the federal securities laws—it did not—and whether the revelation of those allegedly concealed risks caused their losses. The Complaint fails to plead any such misrepresentation, or any connection between PG&E's disclosures and Plaintiffs' investment losses. To the contrary, PG&E had long warned investors of the risk that wildfires might be caused by PG&E's own negligence, and the corresponding risk of strict liability. All of Plaintiffs' claims fail for numerous independent reasons:

*First*, Plaintiffs fail to plead adequately that PG&E's Offering Documents contained any material misrepresentations or omitted information required by law or SEC rule. The Offering Documents disclosed that PG&E's equipment had previously caused devastating fires, that PG&E expected penalties for self-disclosed safety violations, and was being investigated by regulators as to its "safety culture," and warned that its failure to mitigate conditions it had identified as unsafe could lead to additional catastrophic fires that would have a material impact on PG&E's business. This case is therefore indistinguishable from *Barnes v. Edison International*, 2021 WL 2325060

(C.D. Cal. Apr. 27, 2021), *aff'd*, 2022 WL 822191 (9th Cir. Mar. 18, 2022), where investors accused the utility of making false and misleading statements about its vegetation management and wildfire prevention practices before Edison's equipment caused devastating wildfires in Southern California. The Central District of California and the Ninth Circuit dismissed those claims because Edison had warned investors of the risks of wildfires, and its prior history of causing wildfires was well known. Judge Corley just reached the same conclusion with respect to similar claims filed against Hawaiian Electric arising out of the Maui wildfires. *See Bhangal v. Hawaiian Elec. Indus.*, 2024 WL 4505465, at *12-13 (N.D. Cal. Oct. 15, 2024) (citing *Edison*, 2021 WL 2325060, at *9). Plaintiffs' claims should be dismissed for the same reasons. Plaintiffs will no doubt seek to rely on a recent order by Judge Montali in PG&E's bankruptcy that denied certain PG&E objections to securities claims asserted against PG&E in the bankruptcy, but Judge Montali's order did not address *Edison* or *Hawaii Electric* and further, analyzed those claims under bankruptcy standards that are inapplicable here.

**Second**, Plaintiffs lack standing to assert claims related to the March 2016 Notes Offering or the December 2016 Notes Offering. Plaintiffs' alleged purchases of notes from the March 2016 Notes Offering occurred two years *after* the offering, and *after* PG&E had issued two intervening annual reports, yet Plaintiffs do not plead actual reliance on the Offering Documents, as necessary to assert a claim in those circumstances. Nor do Plaintiffs allege that they purchased after the December 2016 Notes Offering traceable to that Offering. And Plaintiffs' claims against the Director Defendants for the 2018 Exchange Offer fail as a matter of law because it was not an independent public offering.

**Finally**, the TAC's claims based on PG&E's Offerings in 2016 and 2017 are untimely, just as in *Edison*, because Plaintiffs filed the Securities Act claims against the Director and Underwriter Defendants in February 2019, well over a year after widespread reports and PG&E disclosures about its liability for the October 2017 North Bay Fires. Indeed, **according to Plaintiffs**, investors understood immediately that PG&E had caused the North Bay Fires and would likely bear substantial liability—precisely the risk of loss that Plaintiffs claim was omitted from the Offering

Documents. In *Edison*, the Ninth Circuit held that identical allegations that "the market understood that Edison caused the Thomas Fire" established that "the statute of limitations began to run on that date." *Edison*, 2022 WL 822191, at *1. Given these disclosures, a reasonable investor should have discovered its claims by October 2017 and timely filed suit no later than PG&E's February 2018 10-K, which disclosed that numerous wildfire victims and shareholders had already done so. But Plaintiffs did not file their Securities Act claims for more than a year later. Plaintiffs' claims are therefore time barred, just like the claims in *Edison* and should be dismissed.

## BACKGROUND

### I. FACTUAL BACKGROUND

#### A. The Parties

Three purported representative plaintiffs (the "Securities Act Plaintiffs") assert Section 11 claims on behalf of a putative class of investors who purchased notes that were issued in the 2016 and 2017 Notes Offerings and the 2018 Exchange Offer. TAC ¶¶ 506-08. Plaintiffs allege that they purchased Notes from the following Offerings:

| Offering[1] | Plaintiff | Purchase(s) | Exchange |
|---|---|---|---|
| March 2016 | York County | May 3 and 30, 2018 | N/A |
| December 2016 | Mid-Jersey | Jan. 31, 2018 | N/A |
| March 2017 | Mid-Jersey | Dec. 22, 2017 | N/A |
| 2018 Exchange Offer for Private Notes | City of Warren | Dec. 21, 2017 & May 1, 2018 | May 14, 2018 |
| | York County | Nov. 27, 2017 | May 14, 2018 |

The Directors served as non-executive members of PG&E's Board and signed one or more registration statements related to the Offerings. *Id.* ¶¶ 515, 518-28.

The Underwriters are financial institutions that participated in one or more of the 2016-2017 Notes Offerings, but not the 2018 Exchange Offer. *Id.* ¶¶ 531-55.

#### B. PG&E's Offerings and Wildfire Disclosures

##### 1. The 2014 Shelf Registration

On February 11, 2014, PG&E filed a Form S-3 shelf registration (the "2014 Shelf

---

[1] *See* TAC ¶¶ 506-08; Attachs. B-D.

3

1  Registration"), which permits streamlined future offerings for qualifying issuers.[2]

2             **2.      The March 2016 Notes Offering**

3          On February 23, 2016, PG&E filed a Rule 424(b)(2) Prospectus Supplement to the 2014

4  Shelf Registration for the issuance of $600 million of senior notes (the "March 2016 Offering").

5  The Prospectus Supplement included warnings about PG&E's wildfire risks that PG&E had

6  previously given in its 2015 annual Form 10-K and it incorporated the 2015 10-K by reference. Ex.

7  1[3] (Feb. 23, 2016 Pro. Supp.) at S-1-3.

8          ***2015 10-K***. PG&E's 2015 Form 10-K, filed on February 18, 2016, included a discussion of

9  "Risk Factors" that included, among many other risks, express warnings that "[t]he Utility's

10  electricity and natural gas operations are inherently dangerous and involve significant risks which,

11  if they materialize, can adversely affect PG&E Corporation's and the Utility's financial results."

12  Ex. 2 (2015 Form 10-K) at 28. PG&E further warned that "[t]he Utility's ability to safely and

13  reliably operate, maintain, construct and decommission its facilities is subject to numerous risks,

14  many of which are beyond the Utility's control, including those that arise from . . . the breakdown

15  or failure of equipment . . . that can cause ***explosions, fires, or other catastrophic events***," that the

16  failure to identify and control "workplace hazards" could "result in serious injury or loss of life for

17  employees or the public, environmental damage, or reputational damage," and that the failure to

18  identify and mitigate unsafe conditions could "lead[] to a catastrophic event (***such as a wild land***

19  ***fire*** . . . .)." *Id.* at 29 (emphasis added).

20          PG&E's 2015 10-K also made clear that PG&E could bear material liability if such failures

21  resulted in a catastrophe:

22       As a result, the Utility could incur costs . . . to compensate third parties. In particular, the

23       Utility may incur material liability in connection with a wildfire (known as the "Butte
     fire") . . . depending on the outcome of the investigations into the cause of the fire. If
     insurance recoveries are unavailable or insufficient to cover such costs, [PG&E's]

24  _____

25  [2] A Form S-3 "shelf" registration statement allows issuers to issue securities pursuant to prospectus

26  supplements filed later. The registration statement's "effective date" for each Offering, for purposes

27  of Section 11 liability, varies depending on each defendant's role in the Offering.

28  [3] References to "Ex." are exhibits to the Declaration of Stephen P. Blake.

> financial condition or results of operations could be materially affected. The Utility also could incur material fines, penalties, or disallowances, as a result of enforcement actions taken by the CPUC or other law enforcement agencies.

*Id.* at 29. The 2015 10-K disclosed that regulators were investigating whether PG&E had caused the Butte Fire, noted that twenty-seven lawsuits had been filed against PG&E and its vegetation management contractors, and warned that PG&E believed "it is reasonably possible that it would be liable" for over $350 million. *Id.* at 36, 123.

The 2015 10-K also disclosed that, as a result of climate change, "increasing temperatures and lower levels of precipitation could increase the occurrence of wildfires in the Utility's service area, causing damage to the Utility's facilities . . . damage to third parties for loss of property, personal injury, or loss of life." *Id.* at 32. And PG&E cautioned that future results could "differ materially" from current expectations or historical results due to factors such as "the impact of . . . wildfires (such as the Butte fire)," potential "liability to third parties for [damage] . . . caused by such events," and related potential "civil, criminal, or regulatory penalties." *Id.* at 65-66.

Finally, the 2015 10-K reported that the CPUC had launched "a formal investigation into whether the organizational culture and governance of PG&E Corporation and the Utility prioritize safety and adequately direct resources to promote accountability and achieve safety goals and standards," including an evaluation of PG&E's "record of safety incidents," *id.* at 58, and it warned that this investigation could have a material impact. *Id.* at 66. The 2015 10-K further noted that PG&E had been fined between "$50,000 to $16.8 million for violations of electric and natural gas laws and regulations," and warned that "it is probable that the [CPUC's Safety & Enforcement Division ('SED')] will impose penalties . . . based on some of the Utility's self-reported non-compliance . . . based on the SED's investigations . . . or based on allegations of non-compliance with[] laws and regulations." *Id.* at 120. Such "additional regulatory or governmental enforcement action" could result from violations of regulations on "vegetation management" and "safety and inspection practices." *Id.* at 25. In addition, the 10-K prominently described PG&E's 2014 federal criminal indictment for "knowingly and willfully violat[ing] minimum safety standards" in connection with a highly publicized 2010 gas pipe explosion caused by its equipment in San Bruno, California. *Id.* at 120.

### 3.    The December 2016 Notes Offering

On November 28, 2016, PG&E filed a new Rule 424(b) Prospectus Supplement to the 2014 Shelf Registration for the issuance of $650 million of senior notes (the "December 2016 Offering"). The prospectus supplement incorporated by reference PG&E's 2015 10-K and 10-Qs for the first and third quarters of 2016. Ex. 3 (Nov. 28, 2016 Pro. Supp.) at S-1-3.

*First quarter 2016 10-Q*. Filed on May 4, 2016, this quarterly report informed investors that, on April 28, 2016, the California Department of Forestry and Fire Protection ("Cal Fire") had concluded that PG&E's poor vegetation management practices were responsible for the Butte Fire. TAC ¶¶ 101, 564, 566; Ex. 4 (Q1 2016 10-Q) at 35.

*Third quarter 2016 10-Q*. Filed on November 4, 2016, this quarterly report disclosed that PG&E had been convicted of multiple violations of law in connection with the 2010 explosion of San Bruno gas pipeline. Ex. 5 (Q3 2016 10-Q) at 36.

### 4.    The 2017 Shelf Registration

On January 25, 2017, PG&E filed with the SEC a new Form S-3 shelf registration statement (the "2017 Shelf Registration").

### 5.    The March 2017 Notes Offering

On March 7, 2017, PG&E filed a Rule 424(b) Prospectus Supplement to the 2017 Shelf Registration for the issuance of $600 million of senior notes. The prospectus supplement incorporated by reference the 2015 10-K, the 1Q and 3Q 2016 10-Qs, and PG&E's annual Form 10-K report for 2016. Ex. 6 (Mar. 7, 2017 Pro. Supp.) at S-1-3, 20.

*2016 10-K*. This annual report included risk disclosures similar to the annual reports described above, *see, e.g.*, Ex. 7 (2016 10-K) at 32-33, 36, 78-81, as well as substantially similar descriptions of the CPUC's safety culture investigation, *id.* at 70, and PG&E's safety record, *see id.* at 27, 134. In addition, PG&E disclosed that damages estimates for the Butte Fire had increased to $750 million and warned that its "financial condition. . . could be materially affected by the ultimate amount of third-party liability that the Utility incurs in connection with the Butte Fire." *Id.* at 26. PG&E further noted that, "[a]s a result of the strict liability standard applied to wildfires . . . the risk of increase in wildfires including as a result of the ongoing drought, and the Butte fire, the

4

1    Utility may not be able to obtain sufficient insurance coverage in the future" and "is unable to

2    predict whether it would be allowed to recover in rates the increased costs of insurance or the costs

3    of any uninsured losses." *Id*. at 33. PG&E also warned that, if its potential wildfire liability

4    exceeded available insurance and was not recoverable in rates, its "financial condition, results of

5    operations, or cash flows could be materially affected." *Id*.

### 6.    North Bay Fires and PG&E's Subsequent Disclosures

7        In early October 2017, the devastating North Bay Fires burned approximately 249,000

8    acres, destroyed 8,898 structures, and caused 44 deaths. TAC ¶¶ 19.

9        ***October 13, 2017 Form 8-K***. PG&E noted that regulators were investigating the "causes of

10    these fires . . . including the possible role of [PG&E's] power lines and other facilities." PG&E

11    warned it "currently is unknown whether the Utility would have any liability" and disclosed that,

12    because it had only $800 million in insurance, its "financial condition or results of operations could

13    be materially affected" if its liability exceeded that amount. Ex. 8 (Oct. 13, 2017 8-K) at 2.

14        ***November 27, 2017 Form 8-K***. On November 27, 2017, PG&E sold restricted notes in a

15    private placement and, in a Form 8-K filed that same day, warned that PG&E's "financial

16    conditions, results of operations, liquidity, and cash flows could be materially and adversely

17    affected by potential losses resulting from the impact of the [North Bay Fires]." Ex. 9 (Nov. 27,

18    2017 8-K) at 1. PG&E cautioned its liability for the North Bay Fires "could be substantially higher

19    than ***$3 billion***" and that 32 lawsuits had been filed alleging PG&E's "failure to maintain and repair

20    their distribution and transmission lines and failure to properly maintain the vegetation surrounding

21    such lines were the causes of the fires." *Id*. at 2 (emphasis added). Only ***after*** these disclosures did

22    any named Securities Plaintiff purchase debt in any Offering. TAC ¶¶ 506-08, Attachs. B-D.

23        ***2017 10-K***. Finally, on February 9, 2018, PG&E filed its annual report for 2017, identifying

24    its liability for the North Bay Fires as the first "Key Factor[] Affecting Financial Result" and the

25    first Risk Factor. Ex. 10 (2017 10-K) at 54. PG&E disclosed that, while ongoing investigations

26    were still in their preliminary stages, "it is reasonably possible that facts could emerge through the

27    course of the various investigations that lead [PG&E] to believe that a loss is probable" in an

28

amount possibly exceeding $10 billion. *Id.* at 28. It also included risk disclosures substantially similar to those made in the 2015 and 2016 10-Ks, *see, e.g., id.* at 36-37, 40-41, 81-85, as well as substantially similar descriptions of the CPUC's safety culture investigation, *id.* at 44, and PG&E's safety record, *see id.* at 31, 141. In addition, PG&E emphasized that "[California] continues to face increased risk of wildfire" and that "the risk posed by wildfires has increased in the Utility's service area" due to environmental factors. *See id.* at 24, 40. Finally, PG&E cautioned that "[l]iabilities that could be incurred as a result of the [North Bay Fires] could adversely affect [PG&E's] ability to comply with [its debt] covenants . . . [and] the ability to borrow." *Id.* at 34.

### 7.    The April 2018 Exchange Offer

On April 13, 2018, PG&E filed a Rule 424(b)(3) Prospectus for the exchange of restricted unregistered notes issued in the November 2017 private placement for publicly traded notes. Ex. 11 (Apr. 13, 2018 Prospectus). The April 2018 prospectus incorporated by reference PG&E's Form 10-K for 2017 filed on February 9, 2018, as described above.

## II.    PROCEDURAL BACKGROUND

Between June and December 2018, Plaintiffs filed three complaints, each of which asserted Exchange Act claims against PG&E and its officers only and did not assert claims under the Securities Act, reference the Offerings, or name any Director or Underwriter Defendant. Dkt. Nos. 1, 103, 113. On February 22, 2019, the Securities Act Plaintiffs filed a lawsuit against certain PG&E officers, directors, and underwriters for alleged Section 11 violations related to the Offerings, and, on May 28, 2019, Plaintiffs filed the consolidated TAC. *See generally* Dkt. Nos. 103, 113, 121.

Meanwhile in the bankruptcy court, the Securities Act Plaintiffs proceeded on the same claims from the TAC against PG&E. The Securites Act Plaintiffs also moved forward in this Court against the non-PG&E defendants, who filed motions to dismiss the TAC. Before ruling on the motions, the Court stayed this action. Plaintiffs appealed the stay order and the Ninth Circuit later remanded for further consideration of the stay. Following remand, this Court lifted the stay, and, on August 21, 2024, the Court ordered renewed motion to dismiss briefing. Dkt. No. 282.

Finally, on September 18, 2024, the bankruptcy court denied PG&E's objection to proofs of claim based on the TAC by applying a lower pleading standard than the one applicable here. Judge Montali concluded that PG&E's adoption of a claims resolution procedure in the bankruptcy precluded the application of Rule 9(b) and the PSLRA. As a result, Judge Montali did not evaluate in detail the alleged misstatements on the Securities Act claims, and did not find any particular statement in the Offering Documents to be misleading. The bankruptcy court also opted to resolve standing questions for the hundreds of proofs of claim on an individual-by-individual basis in the bankruptcy (where no class has been certified). *See In re PG&E Corp.*, No. 19-30088-DM, at 3-8, 50-51 (Bankr. N.D. Cal. Sept. 18, 2024) (ECF No. 14593) ("*In re PG&E*").

## ARGUMENT

## I.    PLAINTIFFS ALLEGE NO MATERIAL MISTATEMENT OR OMISSION

To state a Section 11 claim, Plaintiffs must allege that a registration statement "contained an untrue statement of material fact or omitted to state a material fact . . . necessary to make the statements therein not misleading." 15 U.S.C. § 77k(a). To qualify as an omission, a statement "must affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists." *Brody v. Transitional Hosp. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002). Plaintiffs must also show "that the omitted information existed at the time the registration statement became effective," *Rubke v. Capitol Bancorp Ltd.*, 551 F.3d 1156, 1164 (9th Cir. 2009), and that each alleged misstatement or omission "directly contradict[ed] what the defendant knew at that time" in a material way. *See Weston Fam. P'ship LLP v. Twitter, Inc.*, 29 F.4th 611, 619 (9th Cir. 2022) (citation omitted).

### A.    *Edison* And *Hawaii Electric* Demonstrate That The Complaint Should Be Dismissed

The Offering Documents did not mislead, but disclosed PG&E's wildfire risk and safety issues. Plaintiffs' arguments that these risk disclosures somehow concealed PG&E's true risk is no different than the arguments rejected in *Edison* and *Hawaii Electric*, and fail for the same reasons.

In *Edison*, investors brought claims under both the Exchange Act and the Securities Act

alleging that that Edison misled investors about its true risk of wildfires and its deficient fire safety practices that led to the 2017 Thomas and 2018 Woolsey Fires in Southern California. *See Edison*, 2021 WL 2325060, at *3–4 (noting allegations of safety and compliance issues including (i) failing to inspect and repair electrical poles; (ii) pole loading issues; (iii) vegetation management issues; (iv) down wires; and (v) a "run to failure approach"). These allegations in *Edison* were nearly identical to Plaintiffs' allegations here. *See* TAC ¶ 632 (PG&E "falsely assur[ed] investors that PG&E . . . inspect[ed] its equipment"); TAC ¶¶ 96, 211, 261, 266 ("PG&E failed to comply with safety regulations specifically related to vegetation management."); TAC ¶¶ 577, 606, 655 ("PG&E did not have adequate systems in place to shut down reclosers."); and TAC ¶ 652 (PG&E "failed to update equipment known to be outdated"). The *Edison* plaintiffs also relied on the same two theories of liability:  (1) before the fires, Edison allegedly concealed the true risk that it would be liable for damage from the wildfires by failing to disclose its deficient safety practices and "run to failure" approach, *Edison*, 2021 WL 2325060, at *3, and (2) after the fires, Edison misleadingly stated it was "being investigated" and "may not be authorized to recover its uninsured damages through customer rates" when it allegedly knew it would be liable, *id*. at *5.

The Central District of California held that the *Edison* complaint failed to satisfy the standards for pleading falsity. As to the pre-fire statements, the court held that "Plaintiffs' own allegations reveal that the market was aware of [Edison's] safety failures," based on its public disclosures to investors and regulators, and thus Edison's "general statements related to prioritization of safety would not mislead a reasonable investor." *Id.* at *10. As to the post-fire statements, the court held that "Plaintiffs do not plead facts that [Edison] had already been found liable for the two wildfires or denied recovery rates at the time they made statements related to liability." *Id.* at *11; *see also id*. at *12 ("Edison Defendants could not have known, at the time the statements were made, that CPUC would determine in a future proceeding that their conduct would not meet the standard required to avail themselves of rate recovery."). The Ninth Circuit affirmed and held that the *Edison* plaintiffs had failed "to plead particularized facts showing false or misleading statements or omissions," and rejecting their "argument that their Securities Act claim is

subject to less stringent pleading requirements than their Exchange Act claim." *Edison*, 2022 WL 822191, at *1. A recent decision in this Court similarly held that essentially identical claims arising out of the Maui wildfires failed to satisfy these heightened standards. *See Hawaii Electric*, 2024 WL 4505465, at *10, 11, 14 (holding plaintiffs had not plausibly alleged defendants' statements about replacing "faulty equipment before failures happen," "trimming vegetation," and eliminating "risks created by outdated poles, exposed power lines, and dry vegetation" were false).

### B.    The TAC Should Be Dismissed Under Federal Securities Pleading Standards

Plaintiffs will undoubtedly highlight Judge Montali's recent decision on PG&E's claims objections in the bankruptcy court, but that ruling is of no use to them. The bankruptcy court did not acknowledge *Edison* and did not have the benefit of *Hawaii Electric*.  Nor did it apply Rule 9's heightened pleading standards to the bankruptcy claims, conduct "a statement-by-statement analysis," or consider each statement's "broader context." *In re PG&E Corp.* at 8, 32. Whatever the merits of that ruling in the bankruptcy court, that is not the law applicable to securities class actions in this Court.

Where, as here, Section 11 claims "sound in fraud," they must be pleaded with particularity under Rule 9(b) and specifically identify "what is false or misleading about a statement, and why." *In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399, 1404-05 (9th Cir. 1996); *Rubke*, 551 F.3d at 1161. While the Securities Act claims are necessarily limited to statements in the Offering Documents—and thus do not include, for example, any of PG&E's statements in other contexts that it was "in compliance with relevant laws," *e.g.*, TAC ¶¶ 17, 93, 197—the same "unified course of fraudulent conduct" underlies all Plaintiffs' claims: PG&E allegedly concealed from investors its deficient safety practices and true wildfire risks. *Rubke*, 551 F.3d at 1161. Plaintiffs cannot avoid this heightened pleading standard by merely claiming their Securities Act claims do not sound in fraud, because "it is the conduct pled that matters—not necessarily the words with which plaintiffs artfully seek to allege their claims." *In re Bare Escentuals, Inc. Sec. Litig.*, 745 F. Supp. 2d 1052, 1068 (N.D. Cal. 2010); *accord, e.g.*, *In re Eargo Sec. Litig.*, 656 F. Supp. 3d 928, 938 (N.D. Cal. 2023) ("Plaintiffs cannot circumvent the heightened pleading standard because their Securities Act

1   allegations generally mirror their fraud-based allegations under the Exchange Act"). For this

2   reason, in *Edison*, the Ninth Circuit affirmed that Rule 9(b)'s heightened pleading standard applied

3   to Securities Act claims indistinguishable from Plaintiffs' here. 2022 WL 822191, at *1.

4           But even under a Rule 8 pleading standard, discovery cannot proceed until Plaintiffs

5   "identify particular (and material) facts" showing that the statement was "misleading to a

6   reasonable person reading the statement fairly and in context." *Omnicare, Inc. v. Laborers Dist.*

7   *Council Const. Indus. Pension Fund*, 575 U.S. 175, 194 (2015). The bankruptcy court made no

8   such finding as to any statement in the Offering Documents. *See In re PG&E Corp*. at 46 n.15

9   ("declin[ing] to restate each alleged misstatement" of the Securities Act claims because "PG&E

10  declined to engage in such an analysis").

11          In keeping with *Edison* and *Hawaii Electric*, this Court should dismiss the TAC because no

12  statement in the Offering Documents was misleading given PG&E's well-known and fully

13  disclosed wildfire risks.

### C.    PG&E Disclosed That Its Wildfire Risk And Safety Deficiencies Had Already Materialized

16          Just as in *Edison*, PG&E disclosed the very risk of wildfires and alleged deficiencies in its

17  safety practices that Plaintiffs assert were concealed. Plaintiffs allege PG&E's disclosures were

18  misleading because they stated only that wildfires "could" or "may" have a material impact on

19  PG&E's performance when, in fact, PG&E was facing an "already existing negative impact" due to

20  "subpar safety practices that caused wildfires." TAC ¶¶ 633, 637-38, 634 (alleging PG&E "did not

21  disclose the true existing . . . risks facing PG&E as a result of its deficient safety practices and

22  policies, including the extent of the risks or that they had already come to fruition"). This is

23  insufficient to plead falsity.

24          Just as in *Edison*, Plaintiffs do not allege that PG&E ***knew*** in advance about the specific

25  equipment failures that later caused the North Bay or Camp Fires. Their contention that PG&E did

26  not disclose the general risk that "subpar safety practices" could potentially result in future

27  wildfires is belied by the "full text of the [disclosures], including portions which were not

28  mentioned in the complaint[]," *Stac Elecs.*, 89 F. 3d at 1405 n.4, such as PG&E's comprehensive

10

disclosures about its wildfire history, safety record, and resulting liability. *See generally Omnicare*, 575 U.S. at 190-91 ("reasonable investor" must read a statement, not "in a vacuum," but "in a broader frame" and "in its full context" in determining if there is an "omission of material facts that cannot be squared with such a fair reading"). As in *Edison*, PG&E had previously disclosed its safety deficiencies in public regulatory submissions, and Defendants "cannot be found to have materially omitted the risks posed by its infrastructure when that information was publicly available through its filings with CPUC." *Edison*, 2021 WL 2325060 at *11.

Indeed, the Offering Documents used the 2015 Butte Fire as an example of PG&E's material wildfire risk. PG&E also updated investors regarding the investigation into the Butte Fire and the potential resulting liabilities for PG&E. PG&E's 2015 10-K (incorporated into the 2016 and 2017 Offering Documents) disclosed that PG&E's vegetation management practices may have caused the Butte Fire and that PG&E could be liable for at least $350 million in damages. *See, e.g.*, Ex. 2 (2015 10-K) at 36, 123 (disclosing Butte Fire litigation against PG&E and its vegetation management contractors and that Cal Fire was investigating whether PG&E's power line "was the cause of the fire"). And PG&E's Q1 2016 10-Q (incorporated into the December 2016 and March 2017 Offering Documents) further disclosed that Cal Fire had concluded the Butte Fire was caused by PG&E's "failure . . . to identify certain potential hazards during its vegetation management program." Ex. 4 (Q1 2016 10-Q) at 35. Finally, the 2016 10-K (incorporated into the March 2017 Offering Documents) reported that PG&E had been sued by at least 1,950 tort plaintiffs over the Butte Fire and that "it is probable that [PG&E] will incur a loss of at least $750 million for all potential damages." Ex. 7 (2016 10-K) at 26, 40, 60-61, 137. Thus, contrary to Plaintiffs' contentions, the Offering Documents "disclose[d] the already existing negative impact on PG&E as a result of PG&E's subpar safety practices." TAC ¶ 633. Where, as here, "the prospectus warned against the risks that Plaintiffs claim materialized," any Section 11 claim must be dismissed. *See Belodoff v. Netlist, Inc.*, 2009 WL 1293690, at *7 (C.D. Cal. Apr. 17, 2009); *see also, e.g.*, *Greenberg v. Sunrun Inc.*, 233 F. Supp. 3d 764, 773 (N.D. Cal. 2017) (no misstatement when allegedly omitted risk disclosed in next sentence in the prospectus); *Anderson v. Clow*, 1993 WL

497212, at *7-8 (S.D. Cal. Sept. 17, 1993) (no Section 11 claim where "the purported omissions were actually disclosed" and "other statements . . . rendered the Prospectus as a whole not misleading").

Moreover, it was widely known before Plaintiffs themselves purchased their notes that PG&E caused wildfires. Indeed, the named plaintiffs all purchased their Notes in late 2017 or early 2018—*after* the North Bay Fires and *after* the CPUC had already named PG&E responsible. *See* TAC, Attachs. B-D. The TAC itself alleges "PG&E's deficient vegetation management practices ignited other fires" in the past, TAC ¶ 96 & n.26, with resulting material fines and criminal penalties, *id.* ¶ 95. And since **2014**, regulators had required PG&E to submit annual public reports where its equipment was implicated in a wildfire.[4]  The market had this information. *See Edison*, 2022 WL 822191 at *1; *see also Rubke*, 551 F.3d at 1163 ("[I]t is pointless and costly to compel firms to reprint information already in the public domain.") (citations omitted).

Given this background, no additional disclosure was required to advise the public that PG&E was at risk of causing catastrophic wildfires and incurring liability for resulting harms. *See generally Edison*, 2022 WL 822191, at *1; *accord, e.g.*, *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1060–61 (9th Cir. 2014) (finding statement not misleading when "the market already knew of the difficulties facing" the company) (quotation omitted); *see also In re BP p.l.c. Sec. Litig.*, 843 F. Supp. 2d 712, 761–62 (S.D. Tex. 2012) ("In fact, many of the statements Plaintiffs claim are misleading are actually acknowledgments of BP's risk exposure. . . . While the risk associated with the oil industry . . . is obviously a subject matter important—even material—to investors, it is not one that investors are generally unaware of.").[5]

_____

[4] Ex. 12 (Jan. 13, 2019 WSJ Article) ("The state required [PG&E] to report fires beginning in June 2014. It has since disclosed its equipment started about 1,550 fires through 2017."), cited in TAC ¶¶ 499 & n.151, 600 & n.168; *see also* Ex. 13 (CPUC Fire Incident Data).

[5] For the same reasons, Plaintiffs' claims must be dismissed on negative causation grounds, because Plaintiffs do not plead materialization of any undisclosed risk, but rather a fully disclosed risk
(….continued)

12

### D.    PG&E Warned That Its Safety Violations Increased Present And Future Wildfire Risk

Plaintiffs also contend that the Offering Documents were misleading because they failed to disclose that PG&E's purported safety deficiencies and violations contributed to PG&E's wildfire risk. *See* TAC ¶¶ 633-658, 632 (alleging that "PG&E's 'unsafe conduct' led to deadly wildfires[;] 'PG&E's performance with respect to vegetation management has been dismal[;]' [and] PG&E [had not] expended sufficient resources to reasonably prevent wildfires").

Not so. Plaintiffs ignore myriad disclosures PG&E made for years about its safety record and the resulting risk that its equipment could cause future catastrophic damage:

- ***Ongoing Butte Fire Investigations and Lawsuits***. "[Cal Fire] concluded that the wildfire was caused [by tree impact, and the] failure by the Utility and/or its vegetation management contractors . . . during its vegetation management program ultimately led to the failure of the tree. . . ." Ex. 7 (2016 10-K) at 40; *see also* Ex. 2 (2015 10-K) at 36.

- ***Federal Criminal Conviction and Court-Ordered Monitorship***. "The Utility also faces criminal charges [for] knowingly and willfully violat[ing] minimum safety standards . . . [and] obstructed the NTSB's investigation into the cause of the San Bruno accident." Ex. 2 (2015 10-K) at 7. "[T]he jury in the federal criminal trial . . . found the Utility guilty [and] the court issued a judgment of conviction against the Utility. The court sentenced the Utility to a five-year corporate probation period, oversight by a third-party monitor for a period of five years . . . a fine of $3 million." Ex. 7 (2016 10-K) at 28.

- ***$1.6 Billion CPUC Penalty***. "On April 9, 2015, the CPUC issued a decision in its investigative enforcement proceedings against the Utility to impose total penalties of $1.6 billion [for] numerous violations of laws and regulations . . . that could have . . . contributed to the natural gas explosion that occurred in [San Bruno] on September 9, 2010." Ex. 7 (2016 10-K) at 38; *see also* Ex. 2 (2015 10-K) at 34.

- ***"Safety Culture" Investigation***. "[In 2015,] the CPUC began a formal investigation into whether the organizational culture and governance of [PG&E] prioritize safety and adequately direct resources to promote accountability and achieve safety goals and standards," Ex. 2 (2015 10-K) at 58; "the outcome of the CPUC's investigation into the Utility's safety culture" could have a material impact on PG&E's business. *See id.* at 65; *see also* Ex. 7 (2016 10-K) at 70, 79.

- ***Interior Dep't Debarment Proceeding***. In September 2015, "DOI[] initiated an inquiry into whether the Utility should be suspended or debarred from entering into federal

_____

that caused losses about which investors had been warned. The materialization of known risk is not actionable under the securities laws. *See, e.g.*, *Nuveen Mun. High Income Opp'y Fund v. City of Alameda*, 730 F.3d 1111, 1120, 1122 n.5 (9th Cir. 2013) (Ninth Circuit has not adopted "materialization of the risk approach").

procurement and non-procurement contracts and programs [on account of] alleged poor record-keeping, poor identification and evaluation of threats" related to the San Bruno explosion and fire. Ex. 7 (2016 10-K) at 60; *see also* Ex. 2 (2015 10-K) at 55.

PG&E specifically warned investors in the Offering Documents that its "***failure to take expeditious or sufficient action to mitigate operating conditions, facilities, or equipment, that the Utility has identified, or reasonably should have identified, as unsafe, [could] then lead[] to a catastrophic event (such as a wild land fire . . . .)***." *See, e.g.*, Ex. 2 (2015 10-K) at 29 (emphasis added). PG&E had no obligation under the Securities Act to predict future wildfires or the extent of potential future loss. *See, e.g., Edison*, 2021 WL 2325060, at *10 (finding "[p]laintiffs' own allegations reveal that the market was aware of the safety failures in the Edison [] infrastructure, as each of CPUC's admonitions of [Edison] which purportedly evidence the misleading nature of the statements was publicly available"); *Mallen v. Alphatec Holdings, Inc.*, 861 F. Supp. 2d 1111, 1127 (S.D. Cal. 2012), *aff'd sub nom. Fresno Cnty. Emps.' Ret. Ass'n v. Alphatec Holdings, Inc*., 607 F. App'x 694 (9th Cir. 2015) (dismissing Section 11 claim where, "apart from conclusory statements that these delays existed, Plaintiffs fail to allege any facts to show that such delays were ***known*** at that time or that they could reasonably be expected to have a material impact") (emphasis added).

PG&E also warned of risks resulting from "future investigations or other enforcement proceedings that may be commenced relating to the Utility's compliance with [rules] applicable to its operations, including . . . inspection and maintenance practices," Ex. 2 (2015 10-K) at 29; cautioned that "it is probable that the [Safety and Enforcement Division of the CPUC] will impose fines or take other enforcement action" against PG&E, *id*. at 120; and warned such "additional regulatory or governmental enforcement action" could result from PG&E's violations of regulations concerning "vegetation management" and "safety and inspection practices," *id.* at 25. Where, as here, "the prospectus warned against the risks that Plaintiffs claim materialized," a Section 11 claim must be dismissed. *Belodoff v. Netlist, Inc*., 2009 WL 1293690, at *7 (C.D. Cal. Apr. 17, 2009); *see also Greenberg v. Sunrun Inc.*, 233 F. Supp. 3d 764, 773 (N.D. Cal. 2017) (no misstatement where allegedly omitted risk disclosed in next sentence in prospectus).

Contrary to Plaintiffs' suggestion, PG&E had no obligation to go further and "accuse itself of wrongdoing"—especially where, as here, Plaintiffs have not alleged that the Company actually

14

*knew* that its safety deficiencies would cause the tragedies that subsequently occurred. *In re Volkswagen "Clean Diesel" Mktg., Sales Practices & Prods. Liab. Litig.*, 258 F. Supp. 3d 1037, 1043 (N.D. Cal. 2017) (quoting *In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d 367, 377 (S.D.N.Y. 2004)); *accord, e.g.*, *In re Facebook, Inc. Sec. Litig.*, 477 F. Supp. 3d 980, 1023-24 (N.D. Cal. 2020) (explaining that companies "are not required to engage in 'self-flagellation' by disclosing unproven allegations"). Moreover, to the extent Plaintiffs contend PG&E's current safety practices were insufficient to prevent the North Bay and Camp Fires, they assert management, not a false or misleading statement. *See, e.g.*, *In re LifeLock, Inc. Sec. Litig.*, 690 F. App'x 947, 955 (9th Cir. 2017) ("Federal securities laws do not protect investors from quality control problems, service lapses, or management miscues.") (citing *Gaines v. Haughton*, 645 F.2d 761, 799 n.33 (9th Cir. 1981)).

### E.    Plaintiffs Fail To Plead That PG&E Statements Related To Wildfire Safety Practices Were Materially False Or Misleading

Plaintiffs contend that PG&E's description of its system upgrades and vegetation management practices misled investors about its commitment to and investment in safety. *See* TAC ¶¶ 632, 640-658. But all of PG&E's allegedly misleading statements in the Offering Documents are highly generalized or not misleading in light of PG&E's comprehensive disclosures about its safety efforts and investments. Here, as in *Edison*, PG&E's statements "are 'subjective assessments' which vaguely refer to [PG&E's] prioritization, improvement, and funding of safety procedures. Such an assessment 'hardly amounts to a securities violation.'" *Edison*, 2021 WL 2325060, at *9 (C.D. Cal. Apr. 27, 2021) (citation omitted).

The challenged disclosures from the Offering Documents do not make any assurances about safety or legal compliance—rather, they recite actions that PG&E had taken to improve safety or address issues like climate change.[6]  Plaintiffs do not allege that these statements are inaccurate.

---

[6] Plaintiffs assert that PG&E "falsely assur[ed] investors that [it] complied with safety laws and regulations, [and] sufficiently invested in safety," TAC ¶ 632, but do not identify any such

(….continued)

Moreover, insofar as Plaintiffs allege PG&E's disclosures created the "impression" that PG&E was committed to safety when it was not, TAC ¶ 639, such an impression is not actionable because a "commitment to safety" is too vague and constitutes "mere corporate puffery," as the Ninth Circuit held in *Edison. See Edison*, 2022 WL 822191, at *1. "To be misleading, a statement must be 'capable of objective verification.'" *Retail Wholesale & Dep't Store Union Loc. 338 Ret. Fund v. Hewlett-Packard Co.*, 845 F.3d 1268, 1275 (9th Cir. 2017) (citation omitted). "[G]eneral terms" that "provide[] nothing concrete" are not actionable, *Apollo*, 774 F.3d at 606, and a mere "'optimistic, subjective assessment hardly amounts to a securities violation.'" *Intuitive Surgical*, 759 F.3d at 1060 (quoting *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1111 (9th Cir. 2010)). As a result, "[s]tatements of mere corporate puffery, vague statements of optimism . . . are not actionable because professional investors, and most amateur investors as well, know how to devalue the optimism of corporate executives." *Id.*

Courts have routinely rejected challenges to vague "commitments to safety," even when the issuer subsequently caused a catastrophic accident. *See, e.g.*, *Plumley v. Sempra Energy*, 2017 WL 2712297, at *7 (S.D. Cal. June 20, 2017) (SoCalGas's stated "commitment to or prioritization of safety" before Aliso Canyon gas leak "are too nonspecific and unmeasurable to state a claim"); *In re Plains All Am. Pipeline L.P. Sec. Litig.*, 307 F. Supp. 3d 583, 626 (S.D. Tex. 2018) (Plains'

---

statement in the Offering Documents. Plaintiffs cite a May 23, 2016 press release regarding PG&E's "leadership and commitment on safety," and wrongly allege that it "was filed with the SEC on a Form 8-K [and] incorporated by the March 2017 Offering Documents," TAC ¶ 648 but it was not filed in the Form 8-K, *see* Ex. 14 (May 23, 2016 8-K), or in any other SEC filing, and thus was not part of the Offering Documents. *See, e.g.*, *Shwarz v. United States*, 234 F.3d 428, 435 (9th Cir. 2000) ("The court need not accept as true . . . allegations that contradict facts that may be judicially noticed by the court . . . and may consider documents that are referred to in the complaint whose authenticity no party questions.") (citations omitted). Plaintiffs cannot premise a Securities Act claim on "statements [that] were not incorporated into the Offering Documents." *In re Gen. Elec. Co. Sec. Litig.,* 856 F. Supp. 2d 645, 655 (S.D.N.Y. 2012).

"general commitments to improving safety and legal compliance" before Santa Barbara oil spill were "not specific or objective factual representations, much less 'unambiguous representations' that every Plains pipeline was safely maintained or fully complied with all applicable laws"); *In re BP*, 843 F. Supp. 2d at 756-57 ("generalized statements about BP's commitment to safety [and] prioritization of process safety performance" before Gulf oil spill were "too squishy, too untethered to anything measurable") (quotations omitted).

Regardless, none of PG&E's accurate descriptions of its system upgrades or investments misled investors about PG&E's safety efforts. Plaintiffs point to certain alleged facts that they say should have been disclosed, but "Section 11's omissions clause . . . is not a general disclosure requirement; it affords a cause of action only when an issuer's failure to include a material fact has rendered a published statement misleading." *Omnicare*, 575 U.S. at 194. To be misleading, Plaintiffs must show a statement "affirmatively create[s] an impression of a state of affairs that differs in a material way from the one that actually exists" and not merely that "it is incomplete or does not include all relevant facts." *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002); *see also, e.g.*, *Greenberg*, 233 F. Supp. 3d at 773 (explaining that merely "'omitting material information'. . . is not a problem . . . . [T]he omitted information must have been 'necessary to make the statements therein not misleading.'") (quoting 15 U.S.C. § 77k(a)).

Yet Plaintiffs fail to show that any statement was misleading. *First*, Plaintiffs contend that the Offering Documents misled investors by "emphasiz[ing] the Company's upgrades to its equipment," TAC ¶ 644, and its efforts to address climate change, which "minimiz[ed] the real risks PG&E faced with respect to wildfires as a result of dismal safety practices and insufficient funding to prevent wildfires," *id.* ¶¶ 642, 637-38 (risk disclosure that climate change could "increase the occurrence of wildfires" allegedly "omit[ted] the real risks stemming from PG&E's woefully inadequate safety practices"). But the risks to PG&E posed by wildfires and safety deficiencies were extensively disclosed elsewhere, and these disclosures must be considered in full. *See Stac Elecs.*, 89 F.3d at 1405 n.4 (court should consider the "full text of the [offering materials], including portions which were not mentioned in the complaint"). Plaintiffs do not allege that the described network

17

upgrades or climate change efforts ***did not actually occur***. *See Plains*, 307 F. Supp. 3d at 621 (alleged regulatory violations are not "actionably false or misleading" where they did not "undermine the general proposition that Plains did in fact have an internal-review process in place . . . and that Plains had and implemented programs intended to maintain the integrity of its pipeline network"). Plaintiffs allege in conclusory terms that "PG&E's equipment was outdated and hazardous," TAC ¶ 655, but PG&E never asserted that it had modernized all equipment. To the contrary, PG&E regularly disclosed that it "plans to continue performing work to improve the reliability and safety of its electricity distribution operations." *See, e.g.*, Ex. 2 (2015 10-K) at 16.

    *Second*, Plaintiffs fail to allege that any of the described safety upgrades did not actually increase safety. Plaintiffs contend that PG&E omitted that new "smart switches" could not be "shut down . . . to prevent wildfires," TAC ¶ 645, which purportedly "increas[ed] the danger and likelihood of wildfires in cases where vegetation has fallen onto power lines." *Id*. ¶ 673. This allegation ignores, however, that the Offering Documents only claimed that these devices "***reduce the duration*** of customer outages," *see, e.g.*, Ex. 2 (2015 10-K) at 16 (emphasis added), and said nothing about their relation to wildfires. *See Plains*, 307 F. Supp. 3d at 624 (rejecting argumetns that challenged statements omitted "that the tools were ineffectively used," because they were "statements are about the tools and programs Plains had in place, not about how well the tools worked or that they were 100 percent effective"). Plaintiffs further claim PG&E's statement that its "vegetation management activities also reduce the risk of wildfire impacts on electric and gas facilities" is misleading because PG&E's vegetation "practices were dismal and increased, not reduced, wildfire impact." TAC ¶¶ 640, 651. This conclusory assertion is unsupported and indeed contradicted by Plaintiffs'own theory: that "vegetation contact was the primary risk driver" of wildfires, *id*. ¶ 651, and that wildfires "could have been reduced if PG&E ***was willing to invest more***" in vegetation management, *id*. ¶ 639 (emphasis added).

    *Finally*, Plaintiffs' allegation that "PG&E was not sufficiently investing in safety" fails to state a claim. *See id.* ¶¶ 640, 649, 652 (challenging statement that PG&E was "making substantial investments to build a more modern and resilient system that can better withstand extreme weather

and related emergencies"). Vague adjectives such as "substantial" are mere puffery and "too nonspecific and unmeasurable to state a claim for securities fraud." *Plumley*, 2017 WL 2712297, at *7; *accord, e.g.*, *Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1196 (9th Cir. 2021) ("[A] statement that 'great progress' was being made on battery production would potentially be an actionable false statement only if, as the district court put it, Tesla had been 'making no progress at all.'"); *In re Verifone Sec. Litig.*, 2016 WL 1213666, at *6-7 (N.D. Cal. Mar. 29, 2016) (statements by company of "significant progress" and "great strides" not actionable); *Weiss v. Amkor Tech., Inc.*, 527 F. Supp. 2d 938, 955-56 (D. Ariz. 2007) (statement about "substantial progress" inactionably vague).

Moreover, Plaintiffs themselves allege that PG&E was making substantial safety investments, spending over $190 million annually on vegetation management activities alone. TAC ¶ 78. Their contention that this amount was inadequate to sufficiently mitigate the wildfire risk does not render false or misleading PG&E's statement that its vegetation management activities generally reduce wildfire risk. Their real complaint is about purported mismanagement, not misleading disclosures. *See LifeLock*, 690 F. App'x at 955; *Sterling*, 963 F. Supp. 2d at 1119.

**F.      PG&E's Disclosures Became Even More Robust After The North Bay Fires**

Plaintiffs cannot state a claim related to the 2018 Exchange Offer given both (a) the TAC's own acknowledgment that **the market understood** by October 2017 that PG&E had negligently caused the North Bay Fires and (b) PG&E's own extensive disclosures in the 2017 10-K—filed in February 2018, before the Exchange Offer—about its potential liability for the catasrophic North Bay Fires. PG&E warned investors that "[e]xtreme weather, extended drought and shifting climate patterns have intensified the challenges associated with wildfire management in California [including the] likelihood and severity of extraordinary fire events" and that these factors "have increased the wildfire risk and made wildfire outbreaks increasingly difficult to manage." Ex. 10 (2017 10-K) at 40. Given these explicit disclosures, Plaintiffs cannot state a claim for the 2018 Exchange Offer.

Plaintiffs target three PG&E statements unique to the 2018 Exchange Offer Documents, none of which state a claim. *First*, Plaintiffs find fault with PG&E's disclosure that "the risk posed by wildfires has increased in the Utility's service area" due to environmental factors, TAC ¶ 636,

19

but Plaintiffs nowhere dispute that environmental factors increased wildfire risk.

*Second*, Plaintiffs claim PG&E's disclosure that it had retained a third-party monitor as part of its criminal conviction for the San Bruno gas pipeline explosion was a "false assurance" that PG&E had taken steps to safely operate and maintain its equipment. *See* TAC ¶ 647. Plaintiffs do not allege, however, that no monitor was retained (including at the time of the Camp Fire) or explain how a disclosure that PG&E was required to retain a safety monitor as a condition of its "convict[ion] of five felony counts for knowingly and willfully violating federal safety standards," *id.* ¶ 404, somehow assured investors that PG&E did not face continued wildfire risk or safety problems—especially in light of voluminous disclosures that these risks remained. If anything, PG&E's conviction and a monitorship suggest the opposite. *See Diehl v. Omega Protein Corp.*, 339 F. Supp. 3d 153, 163-64 (S.D.N.Y. 2018) (accurate disclosure of terms of probation did not mislead investors to believe company would not commit further violations); *City of Brockton Ret. Sys. v. Avon Prod., Inc.*, 2014 WL 4832321, at *29 (S.D.N.Y. Sept. 29, 2014) (disclosure that company "continued transition away from [problematic] business model" would not have "be[en] assur[ing to shareholders] that Avon had not committed FCPA violations" given disclosed investigations).

Moreover, issuers are not required to disclose all information about their activities, "even if investors would consider the omitted information significant," as long as the omitted information "do[es] not make the actual statements misleading." *Markette v. XOMA Corp.*, 2017 WL 4310759, at *7 (N.D. Cal. Sept. 28, 2017). Accordingly, these disclosures do not require PG&E to affirmatively include all of the allegedly omitted pieces of information Plaintiffs would have liked to have seen disclosed. *See* TAC ¶¶ 639, 649-658. PG&E's accurate disclosure that it had retained a court-ordered monitor certainly was not false or misleading.

*Finally*, Plaintiffs allege that the 2018 Exchange Offer Documents "misled investors by insinuating that PG&E may not have caused and might not be liable for" the North Bay Fires. TAC ¶¶ 659, 662-63. Plaintiffs concede, however, that, at the time of the 2018 Exchange Offer, Cal Fire and CPUC were still investigating—and had not determined—the cause of the North Bay Fires. *See id.* ¶ 247. Plaintiffs instead focus on PG&E's disclosure of Loss Contingencies under accounting

1  guidelines ASC 450 and assert that PG&E should have concluded that a loss in excess of $10

2  billion was both (a) "probable," TAC ¶¶ 667-68, and (b) able to be "reasonably estimated," *id*. ¶¶

3  670-71, as of the relevant December 31, 2017 measurement date (two months after the North Bay

4  Fires). But PG&E expressly disclosed that "[i]t is reasonably possible that facts could emerge that

5  lead PG&E . . . to believe that a loss is probable." *Id*. ¶ 347. This statement is a quintessential

6  statement of opinion that is not subject to "second-guessing" under the securities laws. *See*

7  *generally Omnicare*, 575 U.S. at 186 (securities laws do "not allow investors to second-guess

8  inherently subjective and uncertain assessments"); *see also In re Lions Gate Entm't Corp. Sec.*

9  *Litig.*, 165 F. Supp. 3d 1, 15-16 (S.D.N.Y. 2016) (finding statement that "the Company does not

10  believe . . . the outcome of any currently pending claims . . . will have a material adverse effect" to

11  be protected opinion statement); *Employees. Ret. Sys. v. Embraer S.A.*, 2018 WL 1725574, at *9

12  (S.D.N.Y. Mar. 30, 2018) (finding loss contingency accrual is a matter of opinion).

13      To adequately plead that an opinion statement was materially misleading, Plaintiffs must

14  allege ***both*** that "the speaker did not hold the belief she professed" ***and*** that the "belief is

15  objectively untrue." *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,

16  856 F.3d 605, 615-16 (9th Cir. 2017). Plaintiffs plead neither. Rather than allege subjective

17  disbelief (Plaintiffs expressly disclaim "intentional misconduct," TAC ¶ 497), Plaintiffs instead

18  argue that "there was no ***reasonable basis*** for [the] representations" as to potential losses for the

19  North Bay Fires. *Id*. ¶ 672 (emphasis added). This is insufficient to plead a subjective disbelief.

20  Indeed, Plaintiffs make no attempt to plead that PG&E knew the results of the ongoing Cal Fire

21  investigations at the time of the 2018 Exchange Offer or of any of the other multiple contingencies

22  required to accrue a loss—for example, that PG&E would be held liable for damages or icur

23  material fines or penalties.[7]

24  _____

25  [7] Plaintiffs cannot plead a claim based entirely on hindsight. *See, e.g.*, *Markette*, 2017 WL

26  4310759, at *5 ("Plaintiff, in other words, makes no effort to allege that Defendants 'did not hold

27  the belief they professed'. . . opting instead to argue that their beliefs and expectations were

28  (….continued)

Plaintiffs also have not adequately pled that PG&E's statements were "objectively untrue" and that a $10 billion loss was "probable." *See, e.g.*, *Golub v. Gigamon Inc.*, 372 F. Supp. 3d 1033, 1052 (N.D. Cal. 2019) (requiring "particularized facts that 'directly contradict' or are 'necessarily inconsistent with' the allegedly misleading statements") (citation omitted). Plaintiffs' assertion that PG&E should have accrued a liability of "$10 billion on [its] consolidated balance sheet," TAC ¶ 664, because of (a) Cal Fire's later conclusions, *id.* ¶ 673, and (b) a January 2018 report that PG&E *disclosed* estimating statewide claims from the North Bay Fires to exceed $10 billion, *id.* ¶ 760, dramatically oversimplifies PG&E's loss contingency assessment. PG&E's ultimate liability did not depend on Cal Fire's investigatory findings, but on the outcome of subsequent regulatory proceedings and lawsuits. *See* Ex. 10 (2017 10-K) at 27-28. Indeed, even with hindsight, Plaintiffs fail to plead objective falsity—for example, Cal Fire did not in fact find PG&E at fault for the Tubbs Fire (which caused a substantial portion of damage stemming from the North Bay Fires), and PG&E's liability for the North Bay Fires was still being adjudicated at the time.

Under these circumstances, Plaintiffs cannot plead that PG&E's belief was objectively untrue. *See, e.g.*, *Ziolkowski v. Netflix*, 2018 WL 4587515, *3 (N.D. Cal. Sept. 25, 2018) ("The burden is on Plaintiff to present facts plausibly showing that the [opinion was objectively wrong], and that the Defendants knew as much when they made the challenged statements."). PG&E's disclosures provided investors with significant detail about its potential exposure for the North Bay Fires, both in terms of what was reasonably estimable as of December 31, 2017 and with respect to the outer bounds of such liability based on third-party estimates. It was not obligated to do anything more. *See, e.g., In re Citigroup*, 330 F. Supp. 2d at 377 ("Citigroup was not required to make disclosures predicting" liability, particularly where disclosures contained "discuss[ion of] pending litigation."); *In re ITT Educ. Servs., Inc. Sec. & Shareholder Deriv. Litig.*, 859 F. Supp. 2d 572, 579 (S.D.N.Y. 2012) ("[T]he securities laws do not impose a general duty to disclose corporate

———————————————

ultimately not borne out") (citation omitted); *see also In re VeriFone Sec. Litig.*, 11 F.3d 865, 871 (9th Cir. 1993) ("The fact that the prediction proves to be wrong in hindsight does not render the statement untrue when made.").

1   mismanagement or uncharged criminal conduct.").[8]

2   **G.    Item 303 And Item 503 Do Not Require Any Additional Disclosures**

3   Unable to identify any false or misleading statement or omission, Plaintiffs invoke Items 303

4   and 503 of SEC Regulation S-K in a flawed attempt to argue that the Offering Documents were

5   required to include additional detail information. But Item 303 only requires that the issuer's Form

6   10-K "[d]escribe any ***known trends or uncertainties*** that have had, or that the registrant reasonably

7   expects will have, a material favorable or unfavorable impact on net sales or revenues or income

8   from continuing operations." 17 C.F.R. § 229.303(a)(3)(ii) (emphasis added). These provisions "do

9   [ ] not provide a basis of liability where a corporation fails to 'disclose' the future." *In re Verifone*

10  *Sec. Litig.*, 784 F. Supp. 1471, 1483 (N.D. Cal. 1992), *aff'd*, 11 F.3d 865 (9th Cir. 1993). Here,

11  PG&E adequately disclosed its wildfire history and risks, and Plaintiffs have failed to identify any

12  other allegedly known trend or uncertainty that was required to be disclosed. *See, e.g.*, *In re*

13  *Progenity, Inc. Sec. Litig.*, 2023 WL 219345, at *14 (S.D. Cal. Jan. 13, 2023) (rejecting Item 303

14  claim where defendants "disclosed that [the issuer] was experiencing downturns"); *Mosco v.*

15  *Motricity, Inc.*, 649 F. App'x 526, 528 (9th Cir. 2016) (rejecting Item 303 claim when "the

16  Registration Statement disclosed the very trend that Plaintiffs claim [the issuer] hid from the market,

17  adequately warning investors"); *In re Rocket Fuel, Inc. Sec. Litig.*, 2015 WL 9311921, at *9 (N.D.

18  Cal. Dec. 23, 2015) (dismissing Item 303 claims where adverse trend was "extensively discussed in

19

20

21  _____

22  [8] If Plaintiffs are arguing that typical risk factor phraseology—such as identifying "whether the

23  company [may] have liability associated with these fires" as a risk—created a misleading

24  impression, TAC ¶ 660, this claim fails because it ignores (a) the totality of the disclosures and

25  (b) market practice for drafting disclosures. *Zeid v. Kimberley*, 930 F. Supp. 431, 437 (N.D. Cal.

26  1996) (dismissing as "absurd" argument that "Defendants' warnings regarding potential adverse

27  factors" were misleading where "Plaintiffs do not assert that any of the warnings were without basis

28  or wrong . . . . Plaintiffs [merely] assert that the warnings should have been more specific").

the registration statements").[9]

Similarly, at the time of the Offerings, Item 503 only required "a discussion of the most significant factors that make the offering speculative or risky." *See* 17 C.F.R. § 229.503 (effective Aug. 12, 2011 to Nov. 4, 2018). Again, PG&E fully disclosed all of the allegedly omitted risks, including the risk of present and future catastrophic wildfires that could have a material impact on PG&E's financial position. *See, e.g.*, *Silverstrand Invs. v. AMAG Pharm., Inc.*, 707 F.3d 95, 103 (1st Cir. 2013) ("[T]o withstand dismissal at the pleading stage, a complaint alleging omissions of Item 503 risks needs to allege . . . the offering documents failed to disclose the risk factor.").

## II. PLAINTIFFS' CLAIMS BASED ON THE 2016 OFFERINGS MUST BE DISMISSED BECAUSE PLAINTIFFS LACK STANDING

Plaintiffs' claims based on the 2016 Offerings fail because no plaintiff has standing. A "named plaintiff must have standing to sue for each of the asserted claims by purchasing in the offerings that are putatively part of the class action." *FDIC v. Countrywide Fin. Corp.*, 2012 WL 5900973, at *10 (C.D. Cal. Nov. 21, 2012); *see also In re Zynga Inc. Sec. Litig.*, 2014 WL 721948, at *3 (N.D. Cal. Feb. 25, 2014) ("The ability to have standing to bring a claims [*sic*] based on . . . one registration statement does not grant statutory standing to bring claims based on different registration statements for an offering in which the plaintiff did not purchase any securities . . . . [A] plaintiff must demonstrate standing for each claim [it] seeks to press."). Plaintiffs lack standing because they fail to allege that they (a) purchased notes issued in the March 2016 offering in reliance on the Offering Documents or (b) purchased notes traceable to the December 2016 Offering.

### A. Plaintiffs Lack Standing As To The March 2016 Notes Offering Because No Plaintiff Relied On The Offering Documents

Plaintiffs fail to allege that any named plaintiff purchased notes issued in the March 2016 offering in reliance on the Offering Documents. Section 11 limits liability for certain "after-market" purchases—*i.e.*, purchases of notes in the secondary market—because when it can no longer be

---

[9] Plaintiffs also do not allege that PG&E's safety practices were "trending toward inadequacy, but rather that [they were] already inadequate and remained so." *City of Roseville Employees Ret. Sys. v. EnergySolutions, Inc.*, 814 F. Supp. 2d 395, 426 (S.D.N.Y. 2011); *see, e.g.*, TAC ¶ 679.

1  presumed that the purchase was based on the registration statement. Under the statute, if a person

2  purchase a security "after the issuer has made generally available to its security holders an earning

3  statement covering a period of at least twelve months beginning after the effective date of the

4  registration statement, then the right of recovery under [Section 11] shall be conditioned on proof

5  that such person acquired the security relying upon such untrue statement in the registration

6  statement." 15 U.S.C. § 77k(a)(5); *see also Lee v. Ernst & Young, LLP*, 294 F.3d 969, 977 (8th Cir.

7  2002) (explaining that alleging reliance is "a requirement for certain aftermarket purchasers").

8          In the PG&E bankruptcy action, the court opted to resolve standing questions for the

9  hundreds of proofs of claim in the bankruptcy on an individual-by-individual basis. *See, e.g.*, *In re*

10  *PG&E Corp.* at 3, 50-51. Whatever the merits of that decision, in this Court, under Ninth Circuit

11  precedent, if a named plaintiff in a putative class action lacks standing to assert a Securities Act

12  claim, the action must be dismissed. *See Lierboe v. State Farm Mutual Automobile Ins. Co.*, 350

13  F.3d 1018, 1022-23 and n.6 (9th Cir.2003) (holding class action must be dismissed where named

14  plaintiff lacks standing).

15          Only Plaintiff York County purchased notes from the March 2016 Offering. It bought them

16  in May 2018, TAC, Attach. B—two years after the offering and ***after*** PG&E filed both its 2016

17  (Feb. 16, 2017) and 2017 (Feb. 9, 2018) Form 10-Ks. *See* Ex. 7 (2016 10-K), Ex. 10 (2017 10-K).

18  Accordingly, York County is obligated to plead actual reliance on the Offering Documents to state

19  a claim. Yet the TAC nowhere alleges that York County relied on the March 2016 Offering

20  Documents. *In re Petrobras Sec. Litig.*, 116 F. Supp. 3d 368, 386 (S.D.N.Y. 2015) (dismissing

21  Section 11 claims "based on Notes purchased after Petrobras issued the relevant earning

22  statements" where plaintiffs "fail to plead that they relied on the original registration statements").

23  No named plaintiff alleges reliance on the Offering Documents for the March 2016 Notes Offering,

24  and therefore the claim as to notes sold in that Offering must be dismissed.

25      **B.      Plaintiffs Lack Standing For The Claims Based On The December 2016 Notes Offering Because No Named Plaintiff Purchased Any Notes Traceable To That Offering**

26

27          The TAC also fails to plead standing for the December 2016 Offering. In *Slack Techs. LLC*

28

*v. Pirani*, the United States Supreme Court held that a plaintiff using Section 11 of the Securities Act must have "purchased shares traceable to the allegedly defective registration statement." 598 U.S. 759, 770 (2023). In other words, a Section 11 plaintiff "must have purchased a security issued under that, rather than some other, registration statement." *Hertzberg v. Dignity P'ners, Inc.*, 191 F.3d 1076, 1080 (9th Cir. 1999). Plaintiffs who purchased not in the offering itself, but later in the aftermarket must "trace the chain of title for their shares back to the [relevant] offering, starting with their own purchases and ending with someone who bought directly in [the relevant] offering." *In re Century Aluminum Co. Sec. Litig.*, 729 F.3d 1104, 1106 (9th Cir. 2013).

Here, no named plaintiff can trace any notes it purchased to the December 2016 Offering. That Offering included floating rate notes[10] and certain 4.00% notes. TAC ¶¶ 502, 572. PG&E thereafter sold similar 4.00% notes in the March 2017 Offering, which are indistinguishable from those issued in December 2016.[11] *Id.* ¶¶ 502, 573. Plaintiff Mid-Jersey purchased 4.00% Notes in January 2018—long after the December 2016 and March 2017 Offerings—and does not plead that its notes are traceable to the December 2016 Offering rather than the March 2017 Offering. *Id.* ¶ 508.

Courts in this Circuit have recognized that "experience and common sense tell us that, when a company has offered shares under more than one registration statement, aftermarket purchasers usually will ***not*** be able to trace their shares back to a particular offering." *Mehedi v. View, Inc.*, 2023 WL 3592098, at *6 (N.D. Cal. May 22, 2023) (citing *In re Century*, 729 F.3d at 1107-08)

---

[10] Any claims based on the floating rate notes should also be dismissed because they were redeemed in full in November 2017. Ex. 10 (2017 10-K) at 63. Plaintiffs therefore have not alleged—nor could they—that any investor suffered losses on those notes. *See In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1169 (C.D. Cal. 2008).

[11] *See* Ex. 6 (Mar. 7, 2017 Pro. Supp.) at S-7 ("We first issued our 4.00% Senior Notes . . . on December 1, 2016. The [4.00%] notes offered by this prospectus supplement and the accompanying prospectus will have the same CUSIP number as the other notes of the same series and will trade interchangeably with notes of the same series immediately upon settlement.")

26

1    (emphasis in original), and have therefore held that plaintiffs "must allege facts from which the

2    Court can reasonably infer that [their] situation is different." *Id*. Here, Plaintiffs' conclusory

3    allegation that Mid-Jersey Trucking's notes were "issued in the December 2016 Notes Offering,"

4    TAC ¶ 508, is insufficient because Plaintiffs provide no "factual specificity" from which this Court

5    could "reasonably infer" that Mid-Jersey Trucking's notes are traceable to the December 2016

6    Offering. *See Mehedi*, 2023 WL 3592098, at *6. Because no Securities Plaintiff can trace its notes

7    to the December 2016 Offering, the claims relating to that offering must be dismissed. *See*

8    *Aluminum*, 729 F.3d at 1107 (where securities issued in two offerings are "indistinguishable," "a

9    greater level of factual specificity" is required before "a court can reasonably infer that [the

10   securities] purchased . . . are traceable to a particular offering").

11   **C.    Claims Against The Director Defendants Based On The March And December
         2016 Offerings Must Be Dismissed Because The Alleged Misrepresentations
12       Post-Date The Effective Date Of The 2014 Shelf Registration Statement**

13           Claims against the Director Defendants based on the March and December 2016 Offerings

14   must also be dismissed because the alleged mispresentations post-date the effective date of the shelf

15   registration statement. These offerings were issued pursuant to the 2014 Shelf Registration, which

16   was signed and became effective in February 2014. *See* TAC, Attach. A; Ex. 1 (Feb. 23, 2016 Pro.

17   Supp.); Ex. 3 (Nov. 28, 2016 Pro. Supp.). But Plaintiffs do not challenge the Shelf Registration

18   itself; instead, they allege misrepresentations in "PG&E's [Rule 424] Prospectuses filed on

19   February 24, 2016, November 29, 2016[, and documents] incorporated by reference." TAC ¶ 630.

20           SEC Rule 430B explicitly distinguishes for purposes of Section 11 liability between the

21   effective date for "the issuer and any underwriter," on the one hand, and directors and "person[s]

22   who signed the registration statement," on the other hand. As to the former, the date on which a

23   form of prospectus is filed—here, in March and December 2016—becomes "the new effective

24   date." But as to the latter, the later date "shall not be an effective date . . . as to [a]ny director"

25   except in limited circumstances not applicable here.[12]  *See* 17 C.F.R. § 230.430B(f)(2), (f)(4).

26

27   _____

28   [12] An exception applies only in narrow circumstances, where a prospectus is filed either (i)
     (….continued)

Plaintiffs therefore cannot rely on the Rule 424 Prospectus to establish a new effective date for the Directors, and their claims against the Director Defendants based on the March and December 2016 Offerings must be dismissed. *See Countrywide*, 932 F. Supp. 2d at 1120 ("[T]he date the prospectus supplements [were filed] is not a new 'effective date' for directors . . . . The only effective date, then, is the filing date of the registration statements . . . . [Because] the registration statements did not contain misstatements on their effective dates . . . ***[t]he Individual Defendants cannot be held liable*** . . . . 'The prospectus filing will not create a new effective date for directors or signing officers of the issuer,' except when the two exceptions listed above occur.") (quoting SEC Release Nos. 33–8591, 34–52056, 70 Fed. Reg. 44722, 44774 (Aug. 3, 2005)) (emphasis added).

## III.    PLAINTIFFS' SECURITIES ACT CLAIMS BASED ON THE 2016 AND 2017 NOTES OFFERINGS ARE TIME-BARRED

Plaintiffs' claims based on the 2016 and 2017 Notes Offerings must also be dismissed for the independent reason that they are time-barred, like the Securities Act claims in *Edison* were. Section 11 claims must be "brought within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence." 15 U.S.C. § 77m. The claims against the Director and Underwriters Defendants were first asserted on February 22, 2019—long after the October 2017 North Bay Fires that ***the TAC itself*** alleges revealed PG&E's true wildfire liability to the market and therefore provided a reasonable investor with "sufficient information about that fact to adequately plead" any alleged Section 11 claim. *Thomas v. Magnachip Semiconductor Corp.*, 167 F. Supp. 3d 1029, 1052 (N.D.

---

to "include[] information required by section 10(a)(3) of the Act," 17 C.F.R. § 230.430B(f)(4), *i.e.*, an "update [to] the financial information in a registration statement after its effective date," *see In re Countrywide Fin. Corp. Mortg.-Backed Sec. Litig.*, 932 F. Supp. 2d 1095, 1119-20 (C.D. Cal. 2013); or (ii) "pursuant to § 229.512(a)(1)(ii) of this chapter," 17 C.F.R. § 230.430B(f)(4), *i.e.*, an update to address "a fundamental change in the information set forth in the registration statement," *Countrywide*, 932 F. Supp. 2d at 1119-20. Neither exception applies here.

28

1   Cal. 2016) (quotations omitted).

2        According to the TAC, "the [m]arket [l]earned [a]bout the [e]ffects and [e]xtent of PG&E's

3   [i]nadequate [s]afety [p]ractices" *in October 2017*, when news of the North Bay Fires broke. TAC

4   ¶¶ 327–338. Investors allegedly "began to understand that PG&E's safety regulation violations

5   were likely a proximate cause of the North Bay Fires," and the "truth started to emerge" on October

6   12, 2017, when regulators sent PG&E a notice to preserve all relevant documents. *Id.* ¶¶ 321, 328–

7   30. PG&E's stock price dropped 6.7% on the news, and market analysts confirmed that the drop

8   "reflected investors' understanding that PG&E was financially responsible for the North Bay

9   Fires." *Id.* ¶¶ 330-34, 331 (noting that analyst concluded the "drop in [PG&E's] stock reflect[s] the

10   following assumptions: 1) the fire was caused by [PG&E's] negligence, . . . and 4) material fines

11   and penalties will be assessed"). The next day, PG&E filed a Form 8-K disclosing that regulators

12   were investigating its role in the North Bay Fires and warning that its insurance coverage might not

13   be sufficient to cover its liability. *Id.* ¶ 335. PG&E's stock price to dropped another 16.5%,

14   allegedly because PG&E's "discussion of liability signaled to the market that at least some of the

15   North Bay Fires were caused by PG&E's negligence or worse." *Id.* ¶¶ 336-38.

16        The TAC's express allegations thus make clear that diligent investors could have discovered

17   sufficient information to timely assert their Section 11 claims. In *Edison*, investors alleged that

18   Edison had issued notes that did not adequately disclose the risks of wildfires that Edison allegedly

19   later caused in 2017 and again in 2018. They filed suit after the second fire, more than a year after

20   the first fire. The Central District of California and the Ninth Circuit dismissed those claims as time

21   barred, because "[i]f the []Offering Documents concealed the risk that [defendant] could recklessly

22   cause a material wildfire, as Plaintiffs allege, then *Plaintiffs should have discovered facts*

23   *constituting the violation on [the date] when the markets purportedly understood that*

24   *[defendant] had caused the [first]Fire*." *Edison*, 2021 WL 2325060 at *10 (emphasis added). The

25   same is true here. Plaintiffs allege that the market, primed by PG&E's disclosures, began to

26   "understand" as soon as the North Bay Fires broke out in October 2017 that PG&E's deficient

27   safety practices and alleged negligence had caused them and would result in significant liability.

28

TAC ¶¶ 328. To the extent the Offering Documents allegedly misled Plaintiffs about that risk, Plaintiffs necessarily discovered at the time they had been misled. Because the Securities Act Claims based on the 2016 and 2017 Notes were not filed until February 22, 2019, more than a year later, those claims are time-barred under the one-year statute of limitations for Section 11 claims.

Finally, apart from the TAC's own allegations, extensive other disclosures and news reports provided additional information about PG&E's wildfire risks and safety deficiencies related to the North Bay Fires well over one year before Plaintiffs asserted these claims:

- **October 19, 2017**: The media reported that "Cal Fire investigators are likely examining whether inadequate maintenance of poles or inadequate trimming of vegetation caused the utility's electric lines to fall and spark during high winds, igniting some of the fires. Last year[,] Cal Fire . . . found PG&E responsible for the 70,000-acre Butte Fire in 2015."[13]

- **October 30, 2017**: The media reported that a consultant's "exhaustive review of PG&E's overall safety performance" concluded it did not "add up to a consistent, robust, and accountable corporate-wide safety program" and "[f]e]ll short of . . . the expectations of the Commission, community leaders, and ratepayers."[14]

- **November 9, 2017**: The media reported "Utility giant PG&E is facing new scrutiny of its vegetation management program after reports that several downed power lines, some of which might have been affected by trees falling on them, may have sparked some of last month's deadly . . . wildfires . . . . Whether those lines were brought down by poorly maintained trees, which would have been eliminated or pruned under PG&E's vegetation program, is now being questioned by regulators, victim's attorneys and the media."[15]

- **November 27, 2017**: PG&E disclosed that 32 lawsuits had been filed blaming the North Bay Fires on PG&E's alleged safety violations. Ex. 9 (November 27, 2017 8-K) at 2-11. PG&E warned the market that it faced over **$3 billion** in potential liability for the North Bay Fires, which could threaten PG&E's sources of financing and its liquidity. Two of the lawsuits were derivative actions against the Director Defendants alleging that the North Bay Fires were "caused by: (i) the defendants' improper and negligent operation of the Company's power lines and related equipment; (ii) the failure of equipment . . . that w[as] operated . . . by the defendants or the Company (under the defendants' direction and on their watch); and/or (iii) the defendants' utter failure to maintain vegetation with prescribed California law and regulations." Ex. 18 (*Lentine v. Williams* Complaint) at 1; *see also* Ex. 19 (*Firemen's Ret. Sys. of St. Louis v. Williams* Complaint)

---

[13] Ex. 15 (Oct. 19, 2017 Sacramento Bee Article).

[14] Ex. 16 (Oct. 30, 2017 Lake County Record-Bee Article).

[15] Ex. 17 (Nov. 9, 2017 San Francisco Business Times Article).

Furthermore, more than a year before this action was filed against the Directors and Officers, PG&E itself disclosed its potential liability for the catastrophic North Bay Fires in its 2017 10-K filed on February 9, 2018.[16]  The 2017 10-K identified "[t]he Impact of the North[ Bay] Wildfires" as the first "Key Factor[] Affecting Financial Results" and the first Risk Factor. Ex. 10 (2017 10-K) at 55. It further contained detailed disclosures about PG&E's North Bay Fire exposure, including that:

- "The fires are being investigated by Cal Fire and the CPUC, including the possible role of the Utility's power lines and other facilities . . . maintenance of facilities, vegetation management, and emergency preparedness and response." Ex. 10 (2017 10-K) at 27, 50.

- "[I]t is reasonably possible that facts could emerge through the course of the various investigations that lead PG&E . . . to believe that a loss is probable . . . the amount of which could be substantial." *Id.* at 28, 136.

- "As of January 31, 2018, the Utility had submitted 22 electric incident reports to the CPUC . . . where Cal Fire has identified a site as potentially involving the Utility's facilities in its investigation." *Id.* at 27, 135.

- "[O]n February 3, 2018, it was reported that investigators with the Santa Rosa Fire Department had completed their investigation . . . and had concluded that the Utility's facilities . . . contributed to those fires." *Id.*

- "PG&E [is] the subject of a still increasing number of lawsuits . . . [over] alleged failure to maintain and repair their distribution and transmission lines and failure to properly maintain the vegetation surrounding such lines were the causes of the fires." *Id.* at 28.

- "If the Utility were to be found liable . . . ***liability could be higher than*** . . . ***approximately $10 billion***." *Id.* (emphasis added).

These public disclosures, exhaustive news coverage, and the multitude of lawsuits filed against PG&E would have enabled any reasonably diligent investor to bring Plaintiffs' claims by February 22, 2018, one year before this case was filed. *See, e.g.*, *Magnachip Semiconductor Corp.*, 167 F. Supp. 3d at 1054 (concluding "that the combination of" the company's announcement, a complaint, and "other coverage" "would have put a reasonably diligent investor on notice of

---

[16] The bankruptcy court did not consider PG&E's 2017 10-K in evaluating PG&E's statute of limitations defense, but only the "facts alleged in 2017 . . . one year before the [January 2019] petition date." *In re PG&E Corp.* at 15.

31

potential Securities Act claims"); *In re Countrywide Fin. Corp. Mortg.-Backed Sec. Litig.*, 2013 WL 12314509, at *1–2 (C.D. Cal. June 6, 2013) (dismissing claims where "numerous media sources" disclosed company's misrepresentations over a year before action was filed); *LC Capital Partners, LP v. Frontier Ins. Grp.*, 318 F.3d 148, 156 (2d Cir. 2003) (noting "a vast number of cases" where Securities Act claims are dismissed on limitations grounds at the pleadings stage).

Even if investors' Securities Act claims asserted against PG&E in its bankruptcy could "relate back" to the earlier Exchange Act complaints initially filed against PG&E in 2018, the untimely claims against the Directors and Underwriters cannot for several reasons. *First*, a complaint naming new defendants—such as the Directors and Underwriters here—relates back to an earlier complaint only if the new defendants "knew or should have known that the action would have been brought against [them], but for a mistake concerning the proper party's identity." Fed. R. Civ. P. 15(c)(1)(C)(ii). But neither the Directors nor the Underwriters were omitted from the Exchange Act complaints by "mistake"; instead, the omission was due to a strategic choice about which claims to bring and whom to sue. The identities of the Directors and Underwriters and their respective roles were well known. Any of the Exchange Act plaintiffs easily could have named them in one of their complaints, and PERA—a purchaser of notes issued in the March 2017 Offering (Dkt. No. 121-1)—had standing to bring at least some of the Securities Act claims, but decided not to do so, which is fatal to any "relation back" argument Plaintiffs may advance. Courts routinely hold that a decision to exclude a known defendant is not a "mistake" contemplated by Rule 15(c). *See, e.g.*, *Louisiana-Pacific Corp. v. ASARCO, Inc.*, 5 F.3d 431, 434-35 (9th Cir. 1993) (affirming denial of relation back where "[t]here was no mistake of identity, but rather a conscious choice of whom to sue"); *Felarca v. Birgeneau*, 2014 WL 7140262, at *6 (N.D. Cal. Dec. 12, 2014) (denying relation back where "plaintiffs chose not to name [certain defendants], presumably for some strategic reason rather than a lack of knowledge").

*Second*, the Directors and Underwriters did not receive notice of the Securities Act claims "within the period provided by Rule 4(m) for serving the summons and complaint." Fed. R. Civ. P. 15(c)(1)(C). The Rule 4(m) period is 90 days, but the Securities Act claims at issue here were first

1    asserted more than 90 days after the filing of both the original Complaint and amended complaint.

2    *Finally*, there is no "identity of interests between the original and newly proposed plaintiff."

3    *In re Syntex Corp. Sec. Litig.*, 95 F.3d 922, 935 (9th Cir. 1996). The initial plaintiff, Weston, only

4    owned common stock and could not sue on any of the Offerings. *See Magnachip*, 167 F. Supp. 3d

5    at 1054 ("no identity of interests because the later complaint . . . was based on a different securities

6    transaction and different disclosures"). And while PERA owns notes issued in the March 2017

7    Offering, it chose not to assert the claims alleged here. *Cf., e.g.*, *Willner v. Manpower Inc.*, 2014

8    WL 2939732, at *5 (N.D. Cal. June 30, 2014) (identity of interests "is not present when the focus

9    of the litigation changed distinctly upon the amendment of the complaint") (quotation omitted).

10   **IV.    PLAINTIFFS' CLAIMS BASED ON THE 2018 EXCHANGE OFFER FAIL AS A
11          MATTER OF LAW BECAUSE SECTION 11 DOES NOT APPLY TO PRIVATE
             OFFERINGS[17]**

12         Plaintiffs' claims based on privately purchased notes that were exchanged for public notes

13   in the April 2018 Exchange Offer are the only ones that are not time-barred. But these claims also

14   fail as a matter of law because the Exchange Offer was not an independent offering of PG&E notes,

15   and the law is clear that "plaintiffs who received their registered bonds through an exchange of

16   unregistered bonds acquired in the preceding Rule 144A offerings" cannot pursue Section 11

17   claims. *In re Levi Strauss & Co. Sec. Litig.*, 527 F. Supp. 2d 965, 975 (N.D. Cal. 2007) (dismissing

18   Section 11 claims brought by purchasers of private notes who had exchanged in a so-called "Exxon

19   Capital exchange" of identical private for public notes); *see also In re Refco, Inc. Sec. Litig.*, 503 F.

20   Supp. 2d 611, 636-37 (S.D.N.Y. 2007).[18]

21

22   _____

23   [17] No claims based on the 2018 Exchange have been asserted against the Underwriter Defendants.

24   [18] There can be no legitimate question that the 2018 Exchange Offering was an "Exxon Capital

25   exchange" akin to the offerings in *Levi Strauss* and *Refco*. The Offering Documents make clear that

26   (i) "the Exchange Offer [is made] in reliance on the position of the SEC as described in previous

27   no-action letters issued to third parties, including in Exxon Capital Holdings Corporation (April 13,

28   1988)", and (ii) was intended to "exchange equal principal amounts of . . . Exchange Notes [for]
     (….continued)

1      Courts have routinely held that "Section 11 liability, which applies to misstatements or

2  omissions in registration statements, *is not available* for [notes purchased in private] offerings."

3  *Levi Strauss*, 527 F. Supp. 2d at 975 (emphasis added). And where, as here, "the unregistered

4  bondholders had already invested in [unregistered] bonds through the [private] offerings, they were

5  not presented with the decision of whether or not to purchase [registered] bonds pursuant to the

6  registration statement." *Id*. at 978. In other words, the Exchange Offer does not give rise to Section

7  11 liability for privately purchased notes that are merely exchanged pursuant to the Exxon Capital

8  exchange registration statement.

9      Plaintiffs previously argued that Plaintiff City of Warren's May 1, 2018 *private* notes

10  purchase and subsequent Exxon Capital exchange should be treated differently because the 2018

11  Exchange Offer's registration statement had already been filed with the SEC. *See In re PG&E*

12  *Corp.*, No. 19-30088-DM, at 3-8, 50-51 (Bankr. N.D. Cal. Sept. 18, 2024), ECF No. 14342. They,

13  however, mistakenly relied on *Hildes v. Arthur Andersen LLP*, 734 F.3d 854 (9th Cir. 2013), where

14  the court found plaintiff had adequately pled he would not have exchanged his shares of an

15  acquired company for the buying company's shares in a merger absent the alleged misstatements.

16  *See id*. at 861. The situation here is markedly different, because an Exxon Capital exchange is one

17  of materially identical notes and squarely falls within *Levi Strauss*. Moreover, multiple recent cases

18  have rejected the notion that securities not acquired pursuant to a registration statement can give

19  rise to a Section 11 claim. *See e.g. Slack Techs.*, 598 U.S. at 770 (Section 11 "requires a plaintiff to

20  plead and prove that he purchased shares traceable to the allegedly defective registration

21  statement"); *In re CarLotz, Inc. Sec. Litig.*, 667 F. Supp. 3d 71, 80-81 (S.D.N.Y. 2023) ("To

22  establish standing under § 11 at the motion-to-dismiss stage . . . Plaintiffs need [to] assert that they

23  purchased shares issued pursuant to, or traceable to the public offerings.") (citation omitted).

24  **V.     PLAINTIFFS FAIL TO STATE A SECTION 15 CLAIM**

25      Because Plaintiffs have failed to plead an underlying Section 11 violation, their Section 15

26  _____

27  Restricted Notes," which "are *identical in all material respects* to those of the outstanding

28  Restricted Notes. . . ." Ex. 11 (Apr. 13, 2018 Prospectus) at 21, 6 (emphasis added).

34

claim necessarily fails. *See, e.g.*, *Primo v. Pac. Biosciences of Cal., Inc.*, 940 F. Supp. 2d 1105, 1130-31 (N.D. Cal. 2013) (dismissing Section 15 claims). Moreover, Plaintiffs have not pled facts demonstrating that any of the Individual Defendants exercised a "significant degree of day to day operational control" over PG&E. *Bare Escentuals*, 745 F. Supp. 2d at 1052. Plaintiffs' Section 15 claim must therefore be dismissed.[19]

<u>**CONCLUSION**</u>

For all of the reasons set forth above, the Director and Underwriter Defendants respectfully request that the Court dismiss the Securities Act claims with prejudice.

Date: October 24, 2024                    Respectfully submitted,

                                          SIMPSON THACHER & BARTLETT LLP


                                          */s/ Stephe P. Blake*
                                          Stephen P. Blake (SBN 260069)
                                          2475 Hanover Street
                                          Palo Alto, CA 94304
                                          Telephone: (650) 251-5000
                                          Facsimile: (650) 251-5002
                                          Email: sblake@stblaw.com

                                          Jonathan K. Youngwood (SBN 350373)
                                          Nicholas S. Goldin (*pro hac vice*)

---

[19] It is also axiomatic that Directors who neither signed certain registration statements nor were directors at the time they became effective are not liable under Sections 11 or 15. *Batwin v. Occam Networks, Inc.*, 2008 WL 2676364, at *20 (C.D. Cal. July 1, 2008) ("[B]y its clear language, Section 11 limits liability to signatory issuers, officers and directors, underwriters. . . ."). Similarly, underwriters are not liable for offerings they did not underwrite. Accordingly, multiple claims against multiple defendants must be dismissed on that basis alone. *See* [Proposed] Order Granting Director and Underwriter Defendants' Renewed Motion to Dismiss (explaining claims against the following defendants must be dismissed: Director Defendant Mullins (who joined the Board after the March 2016 Notes Offering); Herringer and Williams (who left the Board prior to the Exchange Offering); and specific underwriters for offerings that they did not underwrite).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

425 Lexington Avenue
New York, NY 10017
Telephone: (212) 455-2000
Facsimile: (212) 455-2502
Email: jyoungwood@stblaw.com
          ngoldin@stblaw.com

*Attorneys for Director Defendants Barbara L.*
*Rambo, Lewis Chew, Fred J. Fowler, Richard C.*
*Kelly, Roger H. Kimmel, Richard A. Meserve,*
*Forrest E. Miller, Maryellen C. Herringer, Barry*
*Lawson Williams, Rosendo G. Parra, Anne Shen*
*Smith and Eric D. Mullins*


DAVIS POLK & WARDWELL LLP


*/s/ Neal A. Potischman*
Neal A. Potischman (SBN 254862)
1600 El Camino Real
Menlo Park, California 94025
Telephone: (650) 752-2000
Facsimile: (650) 752-2111
Email:      neal.potischman@davispolk.com

Charles S. Duggan (admitted *pro hac vice*)
Dana M. Seshens (admitted *pro hac vice*)
Craig T. Cagney (admitted *pro hac vice*)
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800
Email: charles.duggan@davispolk.com
          dana.seshens@davispolk.com
          craig.cagney@davispolk.com

*Attorneys for Underwriter Defendants Barclays*
*Capital Inc., BNP Paribas Securities Corp.,*
*Morgan Stanley & Co. LLC, MUFG Securities*
*Americas, Inc., The Williams Capital Group, L.P.,*
*Citigroup Global Markets Inc., J.P Morgan*
*Securities LLC, Merrill Lynch, Pierce, Fenner &*
*Smith Incorporated (n/k/a BofA Securities, Inc.),*
*Mizuho Securities USA LLC, Goldman, Sachs &*
*Co., LLC, RBC Capital Markets, LLC, Wells*
*Fargo Securities, LLC, BNY Mellon Capital*
*Markets, LLC, TD Securities (USA) LLC, C.L.*
*King & Associates, Inc., Great Pacific Securities,*
*CIBC World Markets Corp., SMBC Nikko*
*Securities America, Inc., U.S. Bancorp*
*Investments, Inc., Mischler Financial Group, Inc.,*
*Blaylock Van, LLC, Samuel A. Ramirez &*
*Company, Inc., and MFR Securities, Inc. (but not*

36

1

*Lebenthal & Co. LLC, which has not appeared in this action)*

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28