1
2
3
4

UNITED STATES DISTRICT COURT

5

NORTHERN DISTRICT OF CALIFORNIA

6

SAN JOSE DIVISION

7
8

IN RE PG&E CORPORATION
SECURITIES LITIGATION

Case No.   5:18-cv-03509-EJD

9

**ORDER REGARDING RENEWED
MOTIONS TO DISMISS**

10
11

Re: ECF Nos. 284, 286

12
13

  This consolidated putative class action brings claims under the Securities Exchange Act of

14

1934 ("Exchange Act") and the Securities Act of 1933 ("Securities Act").  Lead plaintiff, the

15

Public Employees Retirement Association of New Mexico ("PERA" or "Plaintiff") asserts these

16

claims against PG&E Corporation ("the Company"), its subsidiary Pacific Gas and Electric

17

Company (the "Utility," and together with the Company, "PG&E"),[1] the Officer Defendants,[2] the

18

Director Defendants,[3] and the Underwriter Defendants.[4]  *See* Third Am. Consolidated Compl.

19

---

20

[1] Plaintiffs originally named the Company and the Utility as defendants, but as explained further,
*infra* Section I.B, neither of those parties are currently defendants in this action.

21

[2] Anthony F. Earley, Jr., Geisha J. Williams, Nickolas Stavropoulos, Julie M. Kane, Christopher P.
Johns, Patrick M. Hogan, David S. Thomason, and Dinyar B. Mistry.

22

[3] Barbara L. Rambo, Lewis Chew, Fred J. Fowler, Richard C. Kelly, Roger H. Kimmel, Richard
A. Meserve, Forrest E. Miller, Maryellen C. Herringer, Barry Lawson Williams, Rosendo G.

23

Parra, Anne Shen Smith, and Eric D. Mullins.

24

[4] Barclays Capital Inc., BNP Paribas Securities Corp., Morgan Stanley & Co. LLC, MUFG
Securities Americas, Inc., The Williams Capital Group, L.P. (n/k/a Siebert Williams Shank & Co.,
LLC), Citigroup Global Markets Inc., J.P Morgan Securities LLC, Merrill Lynch, Pierce, Fenner

25

& Smith Incorporated (n/k/a BofA Securities, Inc.), Mizuho Securities USA LLC, Goldman,
Sachs & Co., LLC, RBC Capital Markets, LLC, Wells Fargo Securities, LLC, BNY Mellon

26

Capital Markets, LLC, TD Securities (USA) LLC, C.L. King & Associates, Inc., Great Pacific
Securities, CIBC World Markets Corp., SMBC Nikko Securities America, Inc., U.S. Bancorp

27

Investments, Inc., Mischler Financial Group, Inc., Blaylock Van, LLC, Samuel A. Ramirez &
Company, Inc., and MFR Securities, Inc.

28

United States District Court
Northern District of California

("TAC"), ECF No. 121.  Plaintiff brings this action individually and on behalf of those who purchased or otherwise acquired publicly traded PG&E securities from April 29, 2015 through November 15, 2018 (the "Class Period").  *Id.* ¶¶ 11, 463.

Plaintiff alleges that six of the Officer Defendants made nineteen false statements concerning the Utility's wildfire safety practices in violation of §§ 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder.  Plaintiff avers that when the market discovered the alleged falsity of these statements, PG&E's stock price declined, causing investors to suffer financial losses.

Additionally, named plaintiff New York County, on behalf of the County of York Retirement Fund, City of Warren Police and Retirement System and Mid-Jersey Trucking Industry & Local No. 701 Pension Fund (collectively, the "Securities Act Plaintiffs," and together with PERA, "Plaintiffs") allege violations of §§ 11 and 15 of the Securities Act by the Director Defendants[5] and Underwriter Defendants[6] (collectively, the "Securities Act Defendants").  The Securities Act Plaintiffs claim that offering documents to certain PG&E note offerings materially misled investors, and the revelation of allegedly concealed risks caused investors financial damage.  The Securities Act Plaintiffs bring their claims individually and on behalf of those who acquired PG&E senior notes in or traceable to the Company's offerings during the Class Period.  *Id.* ¶ 496.

Two separate but related motions are now before the Court.  The first is the Officer Defendants' motion to dismiss the TAC as to them, which is focused on Plaintiffs' Exchange Act

---

[5] Barbara L. Rambo, Lewis Chew, Fred J. Fowler, Richard C. Kelly, Roger H. Kimmel, Richard A. Meserve, Forrest E. Miller, Maryellen C. Herringer, Barry Lawson Williams, Rosendo G. Parra, Anne Shen Smith, and Eric D. Mullins.

[6] Barclays Capital Inc., BNP Paribas Securities Corp., Morgan Stanley & Co. LLC, MUFG Securities Americas, Inc., The Williams Capital Group, L.P. (n/k/a Siebert Williams Shank & Co., LLC), Citigroup Global Markets Inc., J.P Morgan Securities LLC, Merrill Lynch, Pierce, Fenner & Smith Incorporated (n/k/a BofA Securities, Inc.), Mizuho Securities USA LLC, Goldman, Sachs & Co., LLC, RBC Capital Markets, LLC, Wells Fargo Securities, LLC, BNY Mellon Capital Markets, LLC, TD Securities (USA) LLC, C.L. King & Associates, Inc., Great Pacific Securities, CIBC World Markets Corp., SMBC Nikko Securities America, Inc., U.S. Bancorp Investments, Inc., Mischler Financial Group, Inc., Blaylock Van, LLC, Samuel A. Ramirez & Company, Inc., and MFR Securities, Inc.

Case No.: 18-cv-03509-EJD
ORDER REGARDING MOTIONS TO DISMISS
2

United States District Court
Northern District of California

1   claims. ECF No. 284. The second is the Director Defendants and Underwriter Defendants'

2   motion to dismiss focused on the Securities Act claims asserted against them. ECF No. 286. For

3   the reasons that follow, the Court **GRANTS** both motions and dismisses the TAC with leave to

4   amend.

**BACKGROUND**

6   A.      **Factual Background**

7            1.      **Regulatory Landscape**

8            The Utility is a wholly owned subsidiary of the Company and operates as a public utility,

9   providing electricity and natural gas to its customers in California. TAC ¶ 43. Unsurprisingly, the

10  Utility's electrical operations are subject to a robust regulatory scheme comprised of federal, state,

11  and local statutes, regulations, and rules. *Id.* ¶¶ 53–70. California specifically has laws and

12  regulations, including vegetation management guidelines promulgated by the California Public

13  Utilities Commission ("CPUC"), that require the Utility to keep electrical equipment clear from

14  vegetation growth or hazardous trees in order to prevent wildfires. *Id.* California Public

15  Resources Code Section 4293, for example, requires utilities to maintain a certain amount of

16  clearance between vegetation and electrical lines. *Id.* ¶ 56–57. California laws and regulations

17  also require the Utility to safely maintain its electrical equipment and infrastructure, including the

18  towers and poles that carry its transmission and distribution lines, to prevent wildfires caused by

19  their failure. *Id.* ¶¶ 58–61.

20           Through regulatory proceedings known as General Rate Cases ("GRCs"), the CPUC

21  determines the costs that the Utility can charge its customers for operating and maintaining its

22  system. *Id.* ¶¶ 62, 78–79. In other words, the GRCs determine which costs PG&E may pass on to

23  rate-payers, and which costs PG&E itself must bear. *Id.* The Utility's vegetation management

24  spending pursuant to these GRCs is administered through Vegetation Management Balancing

25  Accounts ("VMBAs"). *See id.* ¶¶ 79, 259, 265. In times of emergency, the Utility can

26  retroactively recover spending beyond VMBA spending through a Catastrophic Events

27  Memorandum Account ("CEMA"). *See* Cal. Pub. Util. Code § 454.9(a).

28  Case No.: 18-cv-03509-EJD
    ORDER REGARDING MOTIONS TO DISMISS

United States District Court
Northern District of California

1    Additionally, California law applies the doctrine of inverse condemnation, which holds

2    public utilities, like the Utility, strictly liable for damage to real property caused by wildfires.

3    TAC ¶¶ 73–74.  The Utility can recover those costs from the CPUC if it can prove it that it was

4    "reasonable and prudent," meaning that its practices, methods, and acts "follow[ed] the exercise of

5    reasonable judgment in light of facts known or which should have been known at the time the

6    decision was made."  *Id.*

7    ## 2.    2015-2018 California Wildfires

8    In January 2014, California declared a state of emergency due to drought.  *Id.* ¶ 77.

9    Following that declaration, the CPUC ordered the Utility to manage vegetation around its power

10   lines in order to mitigate the wildfire risk created by the drought.  *Id.*  That risk was realized in

11   September 2015 when the Butte Fire burned nearly 71,000 acres, destroyed more than 921

12   buildings, and caused two deaths.  *Id.* ¶¶ 100–02.  At the time, the Butte Fire was the seventh most

13   destructive wildfire in California history.  *Id.* ¶ 21.  In April 2016, Cal Fire, the state agency

14   authorized to make cause and origin determinations for wildfires within its jurisdiction, issued a

15   press release concluding that the Butte Fire was caused by PG&E's safety violations.  *Id.* ¶¶ 72,

16   101.

17   Plaintiffs allege that, by this time, PG&E had begun to make materially false and

18   misleading representations to its investors regarding its level of compliance with relevant

19   California and federal law.  *Id.* ¶¶ 17–19.   Specifically, PG&E repeatedly stated that its vegetation

20   management program complied with all relevant wildfire safety regulations.  According to

21   Plaintiffs, these statements misrepresented the extent to which shareholders would be exposed to

22   liability for damages caused by wildfires and the costs PG&E would incur to remediate its

23   inadequate wildfire safety practices.  *Id.*

24   In October 2017, many separate wildfires (the "North Bay Fires") ignited across nine

25   counties in the North Bay region of California.  *Id.* ¶¶ 19, 23.  These fires burned around 249,000

26   acres, destroyed almost 8,898 buildings, and killed 44 people, resulting in an estimated $17 billion

27   in damages.  *Id.* ¶¶ 19, 32.  The following year, Cal Fire determined that eleven of the fires were

28   

United States District Court
Northern District of California

caused by the Utility's violations of California safety regulations.  *Id.* ¶ 20.  Specifically, Cal Fire found that the Utility had failed to clear vegetation or maintain the integrity of its poles, leading to heightened risk of wildfires.  *Id.* ¶¶ 111–12.  After news of PG&E's responsibility for the North Bay Fires broke, PG&E faced a twofold crisis: (1) the public believed that the Utility had failed to properly maintain its power lines and prevent wildfires, causing share prices to decline, and (2) the Utility's liabilities for the North Bay Fires threatened to bankrupt the Company.  *Id.* ¶ 24.  To address these concerns, PG&E responded to Cal Fire's announcement by reassuring the public that it met applicable vegetation management standards and had taken steps prevent further wildfires. *Id.* ¶¶ 25, 30.

In July 2018, the CPUC issued resolution ESRB-8, which required the Utility to prepare a protocol for de-energizing powerlines during conditions presenting extreme fire danger.  *Id.* ¶¶ 26, 66–67, 141–43.  The Utility responded by announcing the formalization of its program (the "ESRB-8 Shutoff Protocol"), which stated that the Utility would balance seven criteria when determining whether to de-energize powerlines.  *Id.*

Unfortunately, the story does not end there.  Three months after PG&E had formalized its ESRB-8 Shutoff Protocol, a fire ignited in Butte County (the "Camp Fire"), burning more than 153,000 acres, destroying more than 18,804 buildings, and leading to the death of 85 people.  *Id.* ¶¶ 33, 325.  The Camp Fire was and remains the single most destructive and deadliest wildfire in California history, resulting in estimated damages up to $13 billion.  *Id.* ¶ 33.  Upon investigation, Cal Fire determined that the Camp Fire had two ignition points.  The initial fire began when part of PG&E's electrical tower carrying the high-voltage Caribou-Palermo transmission line broke and fell to the ground, igniting the vegetation underneath.  *Id.* ¶¶ 34, 113–20, 138.  Plaintiffs allege that this ignition event was the result of the Utility's failure to deenergize the Caribou-Palermo line in violation of its own ESRB-8 Shutoff Protocol.  *Id.* ¶¶ 36–37, 141–76.  A separate, second fire, which ignited when a nearby PG&E power line failed, eventually merged into the first fire. *Id.* ¶¶ 34, 121–24.

Case No.: 18-cv-03509-EJD
ORDER REGARDING MOTIONS TO DISMISS
5

### 3.    PG&E's Alleged Misrepresentations

Plaintiffs allege that, throughout the Class Period and during the events described above, PG&E made material misrepresentations regarding their wildfire prevention efforts.  PG&E reported that it had "doubled" vegetation management expenditures in 2016 (*id.* ¶¶ 81) and touted that it had trimmed and removed more than a million trees each year (*id.* ¶¶ 83–85).  Furthermore, PG&E represented to the public that it would prioritize disabling reclosers[7] in high wildfire risk areas but did not do so.  *Id.* ¶¶ 86–92.

According to Plaintiffs, the 2015 Butte Fire, 2017 North Bay Fires, and 2018 Camp Fire were not isolated incidents.  They were merely three examples from a longer pattern of PG&E's knowing failure to comply with legal requirements for vegetation management, pole maintenance, and other safety measures.  *Id.* ¶¶ 93–110.  Further, Plaintiffs allege that PG&E failed to make any meaningful changes to its wildfire safety practices even after these the wildfires, despite publicly assuring investors that it was doing so.  *Id.* ¶¶ 125–40.

Further developments after the events of the Class Period add more context.  In November 2018, the U.S. District Court presiding over PG&E's criminal probation related to the 2010 San Bruno gas explosion instituted further proceedings to determine whether PG&E's involvement in causing the North Bay and Camp Fires violated its probation.  *Id.* ¶ 177.  And in January 2019, PG&E declared Chapter 11 bankruptcy.  *Id.* ¶ 179.  PG&E stated that it faced $51.7 billion in liabilities, $30 billion of which were tied to the North Bay and Camp Fires.  *Id.*

### B.    Procedural Background

In June 2018, Plaintiffs filed complaints asserting Exchange Act claims against PG&E and the Officer Defendants in two separate actions.  ECF No. 1;[8] *Moretti v. PG&E Corporation et al*, Case No. 5:18-cv-03545-EJD (N.D. Cal.).  The Court consolidated these actions and appointed PERA as lead plaintiff.  ECF No. 62.  In November and December 2018, Plaintiffs filed a

---

[7] "Reclosers" are devices that are affixed to power line poles and used to send pulses of electricity into lines during outages to prevent blackouts.  TAC ¶ 86.  Plaintiffs allege that it is well known in the industry that reclosers pose a high wildfire risk and that PG&E was specifically warned of this hazard.  *Id.* ¶¶ 86–88.

[8] Record citations refer to the above-captioned action unless otherwise noted.

Case No.: 18-cv-03509-EJD
ORDER REGARDING MOTIONS TO DISMISS

United States District Court
Northern District of California

consolidated class action complaint and second amended consolidated class action complaint asserting their Exchange Act claims. ECF Nos. 83, 95. On January 29, 2019, PG&E commenced voluntary Chapter 11 bankruptcy proceedings in the United States Bankruptcy Court for the Northern District of California, which are being jointly administered as Case Nos. 19-30088 and 19-30089. ECF No. 103. These proceedings triggered an automatic stay of this action as to PG&E pursuant to Section 362(a) of the Bankruptcy Code, leaving this action to proceed against the Officer Defendants. *Id.*

On February 22, 2019, the Securities Act Plaintiffs filed a separate putative class action asserting Securities Act claims against the Director Defendants and Underwriter Defendants. *York County on Behalf of the County of York Retirement Fund et al v. Rambo et al*, Case No. 5:19-cv-00994 (N.D. Cal.). The Court consolidated that case with the earlier-filed Exchange Act action. ECF No. 116. On May 28, 2019, Plaintiffs consolidated all claims in the TAC, which is the operative complaint here. ECF No. 121. The Officer Defendants, Director Defendants, and Underwriter Defendants filed two separate motions to dismiss the TAC. ECF No. 148, 155.

In September 2022, the Court stayed this action as to all Defendants after finding significant overlap between the Chapter 11 bankruptcy proceedings and the instant securities fraud action. ECF No. 217. After the Ninth Circuit vacated and remanded the Court's stay order (ECF No. 256), the Court lifted the stay and ordered briefing regarding the renewed motions to dismiss now before the Court.

### C.    Exchange Act Challenged Statements

Plaintiffs challenge the below statements, which are organized chronologically, in their Exchange Act claims. The numbering of the statements mirrors that in the TAC. The portions of the statements alleged to be false or misleading are bolded and italicized as they appear in the TAC.

**April 29, 2015 – Q1 2015 PG&E Conference Call**

Statement 1: As California enters its fourth year of drought, we're working hard to help the state meet this challenge by reducing water usage at our own facilities, encouraging customers to

Case No.: 18-cv-03509-EJD
ORDER REGARDING MOTIONS TO DISMISS

United States District Court
Northern District of California

conserve by offering rebates for more efficient washers and agricultural pumps. ***We're stepping up our vegetation management activities to mitigate wildfire risk*** and improve access for firefighters.  ¶ 194.

**October 26, 2015 – 2015 PG&E Corporate Responsibility and Sustainability Report**

Statement 2: ***Each year, PG&E's Vegetation Management department***, in consultation with utility arborists and foresters, ***inspects every mile of power line in our service area for public safety*** and electric reliability. ***We do so in compliance with relevant laws*** and with a focus on public involvement, including extensive "Right Tree, Right Place" outreach.  ¶ 197.

**November 18, 2015 – Hogan Testimony Before California Senate Energy, Utilities and Communication Subcommittee on Gas and Electric Infrastructure Safety**

Statement 3: So as I mentioned earlier, our SCADA capabilities where we are able to ***take our reclosers out of service remotely***, we first ***focus on the wildfire areas*** and then we have about 130 some odd locations, we are going to complete about 126 of those this year, ***just about done with that*** six for next year, which will be completed.  ¶ 208.

**October 6, 2016 – 2016 PG&E Corporate Responsibility and Sustainability Report**

Statement 4: ***Each year,*** PG&E's Vegetation Management department and its contracting arborists and foresters ***inspect miles of power lines in our service area for public safety and electric reliability. We do so in compliance with relevant laws*** and with a focus on public involvement, including extensive "Right Tree, Right Place" outreach.  ¶ 211.

**August 9, 2017 – 2017 PG&E Corporate Responsibility and Sustainability Report**

Statement 5: ***PG&E prunes and removes trees growing too close to power lines*** while maintaining as much vegetation as possible to balance land use and environmental stewardship with customer needs. Through a well-established and innovative vegetation management program, ***PG&E balances the need to maintain a vast system of trees growing along power lines while complying with state and federal regulations and delivering safe***, reliable and affordable ***electric service***.  ¶ 222.

**May 23, 2016 – PG&E Press Release Regarding Raising Common Stock Dividend**

Statement 6: PG&E Corporation (NYSE: PCG) today announced that it is raising its quarterly common stock dividend to 49 cents per share, an increase of 3.5 cents per share, beginning with dividends for the second quarter of 2016. The increase, which is the company's first in six years, is a meaningful step toward gradually returning the company's dividend payout to levels that are comparable with those of similar utilities. ***Earley and other senior executives also discussed continued progress on safety***, reliability and other goals, as well as PG&E's strategy for the future [at the annual shareholder meeting].  Earley said, '***We've continued to demonstrate leadership and commitment on safety.*** We're delivering the most reliable service in our company's history. ¶ 233.

### November 4, 2016 – PG&E Conference Call Regarding Q3 2016

Statement 7: ***The improvements we have made in safety*** and reliability ***over the last six years have put us in a position to deliver strong financial results going forward.*** Earlier this year, we announced our first dividend increase in six years, and we have committed to achieving a roughly 60% payout ratio by 2019. Combined with our expected rate based growth, we are confident we can deliver a strong overall return for our shareholders.  ¶ 237.

### May 31, 2017 – PG&E Press Release Regarding Raising Common Stock Dividend

Statement 8: PG&E Corporation (NYSE: PCG) today announced that it is raising its quarterly common stock dividend by 4 cents per share to 53 cents per share, beginning with the dividend for the second quarter of 2017. On an annual basis, this action increases PG&E Corporation's dividend by 8 percent, from $1.96 per share to $2.12 per share. Yesterday, in remarks at the joint annual shareholders meeting of PG&E Corporation and Pacific Gas and Electric Company, [CEO] Williams highlighted the companies' ***progress on safety, reliability*** and reducing greenhouse gas emissions, among other accomplishments. ***She reaffirmed PG&E's commitment to safety and operational excellence***, delivering for customers and leading the way to achieve California's clean energy goals.  ¶ 241.

### October 31, 2017 – PG&E Press Release Regarding Vegetation Management Efforts

Statement 9: ***PG&E follows all applicable federal and state vegetation clearance requirements***

Case No.: 18-cv-03509-EJD
ORDER REGARDING MOTIONS TO DISMISS

United States District Court
Northern District of California

1    *and performs regular power line tree safety activities in accordance with industry standards,*

2    *guidelines, and acceptable procedures that help to reduce outages or fires caused by trees or*

3    *other vegetation*.  ¶ 249.

4    **November 2, 2017 – Conference Call Regarding Q3 2017**

5    Statement 10: I know there's a lot of interest in our pole maintenance and vegetation management

6    programs, so let me address these as well. First, we routinely inspect, maintain and replace our

7    electric poles. This includes annual scheduled patrols, 5-year visual inspections, an intrusive

8    testing and treating on our wood poles on a frequency that significantly exceeds CPUC

9    requirements. *We also have one of, if not, the most comprehensive vegetation management*

10   *programs in the country.* Our vegetation management program manages about 123 million trees

11   across the service territory. *And every year, we inspect every segment of the 99,000 miles of*

12   *overhead line and we clear vegetation as needed.* This is well beyond what is typical in our

13   industry where most utilities have a 3-year vegetation management cycle or sometimes longer.

14   Typically, we spend about $200 million every year to line clear or remove 1.3 million trees to

15   mitigate both the risk of wildfires and to prevent electric outages. With the drought and the tree

16   mortality crisis we've experienced in California, we have been expanding our vegetation

17   management work since 2014. *In 2016, we spent an additional $200 million, essentially doubling*

18   *our typical vegetation management spending last year*. We've removed an incremental 236,000

19   dead or dying trees, and we enhanced our tree maintenance work with additional patrols in areas

20   of high fire danger, including a combination of boots on the ground, aerial patrols, and

21   sophisticated LiDAR technology.  ¶ 258.

22   **November 2, 2017 – Stavropoulos Reply at Conference Call Regarding Q3 2017**

23   Statement 11: [ANALYST:] And then, I guess, *can you discuss your vegetation*

24   *practices for trees that are located near power lines?* I guess we've seen sort of end reports that

25   have come out for some of your peers that they sort of track vegetation that's within certain

26   distances from the lines, and they basically make their decisions on what to do based on sort of

27   updates.

28   Case No.: 18-cv-03509-EJD
ORDER REGARDING MOTIONS TO DISMISS

United States District Court
Northern District of California

[Stavropoulos:] Thank you for the question. So as Geisha mentioned, we have a very aggressive vegetation management program across our 70,000-mile -- square mile territory. We manage about 123 million trees that are near and adjacent to our facilities. ***And over the last 2 years, we've doubled the amount that we've invested in veg[etation] management.*** That includes line clearing to remove parts of trees that are adjacent to our facilities as well as removal of dead and dying trees. So the program involves year-round effort to identify these dead and dying trees through inspection processes where we use foot and aerial patrols; we use LiDAR, which is light, detecting and ranging technology, to identify the trees that need to be worked. ***We inspect all of our overhead lines every year, and we do second patrols in high fire danger areas at least twice a year. In some areas, we do as often as 4x a year.*** So it's a very aggressive program. There are specific requirements around line clearing, and it depends upon the voltage of the lines. And it can range up to feet [sic] to as much a sort of 18 inches away from the facility. So there are all sorts of different requirements, depending upon where the facilities are located and the voltage of the facilities.  ¶ 264.

**November 5, 2017 – Article on *Currents* Website**

Statement 12: ***PG&E meets or exceeds all applicable federal and state vegetation clearance requirements***.  ¶ 271.

**May 25, 2018 – Press Release Responding to North Bay Fire Reports**

Statement 13: ***PG&E meets or exceeds regulatory requirements for pole integrity management***, using a comprehensive database to manage multiple patrol and inspection schedules of our more than two million poles.  ¶ 280.

**June 8, 2018 – Press Release Responding to Cal Fire North Bay Fire Announcement**

Statement 14: ***Programs Overall Met State's High Standards*** We look forward to the opportunity to carefully review the CAL FIRE reports to understand the agency's perspectives. Based on the information we have so far, we continue to believe our overall programs met our state's high standards. For example, ***PG&E meets or exceeds regulatory requirements for pole integrity management***, using a comprehensive database to manage multiple patrol and inspection schedules

Case No.: 18-cv-03509-EJD

ORDER REGARDING MOTIONS TO DISMISS

11

United States District Court
Northern District of California

of our more than two million poles. Similarly, *under PG&E's industry-leading Vegetation Management Program*, we inspect and monitor every PG&E overhead electric transmission and distribution line each year, with some locations patrolled multiple times. We also prune or remove approximately 1.4 million trees annually.  ¶ 287.

**June 8, 2018 – Press Release Responding to Cal Fire North Bay Fire Announcement**

Statement 15: To address the growing threats posed by wildfires and extreme weather, and in light of the wildfires throughout our state last year, *PG&E has launched the Community Wildfire Safety Program* to help keep our customers and communities safe. Among the key components of the new program are. . . Public Safety Power Shutoff: As a last resort, *a program to proactively turn off electric power for safety when extreme fire danger conditions occur*, while helping customers prepare and providing early warning notification, when and where possible.  ¶ 296.

**September 27, 2018 – ESRB-8 Shutoff Protocol**

Statement 16: PG&E's Community Wildfire Safety Program implements additional precautionary measures intended to reduce wildfire threats. *It includes . . . executing protocols to temporarily turn off electric power for safety when extreme fire danger conditions are occurring.*" . . . Public Safety Power Shutoff is one component of the Community Wildfire Safety Program. *PG&E has created a set of procedures for . . . [d]etermining what combination of conditions necessitates turning off lines for safety*.  ¶ 300.

**October 9, 2018 – Press Release Regarding Cascade Fire**

Statement 17: [W]e are continuing to focus on *implementing additional precautionary measures* intended to further reduce wildfire threats, such as *working to remove and reduce dangerous vegetation, improving weather forecasting, upgrading emergency response warnings, [and] making lines and poles stronger in high fire threat areas*, and taking other actions to make our system, and our customers and communities, *even safer* in the face of a growing wildfire threat.  ¶ 303.

**October 9, 2018 – Press Release Regarding Cascade Fire**

Statement 18: To address the growing threats posed by wildfires and extreme weather, and in light

United States District Court
Northern District of California

of the wildfires throughout our state last year, **PG&E has launched the Community Wildfire Safety Program** to help keep our customers and communities safe **by implementing additional precautionary measures** intended to further reduce wildfire threats. Among the key components of the new program are. . . Public Safety Power Shutoff: As a last resort, **a program to proactively turn off electric power for safety when extreme fire danger conditions occur**, while helping customers prepare and providing early warning notification, when and where possible.  ¶ 309.

**November 8, 2018 – Tweet Regarding Camp Fire**

<u>Statement 19</u>: PG&E has determined that it will not proceed with plans today for a Public Safety Power Shutoff in portions of 8 Northern CA counties, as **weather conditions did not warrant this safety measure**.  ¶ 314.

*        *        *

The above statements fall into four categories based on subject matter:

1. Statements regarding PG&E's vegetation management (Statements 1, 10, 11)

2. Statements regarding compliance with law and PG&E's ESRB-8 (Statements 2, 4-5, 9, 12-19)

3. Statements regarding PG&E's dividend (Statements 6-8)

4. Statement regarding reclosers (Statement 3)

### D.    Securities Act Challenged Statements

The Securities Act Plaintiffs list 34 allegedly false and misleading statements relevant to their Securities Act claims in Exhibit A to the TAC.  TAC, Ex. A, ECF No. 121-5.  Because many of the challenged statements are identical or substantially similar to each other, the Securities Act Defendants group the statements in broad categories.  The Court sees no reason to reproduce the alleged misstatements for purposes of this Order.  Instead, the Court will refer to the challenged statements as they are enumerated in Exhibit A when relevant to the analysis.

**REQUESTS FOR JUDICIAL NOTICE OR INCORPORATION BY REFERENCE**

Before turning to the motions to dismiss, the Court addresses a threshold issue.  Namely, the Officer Defendants, Director Defendants, Underwriter Defendants, and Plaintiffs request that

Case No.: 18-cv-03509-EJD

ORDER REGARDING MOTIONS TO DISMISS

13

1    the Court consider documents outside of the complaint pursuant to the doctrine of incorporation

2    by reference and/or judicial notice.

3    **I.      LEGAL STANDARD**

4            Ordinarily, a court may not examine materials outside the pleadings when considering a

5    motion to dismiss for failure to state a claim.  *Lee v. City of L.A.*, 250 F.3d 668, 688 (9th Cir.

6    2001).  There are two exceptions to this general rule.  First, courts may take judicial notice of

7    certain facts that are "not subject to reasonable dispute" because they are "generally known" or

8    "can be accurately and readily determined from sources whose accuracy cannot reasonably be

9    questioned."  Fed. R. Evid. 201(b).  Second, the doctrine of incorporation by reference permits

10   courts to treat an extrinsic document as if it were "part of the complaint itself," but only if the

11   complaint "refers extensively to the document or the document forms the basis of the plaintiff's

12   claim."  *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1002 (9th Cir. 2018) (citing *United

13   States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003)).  The latter doctrine "prevents plaintiffs from

14   selecting only portions of documents that support their claims, while omitting portions of those

15   very documents that weaken—or doom—their claims."  *Id.* (citation omitted).

16          Courts may incorporate documents or portions thereof that are not expressly referenced in

17   the complaint if the claims depend on documents' contents.  *Knievel v. ESPN*, 393 F.3d 1068,

18   1076 (9th Cir. 2005) (affirming incorporation by reference of webpages surrounding photographs

19   to provide crucial context for defamation claims).  Once incorporated, the entire document is

20   assumed to be true for purposes of a motion to dismiss.  *Ritchie*, 342 F.3d at 908.

21          However, these doctrines are not unlimited.  The Ninth Circuit cautions that their overuse

22   and improper application risk premature dismissals of plausible claims that may turn out to be

23   valid after discovery.  *Khoja*, 899 F.3d at 998.  This risk is especially pronounced where, as here,

24   there is a heightened pleading standard and defendants possess materials to which plaintiffs do not

25   yet have access.  *Id.*  Accordingly, courts may take judicial notice of the existence and contents of

26   a public record but may not take notice of the truth of any disputed facts within that record.  *Id.* at

27   999.  Likewise, courts may generally "assume [an incorporated document's] contents are true for

28

1    purposes of a motion to dismiss under Rule 12(b)(6)," *id.* at 1003 (alteration in original) (quoting

2    *Marder v. Lopez*, 450 F.3d 445, 448 (9th Cir. 2006)), but should not assume the truth of facts in an

3    incorporated document "if such assumptions only serve to dispute facts stated in a well-pleaded

4    complaint," *id.*

## II.    DISCUSSION

Before the Court are three sets of requests for incorporation by reference and/or judicial

notice: (1) Officer Defs.' Req. for Judicial Notice ("RJN"), ECF No. 284-1; (2) Director and

Underwriter Defs.' RJN, ECF No. 286-1; and (3) Pls.' RJN, ECF No. 292.  Though there are some

overlapping documents between the requests, the Court addresses each request in turn.

### A.    Officer Defendants' Request

The Officer Defendants request incorporation by reference or judicial notice of Exhibits 1

through 12 to the Declaration of Jason D. Strabo.  Officer Defs.' RJN; Strabo Decl. Exs. 1-12,

ECF No. 284-2.[9]  Plaintiffs do not oppose incorporation by reference or judicial notice of Exhibits

5 (ESRB-4), 6-8 (PG&E's 2015-2017 Corporate Responsibility and Sustainability Reports), 11

(PG&E's November 14, 2016 current report filed with the SEC), and 12 (PG&E's February 22,

2019 response to request for information in *United States v. PG&E*, Case No. 14-cr-00175-WHA

(N.D. Cal.)).[10]  The Court therefore limits its analysis to Exhibits 1-4 and 9-10.

Exhibit 1 is a CPUC Fact Sheet on PG&E Vegetation Management Spending and is the

source for the table in paragraph 79 of the TAC.  Plaintiffs rely on this table in alleging that

PG&E's statement about "doubling" its vegetation management expenditures in 2016 (*see*

Statement 10) was false because "PG&E's vegetation management spending underwent only

modest increases over the relevant time period."  TAC ¶¶ 79–80.  Because Exhibit 1 is a public

agency report and forms the basis of Plaintiffs' claim that Statement 10 was false, it is susceptible

---

[9] The Court will refer to documents in the parties' RJNs by the exhibit numbers in the respective requests.

[10] Plaintiffs did not file a separate opposition to the Officer Defendants' RJN.  Instead, they assert arguments in their opposition to the Officer Defendants' renewed motion to dismiss and reference arguments made in a separate brief filed in opposition to the Underwriter and Director Defendants' RJN.  *See* ECF No. 293-1.

United States District Court
Northern District of California

to both incorporation by reference and judicial notice. *See Khoja*, 899 F.3d at 1002; *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998–99 (9th Cir. 2010) (taking judicial notice of information on government entity websites); *see also United States v. Ritchie*, 342 F.3d 903, 907–09 (9th Cir. 2003) ("Courts may take judicial notice of some public records, including the records and reports of administrative bodies." (internal quotation marks and citation omitted)). Plaintiffs contend that Exhibit 1 is not subject to either doctrine because the Officer Defendants are using the document to dispute well-pled facts in the TAC. Not so. Though the Officer Defendants do use Exhibit 1 to rebut the falsity of Statement 10, they do so by incorporating the context surrounding the table upon which Plaintiffs rely. Indeed, the incorporation by reference doctrine exists to prevent plaintiffs from surviving a motion to dismiss using selective citation. *Khoja*, 899 F.3d at 1002. Whether the context surrounding the table rebuts Plaintiffs' claim of falsity is an inquiry separate from whether the document should be incorporated by reference. Accordingly, the Court will consider Exhibit 1 but will not assume the truth of any facts in that document.

Exhibits 2-4 are PG&E's 2015-2017 Form 10-Ks filed with the SEC, which courts routinely take notice of in federal securities actions. *See Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1064 n.7 (9th Cir. 2008); *Dreiling v. Am. Express. Co.*, 458 F.3d 942, 946 n.2 (9th Cir. 2006). Plaintiffs frequently cite these documents in their complaint, which supports also incorporating the documents by reference. *E.g.*, TAC ¶¶ 43, 483, 493. Plaintiffs argue, though, that the Court should not consider Exhibits 2-4 because Defendants offer them for the improper purposes of establishing that PG&E made adequate disclosures and asserting a truth-on-the-market defense.[11] ECF No. 292 at 13 n.4 (referencing ECF No. 293-1 at 10–13). Neither argument is availing. As above, the Officer Defendants reference the disclosures in Exhibits 2-4 to provide

---

[11] PERA moves to submit supplemental authority in support of its opposition to the Officer Defendants' motion to dismiss. ECF No. 310. Specifically, PERA requests that the Court consider the Ninth Circuit's recent decision in *Pino v. Cardone Cap., LLC*, 139 F.4th 1102 (9th Cir. 2025). PERA proffers a short excerpt from *Pino* but does not explain the relevance of the authority to the instant case. Nor can the Court discern any, especially given that *Pino* only addressed non-fraud claims under Section 12(a)(2) of the Securities Act, which are not at issue here. As such, the Court **DENIES** PERA's request.

Case No.: 18-cv-03509-EJD
ORDER REGARDING MOTIONS TO DISMISS

1    context for the challenged statements and prevent selective citation. *See Khoja*, 899 F.3d at 1002.

2    And whether the Officer Defendants are asserting a truth-on-the-market defense goes to the

3    substance of the motion, not the admissibility of evidence. *See Bos. Ret. Sys. v. Uber Techs., Inc.*,

4    No. 19-CV-06361-RS, 2020 WL 4569846, at *3 (N.D. Cal. Aug. 7, 2020). The Court will

5    therefore consider Exhibits 2-4 for the purpose of identifying what disclosures were made

6    available to the public but will not assume the truth of any disputed facts therein.

7        Exhibits 9 and 10 are PG&E's November 2, 2017 Form 8-K annual report and Form 10-Q

8    quarterly report, respectively. The Officer Defendants claim that these two documents, like

9    Exhibit 1, provide context surrounding Statement 10. However, unlike Exhibit 1, Exhibits 9 and

10   10 are not referenced at all in the TAC, and Plaintiffs' claims do not depend on their contents.

11   That said, Exhibits 9 and 10 are SEC filings and thus proper subjects of judicial notice. *See*

12   *Metzler*, 540 F.3d at 1064 n.7; *Dreiling*, 458 F.3d at 946 n.2. The Court will consider the

13   disclosures in Exhibits 9 and 10 but will not assume the truth of any asserted facts.

14       Accordingly, the Court takes notice of and/or incorporates by reference all exhibits

15   attached to Strabo Declaration.

16   **B.    Director and Underwriter Defendants' Request**

17       The Securities Act Defendants request that the Court consider Exhibits 1 through 19 to the

18   Declaration of Stephen P. Blake. Director and Underwriter Defs.' RJN; Blake Decl. Exs. 1-19,

19   ECF No. 286-2.

20       Exhibits 1-7 and 10-11 are the Offering Documents[12] that Plaintiffs cite and rely upon in

21   the TAC to form the basis of their claims under Section 11 of the Securities Act. As such,

22   Plaintiffs concede that Exhibits 1-3, 6-8, and 10-11 are proper subjects of incorporation by

23   reference. However, they contend that the Court should not consider them for the improper

24   purpose for which the Securities Act Defendants offer them. Plaintiffs argue that the Securities

25

26   _____

27   [12] "Offering Documents" refers to the Company's Registration Statement and Prospectus,
     including all amendments and supplements thereto for each offering, together with all documents
     incorporated by reference in each Registration Statement and Prospectus. TAC ¶ 496 n.149.

28

Act Defendants are asking the Court to assume the truth of matters stated in the documents and offer the documents to support irrelevant defenses. ECF No. 293-1 at 10–13. Both arguments miss the mark. The Securities Act Defendants reference the documents not for the truth of the matters stated therein, but to show that those statements were made and that certain SEC filings were incorporated into the Offering Documents. *See* Director and Underwriter Defs.' RJN at 26–27. And whether the Securities Act Defendants are asserting affirmative defenses using the requested documents "goes to substance of the motion dismiss . . . not the admissibility of evidence." *Bos. Ret. Sys.*, 2020 WL 4569846 at *3. Though the TAC does not cite Exhibits 4-5, those documents are incorporated by reference by Exhibits 3 and 6 and are judicially noticeable for the same reasons described above. The Court therefore will consider Exhibits 1-7 and 10-11 for the purpose of seeing what information was available to investors, but not for the truth of any disputed fact asserted.

Exhibits 8-9 and 14 are PG&E's Form 8-Ks filed with the SEC in 2016 and 2017 and are presumptively subject to judicial notice. *See Metzler*, 540 F.3d at 1064 n.7; *Dreiling*, 458 F.3d at 946 n.2. Plaintiffs concede that Exhibit 14 may be judicially noticed to show, at minimum, that the document does not contain the language attributed to it in the TAC. ECF No. 293-1 at 19. But they argue again that the Securities Act Defendants improperly seek to admit the truth of the matters asserted Exhibits 8-9 and 14, which are irrelevant. *Id.* at 14–15. For the same reasons set forth above, that argument is unavailing. The Court will consider Exhibits 8-9 and 14 for the purpose of seeing what information was available to the investing public, not for the truth of any disputed fact asserted.

Finally, Exhibits 12-13 and 15-19 are public documents like news articles, a document published by the CPUC, and shareholder derivative complaints publicly filed against PG&E. The news articles (Exhibits 12, 15-17) and CPUC document (Exhibit 13) are subject to judicial notice to show what public information was available to the stock market. *See, e.g.*, *Von Saher v. Norton Simon Museum of Art at Pasadena*, 592 F.3d 954, 960 (noticing news articles); *Daniels-Hall*, 629 F.3d at 998–99 (same for information on government entity websites). Plaintiffs attempt to

Case No.: 18-cv-03509-EJD
ORDER REGARDING MOTIONS TO DISMISS

18

preclude these documents by largely repeating the same arguments the Court has already addressed above, and these arguments fail for the same reasons. The shareholder derivative complaints from proceedings in California Superior Court (Exhibits 18-19) are also susceptible to judicial notice. *See, e.g.*, *U.S. ex rel. Robinson Rancheria Citizens Council v. Borneo, Inc.*, 971 F.2d 244, 248 (9th Cir. 1992) (observing that courts "take notice of proceedings in other courts, both within and without the federal judicial system, if those proceedings have a direct relation to matters at issue." (citations omitted)). Here, the Securities Act Defendants request that the Court consider Exhibits 18-19 for the fact that earlier lawsuits asserting similar factual allegations to those in the TAC were filed against PG&E. This goes to the Securities Act Defendants' argument that certain of Plaintiffs' Securities Act claims are time-barred. Indeed, courts routinely take notice of prior lawsuits when presented with statute-of-limitations arguments to determine when the limitations period began to run. *See, e.g.*, *Raifman v. Wells Fargo Advisors, LLC*, 2014 WL 12013436, at *5 (N.D. Cal. Mar. 31, 2014), *aff'd sub nom. Raifman v. Wachovia Sec., LLC*, 649 F. App'x 611 (9th Cir. 2016); *Stichting Pensioenfonds ABP v. Countrywide Fin. Corp.*, 802 F. Supp. 2d 1125, 1138 (C.D. Cal. 2011). As such, the Court will consider Exhibits 12-13 and 15-19 but not for the truth of any disputed fact asserted within those documents.

### C.    Plaintiffs' Request

In scattered portions of their briefs in opposition to the Officer Defendants' motion to dismiss, Plaintiffs request judicial notice of a CPUC document and certain post-TAC developments that they argue bolster their claims. Plaintiffs request that the Court consider PG&E's publicly available CPUC application filed on October 31, 2016 to support their assertion that PG&E sought $126,775,000 in CEMA reimbursement for 2015. ECF No. 292 at 14 n.5. They also request judicial notice of (1) an admission made by the Company's then-CFO Jason P. Wells during PG&E's bankruptcy confirmation hearing; (2) Judge William Alsup's findings during PG&E's criminal probationary proceedings; and (3) the Butte County District Attorney's report detailing the findings of an investigation into the cause of the Camp Fire. *Id.* at 44–47. As to all these documents, the Officer Defendants argue that Plaintiffs are attempting to submit

1    evidence of facts not alleged in the TAC to improperly amend the pleading during the pendency of

2    motions to dismiss.  ECF No. 305-1 at 2–5.

3          The Court agrees with the Officer Defendants.  Though Plaintiffs ask the Court to notice

4    the CPUC application for the narrow purpose of responding to the Officer Defendants' request for

5    incorporation by reference, the fact that PG&E sought a certain amount of CEMA reimbursement

6    for 2015 was not pled in the TAC.  Similarly, developments that occurred after the filing of the

7    TAC are inappropriate subjects of judicial notice.  Plaintiffs admit that they request judicial notice

8    of these developments to strengthen the allegations in the TAC.  ECF No. 292 at 44 ("Plaintiffs

9    request that the Court take judicial notice of several post-TAC developments that bolster the

10   elements of Plaintiffs' claims—particularly falsity and scienter.")  This is an improper attempt to

11   amend the pleadings via judicial notice.  *In re Apple Inc. Device Performance Litig.*, 386 F. Supp.

12   3d 1155, 1166 (N.D. Cal. 2019) (denying request for judicial notice that "appear[ed] to be an

13   attempt to amend the pleadings to add more allegations"); *Oklahoma Firefighters Pension & Ret.*

14   *Sys. v. IXIA*, 50 F. Supp. 3d 1328, 1350 (C.D. Cal. 2014) ("Plaintiffs cannot utilize [judicially

15   noticed] documents to amend the complaint and defeat defendants' motions to dismiss.").  The

16   Court will thus not consider the documents for which Plaintiffs request judicial notice.

17                    **MOTION TO DISMISS – EXCHANGE ACT CLAIMS**

18   **I.     LEGAL STANDARD**

19          Usually, a complaint will survive a Rule 12(b)(6) motion to dismiss if it alleges enough

20   facts that, accepted as true, state a plausible claim.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

21   But the pleading burden for securities fraud claims under Sections 10(b) and 20(a) of the

22   Exchange Act is more stringent.  A plaintiff bringing such claims must meet the heightened

23   pleading requirements of Rule 9(b) and the Private Securities Litigation Reform Act (PSLRA).

24   *Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 604 (9th Cir. 2014).  To comply with

25   Rule 9(b), the plaintiff must plead the "who, what, when, where, and how" of the alleged fraud.

26   *Davidson v. Kimberly-Clark Corp.*, 889 F.3d 956, 964 (9th Cir. 2018) (quoting *United States ex*

27   *rel. Cafasso v. General Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1055 (9th Cir. 2011)).  The

28   Case No.: 18-cv-03509-EJD
     ORDER REGARDING MOTIONS TO DISMISS

United States District Court
Northern District of California

1    PSLRA requires similar levels of particularity for allegations of falsity but imposes stricter

2    particularity requirements for scienter.  *In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869, 876–77

3    (9th Cir. 2012).  Namely, the plaintiff must establish a *strong* inference of scienter.  *Glazer Cap.*

4    *Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 766 (9th Cir. 2023) (quoting 15 U.S.C. § 78u-

5    4(b)(2)(A)).

6          To state a claim under Section 10(b) and Rule 10b-5, a plaintiff must allege "(1) a material

7    misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the

8    misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the

9    misrepresentation or omission; (5) economic loss; and (6) loss causation."  *In re Quality Sys., Inc.*

10   *Sec. Litig.*, 865 F.3d 1130, 1140 (9th Cir. 2017) (quoting *Halliburton Co. v. Erica P. John Fund,*

11   *Inc.*, 573 U.S. 258, 267 (2014)).  The Officer Defendants argue that Plaintiffs fail to satisfy the

12   first, second and sixth elements.

## II.    DISCUSSION

### A.    Defendant Kane as Maker of Twelve Statements

15         As an initial matter, the Officer Defendants challenge Plaintiffs' claims as to twelve of the

16   nineteen allegedly false or misleading statements based on failure to attribute the statements to any

17   Officer Defendant.  More specifically, the Officer Defendants argue that Plaintiffs fail to plead

18   that Kane was the "maker" of Statements 2, 4, 5, 9, and 12-19.

19         Kane may only be held liable under § 10(b) for false or misleading statements if she

20   "made" the statements.  *Janus Cap. Grp., Inc. v. First Deriv. Traders*, 564 U.S. 135, 142–43

21   (2011); *see also ESG Capital Partners, LP v. Stratos*, 828 F.3d 1023, 1033 (9th Cir. 2016)

22   (following *Janus*).  In *Janus*, the Supreme Court clarified that "the maker of a statement is the

23   person or entity with ultimate authority over the statement, including its content and whether and

24   how to communicate it."  564 U.S. at 142.  Put differently, Plaintiffs must plausibly allege that

25   Kane was "intricately involved or [] substantially participated in" deciding what the statements

26   would say and how they would be delivered.  *Reese v. BP Expl. (Alaska) Inc.*, 643 F.3d 681, 694

27   n.8 (9th Cir. 2011).

28   Case No.: 18-cv-03509-EJD
     ORDER REGARDING MOTIONS TO DISMISS

Here, Plaintiffs allege that "because of their high-level positions of control and authority as senior executive officers of PG&E, [the Officer Defendants] possessed the power and authority to control, and did ultimately control, the contents of PG&E's SEC filings, press releases, content on the Company's website and official Twitter.com account, and other market communications during the Class Period." TAC ¶ 52. However, generally alleging that the Officer Defendants must have had ultimate authority over PG&E's statements simply by virtue of their high-level positions is, by itself, insufficient to establish that they made the statements. Courts applying *Janus* have routinely held that "a corporate officer's position alone, without additional allegations as to the officer's ability to control the contents of the statement at issue, does not suffice to render the officer a 'maker of the statement.'" *See Mandalevy v. Bofi Holding, Inc.*, No. 17CV667-GPC-KSC, 2021 WL 794275, at *6 (S.D. Cal. Mar. 2, 2021) (collecting cases).

Perhaps recognizing this defect, Plaintiffs specifically identify Kane—PG&E's Chief Ethics and Compliance Officer ("CECO") during the Class Period—as the sole officer who "controlled and authorized all of PG&E's statements regarding compliance," including Statements 2, 4, 5, 9, and 12-19. *E.g.*, TAC ¶ 432. Plaintiffs allege that the twelve statements "were approved and made under her ultimate authority as CECO." *Id.* This is bolstered by numerous other allegations adding that Kane "reviewed and authorized" the twelve alleged misstatements and was responsible for overseeing PG&E's compliance program and reporting. *Id.* ¶¶ 206–07, 220–21, 230–31, 257, 279, 285, 295, 298, 302, 308, 313, 316, 434. Considering these allegations, Plaintiffs argue that three factors indicate that Kane made the twelve statements: (1) Kane's role in overseeing compliance matters, (2) her responsibility for compliance reporting as PG&E's CECO, and (3) the compliance-focused nature of the statements.

The Court finds that the TAC does not adequately plead that Kane was the "maker" of the statements. To be sure, Kane's high-level position as CECO and her oversight over the Utility's compliance program strongly suggest that she had a significant role in all PG&E compliance matters. But oversight does not necessarily entail control over the content of every statement regarding compliance or their delivery. *See Janus*, 564 U.S. at 142. Rather, oversight implies that

United States District Court
Northern District of California

Kane managed the overall function of PG&E's compliance program and not its day-to-day operations. Kane's responsibility for compliance reporting is also not dispositive of the issue. It is unclear whether the scope of Kane's "reporting" responsibility encompasses only internal reporting to other senior executives or extends to public reporting in press releases as well. PG&E's Corporate Responsibility and Sustainability Report (the source of Statements 2, 4, and 5) indicate that she only had internal reporting duties. *See* ECF No. 284-10 (stating that the CECO "reports to the PG&E [CEO] and President," and "has additional reporting responsibility to the Audit Committees of the PG&E Corporation and Pacific Gas and Electric Company Boards of Directors, and the Compliance and Public Policy Committee of the PG&E Corporation Board"). Even assuming Kane had external reporting duties, the Court cannot readily infer that those duties extend to making all of PG&E's compliance-related statements. The statements in the *Currents* website article (Statement 12) and in a tweet (Statement 19) are hardly the kind one would presume to have been made by a CECO. The statements in PG&E's Corporate Responsibility and Sustainability Reports (Statements 2, 4, 5), press releases (Statements 9, 13-15, 17-18), and on PG&E's website (Statement 16) are a closer call, but the TAC still does not provide sufficient factual support to infer that Kane had ultimate authority over those statements.

Furthermore, the Court does not credit the conclusory allegation that the twelve statements "were approved and made under [Kane's] ultimate authority as CECO" (TAC ¶ 432), because there are no other factual allegations to support this bare legal assertion. *Ashcroft*, 556 U.S. at 678. Nowhere in the TAC do Plaintiffs allege, for example, that Kane had any role in the drafting the statements or in deciding their content, that Kane's approval was required before the statement issued, or that she even reviewed the statements before they were published. *See, e.g.*, *Hefler v. Wells Fargo & Co.*, No. 16-cv-05479-JST, 2018 WL 1070116, at *10 (N.D. Cal. Feb. 27, 2018) ("Plaintiffs fail to show that [defendants] had 'ultimate authority' over . . . statements when they do not even clearly allege that the defendants were even provided with all of these documents before their issuance."); *In re Galena Biopharma, Inc. Sec. Litig.*, 117 F. Supp. 3d 1145, 1187 (D. Or. 2015) (finding that individual defendants had made statements based on allegations that they

Case No.: 18-cv-03509-EJD
ORDER REGARDING MOTIONS TO DISMISS

"had to approve every article and that no article could be published without their approval").  A company's CECO is certainly expected to have a crucial role in compliance, but it does not necessarily follow that she would have final say on the content and delivery of every PG&E statement concerning compliance.  The TAC's allegation that the statements were "approved and made under her ultimate authority" amounts to little more than a recitation of the elements set forth in *Janus*.  *See City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*, 880 F. Supp. 2d 1045, 1070–71 (N.D. Cal. 2012).

Accordingly, the TAC fails to adequately allege that Defendant Kane made statements 2, 4, 5, 9, and 12-19.  However, to provide clarity for any amended complaints, the Court continues its analysis of all the alleged misstatements.

### B.    False or Misleading Statements

Plaintiffs allege that during the Class Period, the Officer Defendants made nineteen false or misleading statements in several contexts, including PG&E conference calls, corporate responsibility and sustainability reports, and press releases.  The Court analyzes the alleged falsity of the statements in the four categories set forth above.  *See supra* Background Section C.

### 1.    Statements Regarding Vegetation Management (Statements 1, 10, 11)

The Officer Defendants argue that Plaintiffs fail to plead that the statements regarding PG&E's vegetation management were false when spoken and that, in any event, some of the statements are inactionable puffery.  Plaintiffs counter that the TAC adequately alleges the statements were false and misleading because they were "inconsistent with" internal PG&E information that was available to the Officer Defendants in real time.  *See In re Quality Sys.*, 865 F.3d at 1144.  The Court begins by addressing whether the alleged misstatements regarding PG&E's vegetation management were puffery.  Then, for those statements that are not puffery, the Court determines whether Plaintiffs have adequately pled falsity.

### a.    Puffery

At its heart, corporate puffery involves a statement of opinion that is not capable of objective verification.  *Macomb Cnty. Employees' Ret. Sys. v. Align Tech., Inc.*, 39 F.4th 1092,

1098–99 (9th Cir. 2022) (citing *Retail Wholesale & Dep't Store Union Local 338 Ret. Fund v. Hewlett-Packard Co.*, 845 F.3d 1268, 1275 (9th Cir. 2017)).  Such "vague statements of optimism like 'good,' 'well-regarded,' or other feel good monikers, are not actionable because professional investors, and most amateur investors as well, know how to devalue the optimism of corporate executives."  *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1060 (9th Cir. 2014) (internal quotations and citation omitted).

        Here, statements about PG&E's "stepping up" its vegetation management activities (Statement 1) and having "one of, if not, the most comprehensive management programs in the country" (part of Statement 10) fall within the ambit of puffery.  The statements are merely generalized and subjective assessments of PG&E's vegetation management efforts.  Plaintiffs' argument that these statements are capable of objective verification fails for the simple reason that Plaintiffs do not propose an objective way to measure "stepping up" activities or having a highly "comprehensive" program.  Nor can the Court discern any.  Plaintiffs argue, though, that even general statements of optimism are actionable "when those statements address specific aspects of a company's operation that the speaker knows to be performing poorly."  *In re Quality Sys.*, 865 F.3d at 1143 (citation omitted).  For example, the Ninth Circuit found that reassuring investors that "everything [was] going fine" with FDA approval was not puffery when the company knew FDA approval would never come.  *Id.* (citing *Warshaw v. Xoma Corp.*, 74 F.3d 955, 959 (9th Cir. 1996)).  But here, the fact PG&E committed safety violations is not mutually exclusive with its "stepping up" vegetation management activities and having "one of . . . the most comprehensive management programs in the country."  PG&E can have a comprehensive program and strive to improve its vegetation management program while still falling short of relevant regulations.  As such, the Court finds that both statements are inactionable corporate optimism.

### b.    Falsity

        The remaining non-puffery portions of Statements 10 and 11 are statements concerning the frequency with which PG&E inspected overhead lines and a statement concerning PG&E's vegetation management spending.

1    Starting with the former, Plaintiffs have not sufficiently pled that the statements

2  concerning the frequency with which PG&E inspected overhead lines were materially false or

3  misleading.  Plaintiffs argue that when Statements 10 and 11 were made, PG&E followed an

4  internal policy to perform inspections of steel towers along transmission lines every five years.

5  TAC ¶ 118.  Indeed, PG&E had not inspected the tower implicated in the Camp Fire in several

6  years.  *Id.*  However, Plaintiffs' argument glosses over the fact that Statements 10 and 11

7  explicitly pertained only to inspection of "overhead lines," and not to the steel towers along those

8  lines.  Plaintiffs' falsity argument presupposes that PG&E's inspection of overhead lines includes

9  an inspection of the towers along those lines.

10    Still, Plaintiffs contend that a reasonable investor would believe that an annual inspection

11  of overhead lines would necessarily include inspection of the towers as part of those lines.  The

12  statements were therefore misleading, because they gave reasonable investors "the impression of a

13  state of affairs that differs in a material way from the one that actually exists."  *Berson v. Applied*

14  *Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008) (quoting *Brody v. Transitional Hospitals*

15  *Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002)).  The Court is not so persuaded.  The statements

16  plainly concern only overhead lines, and even accepting the TAC's allegations as true, Plaintiffs

17  have not pled facts to support an inference that a reasonable investor would have understood

18  otherwise.

19    Plaintiffs' arguments regarding the statements about PG&E's vegetation management

20  spending fare no better.  PG&E stated that it had "spent an additional $200 million" in 2016 and

21  doubled its typical vegetation management spending between 2015 and 2017.  TAC ¶¶ 258

22  (Statement 10), 264 (Statement 11).  Citing a table from a CPUC report, Plaintiffs allege that these

23  statements were false and misleading because PG&E annually spent approximately $200 million

24  on vegetation management each year from 2015 to 2017.  *Id.* ¶¶ 78–80.  Each year's spending was

25  nearly the same and consistent with the amounts the CPUC approved in PG&E's GRCs for those

26  years.  *Id.* ¶ 78.

27    The Officer Defendants argue that these yearly expenditures do not account for separate

28  Case No.: 18-cv-03509-EJD
ORDER REGARDING MOTIONS TO DISMISS

United States District Court
Northern District of California

retroactive spending from a CEMA.  The second page of the CPUC report from which Plaintiffs excerpted the table notes that, in 2014, the CPUC had directed PG&E to seek recovery of additional costs outside of and in addition to the VMBA funds already authorized by PG&E's GRCs.  Strabo Decl. Ex. 1, at 3, ECF No. 284-3.  In PG&E's Form 10-Q for the period ending on September 30, 2017, a line item reflects $353 million in CEMA spending through the end of 2016. Strabo Decl. Ex. 10, at 38, ECF No. 284-12.  The Officer Defendants contend that, when combined with PG&E's VMBA spending, the additional CEMA spending explains how PG&E "doubled" its vegetation management spending.  Plaintiffs counter by pointing out that PG&E claimed CEMA spending in 2015 as well.  They argue that, even after including CEMA spending for 2015 to 2017, PG&E's vegetation management still never doubled.  While that may be true, the Court need not reach that argument because Plaintiffs fail to allege it in the TAC. [13]  Plaintiffs aver that the "doubling" statements were false based solely on PG&E's VMBA spending.  TAC ¶¶ 78–80.  Plaintiffs may not defeat a motion to dismiss by asserting arguments based on facts that were not properly alleged in the operative complaint.  *See Schneider v. Cal. Dep't of Corr.*, 151 F.3d 1194, 1197 n.1 (9th Cir. 1998).

Accordingly, Plaintiffs have not adequately pled the falsity of the parts of Statements 10 and 11 concerning PG&E's "doubling" its vegetation management spending.

### 2.  Statements Regarding Compliance (Statements 2, 4-5, 9, 12-19)

Twelve of the nineteen alleged misstatements concern PG&E's compliance efforts.  The Court further subdivides these statements into two categories: statements regarding PG&E's legal compliance with state and federal safety regulations (Statements 2, 4-5, 9, 12-14, 17) and statements regarding PG&E's compliance with its own ESRB-8 Shutoff Protocol (Statements 15, 16, 18, 19).

### a.  Statements Concerning Compliance with Safety Regulations

---

[13] The Court denied Plaintiffs' request for judicial notice of the CPUC document that shows PG&E's 2015 CEMA spending, because the request was an improper attempt to amend the complaint to survive a Rule 12(b)(6) motion.  *See supra* Requests for Judicial Notice or Incorporation by Reference, Section II.C.

Case No.: 18-cv-03509-EJD
ORDER REGARDING MOTIONS TO DISMISS

**(Statements 2, 4-5, 9, 12–14, 17)**

Plaintiffs allege that PG&E's statements regarding its compliance with safety regulations were false and misleading because they were inconsistent with information available to PG&E at the time the statements were made. *See In re Quality Sys.*, 865 F.3d at 1144. Put differently, Plaintiffs contend that PG&E falsely assured the public that it complied with relevant laws when PG&E knew it was violating those laws. In response, the Officer Defendants assert several theories for why the TAC fails to adequately allege falsity:

First, the Officer Defendants argue that reasonable investors would not understand the Statements 2, 4 and 5 regarding PG&E's compliance with regulations to be guarantees of constant compliance with relevant law. The Court agrees. Statements 2 and 4 say that PG&E's annual inspections of its power lines are performed in compliance with relevant laws, not that PG&E's power lines always are in a compliant state. As explained previously, Plaintiffs fail to allege that PG&E did not perform annual inspections of its power lines. Statement 5 says that "PG&E prunes and removes trees growing too close to power lines" to balance maintaining a vast system of trees while complying with applicable laws. Like Statements 2 and 4, this statement does not necessarily guarantee that the vegetation surrounding PG&E's power lines will always comply with relevant regulations. Rather, it says that PG&E's vegetation management attempts to maintain vegetation surrounding power lines while complying with regulations.

Next, the Officer Defendants claim that the statements concerning legal compliance after the 2017 North Bay Fires (Statements 9, 12-14) were not false or misleading because the TAC fails to allege that any regulatory violations existed when the statements were made. *See Reese v. Malone*, 747 F.3d 557, 578 (9th Cir. 2014) (citing *Glazer*, 549 F.3d at 741–42) ("Statements of legal compliance are pled with adequate falsity when documents detail specific violations of law that existed at the time the warranties were made."), *overruled on other grounds by City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605 (9th Cir. 2017). In these statements, PG&E maintained that it followed all federal and state vegetation clearance requirements (Statements 9 and 12) and met or exceeded all requirements for pole

integrity (Statements 13 and 14).  Plaintiffs allege that the statements were false because in 2018 and 2019, regulators, Cal Fire, and Judge Alsup all determined that PG&E's regulatory violations had played a large role in causing the North Bay Fires.  *See, e.g.*, TAC ¶¶ 251–56.  The Officer Defendants argue that these findings postdate Statements 9 and 12-14—which were made between October 2017 and June 2018—so they do not show there were existing regulatory violations when the statements were made.

The Officer Defendants' response misses the mark.  While it is true that PG&E was officially found to have violated regulations only after the making of the statements, Plaintiffs allege that the violations themselves occurred before and during the statements.  Specifically, Plaintiffs allege that since 2015, PG&E was committing "thousands of violations per year."  *Id.* ¶¶ 104–07.  This pattern of noncompliance continued through the Class Period to 2019, when Judge Alsup found that PG&E's lack of compliance "was a major contributing factor, maybe the single-biggest factor, in causing the fires in 2017 and 2018 in Northern California."  *Id.* ¶ 414.  The recurring nature of PG&E's violations suggests that the violations existed throughout the Class Period.  Read in the light most favorable to Plaintiffs, the TAC therefore alleges specific violations that existed and persisted when Statements 9 and 12-14 were made.  *See Glazer*, 549 F.3d at 740 (holding that plaintiffs had adequately pled falsity of a statement that company was "in compliance in all material respects with all laws" based on later SEC cease and desist order finding legal violations); *see also Mulligan v. Impax Lab'ys, Inc.*, 36 F. Supp. 3d 942, 961 (N.D. Cal. 2014) (FDA's finding violations 18 months after the alleged misstatements did not defeat falsity where the complaint alleged "pervasive, recurring, and long-standing nature of the alleged [violations]").

Finally, the Officer Defendants argue Statements 9, 12-14, and 17 are corporate puffery.  Not so for most of the statements.  The statements saying that "PG&E meets or exceeds regulatory requirements" (Statements 12-14) and that "PG&E follows all applicable federal and state vegetation clearance requirements" (Statement 9) are not puffery because they are objectively verifiable.  Statement 17, which says that PG&E is "continuing to focus on implementing

Case No.: 18-cv-03509-EJD
ORDER REGARDING MOTIONS TO DISMISS

additional precautionary measures . . . such as working to remove and reduce dangerous vegetation," is different. Courts have routinely found general statements about a continued or heightened "focus" on compliance efforts to be examples of inactionable corporate optimism, because they are vague, highly subjective claims as opposed to specific, detailed factual assertions. *See, e.g.*, *Kang v. PayPal Holdings, Inc.*, 620 F. Supp. 3d 884, 898 (N.D. Cal. 2022) (finding statement that company would monitor areas "closely to ensure compliant solutions for customers" to be puffery); *In re Facebook, Inc. Sec. Litig.*, 477 F. Supp. 3d 980, 1023 (N.D. Cal. 2020) (same for statement that company "worked hard to make sure that" it was in compliance with an FTC consent decree); *Veal v. LendingClub Corp.*, 423 F. Supp. 3d 785, 804 (N.D. Cal. 2019) (same for statement about "relentless focus on compliance"). As such, Statement 17 is inactionable puffery.

### b.     Statements Concerning Compliance with ESRB-8 (Statements 15, 16, 18, 19)

Plaintiffs allege that statements regarding PG&E's ESRB-8 Shutoff Protocol were false and misleading because PG&E never actually executed the protocol on the morning of the Camp Fire. TAC ¶¶ 146–48. The ESRB-8 Shutoff Protocol sets out seven criteria that PG&E would consider when determining whether to shut off electricity for safety and states that no single factor is determinative. *Id.* ¶ 143. Statements 15, 16, and 18 respectively say that PG&E had "launched," "execute[ed]," and "implement[ed]" its ESRB-8 Shutoff Protocol. *Id.* ¶¶ 296, 300, 309. Yet, Plaintiffs argue that PG&E had not taken any of those three measures, because when the seven criteria listed in the protocol had been met or exceeded prior to the Camp Fire, PG&E did not shut off power. *Id.* ¶¶ 149–76. Plaintiffs further allege that, after the Camp Fire had ignited, PG&E made another false and misleading statement that it had chosen not to shut off power pursuant to the ESRB-8 Shutoff Protocol because "weather conditions did not warrant this safety measure." *Id.* ¶ 314 (Statement 19).

The Court is not covinced that the TAC adequately alleges the falsity of the ESRB-8 statements. Plaintiffs insist that all seven criteria of the ESRB-8 Shutoff Protocol were met, which

"necessitates" shutting off power, so PG&E's decision not to do so demonstrates that the protocol was illusory.  *See id.* ¶¶ 300–01.  However, the more likely explanation is that PG&E did not believe that all seven criteria had been met.  Several of the factors, like "site-specific conditions such as temperature, terrain and local climate," "critically dry vegetation that could serve as fuel for a wildfire," and "on-the-ground, real-time observations from PG&E field crews" do not have an objective marker for when they are met and are thus left to PG&E's discretion.  *See id.* ¶ 143.  Indeed, Statement 19 confirms that PG&E exercised this discretion and determined that "weather conditions did not warrant [shutting off power]."  *Id.* ¶ 314.  Even if hindsight has revealed that determination to be incorrect, the securities laws do not permit Plaintiffs to allege falsity based on PG&E's business judgment.  *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1419 (9th Cir. 1994) ("Plaintiffs cannot use the benefit of 20-20 hindsight to turn management's business judgment into securities fraud.") (citations omitted); *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 65 F. Supp. 3d 840, 861 (N.D. Cal. 2014), *aff'd*, 856 F.3d 605 (9th Cir. 2017) (dismissing Rule 10b-5 claim where the defendants "made a business judgment that, in hindsight, proved to be extremely poor").

For the foregoing reasons, the TAC does not sufficiently plead falsity as to Statements 2, 4-5, and 15-19.  However, Plaintiffs have adequately pled falsity as to Statements 9 and 12-14.

### 3. Statements Regarding PG&E Dividends (Statements 6-8)

Three statements by Defendants Earley and Williams say that PG&E would be increasing its dividend because PG&E had "continued to demonstrate leadership and commitment on safety" (Statement 6) and tout the "improvements [PG&E had] made in safety" (Statement 7) and its "progress on safety [and] reliability" (Statement 8).  Plaintiffs allege that these statements were false and misleading because PG&E had not made any improvements or progress in safety, much less enough to justify an increased dividend.  In support, Plaintiffs point to Judge Alsup's conclusion that "PG&E's performance with respect to vegetation management has been dismal," and testimony by PG&E's Vegetation Program Manager Richard Yarnell that PG&E had not "made any changes as a result of [the Butte Fire]" as evidence that Statements 6-8 were false.

United States District Court
Northern District of California

TAC ¶ 242.

The Officer Defendants, on the other hand, contend that these statements are inactionable puffery. The Court agrees with that characterization. Stating that PG&E has made "progress" and "improvements" in safety is a generalized, optimistic assessment of PG&E's efforts rather than a factual assertion capable of objective verification. *Macomb*, 39 F.4th 1092 at 1098–99; *see also Barnes v. Edison Int'l*, No. CV 18-09690 CBM, 2021 WL 2325060, at *9 (C.D. Cal. Apr. 27, 2021), *aff'd*, No. 21-55589, 2022 WL 822191 (9th Cir. Mar. 18, 2022) (finding statements from an electrical utility about "prioritization, improvement, and funding of safety procedures" to be puffery). Statements 6-8 are different than other "progress" statements that courts have found actionable, because the latter provided specific markers of advancement as opposed to generalized progression. *See Glazer* 63 F.4th 747 at 770 (finding statements of progress that provided a "concrete description of the past and present state of the pipeline" not to be puffery); *Warshaw v. Xoma Corp.*, 74 F.3d 955, 959 (9th Cir. 1996) (same for statements about imminent FDA approval of a new drug). Here, Plaintiffs fail to allege that the statements have any objectively verifiable indicators of progress or improvement. Thus, Statements 6-8 are inactionable puffery.

### 4.  Statement Regarding Reclosers (Statement 3)

Finally, Plaintiffs allege that Defendant Hogan's statement before the California Energy, Utilities, and Communication Subcommittee on Gas and Electric Infrastructure Safety (Statement 3) was false and misleading because it announced that PG&E was "just about done with" implementing its recloser program. TAC ¶¶ 89–92; 208–10. The program, which would allow the Utility to remotely disable reclosers in areas that were at high risk for wildfires, was allegedly never activated, as evidenced by Cal Fire's determination that PG&E reclosers had caused one of the North Bay Fires.

The Court finds that the TAC fails to plead falsity of Statement 3 for two reasons. First, the statement was a prediction made in 2015 as to the completion of the recloser program. That the recloser program had not been completed prior to the North Bay Fires in 2017, which were caused by an operative recloser, does not render false the statement made two years prior. *See In*

United States District Court
Northern District of California

*re Syntex Corp. Sec. Litig.*, 95 F.3d 922, 926 (9th Cir. 1996) (reasoning that "the fact that [a] prediction proves to be wrong in hindsight does not render the statement untrue when made"). Second, the statement asserts that PG&E was nearly finished with enabling the *capability* to remotely disable reclosers, not that PG&E would disable all reclosers in wildfire areas. The statement does not warrant that all reclosers in wildfire areas would be disabled permanently.

*     *     *

To sum up, the TAC fails to plead that a majority of the alleged misstatements are false or misleading. Plaintiffs have met this first element as to only Statements 9 and 12-14.

### C.   Scienter

To survive a motion to dismiss, the TAC must also create a strong inference of scienter. 15 U.S.C. § 78u-4(b)(2) ("[T]he complaint shall . . . state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."). This means that the "inference of scienter . . . must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 314 (2007). In other words, courts ask: "When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?" *Webb v. Solarcity Corp.*, 884 F.3d 844, 850 (9th Cir. 2018). Plaintiffs can meet this standard by alleging facts demonstrating an "intent to deceive, manipulate, or defraud" or "deliberate recklessness." *Id.* at 851 (quoting *In re Quality Sys.*, 865 F.3d at 1144). "An actor is deliberately reckless if he had reasonable grounds to believe material facts existed that were misstated or omitted, but nonetheless failed to obtain and disclose such facts although he could have done so without extraordinary effort." *Reese*, 747 F.3d at 569 (quoting *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 390 (9th Cir. 2010)).

Here, Plaintiffs assert a core operations theory of scienter as to each of the Officer Defendants. As a backstop, they also argue that other allegations in the TAC give rise to or strengthen the inference of scienter.

Case No.: 18-cv-03509-EJD
ORDER REGARDING MOTIONS TO DISMISS

United States District Court
Northern District of California

### 1.    Core Operations

Under the core operations theory of scienter, "[a]llegations regarding management's role in a corporate structure and the importance of the corporate information about which management made false or misleading statements may [] create a strong inference of scienter when made in conjunction with detailed and specific allegations about management's exposure to factual information within the company." *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 620 (9th Cir. 2017) (quoting *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 785 (9th Cir. 2008)).  Plaintiffs argue that the core operations theory establishes scienter here because (1) wildfire safety and compliance are a core operation of PG&E, (2) each of the Officer Defendants had actual access to information contradicting their alleged misstatements, and (3) even if they did not have actual access, it would be absurd to suggest that PG&E's management did not know of the contradictory information.

The first prong is clearly met.  In public filings and through the Officer Defendants, PG&E repeatedly reaffirmed that its "core business" and "top priority" are safety, and that "[s]afety is at the heart of everything" at PG&E. TAC ¶ 397–98.  This is unsurprising given the financial impact that compliance with wildfire safety regulations has on PG&E's bottom line and the potentially billions of dollars of liability PG&E may face from violations.  *Id.* ¶ 400.  The Officer Defendants argue that wildfire safety and compliance are merely aspects of a much broader range of PG&E's concerns, including nuclear, gas, and hydroelectric energy.  But this characterization ignores the fact that several activities can form a large company's core business.  That PG&E does not solely concern itself with providing electricity does not reduce the critical nature of wildfire safety and compliance to PG&E's business.

The main disagreement between the parties is the second prong: whether the Officer Defendants had actual access to information contradicting their alleged misstatements.  Plaintiffs allege that the Officer Defendants had real-time access to an internal PG&E database that documented numerous instances of noncompliance with safety regulations.  *Id.* ¶¶ 420–25.  The Officer Defendants therefore must have intended to deceive or defraud when they assured

1   investors that PG&E was compliant with wildfire safety regulations.  Alternatively, Plaintiffs

2   argue that, even if the Officer Defendants were somehow unaware of the violations listed in the

3   database, they at least knew of the existence of the database, so making statements acclaiming

4   PG&E's compliance without checking the database beforehand was deliberately reckless.

5          To start, the mere existence of a database to which the Officer Defendants have access is

6   insufficient to create a strong inference of scienter.  *See Metzler*, 540 F.3d at 1068 ("[C]orporate

7   management's general awareness of the day-to-day workings of the company's business does not

8   establish scienter—at least absent some additional allegation of specific information conveyed to

9   management and related to the fraud.").  Plaintiffs must plead particularized facts to show that the

10  Officer Defendants were exposed to the information in the database by, for example, indicating

11  specific information related to the fraud that was conveyed to and used by management.  *See id.*;

12  *In re Quality Sys.*, 865 F.3d at 1145 (scienter adequately pled with allegations that reports from

13  database were "automatically delivered to the management team" and that senior executives were

14  "in the habit" of continually monitoring the data).

15         Here, the database allegations are enough to create a strong inference of scienter only as to

16  Defendant Kane.[14]  Kane served as PG&E's CECO, meaning that she was responsible for

17  implementing PG&E's legal compliance efforts and overseeing compliance monitoring and

18  reporting.  TAC ¶ 433.  Her role included reporting on compliance matters directly to PG&E's

19  CEO and various boards.  *Id.*  To do so, Kane must have regularly monitored the compliance

20  database and kept abreast of compliance violations reported within PG&E.  *Id.* ¶ 434.  Plaintiffs

21  similarly allege that Hogan served on an Executive Officer Risk & Compliance Committee

22  charged with monitoring vegetation management issues.  *Id.* ¶ 401.  Hogan allegedly testified at

23  deposition about PG&E's policy for leaving 1-in-100 trees noncompliant, indicating that he had

24

25  ───────────────

26  [14] Plaintiffs allege access to the database and attempt to establish a strong inference of scienter for the Officer Defendants as a whole.  However, Rule 9(b)'s heightened pleading standard requires the TAC to allege scienter on a defendant-by-defendant basis to "inform each defendant separately

27  of the allegations surrounding his alleged participation in the fraud."  *Swartz v. KPMG LLP*, 476 F.3d 756, 764–65 (9th Cir. 2007).

28  Case No.: 18-cv-03509-EJD
    ORDER REGARDING MOTIONS TO DISMISS
    35

specific knowledge of violations. *Id.* However, the sole statement attributed to Hogan is about reclosers, so his knowledge of noncompliant vegetation management does not give rise to an inference of scienter. *Id.* ¶ 208. Williams is also named as having served on the same committee, but the TAC does not allege that he had any specific knowledge of PG&E's noncompliance, so the inference of scienter is attenuated. And the inference for the remaining individual Officer Defendants is even weaker still. Plaintiffs rely on allegations that Earley, Stavropoulos and Johns knew of PG&E's noncompliance because they apprised investors of PG&E's vegetation management efforts and had access to the real-time database. *Id.* ¶¶ 194, 264, 422, 425. However, Plaintiffs fail to plead facts suggesting that specific information related to the statements was conveyed to the Officer Defendants' or that the Officer Defendants were regularly made aware of the contents of the database. The fact that PG&E implemented a program for employees to report safety violations up the chain of command does not change this result, because the TAC fails to allege any specific report of noncompliance that reached the Officer Defendants. *Id.* ¶¶ 428–29.

Though Plaintiffs' core operations theory fails as to most of the Officer Defendants at the second prong, the analysis does not end there. In rare circumstances, core operations allegations may suffice to establish scienter even without accompanying particularized allegations "where the nature of the relevant fact is of such prominence that it would be 'absurd' to suggest that management was without knowledge of the matter." *Reese*, 747 F.3d at 576 (citation omitted). Plaintiffs argue that particularized allegations about management's exposure to the facts relevant to this case are unnecessary to establish scienter here, because it would be absurd to suggest the Officer Defendants did not know of the Utility's noncompliance. As the argument goes, compliance and safety are critical to PG&E's business, so senior leadership must have been deeply involved in and knowledgeable about violations that would threaten PG&E's bottom line.

The Court agrees that this case presents a "rare circumstance" in which scienter may be established without particularized allegations. Normally, the regulatory violations in PG&E's database would constitute day-to-day operational data of which management would only have a

United States District Court
Northern District of California

general awareness. But given the existential threat created by PG&E's numerous violations and ensuing liability, it is difficult to believe the Officer Defendants were not acutely aware of the noncompliance data. *Compare Berson*, 527 F.3d at 988 (finding it absurd to suggest the directors would not have known about stop-work orders affecting tens of millions of dollars), *with* TAC ¶¶ 19, 33 (alleging that PG&E incurred tens of billions of dollars in liability for the North Bay Fires and the Camp Fire). PG&E's being compelled to declare bankruptcy is further evidence that its noncompliance with vegetation management regulations was mission-critical information that top level management must have known. The TAC, with all allegations taken as a whole, therefore creates a strong inference that the Officer Defendants must have known of a prominent issue like wildfire regulatory violations that would expose PG&E to severe financial penalties and potentially threaten its viability as a going concern. That said, this strong inference of scienter still does not extend to Defendant Hogan. The only statement attributed to Hogan (Statement 3) concerns operation of reclosers, which does not have any obvious connection to the regulatory violations contained in the database.

### 2.    Other Allegations

The Supreme Court has emphasized that courts must review all the allegations holistically when determining whether scienter has been sufficiently pled. *Tellabs*, 551 U.S. at 323. To that end, Plaintiffs argue that other allegations in the TAC strengthen the inference of scienter. Specifically, Plaintiffs allege that PG&E's probation motivated the Officer Defendants to deceive investors, several of the Officer Defendants departed from PG&E under suspicious circumstances, and the Officer Defendants gave changing explanations as to why the ESRB-8 Shutoff Protocol was not activated. *See* TAC ¶¶ 405, 415, 454–55. Though these additional allegations add pieces to the scienter puzzle, they do not themselves create a strong inference that the Officer Defendants had the intent to deceive or defraud.

In sum, the absurdity prong of Plaintiffs' core operations theory gives rise to the strong inference of scienter as to all the Officer Defendants but Hogan.

### D.    Loss Causation

To satisfy the loss causation requirement, Plaintiffs must allege that the Officer Defendants' alleged misstatements, as opposed to some intervening event, caused the loss for which Plaintiffs seek to recover damages.  15 U.S.C. § 78u-4(b)(4); *see also Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342–44 (2005).  "The burden of pleading loss causation is typically satisfied by allegations that the defendant revealed the truth through 'corrective disclosures' which 'caused the company's stock price to drop and investors to lose money.'"  *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1209 (9th Cir. 2016) (quoting *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 264 (2014)).  However, the Ninth Circuit recognizes that there are many other ways to meet the pleading standard; loss causation is simply a variant of proximate cause, so "the ultimate issue is whether the defendant's misstatement, as opposed to some other fact, foreseeably caused the plaintiff's loss."  *Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 753 (9th Cir. 2018) (citations omitted).

Here, Plaintiffs allege that PG&E's stock price dropped nine times during the Class Period in response to disclosures that revealed "the extent and effects of PG&E's responsibility" for the North Bay Fires and the Camp Fire.  TAC ¶¶ 327–90.  For the reasons stated below, the Court finds that Plaintiffs have alleged loss causation as to some of these disclosures, but not others.

The first three disclosures alleged in the TAC were made shortly after the start of the 2017 North Bay Fires.  Plaintiffs allege that a CPUC litigation hold letter on October 12, 2017, PG&E's Form 8-K on October 13, 2017, and a press release included with PG&E's Form 8-K on December 20, 2017 disclosed that PG&E was under investigation for potential regulatory violations and causing the North Bay Fires.  *Id.* ¶¶ 323–41.  But these allegations fail to satisfy the loss causation element because the disclosures were not "corrective."  The announcement of an investigation only reveals the potential for PG&E to be found liable for violating regulations, not that it had been found liable.  *Loos v. Immersion Corp.*, 762 F.3d 880, 888–89 (9th Cir. 2014), *as amended* (Sept. 11, 2014) (citing *Metzler*, 540 F.3d at 1064) ("[A] securities fraud plaintiff is not required to allege an outright admission of fraud to survive a motion to dismiss . . . [but] a mere

1    'risk' or 'potential' for fraud is insufficient to establish loss causation.").

2    However, it follows that the next two disclosures do establish loss causation.  On May 25,

3    2018, Cal Fire issued a press release stating that its investigation had revealed that PG&E failed to

4    ensure clearance between trees and power lines in violation of Public Resources Code section

5    4293.  TAC ¶¶ 346–52.  Then, on June 8, 2018, Cal Fire issued another press release stating that

6    its investigations had been referred to county district attorneys due to evidence of state law

7    violations.  *Id.* ¶¶ 353–62.  Unlike the earlier reports of PG&E's potential liability, these two press

8    releases disclose the role PG&E's regulatory violations played in causing the North Bay Fires and

9    that PG&E would incur significant liability.  These disclosures in turn caused prior statements by

10   the Officer Defendants assuring investors of PG&E's compliance to become false or misleading.

11   The remaining four disclosures suffer from the same problem as the first three—*i.e.*, they

12   only disclose the risk or potential that PG&E's violations had caused the Camp Fire.  Plaintiffs

13   allege that these disclosures made between November 8, 2018 and November 15, 2018 revealed

14   that PG&E not only caused the Camp Fire, but did so by violating state safety regulations.  *Id.* ¶¶

15   363–90.  But that is not exactly what the disclosures say.  Rather, they concern the potential for

16   significant liabilities that PG&E faced due to the fires.  Given that California follows the inverse

17   condemnation doctrine, which imposes liability on utilities like PG&E even if they followed all

18   safety regulations, the subsequent drop in stock prices reflect that PG&E could be held financial

19   responsible regardless of whether the Utility had committed any violations.  Thus, Plaintiffs have

20   sufficiently pled loss causation as to the May 25, 2018 and June 8, 2018 disclosures.

21                              *        *        *

22   To summarize, the TAC fails to state a Section 10(b) claim under the Exchange Act.

23   Plaintiffs have adequately pled falsity as to Statements 9 and 12-14.  They have also sufficiently

24   pled loss causation and scienter as to all defendants except for Defendant Hogan.  However, the

25   TAC fails to plead that Defendant Kane or any other Officer Defendant was the "maker" of

26   Statements 9 and 12-14.  Accordingly, the Court **GRANTS** the Officer Defendants' motion to

27   dismiss the Section 10(b) claims.

28   Case No.: 18-cv-03509-EJD
     ORDER REGARDING MOTIONS TO DISMISS

United States District Court
Northern District of California

### E.    Control Person Liability Under Section 20(a) of the Exchange Act

Plaintiffs have failed to state a claim for violations of Section 10(b) and Rule 10b-5. Without the predicate "primary violation of federal securities law," Plaintiffs cannot establish control liability. *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 623 (9th Cir. 2017). Thus, the Court **GRANTS** the Officer Defendants' motion to dismiss the Section 20(a) claim.

## III.    CONCLUSION

For the foregoing reasons, the Court **GRANTS** Officer Defendants' motion to dismiss the TAC's Exchange Act claims. Because granting Plaintiffs an additional opportunity to amend the complaint would not be futile, cause undue delay, or unduly prejudice the Officer Defendants, and Plaintiffs have not acted in bad faith, the Court grants leave to amend. *Leadsinger, Inc. v. BMG Music Publ'g*, 512 F.3d 522, 532 (9th Cir. 2008). Should they choose to file an amended complaint, Plaintiffs must do so within **30 days** of this Order and attach a redlined copy comparing the TAC with the Fourth Amended Complaint pursuant to the Section III of the Court's Standing Order for Civil Cases.

### MOTION TO DISMISS – SECURITIES ACT CLAIMS

The Securities Act Plaintiffs assert claims under Sections 11 and 15 on behalf of a putative class of investors who purchased public notes issued in three offerings in March 2016, December 2016, and March 2017 (the "Notes Offerings" for those months) and purchasers of privately issued notes exchanged for public notes in April 2018 (the "Exchange Offer") (together with the Notes Offerings, the "Offerings"). The Securities Act Plaintiffs generally allege that PG&E's registration statements and prospectuses (the "Offering Documents") concealed wildfire risks that materialized in the 2017 North Bay Fires and 2018 Camp Fire.

## I.    BACKGROUND

The relevant factual background for the Securities Act claims largely overlaps with that for the Exchange Act claims. *See supra*, Background, Sections A-B. To the extent additional facts are necessary to provide context for the Securities Act claims, the Court outlines them below.

United States District Court
Northern District of California

1    The Director Defendants served as non-executive members of PG&E's board of directors

2    and signed one or more registration statements related to the Offerings.  TAC ¶¶ 515, 518–28.

3    The Underwriter Defendants are financial institutions that participated in one or more of the 2016-

4    2017 Notes Offerings.  *Id.* ¶¶ 531–55.

5    On February 11, 2014, PG&E filed a Form S-3 shelf registration (the "2014 Shelf

6    Registration"), which permitted PG&E to streamline future offerings.  Two years later, PG&E

7    filed a Rule 424(b)(2) Prospectus Supplement to the 2014 Shelf Registration for the issuance of

8    $600 million of senior notes in the March 2016 Notes Offering.  *Id.* ¶ 630(a).  The prospectus

9    supplement incorporated by reference PG&E's Form 10-K for 2015.  *Id.*

10    On November 28, 2016, PG&E filed a Rule 424(b) Prospectus Supplement to the 2014

11    Shelf Registration for the issuance of $650 million of senior notes in the December 2016 Notes

12    Offering.  *Id.* ¶ 630(b).  The prospectus supplement incorporated by reference PG&E's Form 10-K

13    for 2015.  *Id.*

14    On January 25, 2017, PG&E filed a new Form S-3 shelf registration statement (the "2017

15    Shelf Registration").  Less than two months later, PG&E filed a Rule 424(b) Prospectus

16    Supplement to the 2017 Shelf Registration for the issuance of $600 million of senior notes in the

17    March 2017 Notes Offering.  *Id.* ¶ 630(c).  The prospectus supplement incorporated by reference

18    the same three SEC filings as in the 2016 prospectus supplement, as well as PG&E's Form 10-K

19    for 2016.  *Id.*

20    On November 27, 2017, after North Bay Fires had started burning, PG&E sold restricted

21    notes in a private placement.  PG&E filed a Form 8-K filed that same day (Director and

22    Underwriter Defs.' RJN; Blake Decl. Ex. 9, ECF No. 286-13), and a Form 10-K for 2017 three

23    months later (Director and Underwriter Defs.' RJN; Blake Decl. Ex. 10, ECF No. 286-14).

24    On April 13, 2018, PG&E filed a Rule 424(b)(3) Prospectus for the exchange of restricted

25    unregistered notes issued in the November 2017 private placement for publicly traded notes.  ECF

26    No. 286-16.  The prospectus incorporated by reference PG&E's Form 10-K for 2017.  *Id.* ¶

27    630(d).

28    Case No.: 18-cv-03509-EJD
ORDER REGARDING MOTIONS TO DISMISS

## II.    LEGAL STANDARD

Unlike claims under Section 10(b) and Rule 10b-5, claims under Sections 11 and 15 of the Securities Act do not automatically trigger the particularity requirements of Rule 9(b) because they do not inherently involve fraud.  Even so, Securities Act claims may be subject to Rule 9(b)'s heightened pleading standard if they "sound in fraud."  *In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869, 885 (9th Cir. 2012).  To determine whether a complaint "sounds in fraud," courts must closely examine the language and structure of the complaint and decide whether it "allege[s] a unified course of fraudulent conduct" and "rel[ies] entirely on that course of conduct as the basis of a claim."  *Id.* at 885–86 (alterations in original) (citing *Rubke v. Capitol Bancorp Ltd*, 551 F.3d 1156, 1161 (9th Cir. 2009)).

Here, the Securities Act Plaintiffs argue that the Securities Act claims in the TAC should not be held to the heightened pleading requirements of Rule 9(b).  They note that the Securities Act section of the complaint disclaims any reference to the Exchange Act claims' allegations of fraud.  TAC ¶ 497.  The Securities Act claims also involve different defendants who made 34 statements not alleged in the Exchange Act claims.  However, "it is the conduct pled that matters—not necessarily the words with which plaintiffs artfully seek to allege their claims."  *In re Bare Escentuals, Inc. Sec. Litig.*, 745 F. Supp. 2d 1052, 1068 (N.D. Cal. 2010).  A closer look at the language and structure of the TAC reveals that both the Exchange Act claims and Securities Act claims are based upon the same course of conduct: PG&E's inadequate wildfire safety efforts and the alleged concealment of that failure.  *See, e.g.*, TAC ¶¶ 557 ("PG&E engaged in a pattern and practice of ignoring laws and California safety regulations and failed to take appropriate measures to mitigate wildfire hazards."), 632 ("The Offering Documents . . . omitted material adverse information from investors regarding PG&E's deficient safety practices and policies while simultaneously falsely assuring investors that PG&E complied with safety laws and regulations, sufficiently invested in safety, and provided for public safety by clearing vegetation around its equipment, updating equipment, and inspecting its equipment.").  Given that they substantially rely on the same course of conduct underlying the Exchange Act claims, the Securities Act claims

1    sound in fraud.

2        The bankruptcy court's decision to not apply the Rule 9(b) pleading standard to PG&E's

3    claims objections does not change this result. The bankruptcy court, applying precedent from the

4    Southern District of New York, decided that the Section 11 claim was not a fraud claim by nature,

5    so the heightened pleading standard could not apply. *In re PG&E Corp.*, No. BR 19-30088-DM,

6    2024 WL 4230403, at *19 (Bankr. N.D. Cal. Sept. 18, 2024) (citing *In re Initial Pub. Offering*

7    *Sec. Lit.*, 241 F. Supp 2d 281, 341–42 (S.D.N.Y. 2003)). That rule, or at least its application here,

8    is odds with the Ninth Circuit's prescription—which is binding on this Court—to focus not on

9    how the Securities Act claims are drafted, but on the underlying conduct that forms the basis of

10   the claims. *Rubke*, 551 F.3d at 1161; *see also Bare Escentuals*, 745 F. Supp. 2d at 1068.

11   Therefore, the Court finds that Rule 9(b) applies to Plaintiffs' Section 11 and Section 15 claims.

12   **III.    DISCUSSION**

13       The Securities Act Defendants assert several arguments in their motion to dismiss. *First*,

14   the Securities Act Plaintiffs fail to allege any material misstatement or omission in the Offering

15   Documents. *Second*, the Securities Act Plaintiffs lack standing to assert the claims based on the

16   2016 Notes Offerings. *Third*, the claims based on the 2016 and 2017 Notes Offerings are time-

17   barred. *Fourth*, the Securities Act Plaintiffs' claims based on the 2018 Exchange Offer fail

18   because Section 11 does not apply to private offerings. *Fifth*, and finally, the Securities Act

19   Plaintiffs fail to state a Section 15 claim. The Court addresses each argument in turn.

20       **A.    Material Misstatement or Omission**

21       To state a Section 11 claim, the Securities Act Plaintiffs must allege that a registration

22   statement "contained an untrue statement of a material fact or omitted to state a material fact . . .

23   necessary to make the statements therein not misleading." 15 U.S.C. § 77k(a). In other words,

24   they must plead "(1) that the registration statement contained an omission or misrepresentation,

25   and (2) that the omission or misrepresentation was material, that is, it would have misled a

26   reasonable investor about the nature of his or her investment." *Rubke*, 551 F.3d at 1161 (quoting

27   *In re Daou Sys., Inc.*, 411 F.3d 1006, 1027 (9th Cir. 2005)). For an omission to be misleading, it

28   Case No.: 18-cv-03509-EJD

United States District Court
Northern District of California

1    "must affirmatively create an impression of a state of affairs that differs in a material way from the

2    one that actually exists." *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002)

3    (citation omitted). The omitted information must also have existed at the time the registration

4    statement became effective. *Rubke*, 551 F.3d at 1164.

5        "Generally, whether a public statement is misleading, or whether adverse facts were

6    adequately disclosed is a mixed question to be decided by the trier of fact. *SEC v. Todd*, 642 F.3d

7    1207, 1220 (9th Cir. 2011). "Accordingly, resolving an issue as a matter of law is only

8    appropriate when the adequacy of the disclosure is 'so obvious that reasonable minds [could] not

9    differ.'" *Id.* (citations omitted). At the pleading stage, plaintiffs hold "a relatively minimal

10   burden," as they "need only show a material misstatement or omission to establish [a] prima facie

11   case." *Hildes v. Arthur Andersen LLP*, 734 F.3d 854, 859 (9th Cir. 2013) (quotations omitted).

12        **1.    Statements Regarding PG&E's Safety Practices**

13       The Securities Act Plaintiffs allege that certain statements in the Offering Documents were

14   materially misleading because they failed to disclose "the already existing negative impact on

15   PG&E as a result of PG&E's subpar safety practices," including "the extent of the risks or that

16   they had already come to fruition." TAC ¶¶ 633–34. According to the Securities Act Plaintiffs,

17   PG&E only disclosed the wildfire risks posed by "droughts or other weather-related conditions or

18   events, . . . [like] climate change," and misleadingly omitted the fact that PG&E's safety violations

19   created additional risk that would materialize in actual wildfires. *See id.* ¶¶ 634–39 (citing

20   Statements 1-2, 5-6, 9-11, 13-14, 18, 20, 23-24, 26-27, and 32). The Securities Act Plaintiffs'

21   theory relies on the framework set forth in *In re Facebook, Inc. Sec. Litig.*, where the Ninth Circuit

22   held that "a company may make a materially misleading statement when it speaks entirely of as-

23   yet-unrealized risks when the risks have already come to fruition." 87 F.4th 934, 950 (9th Cir.

24   2023) (quotations and citation omitted); *see also In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 702–

25   05 (9th Cir. 2021). Put differently, stating that increased risk of wildfires "could" occur is

26   misleading to a reasonable investor because PG&E's safety violations had already increased the

27   risk of and caused wildfires. *See In re Alphabet, Inc. Sec. Litig.*, 1 F.4th at 704.

United States District Court
Northern District of California

The Securities Act Defendants tell a different story.  According to them, the Offering Documents adequately informed investors of the risk that PG&E's safety practices would cause catastrophic fires and that they had caused at least the 2015 Butte Fire.  PG&E's 2015 Form 10-K (incorporated into the 2016 and 2017 Offering Documents) disclosed that "the breakdown or failure of equipment, electric transmission or distribution lines . . . can cause explosions, fires, or other catastrophic events," and that "failure to take expeditious or sufficient action to mitigate operating conditions, facilities, or equipment, that the Utility has identified, or reasonably should have identified, as unsafe, [could] then lead[] to a catastrophic event (such as a wild land fire . . . .).  Blake Decl. Ex. 2, at 29–30, ECF No. 286-4.  The document further states that PG&E's practices may have caused the Butte Fire and that PG&E could be held monetarily liable.  *See id.* at 36–37, 124.  PG&E's Q1 2016 Form 10-Q (incorporated into the December 2016 and March 2017 Offering Documents) then disclosed Cal Fire's determination that PG&E's vegetation management had caused the Butte Fire.  Blake Decl. Ex. 4, at 36, ECF No. 286-7.  And the 2016 Form 10-K incorporated into the March 2017 Offering Documents disclosed that PG&E had been sued for the Butte Fire and that "it is probable that [PG&E] will incur a loss of at least $750 million."  *See, e.g.*, Blake Decl. Ex. 7, at 27, ECF No. 286-10.

Moreover, the Securities Act Defendants argue that it was widely known that PG&E's deficient safety practices had caused wildfires.  The TAC alleges that PG&E's deficient vegetation management practices had ignited wildfires in the past, which was made public through criminal convictions and monetary penalties.  TAC ¶¶ 95–96.  An article cited in the TAC also notes that California "required [PG&E] to report fires beginning in June 2014.  It has since disclosed its equipment started about 1,550 fires through 2017."  Blake Decl. Ex. 12, at 3–4, ECF No. 286-17 (cited in the TAC at ¶ 499 n.151).

Reading the allegedly misleading statements in this broader context, it is difficult to see how reasonable minds could differ as to the adequacy of PG&E's disclosure.  *Todd*, 642 F.3d at 1220.  Though the allegedly misleading statements spoke to how certain factors "could" lead to greater wildfire risk, they did not create the false impression that deficient safety practices were

United States District Court
Northern District of California

not a contributing factor or that PG&E's safety practices were wholly adequate.  *See Brody*, 280 F.3d at 1006 (9th Cir. 2002) (citation omitted).  Indeed, PG&E dispelled any such notion when it disclosed that its practices had caused the 2015 Butte Fire.  The Securities Act Plaintiffs' argument that PG&E should have affirmatively communicated its existing safety deficiencies in the Offering Documents is unavailing, because PG&E had already been making that information public since 2014.  *See* Blake Decl. Ex. 12, at 3–4, ECF No. 286-17 ("The state required [PG&E] to report fires beginning in June 2014.  It has since disclosed its equipment started about 1,550 fires through 2017."); *see also* Blake Decl. Ex. 13, ECF No. 286-18 (CPUC Fire Incident Data spreadsheet listing fires caused by PG&E's equipment).  It would be impractical and potentially more misleading to investors for PG&E to republish that voluminous information.  *See Rubke*, 551 F.3d at 1163 ("[I]t is pointless and costly to compel firms to reprint information already in the public domain. . . . Section 11 does not require the disclosure of all information a potential investor might take into account when making his decision . . . . In many cases, this information will not only be extraneous, but may by its very volume confuse and mislead potential investors.").  Further, PG&E was not required to characterize these deficiencies as dismal when there is no allegation that PG&E knew the safety violations would cause catastrophic wildfires in the future.  *See, e.g.*, *In re Facebook, Inc. Sec. Litig.*, 477 F. Supp. 3d at 1023–24 (explaining that companies "are not required to engage in 'self-flagellation' by disclosing unproven allegations").

In response, Plaintiffs contend that the Securities Act Defendants' motion to dismiss improperly asserts a truth-on-the-market defense.  This defense excuses a defendant's failure to disclose material information where the information was made available to the public by other sources "with a degree of intensity and credibility sufficient to effectively counterbalance any misleading impression created by the insider's one-sided representations."  *Provenz v. Miller*, 102 F.3d 1478, 1493 (9th Cir. 1996) (internal quotations and citation omitted).  The truth-on-the-market defense is ordinarily unavailable to defendants at the motion to dismiss stage, because it refutes an alleged misrepresentation's materiality, which is a fact-intensive inquiry.  *See Bos. Ret. Sys. v. Uber Techs., Inc.*, No. 19-CV-06361-RS, 2020 WL 4569846, at *6 (N.D. Cal. Aug. 7,

Case No.: 18-cv-03509-EJD
**ORDER REGARDING MOTIONS TO DISMISS**
46

1   2020).

2       The Court does not see the Securities Act Defendants as necessarily asserting this defense.

3   Since 2014, PG&E had publicly disclosed instances where its safety violations caused fires, so the

4   investing public knew that risk affected PG&E.  Courts do not require registration statements to

5   restate all information in the public domain to provide an adequate disclosure of risks.  *See, e.g.*,

6   *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1061 (9th Cir. 2014) ("[N]o

7   matter how detailed and accurate disclosure statements are, there are likely to be additional details

8   that could have been disclosed but were not." (cleaned up)).  *Barnes v. Edison Int'l*, another

9   securities fraud case filed against a public utility related to wildfires, is instructive on this point.

10  No. CV 18-09690 CBM, 2021 WL 2325060, at *11 (C.D. Cal. Apr. 27, 2021), *aff'd*, No. 21-

11  55589, 2022 WL 822191 (9th Cir. Mar. 18, 2022).  There, too, the court found that the defendants

12  "cannot be found to have materially omitted the risks posed by its infrastructure when that

13  information was publicly available through its filings with CPUC."  *Id.* at *11.  This is especially

14  the case where, as here, "Plaintiffs' own allegations reveal[ed] that the market was aware of the

15  safety failures."  *Id.* at *10.  Accordingly, the Securities Act Plaintiffs fail to allege that Statements

16  1-2, 5-6, 9-11, 13-14, 18, 20, 23-24, 26-27, and 32 contained material misstatements or omissions.

17              **2.      Statements Regarding Investments**

18      The Securities Act Plaintiffs also argue that certain statements in the Offering Documents

19  falsely emphasized PG&E's safety efforts and investment into its vegetation management and

20  infrastructure.  *See* TAC ¶¶ 640–58 (citing Statements 3-4, 7-9, 12, 15, 16-19, 21-22, 28, and 29-

21  33).

22      The Securities Act Plaintiffs contend that statements saying PG&E was "making

23  substantial investments to build" better systems (Statements 4, 12, 29), "us[ing] its risk-assessment

24  process to prioritize infrastructure investments for longer-term risks" (Statements 3, 15), and

25  "continu[ing] to demonstrate leadership and commitment on safety" (Statement 19)—created false

26  impressions contrary to reality.  The Court disagrees.  These statements are the kind of subjective

27  assessments that courts have regularly found to be inactionable puffery.  *See, e.g.*, *Barnes*, 2021

28  Case No.: 18-cv-03509-EJD
    ORDER REGARDING MOTIONS TO DISMISS
    47

WL 2325060 at *9 (public utility's vague statements about "prioritization, improvement, and funding of safety procedures" were assessments that "hardly amount[] to a securities violation"); *Plumley v. Sempra Energy*, 2017 WL 2712297, at *7 (S.D. Cal. June 20, 2017) (finding statements regarding "commitment to or prioritization of safety" to be corporate puffery because they were "too nonspecific and unmeasurable"). Here, too, PG&E's statements about making "substantial investments," playing an "important role" in reducing the risk of wildfires, "prioritiz[ing] infrastructure investments," and taking "appropriate steps to maintain the safety of its gas and electric operations" are not specific enough to be verified in any objective manner. *Retail Wholesale & Dep't Store Union Loc. 338 Ret. Fund v. Hewlett-Packard Co.*, 845 F.3d 1268, 1275 (9th Cir. 2017) (citation omitted). That PG&E had been committing safety violations, *see* TAC ¶¶ 650–58, does not change this fact.

Similarly, the TAC fails to state a claim for statements saying that PG&E had upgraded its equipment and deployed smart switches to increase safety. *Id.* ¶¶ 644–45 (Statements 7, 8, 16, 17, 30, 31). The Securities Act Plaintiffs claim that these statements were misleading because they "emphasiz[ed] the Company's upgrades to its equipment" or failed to "disclose that PG&E did not have adequate systems or policies in place . . . to prevent wildfires." *Id.* However, they do not allege that the upgrades or deployment of smart switches did not actually occur. Nor do they allege that PG&E had modernized all its equipment at once or that the changes did not increase wildfire safety. Indeed, in its 2015 Form 10-K, PG&E noted that it "plans to continue performing work to improve the reliability and safety of its electricity operations." *See* Blake Decl. Ex. 2, at 17, ECF No. 286-4. And as to the implementation of smart switches, PG&E disclosed that the devices would "reduce the duration of customer outages," not necessarily reduce wildfire risk. *Id.*

The Securities Act Plaintiffs' allegations as to other statements also fail to state a claim. They argue that PG&E's disclosure that it had retained third-party monitor as part of its criminal conviction for the San Bruno gas pipeline explosion "to help ensure that the Utility takes reasonable and appropriate steps to maintain the safety of its gas and electric operations" falsely assured investors PG&E had taken those steps. TAC ¶ 647 (Statement 33). Yet, the Securities

1   Act Plaintiffs do not allege that PG&E failed to retain a monitor or that PG&E failed to take any

2   steps.  The Securities Act Plaintiffs point to PG&E's later safety violations as post-hoc evidence

3   that PG&E had not retained a monitor, but the fact that PG&E was found to have violated safety

4   regulations is not necessarily evidence of its failure to take steps to avoid those violations.  The

5   Securities Act Plaintiffs also allege that it was misleading for PG&E to state that its equipment

6   might fail for reasons "beyond the Utility's control."  *Id.* ¶ 646 (Statements 9, 18, 32).  However,

7   that phrase is directly preceded by the qualifier "many of which are," which refutes the impression

8   that PG&E does not take responsibility for all equipment failures.  *Id.*  For those reasons, the

9   Securities Act Plaintiffs fail to allege that Statements 3-4, 7-9, 12, 15, 16-19, 21-22, 28, and 29-33

10  were false or misleading.

### 3.    2018 Exchange Offer Statements Regarding the North Bay Fires

12       Next, the Securities Act Plaintiffs allege that the Offering Documents accompanying the

13  April 2018 Exchange Offer contained three misrepresentations or omissions regarding the

14  PG&E's liability for the North Bay Fires and the wildfires' impact on PG&E.  *Id.* ¶¶ 659–73

15  (citing Statements 24, 25, and 34).  The Securities Act Plaintiffs argue that it was misleading for

16  the Offering Documents to represent that it was only a possibility that PG&E caused and would be

17  held liable for the fires, when in fact, there were sufficient facts to make the loss probable.

18       The Securities Act Plaintiffs fail to allege any of the three statements were misleading.

19  The TAC itself alleges that, at the time of the 2018 Exchange Offer, Cal Fire and CPUC were still

20  investigating and not officially determined the cause of the North Bay Fires.  *See id.* ¶ 247.

21  Perhaps recognizing this, the Securities Act Plaintiffs rely on accounting principles for loss

22  contingencies to contend that PG&E should have reported a loss caused by the fires that was

23  "probable" and able to be "reasonably estimated."  *Id.* ¶¶ 667–773.  But PG&E disclosed that "[i]t

24  is reasonably possible that facts could emerge that lead PG&E . . . to believe that a loss is

25  probable."  *Id*. ¶ 347.  The Securities Act Plaintiffs do not plead either that "the speaker did not

26  hold the belief she professed," or that "the belief is objectively untrue," both of which are required

27  to render an opinion statement like PG&E's materially misleading.  *City of Dearborn Heights*, 856

28  Case No.: 18-cv-03509-EJD
    **ORDER REGARDING MOTIONS TO DISMISS**

United States District Court
Northern District of California

1    F.3d at 615–16.  Thus, the TAC fails to plead that the statements in Offering Documents for the

2    April 2018 Exchange Offer (Statements 24, 25, and 34) were false or materially misleading.

3                    **4.    Items 303 of SEC Regulation S-K**

4           Finally, the Securities Act Plaintiffs allege that the Offering Documents misled investors

5    by failing to comply with the disclosure requirements of Item 303 of SEC Regulation S-K.  TAC ¶

6    ¶¶ 674–82.  Item 303 requires registration statements to, among other things, "[d]escribe any

7    known trends or uncertainties that have had or that the registrant reasonably expects will have a

8    material favorable or unfavorable impact on net sales or revenues or income from continuing

9    operations."  17 C.F.R. §229.303(a)(3)(i)-(ii).  The Securities Act Plaintiffs allege that PG&E

10   knew of adverse safety trends—*i.e.*, poor vegetation management and safety violations—

11   unfavorably impacting PG&E's financial operations and did not disclose them.

12          However, as described above, PG&E did disclose those risks.  And by updating investors

13   of investigations regarding the cause of the Butte Fire and North Bay Fires and the ultimate

14   determination that PG&E had caused those fires, PG&E disclosed the known trend or uncertainty

15   and satisfied the requirements of Items 303 and 503.  *See, e.g.*, *In re Progenity, Inc. Sec. Litig.*,

16   2023 WL 219345, at *14 (S.D. Cal. Jan. 13, 2023) (rejecting Item 303 claim where defendants

17   "disclosed that [the issuer] was experiencing downturns"); *Mosco v. Motricity, Inc.*, 649 F. App'x

18   526, 528 (9th Cir. 2016) (rejecting Item 303 claim when "the Registration Statement disclosed the

19   very trend that Plaintiffs claim [the issuer] hid from the market, adequately warning investors"); *In*

20   *re Rocket Fuel, Inc. Sec. Litig.*, 2015 WL 9311921, at *9 (N.D. Cal. Dec. 23, 2015) (dismissing

21   Item 303 claims where adverse trend was "extensively discussed in the registration statements").

22   PG&E cannot be held liable under these provisions for not projecting those risks into the future.

23   *In re Verifone Sec. Litig.*, 784 F. Supp. 1471, 1483 (N.D. Cal. 1992), *aff'd*, 11 F.3d 865 (9th Cir.

24   1993).  As such, the TAC fails to plead that PG&E did not meet the requirements of Item 303.

25                    **B.    Standing to Assert Section 11 Claims**

26          Next, the Securities Act Defendants take aim at the Securities Act Plaintiffs' standing to

27   bring Section 11 claims.  First, the Securities Act Defendants argue that the TAC fails to plead that

28   Case No.: 18-cv-03509-EJD
     ORDER REGARDING MOTIONS TO DISMISS

United States District Court
Northern District of California

any named plaintiff purchased notes in the March 2016 Notes Offering in reliance on the Offering Documents. Second, they claim the Securities Act Plaintiffs fail to plead that a named plaintiff purchased any notes traceable to the December 2016 Notes Offering. Third, the Securities Act Defendants argue that the claims against the Director Defendants based on the March and December 2016 Notes Offerings fail because the alleged misrepresentations post-date the effective date of the 2014 Shelf Registration Statement.

Before turning to those arguments, the Court finds it appropriate to first address a threshold issue. The Securities Act Plaintiffs claim that, even if no named plaintiff has statutory standing to assert Section 11 claims for certain Notes Offerings, they have "class standing" to assert those claims because at least some named plaintiffs purchased notes in the March 2017 Notes Offering. For this proposition, the Securities Act Plaintiffs rely on *Melendres v. Arpaio*, 784 F.3d 1254 (9th Cir. 2015). In *Melendres*, the Ninth Circuit held that "once the named plaintiff demonstrates her individual standing to bring a claim, the standing inquiry is concluded, and the court proceeds to consider whether the Rule 23(a) prerequisites for class certification have been met." *Id.* at 1261–62. That is, a plaintiff who establishes Article III standing for her own claim has class standing to assert the claims of absent class members raising a sufficiently similar set of concerns, even if the named plaintiff cannot herself meet the elements to assert the absent class members' claims. *See id.* at 1262–63. The Securities Act Plaintiffs seek to extend *Melendres* to the Section 11 context. They argue that they have statutory standing to bring claims as to at least the March 2017 Notes Offering, and the statements in the Offering Documents for all of PG&E's Notes Offerings are sufficiently similar, so they have class standing to assert claims for all the Notes Offerings.

The Court is unconvinced that *Melendres* applies to Section 11 claims. "When a company has issued shares in multiple offerings under more than one registration," a plaintiff asserting Section 11 claims must plead facts from which "a court can reasonably infer that shares purchased in the aftermarket are traceable to a particular offering." *In re Century Aluminum Co. Sec. Litig.*, 729 F.3d 1104, 1107 (9th Cir. 2013). "Though difficult to meet in some circumstances, this tracing requirement is the condition Congress has imposed for granting access to the 'relaxed

liability requirements' § 11 affords." *Id.* (citations omitted).  Extending the concept of class

standing from *Melendres* to the Section 11 context would directly conflict with the tracing

requirement and undermine the constraints that requirement places on Section 11 claims.  The

only case the Securities Act Plaintiffs cite in which a court has applied class standing to Section 11

claims did so under facts different than the ones here.  *NECA-IBEW Health & Welfare Fund v.*

*Goldman Sachs & Co.*, 693 F.3d 145 (2d Cir. 2012).  In *NECA-IBEW*, the Second Circuit

permitted named plaintiffs to proceed with Section 11 claims on behalf of purchasers of securities

issued in other offerings because the alleged misstatements were all within the same shelf

registration statement and the same loan originators had sponsored the different offerings.  *See id.*

at 151, 164.  Not so here, where the alleged misstatements span several different registration

statements, and various underwriters participated across the Notes Offerings.  With that out of the

way, the Court proceeds to address the Securities Act Defendants' standing arguments.

### 1.    Standing Based on the March 2016 Notes Offering

If a plaintiff purchased a security "after the issuer has made generally available to its

security holders an earning statement covering a period of at least twelve months beginning after

the effective date of the registration statement," the presumption that she relied on the registration

statement when making the purchase no longer applies.  15 U.S.C. § 77k(a)(5).  In that situation,

the plaintiff must prove that she relied upon the alleged misstatement in the registration statement

when purchasing the security.  *Id.*; *see also Lee v. Ernst & Young, LLP*, 294 F.3d 969, 977 (8th

Cir. 2002).  A plaintiff that fails to do so is not entitled to assert a Section 11 claim.  *See In re*

*Petrobras Sec. Litig.*, 116 F. Supp. 3d 368, 386 (S.D.N.Y. 2015).

Here, the TAC alleges that only named plaintiff York County purchased notes from the

March 2016 Notes Offering and that it bought them in May 2018.  TAC, Attach. B, at 3, ECF No.

121-2.  Between the offering and York County's purchase, PG&E filed its 2016 and 2017 Form

10-Ks.  *See* Director and Underwriter Defs.' RJN; Blake Decl. Ex. 7, ECF No. 286-10 (2016 10-

K); Blake Decl. Ex. 10, ECF No. 286-14 (2017 10-K).  Given the public filing of these two

earning statements, the Securities Act Plaintiffs are obligated to plead reliance on the Offering

United States District Court
Northern District of California

1  Documents to state a Section 11 claim.  *See In re Petrobras Sec. Litig.*, 116 F. Supp. at 386.

2          The Securities Act Plaintiffs do not dispute that the TAC does not do so.  Instead, they

3  argue that (1) PG&E's 2016 and 2017 Form 10-Ks do not constitute "earning statements" because

4  they contain materially false and misleading statements and omissions, and (2) even if they did,

5  the Securities Act Plaintiffs were not required to plead reliance.  Both arguments are unavailing.

6  Whether PG&E's Form 10-Ks contain false and misleading statements and omissions has not been

7  established at this time, *see supra* Section III.A, so there is no reason to disregard the filings as

8  earning statements for purposes of 15 U.S.C. § 77k(a).  This distinguishes the instant case from

9  the only authority the Securities Act Plaintiffs cite in support of discounting the 10-Ks.  *See In re*

10  *WorldCom., Inc. Sec. Litig.*, 219 F.R.D. 267, 293-94 (S.D.N.Y. 2003) (finding that financial

11  statements were not "earning statements" only where "WorldCom's admissions leave no doubt

12  that the earning statements filed with the SEC . . . were misleading and omitted material

13  information").  The Securities Act Plaintiff's reliance on *In re Initial Pub. Offering Sec. Litig.*, 241

14  F. Supp. 2d 281 (S.D.N.Y. 2003) for the assertion that they are not required to plead reliance is

15  similarly unfounded.  That case relied on the now-defunct pleading standard of *Conley v. Gibson*,

16  355 U.S. 41 (1957) to find that "plaintiffs do not need to allege reliance on a registration statement

17  to plead a Section 11 claim."  *In re Initial Pub. Offering Sec. Litig.*, 241 F. Supp. 2d at 342.  Under

18  the new pleading standard set forth in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), a

19  plaintiff who purchases securities after intervening annual financial statements is required to

20  plausibly allege reliance on the registration statement.  *See In re Petrobras Sec. Litig.*, 116 F.

21  Supp. 3d at 378–86.  Accordingly, the Securities Act Plaintiffs fail to show that they have standing

22  to assert their Section 11 claims based on the March 2016 Notes Offering.

23                      **2.        Standing Based on the December 2016 Notes Offering**

24          In *Slack Techs., LLC v. Pirani*, the Supreme Court held that a plaintiff asserting Section 11

25  claims must "plead and prove that he purchased shares traceable to the allegedly defective

26  registration statement."  598 U.S. 759, 770 (2023).  To that end, plaintiffs who purchase notes in

27  the aftermarket rather than during the offering must "trace the chain of title for their shares back to

28  Case No.: 18-cv-03509-EJD
ORDER REGARDING MOTIONS TO DISMISS
53

the [relevant] offering, starting with their own purchases and ending with someone who bought directly in [the relevant] offering." *In re Century Aluminum Co. Sec. Litig.*, 729 F.3d at 1106. "[A]ftermarket purchasers usually will *not* be able to trace their shares back to a particular offering," so they must "allege facts from which [the court] can reasonably infer that their situation is different. *Id.* at 1107–08.

Here, the Securities Act Defendants argue that the Securities Act Plaintiffs have failed to trace any of purchase of notes to the December 2016 Notes Offering.  PG&E sold 4.00% notes in both the December 2016 and March 2017 Notes Offerings.  TAC ¶¶ 502, 572–73.  The TAC alleges that in January 2018, Plaintiff Mid-Jersey acquired PG&E notes that were issued in the December 2016 and March 2017 Notes Offerings.  *Id.* ¶ 508; *id.*, Attach. D, at 3, ECF No. 121-4. However, given the similarity between the notes offered in both Notes Offerings and lack of other factual allegations, the Court cannot reasonably infer that Plaintiff Mid-Jersey's January 2018 purchase of notes can be traced back to the December 2016 Notes Offering as opposed to the March 2017 Notes Offering.

The Court is also not persuaded by the Securities Act Plaintiffs' argument that traceability goes to the merits and is thus inappropriate for a motion to dismiss.  The Supreme Court made clear that the tracing requirement applies at the pleading stage.  *See Slack Techs.*, 598 U.S. at 770. Here, the TAC fails to plead facts to create a plausible inference of tracing.  *See Ashcroft*, 556 U.S. at 678.  The Securities Act Plaintiffs' theory that the December 2016 and March 2017 Notes Offerings are an "integrated" offering is similarly unconvincing.  The Securities Act Plaintiffs do not cite—nor can the Court find any—relevant authority applying this theory to standing or traceability.  As such, the Securities Act Plaintiffs fail to show that they have standing to assert their Section 11 claims based on the December 2016 Notes Offering.

### 3. Standing Based on the 2016 Notes Offerings Against the Director Defendants

Additionally, the Securities Act Defendants argue that claims against the Director Defendants based on the March and December 2016 Notes Offerings must be dismissed because

1    the alleged misrepresentations were made after the effective date of the shelf registration

2    statement.  SEC Rule 430B states that, for purposes of Section 11 liability, the date on which a

3    form of prospectus is filed becomes the "new effective date" of a registration statement as to the

4    issuer and any underwriters.  *See* 17 C.F.R. § 230.430B(f)(2).  However, this later date is not

5    deemed the effective date as to any director, absent two limited exceptions.  *See* 17 C.F.R. §

6    230.430B(f)(4).

7         Here, PG&E issued the March and December 2016 Notes Offerings pursuant to the 2014

8    Shelf Registration, which became effective in February 2014.  *See* TAC, Attach. A.  Plaintiffs

9    only allege misrepresentations in "PG&E's Prospectuses filed on February 24, 2016, November

10   29, 2016 [, and documents] incorporated by reference."  TAC ¶ 630.  However, under SEC Rule

11   430B, the filing dates of those prospectuses became the new effective dates only as to the

12   Underwriter Defendants, not the Director Defendants.  SEC Rule 430B thus precludes the

13   Securities Act Plaintiffs from relying on alleged misrepresentations in the prospectuses to assert

14   Section 11 claims against the Director Defendants.  The Securities Act Plaintiffs must instead rely

15   on statements in the 2014 Shelf Registration to assert those claims, and they fail to do so in the

16   TAC.  *In re Countrywide Fin. Corp. Mortg.-Backed Sec. Litig.*, 932 F. Supp. 2d 1095, 1120 (C.D.

17   Cal. 2013) ("[T]he date the prospectus supplements become part of the registration statement

18   is *not* a new 'effective date' for directors . . . .  The only effective date, then, is the filing date of the

19   registration statements. . . . [T]he registration statements did not contain misstatements on their

20   effective dates.  The Individual Defendants cannot be held liable under Section 11.").

21        In response, the Securities Act Plaintiffs claim that one of the two exceptions applies.

22   They argue that the March and December 2016 Offering Documents constitute "fundamental

23   changes" to the 2014 Shelf Registration.  *See id.*; 17 C.F.R. § 229.512(a)(1)(ii).  But this argument

24   runs contrary to the plain language of Rule 430B, which says that a "fundamental change" "does

25   not occur 'if the registration statement is on Form S–3 . . . and the information required to be

26   included in a post-effective amendment . . . is contained in a form of prospectus filed pursuant to

27   Rule 424(b).'"  *In re Countrywide*, 932 F. Supp. 2d at 1120 (citing 17 C.F.R. § 229.512(a)(1)(B)).

28   Case No.: 18-cv-03509-EJD
     **ORDER REGARDING MOTIONS TO DISMISS**
     55

1    The Securities Act Plaintiffs do not dispute that PG&E filed Prospectus Supplements under Rule

2    424(b) or address *In re Countrywide* other than a brief footnote simply concluding that the case

3    does not preclude liability.  ECF No. 293 at 43 n.11.  The Court therefore finds that the exception

4    does not apply, and Rule 430B precludes the Securities Act Plaintiffs' claims against the Director

5    Defendants based on the March and December 2016 Notes Offerings.

6            **C.      Claims Based on 2016 and 2017 Notes Offerings Time-Barred**

7            The Securities Act Defendants next argue that the Section 11 claims based on the 2016 and

8    2017 Notes Offerings are time-barred.

9            Section 11 claims must be "brought within one year after the discovery of the untrue

10   statement or the omission, or after such discovery should have been made by the exercise of

11   reasonable diligence." 15 U.S.C. § 77m.  The Securities Act Plaintiffs filed their suit asserting

12   Section 11 claims on February 22, 2019 and allege that "[l]ess than one year has elapsed from the

13   time that [they] discovered or reasonably could have discovered the facts upon which [the TAC] is

14   based."  *See* TAC ¶ 702; ECF No. 116.  According to the Securities Act Defendants, however,

15   reasonably diligent investors discovered or at least should have discovered the alleged

16   misstatements or omissions in the Offering Documents as early as October 2017, more than a year

17   before the filing of the complaint.  Nevertheless, the Securities Act Plaintiffs argue that arguments

18   based on a statute of limitation are fact-intensive and inapplicable at this early stage of litigation.

19   *See Rieckborn v. Jefferies LLC*, 81 F. Supp. 3d 902, 916 (N.D. Cal. 2015) ("A defendant seeking

20   to establish, on a motion to dismiss, that a plaintiffs Section 11 claim is time-barred faces an

21   'especially high hurdle.'").  Even if the Court were to consider the statute of limitations argument,

22   the Securities Act Plaintiffs argue that the earliest time investors were on notice of the untrue

23   statements or omissions was November 2018, when PG&E filed a report with the SEC stating that

24   PG&E's equipment was at fault for the Camp Fire.

25           According to the TAC itself, the market started to become aware that PG&E's inadequate

26   safety practices in October 2017, when news of the North Bay Fires broke.  TAC ¶¶ 327–38.

27   Soon after, investors allegedly "began to understand that PG&E's safety regulation violations

28   Case No.: 18-cv-03509-EJD
     **ORDER REGARDING MOTIONS TO DISMISS**

*United States District Court*
*Northern District of California*

1    were likely a proximate cause of the North Bay Fires," and "[o]n this news that PG&E would

2    likely bear at least some responsibility for the fires, PG&E's stock dropped." *Id.* ¶¶ 328–30.

3    Based on these allegations, the Securities Act Defendants contend that *Edison* is on-point.  In that

4    case, investors alleged that Edison had issued notes that did not adequately disclose the risks of

5    wildfires that Edison allegedly caused in 2017 and again in 2018.  The Central District of

6    California dismissed those claims as time-barred—and the Ninth Circuit affirmed—because

7    "Plaintiffs should have discovered facts constituting the violation [] when the markets purportedly

8    understood that [the defendant] had caused the [first] Fire.  *Barnes v. Edison Int'l*, No. CV 18-

9    09690 CBM, 2021 WL 2325060, at *7 (C.D. Cal. Apr. 27, 2021), *aff'd*, No. 21-55589, 2022 WL

10    822191 (9th Cir. Mar. 18, 2022).

11        Though the Court agrees that *Edison* supports dismissal, whether the claims here are time-

12    barred is still a close call.  "At the pleading stage, the question is whether it is plausible that [the]

13    disclosures were insufficient to supply a reasonably diligent plaintiff with the information

14    necessary to plead the Section 11 claims with sufficient detail and particularity to survive a

15    12(b)(6) motion." *Jefferies*, 81 F. Supp. 3d at 915 (citation omitted); *York Cnty. ex rel. Cnty. of*

16    *York Ret. Fund v. HP, Inc.*, 65 F.4th 459, 465 (9th Cir. 2023) ("[A] fact is not deemed

17    'discovered' until a reasonably diligent plaintiff would have sufficient information about that fact

18    to adequately plead it in a complaint." (quotations and citation omitted)).  While the truth that

19    PG&E's deficient safety practices caused the North Bay Fires *began* to emerge in 2017, it is not

20    readily apparent that the Securities Act Plaintiffs would have enough information at that time to

21    adequately plead their claims, especially given the rigor of Rule 9(b)'s particularity requirement.

22    The TAC alleges that through 2017, the market suspected that PG&E "may" have caused the

23    North Bay Fires, PG&E disclosed that it would "potentially" incur liability, and investors

24    understood that PG&E's statements regarding safety compliance "may" have been misleading.

25    TAC ¶¶ 331–45.  But it was not until May 2018, when Cal Fire issued a press release determining

26    that PG&E had indeed caused some of the North Bay Fires, that investors fully understood the

27    alleged misstatements were false.  *See id.* ¶ 346.  This distinguishes the instant case from *Barnes*

United States District Court
Northern District of California

1    enough to justify deferring the statute of limitations issue for resolution on a more developed

2    record.  Accordingly, the Court finds that the Securities Act Defendants have not overcome the

3    "especially high hurdle" to show that the Section 11 claims based on the 2016 and 2017 Notes

4    Offerings are time-barred at the pleadings stage.  *See Jefferies*, 81 F. Supp. 3d at 916.

5    **D.    Section 11 Claims Based on Private Offerings in 2018 Exchange Offer**

6    The Securities Act Defendants also argue that the claims based on the 2018 Exchange

7    Offer fail as a matter of law because the Exchange Offer was not an independent offering of

8    PG&E notes.  "Section 11 liability, which applies to misstatements or omissions in registration

9    statements, is not available for [notes purchased in private] offerings."  *In re Levi Strauss & Co.*

10   *Sec. Litig.*, 527 F. Supp. 2d 965, 975 (N.D. Cal. 2007).  As such, "plaintiffs who received their

11   registered bonds through an exchange of unregistered bonds acquired in the preceding [private]

12   offerings" cannot pursue Section 11 claims.  *Id.*; *see also In re Refco, Inc. Sec. Litig.*, 503 F. Supp.

13   2d 611, 636–37 (S.D.N.Y. 2007).

14   Here, Plaintiff City of Warren purchased notes through the 2018 Exchange Offer, a so-

15   called Rule 144A offering or Exxon Capital exchange.  *See* TAC, Attach. C, ECF No. 121-3 (City

16   of Warren's certification); Blake Decl. Ex. 11, at 27, ECF No. 286-16 (noting that PG&E made

17   the 2018 Exchange Offer "in reliance on the position of the SEC as described in previous no-

18   action letters . . . including in Exxon Capital Holdings Corporation").  As such, Section 11 liability

19   does not apply to City of Warren's purchase.  The Securities Act Plaintiffs argue, though, that City

20   of Warren purchased the notes after PG&E had filed the registration statement and prospectus for

21   the 2018 Exchange Offer, so they relied on the Offering Documents that contained the alleged

22   misrepresentations.  TAC ¶ 578.  For this, they cite *Hildes v. Arthur Andersen LLP*, in which the

23   Ninth Circuit found that "misrepresentations contained in the [r]egistration [s]tatement played a

24   role in the causal chain that resulted in the exchange of stock."  734 F.3d 854, 862 (9th Cir. 2013).

25   But *Hildes* is readily distinguishable, because the plaintiff there was "not irrevocably bound to

26   exchange his . . . shares for . . . stock at the time the [r]egistration [s]tatement was filed" in

27   connection with a merger.  *Id.*  Seeing no principled reason to diverge from *In re Levi Strauss &*

28   Case No.: 18-cv-03509-EJD

United States District Court
Northern District of California

*Co. Sec. Litig.*, the Court finds that the Section 11 claims based on the 2018 Exchange Offer fail to state a claim.

### E.    Section 15 Claim

Plaintiffs have failed to state a claim for violation of Section 11.  Without the predicate "primary violation of federal securities law," Plaintiffs cannot establish control liability.  *See, e.g.*, *Primo v. Pac. Biosciences of California, Inc.*, 940 F. Supp. 2d 1105, 1131 (N.D. Cal. 2013) (citing 15 U.S.C. § 77o).  Thus, the Court **GRANTS** the Securities Act Defendants' motion to dismiss the Section 15 claim.

## IV.    CONCLUSION

For the foregoing reasons, the Court **GRANTS** the Securities Act Defendants' motion to dismiss the TAC's Securities Act claims.  Because granting Plaintiffs an additional opportunity to amend the complaint would not be futile, cause undue delay, or unduly prejudice the Securities Act Defendants, and Plaintiffs have not acted in bad faith, the Court grants leave to amend. *Leadsinger*, 512 F.3d at 532.  Should they choose to file an amended complaint, Plaintiffs must do so within **30 days** of this Order and attach a redlined copy comparing the TAC with the Fourth Amended Complaint pursuant to the Section III of the Court's Standing Order for Civil Cases.


**IT IS SO ORDERED.**

Dated:  September 30, 2025


_____
EDWARD J. DAVILA
United States District Judge

*United States District Court*
*Northern District of California*