**LABATON KELLER SUCHAROW LLP**
THOMAS A. DUBBS (*pro hac vice*)
MICHAEL P. CANTY (*pro hac vice*)
THOMAS G. HOFFMAN, JR. (*pro hac vice*)
JEFFREY A. DUBBIN (#287199)
CHARLES WOOD (*pro hac vice*)
CHARLES J. STIENE (*pro hac vice*)
140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
Email: tdubbs@labaton.com
mcanty@labaton.com
thoffman@labaton.com
jdubbin@labaton.com
cwood@labaton.com
cstiene@labaton.com

*Counsel for Lead Plaintiff the Public Employees Retirement Association of New Mexico and Lead Counsel for the Class*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| IN RE PG&E CORPORATION SECURITIES LITIGATION | Civil Action No. 3:18-cv-03509-EJD<br><br>FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS<br><br>JURY TRIAL DEMANDED |

## TABLE OF CONTENTS


I. INTRODUCTION FOR THE EXCHANGE ACT CLAIMS ... 1

II. NATURE OF THE CASE ... 5

III. JURISDICTION AND VENUE ... 5

IV. OVERVIEW OF THE EXCHANGE ACT VIOLATIONS ... 6

A. PG&E's Failure to Comply with Safety Regulations Proximately Caused Wildfires in 2017 and Investors' Consequent Losses ... 6

B. PG&E's Failure to Prioritize Safety Continued Unabated, Proximately Causing a Disastrous Wildfire in November 2018 as Well as Further Investor Losses ... 9

1. After the North Bay Fires, PG&E Continued to Make False and Misleading Statements and Omissions ... 9

2. PG&E's Continuing Noncompliance with Safety Regulations Caused the Camp Fire ... 11

C. Exchange Act Claims Being Asserted ... 12

V. THE EXCHANGE ACT PARTIES ... 13

VI. SUBSTANTIVE ALLEGATIONS SUPPORTING THE EXCHANGE ACT CLAIMS ... 16

A. PG&E Operates Within a Robust Legal Regime ... 16

1. California Law Required PG&E to Maintain a Safe Distance Between Its Electrical Equipment and Nearby Vegetation ... 16

2. California Law Required PG&E to Safely Maintain Its Electrical Equipment and Infrastructure ... 18

3. PG&E Is Regulated by the CPUC ... 18

(a) CPUC's General Orders 95 and 165 Impose Strict Safety Regulations on PG&E ... 19

(b) CPUC's Resolution ESRB-8 Imposes on PG&E an Obligation to Adopt, Promulgate and Follow the ESRB-8 Shutoff Protocol ... 20

(c) PG&E Must Follow CPUC's Regulations Under Penalty of Law ... 21

4. Cal Fire Is the Duly Authorized Investigative Arm of the State of California for Wildfires ... 21

5. Under California's Inverse Condemnation Law, PG&E Would Not Bear the Cost of Wildfires It Causes if It Could Prove that It Acted Reasonably and Prudently ... 22

6. Federal Law Also Requires PG&E to Follow Minimum Safety Standards ... 22

B. PG&E's Vegetation Management Expenditures Did Not Materially Change from Year to Year During the Class Period, Let Alone Double at Any Point ............23

C. PG&E Engaged in an Unsafe Pattern of Noncompliance with Safety Requirements Before and Throughout the Class Period ............27

1. PG&E's Unsafe and Noncompliant Vegetation Management Caused the Butte Fire in 2015 ............ 28

2. PG&E's Insufficient Safety Practices Allowed Numerous, Company-Wide Vegetation Management and Other Safety Violations During the Class Period ............ 28

(a) PG&E Documented and Tolerated Thousands of Dangerous Safety Violations Across Its Territory During the Class Period ............ 28

(b) PG&E Had Actual Knowledge that Its Insufficient Safety Practices Had the Potential to Allow Dangerous Safety Violations on the Order of Hundreds of Thousands to a Million Wildfire Hazards ............ 30

D. Investors Could Not Have Reasonably Expected the Extent of PG&E's Unsafe Pattern of Noncompliance that Caused the North Bay Fires and the Camp Fire ............31

1. PG&E's Noncompliance with Vegetation Management and Pole Integrity Requirements Caused the North Bay Fires ............ 31

2. PG&E's Noncompliance with Vegetation Management and Pole Integrity Requirements Caused the Camp Fire ............ 32

(a) The Camp Fire's First Ignition Point Was Caused by PG&E's Safety Violations ............ 32

(b) The Camp Fire's Second Ignition Point Was Also Caused by PG&E's Safety Violations ............ 34

E. PG&E's Repeated Vegetation Management and Pole Integrity Safety Violations Show that the Company Knew of Its Numerous and Widespread Violations of Fire Safety Regulations Throughout the Class Period, but Did Not Change Its Practices to Reduce, Much Less Eliminate, Those Safety Violations ............36

1. PG&E Did Not Improve Its Inadequate Safety Practices After Its Safety Violations Caused the Deadly Butte Fire ............ 36

2. PG&E Internally Acknowledged, Extensively Documented, and Tolerated for Years the Safety Violations that Caused the Camp Fire ............ 37

F. PG&E's ESRB-8 Shutoff Protocol Was Illusory, and PG&E's Failure to Follow It Was a Proximate Cause of the Camp Fire ............40

1. PG&E Admitted that All of the Non-Weather Criteria Weighed in Favor of Shutting Off the Power ............ 43

(a) Criterion 1: the National Fire Danger Rating System Rated Jarbo Gap as Having an "Extreme" Fire Danger Threat Level ............ 43

(b) Criterion 2: the National Weather Service Declared a "Red Flag Warning" for the Area ..... 45

(c) Criterion 6: "Critically Dry Vegetation" (*i.e.*, Wildfire Fuel) Weighed in Favor of a Shutoff ..... 45

(d) Criterion 7: PG&E's On-the-Ground Observations Weighed in Favor of a Shutoff ..... 47

2. All of the Weather Criteria Weighed in Favor of Shutting Off the Power ..... 48

(a) Criterion 3: The Jarbo Gap Recorded Sufficiently Low Humidity Levels ..... 51

(b) Criterion 4: The Jarbo Gap Recorded Sufficiently High Wind Speed ..... 52

(c) Criterion 5: Site-Specific Conditions Further Favored Shutoff ..... 53

3. PG&E Knew, or Recklessly Disregarded, that All Seven Criteria Weighed in Favor of Shutting Off the Power ..... 54

G. PG&E's Bankruptcy and Other Post-Class-Period Developments ..... 56

1. PG&E Files for Chapter 11 Bankruptcy and Records Billions in Losses Related to the North Bay And Camp Fires ..... 56

2. District Court Proceedings Before Judge Alsup Provide Additional Detail with Respect to the Scale of the Fraud ..... 57

3. CPUC Investigative Findings, Fines, Penalties, and Newly Imposed Wildfire Mitigation Requirements for PG&E ..... 60

4. Butte County District Attorney Releases Detailed Report Summarizing Camp Fire Investigation After PG&E's Utility Pleads Guilty to 84 Counts of Manslaughter ..... 63

VII. DEFENDANTS' FALSE AND MISLEADING CLASS PERIOD STATEMENTS UNDER THE EXCHANGE ACT ..... 73

A. Overview of the Exchange Act Defendants' Fraudulent Course of Conduct ..... 73

B. Defendants Made Materially False and Misleading Statements and Omissions Regarding Its Vegetation Management Activities and Compliance with Wildfire Safety Regulations Before the North Bay Fires ..... 75

1. October 16, 2015 – Misstatement No. 1 ..... 75

2. October 6, 2016 – Misstatement No. 2 ..... 79

3. August 9, 2017 – Misstatement No. 3 ..... 83

C. After the North Bay Fires Erupted, the Truth Began to Emerge ..... 86

D. After the North Bay Fires Were Contained, the Company Made Additional False and Misleading Statements and Omissions Regarding Compliance with Wildfire-Related Safety Regulations ..... 87

1. October 31, 2017 – Misstatement No. 4 .... 87

2. November 2, 2017 – Misstatement No. 5 .... 90

3. November 2, 2017 – Misstatement No. 6 .... 93

4. November 5, 2017 – Misstatement No. 7 .... 96

5. May 25, 2018 – Misstatement No. 8 .... 99

E. While the Truth Regarding PG&E's Role in Causing the North Bay Fires Emerged, the Company Made Additional False and Misleading Statements and Omissions Regarding Compliance with Wildfire-Related Safety Regulations, Including Its ESRB-8 Shutoff Protocol .... 103

1. June 8, 2018 – Misstatement No. 9 .... 103

2. June 8, 2018 – Misstatement No. 10 .... 106

3. September 27, 2018 – Misstatement No. 11 .... 109

4. October 9, 2018 – Misstatement No. 12 .... 113

5. October 9, 2018 – Misstatement No. 13 .... 117

6. November 8, 2018 – Misstatement No. 14 .... 120

VIII. DEFENDANTS PERPETRATED A STOCK SCHEME THAT CAUSED INVESTOR LOSSES, IN VIOLATION OF SEC RULE 10b-5 (a) AND (c) .... 123

A. Exchange Act Defendants Committed Deceptive and Manipulative Acts and Practices During the Class Period .... 124

1. Deceptive And Manipulative Act/Practice No. 1 .... 125

2. Deceptive And Manipulative Practice No. 2 .... 127

B. Exchange Act Defendants Undertook Those Deceptive and Manipulative Acts and Practices with Scienter .... 128

C. Connection with the Purchase or Sale of Securities .... 130

D. Reliance .... 130

IX. MATERIALITY UNDER THE EXCHANGE ACT .... 133

X. LOSS CAUSATION UNDER THE EXCHANGE ACT .... 134

A. PG&E's Safety Violations Caused the Devastating North Bay and Camp Fires .... 136

1. PG&E's Safety Violations Caused the North Bay Fires .... 136

2. PG&E's Safety Violations Caused the Camp Fire .... 137

B. As the Market Learned of the Extent and Scope of PG&E's Pattern of Violations, the Company's Share Price Fell Dramatically .... 137

1. October 12, 2017 – Corrective Disclosure and/or Materialization of Concealed Risk ........ 137

(a) The Market Began to Learn the Extent and Effects of PG&E's Pattern of Violations Concealed by Fraud ........ 137

(b) Market Commentators Covered PG&E's Share Price Decline ........ 139

2. October 13-16, 2017 – Corrective Disclosure and/or Materialization of Concealed Risk ........ 142

(a) The Market Continued to Learn the Extent and Effects of PG&E's Pattern of Violations Concealed by Fraud ........ 142

(a) Market Commentators Covered PG&E's Share Price Decline ........ 143

3. December 20, 2017 – Corrective Disclosure and/or Materialization of Concealed Risk ........ 144

(a) The Market Continued to Learn the Extent and Effects of PG&E's Pattern of Violations Concealed by Fraud ........ 144

(a) Market Commentators Covered PG&E's Share Price Decline ........ 145

4. May 25, 2018 – Corrective Disclosure and/or Materialization of Concealed Risk ........ 147

(a) The Market Continued to Learn the Extent and Effects of PG&E's Pattern of Violations Concealed by Fraud ........ 147

(a) Market Commentators Covered PG&E's Share Price Decline ........ 149

5. June 8, 2018 – Corrective Disclosure and/or Materialization of Concealed Risk ........ 150

(a) The Market Continued to Learn the Extent and Effects of PG&E's Pattern of Violations Concealed by Fraud ........ 152

(a) Market Commentators Covered PG&E's Share Price Decline ........ 153

6. November 8-9, 2018 – Corrective Disclosure and/or Materialization of Concealed Risk ........ 154

(a) The Market Began to Learn the Extent and Effects of PG&E Pattern of Violations Concealed by Fraud ........ 154

(a) Market Commentators Covered PG&E's Share Price Decline ........ 155

7. November 9-12, 2018 – Corrective Disclosure and/or Materialization of Concealed Risk ........ 157

(a) The Market Continued to Learn the Extent and Effects of PG&E Pattern of Violations Concealed by Fraud ........ 157

(a) Market Commentators Covered PG&E's Share Price Decline ........ 158

8. November 13-14, 2018 – Corrective Disclosure and/or Materialization of Concealed Risk ..... 160

(a) The Market Continued to Learn the Extent and Effects of PG&E Pattern of Violations Concealed by Fraud ..... 160

(a) Market Commentators Covered PG&E's Share Price Decline ..... 161

9. November 15, 2018 – Corrective Disclosure and/or Materialization of Concealed Risk ..... 163

(a) The Market Continued to Learn the Extent and Effects of PG&E Pattern of Violations Concealed by Fraud ..... 163

(a) Market Commentators Covered PG&E's Share Price Decline ..... 163

XI. SCIENTER UNDER THE EXCHANGE ACT ..... 165

A. PG&E Knew that Its Safety Practices Continued to Violate the Law Even After PG&E Was on Notice of the Butte Fire Safety Violations ..... 165

B. Safety Was Core to PG&E's Operations, and the Exchange Act Individual Defendants Were Directly Involved in It ..... 168

C. The Federal Court Overseeing PG&E's Probation, Including Safety Monitoring, Has Uncovered Additional Facts Supporting Scienter ..... 171

D. PG&E's Noncompliance with Safety Regulations Was Well-Known Throughout the Company, Including at the Highest Levels, with Real-Time Access to a Database of Known Safety Violations ..... 183

1. PG&E Recorded Its Violations of Safety Regulations in a Sophisticated Database, Readily Accessible by the Exchange Act Individual Defendants ..... 183

2. PG&E Instituted a Culture Among Its On-the-Ground Employees of Reporting Problems up the Corporate Chain, Which Upper Management Was Aware of and Monitored ..... 185

E. The Threat of a Potential Bankruptcy Gave Defendants a Strong Motive to Mislead Investors ..... 187

F. After PG&E Failed to Follow Its ESRB-8 Shutoff Protocol and Caused the Camp Fire, PG&E's Explanations Keep Changing and are Contradictory ..... 188

G. PG&E's Unprecedented Departure of Officers and Directors Strengthens the Inference of Scienter ..... 193

XII. APPLICABILITY OF THE PRESUMPTION OF RELIANCE AND FRAUD ON THE MARKET FOR THE EXCHANGE ACT CLAIMS ... 194

XIII. CLASS ACTION ALLEGATIONS FOR THE EXCHANGE ACT CLAIMS ... 195

XIV. CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT ... 197

XV. NATURE OF THE SECURITIES ACT CLAIMS ... 200

XVI. THE SECURITIES ACT PARTIES ... 201

A. Securities Act Named Plaintiffs ... 201

B. Bankrupt Entities ... 202

C. Securities Act Individual Defendants ... 203

D. Underwriter Defendants ... 207

XVII. UNBEKNOWNST TO INVESTORS, PG&E'S WILDFIRE MITIGATION PRACTICES WERE SIGNIFICANTLY DEFICIENT IN BOTH SCALE AND COMMITMENT ... 209

A. PG&E's Systemic Vegetation Management Deficiencies Significantly Increased the Risk of Wildfires ... 210

B. PG&E's Gross Neglect of Its Electrical Infrastructure Resulted in Outdated and Hazardous Equipment that Added to the Risk of Wildfires ... 217

C. PG&E Failed to Invest in or Implement Wildfire Mitigation Strategies Necessary to Prevent Wildfires ... 223

1. PG&E's Failure to Allocate Resources to or Prioritize Undergrounding Lines Significantly Exacerbated Wildfire Risk ... 224

2. PG&E's Failure to Invest in Shutoffs Further Exacerbated Wildfire Risk ... 225

D. PG&E Failed to Commit to Wildfire Safety Both Financially and Culturally ... 227

E. PG&E Downplayed Its Dismal Wildfire Safety Record by Failing to Maintain or Report Accurate Records ... 234

F. PG&E's Neglect of Wildfire Safety Practices Is Corroborated by Its Poor Track Record Compared to Its Peers ... 236

XVIII. THE CONSEQUENCES OF PG&E'S NEGLECT OF WILDFIRE SAFETY AND PG&E'S DENIAL OF RESPONSIBILITY ... 238

XIX. PG&E RAISED MORE THAN $4 BILLION FROM NOTES OFFERINGS ... 245

XX. THE OFFERING DOCUMENTS OMITTED PG&E'S SAFETY DEFICIENCIES AND ADVERSE TRENDS ... 246

A. PG&E's Offering Documents Failed to Disclose Material Adverse Trends in Violation of Item 303's Disclosure Requirements ... 247

B. The Securities Act Defendants Misled Investors Regarding PG&E's Safety Practices, Commitment, and Compliance ....249

1. The Offering Documents Omitted PG&E's Widespread Safety Failures and the Existing Risks Associated with Its Inadequate Safety Practices .... 249

2. The Offering Documents Did Not Disclose that PG&E's Investments in, Commitment to, and Practices Related to Safety, Were Grossly Deficient .... 252

C. The Securities Act Defendants Materially Misled Investors Regarding PG&E's Liability for Wildfires in the April 2018 Offering Documents ....257

1. GAAP Requirements .... 257

2. False Statements and Omissions Relating to Loss Probability for the 2017 Northern California Wildfires .... 258

XXI. NO SAFE HARBOR FOR THE SECURITIES ACT CLAIMS .... 263

XXII. CLASS ACTION ALLEGATIONS FOR THE SECURITIES ACT CLAIMS .... 264

XXIII. CLAIMS FOR RELIEF UNDER THE SECURITIES ACT .... 266

XXIV. PRAYER FOR RELIEF .... 268

Court-appointed Lead Plaintiff, the Public Employees Retirement Association of New Mexico ("PERA" or "Lead Plaintiff"), individually and on behalf of all other persons similarly situated, alleges the following against PG&E Corporation, Pacific Gas and Electric Company (the "Utility," and together with PG&E Corporation, "PG&E" or the "Company"), the Exchange Act Individual Defendants (defined below), the Securities Act Individual Defendants (defined below), and the Underwriter Defendants (defined below). In addition, named Plaintiff York County on behalf of the County of York Retirement Fund, City of Warren Police and Fire Retirement System, and Defined Benefit Plan of the Mid-Jersey Trucking Industry and Teamsters Local 701 Pension and Annuity Fund (collectively, the "Securities Act Plaintiffs," and together with Lead Plaintiff, "Plaintiffs"), individually and on behalf of all others similarly situated, allege violations of the Securities Act of 1933 ("Securities Act") against the Securities Act Individual Defendants and the Underwriter Defendants. These allegations are based upon personal knowledge as to Plaintiffs' own acts, and upon information and belief as to all other matters. Plaintiffs' information and belief is based on the investigation conducted by and through their attorneys, which included a review of the Company's Securities and Exchange Commission ("SEC") filings, conference call transcripts and press releases, media and analyst reports about the Company, regulatory investigations, governmental and other third-party reports, court filings, and other public information regarding PG&E. Plaintiffs believe that substantial additional evidentiary support for the allegations set forth herein will be produced through discovery.

## I. INTRODUCTION FOR THE EXCHANGE ACT CLAIMS

1. The investing public depends on PG&E to be honest when talking about its safety practices and level of compliance with vital safety regulations. This federal securities class action arises out of the materially false statements that the Exchange Act Defendants (defined herein) made to investors, and the Exchange Act Defendants' scheme to defraud, from October 16, 2015 through November 15, 2018 (the "Class Period"). Their statements and omissions misled investors about PG&E's wildfire safety practices and commitment to wildfire safety, including their representations of achieving full legal compliance and investing in safety, notwithstanding the Company's numerous and widespread violations of safety regulations.

2. During the Class Period the Exchange Act Individual Defendants also engaged in a scheme to conceal PG&E's pattern of noncompliance with relevant laws and regulations regarding wildfire prevention to artificially maintain PG&E's share price as well as enlarge dividends, bonuses, and political contributions.

3. In just 14 months from October 2017 through November 2018, California experienced some of the deadliest and most destructive wildfire events of its recorded history. This narrow time period included both the 2017 North Bay Fires and the 2018 Camp Fire. One thing these fires have in common is that they were started or exacerbated by noncompliant PG&E electrical equipment and vegetation management: an astounding fact to those who believed PG&E's public statements that it complied with California and federal safety regulations. The other thing these fires have in common is that they incited a series of investigations, which have revealed PG&E's gross deficiencies in the area of safety compliance.

4. The timing of these catastrophic fires is no coincidence; they occurred at the height of PG&E's knowing noncompliance with safety regulations. Among the many details which have emerged, the Honorable William Alsup of the United States District Court for the Northern District of California, in presiding over PG&E's criminal probation, has found as fact "that as of **June 2017**, there were **3,962 unworked trees which PG&E had identified in 2016 as hazardous with the potential to 'fall into or otherwise impact the [electrical] conductors, towers or guy wires before the next inspection cycle**.'"

5. By June 2017, PG&E had known about these thousands of vegetation fire hazards for six to eighteen months (*i.e.*, as far back as January 2016) – yet did nothing other than to internally record their existence. Judge Alsup based this finding on PG&E's own admissions, which further laid bare the Exchange Act Defendants' fraudulent scheme to conceal such issues during the Class Period.

6. Thus, mere months before its vegetation safety violations would cause and exacerbate the 2017 North Bay Fires, PG&E actually knew it was not addressing thousands of violations in the form of vegetation fire hazards, even while falsely assuring investors over the same time period that its vegetation management was, *e.g.*, "***in compliance with relevant laws***"

(October 6, 2016 – Misstatement No. 2), and "***complying with state and federal regulations and delivering safe, reliable and affordable electric service***" (August 9, 2017 – Misstatement No. 3).

7. The public did not immediately know that PG&E was responsible for the North Bay Fires—information that would threaten the Company's financial condition. As such, PG&E doubled down on misinformation in order to build up the public perception of its safety and compliance before the tide of public opinion could turn against it. For example, after the North Bay Fires erupted, the Exchange Act Defendants falsely insisted that the Company had "***doubl[ed] our typical vegetation management spending last year***" and "***inspect[ed] all of our overhead lines***" (November 2, 2017 – Misstatement Nos. 5 & 6), when **it had not**. Similarly, the Company reiterated that it "***meets or exceeds all applicable federal and state vegetation clearance requirements***" (November 5, 2017 – Misstatement No. 7), yet thereafter, state investigators would link evidence of PG&E's violations of California safety regulations to at least **eleven** of the North Bay Fires.

8. Even as the truth began to emerge about PG&E's insufficient safety practices, and the Exchange Act Defendants doubled down on their fraudulent scheme to conceal the Company's pattern of noncompliance as PG&E continued to falsely insist on its compliance, California imposed additional safety regulations on the Company. This included a mandate that PG&E formalize a protocol for proactively turning off its power lines when certain extreme conditions were met, to prevent any further wildfires. However, as disclosed after the Camp Fire in a report by the Butte County DA, PG&E's noncompliant shutoff procedure should have prevented the Camp Fire, and the shutoff procedure was illusory. Specifically, PG&E stated that it had "***created a set of procedures for . . . [d]etermining what combination of conditions necessitates turning off lines for safety***" (September 27, 2018 – Misstatement No. 11). Yet less than two months later, on a day when hazardous weather and other conditions required PG&E to shut off certain lines, the Camp Fire erupted. PG&E would later change its story several times as to why the shutoff procedure had not been deployed on the very lines that ignited the Camp Fire (the Caribou-Palermo lines), which statements are verifiably false and misleading given that, unknown to investors at the time: (i) PG&E had exempted the transmission line responsible as the first ignition point for the

Camp Fire, contrary to safety regulations; and (ii) PG&E chose not to shut off the distribution line responsible for the second ignition point of the Camp Fire, contrary to its own shutoff criteria.

9. PG&E's false and misleading statements destroyed billions of dollars of economic value in the Company's securities. When the true nature and extent of PG&E's responsibility for these fires, failure to mitigate wildfire risk, and the financial impacts associated therewith materialized, investors holding PG&E's publicly traded securities experienced compensable losses. In addition, the investing public was harmed through the Exchange Act Defendants' scheme to defraud. Specifically, the Exchange Act Defendants engaged in a scheme to hide from investors PG&E's decrepit infrastructure and non-compliance with its own recklessly lax inspection and wildfire risk mitigation practices.

10. PG&E's ability to maintain safe power lines, compliant with federal and California safety regulations, is essential to the Company's financial health. PG&E has incurred billions of dollars in losses for claims in connection with the North Bay and Camp wildfires.

11. Indeed, PG&E's responsibility for the North Bay Fire and Camp Fire catastrophes and the Company's years of neglect of its infrastructure caused it to file for bankruptcy under Chapter 11 of Title 11 of the United States Code (11 U.S.C. § 101 et seq.). PG&E's bankruptcy filings stated that the Company was facing $51.7 billion in liabilities, including more than $30 billion in potential liabilities tied to the North Bay and Camp Fires.[1] According to October 31, 2025 filings by PG&E in the Company's bankruptcy proceedings, it has paid approximately $42 billion in claims, as well as at least $630 million in professional fees and expenses, in connection with the bankruptcy.[2]

12. Because it was vital for PG&E's business to be perceived as making safety its highest priority, the Exchange Act Defendants falsely assured investors that the Company's wildfire safety measures were adequate and compliant with applicable laws and regulations. The Exchange Act Defendants' scheme has unraveled since the end of the Class Period, as

---

[1] Amended Decl. of Jason P. Wells at 3 & 7, Case No. 19-bk-30088 (N.D. Cal. Feb. 1, 2019), ECF No. 263.

[2] *See In re: PG&E Corporation*, 19-30088, ECF No. 14969; *see also In re: Pacific Gas and Electric Company*, 19-30088, ECF No. 14970.

investigations following these devastating fires have revealed that PG&E's assurances were false: evidence has emerged that PG&E's safety violations caused at least twelve of these devastating fires, including the Camp Fire—California's deadliest and most destructive wildfire ever. Indeed, during PG&E's bankruptcy proceedings, the Company did not dispute liability for any of the North Bay Fires or the Camp Fire, and did not discount the restitution it paid to victims of any one fire versus any other.

## II. NATURE OF THE CASE

13. This is a federal securities class action brought pursuant to the Securities Exchange Act of 1934 (the "Exchange Act") on behalf of a class of all persons and entities who, during the Class Period, purchased or otherwise acquired publicly traded PG&E securities and were damaged thereby. Excluded from the class are: (i) all defendants in the Action; (ii) members of the immediate family of any individual defendant; (iii) any person who is or was an officer or director of PG&E during or after the Class Period; (iv) any firm, trust, corporation, or other entity in which any defendant has or had a controlling interest; (v) PG&E's employee retirement and benefit plan(s) and their participants or beneficiaries, to the extent they made purchases through such plan(s); and (vi) the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person.

14. Lead Plaintiff seeks to recover compensable damages caused by defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder. This Action also is brought pursuant to the Securities Act of 1933 (the "Securities Act"), as set forth in Sections XIV-XII, *infra*.

## III. JURISDICTION AND VENUE

15. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5), as well as Sections 11 and 15 of the Securities Act (15 U.S.C. §§77k and 77o).

16. This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331, Section 27 of the Exchange Act, and Section 22 of the Securities Act.

17. Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b) as PG&E's principal executive offices are located within this Judicial District. Further, many of the acts and practices complained of herein occurred in substantial part in this Judicial District.

18. In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities markets.

## IV. OVERVIEW OF THE EXCHANGE ACT VIOLATIONS

19. The Exchange Act Defendants' false statements began on October 16, 2015 and continued through November 8, 2018. As detailed herein, they misled investors about PG&E's wildfire safety practices, including representations that the Company was in full legal compliance and continuing adequately to invest in safety, notwithstanding the Company's numerous and widespread violations of safety regulations and inadequate safety practices. During the Class Period the Exchange Act Defendants also engaged in a fraudulent scheme to conceal PG&E's systemic pattern of noncompliance with relevant laws and regulations related to its wildfire prevention measures.

### A. PG&E's Failure to Comply with Safety Regulations Proximately Caused Wildfires in 2017 and Investors' Consequent Losses

20. Throughout the Class Period, the Exchange Act Defendants wanted investors to believe that PG&E was not cutting corners with its vegetation management. So they repeatedly represented to its investors that:

- "***PG&E's Vegetation Management***" was "***in compliance with relevant laws***" (October 6, 2016 – Misstatement No. 2);
- Its "***vegetation management program . . . compl[ies] with state and federal regulations***" (August 9, 2017 – Misstatement No. 3);

- "***PG&E follows all applicable federal and state vegetation clearance requirements***" to "***help to reduce*** outages or ***fires caused by trees or other vegetation***" (October 31, 2017 – Misstatement No. 4); and

- "***PG&E meets or exceeds all applicable federal and state vegetation clearance requirements***" (November 5, 2017 – Misstatement No. 7).[3]

21. These statements, and others, were materially false and misleading because they misrepresented PG&E's level of compliance with California and federal law, and consequently the extent to which shareholders would be exposed to liability for damages caused by wildfires and additional costs to improve the Company's inadequate wildfire safety practices.

22. The Exchange Act Defendants' fraudulent scheme began to unravel when investors learned about PG&E's responsibility – and liability – for the North Bay Fires that devastated Northern California in October 2017.[4] These fires burned approximately 249,000 acres, destroyed 8,898 structures, and killed 44 people across nine counties: Napa, Sonoma, Mendocino, Lake, Humboldt, Butte, Nevada, Solano, and Yuba. They resulted in damages estimated at **more than $17 billion**.[5] The size of this liability imperiled the financial viability of the Company. In fact, several of the Exchange Act Defendants' false and misleading statements were made in the months before PG&E openly expressed its fear that its liability for the North Bay Fires could send the Company into bankruptcy.

23. As the State of California's official investigations into the eighteen North Bay Fires were completed by the California Department of Forestry and Fire Protection ("Cal Fire"), the truth emerged over time that **at least seventeen** were caused by PG&E equipment. Indeed, Cal Fire has determined that **eleven** of these fires, across seven counties, evidenced violations of

[3] The statements made by Defendants that are ***bolded and italicized*** are the statements alleged to be false and misleading. All other emphasis is in **bold**.

[4] There may have been as many as 170 individual fires, but many smaller fires combined into larger fires as they burned. Taking that into consideration, the North Bay Fires consisted of eighteen main fires.

[5] This $17 billion estimate is approximately six times greater than the second most expensive California wildfire at the time, the October 1991 Tunnel Fire in Oakland, which, according to a May 27, 2011 article in *Scientific American*, caused $2.687 billion in insured property damage. Mark Fischetti, *How Much Do Wildfires Cost in Terms of Property Damage?* Scientific American (May 27, 2011), https://www.scientificamerican.com/article/graphic-science-how-much-do-fires-cost-property-damage/?redirect=1.

California safety regulations – contradicting Defendants' false representations of compliance with those regulations.

24. The Exchange Act Defendants' false and misleading misrepresentations and omissions came at a crucial time for the Company. As described below, over the past three decades, PG&E caused a series of wildfires and other disasters in California. For example, in September 2015, its violations of California safety regulations regarding vegetation clearance caused a wildfire known as the "Butte Fire," which burned over 70,000 acres, destroyed 921 structures, and killed two people – making it then the seventh most destructive wildfire in California history at the time. The North Bay and Camp Fires that would follow topped this wildfire by orders of magnitude. However, instead of investing capital to rectify PG&E's gross deficiencies in compliance and infrastructure, the Exchange Act Defendants instead deployed a fraudulent scheme to conceal that such issues were unresolved and worsening.

25. Revealingly, just months before the North Bay Fires began, in an April 2017 non-public deposition concerning PG&E's responsibility for the Butte Fire, a PG&E Vegetation Program Manager named Richard Yarnell admitted: "PG&E—to the best of my knowledge, **we have not made any changes as a result of this fire**." Thus, despite being on notice of its dangerous safety violations and their deadly consequences, neither the Company nor its officers took any steps to improve safety or compliance between the Butte Fire and the far more disastrous North Bay Fires. Instead, the Exchange Act Defendants doubled down on their fraudulent scheme to conceal information from the public. Over this time period, the Exchange Act Defendants either knew or should have known that the Company's wildfire-related safety violations continued unabated.

26. Though the North Bay Fires began on a windy night, they were not the result of an unexpected or unique event. Rather, the circumstance of PG&E causing **seventeen** concurrent fires across **nine counties** shows that the Company tolerated numerous and widespread violations of California safety regulations across its territory. As detailed herein, the underlying explanation for these near-simultaneous North Bay Fires is neither unusual weather nor coincidence, but PG&E's failure to comply with even minimal legal requirements. Accordingly, PG&E and its officers

knew, or deliberately disregarded, that the Company's power lines and other electrical infrastructure were often not in compliance with federal and California safety requirements when making false and misleading statements to the contrary.

### B. PG&E's Failure to Prioritize Safety Continued Unabated, Proximately Causing a Disastrous Wildfire in November 2018 as Well as Further Investor Losses

#### 1. After the North Bay Fires, PG&E Continued to Make False and Misleading Statements and Omissions

27. After the public came to understand PG&E's responsibility for the North Bay Fires over the course of five events from October 12, 2017 and June 11, 2018 (*see* Sections X.D.1-5, *infra*), the Company faced a new crisis: the widespread belief that it failed to prioritize safety in maintaining its power lines and preventing wildfires. It also faced a financial crisis, as its liabilities for the North Bay Fires threatened to bankrupt the Company.

28. As a result, PG&E needed the public, including investors, to believe that it would prioritize safety thereafter. For example, when Cal Fire announced (on May 25, 2018 and June 8, 2018) its conclusions that PG&E had caused the preponderance of the North Bay Fires, and PG&E's share price continued to decline as its financial situation deteriorated, the Exchange Act Defendants responded by reassuring its investors that, *e.g.*:

> "To address the growing threats posed by wildfires and extreme weather, and in light of the wildfires throughout our state last year, ***PG&E has launched . . . a program to proactively turn off electric power for safety when extreme fire danger conditions occur***" (June 8, 2018 – Misstatement No. 10).

29. At the time, the Exchange Act Defendants also acted in furtherance of their fraudulent scheme, whereby they hid their systematic compliance failures. Indeed, one month later, on July 16, 2018, PG&E's primary state regulator **mandated** that PG&E formalize and publicize the Company's protocol for proactively turning off its power lines to prevent further wildfires, enacting a regulation known as Resolution ESRB-8. PG&E announced its response to this new safety requirement on or about September 27, 2018 (the "ESRB-8 Shutoff Protocol"), including:

> "PG&E's Community Wildfire Safety Program implements additional precautionary measures intended to reduce wildfire threats. ***It includes . . . executing protocols to temporarily turn off electric power for safety when extreme fire danger conditions are occurring***" and "***PG&E has created a set of procedures***

> ***for . . . [d]etermining what combination of conditions necessitates turning off lines for safety***" (September 27, 2018 – Misstatement No. 11).

30. While PG&E was finalizing the Company's protocol, on September 21, 2018, California enacted S.B. 901, a law to rescue it from the threat of bankruptcy due to its responsibility for the North Bay Fires. The resulting law put in place a financial stress test to monitor PG&E's financial health, as well as a method to raise capital should the Company's liability for the North Bay Fires cause it to fail the test.

31. The same law made it less likely that PG&E would bear the costs of wildfires the Company caused in 2019 or later. However, the new law did not help the Company bear the financial consequences of any wildfires it caused in the remaining months of 2018.

32. Put differently, PG&E's vegetation management, proactive power line shutoff program, and other touted means of safety compliance would have to ensure wildfire safety for the remainder of 2018, or their failure would drive the Company to ruin.

33. PG&E continued to assure the public that the Company had implemented these measures successfully. For example, when the news broke on October 9, 2018 that Cal Fire had concluded that PG&E was the cause of yet another one of the prior year's North Bay Fires, the Cascade Fire, the Company reassured investors by stating:

- "[W]e are continuing to focus on ***implementing additional precautionary measures*** intended to further reduce wildfire threats, such as ***working to remove and reduce dangerous vegetation, improving weather forecasting, upgrading emergency response warnings, [and] making lines and poles stronger in high fire threat areas***, and taking other actions to make our system, and our customers and communities, ***even safer*** in the face of a growing wildfire threat" (October 9, 2018 – Misstatement No. 12); and

- "***PG&E has launched . . . a program to proactively turn off electric power for safety when extreme fire danger conditions occur***" (October 9, 2018 – Misstatement No. 13).

34. Such statements were materially false and misleading because PG&E had **not** meaningfully improved its safety practices—as would soon be revealed by the Camp Fire. In other words, the Exchange Act Defendants' scheme continued unabated as evidenced by the raging wildfires caused by PG&E's systemic pattern of noncompliance. Such statements were made to

convince the investing public that PG&E had resolved its fire safety failures and would prioritize fire safety thereafter, all while the Exchange Act Defendants concealed the true extent of the Company's exposure to massive liability for causing further wildfires, thereby significantly inflating PG&E's share price.

**2. PG&E's Continuing Noncompliance with Safety Regulations Caused the Camp Fire**

35. This continuation of the fraud unraveled when evidence emerged that PG&E was responsible for the Camp Fire, which devastated Northern California in November 2018, burning 153,336 acres, destroying 18,804 structures, and killing 84 people[6]—making it the single most destructive and deadliest wildfire in California history. Cal Fire confirmed that PG&E's dilapidated electrical equipment caused the Camp Fire.[7]

36. The Camp Fire began when a 100-year-old hook, which was connecting a PG&E 115 kilovolt transmission line to a PG&E tower via an insulator string, failed. PG&E has also acknowledged and investigators also determined a second ignition point for the Camp Fire where a diseased and dying tree toppled over onto and broke an energized PG&E 12 kilovolt distribution line.

37. As a result of PG&E's systemic pattern of noncompliance, the Company's equipment ignited vegetation underneath the lines ignited at two ignition points approximately 30 minutes apart. PG&E's failure to remove such vegetation violated California Public Resources Code Section 4293, and the Company's failure to maintain the integrity of its poles and towers violated California Public Utilities Code Section 451.

38. Starting with two PG&E admissions at the end of the day the Camp Fire began (November 8, 2019), it emerged that the Company's prior promises to prioritize fire safety were false and misleading. PG&E's statements promoting the Company's ESRB-8 Shutoff Protocol were a prime example of this prioritization, promising to shut off electricity broadly rather than

---

[6] Press Release, Cal Fire, *CAL FIRE Investigators Determine Cause of the Camp Fire* (May 15, 2019), https://calfire.ca.gov/communications/downloads/newsreleases/2019/CampFire_Cause.pdf (last viewed May 28, 2019).

[7] *Id.*

risk further wildfires. Soon, however, it emerged that PG&E's ESRB-8 Shutoff Protocol was illusory: it did not apply to the transmission lines that caused the first ignition point of the Camp Fire and the protocol dictated that the electrical lines that caused second ignition point of the Camp Fire **should have been shut off, but PG&E flouted it.**

39. PG&E unilaterally, incomprehensibly, and non-compliantly chose to exempt all 115 kilovolt, 230 kilovolt and 500 kilovolt transmission lines—*i.e.*, its most dangerous lines—from its shutoff protocols, including the 115 kilovolt Caribou-Palermo transmission line responsible as the first ignition point of the Camp Fire, contrary to regulatory guidelines and contrary to its public statements to investors. Even so, the second ignition point for the Camp Fire—the Big Bend 1101 12 kilovolt distribution line—was within the purview of PG&E's shutoff protocol, but the Company flouted shutoff criteria in determining to keep the line live.

40. The Exchange Act Defendants' scheme to cover it up substantiates not only that PG&E's safety failures caused the Camp Fire, but further that PG&E's false and misleading statements—concealing how the Company was not sufficiently prioritizing safety—were made with knowledge of their falsity, or at least deliberate recklessness.

41. Accordingly, the true risks leading to the Camp Fire were concealed by the Exchange Act Defendants' materially false and misleading statements assuring investors of the Company's compliance with California safety regulations, including the ESRB-8 Shutoff Protocol, as well as their fraudulent scheme.

### C. Exchange Act Claims Being Asserted

42. Notwithstanding the Exchange Act Defendants' false and misleading statements to the marketplace, and fraudulent scheme, investors learned over time that PG&E's safety violations were numerous and widespread. Indeed, they were responsible for the lion's share of the North Bay Fires and the Camp Fire. As information regarding the impact of PG&E's deficient safety practices emerged between October 12, 2017 and November 15, 2018, investors were surprised, given the Exchange Act Defendants' numerous public statements during the Class Period touting the Company's compliance, safety measures, and its intertwined financial health. As information came to light relating to PG&E's inadequate safety measures and the effects thereof, PG&E's

artificially inflated share price dropped significantly. Thus, as a result of the Exchange Act Defendants' wrongful acts, omissions, and fraudulent scheme, Lead Plaintiff and other Class members have suffered significant damages.

43. Lead Plaintiff asserts the claims herein against PG&E and certain of its executives and officers, seeking to recover for its damages suffered due to these declines in PG&E's publicly traded securities. PG&E's statements of compliance with safety regulations during the Class Period misrepresented current facts and were not statements of opinion.

## V. THE EXCHANGE ACT PARTIES

44. Lead Plaintiff PERA was established in 1947 and manages a retirement system for state, county, and municipal employees including police, firefighters, judges, magistrates, legislators and volunteer firefighters. PERA oversees assets of more than $18 billion on behalf of its members, retirees, and beneficiaries. As set forth in its Certification (previously filed at ECF No. 121-1), PERA purchased PG&E securities at artificially inflated prices during the Class Period and was damaged as the result of the Exchange Act Defendants' wrongdoing as alleged in this Complaint. On September 10, 2018, this Court appointed PERA to serve as the Lead Plaintiff in this action pursuant to the Private Securities Litigation Reform Act of 1995.

45. PG&E Corporation is a publicly traded corporation that is headquartered in Oakland, California, with principal executive offices located at 300 Lakeside Drive, Oakland, California 94612. PG&E's securities trade on the New York Stock Exchange ("NYSE") under the ticker symbol "PCG." It is a holding company that holds, directs the actions of, and controls energy-based businesses such as the Utility.

46. The Utility, the Pacific Gas and Electric Company, is a wholly-owned subsidiary of PG&E and operates as a public utility in California. It generates revenue by selling and delivering electricity and natural gas to its customers, also known as "rate-payers." The Utility effectively acts as an alter ego of PG&E; the two entities share the same address, have overlapping directors, intermix finances, and file joint annual reports with the SEC on Form 10-K. Indeed, all of the Utility's shares are owned by PG&E Corporation. Accordingly, this Complaint refers to the Utility and PG&E interchangeably as "PG&E" or the "Company," unless otherwise specified.

47. It is understood that the action against PG&E is stayed pursuant to the automatic stay provisions of 11 U.S.C. § 362. But for the automatic stay of proceedings and the bankruptcy court's jurisdiction over claims against PG&E, both PG&E and the Utility would be named as defendants herein. However, PG&E and the Utility are primary violators for purposes of liability of Section 20(a) of the Exchange Act.

48. Defendant Anthony F. Earley, Jr. ("Earley") served as PG&E Corporation's President, Chief Executive Officer ("CEO"), and Chairman of the Board from September 13, 2011 to March 1, 2017, and as its Executive Chairman from March 1, 2017 to December 2017. At all relevant times as PG&E's CEO, Earley received final drafts of PG&E documents for his review and approval prior to their public issuance, including PG&E's corporate filings with the SEC and the Company's annual Corporate Responsibility and Sustainability Report.

49. Defendant Geisha J. Williams ("Williams") served as PG&E Corporation's CEO and President from March 1, 2017 until her resignation on January 13, 2019. At all relevant times as PG&E's CEO, Williams received final drafts of PG&E documents for her review and approval prior to their public issuance, including PG&E's corporate filings with the SEC, press releases, and the Company's annual Corporate Responsibility and Sustainability Report. Previously, she served as the President of Electric Operations at the Utility from August 17, 2015 to February 28, 2017. Prior to that, she served as Executive Vice President of Electric Operations at the Utility from June 1, 2011 to August 16, 2015. Additionally, Williams was a director of PG&E Corporation from May 2017 to January 2019 and a director of the Utility from August 2015 to January 2019.

50. Defendant Nickolas Stavropoulos ("Stavropoulos") served as the President and COO of PG&E Corporation from March 1, 2017 to September 30, 2018, and served as President of Gas Operations at the Utility from August 17, 2015 to February 28, 2017. As PG&E's former COO, Stavropoulos received final drafts of PG&E documents for his review and approval prior to their public issuance, including PG&E's annual Corporate Responsibility and Sustainability Report. Prior to that, he served as Executive Vice President of Gas Operations at the Utility from June 13, 2011 to August 16, 2015. Stavropoulos was a director of the Utility from August 2015 to September 2018.

51. Defendant Julie M. Kane ("Kane") has served as Senior Vice President, Chief Ethics and Compliance Officer, and Deputy General Counsel for PG&E Corporation since May 18, 2015. Kane is named as a Defendant solely in her capacity as Chief Ethics and Compliance Officer ("CECO"). At all relevant times as PG&E's CECO, Kane received final drafts of PG&E documents for her review and approval prior to their public issuance, including PG&E's annual Corporate Responsibility and Sustainability Report and the Company's press and news releases regarding vegetation management or wildfire management.

52. Defendant Christopher P. Johns ("Johns") served as the President of Pacific Gas and Electric Company from August 1, 2009 to August 17, 2015.

53. Defendant Patrick M. Hogan ("Hogan") served as the Utility's Senior Vice President of Electric Operations from March 2016 through January 8, 2019, and he retired from the Utility on January 28, 2019. Prior to that, he served as the Utility's Vice President of Electric Operations Asset Management from November 2013 through February 2016.

54. The Defendants referenced above in ¶¶48-53 are referred to herein as the "Exchange Act Individual Defendants." The Exchange Act Individual Defendants, together with Defendant PG&E and Defendant Utility, are referred to herein as the "Exchange Act Defendants."

55. The Exchange Act Individual Defendants, because of their high-level positions of control and authority as senior executive officers of PG&E, possessed the power and authority to control, and did ultimately control, the contents of PG&E's SEC filings, press releases, content on the Company's website and official Twitter.com account, and other market communications during the Class Period. The Exchange Act Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Because of their positions within the Company and/or Utility, and their access to material information available to them but not to the public, the Exchange Act Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations being made were then materially

false and misleading. The Exchange Act Individual Defendants are liable for the false statements and omissions pleaded herein.

## VI. SUBSTANTIVE ALLEGATIONS SUPPORTING THE EXCHANGE ACT CLAIMS

### A. PG&E Operates Within a Robust Legal Regime

56. As detailed herein, electricity transmission and distribution is a heavily regulated industry in California.

#### 1. California Law Required PG&E to Maintain a Safe Distance Between Its Electrical Equipment and Nearby Vegetation

57. Vegetation management is critical to effectively mitigate the risk of wildfires. As PG&E itself has acknowledged: "[V]egetation presents an acute risk of wildfire ignition across PG&E's service territory . . . [and] in PG&E's [high-fire threat] areas, vegetation contacting its facilities is the leading source of electric involved fire incidents."[8]

58. To ensure public safety from wildfires, California has laws and regulations that require PG&E to keep its electrical equipment clear from vegetation growth or hazardous trees, and otherwise safe.

59. Pursuant to California Public Resources Code Section 4292, for instance:

> [A]ny person that owns, controls, operates, or maintains any electrical transmission or distribution line upon any mountainous land, or forest-covered land, brush-covered land, or grass-covered land shall, during such times and in such areas as are determined to be necessary by the director or the agency which has primary responsibility for fire protection of such areas, maintain around and adjacent to any pole or tower which supports a switch, fuse, transformer, lightning arrester, line junction, or dead end or corner pole, a firebreak which consists of a clearing of not less than 10 feet in each direction from the outer circumference of such pole or tower.

60. Similarly, California Public Resources Code Section 4293 provides that:

> [A]ny person that owns, controls, operates, or maintains any electrical transmission or distribution line upon any mountainous land, or in forest-covered land, brush-covered land, or grass-covered land shall, during such times and in such areas as are determined to be necessary by the director or the agency which has primary responsibility for the fire protection of such areas, **maintain a clearance of the respective distances which are specified in this section in all directions between**

---

[8] Response to Order to Show Cause Why PG&E's Conditions of Probation Should Not Be Modified, PG&E Criminal Proceedings (N.D. Cal. Jan. 23, 2019), ECF No. 976.

> **all vegetation and all conductors which are carrying electric current**: (a) For any line which is operating at 2,400 or more volts, but less than 72,000 volts, four feet. (b) For any line which is operating at 72,000 or more volts, but less than 110,000 volts, six feet. (c) For any line which is operating at 110,000 or more volts, 10 feet. In every case, such distance shall be sufficiently great to furnish the required clearance at any position of the wire, or conductor when the adjacent air temperature is 120 degrees Fahrenheit, or less. **Dead trees, old decadent or rotten trees, trees weakened by decay or disease and trees or portions thereof that are leaning toward the line which may contact the line from the side or may fall on the line shall be felled, cut, or trimmed so as to remove such hazard**.

61. Cal Fire interprets this law to "mean[] that a tree, or portion thereof, that is leaning toward the line, must be 'felled, cut, or trimmed' regardless of its health, if it 'may contact the line from the side or may fall on the line.'" The law also "requires utilities to identify and remove such hazards." Thus, Section 4293 not only "mandates that utilities trim or remove limbs overhanging powerlines if those limbs are inside the statutory clearance distances," but further "also mandates that utilities trim or remove, among other hazards, trees or portions thereof that are leaning toward the powerlines, including overhanging limbs, if those trees or limbs **may** contact the line from the side or fall on the line." Cal Fire also makes clear that "[a] utility's compliance with Section 4293 is mandatory, not discretionary."[9]

62. Finally, leading up to the Class Period, PG&E was under an enhanced mandate regarding the integrity of its vegetation management and hazard tree removal practices. Specifically, on January 17, 2014, then California Governor Jerry Brown declared a state of emergency because of severe drought conditions.

63. Thereafter, on or around October 30, 2015, Governor Brown expanded on that state of emergency as result of years of historic drought conditions and widespread bark beetle infestation, resulting in the death of tens of millions of trees. He noted that "this die-off is of such scale that it worsens wildfire risk" and "presents life safety risks from falling trees." As a result, he ordered utilities (including PG&E), to "undertake efforts to remove dead or dying trees in [] high hazard zones."

---

[9] Supplemental Response of Cal Fire following Jan. 30, 2019 Hearing on Order to Show Cause, *United States v. Pacific Gas and Electric Co.*, No. 14-cr-175 ("PG&E Criminal Proceedings") (N.D. Cal. Feb. 6, 2019), ECF No. 1012.

### 2. California Law Required PG&E to Safely Maintain Its Electrical Equipment and Infrastructure

64. In addition to the vegetation management regulations discussed above, California laws and regulations further require PG&E to safely maintain its electrical equipment and infrastructure, including an obligation to maintain the towers and poles that carry its transmission and distribution lines.

65. Pursuant to California Public Utilities Code Section 451:

> Every public utility shall furnish and maintain such adequate, efficient, just, and reasonable service, instrumentalities, equipment, and facilities, including telephone facilities, as defined in Section 54.1 of the Civil Code, as are necessary to promote the safety, health, comfort, and convenience of its patrons, employees, and the public.

66. California Health & Safety Code Section 13007 further provides:

> Any person who personally or through another willfully, negligently, or in violation of law, sets fire to, allows fire to be set to, or allows a fire kindled or attended by him to escape to, the property of another, whether privately or publicly owned, is liable to the owner of such property for any damages to the property caused by the fire.

67. Accordingly, California law required PG&E to maintain its electrical equipment and infrastructure, including electrical towers and poles, sufficiently to prevent wildfires from being caused by the failure of its towers and poles.

### 3. PG&E Is Regulated by the CPUC

68. PG&E's primary regulator is the California Public Utilities Commission ("CPUC"). The CPUC promulgates safety regulations and adjudicates PG&E's annual General Rate Cases – essentially determining which costs PG&E may pass on to rate-payers, and which costs PG&E must bear. The CPUC was created under Article XII of the California State Constitution, and derives its regulatory authority from Section 701 of the California Public Utilities Code.

**(a) CPUC's General Orders 95 and 165 Impose Strict Safety Regulations on PG&E**

69. Pursuant to CPUC General Order 95, Rule 35, PG&E was required "to establish necessary and reasonable clearances" between overhead conductors and nearby vegetation, with certain "minimum clearances" set forth by CPUC. Furthermore, this rule required that:

> When a supply or communication company has actual knowledge, obtained either through normal operating practices or notification to the company, that dead, rotten or diseased trees or dead, rotten or diseased portions of otherwise healthy trees overhang or lean toward and may fall into a span of supply or communication lines, said trees or portions thereof should be removed.
>
> * * *
>
> When a supply or communication company has actual knowledge, obtained either through normal operating practices or notification to the company, that its circuit energized at 750 volts or less shows strain or evidences abrasion from vegetation contact, the condition shall be corrected by reducing conductor tension, rearranging or replacing the conductor, pruning the vegetation, or placing mechanical protection on the conductor(s).

70. CPUC General Order 95 provides further details regarding the maintenance and upkeep of PG&E's power lines and infrastructure. Among other things, it provides that "[a]ll lines and portions of lines shall be maintained in such condition as to provide safety factors not less than those specified in Rule 44.3." This order further provides certain requirements intended to, among other things, guard against corrosion.

71. Pursuant to CPUC General Order 165, PG&E must also follow certain "requirements for electric distribution and transmission facilities (excluding those facilities contained in a substation) regarding inspections in order to ensure safe and high-quality electrical service." In relevant part, General Order 165 requires that: "Each utility subject to this General Order shall conduct inspections of its distribution facilities, as necessary, to ensure reliable, high-quality, and safe operation."[10]

[10] CPUC General Order 95, *Rules for Overhead Electric Line Construction* (May 2018), http://docs.cpuc.ca.gov/PublishedDocs/Published/G000/M217/K418/217418779.pdf (last viewed November 14, 2025).

**(b) CPUC's Resolution ESRB-8 Imposes on PG&E an Obligation to Adopt, Promulgate and Follow the ESRB-8 Shutoff Protocol**

72. On July 16, 2018, the CPUC issued Resolution ESRB-8. Recognizing that the "2017 California wildfire season was the most destructive wildfire season on record," the resolution required California's utilities, including PG&E, to adopt, promulgate and follow "de-energization policy and procedures" pursuant to which each utility will "de-energize power lines" as a means to mitigate wildfire risks "to ensure public safety." It further established notification, mitigation, and reporting requirements.

73. Resolution ESRB-8 included the following directives:

> PROPOSED OUTCOME:
>
> This Resolution extends the de-energization reasonableness, public notification, mitigation and reporting requirements in Decision (D.) 12-04-024 to all electric Investor Owned Utilities (IOUs) [including PG&E] and adds new requirements. It also places a requirement on utilities to make all feasible and appropriate attempts to notify customers of a de-energization event prior to performing de-energization.
>
> SAFETY CONSIDERATIONS:
>
> De-energizing electric facilities during dangerous conditions can save lives and property and can prevent wildfires. This resolution provides guidelines that IOUs must follow and strengthens public safety requirements when an IOU decides to de-energize its facilities during dangerous conditions.
>
> * * *
>
> PG&E reports that prior to 2018, it did not have a policy to de-energize lines as a fire prevention measure. PG&E reported that it did not proactively de-energize lines due to extreme fire weather conditions in 2017. However, in March 2018 PG&E announced that it is developing a program to de-energize lines during periods of extreme fire conditions and has been meeting with local communities to gather feedback.
>
> * * *
>
> - The IOU shall ensure that de-energization policies and procedures are well-communicated and made publicly available, including the following:
>     - **Make available and post a summary of de-energization policies and procedures on its website**.
>     - Meet with representatives from local communities that may be affected by de-energization events, before putting the practice in effect in a particular area.

> - Provide its de-energization and restoration policy **in full**, and in summary form, to the affected community officials before de-energizing its circuits.
>
> * * *
>
> De-energization of electric facilities could save lives, protect property, and prevent fires.

**(c) PG&E Must Follow CPUC's Regulations Under Penalty of Law**

74. The CPUC's regulations have the full force of law, and PG&E has a legal obligation to follow them, including the General Orders and resolutions listed above, under penalty of law.

75. For example, California Public Utilities Code Section 702 provides that:

> Every public utility shall obey and comply with every order, decision, direction, or rule made or prescribed by the commission in the matters specified in this part, or any other matter in any way relating to or affecting its business as a public utility, and shall do everything necessary or proper to secure compliance therewith by all of its officers, agents, and employees.

76. Further, under California Public Utilities Code Section 2106:

> Any public utility which does, causes to be done, or permits any act, matter, or thing prohibited or declared unlawful, or which omits to do any act, matter, or thing required to be done, either by the Constitution, any law of this State, or any order or decision of the commission, shall be liable to the persons or corporations affected thereby for all loss, damages, or injury caused thereby or resulting therefrom. If the court finds that the act or omission was willful, it may, in addition to the actual damages, award exemplary damages.

**4. Cal Fire Is the Duly Authorized Investigative Arm of the State of California for Wildfires**

77. Cal Fire is an agency of the State of California that, pursuant to Title 14 of California's Code of Regulations, is administratively in charge of both the state's fire departments and its law enforcement related to state fire and forest laws. As a result, Cal Fire is responsible for both fighting fires as they occur and for investigating the causes of fires. Cal Fire conducts official investigations as an arm of the State of California to determine the causes of wildfires within the state, as well as any violations of state laws and regulations.

78. Pursuant to an agreement with the U.S. Department of the Interior and the U.S. Department of Agriculture, Cal Fire is the state agency that is authorized to make fire cause and

origin determinations for wildfires – such as the North Bay Fires and the Camp Fire – that fall within its jurisdiction.

**5. Under California's Inverse Condemnation Law, PG&E Would Not Bear the Cost of Wildfires It Causes if It Could Prove that It Acted Reasonably and Prudently**

79. The California Supreme Court has interpreted Article 1, Section 19 of the California Constitution as imposing a doctrine known as "inverse condemnation," whereby public utilities such as PG&E are required to compensate individuals whose real property has been damaged by the utility under a strict liability regime. However, importantly, a utility such as PG&E is able to recover those same costs from the CPUC – effectively passing the costs from the shareholders to the rate payers – if it can "affirmatively prove that it reasonably and prudently operated and managed its system." Order Denying Rehearing of Decision (D.) 17-11-033 at 3, App. of SDG&E for Authorization to Recover Costs Related to the 2007 Southern Cal. Wildfires Recorded in the Wildfire Expense Memo Account, App. No. 15-09-010, Decision 18-07-025 (July 12, 2018).

80. In other words, PG&E bears the costs of wildfires it causes unless it can prove that it was "reasonable and prudent," meaning "that at a particular time any of the practices, methods, and acts engaged in by a utility follows the exercise of reasonable judgment in light of facts known or which should have been known at the time the decision was made." *Id.* Embodied in this standard, at a minimum, is compliance with state safety laws and regulations.

**6. Federal Law Also Requires PG&E to Follow Minimum Safety Standards**

81. PG&E is also required to adhere to a number of federal laws and regulations. Federal Energy Regulatory Commission ("FERC") Electric Reliability Standard FAC-003-4, for example, "requires that trees and other vegetation growing in or adjacent to the power line right-of-way be trimmed to prevent power outages caused by tree contact with a transmission line."[11]

[11] *See* FERC, *Tree Trimming & Vegetation Management* (updated Apr. 10, 2018), https://www.ferc.gov/frequently-asked-questions-faqs-0/tree-trimming-and-vegetation-management-landowners-faq; FERC, *FAC-003-4 Transmission Vegetation Management*, https://www.ferc.gov/transmission-line-vegetation-management; *see also* Order Adopting New Conditions of Probation, PG&E Criminal Proceedings, (N.D. Cal. Apr. 3, 2019), ECF No. 1040.

82. FAC-003-4 also imposes minimum vegetation clearance distances that depend on the type of current (alternating or direct), the nominal and maximum system voltages, and the altitude of the conductor above sea level. FAC-003-4 also imposes other requirements on owners and operators of transmission facilities, including but not limited to annual inspections, annual completion of necessary work, timely notification and correction of urgent conditions and documentation of vegetation management practices.[12]

### B. PG&E's Vegetation Management Expenditures Did Not Materially Change from Year to Year During the Class Period, Let Alone Double at Any Point

83. The Governor of California declared a state of emergency due to drought conditions in January 2014,[13] which ended in April 2017.[14] In October 2015, the Governor of California also declared a state of emergency regarding tree mortality due to both the ongoing effects of the drought and an epidemic of insect infestations causing millions of trees to die annually.[15] These conditions added to the already existing danger of wildfires in the North Bay region of California created by PG&E's numerous violations. PG&E knew about these conditions and its obligations to prevent its infrastructure and vegetation management from causing wildfires that would become even more dangerous as a result of these environmental factors. For example, the "Proclamation of a State of Emergency" regarding tree mortality made explicit: **"[U]tilities . . . to the extent required by their existing responsibilities to protect the public health and safety, shall undertake efforts to remove dead or dying trees in these high hazard zones that threaten power lines**. . . ."

---

[12] *See* PG&E Response to Request for Information at 4, PG&E Criminal Proceedings (N.D. Cal. Feb. 22, 2019), ECF No. 1016.

[13] California Drought, *State Water Board Approves State and Federal Water Projects Petition to Conserve Water During Drought Conditions*, Drought News Release Archive (Jan. 31, 2014), https://www.waterboards.ca.gov/drought/docs/tucp/tucp_press_release.pdf.

[14] California Executive Dept., *Executive Order B-40-17* (Apr. 7, 2017), https://archive.gov.ca.gov/archive/gov39/wpcontent/uploads/2017/09/4.7.17_Attested_Exec_Order_B-40-17.pdf.

[15] California Executive Dept., *Proclamation Of A State of Emergency* (Oct. 30, 2015), https://www.caloes.ca.gov/wp-content/uploads/LegalAffairs/Documents/Proclamations/20151030Tree_Mortality_State_of_Emergency.pdf

84. Based on information released by CPUC, PG&E spent $194,094,406 on vegetation management in 2015, $198,735,579 in 2016, and $201,456,193 in 2017 – increases of only 2.4% and 1.4%, respectively.[16] Each year's spending was substantially identical to the amounts PG&E requested, and the amounts CPUC approved, in PG&E's 2015, 2016, and 2017 General Rate Cases – notwithstanding the state of emergency directive above and PG&E's continued deficient safety practices. In contrast, inflation rose 5.48% over the same three-year period.[17] Thus, PG&E's spending did not even keep pace with inflation during the Class Period.

85. CPUC released the following chart confirming that PG&E's vegetation management spending underwent only modest increases over the relevant time period:

***Table showing 2011-2017 history of PG&E annual spending ($ million) on vegetation management***

| | PG&E Requested | CPUC Authorized | PG&E Spent |
|---|---|---|---|
| **2017** | $201.0 | $201.0 | *$150.4 YTD* |
| **2016** | $198.8 | $198.8 | $198.7 |
| **2015** | $194.2 | $194.2 | $194.1 |
| **2014** | $190.0 | $190.0 | $189.7 |
| **2013** | $180.0 | $161.5 | $161.6 |
| **2012** | $180.0 | $161.5 | $161.5 |
| **2011** | $180.0 | $161.5 | $161.6 |

86. While the Exchange Act Defendants falsely represented on November 2, 2017 that PG&E "***doubled***" vegetation management expenditures in 2016 (*see* Section VII.D.2, *infra* (Misstatement 5)), tellingly, they made this claim only after the North Bay Fires. At no point did the Company identify any specific budget item indicating that its vegetation management budget

[16] Letter from CPUC to PG&E re: Advice Letter 4827-E (June 3, 2016), https://www.pge.com/tariffs/tm2/pdf/ELEC_4827-E.pdf; Letter from CPUC to PG&E re: Advice Letter 5036-E (Apr. 25, 2017), https://www.pge.com/tariffs/assets/pdf/adviceletter/ELEC_5036-E.pdf.; Letter from CPUC to PG&E re: Advice Letter 5402-E (Nov. 29, 2018), https://www.pge.com/tariffs/assets/pdf/adviceletter/ELEC_5402-E.pdf.

[17] CPI Inflation Calculator, Bureau of Labor Statistics, https://www.bls.gov/data/inflation_calculator.htm.

had, in fact, doubled. Nor did it disclose these expenditures were inadequate to reasonably ensure safety. Indeed, as Judge Alsup later found, "PG&E's performance with respect to vegetation management has been **dismal.**"

87. The statements that PG&E had doubled its vegetation management expenditures remain false and misleading even when including reimbursements received by PG&E through its Catastrophic Event Memorandum Account ("CEMA") with the CPUC. In simple terms, such CEMA account allowed PG&E to seek reimbursement from the CPUC for certain claimed costs related to wildfires. PG&E sought $126,775,000 in CEMA reimbursement for 2015.[18] PG&E initially sought $259,679,000 in CEMA reimbursement for 2016 and $135,170,000 in CEMA reimbursement for 2017, but then voluntarily lowered its request for both years by $36,700,000 in the face of an audit and other scrutiny from the CPUC.[19]

88. Assuming *arguendo* that such ultimate CEMA reimbursements should be included in PG&E's total vegetation management spending for the years 2015, 2016, and 2017, PG&E's vegetation management still did not double during the Class Period: (i) CEMA-adjusted spending for 2015 of $320,869,406 ($194,094,406 budgeted 2015 plus $126,775,000 of CEMA); (ii) CEMA-adjusted spending for 2016 of $440,064,579 ($198,735,579 budgeted in 2016 plus $259,679,000 of CEMA, minus $18,350,000 or half of the $36,700,000 by which PG&E voluntarily lowered its CEMA request); and (iii) CEMA-adjusted spending for 2017 of $318,276,193 ($201,456,193 budgeted in 2017 plus $135,170,000 in CEMA, minus the remaining $18,350,000).

89. The following chart sums PG&E's budgeted vegetation management spending with CEMA reimbursements year-over-year:

| Year | Budgeted Spend | CEMA Reimbursements | Combined Total | Percent Change YoY |
|---|---|---|---|---|
| 2015 | $194,094,406 | $126,775,000 | $320,869,406 | N/A |

[18] CPUC, *Application of Pacific Gas and Electric Company*, filed Oct. 31, 2016, *available at* https://docs.cpuc.ca.gov/PublishedDocs/Efile/G000/M169/K117/169117865.PDF (summing 2015 totals in Table 1-1).

[19] *See* CPUC, Decision Approving Settlement, dated Mar. 31, 2022, *available at* https://docs.cpuc.ca.gov/PublishedDocs/Published/G000/M461/K202/461202251.PDF

| | | | | |
|---|---|---|---|---|
| 2016 | $198,735,579 | $241,329,000 | $440,064,579 | 37% |
| 2017 | $201,456,193 | $116,820,000 | $318,276,193 | (28%) |

90. Moreover, in a November 13, 2020, letter from the CPUC to PG&E, which summarizes the Company's wildfire spending (which includes spending related to the reduction of wildfire risk), PG&E's total spending in fact **decreased** between 2015, 2016, and 2017. Specifically, as illustrated in the chart below, PG&E spent $2 million less in 2016 than it did in 2015, and $35 million less in 2017 than 2016:

Figure 1: Annual Wildfire Program Variance




91. Finally, it was only after the Camp Fire that PG&E announced in December 2018 that it planned to spend an additional $5 billion on wildfire safety programs over five years, with a focus on improving its vegetation management efforts. This post-Class-Period development strongly supports the inference that the Company's previous vegetation management expenditures of around $200 million per year had been dangerously inadequate.[20] In fact, it was not until PG&E's 2019 vegetation management plan, detailed further below, that the Company indicated that it was materially increasing its vegetation management spending to more than $338 million.

[20] *PG&E asking state regulators to charge customers up to $12 more a month*, KTVU Fox 2 (Dec. 14, 2018), http://www.ktvu.com/news/pg-e-asking-state-regulators-to-charge-customers-up-to-12-more-a-month.

**C. PG&E Engaged in an Unsafe Pattern of Noncompliance with Safety Requirements Before and Throughout the Class Period**

92. Despite the important safety measures imposed by California law, PG&E caused deadly wildfires through its failure to comply with the legal requirements for vegetation management, pole maintenance, and other safety requirements. Between causing the devastating Trauner Fire in 1994 and the deadly Butte Fire in 2015, PG&E repeatedly violated California's vegetation management laws and other regulations. During the Class Period, the Exchange Act Defendants engaged in a scheme to conceal PG&E's systemic pattern of noncompliance with relevant laws and regulations regarding its wildfire prevention systems. Instead, they assured investors during the Class Period that PG&E had changed, stating in its 2015, 2016, and 2017 Corporate Responsibility and Sustainability Reports that its "vegetation management" was now "***in compliance with relevant laws***" or "***complying with state and federal regulations***."

93. Notably, in its undated 2018 Corporate Responsibility and Sustainability Report issued **after** the public learned the true causes of the North Bay Fires, PG&E **no longer** represented to investors that its vegetation management complies with California's safety laws.

94. On December 14, 2018, the CPUC opened a case against PG&E alleging, *inter alia*, that **the Company falsified records and data** concerning the safety of its gas pipelines, did not employ an adequate number of pipeline inspectors, and pressured supervisors to unsafely rush work over a five-year period from 2012 to 2017. These deliberate efforts to cut corners, and defraud regulators and the public about the safety of PG&E's utilities, continued up to and including the Class Period. The strong inference is that PG&E's statements concealing the inadequate safety of its electrical utilities, during the Class Period, were likewise made with an intent to defraud.[21]

95. On December 21, 2018, the CPUC issued a Scoping Memo and Ruling, which found that "PG&E has had serious safety problems with both its gas and electric operations for many years" and failed "to develop a comprehensive enterprise-wide approach to address safety."

[21] George Avalos, *PG&E Accused of Gas Pipeline Violations, Falsifying Records: Regulator*, Mercury News (updated Dec. 17, 2018 4:06 am), https://www.mercurynews.com/2018/12/14/pge-accused-of-gas-pipeline-violations-falsifying-records-regulators/.

CPUC concluded that it "was, and remains, concerned that the safety problems being experienced by PG&E were **not just one-off situations or bad luck, but indicated a deeper and more systemic problem**."

**1. PG&E's Unsafe and Noncompliant Vegetation Management Caused the Butte Fire in 2015**

96. In September 2015, one month before the Exchange Act Defendants made Misstatement No. 1 touting its vegetation management (*see* Section VII, *supra*), PG&E's insufficient vegetation management failed, causing the Butte Fire that killed two people, destroyed 921 homes, businesses, and other structures, and scorched more than 70,000 acres over 22 days.

97. On April 28, 2016, Cal Fire issued a press release announcing its conclusion that the Butte Fire was caused by PG&E's safety violations. Cal Fire also referred its investigation to the two relevant district attorneys for the counties the Butte Fire burned.

98. PG&E faced significant liability for the Butte Fire, including an April 13, 2017 lawsuit in which Cal Fire sued PG&E for $87 million to recover the costs that the agency devoted to fighting that fire. Cal Fire's lawsuit alleged that PG&E caused the Butte Fire by maintaining an inadequate vegetation management system.

**2. PG&E's Insufficient Safety Practices Allowed Numerous, Company-Wide Vegetation Management and Other Safety Violations During the Class Period**

99. Internally, PG&E's numerous and widespread violations of relevant safety laws are shown by the fact that the Company's internal controls were designed to permit vegetation management and other violations to go unchecked on a dangerous scale.

**(a) PG&E Documented and Tolerated Thousands of Dangerous Safety Violations Across Its Territory During the Class Period**

100. On March 5, 2019, Judge Alsup, the U.S. District Court presiding over PG&E's criminal probation, issued a revised Order to Show Cause relating to PG&E's lack of compliance with vegetation management and other safety regulations. The Order stated that PG&E's "**unsafe conduct** led to a deadly pipeline explosion and to six felony convictions," and found that PG&E's conduct had now "**led to recurring deadly wildfires caused by its electrical system**." It

contained the following findings summarizing the results of the federal court's probe into PG&E's actual knowledge of safety violations leading up to the North Bay and Camp Fires:

> PG&E's filings have included several relevant **admissions**. Significantly, PG&E acknowledged "that vegetation contact is the primary risk driver with respect to ignitions on its distribution lines." ("Vegetation" means trees and limbs in this context.) In 2016 alone, PG&E experienced approximately **1,400** wires down caused by vegetation contact. As PG&E reported to the CPUC, during 2015 and 2016, vegetation contact with conductors was the leading cause of the **486** fire ignitions associated with PG&E facilities, causing **37%** of those fires. **PG&E further admitted that as of June 2017, there were 3,962 unworked trees which PG&E had identified in 2016 as hazardous with the potential to "fall into or otherwise impact the conductors, towers or guy wires before the next inspection cycle."**[22]

101. Thus, PG&E has admitted that it had **actual knowledge since 2015** that its vegetation management practices did not comply with California safety regulations on the order of **thousands of violations per year**. PG&E has further admitted to **actually knowing** that its violations have **caused hundreds of wildfires per year since 2015**. However, PG&E never disclosed that their own internal compliance reviews showed a lack of compliance on such a huge scale.

102. According to data released by the CPUC,[23] PG&E equipment caused a total of 1,486 vegetation fires between June 10, 2014 and December 29, 2017. Among those vegetation fires, 69 were caused by transmission lines like the line implicated in causing the Camp Fire, including 26 fires caused by lines of the exact same high voltage, 115 kilovolts. PG&E supplied the CPUC with this information under the regulator's Decision 14-02-015, which enacted a "Fire Incident Data Collection Plan."[24]

---

[22] Second Order to Show Cause Why PG&E's Conditions of Probation Should Not Be Modified, PG&E Criminal Proceedings (N.D. Cal. Mar. 5, 2019), ECF No. 1027.

[23] PG&E Fire Incident Data Collection Plan Report Data Compiled from 2014-2019, CPUC website, https://www.cpuc.ca.gov/-/media/cpuc-website/files/uploadedfiles/cpucwebsite/content/news_room/newsupdates/2020/pge-fire-incident-data-2014-2019.pdf.

[24] Decision Adopting Regulations To Reduce The Fire Hazards Associated With Overhead Electric Utility Facilities and Aerial Communications Facilities, CPUC Decision 14-02-015 (CPUC Feb. 5, 2014), http://docs.cpuc.ca.gov/PublishedDocs/Published/G000/M087/K892/87892306.PDF. Pursuant to

103. Similarly, according to documents described in a report by *NBC Bay Area*, PG&E completed a review of its transmission towers' safety compliance immediately after the Camp Fire. As a result, "PG&E's inspections of thousands of transmission towers since the deadly Camp Fire in Butte County found more than 450 safety violations, including 59 that posed serious safety hazards."[25]

**(b) PG&E Had Actual Knowledge that Its Insufficient Safety Practices Had the Potential to Allow Dangerous Safety Violations on the Order of Hundreds of Thousands to a Million Wildfire Hazards**

104. Investigative journalists and attorneys uncovered that PG&E internally accepted that its vegetation management practices leave 1 of every 100 trees noncompliant with California regulations, and further reportedly "cheats" on its internal compliance reviews, in order to give a misleading impression of compliance with tree clearance requirements when it is in fact noncompliant. According to a report from NBC reporter Jaxon Van Derbeken on November 6, 2017, published a month after the North Bay Fires began, PG&E's own internal inspectors allow 1 out of 100 trees they check to violate state power line clearance standards:

> **PG&E auditors allow one out of 100 trees they check to violate state power line clearance standards**, NBC Bay Area has learned.
>
> * * *
>
> [I]t emerged during the Butte fire litigation that [internal] auditors were giving out a passing grade when one out of 100 trees they checked turned out to be too close to power lines under state standards.
>
> * * *
>
> When [PG&E] failed to reach that 99 percent compliance rate in the area around the fire . . . the company just expanded the universe of trees covered in a particular audit.
>
> "So what PG&E does when it doesn't pass, it basically cheats," [Amanda Riddle, one of the attorneys participating in a lawsuit against PG&E related to the Butte

---

the Fire Incident Data Collection Plan, PG&E and other investor-owned electric utilities must "collect and report data to SED regarding power-line fires." *Id.* ("SED" refers to CPUC's Safety and Enforcement Division).

[25] Jaxon van Derbeken, *PG&E Inspectors Find Hundreds of Safety Issues on Electrical Towers*, NBC Bay Area (Apr. 12, 2019), https://www.nbcbayarea.com/investigations/PGE-Inspectors-Find-Hundreds-of-Safety-Issues-on-Electrical-Towers-508344011.html.

Fire] said. "It adds more miles and more miles until it reaches a passing grade."

105. With approximately 123 million trees under PG&E's control,[26] this means that the Company knew during the Class Period that it may have been tolerating as many as 1.2 million trees to be noncompliant with state safety laws at any given time. The measurement of 1.2 million noncompliant trees is a conservative estimate when combined with the detail that PG&E "cheats" to get its rate of violations down to 1%, hence PG&E's real rate of noncompliance may be even higher.

106. According to the plaintiffs who litigated against PG&E for injuries caused by the 2015 Butte Fire, Defendant Hogan's and another PG&E employee's deposition testimony purportedly showed that "PG&E knows and accepts that 1-in-100 trees will be non-compliant, and that 1-in-1000 will be touching its powerlines." Using the same metrics, this means that PG&E knows that it could be allowing as many as approximately 123,000 safety violations in the nature of trees touching its powerlines at any given time.

### D. Investors Could Not Have Reasonably Expected the Extent of PG&E's Unsafe Pattern of Noncompliance that Caused the North Bay Fires and the Camp Fire

#### 1. PG&E's Noncompliance with Vegetation Management and Pole Integrity Requirements Caused the North Bay Fires

107. Of the eighteen main North Bay Fires for which Cal Fire's investigations have been completed, **seventeen** were caused by PG&E equipment. **Eleven** of these fires evidenced violations of California safety regulations, in **seven** different counties at the **same time**. Most of these violations pertained to PG&E's failures to clear vegetation or maintain the integrity of its poles, which fact was concealed from investors as a result of the Exchange Act Defendants' scheme to defraud.[27]

---

[26] *See* PG&E's Response to Safety and Enforcement Divisions' 10/14/17 Questions, CPUC website (Oct. 17, 2017), https://www.cpuc.ca.gov/-/media/cpuc-website/files/uploadedfiles/cpuc_public_website/content/safety/response-to-data-request.pdf.

[27] Indeed, because PG&E's safety violations exacerbated the fires that lacked evidence of PG&E's violations—the eleven fires caused by PG&E's safety violations merged into and strengthened other fires, and PG&E's safety violations diverted scarce firefighting resources to contain the fires PG&E directly caused—PG&E's safety violations were responsible, in full or in

### 2. PG&E's Noncompliance with Vegetation Management and Pole Integrity Requirements Caused the Camp Fire

108. On May 15, 2019, Cal Fire issued a press release announcing its determination that PG&E's electrical equipment caused the Camp Fire.[28] Cal Fire further concluded, "[a]fter a very meticulous and thorough investigation," that PG&E caused **both** of the Camp Fire's two ignition points. Cal Fire also referred its investigation to the Butte County District Attorney to review for potential criminal violations.

#### (a) The Camp Fire's First Ignition Point Was Caused by PG&E's Safety Violations

109. The Camp Fire's first ignition point was "in the Pulga area," according to Cal Fire, and "was caused by electrical transmission lines owned and operated by Pacific Gas and Electric[]."[29] Per its May 15, 2019 press release, "PG&E accepts this determination."[30]

110. According to firefighter radio transmissions and the journalist whose investigation made them public late on November 9, 2018, firefighters were dispatched to a vegetation fire "under the high tension power lines" across the Feather River from Poe Dam in Butte County on November 08, 2018 at 6:33 a.m.[31]—matching the location where Cal Fire officials pinpointed the

part, for **all** of the North Bay Fires, thereby negatively impacting the Company's financial condition. Indeed, PG&E has accepted financial responsibility for all the North Bay Fires.

[28] Press Release, Cal Fire, *CAL FIRE Investigators Determine Cause of the Camp Fire* (May 15, 2019), https://s1.q4cdn.com/880135780/files/doc_downloads/wildfire_updates/May-15-2019-%E2%80%93-CAL-FIRE-Press-Release.pdf.

[29] Press Release, Cal Fire, *CAL FIRE Investigators Determine Cause of the Camp Fire* (May 15, 2019), https://calfire.ca.gov/communications/downloads/newsreleases/2019/CampFire_Cause.pdf.

[30] Press Release, PG&E, *PG&E Responds to Camp Fire Announcement from CAL FIRE* (May 15, 2019), https://investor.pgecorp.com/news-events/press-releases/press-release-details/2019/PGE-Responds-to-Camp-Fire-Announcement-from-CAL-FIRE/default.aspx.

[31] Matthias Gafni, *PG&E Power Lines May Have Sparked Deadly Camp Fire, According To Radio Transmissions,* Mercury News (updated Nov. 12, 2018 12:03 pm), https://www.mercurynews.com/2018/11/09/pge-power-lines-may-have-sparked-deadly-butte-county-wildfire-according-to-radio-transmissions/.

Camp Fire's origin four minutes earlier.[32] As one firefighter described the fire to dispatch: "It is on the west side of the river underneath the transmission lines."

111. Independently that evening, PG&E admitted to the CPUC that one of its 115 kilovolt transmission lines on Pulga Road in Butte County experienced an outage at 6:15 a.m. that day, and noted that the site was near the Camp Fire.[33] Cal Fire listed Pulga Road as the Camp Fire starting point.[34]

112. The same report acknowledged that an aerial patrol later that day, "in the afternoon," observed "damage to a transmission tower" on the same 115 kilovolt transmission line. In a supplemental report filed with the CPUC on December 11, 2018, PG&E identified the tower as number ":27/222" and further specified that this observed damage included the separation of a suspension insulator, meant to support a transposition jumper, from an arm on the tower.[35] PG&E also observed a broken C-hook attached to the separated suspension insulator that once connected the suspension insulator to a tower arm.[36] According to the report, the connection point showed signs of wear; a flash mark was visible close to where the transposition jumper was suspended; and there was damage to the transposition jumper and suspension insulator.[37]

113. PG&E had not inspected Tower :27/222 since August 2014, and prior to that, not since 2009, pursuant to an internal policy whereby "Steel structures on PG&E's 115 kV

---

[32] Camp Fire Incident Update, CAL FIRE Incident Information (Nov. 22, 2018 7:00 pm), http://cdfdata.fire.ca.gov/admin8327985/cdf/images/incidentfile2277_4319.pdf (last viewed May 28, 2019).

[33] CPUC Email re: Electric Safety Incident Reported - PG&E Incident No: 181108-9002 (Nov. 8, 2018), http://s1.q4cdn.com/880135780/files/doc_downloads/2018/wildfire/11/Electric-Safety-Incident-Reported-Pacific-Gas-Electric-Incident-No-181108-9002.pdf; *see also,* Tony Bizjak, *PG&E Reports Power Line Problem In Butte County Near Time and Place Where Wildfire Sparked*, The Fresno Bee (updated Nov. 10, 2018 7:51 PM), https://www.fresnobee.com/news/state/california/article221448500.html.

[34] Camp Fire Incident Information, CAL FIRE Incident Information (last modified May 15, 2019), http://cdfdata.fire.ca.gov/incidents/incidents_details_info?incident_id=2277 (last viewed May 28, 2019).

[35] PG&E Letter to CPUC re: Supplements the Notices provided Nov. 8, 2018 (Dec. 11, 2018), http://s1.q4cdn.com/880135780/files/doc_downloads/2018/wildfire/12/12-11-18.pdf.

[36] *Id.*

[37] *Id.* The same report noted that, at a neighboring tower, an "insulator hold down anchor" had become disconnected. *Id.*

transmission lines, such as Tower :27/222, are subject to maintenance patrols annually and detailed inspections every five years." PG&E has admitted that an aerial patrol is not an inspection, as it is only "[d]uring a detailed inspection of a transmission line" that "PG&E personnel are instructed to look for and document abnormalities or circumstances that will negatively impact safety, reliability, or asset life."[38]

114. Moreover, just one day prior to the Camp Fire's ignition, PG&E had contacted a Pulga landowner named Betsy Ann Cowley regarding transmission line poles on her property that "were having problems with sparks."[39]

115. Accordingly, it emerged that a PG&E electrical pole carrying a high-voltage 115 kilovolt transmission line lost its integrity, in whole or in part, on the morning of November 8, 2018. Shortly thereafter, vegetation underneath the line ignited. PG&E's failure to maintain a clearance for vegetation up to 10 feet away from this transmission line, inclusive of all vegetation underneath, violated California Public Resources Code Section 4293. Further, PG&E's failure to maintain the integrity of its poles and prevent their loss of function violated California Public Utilities Code Section 451.

**(b) The Camp Fire's Second Ignition Point Was Also Caused by PG&E's Safety Violations**

116. Cal Fire determined that the Camp Fire had a second ignition point, which began "near the intersection of Concow Rd. and Rim Rd" before merging with the first fire PG&E caused at first ignition point.[40] According to Cal Fire's report: "The cause of the second fire was determined to be vegetation into electrical distribution lines owned and operated by PG&E," a violation of California Public Resources Code Sections 4292 and 4293, as well as California Public

---

[38] PG&E Camp Fire Incident Description & Factual Summary at 4, PG&E Criminal Proceedings (N.D. Cal. Dec. 31, 2018), ECF No. 956-1.

[39] Matthias Gafni, *Update: PG&E says email to Camp Fire Victim Focused on Different Transmission Line,* Mercury News (updated Nov. 14, 2018 3:59 PM), https://www.mercurynews.com/2018/11/12/state-regulators-investigating-pge-socal-edison-for-roles-in-deadly-camp-woolsey-fires/transmission tower problem.

[40] Press Release, Cal Fire, *CAL FIRE Investigators Determine Cause of the Camp Fire* (May 15, 2019), https://s1.q4cdn.com/880135780/files/doc_downloads/wildfire_updates/May-15-2019-%E2%80%93-CAL-FIRE-Press-Release.pdf.

Utilities Code Section 451. As discussed herein, PG&E's violations were ultimately determined to be the cause of both Camp Fire ignition points.

117. Cal Fire first announced that it had identified a second ignition point for the Camp Fire on November 15, 2018.[41] On November 16, 2018, PG&E admitted to the CPUC that the same day the Camp Fire ignited (indeed, minutes later at 6:45 a.m.), it experienced a second outage on another power line in a nearby part of Butte County near Concow, California.[42]

118. In PG&E's December 11, 2018 supplemental report to the CPUC, PG&E further admitted that it discovered a broken pole on the second power line on November 9, 2018; that the pole was on the ground, along with pole equipment.[43] The supplemental report also detailed a second inspection of the area on November 12, 2018, where a PG&E employee found damaged and downed poles, several snapped trees, downed wires, and some snapped trees on top of the downed wires.[44]

119. Accordingly, the truth emerged that the Camp Fire's second ignition point also exhibited evidence of failures regarding vegetation management and pole integrity in further violation of California safety regulations, including Public Resources Code Sections 4292, 4293 and Public Utilities Code Section 451. The investigations of Cal Fire and the Butte County DA later confirmed these facts, determining that the second ignition point was due to a diseased and decaying tree toppling on a 12 kilovolt distribution line. But for the second ignition point, the Camp Fire would have been less destructive.

---

[41] Andre Byik, *Camp Fire Investigation Leads To Possible Second Origin Away From Pulga*, Enterprise-Record (updated Nov. 15, 2018 10:06 PM), https://www.chicoer.com/2018/11/15/camp-fire-investigation-leads-to-another-area-away-from-pulga/.

[42] CPUC Email re: Electric Safety Incident Reported - PG&E Incident No: 181116-9015 (Nov. 16, 2018), https://www.cpuc.ca.gov/-/media/cpuc-website/files/uploadedfiles/cpucwebsite/content/news_room/newsupdates/2018/eir-incidentno1811; *PG&E Reports Another Outage On The Morning When California Camp Fire Started*, CNBC (Nov. 19, 2018 6:43 AM), https://www.cnbc.com/2018/11/19/pge-reports-another-outage-on-the-morning-when-california-camp-fire-started.html.

[43] PG&E Letter to CPUC re: Supplements the Notices provided Nov. 8, 2018 (Dec. 11, 2018), http://s1.q4cdn.com/880135780/files/doc_downloads/2018/wildfire/12/12-11-18.pdf.

[44] *Id.*

### E. PG&E's Repeated Vegetation Management and Pole Integrity Safety Violations Show that the Company Knew of Its Numerous and Widespread Violations of Fire Safety Regulations Throughout the Class Period, but Did Not Change Its Practices to Reduce, Much Less Eliminate, Those Safety Violations

#### 1. PG&E Did Not Improve Its Inadequate Safety Practices After Its Safety Violations Caused the Deadly Butte Fire

120. Even though PG&E suffered from endemic wildfire safety problems, the Company did not meaningfully change its practices even after the deadly Butte Fire that occurred in 2015. As noted above, in a deposition transcript that has not yet been made publicly available, PG&E's Vegetation Program Manager (Stockton Division)[45] Richard Yarnell reportedly testified under oath: "**PG&E—to the best of my knowledge, we have not made any changes as a result of this fire**" as of April 10, 2017. Accordingly, the **known** noncompliance that caused the Butte Fire in 2015 continued unabated throughout the Class Period, which concealed in furtherance of the Exchange Act Defendants' fraudulent scheme and in stark contradiction to PG&E's public statements.

121. Moreover, the vegetation management problems detailed herein were institutionally entrenched by certain incentive structures PG&E put in place. According to a lawsuit that was filed in California Superior Court against PG&E on December 21, 2017 (Case No. CGC-17-563293), which asserted claims on behalf of victims of the North Bay Fires, PG&E provided monetary incentives to its employees that had the effect of discouraging the implementation of vegetation safety measures.

122. For instance, PG&E's Vegetation Management Program adopted a Vegetation Management Incentive Initiative ("VMII") program, which was purportedly designed to reduce the "annual routine compliance" tree work of PG&E and to shift resources to "reliability" work that focused on urban consumer satisfaction instead of overall safety. By doing so, PG&E shifted its resources away from rural areas that were more prone to wildfires (where the "annual routine compliance" work was typically done), and towards more densely populated urban areas (where

[45] PG&E's Stockton Division is a geographic subdivision within the Company that contained the Butte Fire.

the "reliability" work was done). For example, pursuant to this program, PG&E set a goal to reduce "routine" work by 7.5% annually from 2014 through 2016. PG&E's bonus incentive program therefore put safety at risk in an effort to reduce consumer complaints. *See* Section XVII.A, *infra*.

123. According to the same lawsuit, Robert Urban, a regional officer for a PG&E contractor, stated that he had a concern that the bonus system incentivized his employees to not do their job, but PG&E chose to keep this program despite knowing this risk.

124. As noted above, though PG&E **falsely and repeatedly** assured investors during the Class Period that its compliance failures had been resolved after the Butte Fire, the Company's own employee Richard Yarnell later admitted that nothing of substance had changed over much of the same time period. Accordingly, PG&E's repeated safety violations show that the Company knew of its numerous and widespread violations of California safety regulations throughout the Class Period, but did nothing to change them.

### 2. PG&E Internally Acknowledged, Extensively Documented, and Tolerated for Years the Safety Violations that Caused the Camp Fire

125. PG&E's Caribou-Palermo transmission powerline was originally built in 1919, and was responsible for causing the first ignition point of the Camp Fire.

126. PG&E knew, but concealed, that this powerline had dangerously deteriorated. In December 2012, five steel towers supporting the Caribou-Palermo transmission line collapsed due to windy conditions. In a July 16, 2013 letter to the CPUC, PG&E proposed replacing the five collapsed towers, and one additional tower, on the Caribou-Palermo line "[s]panning Plumas-Butte County border" in a row "up slope and west of Highway 70 and generally parallel to the unpaved Pulga Road in a remote area of the Feather River Canyon within Plumas National Forest"[46]—that is, to say, near the first Camp Fire ignition point.

127. The rest of the aging towers on the line, including the tower alleged to have started the Camp Fire, were not replaced during that project.[47] The age of these remaining towers created

---

[46] Letter from CPUC to PG&E re: Advice Letter 4256-E (Sept. 6, 2013), https://www.pge.com/nots/rates/tariffs/tm2/pdf/ELEC_4256-E.pdf.

[47] Ivan Penn, et al., *How PG&E Ignored Fire Risks in Favor of Profits*, New York Times (Mar. 18, 2019), https://www.nytimes.com/interactive/2019/03/18/business/pge-california-wildfires.html.

a strong, undisclosed risk that corrosion, metal fatigue, or other age-related factors would fail to support transmission line cables and cause wildfires. Indeed, the relevant tower included uninsulated "jumper" lines used to switch currents between transmission lines, making the risk of fire even greater.[48]

128. In a July 26, 2017 FERC filing that news outlets have reported on extensively,[49] PG&E proposed considerable work for the Caribou-Palermo line as part of the Company's annual request to FERC for rate changes. PG&E reported that "[t]he Caribou-Palermo 115 kilovolt circuit was analyzed as part of [a] 2013 NERC Assessment," referring to an analysis by the North American Electric Reliability Corporation ("NERC"). The filing indicated that the 2013 NERC study examined 455 spans of the of the transmission line and found that vegetation or trees were allowed to grow too close to 127 (27.9%) of them: "The completed [NERC] analysis identified 127 spans with clearance issues out of the 455 spans on the electric transmission line." PG&E never fixed the identified issues from the time it learned about them in 2013 as reflected in the July 2017 filing. PG&E's Caribou-Palermo transmission line would later be implicated in the 2018 Camp Fire.

129. On March 18, 2019, *The New York Times* published an exposé on PG&E titled, "How PG&E Ignored California Fire Risks in Favor of Profits." The article discussed an internal Company email, sent long before the Camp Fire, which noted that a group of structures including the transmission tower implicated in the Camp Fire, Tower :27/222, were at risk of collapse due to their age and windy conditions in the area. Indeed, the Company noted that corrosion on another tower in the vicinity was so severe that it had endangered crews attempting to repair it. The

[48] Matthias Gafni, *It was originally built in 1919. What failed on PG&E tower at heart of Camp Fire probe?* Mercury News (updated Dec. 10, 2018 4:09 AM), https://www.mercurynews.com/2018/12/07/it-was-originally-built-in-1919-what-failed-on-pge-tower-at-heart-of-camp-fire-probe/.

[49] *E.g.*, George Avalos, *PG&E Knew For Years That Repairs Were Needed On Transmission Lines In Area Of Fatal Camp Fire*, Mercury News (updated Feb. 28, 2019 6:05 AM), https://www.mercurynews.com/2019/02/27/pge-delayed-repairs-for-years-on-transmission-line-linked-to-lethal-camp-fire/.

Company's own guidelines had warned that **the tower was a quarter-century past its useful life**, yet PG&E failed to repair or replace the aging tower.

130. The article also portrayed a corporate culture at the Company which disregarded safety risks and avoided paying for necessary fire prevention precautions in favor of short-term operating results. The article quoted Mike Florio, a former California utilities commissioner, who observed, "There was very much a focus on the bottom line over everything [at PG&E]: 'What are the earnings we can report this quarter? . . . And **things really got squeezed on the maintenance side**." The article also quoted California's Governor Gavin Newsom, who expressed a similar sentiment: "**[PG&E] have simply been caught red-handed over and over again, lying, manipulating or misleading the public. . . They cannot be trusted.**" The article contrasted the lack of focus on safety at the Company with the approach taken by another California utility facing similar risks, San Diego Gas & Electric, which had significantly revamped its safety protocols to respond to increased wildfire dangers.

131. Also on March 18, 2019, a coalition of law firms representing fire victims published excerpts of internal Company emails demonstrating that PG&E had identified the transmission lines implicated in the 2018 Camp Fire as unsafe long before the fire started.[50] For example, **internal Company documents showed that in December 2012 five aging towers along the Caribou-Palermo transmission line had collapsed, and a 2014 internal Company email stated that "the likelihood of failed structures happening is high"** – a risk PG&E concealed from the public.

132. Similarly, a November 1, 2016 a PG&E document detailed the failure of necessary hardware along the transmission line, with a support hook snapping off during routine painting. PG&E documents internally acknowledged that the supports "had been compromised through corrosion."[51]

---

[50] *Northern California Fire Lawyers Obtain Documents That Show PG&E Knew About Risk of Caribou-Palermo Line Failure*, MarketWatch (Mar. 18, 2019), https://www.marketwatch.com/press-release/northern-california-fire-lawyers-obtain-documents-that-show-pge-knew-about-risk-of-caribou-palermo-line-failure-2019-03-18 (last viewed May 28, 2019).

[51] *Id.*

133. Despite the internal acknowledgment that the Caribou-Palermo lines were in need of repair and posed a significant risk of collapse, PG&E never had the lines fixed. Instead, the Company reasoned that any collapse would not impact a sufficient number of customers to warrant the repairs and that the risks would be mitigated because any fire may be extinguished by rain. Tragically, needed repairs were never undertaken, and **the Caribou-Palermo line caused the first ignition point of the Camp Fire** in 2018.

134. Accordingly, the Exchange Act Individual Defendants had actual knowledge about the safety violations that caused the Camp Fire, months if not years in advance.

135. It was in this context that the Exchange Act Defendants touted PG&E's vegetation management and infrastructure maintenance to investors, falsely representing that it was in full compliance with all relevant regulations throughout the Class Period. *See* Section VII., *supra* (Misstatement No. 1, October 16, 2015; Misstatement No. 3, August 9, 2017; Misstatement No. 4, October 31, 2017; Misstatement No. 7, November 5, 2017; Misstatement No. 8, May 25, 2018; Misstatement No. 9, June 8, 2018).

### F. PG&E's ESRB-8 Shutoff Protocol Was Illusory, and PG&E's Failure to Follow It Was a Proximate Cause of the Camp Fire

136. After the North Bay Fires but before the Camp Fire, on July 16, 2018, the CPUC passed Resolution ESRB-8. As noted above, this regulation mandated that PG&E formalize and publicize a program to de-energize power lines for safety when extreme fire danger conditions occur. PG&E announced its response to this new safety requirement on September 27, 2018 (the "ESRB-8 Shutoff Protocol"), and touted its existence throughout the rest of the Class Period.

137. PG&E also stated that its ESRB-8 Shutoff Protocol applied to **all** of its powerlines, without qualification. Its protocol stated: "PG&E's Wildfire Safety Operations Center team will monitor conditions **across our system** and evaluate whether to temporarily turn off **electric power lines**, in the interest of public safety." Thus, according to PG&E's public statements, its ESRB-8 Shutoff Protocol applied to both higher-voltage transmission power lines and lower-voltage distribution power lines.

138. Under the ESRB-8 Shutoff Protocol, PG&E represented that it would balance seven criteria when determining whether to shut off electricity for safety:

- **"Extreme" fire danger threat level**, as classified by the National Fire Danger Rating System
- **A Red Flag Warning declared** by the National Weather Service
- **Low humidity levels**, generally 20 percent and below
- **Sustained winds** above approx. 25 mph and wind gusts in excess of approx. 45 mph
- **Site-specific conditions** such as temperature, terrain and local climate
- **Critically dry vegetation** that could serve as fuel for a wildfire
- **On-the-ground, real-time observations** from PG&E field crews

(Emphasis original.) During the Class Period, PG&E stated that "no single factor will drive a Public Safety Power Shutoff," and never identified any other criteria.

139. When PG&E's lines ignited the Camp Fire on November 8, all seven criteria had been met or exceeded – a fact of which PG&E could not have been ignorant. Indeed, PG&E had warned customers in that area as early as November 6—two days before the Camp Fire began—that it may need to "proactively turn off power for safety starting on Thursday, November 8."[52]

140. PG&E had only shut off electricity under its ESRB-8 Shutoff Protocol once before, on October 14 through 17, 2018, when it shut off eight transmission power line circuits and thirty-three distribution power line circuits, in seven counties. Though PG&E found damage to its equipment before restoring power, it nevertheless faced strong backlash from customers who were affected by the shutoff.

141. On November 8, 2018 at 3:14 p.m. PG&E announced, via its official Twitter.com account: "PG&E has determined that it will not proceed with plans today for a Public Safety Power

[52] Press Release, PG&E, *PG&E Notifying Customers in Parts of Nine Counties About Extreme Weather Forecasts and Potential for Public Safety Power Shutoff* (Nov. 6, 2018), https://investor.pgecorp.com/news-events/press-releases/press-release-details/2018/PGE-Notifying-Customers-in-Parts-of-Nine-Counties-About-Extreme-Weather-Forecasts-and-Potential-for-Public-Safety-Power-Shutoff/default.aspx.

Shutoff in portions of 8 Northern CA counties, **as weather conditions** did not warrant this safety measure."[53] The three weather-relevant criteria are humidity levels (at 20% or below), wind speed (with sustained winds around 25 miles per hour or stronger, and wind gusts around 45 miles per hour or stronger), and general site-specific conditions (*e.g.*, local climate and terrain).

142. However, as detailed below, **each of these factors weighed in favor of a shutoff**. Where and when the Camp Fire started, humidity was around or below 20%, wind speeds were measured above 25 (sustained) and 45 (gusts) miles per hour, and a myriad of site-specific conditions contributed to the ignition of the most destructive and deadliest fire in California history. As Cal Fire later confirmed in its determination that PG&E caused the Camp Fire: "The tinder dry vegetation and Red Flag conditions consisting of strong winds, low humidity and warm temperatures promoted this fire and caused extreme rates of spread, rapidly burning into Pulga to the east and west into Concow, Paradise, Magalia and the outskirts of east Chico."[54]

143. The Camp Fire originated at "Pulga Road at Camp Creek Road near Jarbo Gap."[55] Jarbo Gap is a geographical area in Butte County and contains a weather station located at 39° 44' 09" N (Latitude), 121° 29' 20" W (Longitude),[56] approximately six miles from the Camp Fire's origin.[57] The Jarbo Gap weather station provided the most accurate record of weather conditions at the time and place where the Camp Fire ignited.

---

[53] PG&E Twitter Account Post (Nov. 8, 2018 3:14PM), https://twitter.com/PGE4Me/status/1060672000929267713.

[54] Press Release, Cal Fire, *CAL FIRE Investigators Determine Cause of the Camp Fire* (May 15, 2019), https://s1.q4cdn.com/880135780/files/doc_downloads/wildfire_updates/May-15-2019-%E2%80%93-CAL-FIRE-Press-Release.pdf.

[55] Camp Fire Incident Information, CAL FIRE Incident Information (last modified May 15, 2019), https://scdd.ca.gov/wp-content/uploads/sites/33/2019/06/CalFire-Incident-Information.pdf.

[56] Jarbo Gap California Weather Station Information, RAWS USA Climate Archive, https://raws.dri.edu/cgi-bin/wea_info.pl?caCJAR.

[57] Camp Fire Incident Information, CAL FIRE Incident Information (last modified May 15, 2019), https://scdd.ca.gov/wp-content/uploads/sites/33/2019/06/CalFire-Incident-Information.pdf.

**1. PG&E Admitted that All of the Non-Weather Criteria Weighed in Favor of Shutting Off the Power**

144. As set forth below, on November 6 and 7, 2018, just before the Camp Fire ignited, PG&E conceded that all seven ESRB-8 criteria favored enactment of the de-energization protocols. These public statements by PG&E, made across three press releases, provided only a caveat that weather-related criteria were subject to change.

**(a) Criterion 1: the National Fire Danger Rating System Rated Jarbo Gap as Having an "Extreme" Fire Danger Threat Level**

145. The area where the Camp Fire ignited was classified as having an "Extreme" fire danger threat level by the National Fire Danger Rating System ("NFDRS"). The U.S. Forest Service "Wildland Fire Assessment System" ("WFAS") archives historical NFDRS ratings in map[58] and data[59] form, both of which confirm that the Jarbo Gap was rated "Extreme" on November 8, 2018. The graphic on the following page has modified the WFAS map to highlight, with a red circle, the "Extreme" rating received by the Jarbo Gap weather station on November 8, 2018:

[58] Observed Fire Danger Class, WFAS-Maps Graphics Fire Behavior Research (Nov. 8, 2018), https://www.wfas.net/archive/www.fs.fed.us/land/wfas/archive/2018/11/08/fd_class.png.

[59] *See* Data Chart of Fire Weather Observations from WIMS at 1700 Mountain Time (Nov. 8, 2018), https://www.wfas.net/archive/www.fs.fed.us/land/wfas/archive/2018/11/08/fdr_obs.txt (row labeled "Jarbo Gap," column labeled "ADJ" for "adjective," data entry "E" for "Extreme").




146. As the U.S. Department of Agriculture Forest Service explained the NFDRS:

> When the fire danger is "extreme", fires of all types start quickly and burn intensely. All fires are potentially serious and can spread very quickly with intense burning. Small fires become big fires much faster than at the "very high" level. Spot fires are probable, with long-distance spotting likely. These fires are very difficult to fight and may become very dangerous and often last for several days.[60]

147. Indeed, in a press release on November 7, 2018, PG&E admitted: "Due to expected **extreme fire danger conditions** . . . PG&E may temporarily turn off power in portions of the following communities: Butte County (including . . . Paradise)" on November 8, 2018.[61]

---

[60] USDA Forest Service, National Fire Danger Rating System, https://www.fs.usda.gov/detail/cibola/landmanagement/resourcemanagement/?cid=stelprdb5368839.

[61] Press Release, PG&E, *PG&E Continues to Notify Customers in Parts of Nine Counties About the Potential for Public Safety Power Shutoff Due to Forecasted Extreme Weather* (Nov. 7, 2018), https://investor.pgecorp.com/news-events/press-releases/press-release-details/2018/PGE-Continues-to-Notify-Customers-in-Parts-of-Nine-Counties-About-the-Potential-for-Public-Safety-Power-Shutoff-Due-to-Forecasted-Extreme-Weather/default.aspx.

148. Accordingly, the National Fire Danger Rating System rating for the area in which the Camp Fire originated had an "Extreme" fire danger threat level, objectively weighing in favor of a shutoff under Criterion 1.

**(b) Criterion 2: the National Weather Service Declared a "Red Flag Warning" for the Area**

149. The National Weather Service issued a "Red Flag Warning" for Butte County on November 8, 2018,[62] as PG&E admitted in a November 6, 2018 Press Release: "Due to expected extreme fire danger conditions, **including the Red Flag warning from the National Weather Service** and several other weather factors, Pacific Gas and Electric Company (PG&E) today began notifying customers in portions of nine counties that the company may proactively turn off power for safety starting on Thursday, November 8" including "Butte County."[63]

150. Accordingly, the National Weather Service issued a "Red Flag Warning" for the area in which the Camp Fire originated, objectively weighing in favor of a shutoff under Criterion 2.

**(c) Criterion 6: "Critically Dry Vegetation" (*i.e.*, Wildfire Fuel) Weighed in Favor of a Shutoff**

151. Throughout the area where the Camp Fire ignited, the soil and vegetation were unusually dry, as there had been almost no rainfall since April 2018. As PG&E admitted in a November 27, 2018 filing to the CPUC, its decision not to shut off the power "was preceded by an extended period of dry fall weather, only one rain event since May, and periods of dry north winds which caused the moisture content of live and dry fuels to remain low."[64]

---

[62] Shirin Rajaee, *PG&E Could Cut Power to 63,000 Amid Red Flag Warning*, CBS13 Sacramento (Nov. 8, 2018 12:17 A.M.), https://sacramento.cbslocal.com/2018/11/08/red-flag-warning-pge/.

[63] Press Release, PG&E, *PG&E Notifying Customers in Parts of Nine Counties About Extreme Weather Forecasts and Potential for Public Safety Power Shutoff Due to* (Nov. 6, 2018), https://investor.pgecorp.com/news-events/press-releases/press-release-details/2018/PGE-Notifying-Customers-in-Parts-of-Nine-Counties-About-Extreme-Weather-Forecasts-and-Potential-for-Public-Safety-Power-Shutoff/default.aspx.

[64] PG&E Letter to CPUC re: Compliance Report (Nov. 27, 2018), http://www.cpuc.ca.gov/uploadedFiles/CPUCWebsite/Content/News_Room/NewsUpdates/2018/11-27-18%20PGE%20PSPS%20Report.pdf (last viewed May 28, 2019).

152. PG&E confirmed this conclusion in a November 7, 2018 press release: "Due to forecasted high winds **and dry vegetation**, PG&E may temporarily turn off power in portions of the following communities: **Butte County** (including Berry Creek, Chico, Forest Ranch, Magalia, Oroville, **Paradise**). . . ."[65]

153. As journalist Matthias Gafni would later report, information from the National Aeronautics and Space Administration showed that California's moisture levels that month were "at the lowest levels in [the] last four years."[66] As the graphic below confirms, this led to extremely dry vegetation:

[65] Press Release, PG&E, *PG&E Continues to Notify Customers in Parts of Nine Counties About the Potential for Public Safety Power Shutoff Due to Forecasted Extreme Weather* (Nov. 7, 2018), https://investor.pgecorp.com/news-events/press-releases/press-release-details/2018/PGE-Continues-to-Notify-Customers-in-Parts-of-Nine-Counties-About-the-Potential-for-Public-Safety-Power-Shutoff-Due-to-Forecasted-Extreme-Weather/default.aspx.

[66] Matthias Gafni, *Why Didn't PG&E Shut Down Power In Advance Of Deadly Camp Fire? Here's The Data,* Bay Area News Group (Nov. 18, 2018 5:00 P.M.), https://www.chicoer.com/2018/11/18/why-didnt-pge-shut-down-power-in-advance-of-deadly-camp-fire-heres-the-data/.




154. Accordingly, the presence of critically dry vegetation in the area in which the Camp Fire originated objectively weighed in favor of a shutoff under Criterion 6.

**(d) Criterion 7: PG&E's On-the-Ground Observations Weighed in Favor of a Shutoff**

155. PG&E's on-the-ground observations objectively favored a shutoff. In a press release dated November 7, 2018, PG&E warned customers that it was considering a shutoff due to "expected extreme fire danger conditions," and that "[f]actors that PG&E considers when deciding to initiate" a shutoff included its "on-the-ground observations."[67]

[67] Press Release, PG&E, *PG&E Continues to Notify Customers in Parts of Nine Counties About the Potential for Public Safety Power Shutoff Due to Forecasted Extreme Weather* (Nov. 7, 2018), https://investor.pgecorp.com/news-events/press-releases/press-release-details/2018/PGE-Continues-to-Notify-Customers-in-Parts-of-Nine-Counties-About-the-Potential-for-Public-Safety-Power-Shutoff-Due-to-Forecasted-Extreme-Weather/default.aspx.

156. This conclusion is corroborated by PG&E's admission in a November 8, 2018 press release that ***only weather factors*** weighed against shutoff: "[PG&E] has determined that it will not proceed with plans today for a Public Safety Power Shutoff in portions of eight Northern California counties, **as weather conditions did not warrant this safety measure**."[68]

157. Accordingly, PG&E's on-the-ground observations objectively weighed in favor of a shutoff under Criterion 7. This fact was corroborated when a Cal Fire Captain arrived on the scene of the Camp Fire's first ignition point and observed "the beginnings of a conflagration under the PG&E high voltage power line," and immediately told dispatchers: "This has the potential of a major incident." *See* The Camp Fire Public Report: A Summary of the Camp Fire Investigation at 2 ("Butte DA Report") (attached hereto as Ex. A).[69]

### 2. All of the Weather Criteria Weighed in Favor of Shutting Off the Power

158. As described above, PG&E attributed its decision not to shut off power to weather conditions alone. Specifically, in a November 27, 2018 filing to the CPUC, PG&E explained that the primary weather condition that fell short was wind speed:

> On Wednesday, November 7, 2018, PG&E refined the forecasted impact down to 63,000 customers and eight counties (Butte, Lake, Napa, Nevada, Placer, Plumas, Sierra and Yuba). **Weather conditions stayed consistent, nearing but not reaching forecasted levels that would warrant temporarily turning off power for customer safety**.
>
> By around 13:00 on Thursday, November 8, **winds were decreasing**, and conditions were no longer forecast to approach [Public Safety Power Shutoffs] criteria. Based on the forecasted information, PG&E no longer anticipated a possible need to de-energize.

---

[68] Press Release, PG&E, *PG&E Determines to Not Proceed with Public Safety Power Shutoff Planned for Portions of Eight Northern California Counties* (Nov. 8, 2018), https://investor.pgecorp.com/news-events/press-releases/press-release-details/2018/PGE-Determines-to-Not-Proceed-With-Public-Safety-Power-Shutoff-Planned-for-Portions-of-Eight-Northern-California-Counties/default.aspx#:~:text=SAN%20FRANCISCO--%20%28BUSINESS%20WIRE%29--%20Pacific%20Gas%20and%20Electric,weather%20conditions%20did%20not%20warrant%20this%20safety%20measure.

[69] The Camp Fire Public Report: A Summary of the Camp Fire Investigation (June 16, 2020), https://www.buttecounty.net/DocumentCenter/View/1881/Camp-Fire-Public-Report---Summary-of-the-Camp-Fire-Investigation-PDF.

159. However, all weather factors – including wind speed – weighed in favor of an electricity shutoff in Jarbo Gap on November 7-8, 2018. The charts[70] on the following page show weather conditions at the Jarbo Gap Weather Station from late November 7, 2018 through the next day:

[70] Weather Station Summary for Jarbo Gap California (Nov. 7, 2018), https://raws.dri.edu/cgi-bin/wea_daysum2.pl?stn=cjar&day=7&mon=11&yea=18&unit=E; Weather Station Summary for Jarbo Gap California (Nov. 8, 2018), https://raws.dri.edu/cgi-bin/wea_daysum2.pl?stn=cjar&day=8&mon=11&yea=18&unit=E (last viewed May 28, 2019).

## Jarbo Gap California

Daily Summary for

**November 7, 2018**

| Hour of Day Ending at L.S.T. | Total Solar Rad. ° ly. | Wind Ave. mph | Wind V. Dir. Deg | Wind Max. mph | Air Temperature Mean Deg. F. | Fuel Temperature Mean Deg. F. | Fuel Moisture Mean Percent | Relative Humidity Mean Percent | Dew Point Deg. F. | Wet Bulb Deg. F. | Baro. Press. in. Hg. | Total Precip. inches |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 9 pm | 0.0 | 25.0 | 39 | 43.0 | 56.0 | 54.0 | 4.7 | 15 | 9 | 38 | | 0.00 |
| 10 pm | 0.0 | 25.0 | 40 | 41.0 | 54.0 | 53.0 | 4.7 | 16 | 9 | 37 | | 0.00 |
| 11 pm | 0.0 | 27.0 | 35 | 44.0 | 53.0 | 52.0 | 4.7 | 18 | 11 | 37 | | 0.00 |
| 12 am | 0.0 | 27.0 | 37 | 45.0 | 52.0 | 51.0 | 4.7 | 19 | 11 | 36 | | 0.00 |

## Jarbo Gap California

Daily Summary for

**November 8, 2018**

| Hour of Day Ending at L.S.T. | Total Solar Rad. ° ly. | Wind Ave. mph | Wind V. Dir. Deg | Wind Max. mph | Air Temperature Mean Deg. F. | Fuel Temperature Mean Deg. F. | Fuel Moisture Mean Percent | Relative Humidity Mean Percent | Dew Point Deg. F. | Wet Bulb Deg. F. | Baro. Press. in. Hg. | Total Precip. inches |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 am | 0.0 | 29.0 | 37 | 48.0 | 51.0 | 50.0 | 4.7 | 21 | 12 | 36 | | 0.00 |
| 2 am | 0.0 | 24.0 | 38 | 44.0 | 50.0 | 48.0 | 4.7 | 22 | 13 | 36 | | 0.00 |
| 3 am | 0.0 | 31.0 | 37 | 50.0 | 49.0 | 48.0 | 4.7 | 22 | 12 | 35 | | 0.00 |
| 4 am | 0.0 | 32.0 | 38 | 52.0 | 49.0 | 48.0 | 4.7 | 22 | 12 | 35 | | 0.00 |
| 5 am | 0.0 | 30.0 | 42 | 51.0 | 48.0 | 47.0 | 4.7 | 23 | 12 | 34 | | 0.00 |
| 6 am | 0.0 | 18.0 | 33 | 40.0 | 48.0 | 46.0 | 4.7 | 23 | 12 | 34 | | 0.00 |
| 7 am | 0.6 | 14.0 | 33 | 28.0 | 49.0 | 46.0 | 4.7 | 21 | 11 | 35 | | 0.00 |
| 8 am | 4.5 | 6.0 | 14 | 25.0 | 51.0 | 51.0 | 4.7 | 18 | 9 | 35 | | 0.00 |
| 9 am | 13.1 | 14.0 | 33 | 21.0 | 53.0 | 55.0 | 4.9 | 17 | 9 | 36 | | 0.00 |
| 10 am | 37.3 | 18.0 | 37 | 30.0 | 55.0 | 58.0 | 4.9 | 16 | 10 | 38 | | 0.00 |
| 11 am | 45.2 | 14.0 | 29 | 29.0 | 58.0 | 61.0 | 5.0 | 14 | 9 | 39 | | 0.00 |
| 12 pm | 47.8 | 16.0 | 31 | 33.0 | 60.0 | 64.0 | 5.0 | 13 | 9 | 40 | | 0.00 |
| 1 pm | 40.7 | 12.0 | 38 | 32.0 | 61.0 | 63.0 | 5.2 | 12 | 8 | 40 | | 0.00 |
| 2 pm | 37.3 | 15.0 | 42 | 24.0 | 63.0 | 67.0 | 4.9 | 11 | 8 | 41 | | 0.00 |
| 3 pm | 21.8 | 10.0 | 40 | 28.0 | 61.0 | 60.0 | 4.8 | 12 | 8 | 40 | | 0.00 |
| 4 pm | 7.5 | 8.0 | 37 | 25.0 | 60.0 | 58.0 | 4.8 | 12 | 7 | 40 | | 0.00 |
| 5 pm | 0.8 | 13.0 | 27 | 23.0 | 58.0 | 55.0 | 4.7 | 11 | 4 | 38 | | 0.00 |
| 6 pm | 0.0 | 15.0 | 27 | 27.0 | 57.0 | 54.0 | 4.6 | 12 | 5 | 38 | | 0.00 |
| 7 pm | 0.0 | 18.0 | 31 | 30.0 | 56.0 | 53.0 | 4.6 | 12 | 4 | 37 | | 0.00 |
| 8 pm | 0.0 | 19.0 | 28 | 34.0 | 55.0 | 52.0 | 4.6 | 12 | 3 | 37 | | 0.00 |

160. Accordingly, PG&E's November 27, 2018 statement to the CPUC that its decision not to shut off power was justified in part by the fact that "[b]y around 13:00 on Thursday, November 8, winds were decreasing," was misdirection. The Camp Fire had already begun over six hours before that point. And indeed, as shown in the chart above, wind speed weighed in favor

of a shutoff in the hours before the fire started. In fact, all of the weather factors weighed in favor of a shut off in the hours before the fire started, as detailed below.

### (a) Criterion 3: The Jarbo Gap Recorded Sufficiently Low Humidity Levels

161. Throughout the night on November 7, 2018, humidity was below the "generally 20%" level, supporting a shutoff. From 9:00 p.m. to midnight, humidity never exceeded 19%. In the ten hours before the Camp Fire, average humidity was 20.1%. Over the 24-hour period, humidity averaged a mere 16.42%.

162. Throughout November 8, 2018, humidity at the Jarbo Gap was at or below the "generally 20%" level that supported a shutoff. Between 6 a.m. and 7 a.m., when the Camp Fire ignited, humidity was between 23% and 21% and falling precipitously; it would drop to as low as 11% in the coming hours.

163. PG&E knew that the humidity would drop precipitously because National Weather Service's forecast of a red flag warning that day—the same red flag warning PG&E mentioned in its press release late the previous evening[71]—warned that "Afternoon [Relative Humidity] values of 5-15% will be common across the area."[72]

164. In fact, humidity weighed even more strongly in favor of a shutdown that day than it did on October 14, 2018, the day on which PG&E had previously determined that a power shutoff was necessary. The National Weather Service's forecast of humidity under 15% and as low as 5% was even more severe than its red flag warning on October 14, 2018, where it predicted relative humidity "into the 7-15% range for much of this region."[73]

---

[71] Press Release, PG&E, *PG&E Continues to Closely Monitor Weather Conditions Ahead of Possible Public Safety Power Shutoff in Parts of Eight Counties* (Nov. 7, 2018), https://investor.pgecorp.com/news-events/press-releases/press-release-details/2018/PGE-Continues-to-Closely-Monitor-Weather-Conditions-Ahead-of-Possible-Public-Safety-Power-Shutoff-in-Parts-of-Eight-Counties/default.aspx.

[72] Storm Prediction Center Day 1 Fire Weather Outlook, NOAA (Nov. 8, 2018 07:51:02 UTC), https://www.spc.noaa.gov/products/fire_wx/2018/181108_1200_fwdy1_print.html.

[73] Storm Prediction Center Day 1 Fire Weather Outlook, NOAA (Oct. 14, 2018 06:58:03 UTC), https://www.spc.ncep.noaa.gov/products/fire_wx/2018/181014_1200_fwdy1_print.html (last visited May 28, 2019) (last viewed May 28, 2019).

165. Accordingly, humidity in the area in which the Camp Fire originated was objectively below the "generally 20%" level, and therefore weighed in favor of a shutoff under Criterion 3.

**(b) Criterion 4: The Jarbo Gap Recorded Sufficiently High Wind Speed**

166. As noted above (*see* Section VI.F.2, *supra*), on November 27, 2018, PG&E informed the CPUC that the primary reason it did not shut off the power was wind speed.

167. Yet throughout the night on November 7, 2018, sustained winds at the Jarbo Gap were at or above the "approx. 25 mph" level that weighed in favor of a shutoff. Similarly, wind gusts reached the "approx. 45 mph" level by midnight, further supporting a shutoff. In the ten hours leading up to the Camp Fire, average sustained winds and gusts were 26.8 and 45.8 miles per hour, respectively.

168. At 5 a.m. on November 8, 2018, approximately an hour and a half before the Camp Fire erupted, sustained winds reached 30 miles per hour, with gusts of 51 miles per hour. Overall, wind conditions strongly weighed in favor of a shutoff in the hours before the Camp Fire's ignition.

169. PG&E knew that sustained winds would be high because National Weather Service's forecast of a red flag warning that day—the same red flag warning PG&E mentioned in its press release late the previous evening[74]—warned of winds "during the morning and afternoon" with a "[s]trong northerly/northeasterly flow of 20-25 mph."[75]

170. In fact, sustained wind speed weighed even more strongly in favor of a shutdown that day than it did on October 14, 2018, the day on which PG&E had previously determined that a power shutoff was necessary. The National Weather Service's forecast of sustained winds of 20-25 miles per hour was even more severe than its red flag warning on October 14, 2018, which

[74] Press Release, PG&E, *PG&E Continues to Closely Monitor Weather Conditions Ahead of Possible Public Safety Power Shutoff in Parts of Eight Counties* (Nov. 8, 2018), https://investor.pgecorp.com/news-events/press-releases/press-release-details/2018/PGE-Continues-to-Closely-Monitor-Weather-Conditions-Ahead-of-Possible-Public-Safety-Power-Shutoff-in-Parts-of-Eight-Counties/default.aspx.

[75] Storm Prediction Center Day 1 Fire Weather Outlook, NOAA (Nov. 8, 2018 07:51:02 UTC), https://www.spc.noaa.gov/products/fire_wx/2018/181108_1200_fwdy1_print.html.

predicted "Strong/gusty east-northeasterly winds of 15-20 mph. . . . where sustained winds are forecast to reach 20-25 mph for a few hours."[76]

171. Accordingly, wind speed in the area in which the Camp Fire originated was objectively above the "approx. 25 mph" level, and therefore weighed in favor of a shutoff under Criterion 3.

**(c) Criterion 5: Site-Specific Conditions Further Favored Shutoff**

172. The specific conditions beneath PG&E's 115 kilovolt transmission line where the Camp Fire ignited were highly conducive to wildfires. Just one day earlier, PG&E contacted Betsy Ann Cowley regarding transmission line poles on her property in Pulga that "were having problems with sparks," indicating that conditions were hazardous.[77] Further, it is indisputable that dry vegetation existed underneath the transmission line given reports of vegetation burning beneath it (*see* Section VI.D.A, *supra*).

173. Notably, PG&E identified nothing about the area's terrain, temperature or climate in its November 27, 2018 letter to the CPUC explaining its decision not to shut off its lines.[78]

174. According to the Butte DA Report, when the Cal Fire Captain in charge of the Jarbo Gap station arrived "up Highway 70 and the Canyon, past the small enclave of Pulga and up river

---

[76] Storm Prediction Center Day 1 Fire Weather Outlook, NOAA (Oct. 14, 2018 06:58:03 UTC), https://www.spc.ncep.noaa.gov/products/fire_wx/2018/181014_1200_fwdy1_print.html (last viewed May 28, 2019).

[77] Matthias Gafni, *Update: PG&E says email to Camp Fire Victim Focused on Different Transmission Line,* Mercury News (updated Nov. 14, 2018 3:59 PM), https://www.mercurynews.com/2018/11/12/state-regulators-investigating-pge-socal-edison-for-roles-in-deadly-camp-woolsey-fires/.

[78] The remoteness and ruggedness of the relevant terrain where the Camp Fire started further supported a shutoff. In a July 16, 2013 letter to the CPUC concerning the exact same Caribou-Palermo transmission line, PG&E described the relevant terrain as being "in a remote area" with "extreme topography." *See* Letter from CPUC to PG&E re: Advice Letter 4256-E (Sept. 6, 2013), https://www.pge.com/nots/rates/tariffs/tm2/pdf/ELEC_4256-E.pdf. After the Camp Fire, an article reported on the terrain immediately around the same transmission line as making fire containment more difficult: "The remoteness and rugged terrain around the tower would make any firefight by hand crews nearly impossible." *See* Matthias Gafni, *It was originally built in 1919. What failed on PG&E tower at heart of Camp Fire probe?* Mercury News (updated Dec. 10, 2018 4:09 AM), https://www.mercurynews.com/2018/12/07/it-was-originally-built-in-1919-what-failed-on-pge-tower-at-heart-of-camp-fire-probe/.

to the Poe Dam. Arriving above PG&E's Poe Dam just before sunrise," and personally observed "the beginnings of a conflagration under the PG&E high voltage power line on the ridge top across the river from them" less than 30 minutes from the Camp Fire's ignition. Ex. A at 2. The captain personally experienced winds that "were so high the Captain struggled to remain upright," and immediately told dispatchers based on the site-specific conditions: "This has the potential of a major incident." *Id.* Further, "[b]ased upon the location of the fire," which was "burning under the electric transmission lines on the ridge on the north side of the Feather River," and based on "the high wind speed and direction, Captain McKenzie concluded there was no available route to attack the fire." *Id.* at 8.

175. There was no better witness, nor more objective of one, than this Cal Fire Captain's site-specific visit at the beginning of the Camp Fire itself. Accordingly, site-specific conditions objectively weighed in favor of a shutoff under Criterion 5.

### 3. PG&E Knew, or Recklessly Disregarded, that All Seven Criteria Weighed in Favor of Shutting Off the Power

176. PG&E knew that severe weather conditions requiring a shutoff were in effect. First, the Company admitted it had been monitoring the weather in the area for days; its November 7 press release confirmed that "PG&E meteorologists continuously monitor weather conditions." Second, the Company had its own "network of PG&E weather stations to enhance weather forecasting and modeling," and stated that the Company had the capability of "[m]onitoring wildfire risks **in real time** from our new Wildfire Safety Operations Center."[79] Finally, the weather data referenced above was publicly available. Indeed, for the hour from midnight to 1 a.m. on November 8, 2018 just before the Camp Fire started, the Jarbo Gap weather station reported that **all weather conditions were met**: humidity at 19%, sustained winds at 27 miles per hour, and wind gusts at 45 miles per hour. Accordingly, PG&E either knew that weather conditions existed that weighed in favor of a shutoff, or deliberately disregarded such information.

[79] PG&E Public Safety Power Shutoff Policies and Procedures, CPUC website (Sept. 2018), http://cpuc.ca.gov/uploadedFiles/CPUC_Public_Website/Content/News_Room/Public-Safety-Power-Shutoff-Policies-and-Procedures-September-2018.pdf (last viewed May 28, 2019).

177. Every factor weighed in favor of shutting off PG&E's powerlines in the area in which the Camp Fire originated. PG&E knew or should have known that all such factors were met. The Exchange Act Defendants had no basis **not** to shut off PG&E's powerlines in advance of igniting the Camp Fire, except for the lost revenue and costs of customer inconvenience to PG&E that result from every such shutoff. While, as discussed herein, the Butte DA Report credits PG&E's explanation that its ESRB-8 Protocol excluded 115 kilovolt transmission lines, this fact supports the conclusion that PG&E's ESRB-8 Protocol was illusory and the Company's public statements about it were materially misleading half truths. In any event, the Butte DA Report agrees that PG&E had no authority to exclude transmission lines from its protocol, hence it still violated ESRB-8.

178. Indeed, PG&E had only shut off electricity in the face of wildfire conditions once before, in October 2018. The backlash to that shutoff was strong, and PG&E received numerous customer complaints. PG&E noted in its October 31, 2018 report to the CPUC that as of October 24, "17 residential customers have complained to the CPUC as a result of the PSPS [Public Safety Power Shutoffs] event since the first customer notification on October 13."[80] Moreover, PG&E reported to the CPUC that it had "received a total of 146 claims as of October 24, 2018," including claims for property damage, business interruption, and spoiled food.

179. In sum, all seven criteria weighed in favor of a shutoff that never happened. From the beginning, the Company misrepresented to investors that it would prioritize safety over customer satisfaction and reliability under the requirements of CPUC's Resolution ESRB-8. The strongest inference from PG&E's failure to shut off power on November 8, 2018 is that its ESRB-8 Shutoff Protocol was illusory, and that the Exchange Act Defendants did not believe themselves bound by the seven criteria PG&E told the public and investors were the crucial criteria. By PG&E's statements listing these—and only these—criteria in its ESRB-8 Shutoff Protocol, investors were entitled to believe that, when **all** criteria were met, PG&E would prioritize safety

[80] Letter from PG&E to CPUC re: Compliance Report (Oct. 31, 2018), https://www.cpuc.ca.gov/-/media/cpuc-website/divisions/safety-and-enforcement-division/reports/psps-post-event-reports/2019-and-earlier/pge-psps-report-letter-oct-13-17-2018.pdf.

and shut off the power rather than risk causing wildfires and the resulting economic as well as reputational harm to PG&E.

180. In the alternative, the Exchange Act Defendants had a duty to update investors once it decided to abandon its ESRB-8 Shutoff Protocol and risk the chance of wildfire.

181. The foreseeable and proximate result of PG&E's non-adherence to the protocol was the deadliest and most destructive wildfire California has ever faced.

### G. PG&E's Bankruptcy and Other Post-Class-Period Developments

182. Following the series of corrective disclosures and/or materializations of the risk that caused investors' economic loss (*see* Section X, *infra*), numerous post-Class Period developments arose that further demonstrate the extent of the Exchange Act Defendants' scheme to defraud investors and conceal PG&E's systemic shortcomings with respect to wildfire mitigation and compliance with related laws, regulations, and heavily touted Company-specific plans and procedures.

#### 1. PG&E Files for Chapter 11 Bankruptcy and Records Billions in Losses Related to the North Bay And Camp Fires

183. On January 14, 2019, PG&E filed a current report on Form 8-K stating that it expected to file for Chapter 11 bankruptcy on or about January 29, 2019. The reason the Company provided for the expected bankruptcy was the "series of catastrophic wildfires that occurred in Northern California in 2017 and 2018"—namely, the North Bay and Camp Fires. PG&E also acknowledged "the need for PG&E to continue enhancing our wildfire mitigation efforts" and that bankruptcy would "enable PG&E to continue investing in its systems, infrastructure and critical safety efforts."

184. On January 29, 2019, PG&E declared Chapter 11 bankruptcy. The Company's initial bankruptcy filings stated that it was facing $51.7 billion in liabilities, including more than $30 billion in potential liabilities tied to the North Bay and Camp Fires.[81]

[81] Amended Decl. of Jason P. Wells at 3 & 7, Case No. 19-br-30088, (N.D. Cal. Feb. 1, 2019), ECF No. 263.

185. On December 1, 2019, PG&E and the Tort Claimants Committee—who served on behalf of the Fire Victim Trust for those with claims against PG&E for the 2015 Butte Fire, the 2017 North Bay Fires, and the 2018 Camp Fire—reached a $13.5 billion settlement with PG&E that the Company funded by contributing (i) $6.75 billion in cash; and (ii) stock in the newly re-organized PG&E (*i.e.*, the new company that emerges after PG&E's bankruptcy).

186. On March 20, 2020, PG&E reached an agreement with California Governor Gavin Newsom, pledging billions of dollars to help wildfire victims and make other safety improvements. As part of the deal, PG&E agreed not to pay dividends to shareholders for three years (saving $4 billion, according to the Governor), and for at least half of the board of directors to be California residents.[82]

187. In September 2022, Defendant Williams and others reached a $117-million settlement agreement in connection with the 2017 North Bay Fires and the 2018 Camp Fire, in a lawsuit brought by Justice John Trotter (Ret., Trustee of the Fire Victim Trust) that claimed they were directly responsible for the fires because of their breach of fiduciary duties to act in the best interests of the Company.

188. According to an October 31, 2025 filing by PG&E in the Company's bankruptcy proceedings, PG&E and the Utility have paid approximately $42 billion in claims, as well as about $630 million in professional fees and expenses, in connection with the bankruptcy.[83]

### 2. District Court Proceedings Before Judge Alsup Provide Additional Detail with Respect to the Scale of the Fraud

189. The Exchange Act Defendants' misconduct occurred while PG&E was already serving its sentence for criminal probation as a result of the Company's felony convictions for knowingly and willfully violating safety standards in causing the deadly San Bruno gas explosion and obstructing justice. Since November 27, 2018, the U.S. District Court presiding over PG&E's

---

[82] Ivan Penn and Peter Eavis, *PG&E Reaches Agreement With Governor, Clearing Bankruptcy Hurdle*, NEW YORK TIMES, (Mar. 20, 2020), https://www.nytimes.com/2020/03/20/business/energy-environment/pge-deal-gavin-newsom-california.html.

[83] *See In re: PG&E Corporation*, 19-30088, ECF No. 14969; see also In re: Pacific Gas and Electric Company, 19-30088, ECF No. 14970.

probation instituted further proceedings to determine whether, *inter alia*, PG&E's safety violations causing the North Bay and Camp Fires may have violated its probation. *See* Section XI.C, *infra*.

190. With respect to its "compliance with existing law," PG&E conceded in its probation proceedings that at all relevant times (encompassing the full Class Period) it had not been in compliance with applicable laws and regulations by claiming it was "impossible" for the Company to comply with a California law requiring it to clear vegetation around its lines.

191. On March 5, 2019, the judge overseeing its probation, Judge Alsup, rejected this excuse, finding "**PG&E's performance with respect to vegetation management has been dismal.**" And, as a result, the court modified the terms of PG&E's probation to require it to comply with state laws regarding vegetation management and its wildfire prevention plan, among other remedial measures, and suspended PG&E's dividend until it could demonstrate that the Company had complied with the modified probation terms.

192. Judge Alsup further explained that PG&E had not generated excess cash through enhanced safety practices, but instead saved money by "knowingly fail[ing] to trim or remove thousands of trees it had already identified as posing a hazard" and that "dividends could and should have been kept and used to bring PG&E into compliance with state and federal law[.]"

193. Indeed, Judge Alsup ordered PG&E to make across-the-board improvements to safety, including that: (i) PG&E must fully comply with all applicable laws concerning vegetation management and clearance requirements; (ii) PG&E must fully comply with the specific targets and metrics set forth in its amended 2019 wildfire mitigation plan; (iii) the Monitor shall assess PG&E's wildfire mitigation and wildfire safety work; (iv) PG&E shall maintain traceable, verifiable, accurate, and complete records of its vegetation management efforts; (v) PG&E shall ensure that sufficient resources, financial and personnel, including contractors and employees, are allocated to achieve the foregoing, and if PG&E cannot find enough contractors, then PG&E must hire and train its own crews to trim and remove trees. In doing so Judge Alsup held, "[t]o ensure that sufficient financial resources are available for this purpose, PG&E may not issue any dividends until it is in compliance with all applicable vegetation management requirements as set forth above."

194. On April 29, 2020, Judge Alsup entered an order modifying PG&E's probation. He stated: "**This failure is upon us because for years, in order to enlarge dividends, bonuses, and political contributions**, **PG&E cheated on maintenance of its grid** – to the point that the grid became unsafe to operate during our annual high winds, so unsafe that the grid itself failed and ignited many catastrophic wildfires. In the past three years alone, PG&E wildfires killed at least 108 and burned 22,049 structures . . . . Yet because PG&E **skimped on vegetation maintenance**, an ever-greater backlog of hazard trees and hazard limbs grew year after year."

195. He added that PG&E was still years away from regulatory compliance, or even compliance with its own plan: "**PG&E has recently stepped up its hazard tree and limb operations, but still admits it has fallen short. In truth, PG&E remains years away from compliance with California law and with its own wildfire mitigation plan**. When asked about its compliance, PG&E told the Court that given the 'dynamic environment' of its purview, it remained 'unable to certify perfect compliance' with the probation conditions. That is an understatement."

196. Judge Alsup further explained how far PG&E's previous inspections and vegetation management were from regulatory compliance: "After the disasters of 2017 and 2018, PG&E ramped up its outsourcing. It now has under contract over 1,000 'pre-inspectors' to flag trees that violate clearance requirements, and roughly 5,000 tree-trimmers to follow behind to remove hazard trees and limbs. This large uptick in effort **has only made a small dent in the backlog of hazard trees and non-compliant vegetation management**. Even if this effort had been perfectly executed, **it will still take close to a decade to come into compliance with California law**. But this effort is *not* being perfectly executed – far from it." Indeed, as of April 29, 2020, 22,000 trees remained "unworked."

197. Judge Alsup's April 29, 2020 order also found that: "In total, the monitor identified ten instances where PG&E's records indicated that specific trees had been worked when, in fact, they had not been."

198. Judge Alsup also held that PG&E's "**unsafe conduct has led to recurring deadly wildfires caused by its electrical system**" and the "large number of trees that should have been

removed by PG&E but weren't . . . was a major contributing factor, **maybe the single-biggest factor, in causing the fires in 2017 and 2018 in Northern California**."

199. Judge Alsup imposed additional conditions as part of the probation, denoting processes PG&E had previously not been employing, including that PG&E employ its own inspectors to help the Company conform to California law, "keep records sufficient to identify when a piece of its equipment was in danger of failing," and require inspections that "truly assess" the state of equipment.

200. In his final comments prior to the 2022 expiration of PG&E's probation on January 19, 2022, Judge Alsup "acknowledge[d] failure" in the effort to rehabilitate PG&E. He noted "PG&E's stubborn refusal to take responsibility for its actions" and lamented that PG&E's "evasion has occurred time and again **over the last five years**." Judge Alsup commented:

> **So, in these five years, PG&E has gone on a crime spree and will emerge from probation as a continuing menace to California. . . . We remain trapped in a tragic era of PG&E wildfires because for decades it neglected its duties concerning hazard-tree removal and vegetation clearance, even though such duties were required by California's Public Resource Code. In time, this neglect led to hazard trees and limbs falling on its distribution lines and sparking wildfires or becoming "ground faults" (wherein the tree remains against a live wire and conducts sufficient electrical power to the earth to overheat and explode in flames). PG&E's backlog of unattended trees and vegetation was staggering at the outset of probation. As probation ends, PG&E remains at least seven years (my estimate) from coming close to being current**.

### 3. CPUC Investigative Findings, Fines, Penalties, and Newly Imposed Wildfire Mitigation Requirements for PG&E

201. On December 21, 2018, CPUC initiated a new phase of its investigation into PG&E's safety culture – which began in 2015[84] – in which CPUC would examine the Company's "current corporate governance, management, and structure to determine the best path forward for Northern Californians to receive safe energy service."[85] Moreover, Senate Bill (SB) 901 was

[84] CPUC, *CPUC TO INVESTIGATE PG&E'S CULTURE AND GOVERNANCE TO ENSURE SAFETY IS A PRIORITY* (Aug. 17, 2015), https://docs.cpuc.ca.gov/PublishedDocs/Published/G000/M154/K298/154298942.PDF.

[85] CPUC, *CPUC ISSUES PROPOSALS TO EVALUATE SAFE ENERGY SERVICE* (Dec. 21, 2018), https://docs.cpuc.ca.gov/PublishedDocs/Published/G000/M252/K798/252798213.PDF.

implemented by the CPUC, which required that PG&E and other electrical corporations under the CPUC jurisdiction submit annual Wildfire Mitigation Plans ("WMP" or "WMPs").

202. On February 6, 2019, PG&E submitted to CPUC its new wildfire mitigation plan, as required by SB 901. PG&E later corrected the filing on February 12, 2019 and amended it on February 14, 2019 and April 25, 2019 (the "2019 WMP").

203. On April 29, 2019, the CPUC largely approved PG&E's 2019 Mitigation Plan, with the exception of "several aspects of the company's planned mitigation that require improvement or other follow-up activity," including improved "[a]nalysis of data to determine whether PG&E's new vegetation-pole clearances have contributed to reduced ignitions, especially during critical weather conditions."[86] As detailed below, the dramatic expansion of safety practices and expenditures in PG&E's 2019 WMP confirms the inadequacy of PG&E's prior activities, showing that PG&E did far less than it should have during the Class Period.

204. PG&E's 2019 WMP stated that the Company would substantially increase its vegetation management efforts. First, the plan provided that approximately 375,000 "additional" hazard trees should be trimmed or cleared in 2019, a 235% increase compared to PG&E's purported totals of 160,000 in 2018 (estimated), 156,344 in 2017 (actual), 225,168 in 2016 (actual), 18,557 in 2015 (actual), and 8,042 in 2014 (actual). Second, it called for performing 2,450 miles of "enhanced vegetation management" (including fuel reduction and overhang clearing,) in 2019, an increase of 320% from its 2018 target of only 760 miles. In approving this proposal, the CPUC noted that "PG&E proposes to spend between $800 million and $1.3 billion to support [this] expansion of its vegetation management program."

205. PG&E's 2019 WMP also stated that the Company would substantially increase its inspections. Instead of just routinely inspecting 517,500 electricity distribution poles, PG&E would also commit to conducting "enhanced inspections" of 685,000 electricity distribution poles

[86] Although PG&E submitted a second corrected plan on April 25, 2019 "proposing to extend the timelines on many of its major wildfire mitigation efforts," the CPUC determined it was "filed too late to be considered and to receive party comment," and thus "not act on those proposals." *See* Proposed Decision of Administrative Law Judge re: 18-10-007 (Apr. 29, 2019), http://docs.cpuc.ca.gov/PublishedDocs/Efile/G000/M285/K712/285712576.pdf.

in High Fire Threat Districts "in addition to routine inspections" over the course of just "five months." (Emphasis original.) "Enhanced Inspection" was described as "includ[ing] ground inspections, drone and helicopter inspections where needed, and climbing inspections of every transmission tower," implying such measures had not been undertaken in the past.

206. Similarly, for its electricity transmission structures, PG&E committed to conducting enhanced inspections for 40,600 structures in addition to 76,000 routine inspections (up from 9,400 and 76,000, respectively). PG&E also committed to conducting "enhanced risk-based inspections" of 200 electricity substations in High Fire Threat Districts.

207. The CPUC noted that these increased inspections were expected to cost PG&E **between $798 million and $1.396 billion—"an increase from $15 million authorized in PG&E's last [General Rate Case]**."

208. The 2019 Mitigation Plan also proposed that the Company would significantly expand the geographic regions where it might preemptively shutoff power pursuant to its ESRB-8 Shutoff Protocol, estimating that the protocol would now cover as many as 5.4 million customers, a **950% increase** from what previously covered approximately 570,000 customers.

209. Thus, PG&E's 2019 WMP described dramatic increases in safety practices and expenditures compared to prior years. These and other aspects of PG&E's expensive proposals represented that it was finally providing the necessary, dramatic expansion of its safety practices and increases in expenditures, which had been absent. Accordingly, the vastly expanded scope of PG&E's 2019 WMP strongly demonstrates the inadequacy of PG&E's prior safety practices, showing that PG&E did far less than it should have during the Class Period.

210. Following the plan's release, the *Associated Press* summarized the general reaction, "Lawyers, industry watchdogs and a federal judge alike wonder: *What took so long*?"[87]

211. On May 7, 2020, the CPUC issued a press release stating that it was imposing a $1.937 billion penalty on PG&E for the 2017 North Bay and 2018 Camp fires, consisting of:

- $1.823 billion in disallowances for wildfire-related expenditures (an increase of $198 million from the original settlement agreement), meaning that PG&E

[87] Paul Elias, *Critics Ask What Took PG&E So Long on Wildfire Safety Effort*, Associated Press (Feb. 7, 2019), https://www.apnews.com/c1d0e16811914177a9b4b473f1eeebee.

shareholders will pay the cost of expenditures that it would otherwise seek to recover from customers.

- $114 million in System Enhancement Initiatives and corrective actions to further protect public safety (an increase of $64 million from the settlement agreement), including:
    - Root cause analysis for wildfires where ignition involved PG&E facilities, and the implementation of recommended actions to prevent similar events;
    - Funding local Fire Safe Councils that focus on community-based wildfire prevention and mitigation efforts; and,
    - Funding to the California Foundation for Independent Living Centers to support the safety and welfare of vulnerable customers before, during, and after disasters and Public Safety Power Shut-off events.

212. CPUC's Decision also imposes a $200 million fine, with the obligation to pay permanently suspended, in order to ensure that payment of the fine does not reduce the funds available to satisfy the claims of wildfire victims and given the unique circumstances of PG&E's bankruptcy.

#### 4. Butte County District Attorney Releases Detailed Report Summarizing Camp Fire Investigation After PG&E's Utility Pleads Guilty to 84 Counts of Manslaughter

213. On March 17, 2020, a Butte grand jury entered an indictment for 84 counts of manslaughter against the Utility, and one count of unlawfully causing a fire, in connection with its failures that caused the Camp Fire. Having met for a year and heard nearly 100 witnesses, reviewed approximately 1600 exhibits, and produced some 6000 pages of transcripts, the grand jury returned an indictment charging the Utility with "unlawfully and recklessly causing the Camp Fire as a result of its gross negligence in maintaining its power line." The Utility pleaded guilty as charged on all counts.

214. On June 16, 2020, the Butte County District Attorney publicly released the Butte DA Report. The Butte DA Report summarized the Butte County District Attorney's investigation into whether there "was sufficient evidence to convict PG&E of its criminal behavior which lead [sic] to the Camp Fire" and was used to establish the factual basis for the Utility's plea of guilty to

84 counts of involuntary manslaughter and one count of unlawfully causing a fire. Ex. A at 3-4, 80-81.

215. Regarding the first ignition point for the Camp Fire—the 115 kilovolt Caribou-Palermo transmission lines—the Butte DA Report (*Id.* at 72-73) determined that it was misleading and against underlying policy these lines had been unilaterally excluded from PG&E's ESRB-8 shutoff protocol. And further, if the 115kV Caribou-Palermo Transmission lines had rightfully been within the purview of PG&E's ESRB-8 protocol, that shutoff criteria would have mandated emergency de-energization:

> However, the Butte County DA obtained copies of the PSPS policy filed by PG&E with the CPUC. The actual PSPS policy was much more detailed and specific than the guide published on PG&E's public website. **As opposed to the publicly posted PSPS guide, the official PG&E PSPS policy differentiated between transmission and distribution lines**. The actual policy specifically and explicitly exempted all 115kV, 230kV and 500kV transmission lines from the PSPS. **After comparing the PSPS guide published on the website with the actual PSPS policy, it appears the authors of the public PSPS guide, in an effort to make the guide understandable to the average PG&E customer, simplified the policy to an extent that became misleading**.
>
> Additionally, the transmission and distribution lines in the Feather River Canyon were not within the area of PSPS program. According to internal PG&E documents, inclusion of 115kV transmission lines in the new PSPS program was initially considered. The committee drafting the PSPS policy explored three transmission line options: 1) all 70kV and below; 2) all 115kV and below; 3) all 70kV and below and some 115kV depending upon factors such as location within high fire threat areas. Ultimately the committee settled on all 70kV transmission lines and below and exempted all 115kV transmission lines from the PSPS program. PG&E did not provide any written documents explaining or justifying this decision. However, based upon all the documents provided, there was no evidence the decision to exempt all 115kV transmission lines and above was reckless or criminally negligent. Based upon the 2018 PG&E PSPS policy, the Caribou-Palermo line was not subject to de-energization prior to the ignition of the Camp Fire and was therefore not included in any PSPS. **However if PG&E had included 115 kV lines, the Caribou-Palermo line should have been included based on the extreme wind conditions in the Feather River Canyon**.

216. Regarding the second ignition point for the Camp Fire, identified as the Big Bend 1101 12 kilovolt distribution line—which was subject to PG&E's shutoff protocol—PG&E's ESRB-8 shutoff protocol mandated shutoff, but PG&E inexplicably failed to de-energize the line, which would have prevented the Camp Fire's second ignition point.

217. Overall, the Butte DA Report determined that PG&E had employed "a run to failure strategy on the entirety of the Caribou-Big Bend section of the Caribou-Palermo line," containing both of the Camp Fire ignition points, insofar that the Company only applied a low degree or patrol with minimal frequency to continuously assess risk, and only performed corrective maintenance. *Id.* at 60.

218. In addition to the anticipated $13.5 billion that PG&E would pay to a victim's compensation fund, PG&E was fined $3.5 million, and was required to pay the District Attorney's office half a million dollars to cover the cost of its investigation. This was the highest penalty allowed under California law. The deal also required PG&E to provide information about its safety practices to a federal monitor for two years, and restricted PG&E from paying dividends to its shareholders for three years.[88] Separately, the Utility committed to spend up to $15 million over five years to provide water to Butte County residents impacted by damage to the Utility's Miocene Canal caused by the Camp Fire.

219. The Butte DA Report found that PG&E was specifically aware of wear problems with C-hooks, the connection between aging infrastructure and fire risk, and the critical aging of the Caribou-Palermo line, and that it ignored a 2010 consultant report that identified such problems and recommended regular climbing inspections of the hooks. *See id.* at 73-79. Indeed, according to the Butte DA Report, PG&E has known about the risk of fire caused by equipment failure **since as early as 2005**:

> Internal PG&E documents show that by 2006 PG&E was aware that equipment failure (risk) causes fires. According to the October 2006 Risk Analysis of Urban Wildland Fires, written by the PG&E Enterprise Risk Management Committee, in 2005 PG&E electrical equipment failures caused 20 fires. . . . The evidence clearly established PG&E has been aware of the risk/consequence connection between equipment failure and fire since at least 2005. Similarly, the evidence also clearly establishes that PG&E was aware of the risk/consequence connection between aging infrastructure and equipment failure.

*Id.* at 73-75.

[88] Ivan Penn and Peter Eavis, *PG&E Will Plead Involuntary Manslaughter in Camp Fire*, THE NEW YORK TIMES (Mar. 23, 2020), https://www.nytimes.com/2020/03/23/business/energy-environment/pge-camp-fire-manslaughter.html.

220. The Butte DA Report concluded "**that the reckless actions of PG&E created the risk of a catastrophic fire . . . , that PG&E knew of that risk and PG&E ignored the risk by not taking any action to mitigate the risk**." *Id.* at 82.

221. PG&E did not dispute the Butte DA Report's finding of PG&E's criminally reckless state of mind in causing the Camp Fire, hence PG&E conceded that its internal knowledge of its own pattern of noncompliance with safety regulations supported criminal liability, meaning that such knowledge percolated up to a significantly high enough corporate level to bind the Company.

222. As summarized below, the Butte DA Report further shed additional light on PG&E's failures to properly inspect, maintain, and repair or replace equipment on its high-voltage transmission lines and on how the Company's inadequate safety practices with respect to its electrical transmission and distribution system caused the Camp Fire.

223. The Butte DA Report confirmed the existence of a broken C-hook on Tower :27/222, and that PG&E knew, but concealed, that equipment on the Caribou-Palermo line had dangerously deteriorated.

224. According to the Butte DA Report, Cal Fire investigators determined that the first ignition point of the Camp Fire was "the dry brush below Tower [:]27/222 of the Caribou-Palermo line," and that the fire began when "a C hook that linked an insulator string connected to the jumper conductor to the transposition arm of the tower failed, allowing the energized jumper conductor to make contact with the steel tower structure. The ensuing electrical arcing between the jumper conductor and steel tower structure caused the aluminum strands of the conductor to melt as well as a portion of the steel tower structure. The molten aluminum and steel fell to the brush covered ground at the base of the steel tower structure. This molten metal ignited the dry brush." *Id.* at 9.

225. Cal Fire also found that many of the components on towers of the Caribou-Palermo line, including Tower :27/222 and the C-hook that broke, were from the original construction of the line, between 1919 and 1921, and had not been replaced. Specifically, "the insulator string hanging from the 'C hook' that broke on November 8, 2018 was an original 1921 insulator." Further, "with the exception of add-on hanger brackets which were added to the ends of the

transposition arms to replace worn hanger holes, the transposition components on Tower :27/222, including the transposition arms, C hooks, insulator strings and jumper conductor[s], were original components in service since 1921." *Id.* at 18-19, 82.

226. With respect to the specific C-hook that failed and caused the Camp Fire to ignite, investigators found: (i) "that as a result of rotational body on body wear" – caused by movement in the wind – "the edge of the hanger holes had cut a channel into" the C-hook and that "the channel had cut approximately 14/16 into the hook before the remaining metal broke under the weight of the insulator string and jumper conductor," (ii) "substantial wear" on the bolted-on hanger hole plate of the left-phase transposition arm "where the broken hook had hung," and (iii) a "channel" worn into the right-phase C-hook—which had not failed—"where it hung from the bolted-on hanger plate hole of that transposition arm" which was "similar to the channel cut into the broken left phase C hook." *Id.* at 19-20, 22.

227. Investigators found spaces between C-hooks and hanger holes indicative of substantial wear on three other towers on the Caribou-Palermo line. *Id.* at 20.

228. Investigators also found that, at Tower :27/222 and at least one other tower on the Caribou-Palermo line, the C-hooks hung from "bolted-on hanger plate holes [that] had been added to the transposition arms," instead of the original hanger holes, indicating PG&E's awareness of wear on the C-hooks and hanger holes. *Id.* at 20-21, 31.

229. By at least 1987, PG&E had knowledge of wear on the C-hooks and hanger holes on its transmission infrastructure when photographs in the "PG&E Laboratory Test Report" documented worn C-hooks and hanger holes on transmission towers. *Id.* at 24, 78, 83.

230. In 2011 and again in 2018, workers on PG&E's transmission line crews observed similar wear on hanger holes. In 2011, a Utility engineer noted in an email that "[i]t appears that there is a groove cutting into the plate probably caused by years of rubbing between the c-hook and the plate." And in 2018, a Utility lab report found that the wear was "attributed to wind-driven swinging of the insulators" and opined that the "useful life of the hanger plates" was 97-100 years. *Id.* at 78, 83-84.

231. PG&E was aware of the age of the equipment on the Caribou-Palermo line and introduced a "Deteriorated Transmission Equipment Replacement Program" in 2007, **but apparently never funded the program**. *Id.* at 33.

232. By 2007, a PG&E engineer sought $800,000 in funding "for preliminary engineering and purchase of long lead-time material to replace conductor and tower structures on a section of the Caribou-Palermo line," noting that "[t]he probability of . . . failure is imminent due to the age of both the towers and the conductor." *Id.* at 34. After removing language about "the prediction of imminent failure," PG&E's Electric Asset Strategy Division approved the project with a reduced funding amount.

233. Between 2007 and 2009, PG&E conducted "engineering studies of the proposed new tower sites and preparatory work, including building a road to allow access to the proposed new tower sites," but canceled the project "due to Asset Management's reprioritization." *Id.* at 34-35.

234. PG&E reduced the budget allocated to inspection, repair, and maintenance of transmission equipment in the years leading up to the Camp Fire. *Id.* at 49-51.

235. The Butte DA Report also shows that PG&E inadequately inspected the Caribou-Palermo line and its other high-voltage transmission equipment. According to the Butte DA Report, PG&E changed its inspection and patrol policies over the decade preceding the Camp Fire and "drastically reduced the frequency and thoroughness of inspections." *Id.* at 23-25.

236. Under policy changes that PG&E made in 1995, "[t]he Caribou- Palermo line was reduced from three patrol/inspections (one ground/two aerial) per year to one ground inspection every 24 months and one aerial inspection every 24 months. Required routine climbing inspections were eliminated." *Id.* at 24.

237. Under the Electric Transmission Preventative Maintenance Manual ("ETPM")—which went into effect in 2005 (but was not publicly disclosed until after the Class Period)—the Caribou-Palermo line was further "reduced to only being inspected once every five years and patrolled once per year in non-inspection years." *Id.* at 25.

238. The ETPM differentiated between "inspections" and "patrols." Inspections were to be far more thorough, and were "to include detailed visual observations, operational readings, and component testing to identify abnormalities or circumstances that will negatively impact safety, reliability or asset life." *Id.* at 24-25. During an inspection, "[i]ndividual elements and components are carefully examined through visual and/or routine diagnostic tests and the abnormal conditions of each are graded and/or recorded." For a patrol, the inspector's "primary responsibility . . . is to visually observe the electric facilities, looking for obvious structural problems or hazards without the use of measuring devices, tools, or diagnostic tests, and to record the facilities that have been patrolled." *Id.*

239. Despite revising the patrol/inspection policy, PG&E's ETPM acknowledged that "the best position to view insulators and hardware is aerial inspection (not patrol), ground inspection above 10', and climbing inspection." *Id.* at 25.

240. Although the ETPM was intended to "reduce the potential for component failure and facility damage and facilitate a proactive approach to repairing or replacing identified, abnormal components," **PG&E's actual inspections and patrols of the Caribou-Palermo line did not even comply with the already-lowered ETPM standards**. *Id.* at 23, 26, 37. The Butte DA Report concluded that "[t]he evidence clearly established that PG&E did not, in fact, follow the procedures and requirements established in the ETPM" and "it is reasonable to conclude the sections of the ETPM relating to inspections and patrols of overhead electric transmission lines were simply a façade created to meet the requirements of the regulators and the CAISO." *Id.* at 26.

241. PG&E sought to cut costs associated with inspections and patrols "by reducing the thoroughness of the inspections and patrols," specifically by "reducing the amount of time budgeted for the inspections and patrols" and tying salary incentives to staying within reduced inspection and patrol budgets. *Id.* at 27-28, 50.

242. In 2005, PG&E eliminated the direct training of the employees responsible for inspecting and patrolling transmission lines. All of PG&E's employees who "inspected or patrolled the Caribou-Palermo line since the publication of the ETPM in 2005 . . . denied having receiv[ed] any formal training on how to perform an inspection or patrol," including in "assessing wear."

Their training was "limited to filling out reporting forms and notifications for any issues" and the "only training on how to perform an inspection or patrol was via informal mentoring by other, more experienced" employees. *Id.* at 28-30.

243. "[B]y 2007 the inspections and patrols of the Caribou-Palermo line were being conducted by inexperienced, untrained and unqualified [employees]. Both of the 'Detailed Ground Inspections' (2009 and 2014) and seven of the ten Annual Air Patrols on the Caribou Palermo [line] were completed by [employees] who had little or no prior transmission experience, and no formal training on performing inspections and patrols." This violated the ETPM, which required employees to "be thoroughly familiar with all of the facilities, equipment, safety rules and procedures associated with the facilities and equipment." Specifically, "[b]ecause of their lack of knowledge, experience, and training," the employees inspecting the Caribou-Palermo line "could not have been expected to identify the wear" on C-hooks and hanger holes. *Id.* at 30.

244. The last "Detailed Ground Inspection" of the Caribou-Palermo line before the Camp Fire occurred in 2014 and, from 2015 to the Camp Fire in 2018, the line was only subject to annual aerial patrols, *id.* at 37, which were inadequate. PG&E employees "denied it was possible to assess the wear on the C hooks and hanger holes during a detailed ground inspection" or "during aerial patrols." *Id.* at 41. Moreover, such inspections were inconsistent with the ETPM's guidance that "[o]nly climbing inspections or lifted bucket inspections above 10 feet in the air would give the appropriate best view for assessment of insulators and their connectors." *Id.*

245. The linemen who assisted in the inspections of the Caribou-Palermo line had not been trained to perform inspections and patrols and did not conduct their inspections under the supervision of trained, experienced troublemen. Instead, the linemen and troublemen divided the line into sections and each independently inspected his own section. *Id.* at 38.

246. "[B]etween 2001 and 2018 aerial patrol by helicopter was the primary method of inspection and patrol for the Caribou-Palermo line. . . . [T]he thoroughness of the aerial patrols declined through the years." For example, patrol flight time declined from 10 hours for the 2001 patrol to between 3.2 and 7.6 hours for patrols from 2011 to 2018. Employees characterized patrols with such flight times as "'fly bys' not patrols or inspections" and reported that they were "only

confirming the structures and components were 'standing upright.'" They also stated that it would not be "possible to see and assess the wear on the C-hooks and hanger holes during aerial patrols." *Id.* at 40-41.

247. The ETPM required climbing inspection upon certain specific triggers, such as component defects or failures, high fire hazard, and equipment failures caused by storms. But, in practice, **PG&E treated this requirement as discretionary and did not order climbing inspections even when multiple triggers had occurred**. *Id.* at 41-43.

248. Even though 80 towers on the Caribou-Palermo line were subjected to climbing inspections in September and October 2018, those inspections were deficient. They failed to detect defects on numerous towers that were later identified in December 2018 wildfire-related inspections. *Id.* at 43.

249. After the Camp Fire, PG&E initiated wildfire-related climbing inspections on the Caribou-Palermo line and other similar transmission line. Those inspections "identified thousands of conditions requiring repairs on PG&E's system that had not been previously identified." *Id.* at 44.

250. After "the failure of a connector on a jumper line" on a Caribou-Palermo line tower caused the Rock Fire in September 2008, PG&E "did not conduct climbing or aerial inspections on other Caribou-Palermo line towers with similar connectors." *Id.* at 35.

251. After five towers on the Caribou-Palermo line fell in a 2012 windstorm, PG&E failed to perform a formal "Root Cause Analysis" and, despite being advised to do so, never inspected the foundations of other towers on the line for signs of "uplift," which contributed to the tower collapses. *Id.* at 36.

252. After a painting crew broke a J-hook on a Caribou-Palermo line tower in 2016, PG&E reported that "about 20% of the thickness of the bolt had been compromised through corrosion." Nonetheless, "the failure of the J hook did not cause inspections of J hooks in other similar towers." *Id.*

253. "Despite the fact the towers of the Caribou-Palermo line were routinely subjected to winds at or near their design criteria, PG&E never inspected or tested any of the towers or components for wind damage." *Id.* at 72.

254. The Butte DA Report concluded as follows: "The only reasonable conclusion to be drawn from the totality of the evidence is that PG&E was employing a run to failure strategy on the entirety of the Caribou-Big Bend section of the Caribou-Palermo line. Pursuant to the run to failure strategy, PG&E only applied a low degree or patrol with minimal frequency to continuously assess risk, and only performed corrective maintenance." *Id.* at 60.

255. For context, "run to failure" was a term that PG&E specifically used internally, which the Butte County DA found in PG&E documents. The Butte DA Report continued in its conclusions: "Despite the efforts of PG&E personnel to distance the company from the 'Run to Failure' model, the evidence clearly establishes quite the opposite. PG&E had knowledge of the potential consequences of failure of the nearly 100-year-old C hooks, yet PG&E continued its policy of 'Run to Failure.'" *Id.* at 84. The Butte DA Report further explained how PG&E's "run to failure" approach to avoiding basic maintenance of the Caribou-Palermo Transmission Line caused the Camp Fire: "PG&E ran the line for 88 years with minimal maintenance and repair. But for the Camp Fire, PG&E would have continued using the line with minimal maintenance and repair. Catastrophic failure of the Caribou-Palermo line was not an 'if' question; it was a 'when' question." *Id.* at 85. Its conclusion continued:

> PG&E internal emails and documents established that by 2007 PG&E was aware of the aging electric transmission infrastructure problem. . . . Despite its knowledge that its transmission assets were nearing the end of useful life and deteriorating PG&E decreased the expertise of the persons doing the inspections. . . . The evidence clearly demonstrated PG&E understood the relationships between age of components and wear, wear and equipment failure and equipment failure and fire, but unlike a reasonable person, devoted less time and qualified personnel to inspecting the oldest assets. . . . [O]n the electrical transmission side, since 2010 PG&E has continued to rely on assumed values, the least expensive method of inspection and done nothing to ensure the veracity of inspection reports.
>
> *Id.* at 85-87.

256. In addition, the CPUC completed an audit of PG&E's compliance failures in the vicinity of the Camp Fire from January 1, 2016 through May 15, 2019, documenting the falsity and scienter of the Exchange Act Defendants' representations. It found that PG&E failed to timely remediate 904 known equipment hazards (exceeding the statutory deadline), including two "urgent" threats requiring "immediate response" that languished for 632 days.

257. Overall, CPUC found that 14.35% of all work order records were "violations" because they were not completed within statutory deadlines. **CPUC found that PG&E crews had not climbed the tower that sparked the Camp Fire to thoroughly inspect it since at least 2001**.[89] The audit noted that "a climbing inspection of the Incident Tower during that time could have identified the worn C-hook before it failed, and that its timely replacement could have prevented ignition of the Camp Fire." *Id.*

## VII. DEFENDANTS' FALSE AND MISLEADING CLASS PERIOD STATEMENTS UNDER THE EXCHANGE ACT[90]

258. Investors and analysts were focused on the Company's compliance with wildfire-related safety regulations during the Class Period. With an eye towards artificially inflating its share price, PG&E responded to this interest with false and misleading reassurances that PG&E was in compliance with safety regulations. PG&E also significantly raised its quarterly dividend during the Class Period, repeatedly touting that such a move was based, in part, on its success in ensuring safety. As detailed below, the Exchange Act Defendants' fraud proximately caused investors' losses.

### A. Overview of the Exchange Act Defendants' Fraudulent Course of Conduct

259. PG&E was responsible for the North Bay Fires. Of the eighteen main North Bay Fires for which Cal Fire's investigations have been completed, **seventeen** were caused by PG&E

[89] *See* Jason Hanna and Sarah Moon, *PG&E's failure to maintain transmission tower helped lead to the deadly Camp Fire, report says*, CNN (Dec. 3, 2019), https://www.cnn.com/2019/12/03/us/pge-transmission-lines-camp-fire/ (citing SED Camp Fire Investigation Report, Nov. 8, 2019).

[90] All references to "Defendants" in Sections I & IV-XIII refer to the Exchange Act Defendants (PG&E and the Exchange Act Individual Defendants).

equipment. Among those, **eleven** of these fires evidenced violations of California safety regulations, in **seven** different counties at the **same time**.

260. Furthermore, PG&E was responsible for the Camp Fire, which began when a PG&E electrical tower – carrying a high-voltage 115 kilovolt transmission line – failed. On May 15, 2019, Cal Fire issued a news release confirming that its investigation had "determined that the Camp Fire was caused by electrical transmission lines owned and operated by Pacific Gas and Electric[]."[91]

261. PG&E acknowledged a second ignition point for the Camp Fire that exhibited damaged and downed poles and vegetation on top of downed wires. As a result, vegetation underneath the lines ignited in two ignition points approximately 30 minutes apart. PG&E's failure to remove such vegetation violated California Public Resources Code §4293. PG&E's failure to maintain the integrity of its poles violated California Public Utilities Code §451. Cal Fire's investigation also confirmed: "The cause of the second fire was determined to be vegetation into electrical distribution lines owned and operated by PG&E."[92]

262. Moreover, PG&E's ESRB-8 Shutoff Protocol required that the responsible power lines be shut off. While the ESRB-8 Shutoff Protocol requires that PG&E consider seven criteria when determining whether a shutoff would be appropriate, **all seven criteria were satisfied** in the hours leading up to the Camp Fire in the precise location where it started. This, too, Cal Fire confirmed in its determination that PG&E caused the Camp Fire: "The tinder dry vegetation and Red Flag conditions consisting of strong winds, low humidity and warm temperatures promoted this fire and caused extreme rates of spread…."[93] Though adhering to the ESRB-8 Shutoff Protocol would have prevented the Camp Fire entirely, PG&E flouted it.

---

[91] Press Release, Cal Fire, *CAL FIRE Investigators Determine Cause of the Camp Fire* (May 15, 2019), https://s1.q4cdn.com/880135780/files/doc_downloads/wildfire_updates/May-15-2019-%E2%80%93-CAL-FIRE-Press-Release.pdf..

[92] *Id.*

[93] Press Release, Cal Fire, *CAL FIRE Investigators Determine Cause of the Camp Fire* (May 15, 2019), http://calfire.ca.gov/communications/downloads/newsreleases/2019/CampFire_Cause.pdf.

263. Tellingly, the CPUC investigated whether PG&E violated CPUC rules and standards. And since determining that PG&E is responsible for the Camp Fire, Cal Fire forwarded its investigative report to the Butte County District Attorney, which culminated in the issuance of the Butte DA Report and PG&E's guilty plea to 85 felonies.

264. The news about PG&E's responsibility for causing the North Bay Fires and Camp Fire directly impacted the Company's bottom line, because California law requires PG&E to bear the cost of wildfire-related property damage and personal injury caused by its violations of California safety regulations. Moreover, in light of PG&E's systemic compliance deficiencies and pattern of violations, those costs likely could not be passed on to ratepayers.

### B. Defendants Made Materially False and Misleading Statements and Omissions Regarding Its Vegetation Management Activities and Compliance with Wildfire Safety Regulations Before the North Bay Fires

#### 1. October 16, 2015 – Misstatement No. 1

265. On October 16, 2015, PG&E issued its 2015 Corporate Responsibility and Sustainability Report. This report falsely assured investors that PG&E's "vegetation management" was "in compliance with relevant laws":

> ***Each year, PG&E's Vegetation Management department***, in consultation with utility arborists and foresters, ***inspects every mile of power line in our service area for public safety*** and electric reliability. ***We do so in compliance with relevant laws*** and with a focus on public involvement, including extensive "Right Tree, Right Place" outreach. PG&E has been recognized by the National Arbor Day Foundation as a Tree Line USA recipient for 20 consecutive years for demonstrating best practices in utility arboriculture.

266. PG&E, as a juridical person and the issuer of PG&E securities, caused the public dissemination of the statement regarding PG&E's compliance. Accordingly, and for the avoidance of doubt, PG&E was the maker of the statement regarding its compliance.

267. Additionally, and/or in the alternative, Defendant Earley, through his primacy over PG&E's corporate offices as CEO, President, and Chairman, had the ultimate authority of this statement made by PG&E regarding compliance. [redacted]

[redacted][94]

268. Additionally, and/or in the alternative, [redacted][95] Moreover, according to the same 2015 Corporate Responsibility and Sustainability Report:

> Within senior leadership, ethics and compliance are managed by a Chief Ethics and Compliance Officer, a position created in 2015 as part of our commitment to achieve a best-in-class ethics and compliance program. The position reports to the PG&E Corporation CEO and has additional reporting responsibility to the Audit Committees of the Board of Directors, and the Compliance and Public Policy Committee of PG&E Corporation.
>
> The new position is responsible for:
>
> - Building a best-in-class ethics and **compliance** program and **overseeing its implementation**,
> - **Overseeing company-wide programs for compliance reporting and related investigatory processes**. . . .

269. Kane therefore was responsible for both "overseeing . . . implementation" of PG&E's compliance **and "overseeing . . . compliance reporting,"** including this report.

270. Misstatement 1 was materially false and misleading when made. Specifically, at the time such statement was made, PG&E had an undisclosed and systemic pattern of noncompliance with relevant laws and regulations as a result of PG&E's widespread deficient safety practices, including PG&E's ETPM program, which was designed to ensure that the Company's inspections and preventative maintenance activities were conducted in accordance with regulatory requirements. Additionally, at the time this statement was made, PG&E's patrols and inspections

---

[94] *See* [redacted]

[95] *See id.*

were woefully insufficient and its towers were subject to a five-year inspection cadence, not a yearly one. At best, this statement is a materially misleading half-truth insofar that it falsely created the impression that inspections of PG&E's infrastructure were conducted annually and effectively. At bottom, at the time the Misstatement 1 was made, PG&E's vegetation management activities were decidedly not "in compliance with relevant laws" and its mission critical inspections were insufficient.

271. First, according to reports released in subsequent corrective disclosures, including on May 25 and June 8, 2018, PG&E violated relevant wildfire safety laws, including California Public Resources Code Section 4293, multiple times.

272. Second, Cal Fire found sufficient evidence of violations of state law to refer PG&E to the relevant district attorneys for eleven of the North Bay Fires. *See* Section VI.D.2, *supra*.

273. Third, investigations into the causes of the Camp Fire disclosed evidence that this most destructive and deadly wildfire in California history was caused by PG&E violating California Public Resources Code Section 4293 and California Public Utilities Code Section 451, among other safety regulations. Indeed, Cal Fire found that PG&E equipment was responsible for both ignition points of the Camp Fire and reported PG&E to the Butte County District Attorney based on evidence of safety violations.

274. Fourth, the Exchange Act Defendants knew that PG&E was not in compliance with relevant safety laws and best practices at the time of this statement. In proceedings related to PG&E's criminal probation before Judge Alsup, PG&E admitted "that as of June 2017, there were 3,962 unworked trees which PG&E had identified in 2016 as hazardous with the potential to 'fall into or otherwise impact the conductors, towers or guy wires before the next inspection cycle.'" *See* Section VI.C.2, *supra*.

275. Fifth, PG&E admitted that it did not "inspect[] every mile of power line" "each year," because at the time this statement was made, it did not inspect Tower :27/222 of the Caribou-Palermo transmission line since August 2014. This lack of annual inspection contributed to Tower :27/222's failure on November 8, 2018, which was part of the Camp Fire's first ignition point. Indeed, according to the Butte DA Report, PG&E only inspected Caribou-Palermo line "once

every five years," and merely conducted patrols annually. This five-year inspection cadence was not public at the time the above statement was made. Moreover, as explained in Section VI.G.4, *supra*, the efficacy of these patrols and inspections during the Class Period were deficient based on PG&E's failure to adequately train its workforce and allocate sufficient time and resources to ensure its lines and towers were in working order. For instance, the Butte DA Report revealed myriad issues with PG&E's infrastructure, including 100-year-old towers in desperate need of repair.

276. Sixth, this statement materially omitted the true risk that PG&E's pattern of violations would cause wildfires serious enough to imperil the Company's financial condition.

277. Seventh, Judge Alsup's findings demonstrate that any inspections that took place were clearly insufficient, as PG&E's backlog of unattended trees and vegetation was staggering at the outset of the Company's probation. Moreover, Judge Alsup's findings confirm that, in many instances, PG&E reported inspections that never actually occurred. For example, Judge Alsup's April 29, 2020 order states that "In total, the monitor identified ten instances where PG&E's records indicated that specific trees had been worked when, in fact, they had not been."

278. Misstatement 1 had the intended effect of artificially maintaining PG&E's share price by falsely convincing the investing public that the Company was in compliance with all relevant laws and was diligent in its inspection and maintenance of its infrastructure. For example, on October 12, 2017, Guggenheim issued an analyst report that reiterated this misstatement and emphasized the point that investors had no reason to believe that PG&E was not "inspecting and maintaining equipment properly[,]" as this statement reassured that PG&E had "an aggressive vegetation management program that entails inspecting every mile every year."[96]

279. Thus, Misstatement 1 was materially false and misleading when made because it failed to disclose PG&E's pattern of numerous and widespread violations of safety regulations, including regulations specifically related to vegetation management – regulations which were essential for preventing devastating wildfires. *See* Section VI.F.4. As Judge Alsup held, PG&E's

[96] Guggenheim, *PCG – Quick Thoughts on the Sell-Off: Sentiment Seems to Be Short First, Ask Questions Later* (Oct. 12, 2017).

"**unsafe conduct has led to recurring deadly wildfires caused by its electrical system**" and the "large number of trees that should have been removed by PG&E but weren't . . . was a major contributing factor, **maybe the single-biggest factor, in causing the fires** in 2017 and 2018 in Northern California." In fact, PG&E's violations were so pervasive that they caused multiple North Bay Fires all at the same time in seven different counties, and then caused both of the Camp Fire's two ignition points a year later–therefore the violations cannot be explained away as isolated lapses.

**2. October 6, 2016 – Misstatement No. 2**

280. On October 6, 2016, PG&E issued its 2016 Corporate Responsibility and Sustainability Report. This report provided false assurances to investors regarding PG&E's compliance with relevant regulations:

> **Vegetation Management**
>
> ***Each year,*** PG&E's Vegetation Management department and its contracting arborists and foresters ***inspect miles of power lines in our service area for public safety and electric reliability. We do so in compliance with relevant laws*** and with a focus on public involvement, including extensive "Right Tree, Right Place" outreach. PG&E has been recognized by the National Arbor Day Foundation as a Tree Line USA recipient for 21 consecutive years for demonstrating best practices in energy sector arboriculture.

281. PG&E, as a juridical person and the issuer of PG&E shares, caused the public dissemination of the statement regarding PG&E's compliance. Accordingly, and for the avoidance of doubt, PG&E was the maker of the statement regarding its compliance.

282. Additionally, and/or in the alternative, Defendant Earley, through his primacy over PG&E's corporate offices as CEO, President, and Chairman had the ultimate authority of this statement made by PG&E regarding compliance. [redacted]

[redacted][97]

283. Additionally, and/or in the alternative, [redacted][98] Moreover, according to the same 2016 Corporate Responsibility and Sustainability Report:

> Within senior leadership, ethics and compliance are managed by the Chief Ethics and Compliance Officer (CECO), who reports to the PG&E Corporation Chairman and CEO. The CECO has additional reporting responsibility to the Audit Committees of the PG&E Corporation and Pacific Gas and Electric Company Boards of Directors, and the Compliance and Public Policy Committee of the PG&E Corporation Board.
>
> The CECO is responsible for:
>
> - Building a best-in-class ethics and **compliance** program and **managing its implementation**,
> - **Overseeing enterprise-wide programs for compliance monitoring, reporting**, assessment and remediation. . . .

284. Kane therefore was responsible for both "managing . . . implementation" of PG&E's compliance **and "overseeing . . . compliance monitoring [and] reporting,"** including this report.

285. Misstatement 2 was materially false and misleading when made. Specifically, at the time such statement was made, PG&E had an undisclosed and systemic pattern of noncompliance with relevant laws and regulations as a result of PG&E's widespread deficient safety practices, including PG&E's ETPM program, which was designed to ensure that the Company's inspections and preventative maintenance activities were conducted in accordance with regulatory requirements. Additionally, at the time this statement was made, PG&E's patrols and inspections

---

[97] *See* [redacted]

[98] *See id.*

were woefully insufficient and its towers were subject to a five-year inspection cadence, not a yearly one. At best, this statement is a materially misleading half-truth insofar that it falsely created the impression that inspections of PG&E's infrastructure were conducted effectively. At bottom, at the time Misstatement 2 was made, PG&E's vegetation management activities were decidedly not "in compliance with relevant laws" and its mission critical inspections were insufficient.

286. First, according to reports released in subsequent corrective disclosures, including on May 25 and June 8, 2018, PG&E violated relevant wildfire safety laws, including California Public Resources Code Section 4293, multiple times.

287. Second, Cal Fire found sufficient evidence of violations of state law to refer PG&E to the relevant district attorneys for eleven of the North Bay Fires. *See* Section VI.D., *supra*.

288. Third, investigations into the causes of the Camp Fire disclosed evidence that this most destructive and deadly wildfire in California history was caused by PG&E violating California Public Resources Code Section 4293 and California Public Utilities Code Section 451, among other safety regulations. Indeed, Cal Fire found that PG&E equipment was responsible for both ignition points of the Camp Fire and has PG&E to the Butte County District Attorney based on evidence of safety violations.

289. Fourth, the Exchange Act Defendants knew that PG&E was not in compliance with relevant safety laws and best practices at the time of this statement. In proceedings related to PG&E's criminal probation before Judge Alsup, PG&E admitted "that as of June 2017, there were 3,962 unworked trees which PG&E had identified in 2016 as hazardous with the potential to 'fall into or otherwise impact the conductors, towers or guy wires before the next inspection cycle.'" *See* Section VI.C.2, *supra*.

290. Fifth, PG&E admitted that it did not "inspect" all of its powerlines "each year," because at the time this statement was made, it did not inspect Tower :27/222 of the Caribou-Palermo transmission line since August 2014. This lack of annual inspection contributed to Tower :27/222's failure on November 8, 2018, which was part of the Camp Fire's first ignition point. Indeed, according to the Butte DA Report, PG&E only inspected Caribou-Palermo line "once every five years," and merely conducted patrols annually. This five-year inspection cadence was

not public at the time the above statement was made. Moreover, as, explained in Section VI.G.4, *supra*, the efficacy of these patrols and inspections during the Class Period were deficient based on PG&E's failure to adequately train its workforce and allocate sufficient time and resources to ensure its lines and towers were in working order. For instance, the Butte DA Report revealed myriad issues with PG&E's infrastructure, including 100-year-old towers in desperate need of repair.

291. Sixth, this statement materially omitted the true risk that PG&E's pattern of violations would cause wildfires serious enough to imperil the Company's financial condition.

292. Seventh, Judge Alsup's findings demonstrate that any inspections that took place were clearly insufficient, as PG&E's backlog of unattended trees and vegetation was staggering at the outset of the Company's probation. Moreover, Judge Alsup's findings confirm that, in many instances, PG&E reported inspections that never actually occurred. For example, Judge Alsup's April 29, 2020 order states that "In total, the monitor identified ten instances where PG&E's records indicated that specific trees had been worked when, in fact, they had not been."

293. Misstatement 2 had the intended effect of artificially maintaining PG&E's share price by falsely convincing the investing public that the Company was in compliance with all relevant laws and was diligent in its inspection and maintenance of its infrastructure. For example, on October 12, 2017, Guggenheim issued an analyst report that reiterated this misstatement and emphasized the point that investors had no reason to believe that PG&E was not "inspecting and maintaining equipment properly[,]" as this statement reassured that PG&E had "an aggressive vegetation management program that entails inspecting every mile every year."[99]

294. Thus, Misstatement 2 was materially false and/or misleading because of PG&E's numerous and widespread violations of safety regulations, including regulations specifically related to vegetation management – regulations which were essential for preventing devastating wildfires. *See* Section VI.F.4. As Judge Alsup held, PG&E's "**unsafe conduct has led to recurring deadly wildfires caused by its electrical system**" and the "large number of trees that

[99] Guggenheim, *PCG – Quick Thoughts on the Sell-Off: Sentiment Seems to Be Short First, Ask Questions Later* (Oct. 12, 2017).

should have been removed by PG&E but weren't . . . was a major contributing factor, **maybe the single-biggest factor, in causing the fires** in 2017 and 2018 in Northern California." In fact, PG&E's violations were so pervasive that they caused at least 11 of the North Bay Fires all at the same time in **seven** different counties, and then caused both of the Camp Fire's two ignition points a year later – therefore the violations cannot be explained away as an isolated lapse.

### 3. August 9, 2017 – Misstatement No. 3

295. On August 9, 2017, PG&E issued its 2017 Corporate Responsibility and Sustainability Report. This report provided false assurances to investors regarding PG&E's compliance with relevant regulations:

> **Vegetation Management**
>
> ***PG&E prunes and removes trees growing too close to power lines*** while maintaining as much vegetation as possible to balance land use and environmental stewardship with customer needs. Through a well-established and innovative vegetation management program, ***PG&E balances the need to maintain a vast system of trees growing along power lines while complying with state and federal regulations and delivering safe***, reliable and affordable ***electric service***.

296. PG&E, as a juridical person and the issuer of PG&E shares, caused the public dissemination of the statement regarding PG&E's compliance. Accordingly, and for the avoidance of doubt, PG&E was the maker of the statement regarding its compliance.

297. Additionally, and/or in the alternative, Defendant Williams, through her primacy over PG&E's corporate offices as CEO and President, had the ultimate authority of this statement made by PG&E regarding compliance. [redacted][100]

---

[100] *See* [redacted]

298. Additionally, and/or in the alternative, [redacted][101] Moreover, according to the same 2017 Corporate Responsibility and Sustainability Report:

> Within senior leadership, compliance and ethics are managed by the Senior Vice President, Chief Ethics and Compliance Officer and Deputy General Counsel (CECO), who reports to the PG&E Corporation Chief Executive Officer (CEO) and President. The CECO has additional reporting responsibility to the Audit Committees of the PG&E Corporation and Pacific Gas and Electric Company Boards of Directors, and the Compliance and Public Policy Committee of the PG&E Corporation Board.
>
> The CECO is responsible for:
>
> - Building a best-in-class **compliance** and ethics program **and managing its implementation**,
> - **Overseeing enterprise-wide programs for compliance monitoring, reporting**, assessment and remediation. . . .

299. Kane therefore was responsible for both "managing implementation" of PG&E's compliance **and** "**overseeing . . . compliance monitoring [and] reporting**," including this report.

300. Misstatement 3 was materially false and misleading when made. Specifically, at the time such statement was made, PG&E had an undisclosed and systemic pattern of noncompliance with relevant laws and regulations as a result of PG&E's widespread deficient safety practices, including PG&E's ETPM program, which was designed to ensure that the Company's inspections and preventative maintenance activities were conducted in accordance with regulatory requirements. At the time this statement was made, however: (i) PG&E's patrols and inspections were woefully insufficient; and (ii) it was subject to a self-inflicted vegetation management and hazard tree removal backlog that would take years to unwind. At best, this statement was a

---

[redacted]

[101] *See id.*

materially misleading half-truth insofar that it falsely created the impression that inspections of PG&E's infrastructure and vegetation management were conducted effectively. At bottom, at the time Misstatement 3 was made, PG&E's vegetation management activities were decidedly not "complying with state and federal laws" and its mission critical patrols and inspections were insufficient.

301. Because PG&E's vegetation management practices failed to follow relevant federal and California safety laws, PG&E's vegetation management activities were decidedly not "complying with state and federal regulations and delivering safe . . . electric service." At best, this statement is a materially misleading half-truth insofar that it falsely created the impression that PG&E acted with sufficient diligence in seeking to comply with state and federal regulations regarding vegetation management.

302. First, according to reports released in subsequent corrective disclosures, including on May 25 and June 8, 2018, PG&E violated relevant wildfire safety laws, including California Public Resources Code Section 4293, multiple times.

303. Second, Cal Fire found sufficient evidence of violations of state law to refer PG&E to the relevant district attorneys for eleven of the North Bay Fires. *See* Section VI.D.2, *supra*.

304. Third, investigations into the causes of the Camp Fire disclosed evidence that this most destructive and deadly wildfire in California history was caused by PG&E violating California Public Resources Code Section 4293 and California Public Utilities Code Section 451, among other safety regulations. Indeed, Cal Fire found that PG&E equipment was responsible for both ignition points of the Camp Fire and reported PG&E to the Butte County District Attorney based on evidence of safety violations.

305. Fourth, the Exchange Act Defendants knew that PG&E was not in compliance with relevant safety laws and best practices at the time of this statement. In proceedings related to PG&E's criminal probation before Judge Alsup, PG&E admitted "that as of June 2017, there were 3,962 unworked trees which PG&E had identified in 2016 as hazardous with the potential to 'fall into or otherwise impact the conductors, towers or guy wires before the next inspection cycle.'" *See* Section VI.C.2, *supra*.

306. Fifth, this statement materially omitted the true risk that PG&E's pattern of violations would cause wildfires serious enough to imperil the Company's financial condition.

307. Sixth, according to the Butte DA Report, PG&E was, at all relevant times, acting in flagrant violation of the law requiring it to adequately maintain its lines and towers.

308. Thus, Misstatement 3 was materially false and/or misleading because of PG&E's numerous and widespread violations of safety regulations, including regulations specifically related to vegetation management – regulations which were essential for preventing devastating wildfires. *See* Section VI.F.4. As Judge Alsup held, PG&E's "**unsafe conduct has led to recurring deadly wildfires caused by its electrical system**" and the "large number of trees that should have been removed by PG&E but weren't . . . was a major contributing factor, **maybe the single-biggest factor, in causing the fires** in 2017 and 2018 in Northern California." In fact, PG&E's violations were so pervasive that they evidently caused multiple North Bay Fires all at the same time in seven different counties, and then caused both of the Camp Fire's two ignition points a year later – therefore the violations cannot be explained away as an isolated lapse.

### C. After the North Bay Fires Erupted, the Truth Began to Emerge

309. The North Bay Fires began on Sunday evening, October 8, 2017. However, it was not until Thursday, October 12, 2017 that the market began to understand that PG&E's safety regulation violations were likely a major cause. On that date, as detailed below (*see* Section VII.D.1, *infra*), CPUC launched a probe into whether PG&E's violations caused the fires by sending a litigation hold letter reminding PG&E that it (a) "must preserve any factual or physical evidence … includ[ing] all failed poles, conductors and associated equipment from each fire event," and (b) "must inform all employees and contractors that they must preserve all electronic (including emails) and non-electronic documents related to potential causes of the fires, vegetation management, maintenance and/or tree-trimming." This was the first disclosure indicating that PG&E caused any of the North Bay Fires. In response to this news, PG&E's share price declined 6.7%.

310. Late the next day, PG&E issued a statement explaining to investors that: "The causes of these fires are being investigated by [Cal Fire], including the possible role of [PG&E's]

power lines and other facilities." It reported that the Company "has approximately $800 million in liability insurance for potential losses that may result from these fires" – to prepare investors for the possibility that "the amount of insurance is insufficient to cover the Utility's liability," in which case, its "financial condition or results of operations could be materially affected." The market had understood that PG&E would be reimbursed by rate-payers for damages by fires it caused while nevertheless acting as a prudent manager; hence, the Company's discussion of liability and insurance signaled to the market that at least some of the North Bay Fires were proximately caused by PG&E's negligence or worse. In response to this news, PG&E's share price continued to decline until the end of the next trading day, Monday, October 16, 2017, falling by approximately 16.5%.

311. Thereafter, PG&E's management attempted to reassure investors, falsely, as detailed below.

### D. After the North Bay Fires Were Contained, the Company Made Additional False and Misleading Statements and Omissions Regarding Compliance with Wildfire-Related Safety Regulations

#### 1. October 31, 2017 – Misstatement No. 4

312. On October 31, 2017, PG&E issued a press release titled "Facts About PG&E's Electric Vegetation Management Efforts." The release stated: "***PG&E follows all applicable federal and state vegetation clearance requirements and performs regular power line tree safety activities in accordance with industry standards, guidelines, and acceptable procedures that help to reduce outages or fires caused by trees or other vegetation***."

313. PG&E, as a juridical person and the issuer of PG&E shares, caused the public dissemination of the statement regarding PG&E's compliance. Accordingly, and for the avoidance of doubt, PG&E was the maker of the statement regarding its compliance.

314. Additionally, and/or in the alternative, Defendant Williams, through her primacy over PG&E's corporate offices as CEO and President, had the ultimate authority of this statement made by PG&E regarding compliance. [redacted]

[redacted][102]

315. Additionally, and/or in the alternative, [redacted][103] Moreover, Kane was responsible for both "overseeing . . . implementation" of PG&E's compliance and "overseeing . . . compliance reporting," including this press release. Because of her senior position within the Company, Kane had ultimate authority to control the content of this statement.

316. Misstatement 4 was materially false and misleading when made. Specifically, at the time such statement was made, PG&E had an undisclosed and systemic pattern of noncompliance with relevant laws and regulations as a result of PG&E's widespread deficient safety practices, including PG&E's ETPM program, which was designed to ensure that the Company's inspections and preventative maintenance activities were conducted in accordance with regulatory requirements. At the time this statement was made, however: (i) PG&E's patrols and inspections were woefully insufficient; and (ii) it was subject to a self-inflicted vegetation management and hazard tree removal backlog that would take years to unwind. At best, this statement was a materially misleading half-truth insofar that it falsely created the impression that inspections of PG&E's infrastructure and vegetation management were conducted effectively. At bottom, at the time Misstatement 4 was made, PG&E did not "follow[] all applicable federal and state vegetation clearance requirements" and its mission critical patrols and inspections were insufficient.

317. Misstatement 4 was materially false and/or misleading because PG&E did **not** follow "all applicable … state vegetation clearance requirements." At best, this statement is a

[102] *See* [redacted]

[103] *See id.*

materially misleading half-truth insofar that it falsely created the impression that PG&E acted with sufficient diligence in seeking to comply with state and federal regulations regarding vegetation management.

318. First, according to reports released in subsequent corrective disclosures, including on May 25 and June 8, 2018, PG&E violated relevant wildfire safety laws, including California Public Resources Code Section 4293, multiple times.

319. Second, Cal Fire found sufficient evidence of violations of state law to refer PG&E to the relevant district attorneys for eleven of the North Bay Fires. *See* Section VI.D.2, *supra.*

320. Third, investigations into the causes of the Camp Fire disclosed evidence that this most destructive and deadly wildfire in California history was caused by PG&E violating California Public Resources Code Section 4293 and California Public Utilities Code Section 451, among other safety regulations. Indeed, Cal Fire found that PG&E equipment was responsible for both ignition points of the Camp Fire and reported PG&E to the Butte County District Attorney based on evidence of safety violations. This statement concealed that, far from "help[ing] to reduce . . . fires caused by trees or other vegetation," PG&E's vegetation management practices tolerated numerous and widespread violations of safety regulations that would **worsen** the risk of fires.

321. Fourth, the Exchange Act Defendants knew that PG&E was not in compliance with relevant safety laws and best practices at the time of this statement. In proceedings related to PG&E's criminal probation before Judge Alsup, PG&E admitted "that as of June 2017, there were 3,962 unworked trees which PG&E had identified in 2016 as hazardous with the potential to 'fall into or otherwise impact the conductors, towers or guy wires before the next inspection cycle.'" *See* Section VI.C.2, *supra*.

322. Fifth, this statement materially omitted the true risk that PG&E's pattern of violations would cause wildfires serious enough to imperil the Company's financial condition.

323. Sixth, according to the Butte DA Report, PG&E was, at all relevant times, acting in flagrant violation of the law requiring it to adequately maintain its lines and towers.

324. Thus, Misstatement 4 was materially false and/or misleading because of PG&E's numerous and widespread violations of safety regulations, including regulations specifically

related to vegetation management – regulations which were essential for preventing devastating wildfires. *See* Section VI.C.2, *supra*. As Judge Alsup held, PG&E's "**unsafe conduct has led to recurring deadly wildfires caused by its electrical system**" and the "large number of trees that should have been removed by PG&E but weren't . . . was a major contributing factor, **maybe the single-biggest factor, in causing the fires** in 2017 and 2018 in Northern California." In fact, PG&E's violations were so pervasive that they evidently caused multiple North Bay Fires all at the same time in seven different counties, and then caused both of the Camp Fire's two ignition points a year later – therefore the violations cannot be explained away as an isolated lapse.

**2. November 2, 2017 – Misstatement No. 5**

325. On November 2, 2017, PG&E hosted a conference call with analysts to discuss its financial results for the third quarter of 2017. In her prepared remarks, Defendant Williams falsely reassured investors regarding the effectiveness of PG&E's vegetation management:

> Thank you, Chris, and good morning, everyone. Given the recent wildfires impacting our customers and communities, our discussion today will be different from our usual earnings call. . . .
>
> * * *
>
> Now I know there's a lot of interest in how these fires started and in how PG&E assets might have been involved in or impacted by the wildfires. Our communities deserve answers and we are committed to learning what happened. It's critical that we identify anything that will help us to keep our customers and communities safe in the future. That is our goal as we work with CAL FIRE and the CPUC.
>
> * * *
>
> **Many of you have reached out with questions about the potential impact of the wildfires to the company's financials and also about the doctrine of inverse condemnation in California.** At this time, the known financial impact of the wildfires is limited to the cost of the unprecedented response and restoration efforts, costs related to our liability insurance and some legal expenses, and Jason [Wells] will cover these later this morning.
>
> * * *
>
> **I know there's a lot of interest in our pole maintenance and vegetation management programs**, so let me address these as well. First, we routinely inspect, maintain and replace our electric poles. This includes annual scheduled patrols, 5-year visual inspections, an intrusive testing and treating on our wood poles on a frequency that significantly exceeds CPUC requirements.

> ***We also have one of, if not, the most comprehensive vegetation management programs in the country.*** Our vegetation management program manages about 123 million trees across the service territory. ***And every year, we inspect every segment of the 99,000 miles of overhead line and we clear vegetation as needed.*** This is well beyond what is typical in our industry where most utilities have a 3-year vegetation management cycle or sometimes longer. **Typically, we spend about $200 million every year to line clear or remove 1.3 million trees to mitigate both the risk of wildfires and to prevent electric outages. With the drought and the tree mortality crisis we've experienced in California, we have been expanding our vegetation management work since 2014.**
>
> ***In 2016, we spent an additional $200 million, essentially doubling our typical vegetation management spending last year***. We've removed an incremental 236,000 dead or dying trees, and we enhanced our tree maintenance work with additional patrols in areas of high fire danger, including a combination of boots on the ground, aerial patrols, and sophisticated LiDAR technology.

326. Misstatement 5 was materially false and misleading when made by Defendant Williams. Specifically, at the time such statement was made, PG&E had an undisclosed and systemic pattern of noncompliance with relevant laws and regulations, including PG&E's ETPM program, which was designed to ensure that the Company's inspections and preventative maintenance activities were conducted in accordance with regulatory requirements. At the time this statement was made, however: (i) PG&E's patrols and inspections were woefully insufficient; and (ii) it was subject to a self-inflicted vegetation management and hazard tree removal backlog that would take years to unwind. At best, this statement was a materially misleading half-truth insofar that it falsely created the impression that inspections of PG&E's infrastructure and vegetation management were effective. At bottom, at the time Misstatement 5 was made, PG&E's vegetation management program was dismal, not "comprehensive," and its mission critical patrols and inspections were insufficient.

327. Additionally, the assertion in Misstatement 5 that PG&E had "doubl[ed] its typical vegetation management spending" was materially false and misleading when made. Specifically, as explained in Section VI.B, *supra*, PG&E's Vegetation Management Balancing Accounts for the relevant years indicate that PG&E spent $194,094,406 on vegetation management in 2015, $198,735,579 in 2016, and $201,456,193 in 2017 – increases of only 2.4% and 1.4%,

respectively.[104] Even when including CEMA reimbursements in the calculation of PG&E's vegetation management spending year-over-year, the totals do not double either. Specifically, PG&E's CEMA-adjusted spending was $320,869,406 for 2015, $440,064,579 for 2016, and $318,276,193 for 2017. Moreover, as noted in Section VI.B, *supra*, PG&E spent $2 million less on wildfire spending in 2016 than it did in 2015. The lack of improvement to PG&E's vegetation management practices was confirmed by PG&E's own Vegetation Program Manager Richard Yarnell, who reportedly testified under oath that, even by April 10, 2017: "PG&E—to the best of my knowledge, **we have not made any changes** as a result of th[e September 2015 Butte] fire."

328. First, PG&E failed to comply with safety regulations—including regulations specifically related to vegetation management. Thus, when Defendant Williams touted PG&E's vegetation management program as "one of, if not, the most comprehensive vegetation management programs in the country," she gave investors the false impression that PG&E's vegetation management did not fall short of applicable safety regulations, when in fact it did. Given PG&E's numerous and widespread violations of safety regulations, including those violations that would cause multiple of the North Bay Fires as well as evidently cause the Camp Fire, its "vegetation management programs" were **not** "comprehensive."

329. Second, PG&E has admitted that it did not "every year . . . inspect every segment of the 99,000 miles of overhead line," because at the time this statement was made, it did not inspect Tower :27/222 of the Caribou-Palermo transmission line since August 2014. This lack of annual inspection contributed to Tower :27/222's failure on November 8, 2018, which was part of the Camp Fire's first ignition point. Indeed, according to the Butte DA Report, PG&E only inspected Caribou-Palermo line "once every five years," and merely conducted patrols annually. This five-year inspection cadence was not public at the time the above statement was made. Moreover, as, explained in Section VI.G.4, *supra*, the efficacy of these patrols and inspections during the Class Period were deficient based on PG&E's failure to adequately train its workforce and allocate sufficient time and resources to ensure its lines and towers were in working order. For

[104] This spending did not differ more than $100,000 from the amounts PG&E requested, and the amounts CPUC approved, in PG&E's 2015, 2016, and 2017 General Rate Cases.

instance, the Butte DA Report revealed myriad issues with PG&E's infrastructure, including 100-year-old towers in desperate need of repair.

330. Third, PG&E did **not** "have one of, if not, the most comprehensive vegetation management programs in the country" for all the reasons found by Judge Alsup (*see* Sections VI.C.2 & G.2, *supra*, and Section XI.C, *infra*) that led him to conclude: "**PG&E's performance with respect to vegetation management has been dismal**."

331. Fourth, this statement materially omitted the true risk that PG&E would cause wildfires serious enough to imperil the Company's financial condition.

**3. November 2, 2017 – Misstatement No. 6**

332. Later on the same call, an analyst asked the Company for more detail about PG&E's vegetation management practices. Defendant Stavropoulos replied as follows:

> [ANALYST:] And then, I guess, **can you discuss your vegetation practices for trees that are located near power lines?** I guess we've seen sort of end reports that have come out for some of your peers that they sort of track vegetation that's within certain distances from the lines, and they basically make their decisions on what to do based on sort of updates.
>
> [Stavropoulos:] Thank you for the question. So as Geisha mentioned, we have a very aggressive vegetation management program across our 70,000-mile -- square mile territory. We manage about 123 million trees that are near and adjacent to our facilities. ***And over the last 2 years, we've doubled the amount that we've invested in veg[etation] management.*** That includes line clearing to remove parts of trees that are adjacent to our facilities as well as removal of dead and dying trees. So the program involves year-round effort to identify these dead and dying trees through inspection processes where we use foot and aerial patrols; we use LiDAR, which is light, detecting and ranging technology, to identify the trees that need to be worked. ***We inspect all of our overhead lines every year, and we do second patrols in high fire danger areas at least twice a year. In some areas, we do as often as 4x a year.*** So it's a very aggressive program. There are specific requirements around line clearing, and it depends upon the voltage of the lines. And it can range up to feet [sic] to as much a sort of 18 inches away from the facility. So there are all sorts of different requirements, depending upon where the facilities are located and the voltage of the facilities.

333. Misstatement 6 was materially false and misleading when made by Defendant Stavropoulos. Specifically, at the time such statements were made, PG&E had an undisclosed and systemic pattern of noncompliance with relevant laws and regulations, including PG&E's ETPM program, which was designed to ensure that the Company's inspections and preventative

maintenance activities were conducted in accordance with regulatory requirements. At the time this statement was made, however: (i) PG&E's patrols and inspections were woefully insufficient; and (ii) it was subject to a self-inflicted vegetation management and hazard tree removal backlog that would take years to unwind. At best, this statement was a materially misleading half-truth insofar that it falsely created the impression that inspections of PG&E's infrastructure and vegetation management were effective. At bottom, at the time Misstatement 6 was made, PG&E's vegetation management program was dismal and its mission critical patrols and inspections were insufficient.

334. Additionally, the assertion in Misstatement 6 that PG&E had "doubl[ed]" its vegetation management spending was materially false and misleading when made. Specifically, as explained in Section VI.B, *supra*, PG&E's Vegetation Management Balancing Accounts for the relevant years indicate that PG&E spent $194,094,406 on vegetation management in 2015, $198,735,579 in 2016, and $201,456,193 in 2017 – increases of only 2.4% and 1.4%, respectively.[105] Even when including CEMA reimbursements in the calculation of PG&E's vegetation management spending year-over-year, the totals do not double either. Specifically, PG&E's CEMA-adjusted spending was $320,869,406 for 2015, $440,064,579 for 2016, and $318,276,193 for 2017. Moreover, as noted in Section VI.B, *supra*, PG&E spent $2 million less on wildfire spending in 2016 than it did in 2015. The lack of improvement to PG&E's vegetation management practices was confirmed by PG&E's own Vegetation Program Manager Richard Yarnell, who reportedly testified under oath that, even by April 10, 2017: "PG&E—to the best of my knowledge, **we have not made any changes** as a result of th[e September 2015 Butte] fire."

335. First, PG&E failed to comply with safety regulations specifically related to vegetation management. By representing that it "inspect[s] all of [its] overhead lines every year," and inspects some trees "twice" or "4x" each year, Stavropoulos falsely created the impression that PG&E would prevent many safety violations from occurring, especially in "high fire danger areas" such as those where the North Bay Fires and Camp Fire erupted. In reality, safety violations

[105] This spending did not differ more than $100,000 from the amounts PG&E requested, and the amounts CPUC approved, in PG&E's 2015, 2016, and 2017 General Rate Cases.

were so pervasive that they evidently caused both ignition points of the Camp Fire as well as at least eleven fires at the same time in **seven** different counties. In touting its "very aggressive vegetation management program," the statement actionably omitted the widespread failure of these measures to bring PG&E into compliance.

336. As another example, in the afternoon of November 8, 2018, PG&E's aerial inspection of the 115 kilovolt transmission line that caused the Camp Fire discovered "damage to a transmission tower" carrying that electrical line. PG&E has also acknowledged a second ignition point for the Camp Fire that exhibited damaged and downed poles, vegetation on top of downed wires, and other signs of safety violations. Cal Fire determined that PG&E caused both of these ignition points.

337. Second, PG&E has admitted that it did not "inspect all of our overhead lines every year," much less "twice a year" or "4x a year," because at the time this statement was made, it did not inspect Tower :27/222 of the Caribou-Palermo transmission line since August 2014. This lack of annual inspection contributed to Tower :27/222's failure on November 8, 2018, which was part of the Camp Fire's first ignition point. Indeed, according to the Butte DA Report, PG&E only inspected Caribou-Palermo line "once every five years," and merely conducted patrols annually. This five-year inspection cadence was not public at the time the above statement was made. Moreover, as, explained Section VI.G.4, *supra*, the efficacy of these patrols and inspections during the Class Period were deficient based on PG&E's failure to adequately train its workforce and allocate sufficient time and resources to ensure its lines and towers were in working order. For instance, the Butte DA Report revealed myriad issues with PG&E's infrastructure, including 100-year-old towers in desperate need of repair.

338. Third, this statement materially omitted the true risk that PG&E's safety practices would cause wildfires serious enough to imperil the Company's financial condition.

339. Fourth, Judge Alsup (*see* Sections VI.C.2 & G.2, *supra*, and Section XI.C, *infra* ) concluded, after a thorough review: "**PG&E's performance with respect to vegetation management has been dismal**."

**4. November 5, 2017 – Misstatement No. 7**

340. At all relevant times, PG&E's Media Relations department maintained a news website named *Currents*,[106] providing news, information, and commentary about PG&E's activities, including the delivery of electricity and the operation, maintenance, and safety of the Company's electric services. Through the website, PG&E repeatedly touted the safety of its power lines, the Company's vegetation management program, and its purported success mitigating wildfire risk.

341. In one such article, dated November 5, 2017 and titled "Facts About PG&E's Wildfire and Prevention Safety Efforts," PG&E reassured investors that "***PG&E meets or exceeds all applicable federal and state vegetation clearance requirements***."[107]

342. PG&E, as a juridical person and the issuer of PG&E shares, caused the public dissemination of the statement regarding PG&E's compliance. Accordingly, and for the avoidance of doubt, PG&E was the maker of the statement regarding its compliance.

343. Additionally, and/or in the alternative, Defendant Williams, through her primacy over PG&E's corporate offices as CEO and President, had the ultimate authority of this statement made by PG&E regarding compliance. [redacted]

[106] *Currents*, PG&E, http://www.pgecurrents.com.

[107] On November 14, 2017, PG&E spokesperson Greg Snapper repeated this false and misleading reassurance *verbatim* in an NBC article titled "PG&E Risk Assessment at Issue in North Bay Wildfires." See Jaxon Van Derbeken, PG&E Risk Assessment at Issue in North Bay Wildfires, NBC Universal Media (Nov. 14, 2017), https://www.nbcconnecticut.com/troubleshooters/national-investigations/PGE-Risk-Assessment-at-Issue-in-North-Bay-Wildfires-457356963.html.

[redacted][109]

344. Additionally, and/or in the alternative, [redacted][111] Moreover, Defendant Kane was responsible for both "overseeing . . . implementation" of PG&E's compliance and "overseeing . . . compliance reporting," including this news release. Because of her senior position within the Company, Kane had ultimate authority to control the content of this statement.

345. Misstatement 7 was materially false and misleading when made. Specifically, at the time such statement was made, PG&E had an undisclosed and systemic pattern of noncompliance

---

[108] *See, e.g.,* [redacted]

[109] *See* [redacted]

[110] *See, e.g.,* [redacted]

[111] *See* [redacted]

with relevant laws and regulations, including PG&E's ETPM program, which was designed to ensure that the Company's inspections and preventative maintenance activities were conducted in accordance with regulatory requirements. At the time this statement was made, however: (i) PG&E's patrols and inspections were woefully insufficient; and (ii) it was subject to a self-inflicted vegetation management and hazard tree removal backlog that would take years to unwind. At best, this statement was a materially misleading half-truth insofar that it falsely created the impression that inspections of PG&E's infrastructure and vegetation management were effective. At bottom, at the time Misstatement 7 was made, PG&E did not "meet" – much less "exceed" – "all applicable … state vegetation clearance requirements."

346. First, according to reports released in subsequent corrective disclosures, including on May 25 and June 8, 2018, PG&E violated relevant wildfire safety laws, including California Public Resources Code Section 4293, multiple times. *See* Sections X.B.5 & 6, *infra*.

347. Second, Cal Fire found sufficient evidence of violations of state law to refer PG&E to the relevant district attorneys for eleven of the North Bay Fires. *See* Section VI.D, *supra*.

348. Third, investigations into the causes of the Camp Fire disclosed evidence that this most destructive and deadly wildfire in California history was caused by PG&E violating California Public Resources Code Section 4293 and California Public Utilities Code Section 451, among other safety regulations. Indeed, Cal Fire found that PG&E equipment was responsible for both ignition points of the Camp Fire and reported PG&E to the Butte County District Attorney based on evidence of safety violations.

349. Fourth, the Exchange Act Defendants actually knew that PG&E was not in compliance with relevant safety laws and best practices at the time of this statement. In proceedings related to PG&E's criminal probation before Judge Alsup, PG&E admitted "that as of June 2017, there were 3,962 unworked trees which PG&E had identified in 2016 as hazardous with the potential to 'fall into or otherwise impact the conductors, towers or guy wires before the next inspection cycle.'" *See* Section VI.C.2, *supra*.

350. Fifth, this statement materially omitted the true risk that PG&E's pattern of violations would cause wildfires serious enough to imperil the Company's financial condition.

351. Thus, Misstatement 7 was materially false and/or misleading because of PG&E's numerous and widespread violations of safety regulations, including regulations specifically related to vegetation management – regulations which were essential for preventing devastating wildfires. *See* Sections VI.E.1 & G.3-4, *supra*. As Judge Alsup held, PG&E's "**unsafe conduct has led to recurring deadly wildfires caused by its electrical system**" and the "large number of trees that should have been removed by PG&E but weren't . . . was a major contributing factor, **maybe the single-biggest factor, in causing the fires** in 2017 and 2018 in Northern California." In fact, PG&E's violations and safety deficiencies were so pervasive that they evidently caused multiple North Bay Fires all at the same time in seven different counties, and then caused both of the Camp Fire's two ignition points a year later – therefore the violations cannot be explained away as an isolated lapse.

### 5. May 25, 2018 – Misstatement No. 8

352. On May 25, 2018, PG&E issued a press release to respond to Cal Fire's reports regarding some of the October 2017 North Bay Fires (*see* Section X.B.4, *infra*), to reassure investors that PG&E had followed robust safety measures and met all state regulations concerning fire safety. The press release stated:

- Following Governor Brown's January 2014 Drought State of Emergency Proclamation and the California Public Utilities Commission's Resolution ESRB-4, PG&E has added enhanced measures to address areas particularly affected by drought and bark beetles including:

- Increased foot and aerial patrols along power lines in high fire-risk areas;

- Removed approximately 236,000 dead or dying trees in 2016 and 140,000 dead or dying trees in 2017; these tree removals were in addition to approximately 30,000 trees removed per year prior to the drought;

- Launched daily aerial fire detection patrols during high fire season to improve fire spotting and speed of fire response;

- Since 2014, provided $11.4 million to local Fire Safe Councils (FSCs) for fuel reduction projects in communities; and

- Provided $1.7 million to local FSCs for 28 highly programmable remote-sensing cameras for critical fire lookout towers.

- ***PG&E meets or exceeds regulatory requirements for pole integrity management***, using a comprehensive database to manage multiple patrol and inspection schedules of our more than two million poles.

353. PG&E, as a juridical person and the issuer of PG&E shares, caused the public dissemination of the statement regarding PG&E's compliance. Accordingly, and for the avoidance of doubt, PG&E was the maker of the statement regarding its compliance.

354. Additionally, and/or in the alternative, Defendant Williams, through her primacy over PG&E's corporate offices as CEO and President, had the ultimate authority of this statement made by PG&E regarding compliance. [redacted][113]

355. Additionally, and/or in the alternative, [redacted]

[112] *See, e.g.*, [redacted]

[113] *See* [redacted]

[redacted][114] Moreover, Kane was responsible for both "overseeing . . . implementation" of PG&E's compliance and "overseeing . . . compliance reporting," including this press release. Because of her senior position within the Company, Kane had ultimate authority to control the content of this statement.

356. Misstatement 8 was materially false and misleading when made. Specifically, at the time such statement was made, PG&E had an undisclosed and systemic pattern of noncompliance with relevant laws and regulations, including PG&E's ETPM program, which was designed to ensure that the Company's inspections and preventative maintenance activities were conducted in accordance with regulatory requirements. At the time this statement was made, however: (i) PG&E's patrols and inspections were woefully insufficient; and (ii) it was subject to a self-inflicted vegetation management and hazard tree removal backlog that would take years to unwind. At best, this statement was a materially misleading half-truth insofar that it falsely created the impression that inspections of PG&E's infrastructure and vegetation management were effective. At bottom, at the time Misstatement 8 was made, PG&E did not "meet" – much less "exceed" – "regulatory requirements for pole integrity management."

357. First, according to a report released in a subsequent corrective disclosure, PG&E violated California's safety regulations multiple times. Indeed, on June 8, 2018, Cal Fire disclosed that its "investigators have determined that 12 Northern California wildfires in the October 2017

[114] *See, e.g.*, [redacted]

Fire Siege were caused by electric power and distribution lines, conductors **and the failure of power poles**." In fact, at least one of the North Bay Fires – the Sulphur Fire – "was caused by the failure of a PG&E owned power pole" evidencing "violations of state law" sufficient to be referred to the relevant district attorney. Further, Cal Fire found enough evidence of violations of state law to refer PG&E to the relevant district attorneys for eight of these twelve North Bay Fires. *See* Section X.B.5, *infra*.

358. Second, PG&E acknowledged that an aerial patrol of the Camp Fire's origin later the same day showed "damage to a transmission tower" or pole that PG&E failed to maintain, as well as a second ignition point that exhibited damaged and downed poles, in violation of Section 451. Thus, PG&E did **not** "meet[] or exceed[] regulatory requirements for pole integrity management" – regulations which were essential for preventing devastating wildfires. PG&E's representation to the contrary was materially false and/or misleading. Cal Fire confirmed that PG&E equipment was responsible for both of the Camp Fire's ignition points, and referred its investigations to the relevant district attorney based on evidence of safety violations.

359. Third, this statement was materially false and/or misleading because of PG&E's numerous and widespread violations of safety regulations – regulations which were essential for preventing devastating wildfires. In fact, PG&E's violations were so pervasive that they evidently caused multiple North Bay Fires all at the same time in seven different counties, and then caused both of the Camp Fire's two ignition points a year later – therefore the violations cannot be explained away as an isolated lapse. This statement materially omitted the true risk that PG&E would cause wildfires serious enough to imperil the Company's financial condition.

360. Fourth, the Exchange Act Defendants knew that PG&E was not in compliance with relevant safety laws and best practices at the time of this statement. In proceedings related to PG&E's criminal probation before Judge Alsup, PG&E admitted "that as of June 2017, there were 3,962 unworked trees which PG&E had identified in 2016 as hazardous with the potential to 'fall into or otherwise impact the conductors, towers or guy wires before the next inspection cycle.'" *See* Section VI.C.2, *supra* .

### E. While the Truth Regarding PG&E's Role in Causing the North Bay Fires Emerged, the Company Made Additional False and Misleading Statements and Omissions Regarding Compliance with Wildfire-Related Safety Regulations, Including Its ESRB-8 Shutoff Protocol

361. As detailed below (*see* Sections X.B.1-4, *supra*), PG&E's share price declined precipitously as the truth about its responsibility for the North Bay Fires emerged. As liabilities for the North Bay Fires threatened the Company's financial viability, Defendants would realize that the Company needed a legislative bailout to avoid bankruptcy. As a result, PG&E needed the public, including investors, to believe that it would prioritize safety thereafter.

#### 1. June 8, 2018 – Misstatement No. 9

362. On June 8, 2018, Cal Fire announced its conclusions that PG&E caused the preponderance of the North Bay Fires (*see* Section X.B.5, *infra*), PG&E's share price continued its decline, and its financial situation deteriorated. Later that day, PG&E issued a press release to respond to Cal Fire's report, falsely and misleadingly reassuring investors that PG&E had met all state regulations concerning fire safety. The press release, titled "PG&E Responds to Latest CAL FIRE Announcement" stated, in relevant part:

> ***Programs Overall Met State's High Standards***
>
> We look forward to the opportunity to carefully review the CAL FIRE reports to understand the agency's perspectives.
>
> Based on the information we have so far, we continue to believe our overall programs met our state's high standards.
>
> For example, ***PG&E meets or exceeds regulatory requirements for pole integrity management***, using a comprehensive database to manage multiple patrol and inspection schedules of our more than two million poles.
>
> Similarly, ***under PG&E's industry-leading Vegetation Management Program***, we inspect and monitor every PG&E overhead electric transmission and distribution line each year, with some locations patrolled multiple times. We also prune or remove approximately 1.4 million trees annually.

363. PG&E, as a juridical person and the issuer of PG&E shares, caused the public dissemination of the statement regarding PG&E's compliance. Accordingly, and for the avoidance of doubt, PG&E was the maker of the statement regarding its compliance.

364. Additionally, and/or in the alternative, Defendant Williams, through her primacy over PG&E's corporate offices as CEO and President, had the ultimate authority of this statement made by PG&E regarding compliance. [redacted][116]

365. Additionally, and/or in the alternative, [redacted][117] Kane was responsible for both

[115] *See, e.g.*, [redacted]

[116] *See* [redacted]

[117] *See, e.g.*, [redacted]

"overseeing . . . implementation" of PG&E's compliance and "overseeing . . . compliance reporting," including this press release. Because of her senior position within the Company, Kane had ultimate authority to control the content of this statement.

366. Misstatement 9 was materially false and misleading when made. Specifically, at the time such statement was made, PG&E had an undisclosed and systemic pattern of noncompliance with relevant laws and regulations, including PG&E's ETPM program, which was designed to ensure that the Company's inspections and preventative maintenance activities were conducted in accordance with regulatory requirements. At the time this statement was made, however: (i) PG&E's patrols and inspections were woefully insufficient; and (ii) it was subject to a self-inflicted vegetation management and hazard tree removal backlog that would take years to unwind. At best, this statement was a materially misleading half-truth insofar that it falsely created the impression that inspections of PG&E's infrastructure and vegetation management were effective. At bottom, at the time Misstatement 9 was made, PG&E's "Vegetation Management Program" and "pole integrity management" decidedly did not meet California's "High Standards."

367. Investigations into the causes of the Camp Fire uncovered evidence that it was caused by PG&E violating California Public Resources Code Section 4293 and California Public Utilities Code Section 451, among other safety regulations. Indeed, Cal Fire found that PG&E equipment was responsible for both ignition points of the Camp Fire and reported PG&E to the Butte County District Attorney based on evidence of safety violations.

368. First, the Camp Fire was described in initial communications between firefighters and dispatch as a vegetation fire "underneath the transmission lines," which vegetation should have been cleared by PG&E pursuant to Section 4293.

369. Second, PG&E acknowledged that an aerial patrol of the Camp Fire's origin later the same day showed "damage to a transmission tower" or pole that PG&E failed to maintain, in violation of Section 451.

---

[redacted]

370. Third, PG&E acknowledged a second ignition point for the Camp Fire that exhibited damaged and downed poles, vegetation on top of downed wires, and other signs of safety violations. Cal Fire confirmed that PG&E equipment was responsible for both of the Camp Fire's ignition points, and referred its investigations to the relevant district attorney based on evidence of safety violations.

371. Fourth, the Exchange Act Defendants knew that PG&E was not in compliance with relevant safety laws and best practices at the time of this statement. In proceedings related to PG&E's criminal probation before Judge Alsup, PG&E admitted "that as of June 2017, there were 3,962 unworked trees which PG&E had identified in 2016 as hazardous with the potential to 'fall into or otherwise impact the conductors, towers or guy wires before the next inspection cycle.'" *See* Section VI.C.2, *supra*.

372. Fifth, this statement materially omitted the true risk that PG&E's pattern of violations would cause wildfires serious enough to imperil the Company's financial condition.

373. Thus, PG&E did **not** "meet[] or exceed[] regulatory requirements for pole integrity management" or "Vegetation Management" – regulations which were essential for preventing devastating wildfires. *See* Section VI.F.4. As Judge Alsup held, PG&E's "**unsafe conduct has led to recurring deadly wildfires caused by its electrical system**" and the "large number of trees that should have been removed by PG&E but weren't . . . was a major contributing factor, **maybe the single-biggest factor, in causing the fires** in 2017 and 2018 in Northern California." PG&E's representation to the contrary was materially false and/or misleading.

### 2. June 8, 2018 – Misstatement No. 10

374. The same press release contained a further false and/or misleading statement:

> **To address the growing threats posed by wildfires and extreme weather, and in light of the wildfires throughout our state last year, *PG&E has launched the Community Wildfire Safety Program*** to help keep our customers and communities safe. Among the key components of the new program are. . .
>
> - Public Safety Power Shutoff: As a last resort, ***a program to proactively turn off electric power for safety when extreme fire danger conditions occur***, while helping customers prepare and providing early warning notification, when and where possible.

375. PG&E, as a juridical person and the issuer of PG&E shares, caused the public dissemination of the statement regarding PG&E's compliance. Accordingly, and for the avoidance of doubt, PG&E was the maker of the statement regarding its compliance.

376. Additionally, and/or in the alternative, Defendant Williams, through her primacy over PG&E's corporate offices as CEO and President, had the ultimate authority of this statement made by PG&E regarding compliance. [redacted][118]

377. Additionally, and/or in the alternative, [redacted][119] Moreover, Kane was responsible for both "overseeing . . . implementation" of PG&E's

[118] *See, e.g.,* [redacted]

[119] *See, e.g.,* [redacted]

compliance and "overseeing . . . compliance reporting," including this press release. Because of her senior position within the Company, Kane had ultimate authority to control the content of this statement.

378. Misstatement 10 was materially false and misleading when made. PG&E's representation that it "has launched . . . a program to proactively turn off electric power for safety when extreme fire danger conditions occur," would eventually become its ESRB-8 Shutoff Protocol, was illusory insofar that: (i) PG&E exempted the relevant Caribou-Palermo transmission line from its de-energization protocols, which was contrary to public information and regulatory guidelines, and (ii) would fail to even enact its own protocols when such conditions were met. Indeed, even when all seven relevant "extreme fire danger conditions" **did** "occur," weighing strongly in favor of shutting off PG&E's transmission lines near the Jarbo Gap on November 7 and 8, 2018, PG&E flouted its own supposed program. Critically, PG&E's failure to shut off its transmission line caused the Camp Fire: the most destructive and deadly wildfire in California history. By touting a wildfire safety program PG&E did not adhere to, and where its nonadherence would risk devastating wildfires, PG&E misrepresented existing and material facts to investors.

379. First, as set forth in the Butte DA Report, PG&E "exempted all 115kV transmission lines from the PSPS program," and therefore, "the Caribou-Palermo line was not subject to de-energization prior to the ignition of the Camp Fire and was therefore not included in any PSPS." Ex. A at 73. Such decision was "misleading" insofar that it was not reflected in PG&E's public policy regarding shutoff. *Id.* Further, PG&E's decision to exempt such transmission lines was "opposed to the publicly posted PSPS guide," and therefore exclusively unilateral on the part of PG&E. *Id.* Finally, according to the Butte DA Report, "if PG&E had included 115 kV lines, the Caribou-Palermo line should have been included based on the extreme weather conditions in the Feather River Canyon." *Id.*

380. Second, the Big Bend 1101 12kV distribution line determined as the second ignition point for the Camp Fire was included in PG&E's lacking ESRB-8 protocol, and its shut off

---

[redacted]

warranted. PG&E's purported protocol listed seven criteria, did not list a placeholder for additional criteria, and stated that "no single factor will drive a Public Safety Power Shutoff." *See* Section VI.F, *supra*. As detailed herein, all seven protocol-specified criteria were met or exceeded just prior to the Camp Fire, which PG&E knew. *See id.* Thus, the so-called protocol unequivocally would have mandated a shutoff that would have prevented the Camp Fire. Accordingly, PG&E never actually implemented a binding protocol, hence it was materially false to insist it had "launched" a power shutoff under such exact circumstances.

381. Third, and even more suggestive of fraud, PG&E's later explanations for why the power stayed on have been inconsistent and easily disproven. Specifically, after PG&E's failure to follow the Protocol caused the Camp Fire, PG&E changed its reasons why three times. First, it stated that "weather conditions did not warrant this safety measure" (*see* Section VI.F, *supra*), but in the week that followed, it soon became clear that **all** weather criteria weighed in favor of a shutoff (*see* Section VI.F.1, *supra*). Then, PG&E stated that its reason for inaction was actually that the ESRB-8 Shutoff Protocol tied their hands: "PG&E ha[d] not extended the (shutoff) program to transmission lines." *See* Section XI.F, *infra*. This, too, was false: the "in full" expression of the protocol omitted this limitation given the exemption was non-public at the time, nor did apply to the second ignition point. (*see* Section VI.F, *supra*). Finally, when PG&E previously shut off electricity preemptively, both a month prior and a year prior, it **did** shut off transmission lines. *See* Section VI.F, *supra*

### 3. September 27, 2018 – Misstatement No. 11

382. On July 16, 2018, the CPUC enacted Resolution ESRB-8, which required PG&E to adopt, promulgate and follow "de-energization policy and procedures" to "de-energize power lines" in the face of unprecedented wildfire threats "to ensure public safety." It was the Company's official announcement of its de-energization policy and procedures implementing Resolution ESRB-8, detailed below, that materially misled investors.

383. On or about September 27, 2018, PG&E announced the full details of its ESRB-8 Shutoff Protocol in a filing with CPUC[120] that was also posted on its website.[121] The ESRB-8 Shutoff Protocol stated:

> PG&E's Community Wildfire Safety Program implements additional precautionary measures intended to reduce wildfire threats. ***It includes . . . executing protocols to temporarily turn off electric power for safety when extreme fire danger conditions are occurring***."
>
> * * *
>
> Public Safety Power Shutoff is one component of the Community Wildfire Safety Program. ***PG&E has created a set of procedures for. . . [d]etermining what combination of conditions necessitates turning off lines for safety***.
>
> * * *
>
> PG&E will take a combination of many criteria into consideration, including:
>
> - **"Extreme" fire danger threat level**, as classified by the National Fire Danger Rating System
> - **A Red Flag Warning declared** by the National Weather Service
> - **Low humidity levels**, generally 20 percent and below
> - **Sustained winds** above approx. 25 mph and wind gusts in excess of approx. 45 mph
> - **Site-specific conditions** such as temperature, terrain and local climate
> - **Critically dry vegetation** that could serve as fuel for a wildfire
> - **On-the-ground, real-time observations** from PG&E field crews

(Emphasis original.)

---

[120] PG&E Public Safety Power Shutoff Policies and Procedures, CPUC website (Sept. 2018), http://cpuc.ca.gov/uploadedFiles/CPUC_Public_Website/Content/News_Room/Public-Safety-Power-Shutoff-Policies-and-Procedures-September-2018.pdf (last viewed May 28, 2019).

[121] PG&E Public Safety Power Shutoff Policies and Procedures, PG&E website (Sept. 2018), https://www.pge.com/pge_global/common/pdfs/safety/emergency-preparedness/natural-disaster/wildfires/Public-Safety-Power-Shutoff-Policies-and-Procedures-September-2018.pdf (last viewed May 28, 2019).

384. PG&E, as a juridical person and the issuer of PG&E shares, caused the public dissemination of the statement regarding PG&E's compliance. Accordingly, and for the avoidance of doubt, PG&E was the maker of the statement regarding its compliance.

385. Additionally, and/or in the alternative, Defendant Williams, through her primacy over PG&E's corporate offices as CEO and President, had the ultimate authority of this statement made by PG&E regarding compliance. [redacted][122]

386. Additionally, and/or in the alternative, [redacted][123] Moreover, Kane was responsible for both "overseeing . . . implementation" of PG&E's

[122] *See, e.g.*, [redacted]

[123] *See, e.g.*, [redacted]

compliance and "overseeing . . . compliance reporting," including this report. Because of her senior position within the Company, Kane had ultimate authority to control the content of this statement.

387. Misstatement 11 was materially false and misleading when made. PG&E's representation that it had "implement[ed] additional precautionary measures" including "determining what combination of conditions necessitates turning off lines for safety" was false and misleading. It was false because the ESRB-8 Shutoff Protocol was illusory insofar that (i) PG&E exempted the relevant Caribou-Palermo transmission line from its de-energization protocols, which was contrary to public information and regulatory guidelines, and (ii) would fail to even enact its own protocols when such conditions were met. Indeed, even when all seven relevant "criteria" weighed in favor of shutting off PG&E's transmission lines near the Jarbo Gap on November 7 and 8, 2018, PG&E nevertheless flouted its protocol. PG&E's failure to shut off its transmission line caused the Camp Fire: the most destructive and deadly wildfire in California history. By touting a wildfire safety program PG&E did not adhere to, and where its nonadherence risked devastating wildfires, PG&E misrepresented existing and material facts to investors.

388. First, as set forth in the Butte DA Report, PG&E "exempted all 115kV transmission lines from the PSPS program," and therefore, "the Caribou-Palermo line was not subject to de-energization prior to the ignition of the Camp Fire and was therefore not included in any PSPS." Ex. A at 73. Such decision was "misleading" insofar that it was not reflected in PG&E's public policy regarding shutoff. *Id.* Further, PG&E's decision to exempt such transmission lines was "opposed to the publicly posted PSPS guide," and therefore exclusively unilateral on the part of PG&E. *Id.* Finally, according to the Butte DA Report, "if PG&E had included 115 kV lines, the Caribou-Palermo line should have been included based on the extreme weather conditions in the Feather River Canyon." *Id.*

389. Second, the Big Bend 1101 12kV distribution line determined as the second ignition point for the Camp Fire was included in PG&E's lacking ESRB-8 protocol, and its shut off warranted. PG&E's purported protocol listed seven criteria, did not list a placeholder for additional criteria, and stated that "no single factor will drive a Public Safety Power Shutoff." *See* Section VI.F, *supra*. As detailed herein, all seven protocol-specified criteria were met or exceeded just

prior to the Camp Fire, which PG&E knew. *See id.* Thus, the so-called protocol unequivocally would have mandated a shutoff that would have prevented the Camp Fire. Accordingly, PG&E never actually implemented a binding protocol, hence it was materially false to insist it had "launched" a power shutoff under such exact circumstances.

390. Third, and even more suggestive of fraud, PG&E's later explanations for why the power stayed on have been inconsistent and easily disproven. Specifically, after PG&E's failure to follow the Protocol caused the Camp Fire, PG&E changed its reasons why three times. First, it stated that "weather conditions did not warrant this safety measure" (*see* Section VI.F, *supra*), but in the week that followed, it soon became clear that **all** weather criteria weighed in favor of a shutoff (*see* Section VI.F.1, *supra*). Then, PG&E stated that its reason for inaction was actually that the ESRB-8 Shutoff Protocol tied their hands: "PG&E ha[d] not extended the (shutoff) program to transmission lines." *See* Section XI.F, *infra*. This, too, was false: the "in full" expression of the protocol omitted this limitation given the exemption was non-public at the time, nor did apply to the second ignition point. (*see* Section VI.F, *supra*). Finally, when PG&E previously shut off electricity preemptively, both a month prior and a year prior, it **did** shut off transmission lines. *See* Section VI.F, *supra*.

#### 4. October 9, 2018 – Misstatement No. 12

391. On October 9, 2018, Cal Fire announced its conclusions that PG&E equipment caused another of the North Bay Fires, known as the Cascade Fire. Later the same day, PG&E issued a press release to respond to Cal Fire's report, falsely and misleadingly reassuring investors that PG&E had met all state regulations concerning fire safety. The press release, titled "PG&E Responds to Cascade Wildfire Announcement" stated, in relevant part:

> [W]e are continuing to focus on ***implementing additional precautionary measures*** intended to further reduce wildfire threats, such as ***working to remove and reduce dangerous vegetation, improving weather forecasting, upgrading emergency response warnings, [and] making lines and poles stronger in high fire threat areas***, and taking other actions to make our system, and our customers and communities, ***even safer*** in the face of a growing wildfire threat.

392. PG&E, as a juridical person and the issuer of PG&E shares, caused the public dissemination of the statement regarding PG&E's compliance. Accordingly, and for the avoidance of doubt, PG&E was the maker of the statement regarding its compliance.

393. Additionally, and/or in the alternative, Defendant Williams, through her primacy over PG&E's corporate offices as CEO and President, had the ultimate authority of this statement made by PG&E regarding compliance. [redacted][125]

394. Additionally, and/or in the alternative, [redacted]

[124] *See, e.g.*, [redacted]

[125] *See* [redacted]

[redacted][126] Kane was responsible for both "overseeing . . . implementation" of PG&E's compliance and "overseeing . . . compliance reporting," including this press release. Because of her senior position within the Company, Kane had ultimate authority to control the content of this statement.

395. Misstatement 12 was materially false and misleading when made. Specifically, at the time such statement was made, PG&E had an undisclosed and systemic pattern of noncompliance with relevant laws and regulations, including PG&E's ETPM program, which was designed to ensure that the Company's inspections and preventative maintenance activities were conducted in accordance with regulatory requirements. At the time this statement was made, however: (i) PG&E's patrols and inspections were woefully insufficient; and (ii) it was subject to a self-inflicted vegetation management and hazard tree removal backlog that would take years to unwind. At best, this statement was a materially misleading half-truth insofar that it falsely created the impression that inspections of PG&E's infrastructure and vegetation management were conducted effectively. At bottom, it was false and misleading for PG&E to tout "implementing additional precautionary measures . . . to remove and reduce dangerous vegetation" and "mak[e] lines and poles stronger in high fire threat areas."

396. First, according to reports released in subsequent corrective disclosures, including on May 25 and June 8, 2018, PG&E violated relevant wildfire safety laws, including California Public Resources Code Section 4293, multiple times.

397. Second, investigations into the causes of the Camp Fire disclosed evidence that this most destructive and deadly wildfire in California history was caused by PG&E violating California Public Resources Code Section 4293 and California Public Utilities Code Section 451,

[126] *See, e.g.,* [redacted]

among other safety regulations. Indeed, Cal Fire found that PG&E equipment was responsible for both ignition points of the Camp Fire and reported PG&E to the Butte County District Attorney based on evidence of safety violations.

398. Third, the Exchange Act Defendants knew that PG&E was not in compliance with relevant safety laws and best practices at the time of this statement. In proceedings related to PG&E's criminal probation before Judge Alsup, PG&E admitted "that as of June 2017, there were 3,962 unworked trees which PG&E had identified in 2016 as hazardous with the potential to 'fall into or otherwise impact the conductors, towers or guy wires before the next inspection cycle.'" *See* Section VI.C.2, *supra*.

399. Fourth, later facts demonstrate that PG&E's inspections and patrols were insufficient, because at the time this statement was made, it did not inspect Tower :27/222 of the Caribou-Palermo transmission line since August 2014. This lack of annual inspection contributed to Tower :27/222's failure on November 8, 2018, which was part of the Camp Fire's first ignition point. Indeed, according to the Butte DA Report, PG&E only inspected Caribou-Palermo line "once every five years," and merely conducted patrols annually. This five-year inspection cadence was not public at the time the above statement was made. Moreover, as explained in Section VI.G.4, *supra*, the efficacy of these patrols and inspections during the Class Period were deficient based on PG&E's failure to adequately train its workforce and allocate sufficient time and resources to ensure its lines and towers were in working order. For instance, the Butte DA Report revealed myriad issues with PG&E's infrastructure, including 100-year-old towers in desperate need of repair.

400. Sixth, this statement materially omitted the true risk that PG&E's pattern of violations would cause wildfires serious enough to imperil the Company's financial condition.

401. Seventh, Judge Alsup's findings demonstrate that any inspections that took place were clearly insufficient, as PG&E's backlog of unattended trees and vegetation was staggering at the outset of the Company's probation. Moreover, Judge Alsup's findings confirm that, in many instances, PG&E reported inspections that never actually occurred. For example, Judge

Alsup's April 29, 2020 order states that "In total, the monitor identified ten instances where PG&E's records indicated that specific trees had been worked when, in fact, they had not been."

402. Thus, Misstatement 12 was materially false and misleading when made because it failed to disclose PG&E's systemic safety deficiencies and pattern of noncompliance with safety laws and regulations, including regulations specifically related to vegetation management – regulations which were essential for preventing devastating wildfires. *See* Section VI.G.2. As Judge Alsup held, PG&E's "**unsafe conduct has led to recurring deadly wildfires caused by its electrical system**" and the "large number of trees that should have been removed by PG&E but weren't . . . was a major contributing factor, **maybe the single-biggest factor, in causing the fires** in 2017 and 2018 in Northern California." In fact, PG&E's violations were so pervasive that they caused multiple North Bay Fires all at the same time in seven different counties, and then caused both of the Camp Fire's two ignition points a year later – therefore the violations cannot be explained away as an isolated lapse.

**5. October 9, 2018 – Misstatement No. 13**

403. The same PG&E press release contained a further false and/or misleading statement:

> To address the growing threats posed by wildfires and extreme weather, and in light of the wildfires throughout our state last year, ***PG&E has launched the Community Wildfire Safety Program*** to help keep our customers and communities safe ***by implementing additional precautionary measures*** intended to further reduce wildfire threats. Among the key components of the new program are. . .
>
> Public Safety Power Shutoff: As a last resort, ***a program to proactively turn off electric power for safety when extreme fire danger conditions occur***, while helping customers prepare and providing early warning notification, when and where possible.

404. PG&E, as a juridical person and the issuer of PG&E shares, caused the public dissemination of the statement regarding PG&E's compliance. Accordingly, and for the avoidance of doubt, PG&E was the maker of the statement regarding its compliance.

405. Additionally, and/or in the alternative, Defendant Williams, through her primacy over PG&E's corporate offices as CEO and President, had the ultimate authority of this statement made by PG&E regarding compliance. [redacted]

[redacted][128]

406. Additionally, and/or in the alternative, [redacted] Moreover, Kane was responsible for both "overseeing . . . implementation" of PG&E's compliance and "overseeing … compliance reporting," including this press release. Because of her senior position within the Company, Kane had ultimate authority to control the content of this statement.

407. Misstatement 13 was materially false and misleading when made. PG&E's representation that it "has launched" and "implement[ed] . . . a program to proactively turn off

[127] *See, e.g.*, [redacted]

[128] *See* [redacted]

electric power for safety when extreme fire danger conditions occur" was false and misleading. It was false because the touted program, its ESRB-8 Shutoff Protocol, was illusory from the beginning illusory insofar that: (i) PG&E exempted the relevant Caribou-Palermo transmission line from its de-energization protocols, which was contrary to public information and regulatory guidelines, and (ii) would fail to even enact its own protocols when such conditions were met. Indeed, even when all seven relevant "extreme fire danger conditions" did "occur," weighing in favor of shutting off PG&E's transmission lines near the Jarbo Gap on November 7 and 8, 2018, PG&E nevertheless flouted its supposed program. PG&E's failure to shut off its transmission line caused the Camp Fire: the most destructive and deadly wildfire in California history. By touting a wildfire safety program PG&E did not adhere to, where its nonadherence would risk devastating wildfires, PG&E misrepresented existing and material facts to investors.

408. First, as set forth in the Butte DA Report, PG&E "exempted all 115kV transmission lines from the PSPS program," and therefore, "the Caribou-Palermo line was not subject to de-energization prior to the ignition of the Camp Fire and was therefore not included in any PSPS." Ex. A at 73. Such decision was "misleading" insofar that it was not reflected in PG&E's public policy regarding shutoff. *Id.* Further, PG&E's decision to exempt such transmission lines was "opposed to the publicly posted PSPS guide," and therefore exclusively unilateral on the part of PG&E. *Id.* Finally, according to the Butte DA Report, "if PG&E had included 115 kV lines, the Caribou-Palermo line should have been included based on the extreme weather conditions in the Feather River Canyon." *Id.*

409. Second, the Big Bend 1101 12kV distribution line determined as the second ignition point for the Camp Fire was included in PG&E's lacking ESRB-8 protocol, and it's shut off warranted. PG&E's purported protocol listed seven criteria, did not list a placeholder for additional criteria, and stated that "no single factor will drive a Public Safety Power Shutoff." *See* Section VI.F, *supra*. As detailed herein, all seven protocol-specified criteria were met or exceeded just prior to the Camp Fire, which PG&E knew. *See id.* Thus, the so-called protocol unequivocally would have mandated a shutoff that would have prevented the Camp Fire. Accordingly, PG&E

never actually implemented a binding protocol, hence it was materially false to insist it had "launched" a power shutoff under such exact circumstances.

410. Third, and even more suggestive of fraud, PG&E's later explanations for why the power stayed on have been inconsistent and easily disproven. Specifically, after PG&E's failure to follow the Protocol caused the Camp Fire, PG&E changed its reasons why three times. First, it stated that "weather conditions did not warrant this safety measure" (Section VI.F, *supra*), but in the week that followed, it soon became clear that **all** weather criteria weighed in favor of a shutoff (*see* Section VI.F.1, *supra*). Then, PG&E stated that its reason for inaction was actually that the ESRB-8 Shutoff Protocol tied their hands: "PG&E ha[d] not extended the (shutoff) program to transmission lines." *See* Section XI.F, *infra*. This, too, was false: the "in full" expression of the protocol does omitted this limitation given the exemption was non-public at the time, nor did apply to the second ignition point. (*see* Section VI.F, *supra*). Finally, when PG&E previously shut off electricity preemptively, both a month prior and a year prior, it **did** shut off transmission lines. *See* Section VI.F, *supra*.

**6. November 8, 2018 – Misstatement No. 14**

411. On November 8, 2018, the Camp Fire started after PG&E decided not to shut off its power. Before the public became aware of the true scope of PG&E's role in causing the Camp Fire, the Company announced via its official Twitter.com account at 3:14 p.m. that day: "PG&E has determined that it will not proceed with plans today for a Public Safety Power Shutoff in portions of 8 Northern CA counties, as ***weather conditions did not warrant this safety measure***."[129]

412. PG&E, as a juridical person and the issuer of PG&E shares, caused the public dissemination of the statement regarding PG&E's compliance. Accordingly, and for the avoidance of doubt, PG&E was the maker of the statement regarding its compliance.

413. Additionally, and/or alternatively, Defendant Williams, through her primacy over PG&E's corporate offices as CEO and President, had the ultimate authority of this statement made

[129] PG&E Twitter Account Post (Nov. 8, 2018 3:14PM), https://twitter.com/PGE4Me/status/1060672000929267713.

by PG&E regarding compliance. [redacted][131]

414. Additionally, and/or in the alternative, [redacted]

[130] *See, e.g.*, [redacted]

[131] *See* [redacted]

[132] *See, e.g.*, [redacted]

[redacted][133] Kane was responsible for both "overseeing . . . implementation" of PG&E's compliance and "overseeing . . . compliance reporting," including this announcement. Because of her senior position within the Company, Kane had ultimate authority to control the content of this statement.

415. Misstatement 14 was materially false and misleading when made. This statement was affirmatively false: weather conditions did, in fact, warrant a shutoff. As detailed above, all seven criteria that PG&E deemed relevant, including those related to weather conditions, weighed in favor of a shutoff under PG&E's ESRB-8 Shutoff Protocol. *See* Section VI.F, *supra*.

416. First, as set forth in the Butte DA Report, PG&E "exempted all 115kV transmission lines from the PSPS program," and therefore, "the Caribou-Palermo line was not subject to de-energization prior to the ignition of the Camp Fire and was therefore not included in any PSPS." Ex. A at 73 Such decision was "misleading" insofar that it was not reflected in PG&E's public policy regarding shutoff. *Id.* Further, PG&E's decision to exempt such transmission lines was "opposed to the publicly posted PSPS guide," and therefore exclusively unilateral on the part of PG&E. *Id.* Finally, according to the Butte DA Report, "if PG&E had included 115 kV lines, the Caribou-Palermo line should have been included based on the extreme weather conditions in the Feather River Canyon." *Id.*

417. Second, the Big Bend 1101 12kV distribution line determined as the second ignition point for the Camp Fire was included in PG&E's lacking ESRB-8 protocol, and it's shut off warranted. PG&E's purported protocol listed seven criteria, did not list a placeholder for additional criteria, and stated that "no single factor will drive a Public Safety Power Shutoff." *See* Section VI.F, *supra*. As detailed herein, all seven protocol-specified criteria were met or exceeded just prior to the Camp Fire, which PG&E knew. Thus, the so-called protocol unequivocally would have mandated a shutoff that would have prevented the Camp Fire. Accordingly, PG&E never actually

[133] *See* [redacted]

implemented a binding protocol, hence it was materially false to insist it had "launched" a power shutoff under such exact circumstances.

418. Third, and even more suggestive of fraud, PG&E's later explanations for why the power stayed on have been inconsistent and easily disproven. Specifically, after PG&E's failure to follow the Protocol caused the Camp Fire, PG&E changed its reasons why three times. First, it stated that "weather conditions did not warrant this safety measure" (Section VI.F, *supra*), but in the week that followed, it soon became clear that **all** weather criteria weighed in favor of a shutoff (*see* Section VI.F.1, *supra*). Then, PG&E stated that its reason for inaction was actually that the ESRB-8 Shutoff Protocol tied their hands: "PG&E ha[d] not extended the (shutoff) program to transmission lines." *See* Section XI.F, *infra*. This, too, was false: the "in full" expression of the protocol does not mention this limitation given the exemption was non-public at the time, nor did apply to the second ignition point. (*see* Section VI.F, *supra*). Finally, when PG&E previously shut off electricity preemptively, both a month prior and a year prior, it **did** shut off transmission lines. *See* Section VI.F, *supra*.

## VIII. DEFENDANTS PERPETRATED A STOCK SCHEME THAT CAUSED INVESTOR LOSSES, IN VIOLATION OF SEC RULE 10b-5 (a) AND (c)

419. To further implement Section 10(b), the SEC also promulgated Rule 10b-5(a) and (c), which makes it unlawful:

> (a) To employ any device, scheme, or artifice to defraud, . . . or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5(a) and (c).

420. The Exchange Act Defendants' deceptive and manipulative acts and practices had no justification except to conceal the true state of PG&E's operations and commitment to safety, and artificially inflate the price of PG&E's securities, hence they constituted a scheme in connection with the purchase and sale of PG&E securities and violated subsections (a) and (c) of Rule 10b-5.

### A. Exchange Act Defendants Committed Deceptive and Manipulative Acts and Practices During the Class Period

421. As part of the fraudulent scheme, the Exchange Act Defendants caused PG&E to prioritize short-sighted revenue, cost-cutting, dividends, and/or profit over safety across the Company and conspired to conceal PG&E's pattern of noncompliance with relevant laws and regulations regarding wildfire prevention. Under the leadership and control of the Exchange Act




Individual Defendants throughout the entire Class Period, the wrongful acts and "course of business" alleged herein had no reasonable justification except to make it appear that PG&E was a prudent operator (when it was not) and to artificially inflate the price of PG&E's securities. PG&E's own internal slide presentation discussed in the discussed in the July 7, 2017 deposition testimony of defendant Williams memorialize this fraudulent "course of business": "What is up for debate?," to which the response included "Safety." A companion slide asked, "What is not up for debate?" and the response listed "8% EPS growth":

422. The scheme further manifested as the following wrongful acts, practices, and/or courses of business which were performed by, sanctioned by, and/or ratified by the Exchange Act Defendants in violation of Rule 10b-5(a) and (c).

**1. Deceptive And Manipulative Act/Practice No. 1**

423. The Exchange Act Defendants devised and implemented a scheme to prioritize short-term financial performance over safety. Each decision formed part of a larger pattern whereby the Exchange Act Defendants pursued short-sighted revenue, cost-cutting, and/or profits to prop up the Company's earnings, increase its dividend, and inflate PG&E's share price rather than invest in safety.

424. As one example, the Exchange Act Defendants did not shut off power to the Caribou-Palermo lines that sparked the Camp Fire. This failure to de-energize the Caribou-Palermo lines was deceptive in two ways: (i) the Exchange Act Defendants had unjustifiably exempted relevant transmission lines contrary to guidelines and further contrary to their public statements and **previous shutoff** of transmission lines; and (ii) failed to shut off relevant distribution lines within the purview of the policy. These facts show that the Company's ESRB-8 Shutoff Protocol was a sham, because all seven factors mentioned in the ESRB-8 Shutoff Protocol weighed in favor of shutting off the Caribou-Palermo line, yet PG&E did not shut it off. *See* Section VI.F, *supra*.

425. All seven shutoff criteria objectively weighed in favor of de-energizing the Caribou-Palermo lines. Specifically, (i) the National Fire Danger Rating System rated the area where the Camp Fire erupted as having an "Extreme" fire danger threat level; (ii) the National Weather Service declared a "Red Flag Warning" for the area where the Camp Fire erupted; (iii) the area where the Camp Fire erupted had "critically dry vegetation"; (iv) PG&E's on-the-ground observations weighed in favor of a shutoff; (v) the area where the Camp Fire erupted recorded sufficiently low humidity levels; (vi) the area where the Camp Fire erupted recorded sufficiently high wind speed; and (vii) site-specific conditions weighed in favor of a shutoff.

426. This act of keeping the power on when all these factors weighed heavily against it evidences the Exchange Act Defendants' deceptive and manipulative practice of prioritizing short-

term financial performance over safety. This decision by the Exchange Act Defendants to keep the power dangerously running, for no benefit other than the revenue such power service would generate and the inflated share price such an act would support, directly caused the Camp Fire because the Camp Fire would have been prevented—and 84 lives saved, as well as more than $10 billion in wildfire damage avoided—if the Exchange Act Defendants only complied with PG&E's own policy and shut off the power that day.

427. As a second example, Judge Alsup found that the Company, under the Exchange Act Defendants' direction, improperly diverted capital that should have been spent on safety and compliance to profits, dividends, bonuses, and political contributions. Judge Alsup specifically determined that PG&E had not generated excess cash through enhanced safety practices, but instead saved money by "knowingly fail[ing] to trim or remove thousands of trees it had already identified as posing a hazard" and that "dividends could and should have been kept and used to bring PG&E into compliance with state and federal law[.]" He further determined that: "[F]or years, in order to enlarge dividends, bonuses, and political contributions, PG&E cheated on maintenance of its grid—to the point that the grid became unsafe to operate during our annual high winds, so unsafe that the grid itself failed and ignited many catastrophic wildfires. In the past three years alone, PG&E wildfires killed at least 108 and burned 22,049 structures . . . . Yet because PG&E skimped on vegetation maintenance, an ever-greater backlog of hazard trees and hazard limbs grew year after year." *See* Section VI.G.2, *supra*.

428. As a third example, PG&E's Vegetation Management Program adopted a Vegetation Management Incentive Initiative ("VMII") program, which was purportedly designed to reduce the "annual routine compliance" tree work of PG&E and to shift resources to "reliability" work that focused on urban consumer satisfaction instead of overall safety. *See* Sections VI.E.1, *supra*.

429. As a fourth example, PG&E failed to properly inspect the Caribou-Palermo line and its other high-voltage equipment, including by changing its inspection policies over the decade preceding the Camp Fire to "drastically reduced the frequency and thoroughness of inspections" from once per year to once every five years, as a cost-cutting measure. *See* Sections VI.D.2. &

VI.G.2 & 4, *supra*. The Exchange Act Defendants would have had policy-setting authority to make this change.

430. As a fifth example, the Exchange Act Defendants failed to replace or repair outdated equipment well past its useful life. *See* Section VI.G.4, *supra*. Illustrative of this fraudulent course of business was the Exchange Act Defendants, per the Butte DA Report, "a run to failure strategy on the entirety of the Caribou-Big Bend section of the Caribou-Palermo line." Despite widespread internal acknowledgment that the Caribou-Palermo lines were in need of repair and posed a significant risk of collapse, PG&E never had the lines fixed to save money on repair costs. The Exchange Act Defendants operated a deceptive course of business that failed to allocate funds to repair the Caribou-Palermo line notwithstanding an internal PG&E email acknowledged that Tower :27/222 (the Camp Fire's first ignition point) was a quarter-century past its useful life and **a 2014 internal Company email stated that "the likelihood of failed structures happening** [on the Caribou-Palermo transmission line including Tower :27/222] **is high**." *See* Sections VI.E.2 & VI.G.4, *supra*.

431. All five of these deceptive acts and/or practices prioritized short-sighted revenue, cost-cutting, and/or profit over safety. Collectively, they had the effect of diverting billions of dollars necessary to improve safety to instead inflate the share price during the Class Period. As one of the "Factors in Aggravation" noted in the Butte DA Report that PG&E conceded as forming the basis of its criminal guilty plea for 84 counts of manslaughter and unlawfully causing the Camp Fire: "**By saving money on needed maintenance, repairs, replacements was able to generate profits in the billions of dollars**." (Emphasis original.)

432. Overall, the pattern created by these acts and other acts pled herein throughout the Class Period constituted a scheme to prioritize short-term financial performance over safety and inflate PG&E's share price so long as a wildfire catastrophe never occurred.

### 2. Deceptive And Manipulative Practice No. 2

433. The Exchange Act Defendants caused PG&E to increase its dividend when they knew PG&E was not investing enough into safety.

434. On May 23, 2016, Exchange Act Individual Defendant CEO Earley announced that he was causing PG&E to increase its quarterly dividend from $0.455/share to $0.49/share—the Company's first increase in six years.

435. On May 31, 2017, Exchange Act Individual Defendant CEO Williams announced that she was causing PG&E to increase its quarterly dividend again, from $0.49/share to $0.53/share.

436. As Judge Alsup found, over the relevant time period, PG&E "pumped out $4.5 billion in the last five years in dividends and let the tree budget wither so that a lot of trees that should have been taken down were not."

437. The Exchange Act Defendants caused PG&E to pay its dividend, and indeed even increased it twice, create the appearance that the Company's financial condition and future prospects were stronger than reality, and in-turn prop up the Company's inflated share price rather than invest in safety.

**B. Exchange Act Defendants Undertook Those Deceptive and Manipulative Acts and Practices with Scienter**

438. The Exchange Act Defendants knew, or recklessly disregarded, PG&E's pattern of noncompliance with relevant laws and regulations regarding wildfire prevention to artificially inflate and maintain the price of PG&E's securities as well as enlarge dividends, bonuses, and political contributions. *See* Section XI, *infra*.

439. For the same reasons, the Exchange Act Defendants knew, or recklessly disregarded, that they were directing the Company to prioritize short-term financial performance over safety.

440. PG&E internally acknowledged, extensively documented, and tolerated for years the safety violations that caused the Camp Fire, including that the nearly 100-year-old C hooks on the Caribou-Palermo line reaching the end of their useful life following 88 years with minimal maintenance and repair. Such information was well-known within the Company. *See* Sections VI.E.2 & VI.G.2-4, *supra*.

441. The Exchange Act Defendants knew about PG&E's changes to its inspection policies that reduced the frequency and thoroughness of inspections as a cost-saving measure, because these were the Company's official policies. *See* Sections VI.E.2. & VIG.4, *supra*. At the very least, they would have acted with deliberate recklessness to not know about the Company's official policies.

442. Defendants Earley, Williams, and Kane regularly monitored the compliance database and kept abreast of compliance violations reported within PG&E. *See* Sections XI.A-B & D, *infra*.

443. At PG&E's Bankruptcy Plan Confirmation Hearing, on May 28, 2020, PG&E's CFO Wells admitted under oath that Kane would be "very knowledgeable" about all compliance and ethics issues related to PG&E.

444. The Exchange Act Defendants knew, or recklessly disregarded, that all seven ESRB-8 criteria weighed unanimously in favor of shutting off the power. *See* Section VI.F.3, *supra*.

445. After PG&E failed to shut off the Caribou-Palermo Transition Line and caused the Camp Fire, the Exchange Act Defendants caused PG&E to keep changing its explanation why, with each new explanation being demonstrably false. *See* Section XI.F, *supra*. Such continued dissembling is indicative of their guilty minds. To date, PG&E has never provided a coherent explanation for why it actually chose not to shut off the Caribou-Palermo Transition Line despite all seven ESRB-8 criteria being met.

446. In light of the importance of safety to PG&E's business and the extensive knowledge of the Exchange Act Defendants regarding PG&E's noncompliance with safety regulation at the time of all the above-described wrongful acts, there can be no innocent explanation for such deliberate acts and practices constituting the scheme.

447. The Exchange Act Individual Defendants because of their positions within the Company each had the ability to direct PG&E's course of business with respect to investing in safety and setting policies to mitigate wildfire risk but deliberately choose to prioritize profits over safety.

**C. Connection with the Purchase or Sale of Securities**

448. The deceptive and manipulative acts and practices during the Class Period were done in connection with all Class purchases and sales of securities.

449. Each of the deceptive and manipulative acts and practices enumerated above occurred at all times throughout the Class Period. There was never a moment during the Class Period in which at least one of the Exchange Act Defendants did not conceal PG&E's pattern of noncompliance with relevant laws and regulations regarding wildfire prevention to artificially inflate the price of PG&E's securities, overstate the Company's current and future financial health, including earnings by cutting costs shortsightedly, as well as enlarge dividends, bonuses, and political contributions. Indeed, given the enormity of the destructive wildfires that resulted from PG&E's wrongful acts constituting the scheme, such acts had no reasonable justification except to artificially inflate PG&E's share price. Furthermore, the Exchange Act Defendants' acts and practices coincided with every Class purchase or sale of securities.

450. Accordingly, the Exchange Act Defendants' acts and practices inflated PG&E's share price at all times during the Class Period and were connected with all Class purchases and sales during the Class Period.

**D. Reliance**

451. A Class-wide presumption of reliance is appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because the Class's claims are grounded on the Exchange Act Defendants' material omissions in the context of their affirmative duties to disclose material, adverse facts, including all of the deceptive and manipulative acts and practices enumerated in Section XIII.A, *supra*. Because this scheme involves Defendants' failure to disclose material adverse information regarding the Company's pattern of noncompliance with relevant laws and regulations regarding wildfire prevention, including its illusory ESRB-8 Shutoff Protocol, insufficient vegetation management, inadequate inspections, and "run to failure" approach to equipment maintenance—information that the Exchange Act Defendants were obligated to disclose—proof of positive reliance is not a prerequisite to discovery. All that is necessary to plead a violation of Rule 10b-5 (a) or (c) is that

the facts withheld were material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of compliance with safety regulations and of wildfire prevention, as set for above, that requirement is satisfied here.

452. The Exchange Act Defendants also had a duty to cause PG&E to disclose these material adverse facts due to PG&E's criminal probation. Starting on January 26, 2017, PG&E was sentenced to probation including a term that it "Not Commit Another Federal, State, or Local Crime During the Term of the Probation." Because the terms of PG&E's criminal probation imposed on the Exchange Act Defendants a duty to disclose any violations to the federal court presiding over PG&E's probation, the Exchange Act Defendants' silence on the subject and omission of PG&E's material safety violations inflated the Company's share price. Every day that the Exchange Act Defendants did not report the materially adverse facts violating the terms of its criminal probation, including every safety violation—which was every day of Class Period—investors reasonably presumed that no such violations were occurring.

453. The Exchange Act Defendants also had a duty to cause PG&E to disclose these material adverse facts due to PG&E's position as a public utility, and public steward of Northern California's electricity infrastructure, highly regulated by the State of California. Specifically, PG&E had an affirmative duty to disclose its safety violations, and organizational culture that failed to prioritize safety, to the ongoing CPUC investigation into PG&E's safety culture (Investigation 15-08-019) since August 27, 2015 and continuing throughout the Class Period.[134] It was pursuant to this CPUC investigation that the CPUC imposed its $1.937 billion penalty on PG&E on May 7, 2020. *See* Section VI.G.3, *supra*.

454. In addition, the State and citizens of California entrusted care of its electrical grid, the safety of their property, and their very lives to PG&E during the Class Period. As the Butte DA Report found and PG&E agreed when pleading guilty to 84 counts of manslaughter, "PG&E was entrusted by the People of the State of California to provide safe and reliable electricity. PG&E

[134] CPUC, Online Document Portal, I1508019 PG&E and PG&E Corp.'s Organizational Culture and Governance Prioritize Safety.docx, available at: https://docs.cpuc.ca.gov/SearchRes.aspx?DocFormat=ALL&DocID=154363217.

took advantage of that position of trust and was able to generate billions of dollars in profit." In combination with the catastrophic damage to life and property that would be caused by these materially adverse facts, PG&E had a moral duty to disclose these materially adverse facts.

455. Because PG&E could have caused a catastrophic wildfire at any time during the Class Period, and indeed did multiple times, no reasonable investor would have paid the inflated Class Period prices for PG&E shares if they had known the true extent to which the Exchange Act Defendants ran a Company that prioritized short-sighted revenue, cost-savings, and profits over safety.

456. But for the deceptive and manipulative acts and practices enumerated in Section VIII.A, *supra*, Class members would not have purchased PG&E shares at the inflated prices they paid throughout the Class Period. The Exchange Act Defendants undertook these wrongful acts precisely to induce the Class's purchases and sales.

457. The Exchange Act Defendants also had a duty to cause PG&E to disclose its de-energization and restoration policy **in full** pursuant to Resolution ESRB-8. However, PG&E's published ESRB-8 Shutoff Protocol never mentioned a limitation on 115 kilovolt transmission lines or in fact any transmission lines. Every day that the Exchange Act Defendants did not report to the public any exceptions to its protocol which would enable the Company to exclude the Caribou-Palermo transmission line—exceptions which made the policy materially weaker, as proven by the Camp Fire itself—investors would have reasonably relied on PG&E's public protocol (which lacked such unjustified exceptions) being the operative one.

458. Investors' reasonable reliance on the assumption that the Caribou-Palermo Transmission Line was not exempted from the Company's protocol was encouraged by the Company's further acts, including: (a) the Company's first explanation for why the Caribou-Palermo line was not shut off on November 8, 2018 said nothing about its status as a transmission line, but simply said instead that "weather conditions did not warrant this safety measure;" and (b) the fact that when PG&E first shut off electricity under its ESRB-8 Shutoff Protocol on October 14 through 17, 2018, by its own admission, PG&E shut off both transmission and distribution lines. *See* Sections VI.F & XI.F, *supra*.

459. Accordingly, investors are entitled to a presumption of reliance based on the Exchange Act Defendants' omission of the material weaknesses in its noncompliant ESRB-8 Shutoff Protocol, or (in the alternative) its illusory ESRB-8 Shutoff Protocol—which was every day of Class Period starting after July 16, 2018 (the date that the CPUC issued Resolution ESRB-8). Investors are further entitled to a presumption of reliance on the omission of the true reasons why the Caribou-Palermo line was not shut off pursuant to ESRB-8, which decision caused the Camp Fire.

## IX. MATERIALITY UNDER THE EXCHANGE ACT

460. PG&E's reassurances to investors about its safety, prudence, and compliance with the law were especially important to investors because of California's legal regime known as inverse condemnation. As described in more detail above (*see* Section VI.A.5, *supra*), PG&E is strictly liable for the property costs of wildfires its equipment caused. However, during the Class Period, it could be reimbursed for those costs by ratepayers by petitioning CPUC and showing that it had acted as a prudent manager. On such a showing, CPUC could have rate payers reimburse PG&E for some or all of its liability.

461. PG&E's investors understood that PG&E would bear the costs of wildfires it caused, and that PG&E's ability to pass some or all of those costs on to ratepayers was limited by PG&E's prudence. For example, an analyst report issued by Evercore ISI on December 21, 2017 stated:

> On the 3Q17 call PCG indicated company operations were conducted properly leading up to and after the fire, but they still had little information regarding the cause of the fire or potential shareholder exposure.
>
> * * *
>
> PCG reiterated the company routinely inspects, maintains, and replaces poles, and tests and treats wood poles on a frequency that significantly exceeds CPUC requirements. The company claims to have one of, if not the most comprehensive vegetation management programs in the country. Further, the company doubled its vegetation management spending in 2016 due to the drought and tree mortality crisis in California. That being said, we still do not know and likely will not know what caused the various fires for some time, **whether or not PCG's equipment was solely or partly the cause**, and whether or not the facts will support a ruling at CPUC that PCG **acted prudently** should they be successfully sued under inverse condemnation.

462. In light of these provisions of California law, PG&E's repeated reassurances to its investors – *e.g.*, that it complied with relevant safety regulations, doubled its vegetation management spending, inspected all of its powerlines every year, and would adhere to a formal ESRB-8 Shutoff Protocol – effectively communicated that the Company would be able to recover any property damage liabilities from wildfires caused by its systems, through the CPUC. Those reassurances, when revealed to have been false and misleading, impacted the Company's valuation by at least the amount of damage it caused by starting or exacerbating the North Bay and Camp Fires. The impact of these misstatements, and their importance to the Company's financial condition, is underscored by PG&E's decision to file for Chapter 11 bankruptcy based on its (anticipated) tens of billions of dollars in potential liabilities tied to the North Bay and Camp Fires, and related concern that as a result, neither PG&E Corporation nor the Utility would be able "to continue as going concerns."

463. In total, PG&E's share price declined $55.60 per share on the nine corrective disclosures and/or materializations of concealed risk herein alleged. Given that the Company had between approximately 514.4 and 518.6 million shares outstanding from October 24, 2017 to October 25, 2018, the losses caused by PG&E's fraud under the Exchange Act were in the billions of dollars.

## X. LOSS CAUSATION UNDER THE EXCHANGE ACT

464. A key component of PG&E's economic viability was managing the risk of wildfires in approximately a coverage area that included 100,000 miles of overhead lines and tens of millions of trees. During the Class Period, the Exchange Act Defendants' materially false and misleading statements and fraudulent scheme artificially inflated and/or artificially maintained the price of PG&E securities by creating a false impression of the Company's inspection and compliance programs, while concealing its safety deficiencies and pattern of violations. Under both fraudulent devices employed, as a sum and separately, the Exchange Act Defendants knowingly or with deliberate recklessness caused PG&E shares to trade at inflated prices throughout the Class Period. The Exchange Act Defendants' misrepresentations and fraudulent scheme had the intended effect and caused PG&E shares to trade at artificially inflated levels throughout the Class Period,

reaching as high as $71.56 per share on September 11, 2017 – a month before the truth started to emerge on October 12, 2017. Ultimately, PG&E's share price plummeted to $17.74 by the close of trading on the last day of the Class Period, November 15, 2018.

465. The declines in the price of PG&E securities pled herein were a direct and proximate result of the information previously concealed by Exchange Act Defendants' misrepresentations and fraudulent scheme—specifically, information concerning PG&E's safety deficiencies and pattern of violations with respect to inspections, vegetation management, and pole integrity, and their attendant risks—being revealed to investors. The timing and magnitude of the price declines of PG&E securities negates any inference that the loss suffered by Lead Plaintiff and other Class members was caused entirely by adverse weather, changed market conditions, macroeconomic or industry factors, or unrelated Company-specific factors.

466. At least a portion of the economic loss suffered by Lead Plaintiff and other members of the Class was a direct and proximate result of the Exchange Act Defendants' misrepresentations and fraudulent scheme, which inflated the prices of PG&E securities and resulted in the subsequent decline in the value of PG&E securities when the extent and scope of PG&E's systemic safety deficiencies and pattern of violations was revealed to investors through the series of partial corrective disclosures. The risks concealed by the Exchange Act Defendants' misrepresentations and fraudulent scheme—specifically, the true risk that PG&E's systemic compliance deficiencies and pattern of violations would cause wildfires, that it could not meet the prudent manager standard with respect to those fires, and that its investors would suffer economic harm because the Company would not be able to cover its resulting financial liability with the available insurance proceeds or by seeking recovery from ratepayers.

467. It was foreseeable that the Exchange Act Defendants' misrepresentations and fraudulent scheme would artificially inflate and/or maintain the price of PG&E securities. It was also foreseeable that the revelation of the truth alleged herein would cause the price of PG&E securities to fall as the artificial inflation caused by Defendants' misrepresentations and fraudulent scheme was removed. Therefore, the stock price declines described herein were directly and proximately caused by the Exchange Act Defendants' misrepresentations and fraudulent scheme.

At bottom, the artificial inflation (or fraud premium) in the price of PG&E securities dissipated on the dates listed below through a series of partial corrective disclosures and/or materializations of omitted risks. The commentary from sophisticated market participants, as well as journalist scrutiny, makes clear that these declines in PG&E securities were at least partially the direct and proximate result of the corrective disclosures and/or materializations of the omitted risks.

468. Thus, as a result of their purchases of PG&E's securities during the Class Period, Lead Plaintiff and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws.

### A. PG&E's Safety Violations Caused the Devastating North Bay and Camp Fires

#### 1. PG&E's Safety Violations Caused the North Bay Fires

469. PG&E caused the North Bay Fires. Of the eighteen fires for which Cal Fire has determined the cause, it has determined that **seventeen were caused by PG&E equipment**.

470. Of these seventeen fires, Cal Fire determined that **eleven were due to PG&E's violation of California safety regulations**. Together, these fires were responsible for **more than 100,000 acres of land devastated**, **more than 2,000 structures destroyed,** and **at least 9 of the 44 North Bay Fire fatalities.**

471. Six more of the North Bay Fires were also deemed to have been caused by PG&E electrical lines; though Cal Fire found no specific evidence of safety violations for these six fires, PG&E may still be found liable under California's legal regime known as inverse condemnation, which provides strict liability for utilities when their power lines are implicated in wildfires that lead to property damage. Together, these fires were responsible for an additional **more than 50,000 acres of land devastated**, **more than 800 structures destroyed**, and **at least 13 of 44 fatalities.** Necessarily, these six fires would have been more easily contained, and accordingly less destructive, if not for the fires caused by PG&E's violations and inadequate safety practices.[135]

[135] Similarly, another of the North Bay Fires known as the Tubbs fire (which burned 36,807 acres, destroyed 5,636 structures, and resulted in 22 fatalities) would have been more easily contained, and accordingly less destructive, if not for the fires caused by PG&E's violations and inadequate safety practices at the same time.

**2. PG&E's Safety Violations Caused the Camp Fire**

472. At or about 6:29 a.m. on November 8, 2018, in Pulga, California, on Pulga Road and Camp Creek Road near the Jarbo Gap, faulty PG&E equipment started the Camp Fire.[136] A second ignition point, also caused by faulty PG&E equipment, began approximately 15 minutes later near the community of Concow. The combined Camp Fire soon devastated several surrounding communities, largely destroying Paradise, Concow, Magalia, and Parkhill. The Camp Fire incinerated 153,336 acres, destroyed 18,804 structures, and killed at least 85 people.

473. As noted above, Cal Fire later concluded that PG&E caused both of the Camp Fire's two ignition points under circumstances evidencing violations of safety regulations and referred its investigation to the Butte County District Attorney.

**B. As the Market Learned of the Extent and Scope of PG&E's Pattern of Violations, the Company's Share Price Fell Dramatically**

474. On or about October 8, 2017, eighteen major wildfires known as the North Bay Fires started in California, burning at least 249,000 acres and devastating properties across nine California counties.

**1. October 12, 2017 – Corrective Disclosure and/or Materialization of Concealed Risk**

**(a) The Market Began to Learn the Extent and Effects of PG&E's Pattern of Violations Concealed by Fraud**

475. On October 10, 2017, two days after the North Bay Fires started, *The Mercury News* first reported that PG&E's equipment was implicated in the North Bay Fires in an article titled "PG&E Powers Lines Linked to Wine Country Fires."[137] The article specifically stated that "**power equipment failures began to turn the spotlight on PG&E, raising questions about how well it maintained its equipment in the area and whether it adequately cut back trees from power lines to reduce fire risk—as required by state law**." The article cited to a statement

[136] Camp Fire Incident Update (Nov. 25, 2018 7:00AM), http://cdfdata.fire.ca.gov/admin8327985/cdf/images/incidentfile2277_4326.pdf (last viewed on May 28, 2019).

[137] Paul Rogers, *PG&E Power Lines Linked to Wine Country Fires*, The Mercury News (Oct. 10, 2017), https://www.mercurynews.com/2017/10/10/pge-power-lines-linked-to-wine-country-fires/.

by "**PG&E officials** issued … Tuesday [October 10, 2017] evening, **acknowledging the equipment troubles** . . . ." However, that same PG&E statement dismissed as "highly speculative" any assertion that "questions about maintenance" (or a lack thereof) were the cause of the equipment troubles or the actual wildfires. Finally, the article contained a statement from the CPUC, stating:

> It may take some time for fire officials or utilities to determine the possible cause of the fires. . . . Once that occurs, ***if its appears that a utility line may have been involved, the [C]PUC will investigate***.

476. Accordingly, based on the CPUC's assurance that it "[would] investigate" upon a determination a PG&E utility line was involved in the North Bay Fires, any substantive market reaction was temporarily held in abeyance.

477. On Thursday, October 12, 2017, additional information was publicly disseminated linking PG&E equipment to the North Bay Fires and further that Company's noncompliance with regulations were a proximate cause thereof. Specifically on that date, the CPUC served upon PG&E a litigation hold letter informing the Company of its "obligation to preserve all evidence with respect to the Northern California wildfires in Napa, Sonoma, and Solano Counties." Although this letter was made public on October 12, 2017, it "affirm[ed] a verbal communication" of the same obligation by CPUC Safety Enforcement Division Program Manager Charlotte TerKeurst to PG&E "at approximately 6:00 p.m. on October 10, 2017." The public disclosure on October 12, 2017 also revealed that "Ms. TerKeurst reminded PG&E of the need to preserve all evidence, and PG&E acknowledged that it would do so."[138]

478. The litigation hold letter expressly compelled: (a) PG&E to "preserve any factual or physical evidence … includ[ing] **all failed poles, conductors and associated equipment from each fire event[;]**" (b) "[t]he physical evidence must be cataloged and tagged in a manner that will identify where it came from so that SED staff may reconstruct the poles for analysis[;]" and (c) PG&E "must inform all employees and contractors that they must preserve all electronic

[138] *See* CPUC Letter dated October 12, 2017, available at: https://www.cpuc.ca.gov/-/media/cpuc-website/files/uploadedfiles/cpuc_public_website/content/safety/letter-to-pge-reminding-of-the-obligation-to-preserve-evidence.pdf.

(including emails) and non-electronic documents related to **potential causes of the fires, vegetation management, maintenance and/or tree-trimming**."[139]

479. On the same day, *NBC* issued a news article confirming that the CPUC had "**launched a probe into PG&E's vegetation management and maintenance practices** in the wake of the deadly firestorm in the North Bay."[140]

480. On this news, PG&E's stock dropped $4.65 per share, from a closing price of $69.15 on October 11 to a closing price of $64.50 on October 12, or -6.7%, with unusually heavy trading volume of almost 13 million shares (compared to a Class Period daily average trading volume of 3.5 million[141]). However, PG&E's share price remained artificially inflated, as PG&E's statements blamed the North Bay Fires on "hurricane-strength winds in excess of 75 mph in some case" and claimed that it was "highly speculative" to assume PG&E's insufficient vegetation management and maintenance caused the fires. Likewise, the full extent and scope of PG&E's safety deficiencies and pattern of violations remained concealed.

**(b) Market Commentators Covered PG&E's Share Price Decline**

481. Following the CPUC announcement, analysts were quick to issue reports regarding PG&E share price declines and the cause therefor: that PG&E's equipment was involved in, and may have been the cause of, the North Bay Fires, and the liability associated therewith. For example, on October 12, 2017, J.P. Morgan issued a report stating that "at least one media outlet is citing reports of PCG power lines as a potential cause of the 21 separate ignition points." J.P. Morgan clarified that a "media report Tuesday [October 10, 2017] night cited multiple reports of downed power lines reported near the fires on Sunday evening." According to J.P. Morgan, among the reasons for the drop in PG&E shares was the Company's potential culpability and the liabilities associated therewith:

[139] *See id.*

[140] *See* CNBC, *CPUC Launches PG&E Probe in Wake of Deadly North Bay Firestorm* (Oct. 12, 2017), available at: https://www.nbcbayarea.com/news/local/cpuc-launches-pge-probe-in-wake-of-deadly-north-bay firestorm/35032/#:~:text=Earlier%20Thursday%2C%20PUC%20President%20Michael,PUC%20puts%20PG&E%20on%20notice.%E2%80%9D.

[141] This average excludes alleged corrective disclosure and/or materialization of risk dates.

> **Since then**, **PCG shares have lost $4/shr and over 8.3% or $2.9Bn on a relative basis**, an amount that approaches the $4.5Bn+ total San Bruno explosion costs borne by shareholders when grossed up for taxes. We feel this reflects the following assumptions: 1) **the fire was caused by PCG's negligence**, 2) insurance coverage for 3rd party liabilities will be very limited, 3) damage costs per acre far larger than those for the 2015 Butte fire and 4) **material fines and penalties will be assessed**. We appreciate the severity of the fires and the legal challenges of operating in California, but estimate this loss of value as approaching a worst-case scenario for PCG shares.

482. J.P. Morgan was not alone in its concern regarding the escalating public attention as to the involvement of PG&E equipment in the cause of the North Bay Fires. For example, an October 12, 2017 report by a Guggenheim stock analyst attributed PG&E's stock price decline to "media reports linking the company to some of the most destructive wildfires experienced in CA, which continued to burn." Similarly, on October 13, 2017, Deutsche Bank issued an analyst report that also attributed PG&E's recent share price decline to this disclosure, stating:

> PCG sold off hard on Thursday (-6.7%) and closed near its low as the market reacted to the ongoing wildfire situation in PG&E's northern California service territory. While we have fielded questions on this issue all week**, today's selling pressure appeared to be sparked by news stories suggesting PG&E power lines may have been involved or "linked" to some of the fires**.

483. Similarly, Morgan Stanley issued an analyst report that commented on the CPUC's investigation, noting that PG&E had previously covered a significant portion of its liability for the Butte Fire using its $900 million insurance policy. However, Morgan Stanley conceded that potential liability for the North Bay Fires would result in fines, penalties, and costs significantly greater than those incurred after the Butte Fire. Indeed, the Morgan Stanley analyst report estimated that damages for the North Bay Fires were approximately $6 billion.

484. Indeed, confirmation that PG&E's equipment was linked to the wildfires and PG&E's negligence and failure to adequately trim trees around their power lines was currently under investigation had created a recognized overhang on Company shares. For example, on October 12, 2017, *SF Gate* published an article observing: "**[T]he state agency that regulates utilities has told PG&E to save every piece of damaged equipment from the area as evidence for the investigations to come**." The article concluded by stating that PG&E's vegetation management practices caused the North Bay Fires: "In all, **the company spent $198 million in**

**2016 on 'vegetation management**.' But those efforts and that money – all of it coming from PG&E's customers – **may not have been enough**."[142]

485. On October 13, 2017, Wells Fargo issued an analyst report explicitly questioning whether PG&E had complied with California vegetation management regulations:

> Yesterday (10/12), shares of PCG underperformed the S&P Utilities by roughly 720 bps. **We attribute the material decline in price to the revelation that the company's power lines might have played a role in the Northern California fires**. Over the weekend Northern California experienced winds in excess of 70 miles per hour, which could have caused trees to impact power lines that could have sparked fires particularly given the very dry vegetation. While there is still significant uncertainty in what caused the fires, apparently investigators are looking into the role of PCG's infrastructure. **The concern for investors is whether PCG did not adequately trim trees around their power lines it is our understanding that in California utilities are required to clear vegetation within 10 feet of power lines. In the absence of inadequate tree trimming, we think that property damage attributable to PCG's infrastructure should be largely covered by insurance.**

486. In addition to analyst commentary, the media also continued to comment on this news and attributed PG&E's share price decline to the CPUC's October 12, 2017 announcement. For example, on October 13, 2017, *CNBC* published an article titled "PG&E shares plunge on concern its power lines may have started California wildfires."[143] The article observed: "The California Public Utilities Commission sent a letter on Thursday to PG&E reminding them to preserve 'all evidence with respect to the Northern California wildfires in Napa, Sonoma and Solano Counties,' according to multiple reports." It continued to note that PG&E's share price decline occurred "on concerns its power lines may have started the massive wildfires that have ravaged California recently."

487. Thus, the October 12, 2017 disclosure confirmed and corroborated media reports that PG&E equipment was involved in the North Bay Fires, and revealed that the CPUC had reason to investigate whether the Company's compliance violations were implicated, which could result

---

[142] David R. Baker, *PG&E Spent Millions on Fire Prevention; It May Not Have Been Enough*, San Francisco Gate (Oct. 13, 2017), https://www.sfgate.com/bayarea/article/PG-E-millions-fire-prevention-Santa-Rosa-wildfires-12277237.php.

[143] This article was published prior to the Company's corrective disclosure later that day, discussed *infra*.

in staggering financial liability in the billions of dollars. This was a partial corrective disclosure of the falsity of Misstatements 1-3, which falsely touted PG&E's inspection and compliance programs, including the Company's misleading claim that it inspected every mile of its power lines every year. *See* Section VII, *supra* (Misstatement 1). It was also a materialization of the risks concealed by PG&E's misrepresentations and fraudulent scheme—specifically, the true risk that PG&E's systemic compliance deficiencies and pattern of violations would cause wildfires, and that its investors would suffer economic harm because the Company would not be able to cover its resulting financial liability.

### 2. October 13-16, 2017 – Corrective Disclosure and/or Materialization of Concealed Risk

#### (a) The Market Continued to Learn the Extent and Effects of PG&E's Pattern of Violations Concealed by Fraud

488. Shortly before the close of trading on October 13, 2017, PG&E filed a Form 8-K with the SEC, which further confirmed PG&E was under investigation by Cal Fire. In the release, the Company disclosed that it only had $800 million in insurance coverage—multiples less than the $6 billion estimated by Morgan Stanley as needed to fully shield PG&E:

> **Investigation of Northern California Fires**
>
> Since October 8, 2017, several catastrophic wildfires have started and remain active in Northern California. The causes of these fires are being investigated by the California Department of Forestry and Fire Protection (Cal Fire), including the possible role of power lines and other facilities of Pacific Gas and Electric Company's (the "Utility"), a subsidiary of PG&E Corporation.
>
> It currently is unknown whether the Utility would have any liability associated with these fires. **The Utility has approximately $800 million in liability insurance for potential losses that may result from these fires. If the amount of insurance is insufficient to cover the Utility's liability or if insurance is otherwise unavailable, PG&E Corporation's and the Utility's financial condition or results of operations could be materially affected**.

489. In addition to confirming Cal Fire's investigation into PG&E's "possible role" in the North Bay Fires, PG&E's Form 8-K disclosed information regarding the amount of insurance that the Company had available for potential losses associated with the fires. This information was critical to investors, as it disclosed that PG&E had only $800 million in insurance to cover the

Company's liabilities associated with the North Bay Fires. As mentioned above, analysts had estimated that PG&E could be liable for ~$6 billion in connection with these fires.

490. Upon release of the October 13, 2017 Form 8-K, PG&E's share price continued to decline. From its opening price of $63.95 per share that day to its closing price of $53.43 per share at the end of the next trading day (Monday, October 16, 2017), PG&E's stock declined $10.52 per share, or approximately 16.5%. Over the same period, it experienced unusually heavy trading volume of over 68.5 million shares. The price of PG&E securities, however, remained artificially inflated, because PG&E's safety deficiencies and pattern of violations were not yet confirmed to be a cause of the North Bay Fires.

**(a) Market Commentators Covered PG&E's Share Price Decline**

491. The Company's October 13, 2017 disclosure of its previously undisclosed liability insurance was understood by the market to be the cause of the continuing share price declines as the overhang of liability on PG&E's shares grew heavier. Because it was well-understood that PG&E would be reimbursed for damages by fires to which it wasn't culpable, the Company's disclosure of insurance coverage and potential adverse impacts to the Company signaled that at least some apportionment of fault for the North Bay Fires would be laid on PG&E's doorstep. For example, a Guggenheim stock analyst published a report that day reacting to this news, noting that PG&E "had slid even further in the early afternoon actually as well, following the company's 8-K disclosing the utility's $800mm in liability insurance, which we noted had not been disclosed previously (since it had been renewed following the Butte fire)."

492. Similarly, on October 15, 2017, Goldman Sachs issued an analyst report that lowered estimates for PG&E earnings on concerns regarding amount of insurance disclosed and the "overall size and magnitude" of the damages associated with the North Bay Fires, stating:

> [W]e note PCG's only disclosure is that at least $800mn in liability coverage exists – but view, given the potential size and scale of this event, as well as the Fact insurers continue making payments on a 2015 wild[fire], that any cap could require PCG to seek recovery of costs from customers or **cause PCG to self fund any of these costs**.

493. Thus, the October 13, 2017 disclosure was an acknowledgement by PG&E that the Company's financial liabilities in connection with the North Bay Fires could far outstrip its available insurance coverage by billions of dollars. This was a partial corrective disclosure of the falsity of Misstatements 1-3, which falsely touted PG&E's inspection and compliance programs, including the Company's misleading claim that it inspected every mile of its power lines every year. *See* Section VII, *supra* (Misstatement 1). It was also a materialization of the risks concealed by PG&E's misrepresentations and fraudulent scheme—specifically, the true risk that PG&E's systemic compliance deficiencies and pattern of violations would cause wildfires, and that its investors would suffer economic harm because the Company would not be able to cover its resulting financial liability.

### 3. December 20, 2017 – Corrective Disclosure and/or Materialization of Concealed Risk

#### (a) The Market Continued to Learn the Extent and Effects of PG&E's Pattern of Violations Concealed by Fraud

494. As discussed in Section VII, *supra*, the Exchange Act Defendants' misstatements tied PG&E's "progress on safety" and its ability to mitigate wildfire risk to the Company's ability to increase its dividend.

495. On December 20, 2017, after the market closed, PG&E filed a press release on Form 8-K with the SEC titled "PG&E Announces Suspension of Dividend, Citing Uncertainty Related to Causes and Potential Liabilities Associated with Northern California Wildfires." The filing included a press release in which the Company announced that it would be suspending its quarterly cash dividend. In the press release, PG&E stated in pertinent part:

> **SAN FRANCISCO, Calif.**-PG&E Corporation (NYSE: PCG) today announced that its Board of Directors has determined to **suspend the quarterly cash dividend on the Corporation's common stock**, beginning with the fourth quarter of 2017, **citing uncertainty related to causes and potential liabilities associated with the extraordinary October 2017 Northern California wildfires**.
>
> In addition, the Board of Directors of the Corporation's utility subsidiary, Pacific Gas and Electric Company, **determined to suspend the dividend on the utility's preferred stock, beginning with the three-month period ending Jan. 31, 2018**, citing the same uncertainty.

> No causes have yet been identified for any of the unprecedented wildfires, which continue to be the subject of ongoing investigations.
>
> However, California is one of the only states in the country in which courts have applied inverse condemnation **to events caused by utility equipment**. This means that if a utility's equipment is found to have been a substantial cause of the damage in an event such as a wildfire - even if the utility has followed established inspection and safety rules - **the utility may still be liable for property damages and attorneys' fees associated with that event**.
>
> "After extensive consideration and in light of the uncertainty associated with the causes and potential liabilities associated with these wildfires as well as state policy uncertainties, the PG&E boards determined that suspending the common and preferred stock dividends is prudent with respect to cash conservation and is in the best long-term interests of the companies, our customers and our shareholders," said PG&E Corporation Chair of the Board Richard C. Kelly.

496. On this news, PG&E's share price fell $6.62, or 12.95%, to close at $44.50 on December 21, 2017, the following trading day. The stock experienced heavy trading volume, with over 52 million shares trading hands. The price of PG&E securities, however, remained artificially inflated, because the full extent and scope of the Company's safety deficiencies and pattern of violations remained concealed.

**(a) Market Commentators Covered PG&E's Share Price Decline**

497. Analysts explicitly attributed the drop in PG&E's share price to the December 20, 2017 disclosure. For example, on December 21, 2017, Guggenheim issued an analyst report stating that "PCG suspended its dividend due to the possibility that it could be held liable for the Sonoma county wildfires. **PCG shares fell 10% in after-hours trading yesterday after its announcement**."

498. Moreover, analysts understood PG&E's dividend suspension as a revelation that PG&E would bear a higher-than-expected level of responsibility—and thus liability—for the North Bay Fires. For example, a December 21, 2017 RBC Capital Markets report issued stated: "We downgrade PCG to Sector Perform following the Board's decision to suspend the dividend. **This unexpected decision suggests greater risk than we had assumed surrounding regulatory treatment of the October 2017 Northern California wildfires**."

499. Indeed, in a December 20, 2017 report, Deutsche Bank stated: "It also seems somewhat inevitable that the move will be read to some extent as **a tacit admission of guilt, or at least that PCG knows something the market does not, such as the likelihood of an incriminating CalFire investigation report**." Similarly, in a December 21, 2017 report, Evercore stated, "**PCG's decision to suspend the dividend may be seen by some as a tacit admission of guilt**."

500. Thus, PG&E's December 20, 2017 disclosure the Company's dividend suspension was a further acknowledgement that its financial liabilities in connection with the North Bay Fires could far outstrip its available insurance coverage by billions of dollars. This was a partial corrective disclosure of the falsity of Misstatements 1-7, which falsely touted PG&E's inspection and compliance programs, including the Company's misleading claims that it inspected every mile of its power lines every year (Misstatement 1) and doubled its vegetation management spending (Misstatement 5). *See* Section VII, *supra*. It was also a materialization of the risks concealed by PG&E's misrepresentations and fraudulent scheme—specifically, the true risk that PG&E's systemic compliance deficiencies and pattern of violations would cause wildfires, and that its investors would suffer economic harm because the Company would not be able to cover its resulting financial liability.

501. Exchange Act Individual Defendants' deceptive and manipulative acts during the Class Period entailed prioritizing short-sighted revenue, cost-cutting, and/or profit over safety, including diversion of funds from safety to raise PG&E's dividend and inflate PG&E's share price, and therefore related directly to their later decision to suspend PG&E's dividend entirely. It was foreseeable to Defendants that diverting funds from vegetation management, inspection, and equipment maintenance to maintain and increase the size of PG&E's dividend would contribute to the cause of catastrophic wildfires and, in turn, increase the likelihood that PG&E would need to suspend its dividend to bear the costs of the catastrophic wildfires PG&E caused. Diverting funds from vegetation management, inspection, and equipment maintenance made it more likely that PG&E would have to suspend its dividend to cover the costs and liabilities from catastrophic

wildfires it caused, unbeknownst to investors. Indeed, that is precisely what happened on December 20, 2017.

#### 4. May 25, 2018 – Corrective Disclosure and/or Materialization of Concealed Risk

##### (a) The Market Continued to Learn the Extent and Effects of PG&E's Pattern of Violations Concealed by Fraud

502. Analysts advised that the results of the Cal Fire investigation would have a material impact on PG&E's share price. For example, a May 23, 2018 analyst report by BoA Merrill Lynch surmised that: "**Outcomes from the CalFire investigations remain the largest overhang to shares, which will keep the story at a discount, in our view. Shares could also sharply re-rate higher if PCG is found to not be responsible for the wildfires**."

503. On Friday, May 25, 2018, Cal Fire issued a press release announcing the cause of four wildfires in Butte and Nevada counties ("May 2018 Press Release"), stating in relevant part:

> **CAL FIRE Investigators Determine Cause of Four Wildfires in Butte and Nevada Counties**
>
> Sacramento - After extensive and thorough investigations, CAL FIRE investigators have determined that four Northern California wildfires in last year's October Fire Siege were caused by trees coming into contact with power lines. The four fires, located in Butte and Nevada counties, are the first fire investigations from last October to be completed.
>
> CAL FIRE investigators were dispatched to the fires last year and immediately began working to determine their origin and cause. The Department continues to investigate the remaining 2017 fires, both in October and December, and will release additional reports as they are completed.
>
> The October 2017 Fire Siege involved more than 170 fires and charred more than 245,000 acres in Northern California. More than 11,000 firefighters from 17 states helped battle the blazes.
>
> Below is a summary of the four completed investigations:
>
> - The La Porte Fire, in Butte County, started in the early morning hours of Oct. 9 and burned a total of 8,417 acres, destroying 74 structures. There were no injuries to civilians or firefighters. CAL FIRE has determined the fire was caused by tree branches falling onto PG&E power lines. CAL FIRE investigators determined there were no violations of state law related to the cause of this fire.

- The McCourtney Fire, in Nevada County, started the evening of Oct. 8 and burned a total of 76 acres, destroying 13 structures. There were no injuries to civilians or firefighters. CAL FIRE has determined the fire was caused by a tree falling onto PG&E power lines. **The investigation found evidence that PG&E allegedly failed to remove a tree from the proximity of a power line, in violation of the state Public Resources Code section 4293.**

- The Lobo Fire, in Nevada County, started the evening of Oct. 8 and burned a total of 821 acres, destroying 47 structures. There were no injuries to civilians or firefighters. **CAL FIRE has determined the fire was caused by a tree contacting PG&E power lines. The investigation found evidence that Public Resources Code section 4293, which requires adequate clearance between trees and power lines, was allegedly violated.**

- The Honey Fire, in Butte County, started in the early morning hours of Oct. 9 and burned a total of 76 acres. There were no injuries to civilians or firefighters and no structures were destroyed. **CAL FIRE has determined the fire was caused by an Oak branch contacting PG&E power lines. The investigation found evidence that Public Resources Code 4293, which requires adequate clearance between trees and power lines, was allegedly violated.**

The McCourtney, Lobo, Honey investigations have been referred to the appropriate county District Attorney's offices for review.

504. Then, early on Tuesday, May 29, 2018, prior to the start of trading after Memorial Day weekend, PG&E filed a report on Form 8-K with the SEC. Rather than contradicting any of Cal Fire's findings, the filing quoted extensively from the May 25, 2018 Cal Fire release described above, including the role of PG&E equipment in starting all four of the relevant North Bay Fires, Cal Fire's findings that three of the fires were caused by violations of California safety laws, and Cal Fire's decision to refer criminal investigations regarding these three fires to the relevant district attorneys' offices. The filing also stated: "It is reasonably possible that facts could emerge that lead PG&E Corporation and the Utility to believe that a loss is probable, resulting in an accrued liability in the future, the amount of which could be substantial."

505. On this news, PG&E's share price fell $2.32, or 5.19%, to close at $42.34 on May 29, 2018, the following trading day. The stock experienced unusually high trading volume that day, with over 5.7 million shares changing hands on May 29, 2018. The price of PG&E securities, however, remained artificially inflated as investors waited for Cal Fire's findings for the remaining

wildfires and because the full extent and scope of PG&E's safety deficiencies and pattern of violations remained concealed.

#### (a) Market Commentators Covered PG&E's Share Price Decline

506. Analysts were surprised by the results of the Cal Fire reports. For example, Deutsche Bank stated in its May 28, 2018 report:

> From the investor perspective **the market should not be particularly surprised that PG&E's lines have been found to be involved in starting the fires. That said, the fact that this was the case in all four of the fires – and that violations were found in three of the four instances – will likely be seen as a negative data point.** Reading through the LaPorte fire investigation for other data points, investors may be concerned to note that the wind speeds around the time of the ignition do not seem to have been particularly high – with a maximum gust of 29 mph.

507. UBS Research published an analyst report that same day, noting that PG&E's potential liability "**ha[d] sparked a sharp discount in PCG shares**."

508. A May 29, 2018 Citigroup stated that the new Cal Fire reports specifically "link the fires to [PG&E's] **equipment**," "claim **improper vegetation management** for three of the fires," were "suggesting **negligence**" on PG&E's part, and "will support 'causation' and **likely lead to [PG&E] bearing the liability for damages under Inverse Condemnation**." Moreover, the analyst noted that PG&E might even be liable for "Gross Negligence," and could be barred from recovering costs from ratepayers insofar as it would be "tough to meet" the "prudent manager" standard that is necessary for such a recovery.

509. Thus, the May 25-29, 2018 disclosures revealed information concerning PG&E's pattern of violations. This was a partial corrective disclosure of the falsity of Misstatements 1-7, which falsely touted PG&E's inspection and compliance programs, including the Company's misleading claims that it inspected every mile of its power lines every year (Misstatement 1) and doubled its vegetation management spending (Misstatement 5). *See* Section VII, *supra*. It was also a materialization of the risks concealed by PG&E's misrepresentations and fraudulent scheme—specifically, the true risk that PG&E's systemic compliance deficiencies and pattern of violations would cause wildfires, and that its investors would suffer economic harm because the Company would not be able to cover its resulting financial liability.

### 5. June 8, 2018 – Corrective Disclosure and/or Materialization of Concealed Risk

510. On Friday, June 8, 2018, after the market closed, Cal Fire issued another press release announcing the causes of twelve wildfires in Mendocino, Humboldt, Butte, Sonoma, Lake, and Napa Counties, stating in relevant part:

> **CAL FIRE Investigators Determine Causes of 12 Wildfires in Mendocino, Humboldt, Butte, Sonoma, Lake, and Napa Counties**
>
> **Sacramento** – After extensive and thorough investigations, CAL FIRE investigators have determined that 12 Northern California wildfires in the October 2017 Fire Siege were caused by electric power and distribution lines, conductors and the failure of power poles.
>
> The October 2017 Fire Siege involved more than 170 fires and burned at least 245,000 acres in Northern California. About 11,000 firefighters from 17 states and Australia helped battle the blazes.
>
> CAL FIRE investigators were dispatched to the fires last year and immediately began working to determine their origin and cause. CAL FIRE investigators continue to investigate the remaining 2017 fires, both in October and December, and will release additional reports as they are completed. The cause of four Northern California fires were released on May 25.
>
> Below is a summary of the findings from the 12 completed investigations:
>
> The **Redwood Fire**, in Mendocino County, started the evening of Oct. 8 and burned a total of 36,523 acres, destroying 543 structures. There were nine civilian fatalities and no injuries to firefighters. **CAL FIRE has determined the fire started in two locations and was caused by tree or parts of trees falling onto PG&E power lines**.
>
> The **Sulphur Fire**, in Lake County, started the evening of Oct. 8 and burned a total of 2,207 acres, destroying 162 structures. There were no injuries. **CAL FIRE investigators determined the fire was caused by the failure of a PG&E owned power pole, resulting in the power lines and equipment coming in contact with the ground**.
>
> The **Cherokee Fire**, in Butte County, started the evening of Oct. 8 and burned a total of 8,417 acres, destroying 6 structures. There were no injuries. **CAL FIRE investigators have determined the cause of the fire was a result of tree limbs coming into contact with PG&E power lines**.
>
> The **37 Fire**, in Sonoma County, started the evening of Oct. 9 and burned a total of 1,660 acres, destroying 3 structures. There were no injuries. **CAL FIRE investigators have determined the cause of the fire was electrical and was associated with the PG&E distribution lines in the area**.

> The **Blue Fire**, in Humboldt County, started the afternoon of Oct. 8 and burned a total of 20 acres. There were no injuries. **CAL FIRE investigators have determined a PG&E power line conductor separated from a connector, causing the conductor to fall to the ground, starting the fire**.
>
> The Norrbom, Adobe, Partrick, Pythian and Nuns fires were part of a series of fires that merged in Sonoma and Napa counties. These fires started in the late-night hours of Oct. 8 and burned a combined total of 56,556 acres, destroying 1355 structures. There were three civilian fatalities.
>
>> **CAL FIRE investigators determined the Norrbom Fire was caused by a tree falling and coming in contact with PG&E power lines**.
>>
>> **CAL FIRE investigators determined the Adobe Fire was caused by a eucalyptus tree falling into a PG&E powerline**.
>>
>> **CAL FIRE investigators determined the Partrick Fire was caused by an oak tree falling into PG&E powerlines**.
>>
>> **CAL FIRE investigators determined the Pythian Fire was caused by a downed powerline after PG&E attempted to reenergize the line**
>>
>> **CAL FIRE investigators determined the Nuns Fire was caused by a broken top of a tree coming in contact with a power line**.
>
> The **Pocket Fire**, in Sonoma County, started the early morning hours of Oct. 9 and burned a total of 17,357 acres, destroying 6 structures. There were no injuries. **CAL FIRE has determined the fire was caused by the top of an oak tree breaking and coming into contact with PG&E power lines**.
>
> The **Atlas Fire**, in Napa County, started the evening of Oct. 8 and burned a total of 51,624 acres, destroying 783 structures. There were six civilian fatalities. **CAL FIRE investigators determined the fire started in two locations. At one location, it was determined a large limb broke from a tree and came into contact with a PG&E power line. At the second location, investigators determined a tree fell into the same line**.
>
> **CAL FIRE's investigations have been referred to the appropriate county District Attorney's offices for review in eight of the 12 fires - Sulphur, Blue, Norrbom, Partrick, Pythian, Adobe, Pocket and Atlas - <u>due to evidence of alleged violations of state law</u>.**

511. While this news release did not discuss specific violations found, it disclosed that the causes of the fires implicated PG&E equipment and vegetation management, as well as the fact that Cal Fire referred its investigations to the relevant district attorneys of five counties due to the evidence Cal Fire discovered regarding state law violations.

**(a) The Market Continued to Learn the Extent and Effects of PG&E's Pattern of Violations Concealed by Fraud**

512. On Saturday, June 9, 2018, *Bloomberg* published an article entitled "PG&E May Face Criminal Charges After Probe of Deadly Wildfires." The article reported, in part, that following an investigation into the causes of wildfires "that altogether killed 44 people, consumed thousands of homes and racked up an estimated $10 billion in damages" in October 2017, California's fire agency "found evidence of alleged violations of law by PG&E in connection with" the fires. Specifically, the state's investigation found "that PG&E equipment caused at least 12 of the wine country blazes."

513. Early on Monday, June 11, 2018, prior to the start of trading, PG&E filed a Current Report on Form 8-K with the SEC. Rather than contradicting any of Cal Fire's findings, the filing quoted extensively from the June 8, 2018 Cal Fire release described above, including the role of PG&E equipment in starting all 12 of the relevant North Bay Fires and Cal Fire's decision to refer criminal investigations regarding eight of the fires to the relevant district attorneys' offices "due to evidence of alleged violations of state law." The filing also admitted that Defendants expected to "record a **significant liability** for losses associated with" at least 14 of the North Bay Fires, as follows:

> Although the Utility's analysis is ongoing regarding the fires that were the subject of the June 8, 2018 and May 25, 2018 CAL FIRE news releases:
>
> - for the La Porte, McCourtney, Lobo, Honey, Redwood, Sulphur, Cherokee, Blue, Pocket and Sonoma/Napa merged fires (which include Nuns, Norrbom, Adobe, Partrick and Pythian), based on the current state of the law on inverse condemnation, the information currently available to the Utility, and the CAL FIRE determinations of cause, **PG&E Corporation and the Utility currently expect that they will record a significant liability for losses associated with such fires** in PG&E Corporation and the Utility's condensed consolidated financial statements to be included in their Form 10-Q for the quarterly period ending June 30, 2018 (the "Q2 financial statements"); and
>
> - for the Atlas and Highway 37 fires, PG&E Corporation and the Utility do not believe a loss is probable at this time, given the information currently available. However, **it is reasonably possible that facts could emerge that lead PG&E Corporation and the Utility to believe that a loss is probable**, resulting in the accrual of a liability in the future, the amount of which could be significant.

514. Following these disclosures, PG&E's share price fell $1.69, or 4.08%, to close at $39.76 on June 11, 2018, the following trading day. The stock experienced unusually high trading volume that day, with over 12.6 million shares trading hands on June 11, 2018. The price of PG&E securities, however, remained artificially inflated as the full extent and scope of PG&E's safety deficiencies and pattern of violations remained concealed.

**(a) Market Commentators Covered PG&E's Share Price Decline**

515. The market was surprised by the number and range of alleged violations of safety laws in the Cal Fire report. For example, in J.P. Morgan's analyst report on June 10, 2018, it stated that "**[w]ith this batch of reports, we find the range of 'alleged' law violations noteworthy. CAL FIRE opined on law regarding not just vegetation management but also pole and conductor failure and the re-energizing of equipment by the company**." Deutsche Bank also stated in its June 10, 2018 analyst report that "**[o]verall, Friday's data points are likely to be read as another negative for PCG, given the high percentages of incidents blamed on the company's lines and referred to DAs**," and further that PG&E's "liability exposure . . . **remains the critical one for investors**." Guggenheim further reiterated its "Sell" recommendation on June 10, 2018 because "[o]ut of the 16 fires now investigated thus far, **PCG was found to have allegedly violated state law in 11 of those instances with Cal Fire referring its evidence to the District Attorney – likely a strong indictment to potential criminal and civil cases/lawsuits against the company**." The analyst from Guggenheim noted that "all signs seem to point to PCG being imprudent operators in the majority of instances, which would therefore mean it should assume liability." Accordingly, the revelations about the number and range of PG&E's safety violations proximately caused the Company's share price decline on June 8-11, 2018.

516. On June 11, 2018, *Bloomberg* published an article reporting: "The company said Monday it expects to record a 'significant liability' for fires, and the shares plunged the most in five months at the open" of trading. The article also noted that "[t]he alleged violations could also expose PG&E to criminal charges only two years after the San Francisco company was convicted of breaking safety rules that led to a deadly gas pipeline explosion in San Bruno, California."

517. Thus, the June 8, 2018 disclosure revealed information concerning PG&E's pattern of violations and the "significant liability" that the Company would incur as a result,. This was a partial corrective disclosure of the falsity of Misstatements 1-8, which falsely touted PG&E's inspection and compliance programs, including the Company's misleading claims that it inspected every mile of its power lines every year (Misstatement 1) and doubled its vegetation management spending (Misstatement 5). *See* Section VII, *supra*. It was also a materialization of the risks concealed by PG&E's misrepresentations and fraudulent scheme—specifically, the true risk that PG&E's systemic compliance deficiencies and pattern of violations would cause wildfires, and that its investors would suffer economic harm because the Company would not be able to cover its resulting financial liability.

**6. November 8-9, 2018 – Corrective Disclosure and/or Materialization of Concealed Risk**

518. The Camp Fire began in the early morning of November 8, 2018 and grew steadily throughout the day. However, as of the close of trading that day, no prominent news sources had reported that PG&E's equipment was implicated in the Camp Fire or that the Company's pattern of violations may have been the cause of the fire.

**(a) The Market Began to Learn the Extent and Effects of PG&E Pattern of Violations Concealed by Fraud**

519. After the close of trading on November 8, 2018, PG&E announced via its official Twitter.com account that it had decided not to implement its procedure for shutting off power lines during dangerous weather conditions. This communication was the first indication that PG&E's equipment and decisions may have contributed to the Camp Fire. While the announcement began to disclose the truth regarding PG&E's responsibility for the Camp Fire, it also contained a further false reassurance that PG&E's decision was because "weather conditions did not warrant this safety measure," as detailed above.

520. Also after the close of trading on November 8, 2018, PG&E filed an Electric Incident Report with the CPUC stating that PG&E had experienced a problem with its Caribou-Palermo high-voltage transmission line on "Pulga Rd. Pulga, Butte County" only fourteen minutes before the Camp Fire began, "in the area of the Camp Fire." The same report acknowledged that

an aerial patrol later in the day showed "damage" to the same transmission tower. However, this information undermining PG&E's statements about compliance and prioritizing safety during the Class Period would not be reported by major news outlets until the next day, November 9, 2018.

521. On this news, PG&E's share price fell $7.88, or approximately 19.7% to close at $39.92 on November 9, 2018, the following trading day. The stock experienced unusually high trading volume of 23,627,100 shares. The price of PG&E securities, however, remained artificially inflated as the full extent and scope of PG&E's safety deficiencies and pattern of violations.

**(a) Market Commentators Covered PG&E's Share Price Decline**

522. Market commentators confirmed that PG&E's share price declined due to news connecting PG&E to the Camp Fire. For example, on November 9, 2018, CNBC published an article entitled "Shares of electricity provider PG&E have worst day since 2002 as wildfires ravage California."[144] The article noted that "Shares of PG&E plunged more than 16 percent on Friday as wildfires continued to rage through California. This was the biggest one-day decline for the stock since Aug. 8, 2002. . . ." It further observed: "PG&E also traded 23.6 million shares, about five time [sic] its average 30-day volume." The article was initially published at 1:03 p.m. Eastern Time (*i.e.,* prior to the close of trading) and updated at 4:19 p.m. the same day (after the close of trading), yet made no mention of PG&E's Electric Incident Report tying the Company's equipment to the origin of the Camp Fire.

523. On November 9, 2018, Deutsche Bank described how investors were "understandably concerned" given the emerging news of the Camp Fire and S.B. 901's lack of provisions regarding 2018 wildfires:

> While there has been no specific indication of utility lines being involved in these ignitions, **investors are understandably concerned** considering that the recently passed wildfire bill (SB901) left utilities particularly exposed to 2018 fires if their infrastructure ends up being implicated. This is due to the fact that the so-called stress test or customer harm threshold is only applicable to 2017 fire losses. Meanwhile, the new reasonableness standard which the CPUC will use to

[144] Fred Imbert, *Shares of Electricity Provider PG&E Have Worst Day Since 2002 as Wildfires Ravage California*, CNBC (Nov. 9, 2018), https://www.cnbc.com/2018/11/09/shares-of-electricity-provider-pge-plunge-as-wildfires-ravage-california.html#:~:text=Shares%20of%20PG%26E%20plunged%20more,its%20average%2030%2Dday%20volume.

determine eligibility for recovery of liability costs from customers only kicks in from 2019.

524. A Barclays report from the same day supported the conclusion that investor concern regarding the Camp Fire and its lack of coverage by S.B. 901 were contributing to the stock price drop:

> **We believe the lack of explicit language for 2018 wildfires in SB 901 may be increasing market pressure**. SB 901 specifically addresses 2017 wildfire liability by tasking the CPUC with creating a cap on IOU [Investor-Owned Utility] liability to ensure safe and affordable service. The bill addresses wildfire liability in 2019 and beyond by creating a securitization mechanism. However, specific language addressing 2018 liability coverage is noticeably absent. The general consensus among CA stakeholders is that 2018 will be treated in a similar fashion to 2017, however the lack of a specific prescription may be heightening investor concern if the Camp Fire is found to be started by PCG.

525. This report emphasized that PG&E's decision not to de-energize its lines could become a source of liability if PG&E equipment was found to be involved, stating: "we expect PCG's decision not to de-energize lines after warning of high fire risk will be investigated if the fire is found to have been sparked by PCG equipment."

526. Moreover, as explained *supra*, investors feared that, in addition to any potential liability PG&E would incur for the North Bay Fires or Camp Fire as a result of the inverse condemnation doctrine, PG&E also faced the risk of incurring material fines or penalties from regulators.

527. Thus, the November 8, 2018 disclosure revealed information concerning the potential involvement of PG&E equipment in the Camp Fire, and the Company's decision not to de-energize its lines in the vicinity. This was a partial corrective disclosure of the falsity of Misstatements 1-13, which falsely touted PG&E's inspection and compliance programs, including the Company's misleading claims regarding its illusory shutoff protocol (Misstatements 10-11 and 13). *See* Section VII, *supra*. It was also a materialization of the risks concealed by PG&E's misrepresentations and fraudulent scheme—specifically, the true risk that PG&E's systemic compliance deficiencies and pattern of violations would cause wildfires, and that its investors

would suffer economic harm because the Company would not be able to cover its resulting financial liability.

### 7. November 9-12, 2018 – Corrective Disclosure and/or Materialization of Concealed Risk

#### (a) The Market Continued to Learn the Extent and Effects of PG&E Pattern of Violations Concealed by Fraud

528. On Friday, November 9, 2018, investors began to learn the true likelihood and extent to which PG&E would bear financial responsibility for the Camp Fire's destruction, *i.e.*, without eligibility for reimbursement by ratepayers. *See* Section IX, *supra*. After the close of trading that day, news outlets began to report that there was evidence PG&E caused the Camp Fire based on the Electric Incident Report that PG&E filed with the CPUC the previous evening. The first such report, written by Pulitzer Prize-winning journalist Matthias Gafni and published in *The Mercury News*, occurred at 5:49 p.m. EST on November 9, 2018.[145]

529. Further, news outlets also began to report on the fact that state officials were investigating PG&E's electrical equipment as a cause of the Camp Fire, based on the Electric Incident Report. For example, on November 9, 2018, *The Gazette* issued an article containing commentary from Scott McLean, a spokesman for Cal Fire, stating that "State officials are investigating electrical equipment as one of several possible causes of the fire in the north."[146]

530. On Saturday, November 10, 2018, it was reported that the town of Paradise was destroyed as the Camp Fire continued to spread.[147] It was further reported that the fire had raced through the communities of Concow and Magalia, causing at least nine fatalities and the loss of at

---

[145] Matthias Gafni, *PG&E Power Lines May Have Sparked Deadly Camp Fire, According To Radio Transmissions,* The Mercury News (updated Nov. 12, 2018 12:03 PM), https://www.mercurynews.com/2018/11/09/pge-power-lines-may-have-sparked-deadly-butte-county-wildfire-according-to-radio-transmissions/.

[146] David R. Baker, *California wildfire quadruples in size*, The Gazette (Nov. 9, 2018), available at https://www.thegazette.com/nation-world/california-wildfire-quadruples-in-size/#:~:text=State%20officials%20are%20investigating%20electrical,Los%20Angeles%20County%20Fire%20officials.

[147] Anna Sciacca and Lisa Krieger, *'Our Town Has Burned': Most of Paradise is Lost After Camp Fire Ravages the Area*, Enterprise Record (Nov. 10, 2018), https://www.chicoer.com/2018/11/10/our-town-has-burned-most-of-paradise-is-lost-after-camp-fire-ravages-the-area/.

least 6,453 homes and 260 commercial buildings.[148] The Camp Fire grew in size and severity over the weekend, with reports on Saturday that it had already consumed 70,000 acres and was only 5 percent contained—with winds pushing it toward Chico and Yankee Hill. By Sunday, November 11, 2018, it was reported that more than 200 people were missing, the death toll had risen to 29, and the fire—which had by then consumed 111,000 acres—was only 25 percent contained.[149]

531. Then on Monday, November 12, 2018, the next trading day, it was reported that BetsyAnn Cowley, a property owner in Pulga, received an email from PG&E the **day before** the Camp Fire ignited; the email communicated that the Utility needed access to her property to repair a transmission line that was "sparking." It was further reported that the incident occurred near the origin point of the Camp Fire, with Cowley's property next to the junction of Pulga and Camp Creek Road.

532. On the above news, PG&E's share price fell $6.94, or 17.385%. to close at $32.98 on November 12, 2018. The stock experienced a trading volume of 44,033,200 on November 12, 2018. The price of PG&E securities, however, remained artificially inflated as the full extent and scope of PG&E's safety deficiencies and pattern of violations remained concealed.

**(a) Market Commentators Covered PG&E's Share Price Decline**

533. Investors were concerned over these disclosures—that PG&E's equipment was implicated in the Camp Fire and that the Company's pattern of violations was likely the cause of the fire, including the likely import for PG&E's liability of Cowley's comments to the press regarding PG&E's knowledge of transmission line problems in the area. As a result, PG&E's stock price continued to drop. As the *San Francisco Chronicle* reported on November 12, 2018, "Cowley's revelation came as shares of Pacific Gas and Electric Co.'s parent company plummeted Monday amid concerns from investors about the utility's liability connected to the Camp Fire."[150]

---

[148] *Id.*

[149] Melody Gutierrez, *More than 200 Remain Missing in Camp Fire*, San Francisco Chronicle (Nov. 8, 2018), https://www.sfchronicle.com/california-wildfires/article/100-missing-in-Camp-Fire-butte-county-death-toll-13382433.php.

[150] J.D. Morris and Kurtis Alexander, *Homeowner's Claim on PG&E Work Raises Questions on Camp Fire's Origin*, San Francisco Chronicle (Nov. 12, 2018),

534. Similarly, a Wells Fargo analyst report observed the same day that "[t]he Camp Fire is in PCG's service territory and there are initial indications that the company's transmission infrastructure may have been a root cause of the fire pending an investigation by Cal Fire." Likewise, a Morgan Stanley analyst report made explicit mention of PG&E's Electric Incident Report and the fact that PG&E's utility experienced an outage on the Caribou-Palermo 115 kV transmission line, stating:

> PG&E has filed an electric safety incident report with the CPUC (here). "The utility experienced an outage on the Caribou-Palermo 115 kV Transmission line in Butte County. In the afternoon of November 8, PG&E observed by aerial patrol damage to a transmission tower on the Caribou-Palermo 115 kV Transmission line, approximately one mile north-east of the town of Pulga, in the area of the Camp Fire.

535. A Macquarie Research analyst report on November 13, 2018 estimated PG&E's fire-related liabilities at about $8 billion, while noting that the real measure of PG&E's liability could be higher given that the Camp Fire was not yet contained:

> We've reduced our [target price] to US$45 from US$57, is based on 10.4x our '20E EPS vs 13.6x previously. Our new [target price] reflects incremental **~US$8bn** in fire-related liabilities, which we hope proves excessive given the stress test included in the SB901, **but we have no way to assess the potential liabilities as the fire is only 30% contained**.

536. A November 13, 2018 Bloomberg Intelligence report remarked that the analyst **expected** PG&E's liability to **exceed its total equity value** absent additional assistance from the California government, and that such a bailout was not certain: "Unless mitigated by regulators, we expect PG&E's write-offs could exceed the company's total equity. California's utility owners are dangerously squeezed between two forces: Onerous inverse-condemnation rule makes utilities liable for most of the billions in fire damage, but powerful political resistance prevents customer bills from rising much above inflation."

537. Moreover, as explained *supra*, investors feared that, in addition to any potential liability PG&E would incur for the North Bay Fires or Camp Fire as a result of the inverse

---

https://www.sfchronicle.com/california-wildfires/article/PG-E-stock-hammered-on-wildfire-fallout-13384830.php.

condemnation doctrine, PG&E also faced the risk of incurring material fines or penalties from regulators.

538. Thus, the November 9-12, 2018 disclosures revealed information about the increasing likelihood PG&E would be held financially liable for the destruction caused by the Camp Fire, and the magnitude of that potential liability. This was a partial corrective disclosure of the falsity of Misstatements 1-13, which falsely touted PG&E's inspection and compliance programs, including the Company's misleading claims regarding its illusory shutoff protocol (Misstatements 10-11 and 13). *See* Section VII. It was also a materialization of the risks concealed by PG&E's misrepresentations and fraudulent scheme—specifically, the true risk that PG&E's systemic compliance deficiencies and pattern of violations would cause wildfires, and that its investors would suffer economic harm because the Company would not be able to cover its resulting financial liability.

### 8. November 13-14, 2018 – Corrective Disclosure and/or Materialization of Concealed Risk

#### (a) The Market Continued to Learn the Extent and Effects of PG&E Pattern of Violations Concealed by Fraud

539. After the close of trading on November 13, 2018, PG&E released a Form 8-K that showed a much bleaker picture of PG&E's deteriorating financial situation than investors had reason to previously expect, even calling into question its ability to remain solvent in the face of mounting evidence of its liability for the Camp Fire. The SEC filing admitted, among other things, that PG&E's and the Utility's revolving credit facilities were fully drawn and that its liability for the Camp Fire could exceed its insurance:

> **Item 2.03. Creation of a Direct Financial Obligation or an Obligation Under an Off-Balance Sheet Arrangement of a Registrant**
>
> As of November 13, 2018, Pacific Gas and Electric Company ("Utility"), a subsidiary of PG&E Corporation, and PG&E Corporation have aggregate borrowings outstanding under their respective revolving credit facilities of $3.0 billion and $300 million, respectively. . . . **No additional amounts are available under the Utility's and PG&E Corporation's respective revolving credit facilities**.
>
> * * *
>
> **Item 8.01 Other Events.**

***Camp Fire***

> On November 8, 2018, a wildfire began near the city of Paradise, Butte County, California (the "Camp Fire"), located in the service territory of the Utility. . . .
>
> As previously reported, during the third quarter of 2018, PG&E Corporation and the Utility renewed their liability insurance coverage for wildfire events in an aggregate amount of approximately $1.4 billion for the period from August 1, 2018 through July 31, 2019. . . .
>
> While the cause of the Camp Fire is still under investigation, if the Utility's equipment is determined to be the cause, the Utility could be subject to significant liability in excess of insurance coverage that would be expected to have a material impact on PG&E Corporation's and the Utility's financial condition, results of operations, liquidity, and cash flows.

540. On this news, PG&E's share price fell $7.13, or 21.791% to close at $25.59 on November 14, 2018. The stock experienced high trading volume of 53,543,100. The price of PG&E securities, however, remained artificially inflated as the full extent and scope of PG&E's safety deficiencies and pattern of violations remained concealed.

**(a) Market Commentators Covered PG&E's Share Price Decline**

541. Analyst commentary attributed the drop in PG&E's stock price to news about PG&E's insufficient insurance coverage and deteriorating financial situation, including the chance of bankruptcy, revealed in PG&E's Form 8-K disclosures published after the market closed the previous day.

542. For example, Wells Fargo issued an analyst report on November 14, 2018 that linked PG&E's share price decline to the filing of the Company's Form 8-K, stating:

> Shares of PCG are down 30% versus -1% for the S&P Utilities intraday and, since the Camp Fire ignited on 11/8, are now down 53% versus -1% for the S&P Utilities. **We attribute the latest weakness to an 8-K filed yesterday (11/13) after-the-close that disclosed that PCG has fully drawn both the utility's $3B and the parent's $300M revolving credit facilities "for greater financial flexibility" purposes**. We consider the development unsettling but do not believe it necessarily means that PCG is close to filing for bankruptcy.

543. CNBC reported that PG&E's Form 8-K disclosures were responsible for the drop in stock price on November 14, 2018:

> Shares of utility PG&E fell 21 percent on Wednesday after the company said that if its equipment is responsible for the "Camp Fire" burning in Northern California, the cost of the damage would exceed its insurance coverage and **harm its financial health**. . . . "With these borrowings, the entire credit facility has been drawn and PG&E now has $3.5 billion of cash on its balance sheet," Citi analyst Praful Mehta wrote in a note Wednesday. "We think the primary driver could be a concern around a downgrade to a non-investment grade credit rating and the liquidity requirements as a result of the downgrade."[151]

544. Similarly, a November 14, 2018 Bloomberg Intelligence report also connected PG&E's Form 8-K disclosures to its share price decline afterward, stating that the filing indicated the Company's own concern about bankruptcy:

> **The abrupt drawdown of its entire $3.3 billion in revolving credit suggests to us that PG&E (PCG -22%) is concerned about a near-term cash and credit crunch**. The company warned of bankruptcy earlier this year, and **the situation is more desperate now**. If found liable for California's Camp Fire, which may match or surpass 2017's $15 billion in damages, the total exceeds PG&E's book equity and annual revenue.

545. Moreover, as explained *supra*, investors feared that, in addition to any potential liability PG&E would incur for the North Bay Fires or Camp Fire as a result of the inverse condemnation doctrine, PG&E also faced the risk of incurring material fines or penalties from regulators.

546. Thus, the November 13-14, 2018 disclosures revealed information about the increasing likelihood PG&E would be held financially liable for the destruction caused by the Camp Fire, and its inability to bear such liability. This was a partial corrective disclosure of the falsity of Misstatements 1-14, which falsely touted PG&E's inspection and compliance programs, including the Company's misleading claims regarding its illusory shutoff protocol (Misstatements 10-11 and 13). *See* Section VII. It was also a materialization of the risks concealed by PG&E's misrepresentations and fraudulent scheme—specifically, the true risk that PG&E's systemic compliance deficiencies and pattern of violations would cause wildfires, and that its investors

[151] Thomas Franck, *PG&E Plunges 21% Amid Disclosure of an 'Electric Incident' Just Before Wildfire*, CNBC (Nov. 14, 2018), https://www.cnbc.com/2018/11/14/pge-plunges-20percent-after-disclosing-an-electric-incident-just-before-fire.html.

would suffer economic harm because the Company would not be able to cover its resulting financial liability.

**9. November 15, 2018 – Corrective Disclosure and/or Materialization of Concealed Risk**

**(a) The Market Continued to Learn the Extent and Effects of PG&E Pattern of Violations Concealed by Fraud**

547. On November 15, 2018, Cal Fire announced that it had identified a second ignition point for the Camp Fire.[152] Specifically, a news report disclosed that Cal Fire was conducting a thorough investigation into a second cause of the fire "outside Concow [] on Concow Road . . . somewhere between Mountain Pine Lan and Rim Road"—an area under PG&E's Big Bend 1101 12k2 distribution line that would have been subject to PG&E's ESRB-8 Shutoff Protocol. This news further evidenced the extent of PG&E's responsibility for the Camp Fire, undermining the Company's assurances to investors that it would comply with safety regulations and prioritize safety, detailed above.

548. On this news, PG&E's share price fell $7.85, or 30.676% to close at $17.74 on November 15, 2018. The stock experienced its highest trading volume during the Class Period of 107,155,700 on November 15, 2018.

**(a) Market Commentators Covered PG&E's Share Price Decline**

549. Market commentary confirmed that the November 15, 2018 decline in PG&E's share price was due to mounting evidence of PG&E's liability for the Camp Fire and chance of bankruptcy, the true risk of which was concealed by PG&E's false and misleading statements and omissions.[153] For example, on November 15, 2018, UBS issued an analyst report mentioning the bank's exposure to PG&E debt, stating that "**[w]ith headlines indicating that PG&E Corp.**

[152] Andre Byik, *Camp Fire Investigation Leads To Possible Second Origin Away From Pulga*, Enterprise-Record (updated Nov. 15, 2018 10:06 PM), https://www.chicoer.com/2018/11/15/camp-fire-investigation-leads-to-another-area-away-from-pulga/.

[153] As explained *supra*, investors feared that, in addition to any potential liability PG&E would incur for the North Bay Fires or Camp Fire as a result of the inverse condemnation doctrine, PG&E also faced the risk of incurring material fines or penalties from regulators.

**equipment may be associated with California wildfires** and PCG stock under considerable pressure, **we examined our coverage universe's exposure to PG&E debt**."

550. Further, on November 15, 2018, CNN published a news article commented on PG&E's overwhelming liabilities, stating that "Moody's said earlier this week that it could cost up to $6.8 billion, while Citigroup estimates the damages could be as high as $15 billion. PG&E may not have enough to cover this cost, let along legal fees or fines it might have to pay."

551. Indeed, PG&E's share price declined until CPUC President Michael Picker commented after the close of trading that day that he did not want the Company to become bankrupt. A *Bloomberg* article reported: "His comments capped a roller-coaster week for PG&E shares. They lost about two-thirds of their value during several days of free fall, then partially rebounded Friday after Picker said he doesn't want the company to slide into bankruptcy."[154]

552. A J.P. Morgan report from November 16, 2018 noted that the market was affected by continued uncertainty over California's willingness to aid PG&E:

> **if one assumes for sake of argument a $30Bn grand total of liabilities for the 2017-18 events for PCG, a 40 year amortization of securitized debt would still only be $10/month for the average customer; this would be even less if a multibillion dollar stress test cap was absorbed by the company;** it is a small price to pay for safe electric service and environmental goals. We remain focused on upcoming policymaker statements on the issue, and the pending CPUC implementation of securitization and stress-test mandates created with SB901. We acknowledge the long and challenging road ahead for investors, but see too much at stake for the state to realistically abandon utilities given the above considerations

553. Thus, the November 15, 2018 disclosure revealed information about the increasing likelihood PG&E would be held financially liable for the destruction caused by the Camp Fire, and its inability to bear such liability. This was a partial corrective disclosure of the falsity of Misstatements 1-14, which falsely touted PG&E's inspection and compliance programs, including the Company's misleading claims regarding its illusory shutoff protocol (Misstatements 10-11 and 13). *See* Section VII. It was also a materialization of the risks concealed by PG&E's

[154] David R. Baker, Mark Chediak & Romy Varghese, *PG&E State Review Puts Board Shuffle and Breakup on the Table*, Bloomberg (updated Nov. 17, 2018 12:00AM), https://www.bloomberg.com/news/articles/2018-11-16/pg-e-soars-after-regulator-eases-concern-on-bankruptcy-risk.

misrepresentations and fraudulent scheme—specifically, the true risk that PG&E's systemic compliance deficiencies and pattern of violations would cause wildfires, and that its investors would suffer economic harm because the Company would not be able to cover its resulting financial liability.

554. As a result of the Exchange Act Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Lead Plaintiff and other Class members have suffered significant losses and damages.

## XI. SCIENTER UNDER THE EXCHANGE ACT

555. The public was surprised to learn the extent to which PG&E had misled everyone about its lack of safety procedures related to wildfire prevention and responsibility for the North Bay and Camp Fires. Based on the extensive, widespread, and egregious nature of PG&E's underlying noncompliance and disregard for safety, there is a strong inference that PG&E itself, and the officers who spoke on its behalf and controlled its public statements, knew or should have known the truth. Moreover, those same facts create a strong inference that Defendants acted with scienter when they perpetrated a scheme to defraud investors by concealing PG&E's pattern of noncompliance with laws and regulations, including those governing its vegetation management and tower maintenance. As detailed below, they either knew the material, adverse facts about PG&E's lack of safety undermining and contradicting their public representations, or were culpably reckless in avoiding knowledge of and/or disregarding that reality. Thus, throughout the Class Period, Defendants acted with scienter (a) by making false and misleading statements and omissions about PG&E's financial health and compliance with relevant safety rules and regulations while having actual knowledge of their false or misleading nature, and/or (b) by acting in a deliberately reckless manner.

### A. PG&E Knew that Its Safety Practices Continued to Violate the Law Even After PG&E Was on Notice of the Butte Fire Safety Violations

556. As detailed above, PG&E's safety lapses caused the 2015 Butte Fire when a tree came into contact with PG&E's power line due to PG&E violating multiple safety regulations. At the time, the Butte Fire was the seventh most destructive wildfire in California history; it killed

two people, destroyed 921 homes, and destroyed more than 70,000 acres over 22 days. As noted above (*see* Section VI.C.1, *supra*) and described in more detail below, PG&E had a company policy to perversely incentivize its contractors to clear less vegetation than is safe.

557. Even after PG&E caused the disastrous Butte Fire through its serious fire safety lapses, PG&E made **no changes at all** to improve its vegetation management or compliance with safety regulations. In a deposition transcript that has not yet been made publicly available, PG&E's Vegetation Program Manager Richard Yarnell reportedly testified under oath: "PG&E—to the best of my knowledge, we have not made any changes as a result of this fire." Despite being on notice of its dangerous safety violations, neither the Company nor its officers made any changes to improve safety or compliance. Thus, they either knew, or should have presumed, that its violations continued unabated.

558. On February 27, 2019, *The Mercury News* published an article titled, "PG&E knew for years that repairs were needed on transmission lines in area of fatal Camp Fire." According to the article, energy officials had been warning PG&E about its fast-aging system of transmission lines for the better part of a decade. For example, according to a May 2017 CPUC filing, "In 2010 and again in 2015, the California Independent System Operator transmission plan identified the need to improve and upgrade this system to address potential overloads and power outages that would affect customers in the service area."

559. Also on February 27, 2019, *The Wall Street Journal* published an article titled, "PG&E Delayed Safety Work on Power Line That Is Prime Suspect in California Wildfire." The article stated that the Company had delayed for several years needed repairs to its high-voltage Caribou-Palermo transmission line, a source of the Camp Fire. PG&E had failed to fix the 100-year-old line despite informing federal regulators of its plans to repair and replace damaged sections of the line as early as 2013.

560. Specifically, PG&E stated in a July 2017 filing to FERC that it would embark on numerous repairs of the Caribou-Palermo system. The planned repairs and maintenance included new tower frames, steel poles, improved line tension and hardware upgrades. As PG&E stated in the filing: "The project has a forecasted capital expenditure of $30.3 million."

561. PG&E also proposed in July 2017 considerable work for the Caribou-Palermo line as part of the Company's annual request to FERC for rate changes. "The Caribou-Palermo 115kV circuit was analyzed as part of the 2013 NERC Assessment," PG&E stated, referring to an analysis by the North American Electric Reliability Corporation. The filing indicated the 2013 NERC study determined that well over 100 transmission line spans were perilously close to vegetation or trees. "The completed analysis identified 127 spans with clearance issues out of the 455 spans on the electric transmission line," PG&E stated in its 2017 FERC filing. PG&E never fixed the identified issues from the time it learned about them in 2013 as reflected in the July 2017 filing. PG&E's Caribou-Palermo transmission system would later be implicated in the 2018 Camp Fire.

562. On March 5, 2019, Judge Alsup, presiding over PG&E's criminal probation, issued a revised Order to Show Cause relating to PG&E's lack of compliance with vegetation management and other safety regulations. The Order contained the following findings summarizing the results of the federal court's probe into PG&E's actual knowledge of safety violations leading up to the North Bay and Camp Fires:

> PG&E's filings have included several relevant admissions. Significantly, PG&E acknowledged "that vegetation contact is the primary risk driver with respect to ignitions on its distribution lines." ("Vegetation" means trees and limbs in this context.) In 2016 alone, PG&E experienced approximately 1,400 wires down caused by vegetation contact. As PG&E reported to the CPUC, during 2015 and 2016, vegetation contact with conductors was the leading cause of the 486 fire ignitions associated with PG&E facilities, causing 37% of those fires. PG&E further admitted that as of June 2017, there were 3,962 unworked trees which PG&E had identified in 2016 as hazardous with the potential to "fall into or otherwise impact the conductors, towers or guy wires before the next inspection cycle."[155]

563. Thus, PG&E has admitted its **actual knowledge from 2015 to 2017** that its vegetation management practices did not comply with California safety regulations on the order of **thousands of violations per year**. PG&E has further admitted to **actually knowing** that its violations have **caused hundreds of wildfires per year since 2015**. However, PG&E never

[155] Second Order to Show Cause Why PG&E's Conditions of Probation Should Not Be Modified, PG&E Criminal Proceedings (N.D. Cal. Mar. 5, 2019), ECF No. 1027.

disclosed to investors that their own internal compliance reviews showed a lack of compliance on a huge scale.

564. Moreover, the Butte County District Attorney concluded "that the reckless actions of PG&E created the risk of a catastrophic fire . . . that PG&E knew of that risk and PG&E ignored the risk by not taking any action to mitigate the risk." Butte DA Report at 82.

565. In the time period of 2017 to 2018, after the North Bay Fires and leading up to the Camp Fire, PG&E's notice of its numerous and widespread safety violations was even stronger. For example, PG&E had known about the dangerous noncompliance of its Caribou-Palermo transmission line – the same line whose failure would cause the Camp Fire's first ignition point – since a **2014 internal Company email stated that "the likelihood of failed structures** [on the Caribou-Palermo line] **happening is high**."

### B. Safety Was Core to PG&E's Operations, and the Exchange Act Individual Defendants Were Directly Involved in It

566. In a January 16, 2019 filing to the CPUC, PG&E stated unequivocally that safety is its "core business," and as such, was the "focus" of Defendant Williams's activities as CEO: "Since the Utility is the sole operating subsidiary of PG&E Corporation, the activities of the PG&E Corporation CEO and President **focus on** the Utility's **core business**, including most notably **safety**."[156]

567. During the Class Period, PG&E repeatedly acknowledged that "[s]afety is at the heart of everything we do at PG&E" (Geisha Williams, July 27, 2017 Analyst Call), that safety was PG&E's "top priority" (Patrick Hogan, November 18, 2015 California Senate Sub-Committee Hearing), and that "[n]othing is more important than the safety of our customers, employees and the communities we serve" (Kevin Dasso, vice president of Electric Asset Management, May 10, 2017 Press Release). PG&E further represented to the public that PG&E's safety and compliance were closely monitored by the Company's management and the Exchange Act Individual

[156] Summary of Corporate Structure of Pacific Gas and Electric Company (U 39 M) and PG&E Corporation (Cal. Public Utilities Commission filed Jan. 16, 2019), http://docs.cpuc.ca.gov/PublishedDocs/Efile/G000/M263/K658/263658434.PDF (last viewed May 28, 2019).

Defendants. For instance, the PG&E Board's Finance Committee was alleged in a separate lawsuit over the Butte Fire – where litigation is still ongoing – to have been "actively involved in, and responsible for, assisting the Boards in their oversight of safety risk through its review of strategies to manage the largest individual risks identified in the enterprise risk management program," including the risk of "wildfire." Indeed, because the Company faced the possibility of strict liability for property damages caused by wildfires, and such liability could not only be extraordinary but also non-reimbursable if its officers had not acted "prudently," wildfire safety was a particular focus of the Exchange Act Individual Defendants, who spoke personally on the subject with investors and regulators throughout the Class Period. Further, Defendants' repeated misrepresentations about PG&E's safety and compliance record concerned the Company's core operations. Therefore, the Exchange Act Individual Defendants, by virtue of the importance of safety to the Company and their positions as its leaders, reasonably had knowledge about PG&E's safety and regulatory failures during the Class Period.

568. As discussed in Section VI.C.2, VII.D.2 & 5, *supra*, the Exchange Act Individual Defendants repeatedly spoke to investors on the specifics of PG&E's vegetation management procedures and results. For example, they kept investors apprised about how many hundreds of thousands of trees the Company was trimming and removing, including how many thousands were "dead or dying." In both reporting and inflating these numbers, the Exchange Act Individual Defendants showed they knew that vegetation management and compliance was important to investors on a granular level.

569. A core operation concerns a company's primary products or services, and it extends to matters of importance that might significantly impact the company's bottom line. There is no question that PG&E's safety policies and procedures were critically important to the Company's operations. In addition to the fact that PG&E repeatedly acknowledged this reality, it is also notable that PG&E is potentially facing $30 billion of liability or more due to its failures, and that California's regulatory regime imposes significant liability for PG&E's vegetation management and other safety failures. This is strong evidence of the centrality of the Company's wildfire safety and compliance regime.

570. In a separate lawsuit that was filed in connection with the Butte Fire, it was publicly alleged – based on discovery and deposition testimony that has **not** yet been publicly revealed – that Exchange Act Individual Defendants Williams and Hogan both served on an Executive Officer Risk & Compliance Committee that was charged with monitoring vegetation management issues. Further, according to the parties litigating against PG&E for injuries caused by the 2015 Butte Fire, Defendant Hogan's and another individual's[157] deposition testimony purportedly showed that "PG&E knows and accepts that 1-in-100 trees will be non-compliant, and that 1-in-1000 will be touching its powerlines." As noted above, this means noncompliance for approximately 1.2 million trees in PG&E's territory of 123 million trees, approximately 123,000 of which are safety violations in the nature of trees touching its powerlines at any given time. *See* Section IV.F.4.

571. Just months before the North Bay Fires broke out, United States District Judge Thelton E. Henderson in the Northern District of California ordered that PG&E work with federal prosecutors to retain a monitor to oversee the Company's compliance and ethics programs, and implement "policies and procedures that address threats caused by vegetation," in light of the deadly San Bruno explosion. Order at 3, PG&E Criminal Proceedings, (N.D. Cal. Jan. 26, 2017), ECF No. 916 (the "San Bruno Order"). As part of the sentencing process, PG&E had promised the Court that Defendant Julie Kane – as Chief Ethics and Compliance Officer of the Company – "reports directly to PG&E Corporation's Chairman and CEO" regarding PG&E's compliance efforts, and that "PG&E's senior executives" regularly reviewed the Company's safety and compliance, such that "high-level personnel of the organization ensure its effectiveness." *Id.*; Def's Sentencing Memo. at 6-7, PG&E Criminal Proceedings (N.D. Cal. Jan. 9, 2017), ECF No. 906. At PG&E's Bankruptcy Plan Confirmation Hearing, on May 28, 2020, PG&E's CFO Wells admitted under oath that Defendant Kane would be "very knowledgeable" about all compliance and ethics issues related to PG&E. Accordingly, Exchange Act Individual Defendants Kane, Earley, and Williams had actual knowledge of PG&E's lack of compliance.

[157] Court filings identify this individual as Dean McFarren, PG&E's Quality Assurance Supervisor.

572. Because the Defendants represented that they closely monitored PG&E's critically important safety and compliance, and because PG&E's fire safety practices resulted in thousands of fire safety violations during the Class Period, they knew – or were deliberately reckless in not knowing – that PG&E's level of safety with respect to vegetation management and wildfire prevention did not comport with state law.

### C. The Federal Court Overseeing PG&E's Probation, Including Safety Monitoring, Has Uncovered Additional Facts Supporting Scienter

573. PG&E was convicted of five felony counts for knowingly and willfully violating federal safety standards in causing the deadly San Bruno explosion in September 2010. On January 26, 2017, Judge Henderson sentenced PG&E to an expansive program of probation, including a corporate compliance and ethics monitorship program, 10,000 hours of community service, expenditure of $3 million to inform the public of its criminal conduct, and a mandate to refrain from any further criminal behavior. San Bruno Order.

574. The first condition to PG&E's probation is that it "Not Commit Another Federal, State, or Local Crime During the Term of the Probation." PG&E did not object to this term in its responsive sentencing memorandum. PG&E Sentencing Memorandum at 15, PG&E Criminal Proceedings (N.D. Cal. Jan. 9, 2017), ECF No. 906. PG&E reassured the Court, prosecutors, the public, and its investors that it would not engage in further criminal acts, including criminally negligent or reckless safety violations. This condition of PG&E's probation applied to PG&E's electrical operations and gas operations alike. Accordingly, as of January 8, 2017, PG&E had an unusual motive to deceive investors and conceal its lack of compliance with safety regulations: it needed investors to believe it was meeting the terms of its probation.

575. On August 14, 2017, Judge Alsup was assigned to preside over the criminal case and PG&E's resulting probation.

576. After the deadly Camp Fire, Judge Alsup ordered the parties on November 27, 2018 to answer the following questions by December 31, 2018:

> 1. What requirements of the judgment herein, including the requirement against further federal, state, or local crimes, might be implicated were any wildfire started by **reckless operation or maintenance of PG&E power lines**?

2. What requirements of the judgment herein might be implicated by any inaccurate, slow, or failed reporting of information about any wildfire by PG&E?

3. What specific steps has the monitor herein taken to monitor and improve PG&E safety and reporting with respect to power lines and wildfires?

4. **Provide an accurate and complete statement of the role, if any, of PG&E in causing and reporting the recent Camp Fire in Butte County** and all other wildfires in California since the judgment herein.

577. On December 5, 2018, Judge Alsup requested "that the Office of the California Attorney General advise the Court of its view on one aspect of this question, namely, the extent to which, if at all, **the reckless operation or maintenance of PG&E power lines would constitute a crime under California law**." In response, the Attorney General of California replied that PG&E's actions or failures to act could constitute a range of criminal violations if the Utility was found to be "reckless" in causing California wildfires.[158] The listed potential offenses ranged from "misdemeanor offenses related to vegetation and power lines" to "implied-malice murder and involuntary manslaughter."

578. On December 10, 2018, the *San Diego Union-Tribune* reported that despite the 2015 Butte Fire and North Bay Fires, PG&E had never produced a report for wildfire mitigation risks two years after the law requiring the production of such a report was enacted. Enacted in September 2016, California Senate Bill 1028 ("SB 1028") required PG&E and other California utilities to produce an annual report detailing efforts to limit the risks from wildfires and specifying who was responsible for implementing safety provisions in the plans. State Senator Jerry Hill, who introduced SB 1028, said of utility regulators' failure to oversee PG&E's implementation of the report: **"They have done absolutely nothing in those two years."** In part to rectify this delinquency, the California State Legislature passed California Senate Bill 901 ("SB 901") in the Fall of 2018 in order to force California utilities to develop and submit their wildfire mitigation plans no later than February 2019.

579. Thereafter, on December 21, 2018, the CPUC issued a Scoping Memo and Ruling (the "Ruling") regarding its efforts to reform PG&E's corporate safety culture. The Ruling found

[158] Attorney General's Amicus Brief Regarding PG&E's Potential Criminal Liability, PG&E Criminal Proceedings (N.D. Cal. Dec. 28, 2018), ECF No. 954.

that "PG&E has had serious safety problems with both its gas and electric operations for many years" and stated that, despite these shortcomings, **the Company had failed "to develop a comprehensive enterprise-wide approach to address safety**." The Ruling stated that the CPUC "was, and remains, concerned that the safety problems being experienced by PG&E were **not just one-off situations or bad luck, but indicated a deeper and more systemic problem**."

580. On December 28, 2018, the Attorney General of California filed an amicus brief in connection with PG&E's probation proceedings before Judge Alsup. The brief stated that PG&E's actions or failures to act could constitute a range of criminal violations if the Utility was found to be "reckless" in causing California wildfires.[159] The listed potential offenses ranged from misdemeanors to implied-malice murder.

581. On January 9, 2019, in PG&E's probation proceedings before Judge Alsup, a U.S. probation officer filed a Petition for Summons for Offender Under Supervision, which: (i) found "probable cause to believe that Pacific Gas and Electric Company violated the conditions of their Probation" stemming from the San Bruno pipeline explosion;[160] (ii) cited the Company's failure to report the investigation by the Butte County District Attorney's Office into PG&E's role in starting several fires that formed part of the North Bay Fires; and (iii) cited PG&E's failure to report Cal Fire's findings of responsibility for the Honey Fire (part of the North Bay Fires), that there was the possibility of criminal prosecution stemming from PG&E's role in starting this fire, or that the Company had entered into a settlement agreement with Butte County to avoid such criminal prosecution.

582. On January 9, 2019, Judge Alsup also issued an order to show cause as to why the terms of PG&E's probation should not be modified "[i]n order to protect the public from further wrongs by the offender, to deter similar wrongs by other utilities, and to promote the rehabilitation

[159] Attorney General's Amicus Brief Regarding PG&E's Potential Criminal Liability, PG&E Criminal Proceedings (N.D. Cal. Dec. 28, 2018), ECF No. 954.

[160] Petition for Summons for Offender Under Supervision at 4, PG&E Criminal Proceedings (N.D. Cal. Dec. 28, 2018), ECF No. 960.

of the offender."[161] The order cited Cal Fire's finding that PG&E had caused wildfires in 2017, 12 of which it had referred to criminal prosecution, and suggested the Company significantly bolster its vegetation management activities and re-inspect its entire electrical grid in "light of PG&E's history of falsification of inspection reports," among other proposed modifications to the terms of the Company's probation.[162]

583. On January 13, 2019, *The Wall Street Journal* reported that PG&E had started more than 1,500 fires between June 2014 and December 2017, or more than one a day on average.[163]

584. On January 14, 2019, PG&E filed with the SEC a report on Form 8-K stating that the Company expected to file for Chapter 11 bankruptcy on or about January 29, 2019. The reason the Company provided for the expected bankruptcy filing was the "series of catastrophic wildfires that occurred in Northern California in 2017 and 2018."

585. On January 15, 2019, *MarketWatch* reported in an article titled "PG&E's slide into bankruptcy would mark its third largest investment-grade default since 1998,"[164] that PG&E faced a significant risk of defaulting on bonds:

> If Pacific Gas & Electric Co. follows through with its bankruptcy announcement, the country's largest utility would record the third largest default in the U.S. investment-grade corporate bond market since 1998.
>
> PG&E announced it would file for bankruptcy by Jan. 29 after devastating California wildfires in 2017 and 2018 left it facing billions in potential liabilities.

---

[161] Order to Show Cause Why PG&E's Conditions of Probation Should Not Be Modified at 1, PG&E Criminal Proceedings (N.D. Cal. Jan. 9, 2019), ECF No. 961.

[162] PG&E was found responsible by Cal Fire for at least ***17*** of the 2017 Northern California wildfires that Cal Fire had investigated up until that point. Only the Tubbs Fire had not been found to have been PG&E's fault.

[163] Russell Gold et al., *G&E Sparked at Least 1,500 California Fires. Now the Utility Faces Collapse*, WALL STREET J. (Jan. 13, 2019), https://www.wsj.com/articles/pg-e-sparked-at-least-1-500-california-fires-now-the-utility-faces-collapse-11547410768?gaa_at=eafs&gaa_n=AWEtsqdneT1upGIZO69NdAvYY4cUS2H4NPMqF1b8ohuKcMwhBZZQEdxVhDYsrbApyc4%3D&gaa_ts=691792b2&gaa_sig=N8RHOdOb28mBEycWoiO_vXevC9WTV-J4sZkWmPVk8GBibkyO4WxuzDu1NBjq3E-nmFxk7c0hWVRsXot5aK5nmw%3D%3D.

[164] Sunny Oh, *PG&E's Slide Into Bankruptcy Would Mark Third Largest Investment-Grade Default Since 1998*, MARKETWATCH (Jan. 15, 2019), https://www.marketwatch.com/story/pges-slide-into-bankruptcy-would-mark-third-largest-investment-grade-default-since-1998-2019-01-15.

> The company also said it would not pay an interest payment due on bonds maturing in 2040 on Wednesday, which would also trigger a default.
>
> * * *
>
> PG&E's bankruptcy would mark a dramatic collapse for a company that was once seen as an attractive bet among hedge funds. More than $17 billion of its bonds would be facing default, according to analysts at Bank of America Merrill Lynch.
>
> * * *
>
> In terms of sheer scale of a default from an investment-grade issuer, BAML found only Lehman Bros. and WorldCom would rank above the PG&E.

586. On January 17, 2019, Judge Alsup issued a tentative finding that "the single most recurring cause of the large 2017 and 2018 wildfires attributable to PG&E's equipment has been **the susceptibility of PG&E's distribution lines to trees or limbs falling onto them** during high-wind events."[165]

587. On January 30, 2019, Judge Alsup held a probationary hearing to determine whether PG&E's conduct had violated the terms of its probation. Part of the hearing concerned PG&E's failure to inform the probation officer that the Butte County District Attorney's Office was investigating PG&E's role starting several of the North Bay Fires, that the District Attorney considered criminal prosecution, and that it executed a settlement with PG&E to avoid such prosecution. The court made a "**find[ing] that PG&E violated the conditions of probation**," with sentencing to be determined at a later date.[166] Judge Alsup also reminded the Company:

> [O]ne of the conditions of probation is you will not commit another federal, state, or local crime. It doesn't have to be a pipeline or a natural gas. It can be any crime. You cannot – you've got to be on your absolute best behavior. No more crimes. . . . That's what PG&E is up against now.

588. During the hearing, Judge Alsup reportedly stated: "**[T]here is one very clear-cut pattern here: That PG&E is starting these fires**. . . . PG&E, according to Cal Fire, started the fire. Global warming did not start the fire. According to Cal Fire, PG&E started it, all 17 of them."

[165] U.S. Response to Court's Order to Show Cause and Request for Comment, PG&E Criminal Proceedings (N.D. Cal. Jan. 17, 2019), ECF No. 970.

[166] Transcript of Proceedings, PG&E Criminal Proceedings (N.D. Cal. Jan. 31 2019), ECF No. 999.

Judge Alsup continued, "what do we do[?] Does the judge just turn a blind eye and say, 'PG&E, continue your business as usual. Kill more people by starting more fires'?"[167] Judge Alsup heard testimony from PG&E's probation officer, Jennifer Hutchings, concerning the Honey Fire – one of the North Bay Fires for which Cal Fire found evidence of a safety violation and referred further criminal investigation to the relevant district attorney for Butte County. Probation Officer Hutchings testified: "I discovered that there had actually been an extensive investigation done by Butte County, that they were fully prepared to bring criminal charges against Pacific Gas and Electric; that Pacific Gas and Electric had entered into a settlement agreement with them in order to avoid these charges being brought." **The court then made a "find[ing] that PG&E violated the conditions of probation as charged in the Form 12."** Thereafter, the court turned to address whether it "should not impose further condition on PG&E to help protect the public from possible further other crimes of the offender," including the following exchange with PG&E representative:

> The Court: Okay. When you say "mitigate," why can't the risk [of wildfire] be zero? Why is it that PG&E should be permitted to start a single wildfire?"
>
> PG&E: Well, the answer to the first question is bringing the risk to zero is an incredibly complicated series of policy decisions that have to factor in reliability, cost, safety, and there's a tremendous amount of analysis that goes into how best to, for instance, make vegetation management decisions and how aggressive vegetation management should be versus the cost of –
>
> * * *
>
> The Court: So why is it PG&E says all the time "Safety is our number one thing"? I hear it all the time, "Safety. Safety. Safety," **but it's not really true. Safety is not your number one thing**.

At the conclusion of this proceeding, PG&E accepted that full compliance with safety regulations, rather than "mitigation," was both possible and PG&E's goal: "[U]ltimately we agree with Your Honor's goal. We think that Your Honor's goal of trying to eliminate the risk is exactly what we all need to be working towards."

[167] Transcript of Proceedings, PG&E Criminal Proceedings (N.D. Cal. Jan. 31 2019), ECF No. 999.

589. On February 6, 2019, attorneys for fire victims provided a submission to Judge Alsup in response to the January 30, 2019 probationary hearing.[168] The submission compiled data from PG&E's regulators which demonstrated that the Company posed a far greater risk to the public than its peers. For example, according to the submission, Southern California Edison ("SoCalEd") serves 15 million people across approximately 50,000 square-miles, operating and maintaining 91,375 miles of distribution lines and 1,433,336 electric poles. By comparison, PG&E services approximately 16 million people throughout a 70,000-square-mile service area, operating and maintaining between 81,000 miles and 115,000 miles of distribution lines and 2,400,000 electric poles. Yet, despite these similarities in service size and miles of distribution lines, ***PG&E's electrical equipment caused 1,208 more wildfires than SoCalEd's equipment between 2014 to 2017*** as self-reported to the CPUC. In total, PG&E's equipment caused 1,552 wildfires, while SoCalEd only caused 344 fires over the same time period. Put differently, PG&E's equipment caused ***4.5 times more wildfires*** than SoCalEd. PG&E's equipment was also responsible for more large-scale fires, including 43 more fires than SoCalEd that burned between 10-99 acres, three more between 100-299 acres, and two more between 300-999 acres. Similarly, since 2014, the electrical equipment of San Diego Gas & Electric ("SDG&E") caused 109 wildfires with only one wildfire burning over 10 (and below 300) acres. By contrast, PG&E caused 1,552 wildfires during that same timeframe with 68 of those fires burning over 10 acres.

590. Additionally on February 6, 2019, PG&E finally submitted to CPUC its new wildfire mitigation plan, as required by SB 901. PG&E later corrected the filing on February 12, 2019 and amended it on February 14, 2019 (the "2019 Mitigation Plan"). On April 29, 2019, the CPUC largely approved PG&E's 2019 Mitigation Plan, with the exception of "several aspects of the company's planned mitigation that require improvement or other follow-up activity," including improved "[a]nalysis of data to determine whether PG&E's new vegetation-pole clearances have

[168] Submission of Attorneys Pitre and Campora in Response to Order dated Jan. 30, 2019, PG&E Criminal Proceedings (N.D. Cal. Feb. 6, 2019), ECF No. 1005.

contributed to reduced ignitions, especially during critical weather conditions."[169] As detailed below, the dramatic expansion of safety practices and expenditures in PG&E's 2019 Mitigation Plan confirms the inadequacy of PG&E's prior activities, showing that PG&E did far less than it should have during the Relevant Period.

591. PG&E's 2019 Mitigation Plan stated that the Company would substantially increase its vegetation management efforts. First, the plan provided that approximately 375,000 "additional" hazard trees should be trimmed or cleared in 2019, a 235% increase compared to PG&E's purported totals of 160,000 in 2018 (estimated), 156,344 in 2017 (actual), 225,168 in 2016 (actual), 18,557 in 2015 (actual), and 8,042 in 2014 (actual). Second, it called for performing 2,450 miles of "enhanced vegetation management" (including fuel reduction and overhang clearing) in 2019, an increase of 320% from its 2018 target of only 760 miles.

592. PG&E's 2019 Mitigation Plan also stated that the Company would substantially increase its inspections. Instead of just routinely inspecting 517,500 electricity distribution poles, PG&E would also commit to conducting "enhanced inspections" of 685,000 electricity distribution poles in High Fire Threat Districts "in addition to routine inspections" over the course of just "five months." (Emphasis original.) "Enhanced Inspection" was described as "includ[ing] ground inspections, drone and helicopter inspections where needed, and climbing inspections of every transmission tower," implying such measures had not been undertaken in the past. Similarly, for its electricity transmission structures, PG&E committed to conducting enhanced inspections for 40,600 structures in addition to 76,000 routine inspections (up from 9,400 and 76,000, respectively). PG&E also committed to conducting "enhanced risk-based inspections" of 200 electricity substations in High Fire Threat Districts.

[169] Although PG&E submitted a second corrected plan on April 25, 2019 "proposing to extend the timelines on many of its major wildfire mitigation efforts," the CPUC determined it was "filed too late to be considered and to receive party comment," and thus would "not act on those proposals." *See* Proposed Decision of Administrative Law Judge re: 18-10-007 (Apr. 29, 2019), http://docs.cpuc.ca.gov/PublishedDocs/Efile/G000/M285/K712/285712576.pdf. In the proposal, the CPUC noted that "PG&E proposes to spend between $800 million and $1.3 billion to support [this] expansion of its vegetation management program."

593. The CPUC noted that these increased inspections were expected to cost PG&E between $798 million and $1.396 billion – "an increase from $15 million authorized in PG&E's last [General Rate Case]."

594. The 2019 Mitigation Plan also proposed that the Company would significantly expand the geographic regions where it might preemptively shut off power pursuant to its ESRB-8 Shutoff Protocol, estimating that the protocol would now cover as many as 5.4 million customers, a 950% increase from what previously covered approximately 570,000 consumers. PG&E planned to increase inspections of its equipment and install more weather stations and cameras for earlier risk detection.

595. Thus, PG&E's 2019 Mitigation Plan described dramatic increases in safety practices and expenditures compared to prior years. These and other aspects of PG&E's expensive proposals represented that it was finally providing the necessary, dramatic expansion of its safety practices and increases in expenditures, which had been absent. Accordingly, the vastly expanded scope of PG&E's 2019 wildfire plan strongly demonstrates the inadequacy of PG&E's prior safety practices, showing that PG&E did far less than it should have during the Relevant Period.

596. Following the plan's release, the *Associated Press* summarized the general reaction: "Lawyers, industry watchdogs and a federal judge alike wonder: *What took so long*?"[170] Yet, at the hearing on the Second Order to Show Cause in PG&E's probation proceedings before Judge Alsup, counsel for PG&E stated that the plan was not final. He explained, "the wildfire mitigation plan is still in the process of being reviewed and there isn't a final one . . . that plan is still in flux."[171]

597. In addition to its wildfire mitigation failures, PG&E is also alleged to have falsified safety data and records for five years. As PG&E noted in a press release, filed on January 14, 2019

---

[170] Paul Elias, *Critics Ask What Took PG&E So Long on Wildfire Safety Effort*, ASSOCIATED PRESS (Feb. 7, 2019), https://docs.cpuc.ca.gov/PublishedDocs/Efile/G000/M285/K712/285712576.PDF.

[171] Transcript of Proceedings at 10, PG&E Criminal Proceedings (N.D. Cal. Apr. 2, 2019), ECF No. 1047. PG&E has filed amended wildfire mitigation plans in compliance with California law direction from the CPUC Wildfire Safety Division on February 12, 2019 and April 25, 2019, February 7, 2020, February 5, 2021, and February 25, 2022.

with the SEC on a Form 8-K, the CPUC announced on December 14, 2018 that it had opened a case against PG&E for allegedly falsifying its data and safety records. While the documented violations related to the intentional falsification of pipeline data, the agency stated that the findings were an example of why it was "investigating PG&E's safety culture" and considering the forced implementation of measures that "address systemic safety issues at PG&E." In other words, according to the CPUC, the Company's falsification of pipeline safety data implicated the Company's entire operations and approach to safety. According to the CPUC's annual report for 2018, PG&E falsified records from 2012 through 2017.[172]

598. On March 5, 2019, Judge Alsup issued a revised order to show cause as to why the court should not modify the terms of PG&E's probation in light of subsequent submissions.[173] Judge Alsup's Revised Order further found that this **"record demonstrates that PG&E's performance with respect to vegetation management has been dismal**." Although PG&E had previously balked at new conditions of probation that would require full compliance on the grounds that they would be impossible to achieve, Judge Alsup's March 5, 2019 order rejected that notion:

> To address PG&E's complaints that the vegetation-management conditions proposed in the January 9 order would be unduly expensive, require superhuman efforts, and exceed the requirements of state and federal law, the above conditions would now simply require full compliance with existing law and with the metrics proposed in PG&E's own wildfire mitigation plan. This order rejects PG&E's back-up contention that "perfect compliance" with Section 4293 is impossible due to "densely forested, highly dynamic, living environments, in which conditions can rapidly change" (Dkt. No. 1016 at 9). **The record demonstrates that PG&E's performance with respect to vegetation management has been dismal.** And, not only does the offender provide no evidentiary support for its claim, but anyone who knows the terrain and its vegetation knows that it takes years for trees to grow to the height of PG&E's lines. Regular inspections could easily spot trees that are high enough to present a hazard. If state or federal law is too strict, moreover, PG&E's remedy would be to seek the relaxation of such laws through its well-oiled lobbying efforts. . . . The proposed conditions would help ensure that, going forward, funds

---

[172] *See* CPUC 2018 Annual Report at 9, https://www.cpuc.ca.gov/-/media/cpuc-website/divisions/news-and-outreach/reports/annual-reports/2018-annual-report.pdf.

[173] Second Order to Show Cause Why PG&E's Conditions of Probation Should Not Be Modified, PG&E Criminal Proceedings (N.D. Cal. Mar. 5, 2019), ECF No. 1027.

> are adequately allocated to PG&E's vegetation management and wildfire mitigation costs.[174]

599. On April 2, 2019, Judge Alsup held a hearing on his second order to show cause in PG&E's probation proceedings. At the hearing, Judge Alsup stated:

> PG&E over several years allowed the trees that needed to be removed to be built up and did not remove them, did not trim them so that we wound up with a large number of trees that should have been removed by PG&E but weren't. And that was a major contributing factor, maybe the single-biggest factor, in causing the fires in 2017 and 2018 in Northern California.[175]

Judge Alsup also explained "as we've gotten into the evidence, and I've studied quite a lot of it, again I want to say it's quite clear that PG&E . . . let the tree budget wither so that a lot of trees that should have been taken down were not." He concluded, "[t]his is a crisis, a crisis that California faces on these wildfires, and PG&E is the single-most culpable entity in the mix. . . . PG&E has started more than – way more than its share of these fires. . . This is a problem of your own making."

600. Judge Alsup had proposed more sweeping measures, with which PG&E said it would take 18 years to comply, so instead, he "acquiesced and just simply [decided] to require, subject to this hearing, that PG&E comply with the state law, and that PG&E comply with its own wildfire prevention plan that it now has before the PUC, among other smaller issues, but those are the main things."

601. He concluded, "[t]his is a crisis, a crisis that California faces on these wildfires, and PG&E is the single-most culpable entity in the mix. . . . PG&E has started more than – way more than its share of these fires. . . This is a problem of your own making. A lot of money went out in dividends that should have gone to the tree budget. This is a problem of your own making and you've got to undo this problem. You've got to address it and get back square with the people of the State of California that depend on you to do the job safely." Under these circumstances, PG&E's violation of court-imposed probation and California law, while under monitoring and

---

[174] Second Order to Show Cause Why PG&E's Conditions of Probation Should Not Be Modified, PG&E Criminal Proceedings (N.D. Cal. Mar. 5, 2019), ECF No. 1027.

[175] Transcript of Proceedings at 6-7, PG&E Criminal Proceedings (N.D. Cal. Apr. 2, 2019), ECF No. 1047.

reporting obligations regarding its purported compliance throughout the Class Period, support strong inferences that Defendants knew, or were severely reckless in not knowing, that it failed to comply with relevant laws and regulations when making the false and misleading statements detailed above.

602. As a result, on April 3, 2019, Judge Alsup issued an Order Adopting New Conditions of Probation. The court modified the terms of PG&E's probation to require it to (i) "fully comply with all applicable laws concerning vegetation management and clearance requirements"; (ii) "fully comply with the specific targets and metrics set forth in its" 2019 Mitigation Plan; and (iii) not issue dividends until it was in compliance with all applicable vegetation management requirements, among other conditions.[176]

603. On May 7, 2019, Judge Alsup conducted a sentencing hearing for PG&E's violation of probation. In a colloquy with PG&E's new CEO William D. Johnson, the Court stated: "one of the biggest problems we've had is that PG&E has been starting a lot of fires, and they had that horrible explosion in San Bruno, and **I just don't think PG&E has put safety first.**" He further reminded the new CEO: "your company **admitted** that it started 17 of those fires in 2017 just in the Wine Country."[177]

604. During the sentencing hearing, Judge Alsup also observed that while there are other causes of fire, "**no one has started more fires than PG&E**."

605. The magnitude of PG&E's failures show that the Company and Exchange Act Individual Defendants either knew these facts, or were deliberately reckless in not knowing them. The inference of scienter is made even stronger when combined with the fact that safety was a core operation of PG&E's, as discussed in Section XI.B, *supra*.

---

[176] Order Adopting New Conditions of Probation, PG&E Criminal Proceedings (N.D. Cal. Apr. 3, 2019), ECF No. 1040.

[177] Transcript of Proceedings at 11, PG&E Criminal Proceedings, (N.D. Cal. May 7, 2019), ECF No. 1061.

### D. PG&E's Noncompliance with Safety Regulations Was Well-Known Throughout the Company, Including at the Highest Levels, with Real-Time Access to a Database of Known Safety Violations

#### 1. PG&E Recorded Its Violations of Safety Regulations in a Sophisticated Database, Readily Accessible by the Exchange Act Individual Defendants

606. PG&E maintained a database of inspection data to document the condition of its power lines, which provided its personnel with ready access to information about instances of noncompliance with state safety regulations. In a November 8, 2017 article about its pole management and maintenance efforts, PG&E stated that it "**uses a comprehensive database to manage these multiple patrol and inspection schedules of our 2.4 million poles.**"[178]

607. This information was used to develop the company's *Mobile Asset Inspection* application that provided "electric power inspectors in the field with real-time information including maps, customer information, safety and access information."[179] The system was developed in 2016 and had become sophisticated enough by 2017 to win *InformationWeek*'s IT Excellence Award in the Data and Analytics category.[180] The article further states that "**[s]atellite maps were layered with the location of PG&E's two million electric poles along with decades' worth of data on each individual pole.**"[181] PG&E's 2016 Corporate Responsibility and Sustainability Report announced that a Margaret Mooney Award for Innovation was awarded to its "Data Visualization—Google Earth SAP team, which created a new technology that provides work crews with a dramatically enhanced data visualization of **work in progress**." The report further mentioned "[t]he development of an SAP-based **compliance tool** that can analyze trends and inform [PG&E's] risk management efforts." Thus, PG&E used sophisticated software that kept track of its safety regulation noncompliance for its powerlines and poles in real time.

---

[178] *Facts about PG&E Pole Management and Maintenance*, Currents, PG&E (Nov. 8, 2017), http://www.pgecurrents.com/2017/11/08/facts-about-pge-pole-management-and-maintenance/ (last viewed May 28, 2019).

[179] Press Release, PG&E, *Innovative App for PGE Field Crews Earns InformationWeek IT Excellence Award* (May 22, 2017), https://investor.pgecorp.com/news-events/press-releases/press-release-details/2017/Innovative-App-for-PGE-Field-Crews-Earns-InformationWeek-IT-Excellence-Award/default.aspx.

[180] *Id.*

[181] *Id.*

608. PG&E assigns a unique "pole SAP ID number" that corresponds to each pole's data.[182] According to an *InformationWeek* article about PG&E's mobile application, "**[t]he status of a pole's inspection is tracked in SAP [database technology] so the inspection team knows when it's time to inspect each pole**. That information flows into the enterprise platform PG&E built, which pushes electronic lists to inspectors' iPad Pros."[183] The data collected is extensive enough to enable "an enterprise data and analytics organization that is using advanced analytics to predict when poles will fail."[184] And by 2017, the PG&E Corporate Responsibility and Sustainability Report mentions that the Company's "SAP-based tool" was used to analyze trends in environmental compliance. Thus, PG&E's records of safety regulation violations were stored in a readily accessible database. Defendants Earley, Williams, Stavropoulos, Kane, Johns, and Hogan each had easy access to this database.

609. Furthermore, in its submissions to Judge Alsup in the Company's criminal probation, PG&E represented that it conducts quality assurance audits to obtain "real time" assessments of its vegetation management compliance:

> PG&E has also implemented checks on its contractors' vegetation management work as another way to monitor compliance. For example, PG&E conducts audits and reviews of its vegetation management program to assess the quality of contractors' work and compliance with PG&E's standards and legal requirements, including Public Resource Code § 4293. PG&E's audit and review process consists primarily of two programs, Quality Control ("QC") and Quality Assurance ("QA"). . . . .
>
> **PG&E's QA audits are designed to obtain a "real-time" assessment of PG&E's vegetation management program and whether the conditions in its service territory are consistent with PG&E's legal obligations**. To ascertain a **true "real-time" condition** of the program, audits are performed throughout the year. .

[182] PG&E Pole Data Request Form, PG&E (Aug. 9, 2017), https://www.pge.com/assets/pge/docs/about/doing-business-with-pge/pole-data-request-form.pdf.

[183] Lisa Morgan, *PG&E's Winning Recipe for a Mobile Asset Inspection App*, InformationWeek (June 29, 2017), https://www.informationweek.com/data-management/pg-e-s-winning-recipe-for-a-mobile-asset-inspection-app.

[184] *Id.*

. . The audits indicate whether any identified issues pose compliance violations or potential violations (e.g., potential violation may occur within 90 days).[185]

610. Further, in those same criminal probation proceedings, Judge Alsup found that PG&E has admitted "that as of June 2017, there were 3,962 unworked trees which PG&E had identified in 2016 as hazardous with the potential to 'fall into or otherwise impact the conductors, towers or guy wires before the next inspection cycle.'" Such a precise admission confirms the existence of such a database, awareness of its contents showing that vegetation management violations were widespread during the Class Period, and access to that information by the highest levels.

611. Consequently, it is clear that PG&E was noncompliant with safety regulations concerning vegetation management and pole integrity, and that such facts would have been documented electronically, stored in an accessible SAP database, and available to PG&E personnel throughout the Company in real-time. Defendants Earley, Williams, Stavropoulos, Kane, Johns, and Hogan each had easy access to this database.

**2. PG&E Instituted a Culture Among Its On-the-Ground Employees of Reporting Problems up the Corporate Chain, Which Upper Management Was Aware of and Monitored**

612. PG&E repeatedly touted the culture among its lower-level employees that encouraged reporting safety problems up the chain of management. Further, the Exchange Act Individual Defendants touted their knowledge and familiarity with this practice at the Company, indicating either they personally received information of safety violations this way, or they knew where to find such information but deliberately avoided it.

613. On August 18, 2016, PG&E issued a press release titled "PG&E Becomes First Natural Gas Utility to Receive Process Safety." It contained a description of an internal Company policy termed "**The Corrective Action Program, a program that empowers employees at all levels of PG&E to speak up and identify issues that are in need of improvement**."

[185] PG&E Response to Request for Information at 12, PG&E Criminal Proceedings (N.D. Cal. Feb. 22, 2019), ECF No. 1016.

614. On November 4, 2016, PG&E hosted a conference call with analysts to discuss its financial results for the third quarter of 2016. In his prepared remarks, Earley elaborated on PG&E's culture of encouraging "every employee" to report safety violations up the chain of command, as follows:

> **We also wanted to make sure that every employee felt comfortable raising concerns, no matter how big or small, so we made a number of changes to encourage all employees to speak up when something doesn't seem right. For example, we worked with our unions to develop a non-punitive self-reporting policy.**
>
> We've also adapted the nuclear industry's corrective action program **across the Company**, to **make it easy for employees to report things that need to be fixed. In fact, employees can now report corrective action items through a simple app on their smart devices. And we've created a number of awards to publicly recognize employees when they do speak up, so that we are encouraging and reinforcing that behavior.**
>
> * * *
>
> **The improvements we have made in safety and reliability over the last six years have put us in a position to deliver strong financial results going forward.**
>
> **Earlier this year, we announced our first dividend increase in six years, and we have committed to achieving a roughly 60% payout ratio by 2019.** Combined with our expected rate based growth, we are confident we can deliver a strong overall return for our shareholders.

615. Thus, PG&E went significantly beyond making employees feel safe "report[ing] things that need to be fixed." The CEO himself took credit for "mak[ing] sure that every employee felt comfortable raising concerns" and "encourag[ing] all employees to speak up" "**across the Company**" – *i.e.,* **not just at the lower levels.** Further, by virtue of the fact that the CEO personally took credit for this phenomenon within the company, it indicates his awareness of what employees actually reported. Indeed, he stated that he was involved in "publicly recogniz[ing] employees when they do speak up."

616. As a result, the persistence of safety violations cannot be attributed to their being unknown. Rather, such problems persisted because of what the Exchange Act Individual Defendants did – or failed to do – to mitigate safety problems once they were reported. Indeed,

PG&E's inadequate safety compliance did not stem from a lack of information but rather a lack of willingness to devote sufficient Company funds to remediate problems, as detailed above (*see* Sections VI.B.-G, *supra*).

617. Earley's statement also affirms the direct connection between PG&E's treatment of safety issues, the Company's long-term financial results, and the size of its dividend. Indeed, as the truth emerged regarding PG&E's insufficient safety compliance during the Class Period (*see* Section X, *supra*), the market understood the connection between the Company's safety violations and the foreseeable, material detriment they would have on the Company's financial results and dividend.

**E. The Threat of a Potential Bankruptcy Gave Defendants a Strong Motive to Mislead Investors**

618. PG&E is currently facing approximately $17 billion in liability over the North Bay Fires and $13 billion for the Camp Fire, of which the Company has already recorded anticipated losses totaling over $14 billion. This immense exposure dwarfs the $1.6 billion that the Company reported it earned in the full year 2017—a performance not likely to be repeated given the substantial increase in PG&E's required vegetation management and other safety compliance expenditures.

619. Once the North Bay Fires began, it was clear to Defendants that PG&E's liability could have severe repercussions for the Company's financial condition, and for the careers of the Exchange Act Individual Defendants. This was true even before the flight of PG&E's officers and directors and the Company's bankruptcy.

620. One California legislator reported on June 15, 2018 that "[i]n this Capitol, they [PG&E] keep talking about the sky is falling, that they're going to go bankrupt and what are we going to do, and they're creating a lot of fear in the Capitol." On July 31, 2018, *Reuters* further reported that an anonymous source had leaked that PG&E hired a prominent law firm to "explore debt restructuring options," as well as the possibility of "breaking up the company." On August 1, 2018, California Governor Jerry Brown even cautioned the public that "there is concern that we could lose our utilities."

621. The reason for these dire warnings was simple: PG&E wanted to rush through legislation that would grant it additional defenses and a lower bar to be reimbursed for their part in causing the North Bay Fires. After the North Bay Fires had erupted, the threat of bankruptcy and the narrow possibility of a legislative bail-out gave PG&E and the Exchange Act Individual Defendants had an unusual motivation to hide their culpability.

622. It was within this context that PG&E falsely and misleadingly told investors, *inter alia*, that "***PG&E meets or exceeds all applicable federal and state vegetation clearance requirements***," and that "***we've doubled the amount that we've invested in veg[etation] management***." PG&E had an unusual motive to make these and other statements after the North Bay Fires erupted: to conceal its wrongdoing long enough to secure the liability bailout it was seeking from the California legislature.

623. Indeed, this would not be the first time that a large potential liability caused PG&E to act unethically. When PG&E faced a substantially ***lower*** liability for its role in the deadly San Bruno explosion, the Company engaged in improper "back-channel" communications with its regulators that ultimately resulted in a $97.5 million fine that was imposed in April 2018. A federal jury also found PG&E to be guilty of six criminal charges, including obstruction of justice, related to that blast that killed eight people.

### F. After PG&E Failed to Follow Its ESRB-8 Shutoff Protocol and Caused the Camp Fire, PG&E's Explanations Keep Changing and are Contradictory

624. As noted above, the public learned after the Camp Fire erupted that PG&E did not shut down its Caribou-Palermo transmission or distribution lines that ignited the Camp Fire, despite the Company's ESRB-8 Shutoff Protocol. As further detailed above, PG&E faced criticism from a variety of sources for that decision, as well as significant decreases to its share price. *See* Section X.B.6, *supra*.

625. To reiterate relevant background, unknown to the public at the time and contrary to underlying shutoff guidelines, PG&E unilaterally determined to exempt the 115kV Caribou-Palermo transmission lines from its de-energization protocols. Ex. A at 73. Indeed, the Butte County DA determined that this exemption was misleading when viewed against PG&E's public

shutoff policy at the time. *Id.* Further, the Butte County DA determined that if PG&E had followed guidelines and included these transmission lines within its shutoff protocol, weather conditions would have mandated their de-energization prior to the Camp Fire. *Id.*

626. Further, the Big Bend 1101 12kV distribution line determined as the second ignition point for the Camp Fire was included in PG&E's lacking ESRB-8 protocol, and it's shut off warranted. According to the Butte County DA, was that PG&E had knowingly employed a "run to failure strategy," with respect to these distribution lines, whereby "PG&E only applied a low degree or patrol with minimal frequency to continuously assess risk, and only performed corrective maintenance" *Id.* at 60.

627. While the Camp Fire continued to burn, the Company insisted that its ESRB-8 Shutoff Protocol would not have included the Caribou-Palermo transmission line.

628. For example, in a November 16, 2018 statement reported by *KQED News*, PG&E spokeswoman Deanna Contreras stated in an email to the reporter: "However, in light of the potential public safety issues resulting from de-energizing higher voltage transmission lines, including the potential to impact millions of people and create larger system stability issues for the grid, PG&E has not extended the (shutoff) program to transmission lines that operate at 115kV or above."[186]

629. Similarly, in a November 22, 2018 statement reported by *Mercury News*, PG&E spokeswoman Lynsey Paulo said to the reporter: "In light of the potential public safety issues resulting from de-energizing higher voltage transmission lines, including the potential to impact millions of people and create larger system stability issues for the grid, PG&E has not extended the (shutoff) program to transmission lines that operate at 115kV or above."[187] Spokeswoman Paulo "added that the Federal Energy Regulatory Commission (FERC) regulates transmission lines

---

[186] Dan Brekke, *PG&E: High-Voltage Transmission Lines Not Covered by Fire Safety Shutdown Plan*, KQED (Nov. 16, 2018), https://www.kqed.org/news/11706846/pge-high-voltage-transmission-lines-not-covered-by-fire-safety-shutdown-plan.

[187] Matthias Gafni, *Camp Fire: Map Shows Where PG&E Had Planned to Shut Down Power Ahead of Blaze*, Mercury News (Nov. 22, 2018), https://www.mercurynews.com/2018/11/22/maps-show-where-pge-had-planned-to-shut-down-power-ahead-of-camp-fire/.

and such an emergency shutdown would need to be coordinated with the California Independent System Operator, which oversees the state's power grid." But as the article further reported:

> But state and federal regulators say PG&E can shut down transmission lines of any size at its own discretion.
>
> "The transmission owners are solely responsible for operating their transmission and distribution lines and they can de-energize transmission and distribution lines without seeking approval from the ISO, with or without prior notice," Cal ISO spokesman Steven Greenlee said. "The transmission owner tells us that they are de-energizing a line and if a 230kV or 500kV line is de-energized it may require (us) to re-dispatch generation if the remaining lines become heavily loaded. This is a practice we perform every day with scheduled work and unplanned outages."
>
> CPUC spokeswoman Terrie Prosper also said the decision is up to the individual utility.
>
> "Utilities can de-energize whatever lines and voltage they deem appropriate," Prosper said. "They typically de-energize distribution lines because those lines are more localized than transmission lines."
>
> FERC Spokesman Craig Cano said PG&E would not need its approval to cut power to high-voltage lines for safety reasons.
>
> "FERC-approved standards address transmission system reliability and explicitly exclude safety matters, which could be the reason for shutting down a power line in response to wildfires or to mitigate the risk of fires," he said.

630. PG&E's entire response, including its denial that its ESRB-8 Shutoff Protocol would not have included the Caribou-Palermo transmission line, **was not true**.

631. First, PG&E's published ESRB-8 Shutoff Protocol never mentioned a limitation on 115-kilovolt transmission lines or in fact any transmission lines.[188] However, pursuant to CPUC's Resolution ESRB-8, PG&E was required to both "Make available and post a summary of de-energization policies and procedures on its website" and "Provide its de-energization and restoration policy **in full**, and in summary form, to the affected community officials before de-

[188] *See generally* PG&E Public Safety Power Shutoff Policies and Procedures, PG&E website (Sept. 2018), https://www.pge.com/assets/pge/docs/outages-and-safety/safety/Public-Safety-Power-Shutoff-Policies-and-Procedures.pdf.

energizing its circuits."[189] Because a limitation on transmission lines was never mentioned in PG&E's ESRB-8 Shutoff Protocol, it did not exist.

632. Second, PG&E had never mentioned this exclusion for 115-kilovolt transmission lines, even unofficially, until **after** it faced criticism for deciding not to shut down its Caribou-Palermo transmission line and causing the Camp Fire.

633. Third, when PG&E first shut off electricity under its ESRB-8 Shutoff Protocol on October 14 through 17, 2018, by its own admission, PG&E shut off **both** transmission and distribution lines. Specifically, PG&E shut off eight transmission power line circuits and thirty-three distribution power line circuits, as detailed in its later filing to CPUC.[190] This admission confirms that PG&E's ESRB-8 Shutoff Protocol did not include a limitation on shutting down transmission lines.

634. The same conclusion is confirmed by a telling revision PG&E made to otherwise identical text in two succeeding reports to the CPUC—the first being its October "Public Safety Power Shutoff Report" regarding the October shutoff,[191] and the second being its November "Public Safety Power Shutoff Report" **after the Camp Fire**. Therein, PG&E made the following revelatory insertion:

> [PG&E has] reached out to more than 570,000 homes and businesses that are served by our electric lines, operating at 70kV and lower, that run through extreme fire-threat areas. We have communicated to these customers through several formats (letter, email, TV and print ads, social media and news stories) that, if extreme fire danger conditions were forecasted, it might be necessary to temporarily turn off power to their neighborhood or community for safety.

---

[189] Resolution Extending De-Energization Reasonableness, Notification, Mitigation And Reporting Requirements In Decision 12-04-024 To All Electric Investor Owned Utilities, (Cal. Public Utilities Commission July 16, 2018), https://docs.cpuc.ca.gov/publisheddocs/published/g000/m218/k186/218186823.pdf.

[190] Letter from PG&E to CPUC re: compliance report (Oct. 31, 2018), http://cpuc.ca.gov/uploadedFiles/CPUC_Public_Website/Content/Utilities_and_Industries/Energy_-_Electricity_and_Natural_Gas/PGE%20PSPS%20Report%20Letter%2020181031.pdf (last viewed May 28, 2019).

[191] Letter from PG&E to CPUC re: compliance report (Oct. 31, 2018), http://cpuc.ca.gov/uploadedFiles/CPUC_Public_Website/Content/Utilities_and_Industries/Energy_-_Electricity_and_Natural_Gas/PGE%20PSPS%20Report%20Letter%2020181031.pdf (last viewed May 28, 2019).

(Underlining added to signify PG&E's addition.) The absence of such language in its October 2018 shutoff report, in an otherwise identical paragraph, confirms that an exclusion for 115-kilovolt transmission lines was never part of PG&E's ESRB-8 Shutoff Protocol.

635. Finally, PG&E was required to answer questions posed by the CPUC's Safety and Enforcement Division after the North Bay Fires, which PG&E submitted on October 17, 2017.[192] The Safety and Enforcement Division asked: "Has PG&E proactively de-energized power lines in the last 10 days without being requested to do so by CAL FIRE? If so, please provide information about location, duration and reasons for doing so." In response, PG&E stated that it had de-energized **two** 115-kilovolt lines in 2017 to prevent wildfires:

> PG&E de-energized multiple transmission lines as described below without the direction of CAL FIRE:
>
> * * *
>
> 3. On 10/9 at 0644, PG&E de-energized the Fulton-Santa Rosa #1-**115kV line** due to fire in the area. The line was returned to service on 10/9 at 1455.
>
> 4. On 10/9 at 0644, PG&E de-energized the Fulton-Santa Rosa #2-**115kV line** due to fire in the area. The line was returned to service on 10/14 at 1044.

636. As such, it was affirmatively false that PG&E's ESRB-8 Shutoff Protocol excluded transmission lines of any kind. It was also false that PG&E's ESRB-8 Shutoff Protocol excluded 115-kilovolt transmission lines in particular.

637. PG&E's representations after the Camp Fire that such exclusions existed – when they did not exist – amount to a cover-up, and evidence the Company's scienter. It is a continuation of PG&E's deliberate efforts to conceal the unsafe operations of its utilities, as further exposed by CPUC's allegations that the Company falsified records and data concerning the safety of its utilities from 2012 through 2017. *See* Section VI.C, *supra*.

[192] PG&E's Response to Safety and Enforcement Divisions' 10/14/17 Questions, CPUC website (Oct. 17, 2017), https://www.cpuc.ca.gov/-/media/cpuc-website/files/uploadedfiles/cpuc_public_website/content/safety/response-to-data-request.pdf.

### G. PG&E's Unprecedented Departure of Officers and Directors Strengthens the Inference of Scienter

638. On January 13, 2019, PG&E announced the abrupt departure of its CEO and President, Defendant Williams.[193] To explain Williams's unceremonious departure—less than two years after she became CEO in March 2017—PG&E's May 17, 2019, preliminary proxy statement began with a letter to shareholders from the PG&E Board of Directors, stating:

> "The tragic events of the past few years have made clear that the energy system status quo is no longer working for California. We have heard the calls for change and are committed to answering them with strong actions that will help us re-earn the trust of all our stakeholders. **This starts at the top. We replaced PG&E Corporation's CEO and the vast majority of our Boards of Directors with experienced people with the commitment and expertise necessary to redirect our safety culture** and navigate one of the most complex corporate reorganizations ever."

639. Thus, shortly after Williams's departure, PG&E admitted that she lacked the commitment and expertise necessary for safety. In the same letter, PG&E argued its Chapter 11 bankruptcy would ultimately provide "a reorganized enterprise with refreshed management and Board members who are committed to safety and reliability in all aspects of our business."

640. In addition to Williams's departure, three senior executives in PG&E's electric division also left the Company after the 2017 or 2018 fires. Earley left his position as Executive Chairman of the Company in December 2017, Stavropoulos left his position as COO in September 2018, and Hogan left his position as Senior Vice President of Electric Operations in January 2019. As a consequence, it may be inferred that the Company had widespread dissatisfaction with its officers' and directors' commitment and expertise necessary for safety beyond just Williams.

641. Indeed, on February 11, 2019, PG&E issued a press release stating that it would be replacing the majority of its Boards. As of today, only two Board members out of 13 have not been replaced. In a further expression of lack of support for the Company's previous leadership, the release acknowledged "that **PG&E must re-earn trust and credibility** with its customers, regulators, the communities it serves and all of its stakeholders . . . ."

---

[193] J.D. Morris, *PG&E CEO Geisha Williams Out Amid Utility's Widening Financial Crisis*, San Francisco Chronicle (Jan, 13, 2019), https://www.sfchronicle.com/business/article/PG-E-CEO-Geisha-Williams-out-amid-utility-s-13530807.php.

## XII. APPLICABILITY OF THE PRESUMPTION OF RELIANCE AND FRAUD ON THE MARKET FOR THE EXCHANGE ACT CLAIMS

642. For the misrepresentation claims alleged under the Exchange Act and SEC Rules 10b–5(b), Lead Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a) Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b) The omissions and misrepresentations were material;

(c) The Company's securities traded in an efficient market;

(d) The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

(e) Lead Plaintiff and other members of the Class purchased PG&E securities between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

643. At all relevant times, the market for PG&E securities was efficient for the following reasons, among others:

(a) PG&E stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b) As a regulated issuer, PG&E filed periodic public reports with the SEC and the NYSE;

(c) PG&E regularly communicated with public investors via established market communication mechanisms, including through the regular dissemination of press releases on the major newswire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services; and

(d) PG&E was followed by numerous securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales forces and certain customers

of their respective brokerage firms. Each of those reports was publicly available and entered the public marketplace.

644. As a result of the foregoing, the market for PG&E securities promptly digested current information regarding PG&E from publicly available sources and reflected such information in PG&E's stock price. Under these circumstances, all purchasers of PG&E securities during the Class Period suffered similar injury because of their purchases of securities at artificially inflated prices and a presumption of reliance applies.

645. For the fraudulent scheme claims alleged under the Exchange Act claims and SEC Rules 10b–5(a) and 10b–5(c), Lead Plaintiff will rely on the presumption of reliance under the Supreme Court's decision in *Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128 (1972), and its progeny, as Defendants' misstatements throughout the Class Period included omissions, in that they failed to inform investors of PG&E's safety and regulatory failures.

## XIII. CLASS ACTION ALLEGATIONS FOR THE EXCHANGE ACT CLAIMS

646. Lead Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired PG&E securities traded on the NYSE during the Class Period (the "Class") and were damaged thereby. Excluded from the Class are the excluded persons defined in Section II, *supra*.

647. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, PG&E securities were actively traded on the NYSE. While the exact number of Class members is unknown to Lead Plaintiff at this time and can be ascertained only through appropriate discovery, Lead Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by PG&E or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

648. Lead Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

649. Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Lead Plaintiff has no interests antagonistic to or in conflict with those of the Class.

650. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;
- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the financial condition, business, operations, and safety of PG&E;
- whether Defendants caused PG&E to issue false and misleading financial statements during the Class Period;
- whether Defendants acted with actual knowledge of falsity or recklessly in issuing false and misleading financial statements;
- whether Defendants engaged in a scheme to defraud investors;
- whether the prices of PG&E securities during the Class Period were artificially inflated because of Defendants' conduct complained of herein;
- whether some or all of Defendants' false and misleading misstatements or omissions served to maintain PG&E's inflated securities prices; and
- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

651. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

652. Lead Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine, as discussed above in Section XII, *supra*.

653. Based upon the foregoing, Lead Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

## XIV. CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT

### FIRST CLAIM

### For Violation of Section 10(b) of The Exchange Act and Rule 10b-5 Against the Exchange Act Individual Defendants

654. Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

655. This Count is asserted against the Exchange Act Individual Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

656. During the Class Period, PG&E and the Exchange Act Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

657. The Exchange Act Defendants each carried out a plan, scheme, and course of conduct which was intended to and did: (i) deceive the investing public, and Lead Plaintiff, as alleged herein; and (ii) cause Lead Plaintiff and the Class to purchase securities at artificially inflated prices.

658. The Exchange Act Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they:

- employed devices, schemes and artifices to defraud;
- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

- engaged in acts, practices and a course of business that operated as a fraud or deceit upon Lead Plaintiff and others similarly situated in connection with their purchases of PG&E securities during the Class Period.

659. The Exchange Act Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of PG&E were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. The Exchange Act Defendants, by virtue of their receipt of information reflecting the true facts of PG&E, their control over, and/or receipt and/or modification of PG&E's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning PG&E, participated in the fraudulent scheme alleged herein.

660. The Exchange Act Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Lead Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other PG&E personnel to members of the investing public, including Lead Plaintiff and the Class.

661. As a result of the foregoing, the market price of PG&E securities was artificially inflated during the Class Period. In ignorance of the falsity of PG&E's and the Exchange Act Defendants' statements, Lead Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of PG&E securities during the Class Period in purchasing PG&E securities at prices that were artificially inflated as a result of PG&E's and the Exchange Act Defendants' false and misleading statements.

662. Had Lead Plaintiff and the other members of the Class been aware that the market price of PG&E securities had been artificially and falsely inflated by the Exchange Act Defendants' misleading statements and by the material adverse information which PG&E's and

the Exchange Act Defendants did not disclose as a result of their scheme to defraud investors, they would not have purchased PG&E's securities at the artificially inflated prices that they did, or at all.

663. As a result of the wrongful conduct alleged herein, Lead Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

664. By reason of the foregoing, the Exchange Act Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to Lead Plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchase of PG&E securities during the Class Period.

## SECOND CLAIM

### For Violation of Section 20(a) of The Exchange Act Against The Exchange Act Individual Defendants

665. Lead Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

666. During the Class Period, the Exchange Act Individual Defendants participated in the operation and management of PG&E. The Exchange Act Individual Defendants conducted and participated, directly and indirectly, in the conduct of PG&E's business affairs. Because of their senior positions, they knew the adverse non-public information regarding the Company's financial condition and noncompliance with relevant laws and regulations.

667. As officers and/or directors of a publicly owned company, the Exchange Act Individual Defendants had a duty to disseminate accurate and truthful information with respect to PG&E's financial condition and results of operations, and to correct promptly any public statements issued by PG&E which had become materially false or misleading.

668. Because of their positions of control and authority as senior officers, the Exchange Act Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which PG&E disseminated in the marketplace during the Class Period. Throughout the Class Period, the Exchange Act Individual Defendants exercised their power and authority to cause PG&E to engage in the wrongful acts complained of herein. The Exchange Act

Individual Defendants, therefore, were "controlling persons" of PG&E within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of PG&E securities.

669. By reason of the above conduct, the Exchange Act Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by PG&E.

## XV. NATURE OF THE SECURITIES ACT CLAIMS

670. Securities Act Plaintiffs (defined below) bring claims for violations of the Securities Act, individually and on behalf of all persons or entities that acquired PG&E senior notes in or traceable to the Company's Notes Offerings, as detailed herein. The claims are asserted against former PG&E officers and directors responsible for the registration statements and against the underwriters of the Notes Offerings.[194] Between March 2016 and PG&E's January 2019 bankruptcy filing, PG&E issued over $4 billion worth of senior notes registered with the SEC. According to a PG&E court filing: "PG&E consistently spends more cash than it generates through its operations and cannot fund all its infrastructure investments without external financing from the debt and equity markets."[195]

671. The Securities Act Claims set forth herein are based on strict liability and negligence and are not based on any allegation that any defendant engaged in fraud or intentional misconduct. The Securities Act Plaintiffs specifically disclaim any reference to, or reliance on, allegations of fraud.

672. This Complaint adds additional facts from court filings, regulatory investigations, governmental and other third-party reports, media accounts, audits, as well as PG&E's own

---

[194] "Notes Offerings" refers to the Company's March 2016 public offering of senior notes (the "March 2016 Notes Offering"), the Company's December 2016 public offering of senior notes (the "December 2016 Notes Offering"), the Company's March 2017 public offering of senior notes (the "March 2017 Notes Offering"), and the Company's April 2018 public offering of senior notes (the "April 2018 Notes Offering"). The "Offering Documents" refers to the registration statement and prospectus (to include all amendments and supplements thereto for each Notes Offering, together with all documents incorporated by reference in each registration statement and prospectus). *See* ¶829(a)-(d).

[195] Response to Second Order to Show Cause Why PG&E's Conditions of Probation Should Not Be Modified at 4, PG&E Criminal Proceedings, (N.D. Cal. Mar. 22, 2019), ECF No. 1032.

admissions. As set forth below, the facts demonstrate that investors were unaware of: (i) the scope and magnitude of PG&E's subpar and noncompliant safety and maintenance practices that were far worse than its peers, including systemic failures related to vegetation management and gross neglect of infrastructure needs that materially increased the risk of wildfires; and (ii) PG&E's prolonged lack of commitment to or investment in wildfire safety despite acknowledging a growing wildfire threat, including a failure to allocate resources to prioritize undergrounding utility lines, which PG&E now admits reduces wildfire risk by 98%.

673. These undisclosed acts, conditions, and misstatements rendered PG&E's Offering Documents materially false and misleading and form the basis of the Securities Act Claims asserted herein.

## XVI. THE SECURITIES ACT PARTIES

### A. Securities Act Named Plaintiffs

674. Plaintiff York County on behalf of the County of York Retirement Fund acquired PG&E securities, including senior notes issued in the March 2016 Notes Offering and the April 2018 Notes Offering as described in the Certification previously filed with the Court (ECF No. 121-2) and incorporated by reference, and has been damaged thereby.

675. Plaintiff City of Warren Police and Fire Retirement System acquired PG&E securities, including PG&E stock and senior notes issued in the April 2018 Notes Offering as described in the Certification previously filed with the Court (ECF No. 121-3) and incorporated by reference, and has been damaged thereby.

676. Plaintiff Defined Benefit Plan of the Mid-Jersey Trucking Industry and Teamsters Local 701 Pension and Annuity Fund, formerly known as Mid-Jersey Trucking Industry & Local No. 701 Pension Fund, acquired PG&E securities, including senior notes issued in the December 2016 Notes Offering and the March 2017 Notes Offering as described in the Certification previously filed with the Court (ECF No. 121-4) and incorporated by reference, and has been damaged thereby. The 4.00% Senior Notes due December 1, 2046, that Plaintiff Defined Benefit

Plan of the Mid-Jersey Trucking Industry and Teamsters Local 701 Pension and Annuity Fund purchased in the December 2016 Offering had an issue date of December 1, 2016.[196]

677. The Plaintiffs identified in ¶¶674-676 are referred to herein as the "Securities Act Plaintiffs." These Plaintiffs also are members of the putative Exchange Act Class as they have claims under the Exchange Act for their purchase of PG&E securities during the Class Period and were damaged thereby.

**B. Bankrupt Entities**

678. Pacific Gas and Electric Company is a California public utility operating in northern and central California, with headquarters in Oakland. The Utility is the registrant and issuer of the PG&E senior notes issued in the Notes Offerings. The Utility filed for bankruptcy on January 29, 2019, and is therefore not named as a defendant in this action due to the automatic stay of proceedings under the federal bankruptcy laws. But for the automatic stay of proceedings and the bankruptcy court's jurisdiction over claims against PG&E, the Utility would be named as a defendant for all counts asserted herein.

679. PG&E Corporation is a holding company whose primary operating subsidiary is Pacific Gas and Electric Company. PG&E Corporation is headquartered in the same Oakland building as the Utility, and it shared an overlapping board of directors with the Utility. As the parent and owner of the Utility, PG&E Corporation also issued and sold the PG&E senior notes issued in the Notes Offerings. Like the Utility, PG&E Corporation declared bankruptcy and is therefore not named as a defendant in this action due to the automatic stay of proceedings under the federal bankruptcy laws. But for the automatic stay of proceedings and the bankruptcy court's jurisdiction over claims against PG&E, PG&E Corporation would be named as a defendant for all counts asserted herein.

---

[196] PG&E issued the 4.00% notes in the December 2016 Offering, and reissued more of the same notes in the March 2017 Offering. PG&E identified the 4.00% notes issued pursuant to each offering as having different issue dates. *See infra* ¶¶825-827.

**C. Securities Act Individual Defendants**

680. The following former directors and/or officers are named as Defendants for the Securities Act Claims.

681. Defendant Anthony F. Earley, Jr. ("Earley") served as PG&E Corporation's President, Chief Executive Officer ("CEO"), and Chairman of the Board from September 13, 2011 to March 1, 2017, and as its Executive Chairman from March 1, 2017 to December 2017. Earley was a director of the Utility at the time of the March 2016 Notes Offering, the December 2016 Notes Offering, and the March 2017 Notes Offering. Earley signed the registration statements for the March 2016 Notes Offering, the December 2016 Notes Offering, and the March 2017 Notes Offering.

682. Defendant Geisha J. Williams ("Williams") served as PG&E Corporation's CEO and President from March 1, 2017 until her resignation on January 13, 2019. Previously, she served as the President of Electric Operations at the Utility from August 17, 2015 to February 28, 2017. Prior to that, she served as Executive Vice President of Electric Operations at the Utility from June 1, 2011 to August 16, 2015. Williams was a director of the Utility at the time of the March 2016 Notes Offering, the December 2016 Notes Offering, the March 2017 Notes Offering, and the April 2018 Notes Offering. Williams signed the registration statements for the March 2017 Notes Offering and the April 2018 Notes Offering.

683. Defendant Nickolas Stavropoulos ("Stavropoulos") served as the President and COO of PG&E Corporation from March 1, 2017 to September 30, 2018, and served as President of Gas Operations at the Utility from August 17, 2015 to February 28, 2017. Prior to that, he served as Executive Vice President of Gas Operations at the Utility from June 13, 2011 to August 16, 2015. Stavropoulos was a director of the Utility at the time of the March 2016 Notes Offering, the December 2016 Notes Offering, the March 2017 Notes Offering, and the April 2018 Notes Offering. Stavropoulos signed the registration statements for the March 2017 Notes Offering and the April 2018 Notes Offering.

684. Defendant Barbara L. Rambo ("Rambo") was a director of the Utility at the time of the March 2016 Notes Offering, the December 2016 Notes Offering, the March 2017 Notes

Offering, and the April 2018 Notes Offering. Rambo signed the registration statements for the March 2016 Notes Offering, the December 2016 Notes Offering, the March 2017 Notes Offering, and the April 2018 Notes Offering. Rambo was appointed a director of PG&E in 2005. As of May 2, 2019, Rambo was no longer a director.

685. Defendant David S. Thomason ("Thomason") was the Vice President, Chief Financial Officer ("CFO") and Controller of the Utility at the time of the December 2016 Notes Offering, the March 2017 Notes Offering, and the April 2018 Notes Offering. Thomason signed the registration statements for the March 2017 Notes Offering and the April 2018 Notes Offering. Thomason has worked in various roles at PG&E between 2001 and 2023, including roles as CFO, Vice President, and controller. His employment was terminated effective February 17, 2023.

686. Defendant Dinyar B. Mistry ("Mistry") was the Vice President, CFO and Controller of the Utility at the time of the March 2016 Notes Offering, and PG&E's Senior Vice President of Human Resources during the December 2016 Notes Offering, the March 2017 Notes Offering, and the April 2018 Notes Offering. Mistry signed the registration statements for the March 2016 Notes Offering and the December 2016 Notes Offering. According to PG&E, Mistry joined Pacific Gas and Electric Company in 1994, and held various positions until 2020, including Vice President and Controller of Pacific Gas and Electric Company; as Vice President, Regulation and Rates; as Vice President, Internal Audit and Compliance; and as Vice President and Chief Risk and Audit Officer.

687. Defendant Lewis Chew ("Chew") was a director of the Utility at the time of the March 2016 Notes Offering, the December 2016 Notes Offering, the March 2017 Notes Offering, and the April 2018 Notes Offering. Chew signed the registration statements for the March 2016 Notes Offering, the December 2016 Notes Offering, the March 2017 Notes Offering, and the April 2018 Notes Offering. Chew was appointed a director of PG&E in 2009. As of May 2, 2019, Chew was no longer a director.

688. Defendant Fred J. Fowler ("Fowler") was a director of the Utility at the time of the March 2016 Notes Offering, the December 2016 Notes Offering, the March 2017 Notes Offering, and the April 2018 Notes Offering. Fowler signed the registration statements for the March 2016

Notes Offering, the December 2016 Notes Offering, the March 2017 Notes Offering, and the April 2018 Notes Offering. Fowler was a PG&E director from 2012 to 2020.

689. Defendant Maryellen C. Herringer ("Herringer") was a director of the Utility at the time of the March 2016 Notes Offering, and the December 2016 Notes Offering. Herringer signed the registration statements for the March 2016 Notes Offering, the December 2016 Notes Offering, and the March 2017 Notes Offering. Herringer was appointed a director of PG&E in 2009. As of May 2, 2019, Herringer was no longer a director.

690. Defendant Richard C. Kelly ("Kelly") was a director of the Utility at the time of the March 2016 Notes Offering, the December 2016 Notes Offering, the March 2017 Notes Offering, and the April 2018 Notes Offering. He was also Chairman of the Board of PG&E Corporation beginning in December 2017. Kelly signed the registration statements for the March 2016 Notes Offering, the December 2016 Notes Offering, the March 2017 Notes Offering, and the April 2018 Notes Offering. Kelly was a PG&E director from 2013 until his resignation from the Board was announced by PG&E on April 22, 2019.

691. Defendant Roger H. Kimmel ("Kimmel") was a director of the Utility at the time of the March 2016 Notes Offering, the December 2016 Notes Offering, the March 2017 Notes Offering, and the April 2018 Notes Offering. Kimmel signed the registration statements for the March 2016 Notes Offering, the December 2016 Notes Offering, the March 2017 Notes Offering, and the April 2018 Notes Offering. Kimmel was appointed a director of PG&E in 2009. As of May 2, 2019, Kimmel was no longer a director.

692. Defendant Richard A. Meserve ("Meserve") was a director of the Utility at the time of the March 2016 Notes Offering, the December 2016 Notes Offering, the March 2017 Notes Offering, and the April 2018 Notes Offering. Meserve signed the registration statements for the March 2016 Notes Offering, the December 2016 Notes Offering, the March 2017 Notes Offering, and the April 2018 Notes Offering. Meserve was appointed a director of PG&E in 2006. As of May 2, 2019, Meserve was no longer a director.

693. Defendant Forrest E. Miller ("Miller") was a director of the Utility at the time of the March 2016 Notes Offering, the December 2016 Notes Offering, the March 2017 Notes

Offering, and the April 2018 Notes Offering, and Chairman of the Utility's Board since May 2017. Miller signed the registration statements for the March 2016 Notes Offering, the December 2016 Notes Offering, the March 2017 Notes Offering, and the April 2018 Notes Offering. Miller was appointed a director of PG&E in 2009. As of May 2, 2019, Miller was no longer a director.

694. Defendant Barry Lawson Williams ("B. Williams") was a director of the Utility at the time of the March 2016 Notes Offering and the December 2016 Notes Offering, during which time he served as Chairman of the Utility's Board of Directors. B. Williams signed the registration statements for the March 2016 Notes Offering, the December 2016 Notes Offering, and the March 2017 Notes Offering. B. Williams was appointed a director of PG&E in 1996. As of May 2, 2019, B. Williams was no longer a director.

695. Defendant Rosendo G. Parra ("Parra") was a director of the Utility at the time of the March 2016 Notes Offering, the December 2016 Notes Offering, the March 2017 Notes Offering, and the April 2018 Notes Offering. Parra signed the registration statements for the March 2017 Notes Offering and the April 2018 Notes Offering. Parra was appointed a director of PG&E in 2009. As of May 2, 2019, Parra was no longer a director.

696. Defendant Anne Shen Smith ("Smith") was a director of the Utility at the time of the March 2016 Notes Offering, the December 2016 Notes Offering, the March 2017 Notes Offering, and the April 2018 Notes Offering. Smith signed the registration statements for the March 2017 Notes Offering and the April 2018 Notes Offering. Smith was appointed a director of PG&E in 2015. As of May 2, 2019, Smith was no longer a director.

697. Defendant Eric D. Mullins ("Mullins") was a director of the Utility at the time of the December 2016 Notes Offering, the March 2017 Notes Offering, and the April 2018 Notes Offering. Mullins signed the registration statements for the March 2017 Notes Offering and the April 2018 Notes Offering. Mullins was a PG&E director from 2016 to 2020.

698. The Defendants identified in ¶¶681-697 are referred to herein as the "Securities Act Individual Defendants." The Securities Act Individual Defendants signed the registration statements for one or more of the Notes Offerings as detailed herein, and, as directors and/or

executive officers of the Company, participated in the solicitation and sale of PG&E senior notes to investors in the Notes Offerings for their own benefit and the benefit of PG&E.

699. The Director Defendants in ¶¶681, 684, 686-694 above signed the 2014 shelf registration statement pursuant to which PG&E offered notes to the public in the March 2016 Offering and December 2016 Offering. The prospectus supplements to the March 2016 Offering and the December 2016 Offering included fundamental changes in information from the 2014 shelf registration statement. For example, the 2014 shelf registration statement did not mention "droughts or other weather-related conditions or events" that led the governor of California to declare a state of emergency in 2014, while the prospectus supplements for the two Offerings did. PG&E's warnings in the prospectus supplements concerning drought and other conditions or events were false and misleading, as alleged herein (*see infra*¶¶728, 839-840).

**D. Underwriter Defendants**

700. In addition to the above, the following underwriters are named as defendants for the Securities Act Claims for the Notes Offerings for which they served as underwriters.

701. Defendant Barclays Capital Inc. ("Barclays") served as a lead underwriter for the March 2016 Notes Offering.

702. Defendant Blaylock Beal Van, LLC, now known as Blaylock Van, LLC ("Blaylock"), served as an underwriter for the March 2017 Notes Offering.

703. Defendant BNP Paribas Securities Corp. ("BNP") served as a lead underwriter for the March 2016 Notes Offering and the March 2017 Notes Offering.

704. Defendant BNY Mellon Capital Markets, LLC ("BNY") served as an underwriter for the March 2016 Notes Offering and the March 2017 Notes Offering.

705. Defendant CIBC World Markets Corp. ("CIBC") served as an underwriter for the December 2016 Notes Offering.

706. Defendant Citigroup Global Markets Inc. ("Citigroup") served as a lead underwriter for the December 2016 Notes Offering.

707. Defendant C.L. King & Associates, Inc., now known as C.L. King & Associates ("C.L. King"), served as an underwriter for the March 2016 Notes Offering.

708. Defendant Goldman, Sachs & Co., now known as Goldman, Sachs & Co., LLC ("Goldman Sachs"), served as a lead underwriter for the March 2017 Notes Offering.

709. Defendant Great Pacific Securities ("Great Pacific") served as an underwriter for the March 2016 Notes Offering.

710. Defendant J.P. Morgan Securities, LLC ("J.P. Morgan") served as a lead underwriter for the December 2016 Notes Offering.

711. Defendant Lebenthal & Co., LLC ("Lebenthal") served as an underwriter for the December 2016 Notes Offering.

712. Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated, now known as BofA Securities, Inc. ("Merrill Lynch"), served as a lead underwriter for the December 2016 Notes Offering.

713. Defendant MFR Securities, Inc. ("MFR") served as an underwriter for the March 2017 Notes Offering.

714. Defendant Mischler Financial Group, Inc. ("Mischler") served as an underwriter for the December 2016 Notes Offering.

715. Defendant Mitsubishi UFJ Securities (USA), Inc., now known as MUFG Securities Americas, Inc. ("Mitsubishi UFJ"), served as a lead underwriter for the March 2016 Notes Offering.

716. Defendant Mizuho Securities USA Inc., now known as Mizuho Securities USA LLC ("Mizuho"), served as a lead underwriter for the December 2016 Notes Offering.

717. Defendant Morgan Stanley & Co. LLC ("Morgan Stanley") served as a lead underwriter for the March 2016 Notes Offering.

718. Defendant RBC Capital Markets, LLC ("RBC") served as a lead underwriter for the March 2017 Notes Offering.

719. Defendant Samuel A. Ramirez & Company, Inc. ("Ramirez") served as an underwriter for the December 2016 Notes Offering.

720. Defendant SMBC Nikko Securities America, Inc. ("SMBC") served as an underwriter for the December 2016 Notes Offering.

721. Defendant TD Securities (USA) LLC ("TD Securities") served as an underwriter for the March 2016 Notes Offering and the March 2017 Notes Offering.

722. Defendant The Williams Capital Group, L.P., now known as Siebert Williams Shank & Co., LLC ("Williams Capital"), served as a lead underwriter for the March 2016 Notes Offering.

723. Defendant U.S. Bancorp Investments, Inc. ("U.S. Bancorp") served as an underwriter for the December 2016 Notes Offering.

724. Defendant Wells Fargo Securities, LLC ("Wells Fargo") served as a lead underwriter for the March 2017 Notes Offering.

725. The Defendants identified in ¶¶701-724 are referred to herein as the "Underwriter Defendants." The Underwriter Defendants served as underwriters for the Notes Offerings and sold billions of dollars' worth of PG&E senior notes in the Notes Offerings, for which they collectively received tens of millions of dollars in fees and commissions. The Underwriter Defendants drafted and disseminated the Offering Documents used to effectuate each of the Notes Offerings for which they served as underwriters. The Underwriter Defendants' failure to conduct an adequate due diligence investigation was a substantial factor leading to the harm complained of herein with respect to the Securities Act Claims. The Underwriter Defendants are not alleged to be defendants for the April 2018 Notes Offering at this time.

726. The Securities Act Individual Defendants, together with the Underwriter Defendants, are referred to collectively as the "Securities Act Defendants" and are named as defendants with respect to the Securities Act Claims alleged herein.

## XVII. UNBEKNOWNST TO INVESTORS, PG&E'S WILDFIRE MITIGATION PRACTICES WERE SIGNIFICANTLY DEFICIENT IN BOTH SCALE AND COMMITMENT

727. This case rests on the Securities Act Defendants' material omissions of the true risk of wildfires created by PG&E's widespread neglect of wildfire safety practices and its lack of commitment to safety. Investors were unaware of both: (i) the scope and magnitude of PG&E's subpar wildfire practices; and (ii) the Company's appalling lack of commitment to wildfire safety.

728. By way of background, on January 17, 2014, then California Governor Jerry Brown declared a state of emergency because of severe drought conditions. Thereafter, on October 30, 2015, he expanded on that state of emergency as a result of years of historic drought conditions and widespread bark beetle infestation, resulting in the death of tens of millions of trees. He noted that "the die-off is of such scale that it significantly worsens wildfire risk" and "presents life safety risks from falling trees." As a result, he ordered California utilities (including PG&E), to "undertake efforts to remove dead or dying trees in . . . high hazard zones."

729. PG&E was well aware of the increased risk of wildfires and mandate to improve its safety practices as a result. PG&E, however, fell far short of mitigating wildfire risk. In fact, its subpar safety practices and lack of commitment – both financially and culturally – had the opposite effect: PG&E's practices significantly **increased** the risk of wildfires. As the Butte County DA described in June 2020, PG&E's failures created a situation where "'[c]atastrophic failure . . . **was not an "if" question; it was a "when" question**.'" Ex. A at 85. PG&E's systemic failures took multiple forms, as detailed below.

### A. PG&E's Systemic Vegetation Management Deficiencies Significantly Increased the Risk of Wildfires

730. Vegetation management is critical to effectively mitigate the risk of wildfires. As PG&E itself has acknowledged: "[V]egetation presents an acute risk of wildfire ignition across PG&E's service territory . . . [and] in PG&E's [high-fire threat] areas, vegetation contacting its facilities is the leading source of electric involved fire incidents."[197]

731. Because of wildfire risk, PG&E was subject to certain regulations and orders governing its vegetation management practices. These included: (i) Governor Brown's October 2015 emergency proclamation directing utilities to remove and clear trees posing wildfire hazards, as reflected in ¶728 above; (ii) §4292 of the California Public Resources Code ("CPRC"), which requires PG&E to maintain a ten-foot firebreak around any pole that supports electrical equipment; (iii) §4293 of the CPRC, which requires PG&E to remove dead, dying, or diseased trees and limbs

[197] Response to Order to Show Cause Why PG&E's Conditions of Probation Should Not Be Modified, PG&E Criminal Proceedings (N.D. Cal. Jan. 23, 2019), ECF No. 976.

that could contact power lines, and to maintain specified clearance distances – at least four feet around power lines and ten feet around high-voltage power lines – in order to prevent ignition; and (iv) General Order 95, Rule 35 of the CPUC, which imposes substantially the same clearance standards and requires that "dead, rotten or diseased trees or dead, rotten or diseased portions of otherwise healthy trees overhang or lean toward and may fall into a span of supply or communication lines, said trees or portions thereof should be removed."

732. Beginning no later than October 2015, PG&E faced emergency conditions requiring significant increases in its vegetation management practices for the over 100 million trees in its service territory in order to prevent wildfires. The situation was dire, as explained by PG&E in January 2020: "[b]etween 2010 and 2018 . . . over 147 million trees in California alone have died from drought and invasive beetles."[198] PG&E admitted these circumstances tripled the threat of wildfires, "more than 50 percent of PG&E's service area is designated as a high fire-threat area by the . . . (CPUC) and CAL FIRE. **This means that now, over 30,000 miles of PG&E's electric assets are exposed to a higher wildfire risk – more than a tripling of the threat in less than a decade**."[199]

733. Despite the critical importance of vegetation management and the exponential increase in dead and dying trees in its service area, PG&E's safety and vegetation management practices were dismal and, rather than mitigate fire risk, increased it. As Judge Alsup found, despite the requirements of the CPRC, "**for decades [PG&E] neglected its duties** concerning hazard-tree removal and vegetation clearance."[200] He further noted that, at the outset of PG&E's probation in January 2019, the "**backlog of unattended trees and vegetation was staggering**."[201] Subsequently, Judge Alsup found the "**record demonstrates that PG&E's performance with**

---

[198] Testimony of CEO and President, William D. Johnson on January 28, 2020, before the Committee on Energy and Commerce Subcommittee on Energy and Subcommittee on Environment and Climate Change United States House of Representatives on the "Out of Control: The Impact of Wildfires on our Power Sector and the Environment."

[199] *Id.*

[200] Final Comments of District Court Upon Expiration of PG&E's Probation, PG&E Criminal Proceedings (N.D. Cal. Jan. 19, 2022), ECF No. 1559.

[201] *Id.*

**respect to vegetation management has been dismal**" noting several PG&E "admissions," including that in 2016 alone, PG&E experienced approximately 1,400 downed wires caused by vegetation contact.[202] On April 29, 2020, Judge Alsup further stated: "PG&E has recently stepped up its hazard tree and limb operations, but still **admits it has fallen short**. In truth, **PG&E remains years away from compliance with California law and with its own wildfire mitigation plan**. When asked about its compliance, PG&E told the Court that given the 'dynamic environment' of its purview, it remained 'unable to certify perfect compliance' with the probation conditions. That is an understatement."[203]

734. PG&E's efforts to mitigate the risk of wildfires created by the more than 100 million trees within its service territory with the potential to contact power lines fell dramatically short, as PG&E's own statements confirm:

(a) In a June 2018 press release, issued after the catastrophic North Bay Fires, PG&E conceded it only endeavors to "prune or remove approximately 1.4 million trees annually." This represented a paltry 1% of the trees with the potential to contact its power lines and ignite wildfires and, if accurate, simply maintained a steady response to a risk that had tripled, according to PG&E's then CEO Johnson's congressional testimony in January 2020 (*supra*, n.198); and

(b) PG&E's 2019 Wildfire Mitigation Plan submitted to the CPUC on February 6, 2019, detailed the scope of PG&E's prior neglect of its vegetation management duties. The plan included more than $2 billion in new expenditures, including specifically for the following vegetation management activities needed to rectify PG&E's dismal prior work:

(i) Removal of 375,000 trees in 2019 (after cutting down 160,000 in 2018); and

(ii) 2,450 miles of Enhanced Vegetation Management in 2019 (a 320% increase from related practices in 2018).

735. In addition to PG&E's paltry goal to trim just 1% of the trees with the potential to cause deadly wildfires in any given year, PG&E's vegetation management practices faced other

---

[202] Second Order to Show Cause Why PG&E's Conditions of Probation Should Not Be Modified, PG&E Criminal Proceedings (N.D. Cal. Mar. 5, 2019), ECF No. 1027.

[203] Order Modifying Conditions of Probation, PG&E Criminal Proceedings (N.D. Cal. Apr. 29, 2020), ECF No. 1186.

fundamental problems. PG&E faced an adverse trend of regularly failing to identify and address hazardous trees, as confirmed by the November 3, 2016 sworn testimony of PG&E employee Kelly O'Flinn filed in the *Butte Fire Cases* in December 2018. When questioned about a PG&E internal audit reflecting reduced regulatory compliance scores, O'Flinn acknowledged that vegetation management performance was trending downward:

> [Q:] There is a paragraph there [in the audit] that says, "**Regulatory compliance has declined slightly for the last three consecutive SRA audits**[204] and fallen below 99.50 percent for the first time since 2009." . . . Would you consider that to be a trend?
>
> [O'Flinn:] I would say, **yes, it's a trend**.[205]

736. PG&E's ongoing failure to identify and remove hazardous trees was later corroborated by PG&E's court-appointed probation monitor, Kirkland & Ellis LLP (the "Probation Monitor"). In its July 26, 2019 report to Judge Alsup, the Probation Monitor stated that its review "generat[ed] meaningful insight into PG&E's V[egetation] M[anagement] program that [wa]s **otherwise unavailable**."[206] The report found that PG&E was "**missing numerous trees that should have been identified** and worked under applicable regulations." Among other findings:

(a) the Probation Monitor inspected over 1,550 completed vegetation management projects in high fire threat areas, covering approximately 71 miles of electrical circuits, and identified more than **400 hazardous trees that PG&E failed to identify and correct**. This abysmal success rate prompted the Monitor to report that "the quality of the completed work is questionable"; and

(b) the Probation Monitor noted that PG&E missed "**urgent [hazardous trees] that could have resulted in fatalities, injuries, or serious damage**." *Id*. at 15.

---

[204] An SRA Audit is a quality control audit that assesses vegetation management activities in specific areas of PG&E's service territory that are identified by Cal Fire.

[205] *Butte Fire Cases*, No. JCCP 4853, Exhibit G to the Declaration of Kristine K. Meredith, at 45:12-24 (Cal. Super. Ct. Sacramento Cnty. Dec. 21, 2018); *see also id*. at 124:3-12.

[206] The report was based on the Probation Monitor's investigation and observations during the period between April 3, 2019 and July 26, 2019. Letter from Kirkland & Ellis LLP to Judge Alsup, PG&E Criminal Proceedings at 2 (N.D. Cal. July 26, 2019), ECF No. 1089.

737. Likewise, Envista Forensics ("Envista"), hired by the CPUC to conduct a root cause analysis of PG&E's 2017 and 2018 wildfires, found in its July 6, 2022 report that a number of the fires in 2017 and 2018 had been caused by PG&E vegetation management failures that should have been "reasonably detected" prior to the fire's ignition.[207]

738. PG&E's failure to identify hazardous trees was further confirmed by an Independent Safety Monitor ("Independent Monitor") appointed in 2022, to support the CPUC's ongoing safety oversight of PG&E's activities – Filsinger Energy Partners, Inc. During the four-month period between June and September 2022, the Independent Monitor reviewed approximately 500 electric distribution structures and more than 200 miles of circuits in high fire threat areas that were previously inspected by PG&E. The Independent Monitor reported multiple trees missed by PG&E's tree inspectors, including: (i) trees with structural defects likely to cause failure; (ii) dead or dying trees with the potential to strike PG&E facilities; (iii) trees lacking sufficient radial clearance per the relevant regulations and orders; and (iv) trees without adequate overhead clearance according to PG&E's internal vegetation management standards. Additionally, the Independent Monitor identified urgent hazard issues that required immediate attention, such as exposed ground wires and trees that, in their current state, could strike PG&E facilities. These findings reflect that PG&E's vegetation management practices have long continued to be subpar.

739. In fact, rather than ensuring that hazardous trees were identified and removed, PG&E structured its contractor compensation to **discourage tree removal**, offering bonuses to vegetation-management contractors who completed projects "under target." Deposition testimony submitted in the *Butte Fire Cases* in December 2018, confirmed this practice.[208] For example, in his May 16, 2017 deposition, Robert Urban – the corporate representative most qualified to testify

[207] The 2022 root cause analysis conducted by Envista as to PG&E's 2017 and 2018 fires ("Envista Report") was based on, *inter alia*, a review of (i) unredacted reports from Cal Fire and the CPUC, (ii) PG&E documents, and (iii) interviews of PG&E personnel and contractors. Envista, *Root Causes Analyses: 2017-18 Wildfires* at 3-4, 8, 23 (July 6, 2022); *see, e.g.*, *id.* at A-6, A-22, A-70, A-85, A-99.

[208] *See generally Butte Fire Cases*, No. JCCP 4853, Declaration of Kristine K. Meredith (Cal. Super. Ct. Sacramento Cnty. Dec. 21, 2018).

on behalf of PG&E's vegetation management contractors – testified that PG&E paid its contractors bonuses when they identified and cleared **fewer** trees and vegetation:

> [Q:] And under the VMII [bonus] program . . . the way it was set up is **if ACRT listed fewer trees than the target number and it ended up fewer trees than the target number were worked, there would be a bonus provided ACRT met certain other metrics; right**?
>
> [Urban:] **That is correct**.
>
> [Q:] All right. And if ACRT met those certain other metrics, then there would be an amount per tree not worked that would be paid to ACRT; true?
>
> [Urban:] **There would be an incentive paid for trees that came – for unit count that came in under target**. That is correct.
>
> * * *
>
> [Q:] So for every tree underneath – or every tree less than the VMII target, assuming the other metrics had been met, ACRT would receive seven bucks per tree; correct?
>
> [Urban:] That is correct. Seven bucks per unit.
>
> [Q:] Okay. That's right. Because a unit might be a brush, for example; right?
>
> [Urban:] It may.
>
> * * *
>
> [Q:] Did you ever harbor that belief yourself that, hey, **this bonus system kind of incentivizes my people to not do their job**?
>
> [Urban:] **That is a concern**.[209]

740. PG&E further increased the risk of wildfires by failing to hire and train sufficient vegetation management personnel. The Probation Monitor's July 26, 2019 report found that PG&E had a "**lack of qualified tree workers** available to perform all the removals that would be required to fully execute the [vegetation management] program."[210] The Probation Monitor also found: "The large number of potential exceptions identified thus far strongly suggests that there are **gaps in PG&E's training** . . . and that the existing training and contractor oversight is not effective." These shortcomings were not new. As the report explained, "the **supposed** curative training [that

---

209 *Butte Fire Cases*, No. JCCP 4853, Exhibit A to the Declaration of Kristine K. Meredith, at 66:10-22, 68: 15-22, 75:18-22 (Cal. Super. Ct. Sacramento Cnty. Dec. 21, 2018).

210 Letter from Kirkland & Ellis LLP to Judge Alsup, PG&E Criminal Proceedings at 32-33 (N.D. Cal. July 26, 2019), ECF No. 1089.

apparently occurred by April 1, 2019] produced only a 6% improvement and **94% of the problem persisted**," demonstrating that PG&E's training deficiencies had long been known and uncorrected.

741. PG&E further exacerbated wildfire risk by permitting vegetation to violate clearance standards and by manipulating its internal audit process to appear compliant. As reported by *NBC Bay Area* journalist Jaxon Van Derbeken on November 6, 2017:

> **PG&E auditors allow one out of 100 trees they check to violate state power line clearance standards, NBC Bay Area has learned**.
>
> * * *
>
> [I]t emerged during the Butte fire litigation that [internal] auditors were giving out a passing grade when one out of 100 trees they checked turned out to be too close to power lines under state standards.
>
> * * *
>
> When [PG&E] failed to reach that **99 percent compliance** rate in the area around the fire . . . **the company just expanded the universe of trees covered in a particular audit**.
>
> "**So what PG&E does when it doesn't pass, it basically cheats**," [Amanda Riddle, one of the attorneys participating in a lawsuit against PG&E related to the Butte Fire] said. "It adds more miles and more miles until it reaches a passing grade."

Given the more than 100 million hazardous trees in PG&E's service area, this implicated a million hazardous trees with the real potential to start a wildfire.

742. Consistent with the above, on January 31, 2019, during a hearing in the criminal probation proceedings, Judge Alsup commented: "[T]here is one very clear-cut pattern here: That PG&E is starting these fires. . . . PG&E, according to Cal Fire, started the fire. **Global warming did not start the fire**. According to Cal Fire, PG&E started it, all 17 of them."[211]

743. Just a few months later, after reviewing the record and PG&E's submissions, on April 2, 2019, Judge Alsup found that PG&E's vegetation management failures were a major cause of California's catastrophic wildfires:

> **PG&E over several years allowed the trees that needed to be removed to be built up and did not remove them**, did not trim them so that we wound up with a large number of trees that should have been removed by PG&E but weren't. And

[211] Transcript of Proceedings, PG&E Criminal Proceedings (N.D. Cal. Jan. 31, 2019), ECF No. 999.

> that was a major contributing factor, maybe the single biggest factor, in causing the fires in 2017 and 2018 in Northern California.[212]

### B. PG&E's Gross Neglect of Its Electrical Infrastructure Resulted in Outdated and Hazardous Equipment that Added to the Risk of Wildfires

744. As with vegetation management, the safe maintenance of electrical infrastructure, including the inspection, repair, and replacement of facilities and equipment, is critical to mitigate the risk of wildfires. As PG&E purported to warn, "the failure to take expeditious or sufficient action to mitigate operating conditions, facilities, or equipment" can result in the "the breakdown or failure of equipment" which in turn "can cause explosions, fires, or other catastrophic events." *See infra* ¶850. In fact, PG&E faced emergency wildfire conditions exacerbated by its own neglect.

745. Because of these known risks, PG&E was also subject to rules and regulations governing the safe maintenance of its electrical infrastructure, which it repeatedly violated. For example: (i) under CPUC §§451, 702, and 2106, PG&E was required to adequately maintain its infrastructure, including electrical towers, poles, and conductors, to prevent its system from causing fires to furnish and maintain equipment that promotes public safety and health; (ii) under the CPUC's General Order 95, PG&E was required to ensure that: "All lines and portions of lines shall be maintained in such condition as to provide safety factors not less than those specified in Rule 44.3," which in turn prohibits the use of poles, towers, and structures "with a safety factor less than one"; and (iii) under General Order 165, PG&E was required to "conduct inspections of its distribution facilities, as necessary, to ensure reliable, high-quality, and safe operation." These duties also rendered PG&E liable to property owners for damages caused by its equipment under California Health & Safety Code §13007, which provides that negligence or violations of law makes a utility liable for any fire it sets or allows to be set. In violation of these rules and regulations, PG&E failed to adequately maintain, replace or inspect its electrical infrastructure.

746. **Failure to Remediate Safety Issues**: Following the Camp Fire, several sources detailed PG&E's failures to address safety issues. For example, as described by an April 12, 2019, *NBC Bay Area* article titled "**PG&E Inspectors Find Hundreds of Safety Issues on Electrical**

[212] Transcript of Proceedings at 6-7, PG&E Criminal Proceedings (N.D. Cal. Apr. 4, 2019), ECF No. 1047.

**Towers**," PG&E's post-Camp Fire inspections (of thousands of transmission towers across Northern California) **uncovered more than 450 safety violations**, including 59 that posed serious safety hazards.[213] Similarly, in 2020, the CPUC reported that PG&E estimated in its 2020 Wildfire Mitigation Plan it has more than 15,000 "non-exempt" fuse devices, which can ignite fires.[214] Yet, PG&E only planned to replace 625 a year **starting in 2019** – a timeline the CPUC described as "drawn out."

747. **Failure to Replace Outdated Hazardous Equipment**: One of the greatest wildfire safety threats was posed by PG&E's increasingly old and dilapidated infrastructure as reflected by numerous sources including investigations related to PG&E's safety practices and news outlets. For example, several sources reported that PG&E's infrastructure was outdated and past its life expectancy by decades:

(a) as reported in 2019, PG&E's "transmission towers were an average of 68 years old. Their mean life expectancy was 65 years. **The oldest steel towers were 108 years old**";[215]

(b) as observed by the Independent Monitor in 2022, PG&E: (i) had **equipment** with an average age of 60 years – **20 years older than the average industry service life** of 40 years; (ii) had equipment with an average age of failure of 70 years with **47% of this equipment exceeding this average age of failure**; and (iii) would have to purchase and install over 2,000 components in order to bring the asset age of the equipment down to the PG&E average age of

---

213 Jaxon Van Derbeken, *PG&E Inspectors Find Hundreds of Safety Issues on Electrical Towers*, NBC Bay Area (Apr. 12, 2019).

214 June 11, 2020 Wildfire Safety Division Action Statement on Pacific Gas and Electric Company's 2020 Wildfire Mitigation Plan issued by the Wildfire Safety Division of the CPUC ("CPUC Action Stmt.").

215 As reported in a July 10, 2019, *The Wall Street Journal* investigative report titled "PG&E Knew for Years Its Lines Could Spark Wildfire and Didn't Fix Them" based, *inter alia*, on internal PG&E documents.

failure.[216] The monitor concluded that: "[a] **significantly higher investment would be required** to get each asset category reduced to the industry average"; and

(c) PG&E's neglect of its aging infrastructure caused the Camp Fire, which resulted when original components to **a tower erected in 1921**, that had not been properly inspected, repaired, or replaced, failed.[217]

748. Other sources reported both before and after the CPUC's determination on the aged and hazardous Caribou-Palermo line that PG&E neglected to perform safety work, as follows:

(a) as reported in the news in February 2019, PG&E: (i) had **delayed for several years critical repairs** to its high-voltage Caribou-Palermo transmission line; and (ii) **failed to fix the 100-year old** line despite informing federal regulators of its **plans to repair** and replace damaged sections of the line **as early as 2013**;[218]

(b) as reported by *The Wall Street Journal* in July 2019, PG&E: (i) "**delayed safety work** on the Caribou-Palermo line **for more than five years**" – the line that caused the Camp Fire; (ii) "knew that 49 of the steel towers that carry the electrical line that failed needed to be replaced entirely"; (iii) "said it needed a plan to replace towers and better manage lines to prevent "structure failure resulting [in] conductor on ground causing fire"; (iv) "**hadn't regularly climbed its towers** to inspect their condition, despite the suggestion of an outside consultant it hired"; (v) had "acknowledged in its 2017 internal presentation that it had poor age data on the towers in its 60-kilovolt system" but only "recently targeted one leg for extensive work after discovering that 10 towers within the Golden Gate National Recreation Area were at **high risk of failure**"; and (vi) had stated in a "June 5 letter" (presumably from 2019), that its towers remained

[216] The Independent Monitor that assessed the status of PG&E's electrical infrastructure between January 2022 and September 2022, Letter from Kirkland & Ellis LLP to Judge Alsup, PG&E Criminal Proceedings at 2 (N.D. Cal. July 26, 2019), ECF No. 1089.

[217] Butte County District Attorney, *The Camp Fire Public Report A Summary of the Camp Fire Investigation* (June 16, 2020) ("Butte DA Report") (Ex. A) (*e.g.*, at 19).

[218] George Avalos, *PG&E knew for years that repairs were needed on transmission lines in area of fatal Camp Fire*, The Mercury News (updated Feb. 28, 2019 6:05 AM).

in "critical condition with noticeable material loss and ground erosion" requiring round-the-clock monitoring, and estimated that permanent repairs would take more than a year;[219]

(c) also reported in the news in February 2019, a May 2017 CPUC filing reflected that: "'**In 2010 and** again in **2015**, the California Independent System Operator transmission plan **identified the need to improve and upgrade this system** to address potential overloads and power outages that would affect customers in the service area"';[220]

(d) internal documents published in 2019 revealed that: (i) in December 2012, **five aging towers along the Caribou-Palermo transmission line had collapsed**; and (ii) in 2014 internal PG&E emails acknowledged that "**the likelihood of failed structures happening is high**," [221] and

(e) the June 16, 2020 Butte DA Report also confirmed that PG&E sources had internally reported: (i) "'There have been **multiple conductor failures on th[e Caribou-Palermo] line** due to conductor being annealed and parting.'"; (ii) "'**Since 2002** there have been 8 event reports created on this line **5 of which was equipment related failures**.'"; and (iii) "'**The probability of that failure is imminent due to the age of both the towers and the conductor**.'" Ex. A at 34.

749. **PG&E Failed to Inspect its Outdated Infrastructure**: As reported (¶748, above) and determined by the CPUC, PG&E had not followed its own policies for inspecting towers for at least 16 years on Tower 27/222, the same "Incident Tower" that started the Camp Fire. According to the November 8, 2019 CPUC Incident Investigation Report[222] based on the CPUC's Safety and Enforcement Division's ("SED") investigation of the Camp Fire:

---

[219] As reported in a July 10, 2019 *The Wall Street Journal* investigative report titled "PG&E Knew for Years Its Lines Could Spark Wildfire and Didn't Fix Them" based, in part, on internal PG&E documents.

[220] George Avalos, *PG&E knew for years that repairs were needed on transmission lines in area of fatal Camp Fire*, Marin Independent Journal (updated Feb. 28, 2019 6:05 AM).

[221] These internal PG&E documents were published on March 18, 2019, by law firms representing the fire victims revealed PG&E. Many are also referenced in the Butte DA Report. Ex. A (*passim*).

[222] The report was based on several sources of information including field visits and review of PG&E's responses to hundreds of data requests.

> [B]ased on PG&E's records of detailed climbing inspections that SED reviewed, **PG&E did not perform any climbing inspections triggered by specific conditions on the Incident Tower between at least 2001 and the time of the Camp Fire**. . . . SED notes that a climbing inspection of the Incident Tower during that time could have identified the worn C-hook before it failed, and that its timely replacement **could have prevented ignition of the Camp Fire**.

As the report concluded, "the identified shortcomings in PG&E's inspection and maintenance of the [I]ncident [T]ower were not isolated, but rather **indicative of an overall pattern of inadequate inspection and maintenance of PG&E's transmission facilities**."[223]

750. The same CPUC report also determined that PG&E's negligence violated a dozen or more laws and regulations. For example:

| **General Order Rule, Public Utilities Code Requirements** | **Violations** |
|---|---|
| GO 95, Rule 44.3 | PG&E failed to replace or reinforce the C-hook on Tower :27/222 (Incident Tower) before its safety factor was reduced to less than two-thirds of the safety factor specified in Rule 44.1, Table 4, which is a violation of Rule 44.3. |
| GO 95, Rule 31.1 | PG&E failed to maintain the C-hook supporting the transposition jumper on the Incident Tower :27/222 for its intended use and regard being given to the conditions under which it was to be operated. |
| GO 95, Rule 31.2 | PG&E failed to inspect Incident Tower thoroughly and failed to detect an immediate Safety Hazard or Priority A condition on the incident C-hook. |
| GO 165, Section IV | PG&E failed to follow its procedures by failing to document the factors and reasons that led to the delay in the repair work on the Incident Tower. |
| GO 165, Section IV | PG&E failed to conduct detailed climbing inspections when conditions to trigger climbing inspections were evident as specified in PG&E's procedures.<br><br>Wear on the original working eyes that remained on the Incident Tower is an indication of a known condition with potential to recur on the added hanger plates with working eyes, which should have triggered detailed climbing inspection to examine the added hanger plates. |
| GO 95, Rule 31.1 | The condition of the C-hook (material loss > 50%) supporting the transposition jumper on Tower :24/199 demonstrates that PG&E did not maintain the tower for its intended use. |

[223] CPUC Safety and Enforcement Division Electric Safety and Reliability Branch ("ESRB"), *Incident Investigation Report* (Nov. 8, 2019).

| | |
|---|---|
| GO 95, Rule 31.2 | PG&E failed to inspect Tower :24/199 thoroughly and failed to detect an immediate Safety Hazard or Priority A Condition on the C-hook. |
| GO 165, Section IV | C-hook on Tower :24/199 had material loss of over 50%. PG&E failed to detect and correct the Priority A condition as specified in PG&E's procedures. |
| GO 95, Rule 18 | PG&E assigned an incorrect priority for an immediate Safety Hazard (disconnected insulator hold-down anchor on Tower :27/221). |
| GO 165, Section IV | PG&E failed to follow its procedures by using an outdated inspection form during the detailed climbing inspections that PG&E conducted from September 19 to November 5, 2018. |
| D.06-04-055, as amended by Resolution E-4184 | PG&E failed to report the reportable incident on the Big Bend 1101 12vkV Distribution Circuit in a timely manner. |
| CA Public Utilities Code Section 451 | PG&E failed to maintain an effective inspection and maintenance program to identify and correct hazardous conditions on its transmission lines in order to furnish and maintain service and facilities, as are necessary to promote the safety and health of its patrons and the public. |

751. PG&E's failure to conduct adequate inspections is also corroborated by its own admissions. In its February 6, 2019 wildfire mitigation plan submitted to the CPUC, PG&E acknowledged that it stepped up its inspection program only after the deadly 2018 Camp Fire, reporting that it had drastically increased the inspection of PG&E's transmission structures with an increase – from 9,400 in 2018 to 40,600 in 2019. It also admitted it was performing enhanced inspections of 685,000 distribution poles, including climbing of all transmission towers, after making 517,500 routine inspections of distribution poles in 2018.

752. **Failure to Train Inspectors**: PG&E also failed to properly train its front-line inspectors – known as "troublemen." As such, the number of structures or equipment likely to fail was larger than what PG&E was aware of at the time. Indeed, the Butte County District Attorney found in the Butte DA Report that:

(a) "the troublemen . . . unanimously **denied having received any formal training** on conducting inspections and patrols and assessing wear. The troublemen also denied being provided with any records (for example tower schematics)." Ex. A at 30; and

(b) "[t]he evidence established that, despite the lofty goals of the originators of the troubleman position, and the designation of QCR[224] by PG&E, by 2007 the inspections and patrols of the Caribou-Palermo line were being conducted by **inexperienced, untrained and unqualified troublemen**." Ex. A at 30.

753. **PG&E's Run to Failure Approach**: It was PG&E's practice to neglect inspections and repairs (which typically cannot be recouped through rates passed on to customers) and instead operate its equipment to failure. This is reflected in:

(a) the Butte DA Report's conclusion that: "The only **reasonable conclusion to be drawn from the totality of the evidence** is that PG&E was employing a **run to failure strategy on the entirety** of the Caribou-Big Bend section of the Caribou-Palermo line. Pursuant to the run to failure strategy, PG&E only applied a low degree or patrol with minimal frequency to continuously assess risk, and only performed corrective maintenance." Ex. A at 60; and

(b) the 2022 Envista Report found that: "The corrective **maintenance (tag) backlog was significant** in both duration and number, which contributed to **degraded system conditions**" and "**PG&E should . . . not replace on failure**," and the Envista Report further found "[t]he primary form and structure defects would be readily visible to a diligent inspector performing a ground-based inspection along the right-of-way."

754. As a result of the above failures to train inspectors or to inspect, repair, and replace PG&E's failing infrastructure, the Butte DA concluded: "**Catastrophic failure of the Caribou-Palermo line was not an 'if' question; it was a 'when' question**." Ex. A at 85. As was the case for all of PG&E's neglected infrastructure.

### C. PG&E Failed to Invest in or Implement Wildfire Mitigation Strategies Necessary to Prevent Wildfires

755. Unbeknownst to investors, PG&E's subpar and noncompliant vegetation management practices and neglect of its infrastructure as described §§XVII.A.-B. above,

[224] "QCR" means Qualified Company Representative and, according to the Butte DA Report, is "'a person, who by reason of training and work experience is able to complete an accurate assessment of the electric transmission facilities that he/she is asked to inspect.'" Ex. A at 29.

significantly increased (not reduced) wildfire risk during a time that the threat of wildfires had ballooned because of the increase of hazardous trees and infrastructure at risk of "imminent" failure. At the same time, PG&E refused to implement other wildfire safety mitigation practices that would have mitigated the risks PG&E's undisclosed, negligent safety practices had exacerbated, misleading investors into believing they were not necessary to prevent or reduce the risk of wildfires. As a result, the Offering Documents misrepresented the real risk of wildfires that existed at the time.

756. In its SEC filings PG&E now admits that: "In response to the wildfire threat facing California," it has taken steps to "mitigate the threat of catastrophic wildfires" including undergrounding and a Public Safety Power Shutoff ("PSPS") program.[225]

### 1. PG&E's Failure to Allocate Resources to or Prioritize Undergrounding Lines Significantly Exacerbated Wildfire Risk

757. PG&E chose not to invest in undergrounding lines because of the expense but failed to acknowledge prior to each of the Notes Offerings that undergrounding lines "substantially" reduces wildfire risk. Rather, PG&E publicly took the stance that undergrounding decisions were based on cost and aesthetic considerations.

758. This is born out in PG&E's current website "Open Lines" page wherein PG&E belatedly admits that undergrounding is the only way to get 98% of the wildfire risk off its equipment, and that: "**It's safer and cheaper in the long run to move the highest wildfire risk lines** underground." Likewise, in its "Outages & Safety" tab, PG&E highlights the "**[b]enefits of undergrounding for wildfire safety**" including that "[u]ndergrounding is safe, strong and **more cost-effective** in the long term."[226] Notably, PG&E's current website concedes **undergrounding "eliminates nearly all wildfire ignition risk from that line**. It also improves reliability." It further explicitly tells the investment community, as reflected in PG&E's FY24 Form 10-K, that "[u]ndergrounding can **substantially reduce ignition risk**."[227]

---

[225] PG&E's FY24 Form 10-K filed with the SEC on February 13, 2025.

[226] PG&E website, *Open Lines*, (last visited Nov. 11, 2025).

[227] PG&E's FY24 Form 10-K filed with the SEC on February 13, 2025.

759. In contrast, there was no mention in the Offering Documents that "[u]ndergrounding can substantially reduce ignition risk." Rather, during this period PG&E treated undergrounding as a low-priority activity and repeatedly told regulators and the public that it was prohibitively expensive. In its public statements, PG&E emphasized cost and aesthetic considerations rather than safety, even as wildfire threats escalated across its service territory. For example, as of December 5, 2017, a PG&E website titled "Facts About Undergrounding," PG&E asserted "[t]he main benefits of undergrounding are aesthetic improvement in historic or scenic areas and street-side safety in highly congested areas."

760. Only after the 2021 Dixie Fire[228] – and following PG&E's emergence from bankruptcy – did PG&E reverse its position. As reported by *The Wall Street Journal* on July 21, 2021, PG&E's CEO admitted: "'We know that we have long argued that undergrounding was too expensive,' Chief Executive Patti Poppe said. 'This is where we say **it's too expensive not to underground. Lives are on the line**.'"

761. With respect to the little undergrounding work PG&E did do, a 2019 audit conducted by AzP Consulting, LLC of PG&E's undergrounding practices found that PG&E had managed funds for undergrounding "in a manner that was 'inconsistent with the Commission's intent,'" including underspending by $123 million between 2007 and 2016, and failing to provide any record of how the collected funds were used – conduct the auditors considered "concerning." PG&E underspent and diverted these undergrounding funds elsewhere despite knowing how important they were to safety. Only after a series of catastrophic fires and its bankruptcy would PG&E announce, in July 2021, a 10,000-mile plan to underground lines to prevent wildfires.

**2. PG&E's Failure to Invest in Shutoffs Further Exacerbated Wildfire Risk**

762. At the time of the Notes Offerings, PG&E failed to maintain even the most basic emergency-response plan to address situations where there was a near term-risk of wildfires. As Judge Alsup recounted in his final comments at the close of PG&E's criminal probation, PG&E

[228] The Dixie Fire started in July 2021, after a tree fell on energized conductors owned and operated by PG&E. The CPUC issued a $45 million penalty to PG&E for its involvement in the Dixie Fire.

resisted his proposal to implement precautionary power shutoffs despite the court's urging that it do so:

> **When probation started in 2017, PG&E had no Public Safety Power Shutoff program of any kind**. After the Wine Country Fires in 2017, seventeen of which were caused by PG&E when the Diablo winds blew hazard trees and limbs (some of which should have been but had not been removed) onto its lines, the Court proposed to require PG&E, in advance of future windstorms, to deenergize any lines known to be at risk due to unremoved hazard trees and limbs. **PG&E resisted this proposal mightily**.[229]

763. Public reporting confirms that PG&E had known for years that such deenergization policies were effective at reducing wildfire risk. On August 18, 2020, PBS' Frontline and KQED published the results of an investigative report based on hundreds of documents filed with the CPUC between 2008 and 2019, titled "'Deflect, Delay, Defer': Decade of Pacific Gas & Electric Wildfire Safety Pushback Preceded Disasters." The article quoted Mark Ferron, a former CPUC commissioner, as saying: "'**On a scale from one to 10, where 10 is really obstructive and zero is completely cooperative, I would have put PG&E at a nine**." For example, PG&E failed to implement preemptive power shutoff rules before the Notes Offerings, despite its knowledge that such policies effectively reduced the risk of catastrophic wildfires since at least 2013. The article further reported: "'No company makes any money when it is forced to terminate power,'" PG&E commented. PG&E **delayed implementing the policy for years**, former CPUC commissioner Catherine Sandoval said, despite **knowing "it had a wildfire problem fueled by drought and barkbeetle tree die-offs**."

764. Ultimately, because PG&E's vegetation management practices remained so poor and the backlog of overgrown hazard trees so extensive as discussed in § XVII.A., above, PG&E was forced to adopt a PSPS program for the 2019 wildfire season – a policy that Judge Alsup described as a reluctant but necessary "turnabout" (a program that they poorly implemented by loosening criteria in the years shortly thereafter):

> **Then, in a turnabout, PG&E on its own adopted such a program**, which has become known as its Public Safety Power Shutoff (PSPS) program. The highwater mark of its PSPS program came in its first year (2019), when, despite severe windstorms that year, not a single fire was caused by any PG&E distribution line.

---

[229] Final Alsup Comments Order, PG&E Criminal Proceedings (N.D. Cal. Jan. 19, 2022), ECF No. 1559.

> Lines at risk had been deenergized as the storms drew near. PG&E photographs taken in the immediate aftermath of the windstorms showed hundreds of downed trees and limbs collapsed upon the deenergized power lines. Had those lines been energized, many fires would have been started.
>
> So, as the 2019 wildfire season ended, it seemed as if PG&E had found a modus vivendi to save lives, homes, farms, and forests, at least with respect to its distribution lines, until the hazard tree backlog could be worked through. (The massive Kincaid Fire that year was started by a PG&E transmission line, not a distribution line.)

765. To that end, PG&E, in its most recent annual report, linked climate change as continuing "to intensify the potential for wildfires throughout California" but then also tethers it to "requ[iring] PSPS events."[230] Those PSPS events were required at the time of the Notes Offerings to mitigate the potential for catastrophic wildfires, but PG&E failed to either implement them or tell investors that their failure to do so exacerbated the wildfire risk facing PG&E given the circumstances at the time – a massive vegetation management problem and outdated equipment.

766. This conclusion was noted by PG&E's Probation Monitor in its November 19, 2021 report to Judge Alsup:

> The Monitor team understands that **a more ideal situation would be that PG&E had historically** (that is, over the last generation at least) **invested more in hardening infrastructure and in maintaining vegetation** in a way that would obviate the need for proactive deenergization on the scale used by PG&E today. Unfortunately, however, **the current state of affairs requires PG&E to preemptively deenergize assets** in areas with forecasted adverse weather conditions of sufficient severity and high fire potential.[231]

### D. PG&E Failed to Commit to Wildfire Safety Both Financially and Culturally

767. PG&E prioritized shareholder dividends, executive compensation, and other expenditures over wildfire safety, including maintenance of its electrical infrastructure, vegetation management, and mitigation programs designed to reduce wildfire risk.

768. Judge Alsup specifically found in PG&E's criminal-probation proceedings that this misallocation of resources directly undermined safety:

> [A]s we've **gotten into the evidence**, and I've studied quite a lot of it, again I want to say it's quite clear that PG&E pumped out $4.5 billion in the last five years in

[230] PG&E's FY24 Form 10-K filed with the SEC on February 13, 2025.

[231] PG&E Independent Monitor Report of November 19, 2021, PG&E Criminal Proceedings (N.D. Cal. Nov. 23, 2021), ECF No. 1524-1.

> dividends and **let the tree budget wither so that a lot of trees that should have been taken down were not**.

769. Judge Alsup denounced PG&E's deficient safety practices, and condemned the Company's prioritization of dividends:

> This is a crisis, a crisis that California faces on these wildfires, and **PG&E is the single-most culpable entity in the mix**. . . . PG&E has started more than – way more than its share of these fires.
>
> * * *
>
> This is a problem of your own making. **A lot of money went out in dividends that should have gone to the tree budget**.[232]

770. On April 29, 2020, Judge Alsup explained that PG&E's prioritization of its dividend had resulted in an "ever-greater" safety hazard:

> **This failure is upon us because for years, in order to enlarge dividends, bonuses, and political contributions, PG&E cheated on maintenance of its grid** – to the point that the grid became unsafe to operate during our annual high winds, so unsafe that the grid itself failed and ignited many catastrophic wildfires. In the past three years alone, PG&E wildfires killed at least 108 and burned 22,049 structures.
>
> * * *
>
> Yet **because PG&E skimped on vegetation maintenance, an ever-greater backlog of hazard trees and hazard limbs grew year after year**.[233]

771. PG&E's own internal documents also reflected this culture of neglect toward wildfire safety in favor of profits. For example, an internal May 8, 2008 slide presentation[234] discussed in the July 7, 2017 deposition testimony of former CEO Williams, asked, "What is up for debate?", to which the response included "Safety." A companion slide asked, "What is not up for debate?" and the response listed "8% EPS growth":

---

[232] Transcript of Proceedings at 8, 13, PG&E Criminal Proceedings (N.D. Cal. Apr. 4, 2019), ECF No. 1047.

[233] Order Modifying Conditions of Probation, PG&E Criminal Proceedings (N.D. Cal. Apr. 29, 2020), ECF No. 1186

[234] The slide was filed on November 2, 2018, in *Butte Fire Cases*, No. JCCP 4853, PG&E Defendants' Motion *in Limine* No. 8 to Exclude 2008 Draft Presentation Slide; Declaration of Jeffrey N. Boozell in Support (Cal. Super. Ct. Sacramento Cnty. Nov. 22, 2018) and titled "2008 Utility Offsite Strategy Discussion."

DR_OG_009-Q25B-Atch05

Confidential- Provided Pursuant to Public Utilities Code section 583

## Ground rules for our discussion

***What is up for debate?***

- 2009-11 business priorities, metrics and targets
- Program and project trade-offs
- Input on strategic imperatives
- *Other topics including:*
  - Safety
  - Reliability
  - Productivity
  - Labor strategy
  - Outside the box ideas (e.g., use of outsourcing)

***What is <u>not</u> up for debate?***

- 8% EPS growth
- Legislative and regulatory activity

772. PG&E's neglect of wildfire safety is also reflected in internal audit from 2013 which "found that **the company focused mainly on spending its allotted budget, not ensuring expenditures were prudent and effective**, and that it lacked performance data and other records for many projects," as reflected in a February 27, 2019 *The Wall Street Journal* article.

773. Testimony from PG&E likewise established that the Company knowingly underfunded safety efforts. For example, in October 15, 2018 deposition testimony, the director of PG&E's Enterprise and Operational Risk and Insurance Department, Janaize Markland, was asked about prior "prepared testimony" she had written as part of PG&E's general rate case. According to that prepared testimony, it was possible for PG&E to "manage Wildfire Risk" and improve tree-related outages "but that would **require a level of investment greater than what PG&E is making today**."[235] Her prepared testimony acknowledged that "[w]ith limited resources – PG&E cannot do everything and must decide at what point it is okay not to mitigate the risk further – tradeoff decisions must be made," which Ms. Markland testified was a "true" statement. She

[235] On February 6, 2019, the transcript to Markland's October 15, 2018 deposition was filed together with her prepared May 1, 2015 general rate case testimony as Exhibit A in the PG&E Criminal Proceedings, (N.D. Cal. Feb. 6, 2019), ECF No. 1008-1.

further testified that a tradeoff decision has to do with "at what point [can you reduce] risk further" and at what cost.

774. PG&E's failure to commit to wildfire safety is further evidenced by its non-compliance with California Senate Bill 1028 ("SB 1028") – enacted in September 2016 – which required PG&E and other California utilities to produce annual reports detailing wildfire-risk-mitigation efforts and designating responsible officials. Despite causing the catastrophic 2015 Butte Fire and North Bay Fires, on December 10, 2018, *The San Diego Union-Tribune* reported PG&E failed to produce a report for wildfire mitigation risks two years after the law requiring the production of such a report was enacted. State Senator Jerry Hill, who introduced SB 1028, said of utility regulators' failure to oversee PG&E's implementation of the report: "**They have done absolutely nothing in those two years**." In part to rectify this delinquency, the California State Legislature passed California Senate Bill 901 ("SB 901") in Fall 2018, mandating that utilities submit comprehensive wildfire mitigation plans by February 2019. According to a submission of the CPUC in probation proceedings on February 6, 2019, PG&E finally submitted its first WMP ("2019 WMP").

775. The CPUC likewise documented PG&E's persistent safety failures. In a December 21, 2018 CPUC Scoping Memo and Ruling (the "Ruling"), the CPUC found that:

(a) "**PG&E has had serious safety problems** with both its gas and electric operations **for many years**";

(b) despite these shortcomings, the **Company had failed "to develop a comprehensive enterprise-wide approach to address safety**"; and

(c) the CPUC "was, and remains, concerned that the safety problems being experienced by PG&E were not just one-off situations or bad luck, but indicated **a deeper and more systemic problem**."

776. PG&E's later admissions, submitted in response to the Office of Energy Safety in its January 8, 2024, 2023-2025 Wildfire Mitigation Plan R4 ("2023-2025 WMP"), further illustrate its prolonged failure to prioritize safety. Under the section titled Areas for Continuous Improvement, PG&E conceded:

(a) "[a]t the time of the **[2015] Butte Fire, PG&E did not have a process in place for evaluating specific lessons learned from individual fires**" (2023-2025 WMP at 1028) but for years, PG&E did nothing to change that fact;

(b) "[a]t the time of the [August 29, 2017] Railroad Fire," and "[a]t the time of the **October 2017 Wildfires," PG&E still "did not have a process in place** for evaluating specific lessons learned from individual fires" *id*. at 1029, 1031; and

(c) **regarding the 2018 Camp Fire**, PG&E admitted that: "The **lessons learned** . . . include: (1) **the need for rigorous equipment inspections and maintenance**; and (2) using risk modeling to prioritize inspection and maintenance work." *Id*. at 1034.

777. Other examples of PG&E's lack of commitment and investment in wildfire safety include:

(a) Mike Florio, a former California utilities commissioner stating that: "'There was very much a focus on the bottom line over everything [at PG&E]: "What are the earnings we can report this quarter?'" . . . "'And **things really got squeezed on the maintenance side**'" as reflected in the March 18, 2019 *The New York Times* article referenced in ¶790;

(b) the June 16, 2020 Butte DA Report determined that: "**Based upon the evidence, PG&E reduced costs of inspection and patrol** [*i.e*., of its towers and other facilities] by reducing the amount of time budgeted for the inspections and patrols." Ex. A at 28. Further providing that: "As expected, **the result of these reductions was less thorough and less complete inspections and patrols**" (*id.*);

(c) the Butte DA Report also found that based on "**internal emails** indicating budget reductions and the formation of a committee to investigate reducing patrol and inspection costs, **the only reasonable conclusion was that PG&E achieved expense budget cost savings by reducing the thoroughness of inspections and patrols**" (*id.* at 50);

(d) the Butte DA Report further indicated that "PG&E was unable to produce any documentation as to the budget or eligibility requirements for the Deteriorated Transmission Equipment Replacement Program" (*id.* at 33);

(e) The Butte DA Report further reported that:

> Although the name of the program implied that the program was established to replace deteriorated equipment, no records of funding or eligibility requirements for the program were found. During interviews and testimony of PG&E employees familiar with the program, it was simply a "bucket" of money available to fund capital improvements on transmission lines regardless of the condition of the line or its components.

Ex. A at 33; and

(f) as described in both the Butte DA Report and the Envista Report, PG&E prioritized capital investments that could be recouped through rate increases at the expense of higher priority safety spending that could not be recouped, including by **cutting spending on inspections and repairs and by running PG&E's equipment to failure, while diverting safety funds to capital investments**. *See* Ex. A at 48-60 (contrasting capital vs. expense budget); *e.g.*, at 50 ("PG&E also reduced its expense budget by charging expense projects to the capital budget.").

778. In contrast to PG&E's efforts to reduce its spend on inspection and repairs, executives received vastly increased compensation, even despite the Company's felony convictions. For example, in the period following the 2015 Butte Fire and the Company's 2016 felony convictions related to its gas business, Williams was paid $4.2 million in total direct compensation in 2016, an 11.8% raise from 2015. Stavropoulos was paid $3.9 million in 2016, a 9.2% jump from the previous year. Williams was given an additional 8% raise in 2018, despite PG&E's significant role in igniting the North Bay Fires in October 2017. In fact, in 2018, PG&E paid its executives more than $25 million in direct compensation.[236]

779. Besides the considerable increases in executive compensation, PG&E distributed significant sums of money in dividends while its vegetation management program languished. In 2015, the Company distributed $856 million in dividends.[237] In 2016, after causing the 2015 Butte Fire, PG&E increased its dividend payment to $921 million.[238] Over the first three quarters of 2017 PG&E paid $798 million in dividends. Subsequently, Judge Alsup issued an April 3, 2019 order

---

[236] PG&E Proxy Statement on Schedule 14A filed March 26, 2018 at 77.

[237] PG&E FY16 Form 10-K at 57.

[238] *Id.*

prohibiting PG&E from issuing any additional dividends until it was in compliance with all applicable vegetation management requirements set forth as the terms of its probation.[239]

780. PG&E's first substantial commitment to wildfire safety came only after the catastrophic fires and its filing for bankruptcy. PG&E's 2019 WMP submitted to the CPUC on February 6, 2019, PG&E represented **more than $2 billion** in new expenditures for expanded inspections and vegetation management.

781. These belated expenditures stand in marked contrast to PG&E's paltry vegetation management budgets at the times of the Notes Offerings. As detailed in the CPUC's review of PG&E's 2019 interim risk spending accountability report, and made clear in the accompanying chart, PG&E's spending on wildfire risk reduction increased by 463% after its criminal conviction and wildfire liability:




As reported by the CPUC, PG&E's significant 2019 increase in wildfire spending can be attributed to "PG&E's increased prioritization of reducing catastrophic wildfire risk," something that was neglected previously.

239 Order Adopting New Conditions of Probation, PG&E Criminal Proceedings (N.D. Cal. Apr. 3, 2019), ECF No. 1040.

### E. PG&E Downplayed Its Dismal Wildfire Safety Record by Failing to Maintain or Report Accurate Records

782. The depth of PG&E's failure to implement effective wildfire-mitigation practices was compounded by its inability – or refusal – to maintain accurate safety records. Multiple investigations found that PG&E lacked procedures to capture and report safety risks accurately and, in many instances, falsified inspection and maintenance records provided to the CPUC and others.

783. For example, a January 9, 2019 filing by PG&E's Probation Monitor: (i) found "probable cause to believe that Pacific Gas and Electric Company violated the conditions of their Probation" stemming from the San Bruno pipeline explosion;[240] (ii) cited the Company's failure to report the investigation by the Butte County District Attorney's Office into PG&E's role in starting several of the North Bay Fires; and (iii) cited PG&E's failure to report Cal Fire's findings of responsibility for the Honey Fire (part of the North Bay Fires), that there was the possibility of criminal prosecution stemming from PG&E's role in starting this fire, or that the Company had entered into a settlement agreement with Butte County to avoid such criminal prosecution.

784. That same day, Judge Alsup issued an order proposing additional probation conditions requiring PG&E to significantly bolster its vegetation management activities and re-inspect its entire electrical grid in "light of **PG&E's history of falsification of inspection reports**," among other proposed modifications to the terms of the Company's probation.[241]

785. Confirming PG&E's widespread failure to maintain accurate records, in its July 26, 2019 report, PG&E's Probation Monitor found that "**defective records** have been a root cause of PG&E safety problems **for many years**," and a "**failure** of pre-inspectors **to consistently identify risk trees**." The Probation Monitor also noted: "**Recordkeeping defects have been a recurrent**

[240] Petition for Summons for Offender Under Supervision at 4, PG&E Criminal Proceedings (N.D. Cal. Jan. 9, 2019), ECF No. 960.

[241] Order to Show Cause Why PG&E's Conditions of Probation Should Not Be Modified, PG&E Criminal Proceedings (N.D. Cal. Jan. 9, 2019), ECF No. 961. PG&E has been found responsible by Cal Fire for at least 18 of the 19 major fires stemming from the 2017 Northern California Wildfires that Cal Fire investigated up until that point. Only the Tubbs Fire was not found to have involved PG&E's equipment.

**problem for PG&E** – both before and after the San Bruno explosion and before and after the more recent 2017 and 2018 wildfires."

786. For that same report, the Probation Monitor reviewed completed vegetation-management work and issued "over **400 potential exception reports to PG&E**." For example, after "PG&E informed the [Probation] Monitor . . . that [a] particular tree was identified for routine compliance work in November 2018 and a tree work company reported to PG&E that it completed the work in February 2019," the Probation Monitor checked that work and determined **PG&E never completed the work**, *i.e.*, "the tree work company provided a false certification" and PG&E never confirmed the work was actually completed.

787. In addition, a January 17, 2020 CPUC administrative law decision rejected a $65 million proposed settlement and ordered PG&E to pay $110 million stemming from a December 2018 investigation into PG&E's falsification of records. The decision found that PG&E's senior leadership knew that "late tickets" for marking underground facilities for a period from 2012 to 2017, were not reported to the commission and falsely recorded as on time. While the case arose from PG&E's gas operations, the CPUC emphasized that it reflected "**PG&E's history of poor record keeping**. PG&E is only just moving from a paper records system to digitized records." It also specifically tied that failure to wildfire safety risks: "The Commission has found that PG&E's record keeping is deficient in other contexts with serious safety implications, including records on the location of its underground natural gas and electric lines. PG&E should explain whether it has detected errors or other **problems with its wildfire mitigation records**."

788. A subsequent Probation Monitor report dated November 19, 2021, further confirmed that the integrity of PG&E's recordkeeping concealed the extent of PG&E's poor wildfire safety practices, practices that persisted at the time of the Notes Offerings:

> In the wake of San Bruno, PG&E undertook an effort to overhaul its Gas Operations system of record to ensure its accuracy. However, no such effort was successfully implemented in Electric Operations and **PG&E is still playing catch-up** to achieve in Electric what it sought to do in Gas years ago – **build an accurate system of record that reflects the reality of what is in the field**.[242]

[242] PG&E Independent Monitor Report of November 19, 2021, PG&E Criminal Proceedings (N.D. Cal. Nov. 23, 2021), ECF No. 1524-1.

789. Similarly, the 2022 root-cause analysis conducted by Envista found that, among other things, PG&E's safety systems were woefully inadequate in 2017 and 2018: "**PG&E does not** perform reliability focused outage forensics, root cause analyses, or **have a formal equipment failure reporting system**." Nor did PG&E "have a central process for collecting, tracking, and trending all event lessons learned." *See also supra* ¶¶737, 753(b).

### F. PG&E's Neglect of Wildfire Safety Practices Is Corroborated by Its Poor Track Record Compared to Its Peers

790. As a result of and in addition to the failures above, the extent of PG&E's widespread neglect of wildfire mitigation practices is further evidenced by findings that PG&E was a markedly less safe and less prudent operator than its peer utilities. As one industry expert discussed in a March 18, 2019, *The New York Times* article, "there would have been far fewer destructive fires had PG&E followed San Diego's lead years ago. '**Their culture of a lack of safety is unique**.'" The article specifically mentioned that SDG&E has "a higher proportion of overhead lines in areas at high fire risk" than PG&E, but that SDG&E had mitigated that risk with superior data tracking ("[t]he San Diego utility keeps data on every utility pole and transmission tower in its service territory"), weather monitoring, and that "[w]hen data indicates a high wildfire threat, the utility cuts off power to some areas," among other practices that should have provided a "good template" for PG&E.

791. In response to a set of questions posed by SED to PG&E on October 14, 2017, concerning the Company's safety practices, PG&E confirmed that – unlike peer utilities such as SDG&E – it **had no power-shutoff procedures** in place:

> **Question 5:**
>
> Some utilities, for example SDG&E, have procedures in place to proactively de-energize power lines when weather conditions indicate extremely high risks of fires (based on temperature, humidity, wind-speed and other factors). Does PG&E have similar procedures in place?

**Response 5:**

> **PG&E does not have a procedure to de-energize power lines** and thereby disable power service to its customers in advance of weather conditions that indicate extreme fire risk.[243]

792. PG&E's infrastructure, including its facilities and equipment, was also significantly older and in worse shape than its peers. As discussed *supra* (¶747(b)), in 2022 the Independent Monitor reported **PG&E's equipment was at least 18 years older than the industry average**, "with **47% of equipment exceeding its average age of failure**."

793. PG&E's equipment also failed and ignited fires more frequently than that of other large California utilities. The CPUC Action Statement and its Appendix A, reported that: (i) "**[c]ompared to peer utilities**, PG&E ha[d] approximately **twice as many ignitions per circuit mile, primarily driven by equipment failure and contact from object ignitions**"; (ii) "approximately 50 percent more conductor failure ignitions as a percentage of total ignitions, **nearly 2.5 times the number of 'conductor failure' – driven ignitions per overhead circuit mile compared to peer utilities**"; and (iii) "PG&E capacitor bank failures on its distribution system cause[d] **500 percent higher rates of ignition compared to other large electrical corporations**."

794. PG&E's recordkeeping and inspection practices were likewise inferior to its peers. For example, according to the same Appendix A: "PG&E reported all inspection types together, providing no basis for comparison of PG&E to its peers by inspection type and making it difficult to determine the effectiveness of PG&E's various inspection types." But further, PG&E reported a "huge spike in Level 3 findings" in 2019, evincing a "**lack of parity with SCE and SDG&E** in the number of Level 3 findings" demonstrating that unlike its peers, "PG&E may be using the Level 3 category to avoid fixing problems quickly."[244]

---

243 *See* CPUC, *PG&E's Response to Safety and Enforcement Division's 10/14/17 Questions* (Oct. 17, 2017).

244 Under CPUC General Order 95 ("GO 95"), Rule 18, each utility must maintain an auditable maintenance and inspection program for its overhead lines and facilities. Rule 18 requires that corrective actions be prioritized based on the level of safety or reliability risk associated with a condition: Level 1 represents an immediate safety or reliability risk that must be corrected immediately; Level 2 represents a non-immediate but potentially significant safety

795. Further, unlike SDG&E, PG&E had not significantly undergrounded its lines in high-risk areas, as discussed *supra*.

796. PG&E's overall safety record was also dramatically worse than those of its peers. According to PG&E's own submission to Judge Alsup in 2019, PG&E's equipment caused 1,552 wildfires across California since June 2014, averaging more than one fire a day. By comparison, SoCalEd caused 344 fires, and SDG&E caused 109 during the same period. Put differently, PG&E's equipment caused **4.5 times more wildfires** than SoCalEd. PG&E's equipment was also responsible for more large-scale fires, including 43 more fires than SoCalEd that burned between 10-99 acres, three more between 100-299 acres, and two more between 300-999 acres. SDG&E reported only one wildfire burning over 10 acres during the same timeframe. In contrast, 68 of the 1,552 fires PG&E caused burned over 10 acres, and, as noted in an internal PG&E document from 2017, PG&E's own Fire Incident Data Collection Plans from 2014 to 2016 showed "1 to 2 large fires per year (**300 acres or greater**)" were started by PG&E's equipment.[245]

## XVIII. THE CONSEQUENCES OF PG&E'S NEGLECT OF WILDFIRE SAFETY AND PG&E'S DENIAL OF RESPONSIBILITY

797. PG&E's persistent neglect and lack of commitment to wildfire safety practices, including repeated violations of regulations and laws, resulted in conditions that were highly conducive to the ignition and spread of wildfires. It is worth repeating that the question was not "if" a catastrophic fire would ignite, but "when" (¶729). And, as described below, they did.

798. The Offering Documents failed to inform investors of the true nature of the elevated risk of wildfires and associated liabilities. Indeed, even when wildfires did breakout, PG&E denied, deflected, and downplayed its responsibility, attributing the disasters to drought, wind, and other external factors. Nor did PG&E disclose the real risk of future fires as a result of its neglect and failure to remediate its unsafe practices.

---

or reliability risk that must be scheduled for timely correction; and Level 3 represents an acceptable safety or reliability risk for which corrective action may be deferred and taken "as appropriate."

[245] Amended Attorneys Pitre and Campora's Comments on the Accuracy of PG&E's Response, PG&E Criminal Proceedings (Mar. 1, 2019), ECF No. 1026 at 37-38.

799. As discussed above, PG&E's vegetation management failures exacerbated fire risk. The Butte Fire was a consequence. Indeed, PG&E's failure to remove a gray pine tree that had been marked as a hazard but never cut down ignited the Butte Fire on September 9, 2015. The tree contacted PG&E's electric line, sparking a fire that killed two people, destroyed more than 500 homes and 400 other structures, and burned over 70,000 acres across 22 days. Following the March 2016 Offering, on April 28, 2016, Cal Fire announced that the Butte Fire was caused by PG&E's failure to identify potential hazards as part of its vegetation management program. Cal Fire sought $90 million in firefighting costs – an estimate PG&E deemed reasonable in a May 2, 2016 Form 8-K filing.[246]

800. Yet, in that same filing, PG&E impliedly denied any negligence indicating "[i]n connection with this matter, the Utility may be liable . . . without having been found negligent" and assured investors that it had insurance coverage. A message that PG&E would continue to repeat in its 2016 Form 10-K filed with the SEC on February 16, 2017, and 2017 Form 10-K filed with the SEC on February 9, 2018. Thereafter, PG&E explicitly denied that it had acted negligently with respect to the fire in its 2017 Form 10-K (filed February 9, 2018), telling investors that it "believes it was not negligent." Not until post-bankruptcy, on December 6, 2019, would PG&E issue a press release that it had entered into a settlement agreement for multiple fires for $13.5 billion, one of which was the Butte Fire.

801. Another consequence of PG&E's unsafe practices was the North Bay Fires. In October 2017, multiple fires were ignited as result of vegetation coming into contact with PG&E power lines and became known as the North Bay Fires. The fires ravaged over 245,000 acres, killed 44 people, and caused billions of dollars in damages. In addition to the apparent causes of the fires as they were reported, Cal Fire ultimately determined that PG&E's equipment was involved in all but the Tubbs fire, and later in 2018, made additional determinations. Specifically, four fires were linked to violations of state vegetation-clearance regulations, and 12 more were caused by PG&E equipment. Several incidents were referred for potential criminal review. PG&E,

[246] *See also* Press Release, Cal Fire, *Cal Fire Investigators Determine Cause of Destructive Butte Fire* (Apr. 28, 2016).

as it had done with the Butte Fire, deflected responsibility for the North Bay Fires. For example, during its November 2, 2017 earnings call, CEO Williams attributed the fires to high winds and years of drought followed by periods of high rain, while also reassuring investors that PG&E has "one of, if not, the most comprehensive vegetation management programs in the country." While Williams cited incidents that PG&E reported to Cal Fire and the CPUC, she clarified that those reports "do not reflect a finding of cause." Similarly, in its 2017 Form 10-K filed with the SEC on February 9, 2018, PG&E referred to Cal Fire and the CPUC investigating its "possible role" and stated that liability could be determined "without having been found negligent."

802. PG&E's attempts to deflect responsibility convinced analysts and the market. For example, on November 20, 2017, analysts at Evercore ISI ("Evercore") reported that PG&E maintained its operations had been "conducted properly." Evercore concluded that "we still do not know and likely will not know what caused the various fires for some time":

> **On the 3Q17 call PCG indicated company operations were conducted properly leading up to and after the fire, but still have little information regarding the cause of the fire or potential shareholder exposure**. According to PCG, there was an extraordinary weather event with winds "without precedent" exceeding 75 MPH prior to the fires and that the area had trees that were weakened by years of drought and other environmental factors. PCG has submitted incident reports to the CPUC in instances where Cal Fire investigators of PG&E identified a site potentially involving PCG equipment. PCG also indicated they found instances of wires down, vegetation near PCG facilities and some broken poles. PCG reiterated the company routinely inspects, maintains, and replaces poles, and tests and treats wood poles on a frequency that significantly exceeds CPUC requirements. **The company claims to have one of, if not the most comprehensive vegetation management programs in the country**. Further, the company doubled its vegetation management spending in 2016 due to the drought and tree-mortality crisis in California. That being said, **we still do not know and likely will not know what caused the various fires for some time**.

(some emphasis in original).

803. On November 30, 2017, J.P. Morgan published a research report with a subheading titled "Causes of Fires Still Not Clear," which reported PG&E was "**well prepared**" for wildfire conditions and emphasized external factors contributed to the fires, noting for example that the incident reports provided to the CPUC by PG&E "**contain[ed] little discernable information related to the cause of any of the ~21 fires**."

804. Even following the April 2018 Offering, the media was reporting on PG&E's denial of liability for the North Bay Fires. As reported by *ABC7 News* in a May 18, 2018 article titled "Key hearing held on PG&E's North Bay wildfire liability, rate hikes," at a San Francisco Superior Court hearing "**PG&E denied being liable for the wildfires**, but said if they were found liable they want to be able to ask for rate hikes from their customers to pay for the damages."

805. On May 25, 2018, Cal Fire issued a press release announcing the results of its investigation into four of the North Bay Fires. The agency found that all four began as a result of downed vegetation disrupting PG&E power lines, and that three of the four were due to PG&E's apparent violations of California safety regulations regarding the necessary clearance between trees and power lines. The violations were of such a nature that Cal Fire referred these incidents to the appropriate district attorneys' offices for further review.

806. Less than a month later, on June 8, 2018, Cal Fire announced the results of its investigation into 12 additional wildfires that occurred during the North Bay Fires. The agency determined that all 12 wildfires were caused by PG&E equipment and that eight of the 12 had been referred to the appropriate district attorneys' offices for further review "due to evidence of alleged violations of state law." Subsequently, on October 9, 2018, Cal Fire issued a press release announcing the results of its investigation into the Cascade Fire, part of the North Bay Fires. Again, PG&E equipment was found to be the cause of the fire.

807. Despite these announcements, in its November 5, 2018 Form 10-Q PG&E told investors that as to four of the fires the "timing and outcome" of the investigation is "uncertain." It also claimed the outcome of litigation regarding the fires was "uncertain." As to liabilities, PG&E insisted that it would "depend on various factors" including "contributing causes" such as weather and climate-related issues.

808. Days later, on November 8, 2018, PG&E's unsafe practices resulted in the Camp Fire. The Camp Fire was one of the most destructive and fatal wildfires in California history. The fire burned 153,336 acres and caused at least 85 fatalities, with total damages estimated on the low-end at $16.5 billion. The fire was considered the costliest natural disaster in the world in 2018.

809. Cal Fire, as it did with the 2015 Butte Fire and North Bay Fires, conducted an investigation. PG&E equipment was implicated as the cause of the Camp Fire. Specifically, Cal Fire identified the location of the fire as near a PG&E transmission line, which the Company revealed in a December 11, 2018 electric incident report had relayed and de-energized shortly before the fire began. A PG&E employee also reported a fire in the vicinity of the transmission line to 911 the morning the Camp Fire started, and an aerial patrol identified a suspension insulator supporting a transposition jump at the transmission tower that had separated.

810. On November 14, 2018, *Reuters* published an article describing the market's reaction to the news about PG&E's liability for wildfires, titled "PG&E shares and bonds plunge as California wildfire risks mount."

811. On November 15, 2018, Moody's downgraded PG&E's debt. As *Bloomberg* described in a November 15, 2018 article titled "PG&E Credit Cut to Brink of Junk by Moody's on Wildfire Risk":

> **PG&E Corp.'s credit rating was cut to the brink of junk** amid doubt about its ability to manage liabilities from the California wildfires.
>
> Moody's Investors Service lowered the rating to Baa3 from Baa2, the second-lowest level of investment grade, with the possibility of further downgrade, according to a statement. PG&E's grade reflects an exposure of about $10 billion to the 2017 wildfires, and uncertainty around 2018 liabilities, said Moody's, which also reduced the utility's Pacific Gas & Electric Co. subsidiary to Baa2.
>
> "**The rating downgrade reflects the material exposure to new potential liabilities associated with the Camp Fire** and the **uncertainties associated with how the fire-related liabilities will be recovered**," Moody's analyst Jeff Cassella said in the statement.
>
> California's biggest utility said this week it exhausted its credit facilities to boost cash, a move that was widely seen to be in anticipation of a credit rating downgrade, and raising concerns it may have to eventually file for bankruptcy.

812. On January 14, 2019, PG&E filed a report on Form 8-K with the SEC stating that the Company expected to file for Chapter 11 bankruptcy on or about January 29, 2019. The reason the Company provided for the expected bankruptcy filing was the "series of catastrophic wildfires that occurred in Northern California in 2017 and 2018."

813. Also on January 14, 2019, Moody's further downgraded PG&E's debt with its VP-Senior Credit Officer Jeff Cassella being quoted as follows: "Management has indicated that they

believe the Chapter 11 process is the only viable option to resolve potentially substantial wildfire liabilities, **rebuild and invest in its existing system**, and maintain access to sufficient financial and liquidity sources."

814. On January 15, 2019, *MarketWatch* reported in an article titled "PG&E's slide into bankruptcy would mark third largest investment-grade default since 1998," and that PG&E faced a significant risk of defaulting on its bonds:

> If Pacific Gas & Electric Co. follows through with its bankruptcy announcement, the country's largest utility would record the third largest default in the U.S. investment-grade corporate bond market since 1998.
>
> PG&E announced it would file for bankruptcy by Jan. 29 after devastating California wildfires in 2017 and 2018 left it facing billions in potential liabilities. The company also said it would not pay an interest payment due on bonds maturing in 2040 on Wednesday, which would also trigger a default.
>
> * * *
>
> PG&E's bankruptcy would mark a dramatic collapse for a company that was once seen as an attractive bet among hedge funds. More than $17 billion of its bonds would be facing default, according to analysts at Bank of America Merrill Lynch.
>
> * * *
>
> In terms of sheer scale of a default from an investment-grade issuer, BAML found only Lehman Bros. and WorldCom would rank above the PG&E.

815. On January 29, 2019, PG&E declared Chapter 11 bankruptcy. The Company's bankruptcy filings stated that it was facing $51.7 billion in liabilities, including more than $30 billion in possible liabilities tied to the Camp Fire and the North Bay Fires. By December 6, 2019, PG&E had reached a total value of $25.5 billion in settlements with all major groups of wildfire claimants.

816. On February 11, 2019, PG&E issued a press release stating that it would be replacing the majority of its Board. This announcement followed the departure of several Company executives, including PG&E's CEO Williams and three senior executives in PG&E's electric division. The release acknowledged "that PG&E must re-earn trust and credibility with its customers, regulators, the communities it serves and all of its stakeholders." As of May 2019, only two Board members out of 13 had not been replaced. To date, not one remains.

817. On February 28, 2019, PG&E issued a press release providing an update on the financial impact of the Camp Fire and the North Bay Fires, along with the Company's fourth quarter and full-year 2018 financial results. The release stated that PG&E "believes it is probable that its equipment will be determined to be an ignition point of the 2018 Camp Fire." According to the Company, primarily due to the large number of third-party claims against PG&E, the Company reported full-year net losses of $6.9 billion, compared to 2017 net income of $1.6 billion. As a result of the "extraordinary challenges" caused by the wildfires, the release stated that PG&E may not be able to continue as a going concern.

818. Another consequence of PG&E's unsafe practices came to fruition in October 2019, with the Kincade fire. The Kincade fire involved PG&E's equipment, burned more than 77,000 acres, and destroyed ~374 structures. In October of 2020, as reported by the *NBC Bay Area* journalist Jaxon Van Derbeken.[247] Cal Fire found that the fire was caused by PG&E's failure to decommission or de-energize a high voltage transmission line. Cal Fire observed that PG&E was alerted in 2016 to the problem of wind driven wear when it was found to have caused the nearby Sawmill fire, which should have led PG&E to look for vulnerabilities "to eliminate future failures with equipment exposed to similar conditions." It also recommended that PG&E be charged criminally with felony counts. PG&E subsequently reached a $125 million settlement with the CPUC for its role in the fire.

819. On June 16, 2020, PG&E pleaded guilty to 84 counts of involuntary manslaughter for causing the Camp Fire.

820. PG&E's years of neglect and lack of commitment to wildfire safety practices resulted in devastation and decreased the value of a once investment-grade company.

821. More consequences were to follow. On September 27, 2020, the Zogg fire was caused when a tree fell on PG&E's energized conductors in Shasta County. The fire burned 56,338 acres, caused four deaths, one injury, and destroyed 204 structures. On May 18, 2023 the CPUC issued a press release regarding its approval of a $150 million settlement with PG&E for the fire.

[247] Jaxon Van Derbeken, *Kincade Fire Tied to PG&E Failure to Decommission an Unneeded High-Voltage Line*, NBC Bay Area (Oct. 22, 2020).

822. Ten months later, on July 13, 2021, the Dixie Fire began when a Douglas fir tree fell and struck PG&E energized conductors. On January 25, 2024, the CPUC approved a settlement penalizing PG&E $45 million for its involvement in the Dixie Fire.

**XIX. PG&E RAISED MORE THAN $4 BILLION FROM NOTES OFFERINGS**

823. Between March 2016 and PG&E's January 2019 bankruptcy filing, and at the same time as PG&E's business was subject to all of the safety deficiencies above, PG&E issued over $4 billion worth of senior notes registered with the SEC.

824. On March 1, 2016, PG&E issued and delivered the notes offered in the March 2016 Notes Offering. The notes were offered pursuant to a shelf registration, with the prospectus supplement filed on February 23, 2016 with the SEC, and the final prospectus supplement filed February 24, 2016.

825. On December 1, 2016, PG&E issued and delivered the notes offered in the December 2016 Notes Offering. The notes were offered pursuant to a shelf registration, with the prospectus supplement filed with the SEC, on November 28, 2016, and final prospectus supplement filed November 29, 2016. Also on December 1, 2016, PG&E filed on Form 8-K the Twenty-Eighth Supplemental Indenture, which identified the "Original Issue Date: December 1, 2016," for the bonds issued pursuant to the December 2016 Notes Offering.

826. On March 10, 2017, PG&E issued and delivered the notes offered in the March 2017 Notes Offering. The notes were offered pursuant to the registration statement filed with the SEC on January 4, 2017 (and as amended on January 19, 2017), and the prospectus supplement and final prospectus supplement filed with the SEC March 7 and March 8, 2017, respectively.

827. As part of the March 2017 Offering, the sale of the 4.00% Senior Notes due December 1, 2046 constituted a reopening of the December 2016 Notes Offering, as set forth in the Twenty-Ninth Supplemental Indenture, which PG&E filed on Form 8-K on March 10, 2017.[248] The prospectus and prospectus supplement filed in connection with the March 2017 Offering

[248] As explained on Treasurydirect.gov: "In a security reopening, the U.S. Treasury issues additional amounts of a previously issued security. The reopened security has the same maturity date and coupon interest rate or spread as the original security, but with a different issue date and usually a different purchase price."

confirmed that the 4.00% Senior Notes due December 1, 2046, that were also issued in the December 2016 Offering, had different issue dates and prices than the same notes issued on March 10, 2017. The Twenty-Ninth Supplemental Indenture identified the 4.00% Senior Notes due December 1, 2046, sold in the March 2017 Offering, as having an "Original Issue Date: March 10, 2017."

828. On April 2, 2018, PG&E filed with the SEC the registration statement for the April 2018 Notes Offering. On April 13, 2018, PG&E filed the prospectus for the offering. Both the April 2, 2018 registration statement and the April 13, 2018 prospectus explicitly warned investors: "**Before deciding whether to participate in the Exchange Offer**, you should **carefully consider** these risks as well as other information contained or incorporated by reference in this prospectus." The exchange offer under the April 2018 Notes Offering ran until 5:00 p.m. ET on May 14, 2018.

## XX. THE OFFERING DOCUMENTS OMITTED PG&E'S SAFETY DEFICIENCIES AND ADVERSE TRENDS

829. Each of PG&E's prospectuses filed on February 24, 2016, November 29, 2016, March 8, 2017, and April 13, 2018, incorporated by reference the corresponding registration statement (*i.e.*, the Offering Documents), as well as a number of other PG&E filings and reports including the following:

(a) the February 24, 2016 Offering Documents for the March 2016 Notes Offering incorporated by reference PG&E's: Annual Report on Form 10-K for FY15 filed with the SEC on February 18, 2016;

(b) the November 29, 2016 Offering Documents for the December 2016 Notes Offering incorporated by reference PG&E's: Annual Report on Form 10-K for FY15 filed with the SEC on February 18, 2016;

(c) the March 8, 2017 Offering Documents for the March 2017 Notes Offering incorporated by reference PG&E's: Annual Report on Form 10-K for FY15 filed with the SEC on February 18, 2016; and Annual Report on Form 10-K for FY16 filed with the SEC on February 16, 2017; and

(d) the April 13, 2018 Offering Documents for the April 2018 Notes Offering incorporated by reference PG&E's: Annual Report on Form 10-K for FY17 filed with the SEC on February 9, 2018.

830. The statements in or incorporated by reference into the Offering Documents alleged to be materially false and/or misleading pursuant to the Securities Act, as alleged herein, are set forth in Exhibit M attached hereto.[249] In addition, the Securities Act Plaintiffs allege the material omission of adverse trends in each of the Offering Documents.

831. Because PG&E's 2016 and 2017 Forms 10-K included the materially false and misleading statements identified herein, those annual reports do not qualify as "earnings statements" under 15 U.S.C. §77k(a).

### A. PG&E's Offering Documents Failed to Disclose Material Adverse Trends in Violation of Item 303's Disclosure Requirements

832. Item 303 of SEC Regulation S-K requires the Management's Discussion & Analysis ("MD&A") section of registration statements to "[d]escribe any unusual or infrequent events or transactions . . . that materially affected the amount of reported income from continuing operations and, in each case, indicate the extent to which income was so affected" and "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. §229.303(a)(3)(i)-(ii).

833. SEC guidance makes clear that the purpose of MD&A is to give investors information "necessary to an understanding of [a company's] financial condition, changes in financial condition and results of operations." Item 303's objectives are to:

- provide a narrative explanation of a company's financial statements that enables investors to see the company through the eyes of management;

[249] For purposes of this Complaint, not all of the statements alleged to be materially false and misleading are set forth in the text of the Complaint as many are repetitive and are false and misleading for the same reasons as nearly identical statements. They are however, alleged in Exhibit M and incorporated by reference herein. References to Exhibit M are referred to herein as "Ex. M."

- enhance the overall financial disclosure and provide the context within which financial information should be analyzed; and

- provide information about the quality of, and potential variability of, a company's earnings and cash flow, so that investors can ascertain the likelihood that past performance is indicative of future performance.

834. To effectuate that purpose, Item 303 requires "companies to provide investors and other users with material information that is necessary to an understanding of the company's financial condition and operating performance, as well as its prospects for the future." This disclosure requirement is broader for an issuer making a registration statement available to investors than it is for public company making MD&A disclosures in other contexts.

835. The registration statements for the March 2016, December 2016, March 2017, and April 2018 Notes Offerings failed to disclose the known negative trends and uncertainties materially affecting PG&E's business related to PG&E's neglect of and commitment to wildfire safety. At the time of each Notes Offering, PG&E was already experiencing multiple known adverse trends that materially affected – or were reasonably likely to affect – its results, including:

- **Systemic Vegetation Management Failures**: In the face of climate change and drought, PG&E failed to disclose the adverse trend of a growing backlog of hazardous trees that elevated wildfire risk, including a pattern or practice of failing to: (i) identify, accurately report and address hazardous trees; and (ii) properly train inspectors. §XVII.A. In fact, PG&E's own employee testified that the failure to implement adequate safety practices was "a trend." ¶735.

- **Aging and poorly maintained equipment**: PG&E failed to disclose the adverse trend of operating its electrical infrastructure to failure, including failing to inspect, repair, or replace equipment that was well past its operating life and 20 years older than the industry standard, significantly increasing wildfire risk. §XVII.B. In fact, PG&E's own employee testified that the failure to implement adequate safety practices was "a trend." ¶735.

- **Prioritizing Profits Over Safety**: PG&E failed to disclose the adverse trend that they were not allocating the necessary resources or implementing necessary mitigation strategies to effectively address the existing heightened wildfire risk. §XVII.C. This included failing to prioritize undergrounding lines (which would have eliminated 98% of the risk) and power shutoffs in high-risk areas. §XVII.C.1.-§XVII.C.2.

836. The omission of these known adverse trends violated 17 C.F.R. §229.303(a)(3)(ii) because PG&E failed to disclose facts known to management that were reasonably likely to have

an unfavorable impact on earnings and income from continuing operations. It also violated 17 C.F.R. §229.503(c) (now Item 105) by omitting the most significant risk factors that made PG&E securities speculative and risky.

### B. The Securities Act Defendants Misled Investors Regarding PG&E's Safety Practices, Commitment, and Compliance

837. The Offering Documents, including the documents incorporated by reference therein, omitted material adverse information from investors regarding PG&E's deficient safety practices and lack of commitment to safety while simultaneously falsely assuring investors that PG&E complied with safety laws and regulations, sufficiently invested in safety, and provided for public safety by clearing vegetation around its equipment, updating its equipment, and inspecting its equipment. In contrast to what investors were led to believe in the Offering Documents, PG&E's "unsafe conduct" led to deadly wildfires and "PG&E's performance with respect to vegetation management has been dismal." Nor had PG&E expended sufficient resources to reasonably prevent wildfires.

#### 1. The Offering Documents Omitted PG&E's Widespread Safety Failures and the Existing Risks Associated with Its Inadequate Safety Practices

838. Each of the Offering Documents referenced risk factors, including warnings that droughts, climate change, wildfires, and other events **could** cause a material impact on PG&E's financial results. These statements were materially misleading because they did not disclose the already existing negative impact on PG&E as a result of PG&E's subpar safety practices had already substantially increased the risk of wildfires, and in fact caused them, resulting in death, destruction, and liability. PG&E faced more than $30 billion in potential liability and filed bankruptcy as a result. Cal Fire has found PG&E caused wildfires in 2015, 2017, and 2018, as well as 2019 Kincade Fire, 2020 Zogg Fire, and 2021 Dixie Fire.

839. The Offering Documents for each of the Notes Offerings did not disclose the true existing risks facing PG&E as a result of its deficient safety practices and lack of commitment to safety, including the extent of the risks or that they had already come to fruition. For example, the prospectus filed on February 24, 2016, pursuant to the March 2016 Notes Offering, stated:

> Some of the factors that could cause future results to differ materially from those expressed or implied by the forward-looking statements, or from historical results, include . . .
>
> * * *
>
> • ***the impact of droughts or other weather-related conditions or events, wildfires (including the Butte fire in September 2015***, which affected portions of Amador and Calaveras counties), ***climate change***, natural disasters, acts of terrorism, war, or vandalism (including cyber-attacks), and other events, that can cause unplanned outages, reduce generating output, disrupt the our [sic] service to customers, ***or damage or disrupt the facilities, operations***, or information technology and systems owned by us, our customers, or third parties on which we rely; ***whether we incur liability to third parties for property damage or personal injury caused by such events; and whether the we [sic] are subject to civil, criminal, or regulatory penalties in connection with such events***.

*See* Ex. M, Stmt. No. 1.

840. The Offering Documents for the December 2016 Notes Offering, the March 2017 Notes Offering, and the April 2018 Notes Offering each repeated in substantially similar language the same purported warning. *See* Ex. M, Stmt. Nos. 2-4. So too did the FY15 Form 10-K, FY16 Form 10-K, and FY17 Form 10-K. *See* Ex. M, Stmt. Nos. 5-7.

841. Similarly, PG&E's annual report for FY17 filed with the SEC on Form 10-K incorporated by reference into the Offering Documents for the April 2018 Notes Offering misleadingly purported to warn that:

> ***Severe weather conditions, extended drought and shifting climate patterns could materially affect PG&E Corporation's and the Utility's business, financial condition, results of operations, liquidity, and cash flows***.
>
> Extreme weather, extended drought and shifting climate patterns have intensified the challenges associated with wildfire management in California. Environmental extremes, such as drought conditions followed by periods of wet weather, can drive additional vegetation growth (which then fuel any fires) and influence both the likelihood and severity of extraordinary wildfire events. ***In California, over the past five years, inconsistent and extreme precipitation, coupled with more hot summer days, have increased the wildfire risk and made wildfire outbreaks increasingly difficult to manage. In particular, the risk posed by wildfires has increased in the Utility's service area (the Utility has approximately 82,000 distribution overhead circuit miles and 18,000 transmission overhead circuit miles) as a result of an extended period of drought, bark beetle infestations in the California forest and wildfire fuel increases due to record rainfall following the drought, among other environmental factors***. Other contributing factors include local land use policies and historical forestry management practices. ***The combined effects of extreme weather and climate change also impact this risk***.

*See* Ex. M, Stmt. No. 8.

842. In addition, each of the Company's Forms 10-K incorporated by reference into the Offering Documents also represented climate change as a risk to the Company's financial condition while omitting the real risks stemming from PG&E's woefully inadequate safety practices. For example, the "Risk Factors" section of PG&E's FY15 and FY16 annual reports on Forms 10-K purported to warn that: "***The Utility's future operations may be affected by climate change that may have a material impact on PG&E Corporation's and the Utility's financial condition, results of operations, and cash flows***." Ex. M, Stmt. Nos. 9-10.

843. The same FY15 and FY16 Forms 10-K, along with PG&E's FY17 Form 10-K, went on to falsely reassure investors, in substantially similar language, that PG&E had studied climate change but omitted the negative impact and risk created by PG&E's safety violations and deficient safety practices:

> ***[I]ncreasing temperatures and lower levels of precipitation could increase the occurrence of wildfires in the Utility's service territory causing damage to the Utility's facilities or the facilities of third parties on which the Utility relies to provide service, damage to third parties for loss of property, personal injury, or loss of life***. In addition, flooding caused by rising sea levels could damage the Utility's facilities, including hydroelectric assets such as dams and canals, and the electric transmission and distribution assets. ***The Utility could incur substantial costs to repair or replace facilities, restore service, compensate customers and other third parties for damages or injuries***. The Utility anticipates that the increased costs would be recovered through rates, but as rate pressures increase, the likelihood of disallowance or non-recovery may increase.

*See* Ex. M, Stmt. Nos. 11-13.

844. Each of the above statements in ¶¶839-843 concerning the costs of the failure to timely repair or replace PG&E's infrastructure, and the purported risks of weather events, climate change, or other hazards that could cause wildfires were materially false and misleading as the Offering Documents omitted or failed to disclose material adverse facts concerning the real risk of wildfires and the resources needed to sufficiently mitigate wildfire risk as a result of PG&E's widespread neglect of wildfire safety practices and commitment to safety, as reflected, *inter alia*, by the following:

(a) in the face of climate change and drought, PG&E failed to implement adequate vegetation management practices, and its actual practices did not mitigate but rather increased the risk of wildfire in PG&E's service area, including by: (i) creating an increasing

backlog of hazardous trees at the same time as the threat from such trees tripled; (ii) failing to identify and accurately report hazardous trees; and (iii) failing to properly train inspectors (§XVII.A.);

(b) PG&E's practice of widespread neglect of its infrastructure, including failure to inspect, repair, or replace equipment that was well past its operating life and 20 years older than the industry standard, and failure to address equipment it had identified or should have identified as requiring remediation (§XVII.B.);

(c) PG&E failed to commit to wildfire safety, both financially and culturally (§§XVII.C.1., XVII.D.);

(d) PG&E understated the elevated wildfire risk by failing to maintain and accurately report on the true state of its electrical infrastructure and vegetation management practices (§XVII.E.);

(e) compared to its peers, the risk of wildfires in PG&E's service area was substantially higher because of PG&E's aged infrastructure, unsafe vegetation management practices, and failure to prioritize effective mitigation practices (§XVII.F.); and

(f) for all the reasons in (a)-(e) above, the statements in the Offering Documents omitted the scope and magnitude of PG&E's wildfire mitigation deficiencies and gave investors a false or misleading understanding of the true, materialized risks of wildfires that PG&E was facing at the times of the Notes Offerings.

**2. The Offering Documents Did Not Disclose that PG&E's Investments in, Commitment to, and Practices Related to Safety, Were Grossly Deficient**

845. PG&E's Forms 10-K incorporated by reference into the Offering Documents falsely emphasized PG&E's safety efforts by investing in its energy distribution system, in particular by clearing vegetation to prevent wildfires. For example, the annual reports for FY15 and FY16 filed with the SEC on Forms 10-K incorporated into the Offering Documents for the March 2016, December 2016, and March 2017 Notes Offerings misleadingly stated as follows:

> ***The Utility is making substantial investments to build a more modern and resilient system that can better withstand extreme weather and related emergencies. The Utility's vegetation management activities also reduce the risk of wildfire impacts on electric*** and gas ***facilities***.

*See* Ex. M, Stmt. Nos. 14-15.

846. The Company's FY17 Form 10-K, incorporated by reference into the Offering Documents for the April 2018 Notes Offering contained similarly false language:

> ***The Utility is making substantial investments to build a more modern and resilient system that can better withstand extreme weather and related emergencies.*** Over the long-term, the Utility also faces the risk of higher flooding and inundation potential at coastal and low elevation facilities due to sea level rise combined with high tides, storm runoff and storm surges. ***As the state continues to face increased risk of wildfire, the Utility's vegetation management activities will continue to play an important role to help reduce the risk of wildfire and its impact on electric*** and gas ***facilities***.

*See* Ex. M, Stmt. No. 16.

847. PG&E's FY15 and FY16 Forms 10-K incorporated by reference into the Offering Documents for the March 2016, December 2016, and March 2017 Notes Offerings also misleadingly emphasized that PG&E had developed plans and strategies to mitigate the impact of climate change and respond effectively to emergencies as well as prioritizing infrastructure investments minimizing the real risks PG&E faced with respect to wildfires as a result of dismal safety practices and insufficient funding to prevent wildfires:

> ***Climate Change Mitigation and Adaptation Strategies***. During 2015 [2016], the Utility ***continued its programs*** to develop strategies to mitigate the impact of the Utility's operations (including customer energy usage) on the environment and to plan for the actions that it will need to take to adapt to the likely impacts of climate change on the Utility's future operations. The Utility regularly reviews the most relevant scientific literature on climate change such as sea level rise, temperature changes, rainfall and runoff patterns, and ***wildfire risk, to help the Utility identify and evaluate climate change-related risks and develop the necessary adaptation strategies. The Utility maintains emergency response plans and procedures to address a range of near-term risks***, including extreme storms, heat waves and ***wildfires*** and ***uses its risk-assessment process to prioritize infrastructure investments*** for longer-term risks associated with climate change. The Utility also engages with leaders from business, government, academia, and non-profit organizations to share information and plan for the future.

*See* Ex. M, Stmt. Nos. 17-18.

848. Following the 2017 North Bay Fires, the Company's 2017 Form 10-K incorporated by reference into the Offering Documents for the April 2018 Notes Offering misleadingly represented that PG&E had developed "resilience strategies" to mitigate the impacts of climate change on PG&E:

> ***Climate Change Resilience Strategies***

> ***During 2017, the Utility continued its programs to mitigate the impact of the Utility's operations (including customer energy usage) on the environment and to plan for the actions that it will need to take to increase its resilience in light of the likely impacts of climate change on the Utility's operations***. The Utility regularly reviews the most relevant scientific literature on climate change such as rising sea levels, major storm events, increasing temperatures and heatwaves, ***wildfires***, drought and land subsidence, ***to help the Utility identify and evaluate climate change-related risks and develop the necessary resilience strategies. The Utility maintains emergency response plans and procedures to address a range of near-term risks, including wildfires***, extreme storms, and heat waves and ***uses its risk assessment process to prioritize infrastructure investments*** for longer-term risks associated with climate change. The Utility also engages with leaders from business, government, academia, and non-profit organizations to share information and plan for the future.

*See* Ex. M, Stmt. No. 19.

849. Similarly, each of PG&E's Forms 10-K incorporated by reference into the Offering Documents also materially misled investors by regarding the safety of its operations emphasizing the Company's upgrades to its equipment. For example, the Company's FY15, FY16 and FY17 Forms 10-K stated:

> ***Throughout 2015 [2016; 2017], the Utility upgraded several critical substations and re-conductored a number of transmission lines to improve maintenance and system flexibility, reliability and safety***. The Utility expects to undertake various additional transmission projects over the next several years to upgrade and expand the capacity of its transmission system to [accommodate system load growth,] secure access to renewable generation resources, replace aging or obsolete equipment and improve system reliability. The Utility also has taken steps to improve the physical security of its transmission substations and equipment.

*See* Ex. M, Stmt. Nos. 20-22.

850. In addition, each of PG&E's Forms 10-K incorporated by reference into the Offering Documents materially misled investors by warning that the Company's equipment might fail, a risk falsely described as "beyond the Utility's control." For example, PG&E's Forms 10-K for FY15 and FY16, as well as PG&E's Form 10-K for FY17, misleadingly purported to warn investors as follows:

> Utility's ability to safely and reliably operate, maintain, construct and decommission its facilities is ***subject to numerous risks***, ***many of which are beyond the Utility's control***, including those that arise from:

- ***the breakdown or failure of equipment, electric transmission or distribution lines***, or natural gas transmission and distribution pipelines, ***that can cause*** explosions, ***fires***, or other catastrophic events;[250]

* * *

- ***the failure to take expeditious or sufficient action to mitigate operating conditions, facilities, or equipment, that the Utility has identified, or reasonably should have identified, as unsafe, which failure then leads to a catastrophic event (such as a wild land fire or natural gas explosion)***, [and the failure to respond effectively to a catastrophic event].[251]

*See* Ex. M, Stmt. Nos. 23-25.

851. PG&E's 2017 Form 10-K incorporated by reference into the Offering Documents for the April 2018 Notes Offering added false assurances to investors that PG&E had taken steps to safely operate and maintain its equipment:

> On April 12, 2017, the Utility retained a third-party monitor at the Utility's expense as part of its compliance with the sentencing terms of the Utility's January 27, 2017 federal criminal conviction, which sentenced the Utility to, among other things, a five-year corporate probation period and oversight by a third-party monitor for a period of five years, with the ability to apply for early termination after three years. ***The goal of the monitor is to help ensure that the Utility takes reasonable and appropriate steps to maintain the safety of its gas and electric operations and maintains effective ethics, compliance, and safety related incentive programs on a Utility-wide basis***.

*See* Ex. M, Stmt. No. 28.

852. Each of the above statements in ¶¶845-851 were materially false and misleading because contrary to the impression created by the Offering Documents: (i) PG&E was not making "substantial investments" in its systems; (ii) its vegetation management "activities" did not reduce wildfire risk but increased it; (iii) PG&E had not developed necessary "adaptation strategies"; and (iv) PG&E did not prioritize infrastructure investments. Nor did PG&E take "expeditious or sufficient action to mitigate operating conditions, facilities, or equipment" to mitigate the risk of catastrophic wildfires. The impression that the Offering Documents created stood in marked

---

[250] This language is included in each of PG&E's Forms 10-K incorporated by reference into the Offering Documents, and similar language is also included in the registration statement for the April 2018 Notes Offering and in the 2017 Form 10-K. *See* Ex. M, Stmt. Nos. 26-27.

[251] The Form 10-K for FY17 removed the part of the sentence ending "and the failure to respond effectively to a catastrophic event."

contrast to the material adverse facts concerning the real risk of wildfires and the resources needed to sufficiently mitigate wildfire risk, as reflected, *inter alia*, by the following:

(a) in the face of climate change and drought, PG&E failed to implement adequate vegetation management practices, and its actual practices did not mitigate but rather increased the risk of wildfire in PG&E's service area, including by: (i) creating an increasing backlog of hazardous trees at the same time as the threat from such trees tripled; (ii) failing to identify and accurately report hazardous trees; and (iii) failing to properly train inspectors (§XVII.A.);

(b) PG&E's practice of widespread neglect of its infrastructure, including failing to inspect, repair or replace equipment that was well past its operating life and 20 years older than the industry standard, and failing to address PG&E's infrastructure "that the Utility ha[d] identified, or reasonably should have identified, as unsafe." (§XVII.B.);

(c) PG&E failed to commit to wildfire safety, both financially and culturally (§§XVII.C.1., XVII.D.). For example, the record of PG&E's spending on the reduction of catastrophic wildfire risk from 2015 through 2018 was abysmal, as evidenced by PG&E's dramatic increase in 2019 (¶¶780-781). Likewise, PG&E failed to implement wildfire mitigation practices necessary to reduce the risk of wildfires such as undergrounding and shutoffs (§XVII.C.);

(d) PG&E understated the elevated wildfire risk by failing to maintain and accurately report on the true state of its electrical infrastructure and vegetation management practices (§XVII.E.);

(e) compared to its peers, the risk of wildfires in PG&E's service area was substantially higher because of PG&E's aged infrastructure, unsafe vegetation management practices, and failure to prioritize effective mitigation practices (§XVII.F.); and

(f) for all the reasons in (a)-(e) above, the statements in the Offering Documents omitted the scope and magnitude of PG&E's wildfire mitigation deficiencies and gave investors a false or misleading understanding of the true, materialized risks of wildfires that PG&E was facing at the times of the Notes Offerings.

**C. The Securities Act Defendants Materially Misled Investors Regarding PG&E's Liability for Wildfires in the April 2018 Offering Documents**

853. As discussed above, the North Bay Fires began in October of 2017.

854. Beginning in late 2017, numerous lawsuits were filed alleging that the North Bay Fires were ignited by electrical infrastructure owned, operated and improperly maintained by PG&E.

855. As set forth below, the April 2018 Offering Documents materially misled investors regarding PG&E's liability for the 2017 North Bay Fires and the adverse impact on the Company as a result.

**1. GAAP Requirements**

856. The April 2018 Offering Documents represented that PG&E's financial statements were prepared in conformity with Generally Accepted Accounting Principles ("GAAP"). GAAP are the principles established by the Financial Accounting Standards Board as the conventions, rules, and procedures necessary to define accepted accounting practice at a particular time.

857. According to GAAP, Accounting Standards Codification ("ASC") 450, *Loss Contingencies*, an estimated loss from a loss contingency shall be accrued by a charge to income and by the establishment of a liability when both of the following conditions are met:

> a. Information available before the financial statements are issued or are available to be issued . . . indicates that it is probable that an asset had been impaired or a liability had been incurred at the date of the financial statements . . . .
>
> b. The amount of loss can be reasonably estimated.[252]

ASC 450-20-25-2.[253]

---

[252] GAAP states regarding this second provision that the "requirement shall not delay accrual of a loss until only a single amount can be reasonably estimated." ASC 450-20-25-5. "To the contrary, when the condition in [ASC] 450-20-25-2(a) is met and information available indicates that the estimated amount of loss is within a range of amounts, it follows that some amount of loss has occurred and can be reasonably estimated." *Id.* GAAP further instructs that "[i]f some amount within a range of loss appears at the time to be a better estimate than any other amount within the range, that amount shall be accrued." ASC 450-20-30-1. "When no amount within the range is a better estimate than any other amount, however, the minimum amount in the range shall be accrued." *Id.*

[253] In assessing ASC 450's requirements, PG&E was also required by ASC 855 to consider "subsequent events" that occurred after the December 31, 2017 balance sheet date, but before

858. ASC 450 also requires companies to evaluate whether a loss is probable, reasonably possible, or remote (ASC 450-20-55-14) and to recognize losses that are probable even if the precise amount cannot yet be determined (ASC 450-20-25-3). GAAP expressly cautions that these conditions "are not intended to be so rigid that they require virtual certainty before a loss is accrued" (ASC 450-20-25-3).

859. Accordingly, PG&E was obligated to record wildfire-related operating expenses and wildfire-related liabilities in its FY17 Form 10-K (later incorporated into the Offering Documents for the April 2018 Notes Offering) because both requirements of ASC 450 were met when PG&E issued its FY17 Form 10-K: (i) the wildfire-related expenses and liabilities were probable, given the 2017 Northern California Wildfires (referred to herein as the North Bay Fires), California's inverse condemnation laws,[254] and PG&E's knowledge of its widespread safety deficiencies; and (ii) the minimum loss was reasonably estimable based on information available to PG&E at the time of the April 2018 Offering.

### 2. False Statements and Omissions Relating to Loss Probability for the 2017 Northern California Wildfires

860. The April 2018 Offering Documents, including PG&E's incorporated 2017 Form 10-K, misled investors by portraying wildfire losses as only a **possibility** pending investigation. The documents listed the following as a risk that could cause a material adverse impact on PG&E's financial condition:

---

PG&E filed the FY17 Form 10-K on February 9, 2018, including, subsequent events that provide additional evidence about conditions that existed at the balance sheet date that should be recognized in the financial statements. The April 2018 Offering commenced on April 13, 2018. To the extent that material facts emerged following the filing of the annual report and the offering of Notes to the public, those updates are required to be reflected in the Offering Documents. The Offering Documents explicitly state: "These statements reflect management's judgment and opinions which are based on current estimates, expectations, and projections about future events and assumptions regarding these events and management's knowledge of facts as of the date of this prospectus."

[254] California law includes a doctrine of inverse condemnation that imposes strict liability for damages and takings as a result of the design, construction, and maintenance of utility facilities, including its electric transmission and distribution lines. If a utility such as PG&E affirmatively proves "that it reasonably and prudently operated and managed its system," it can recover payments made to property owners for damages caused by a wildfire from the CPUC.

> ***[T]he impact of the Northern California wildfires, including the costs of restoration of service to customers and repairs to the [Company] facilities, and whether the [Company] is able to recover such costs through a [Catastrophic Event Memorandum Account]; the timing and outcome of the wildfire investigations, including into the causes of the wildfires; whether the [Company] may have liability associated with these fires***; ***if liable*** for one or more fires, whether the [Company] would be able to recover all or part of such costs through insurance or through regulatory mechanisms, to the extent insurance is not available or exhausted; and potential liabilities in connection with fines or penalties that could be imposed on the [Company] if the [California Department of Forestry and Fire Protection and the California Public Utilities Commission] ("CPUC") or any other law enforcement agency brought an enforcement action and determined that the [Company] failed to comply with applicable laws and regulations.

*See* Ex. M, Stmt. No. 29.

861. The Offering Documents for the April 2018 Notes Offering repeated in substantially similar language the same purported warning. *See* Ex. M, Stmt. No. 30.

862. PG&E's FY17 Form 10-K further asserted that PG&E did not believe it was "probable," stating only that it was merely "reasonably possible" that PG&E "could be liable for property damage, interest, and attorneys' fees . . . [i]f the Utility's facilities, such as its electric distribution and transmission lines . . . are determined to be the cause of one or more fires, and the doctrine of inverse condemnation applies." PG&E added:

> ***Given the preliminary stages of investigations and the uncertainty as to the causes of the fires, PG&E Corporation and the Utility do not believe a loss is probable at this time***. However, it is ***reasonably possible that facts could emerge*** through the course of the various investigations that lead PG&E Corporation and the Utility to believe that a loss is probable, resulting in an accrued liability in the future, the amount of which could be material.

Ex. M, Stmt. No. 31.

863. PG&E also reassured investors that insurance and regulatory cost-recovery mechanisms would mitigate any potential losses: "The Utility has liability insurance from various insurers, which provides coverage for third-party liability attributable to the Northern California Fires in an aggregate amount of approximately $800 million" and could also "apply for cost recovery."

864. The foregoing statements in ¶860-862 were materially false and misleading because by the time of the April 2018 Notes Offering, a loss was probable, and PG&E would not be able

to recover costs for the wildfires because of PG&E's deficient safety practices, as demonstrated by the following:

(a) PG&E knew of its woefully deficient safety practices and gross neglect of its infrastructure and knew of the allegations being made as early as October 2017 by wildfire victims, and therefore it was probable that the Company would be found liable;

(b) The 2017 Northern California Wildfires were in PG&E's service area. For several of the wildfires, PG&E reported its own downed equipment near the ignition source and PG&E inspected the incident locations. For example, by October 2017, PG&E knew that the Nuns Fire, the Atlas Fire, and the Adobe Fire each involved fallen trees on its equipment;[255]

(c) PG&E's acknowledgment in its November 2, 2017 3Q17 earnings call that while it was cooperating with the CPUC and Cal Fire regarding their investigations, PG&E had both already "received a number of losses," and was "conducting [its] own extensive fact-finding";

(d) PG&E's acknowledgement in its FY17 Form 10-K filed on February 9, 2018 that "[a]s of January 31, 2018, the Utility had submitted 22 electric incident reports to the CPUC associated with the Northern California wildfires where Cal Fire has identified a site as potentially involving the Utility's facilities in its investigation and the property damage associated with each incident exceeded $50,000";

(e) PG&E's acknowledgement in its FY17 Form 10-K filed on February 9, 2018, that investigators had already concluded its facilities contributed to fires in Santa Rosa;

(f) PG&E's acknowledgement in its FY17 Form 10-K filed on February 9, 2018, that by January 31, 2018, more than 100 lawsuits had been consolidated alleging PG&E's equipment and vegetation management caused the 2017 Northern California fires;

(g) PG&E's December 20, 2017 announcement that it had suspended all quarterly dividends, citing "uncertainty related to causes and potential liabilities with the extraordinary October 2017 Northern California wildfires." Indeed, analysts' commentary signaled that such an act was consistent with liability. For example, on December 27 2017, *Argus*

---

[255] *See, e.g.*, Envista Report at A-2-A-17 (Adobe Fire), A-18-A-32 (Atlas Fire), A-108-A-121 (Nuns Fire).

*Research* reported that "PG&E suspended its quarterly dividend based on the likelihood that it would be held liable for damages from recent wildfires";[256] and

(h) PG&E was well aware that California's doctrine of inverse condemnation made PG&E strictly liable for wildfire damage involving its equipment even absent negligence. On November 30, 2017, PG&E was on further notice that PG&E would not be able to pass the costs to recover uninsured wildfire expenses to ratepayers if found to have acted in an "imprudent" or "unreasonable" manner when the CPUC voted unanimously to deny SDG&E recovery of funds from 2007 wildfire costs.[257] Factors contributing to the CPUC's decisions included SDG&E's failure to meet vegetation clearance standards and failure to properly train tree inspectors – characteristics of PG&E's own practices.[258] Because PG&E's deficient wildfire mitigation practices were imprudent and unreasonable, the risk of an adverse impact on PG&E's financial condition had already materialized.

865. Given the existence and PG&E's knowledge of the above facts in (a)-(h), the risk of: (i) an adverse impact on PG&E's financial condition; and (ii) liability for the 2017 Northern California Wildfires, both had already materialized, and a loss was probable before the issuance of the April 2018 Offering Documents.

866. Losses were also reasonably estimable under ASC 450-20-25-2(b), including because:

(a) by January 31, 2018, the California Department of Insurance reported nearly 45,000 insurance claims totaling more than $11.79 billion, of which approximately $10.0 billion related to the October 2017 wildfires;[259] and

---

256 In fact, PG&E's own Board Chair stated in a December 20, 2017 PG&E press release that suspending dividends was "prudent with respect to cash conservation." If PG&E truly believed a loss was not probable, there would have been no reason to conserve cash for wildfire payouts.

257 *See California Public Utilities Commission rules San Diego Gas and Electric can't pass fire lawsuit costs onto customers*, The Press Democrat (Nov. 30, 2017).

258 *See* California Public Utilities Commission Decision 17-11-033 (Nov. 30, 2017).

259 The press release does not account for uninsured losses, interest, attorneys' fees, fire suppression costs, evacuation costs, medical expenses, personal injury, wrongful death damages, or other costs.

(b) PG&E itself acknowledged in its FY17 Form 10-K that its potential liability "could be higher than the approximately $10 billion estimated in respect of the wildfires that occurred in October 2017."

867. As a result of ¶¶864-866 above, PG&E materially understated operating expenses and materially overstated pretax income by $10 billion on PG&E's consolidated statement of income for FY17, and materially understated total liabilities and overstated total equity by $10 billion on PG&E's consolidated balance sheet as of December 31, 2017. As a result, PG&E avoided informing the market that the Company's ability to continue as a going concern was in question as a result of the 2017 North Bay Wildfires.

868. "The conditions [pertaining to the recognition of loss contingencies] are not intended to be so rigid that they required virtual certainty before a loss is accrued." ASC 450-20-25-3. As such, because of the facts above (¶¶864-867), GAAP did **not** permit PG&E to wait until the ongoing investigations by Cal Fire and the CPUC made it a "virtual certainty" that PG&E would be held liable before recognizing that a loss was probable. This is particularly true because:

(a) PG&E publicly admitted in its November 2, 2017 earnings call that it was conducting its own internal investigation and had access to the relevant evidence;

(b) in other instances, such as following the 2018 Camp Fire, 2020 Zogg Fire, and 2021 Dixie Fire, PG&E made the determination that a loss was probable even when no formal finding by Cal Fire had been made;

(c) PG&E itself took a charge for the 2017 Northern California Wildfires prior to Cal Fire's and the CPUC's determinations for several of the fires, indicating that, their conclusions are not determinative of the probability of a loss for purposes of GAAP; and

(d) given PG&E's dismal vegetation management practices and gross neglect of its infrastructure (§§XVII.A.-B.), that were known to the Company but not investors, PG&E was aware of the probability of its liability. As analysts at Guggenheim observed on June 10, 2018, when signs pointed to PG&E being "imprudent operators in the majority of instances . . . it should assume liability."

869. Even if the market and investors suspected PG&E faced potential wildfire liability, the Company's statements that a loss was not "probable" (and that it could not estimate the amount) left investors without any reliable measure of the adverse impact on the Company, including the financial hit to income and equity in the billions.

870. Two months after the April 2018 Offering, PG&E belatedly recorded charges for the 2017 Northern California Wildfires of $2.5 billion for the quarter ending June 30, 2018. By the end of FY18, PG&E had accrued $3.5 billion for the Northern California Wildfires. In January 2019, PG&E filed for chapter 11 bankruptcy protection explaining: "The company is facing extraordinary challenges relating to the 2018 Camp Fire and 2017 Northern California wildfires. Management has concluded that these circumstances raise substantial doubt about PG&E Corporation's and the Utility's ability to continue as going concerns." By the third quarter of 2019, PG&E had accrued $7.5 billion for the Northern California Wildfires and an additional $5 billion was accrued by the end of FY19 mostly for the Northern California and Camp fires. As discussed above, the facts that existed at the time the April 2018 Notes Offering required PG&E to take these charges prior to the Notes Offering.

871. The reasons and facts stated above (¶¶864-870) belie any notion that the Securities Act Individual Defendants conducted a meaningful inquiry into the misrepresentations regarding the probability of losses for the fires or that the misrepresentations fairly aligned with the information that existed at the time, including the failure to account for the adverse facts concerning PG&E's neglect of and failure to commit to wildfire safety that exacerbated the risk of wildfires. *See generally supra* § XVII.

## XXI. NO SAFE HARBOR FOR THE SECURITIES ACT CLAIMS

872. The statutory safe harbor and/or bespeaks caution doctrine applicable to forward-looking statements under certain circumstances do not apply to any of the false or misleading statements or material omissions pleaded with respect to the Securities Act Claims.

873. First, none of the misstatements complained of herein were forward-looking statements. Rather, they were misstatements or omissions of current facts and conditions existing at the time the statements were made. None of the historic or present-tense statements made by the

Securities Act Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any projections or forecasts made by the Securities Act Defendants expressly related to or stated to be dependent on those historic or present-tense statements when made.

874. Second, to the extent that any statements may be construed as forward-looking, those statements were not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements. As set forth in detail above, then-existing material facts were omitted by or contradicted the Securities Act Defendants' statements. Given the then-existing facts omitted by or contradicting the Securities Act Defendants' statements, the generalized risk disclosures made by the Securities Act Defendants were not sufficient to insulate the Securities Act Defendants from liability for their materially false or misleading statements and material omissions.

875. Third, to the extent any statement that may be construed as a false or misleading forward-looking statement, at the time each forward-looking statement was purportedly made, the speaker also knew the forward-looking statement was false or misleading and the forward-looking statement was authorized and/or approved by an executive officer of PG&E who knew that the forward-looking statement was false.

## XXII. CLASS ACTION ALLEGATIONS FOR THE SECURITIES ACT CLAIMS

876. The Securities Act Plaintiffs bring the Securities Act Claims on behalf of themselves and as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure consisting of all persons or entities that acquired PG&E senior notes in or traceable to one or more of the Notes Offerings and corresponding Offering Documents, and who were damaged thereby (the "Securities Act Subclass"). Excluded from the Securities Act Subclass are: (i) all Defendants in the action; (ii) members of the immediate family of any individual defendant; (iii) any person who is or was an officer or director of PG&E at the times of the Notes Offerings; (iv) any firm, trust, corporation, or other entity in which any Defendant has or had a controlling interest; (v) PG&E's employee retirement and benefit plan(s) and their participants or beneficiaries, to the

extent they made purchases through such plan(s); and (vi) the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person.

877. The members of the Securities Act Subclass are so numerous that joinder of all members is impracticable. PG&E notes are traded on the NYSE, and over $4 billion worth of PG&E notes were sold in the Notes Offerings. While the exact number of the Securities Act Subclass members is unknown to the Securities Act Plaintiffs at this time and can only be ascertained through appropriate discovery, the Securities Act Plaintiffs believe that there are dozens if not hundreds of members in the proposed Securities Act Subclass. Record owners and other members of the Securities Act Subclass may be identified from records maintained by PG&E or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

878. Securities Act Plaintiffs' claims are typical of the claims of the members of the Securities Act Subclass, as all members of the Securities Act Subclass are similarly affected by Securities Act Defendants' conduct in violation of the Securities Act that is complained of herein.

879. Securities Act Plaintiffs will fairly and adequately protect the interests of the members of the Securities Act Subclass and have retained counsel competent and experienced in class and securities litigation.

880. Common questions of law and fact exist as to all members of the Securities Act Subclass and predominate over any questions solely affecting individual members of the Securities Act Subclass. Among the questions of law and fact common to the Securities Act Subclass are:

(a) whether the Securities Act Defendants violated the Securities Act;

(b) whether adverse trends were omitted in the Offering Documents for the Notes Offerings;

(c) whether statements made by the Securities Act Defendants to the investing public in the Offering Documents for the Notes Offerings misrepresented or omitted material facts about the business and operations of PG&E; and

(d) to what extent the members of the Securities Act Subclass have sustained damages and the proper measure of damages.

881. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Securities Act Subclass members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Securities Act Subclass to individually redress the wrongs done to them. There will be no difficulty in the management of the Securities Act Subclass as a class in this action.

## XXIII. CLAIMS FOR RELIEF UNDER THE SECURITIES ACT

### THIRD CLAIM

**For Violations of §11 of the Securities Act**
**Against All Securities Act Defendants**

882. This Claim is brought pursuant to §11 of the Securities Act, 15 U.S.C. §77k, on behalf of the Securities Act Subclass, against all Securities Act Defendants.

883. This Claim does not sound in fraud. Securities Act Plaintiffs do not allege that the Securities Act Individual Defendants or the Underwriter Defendants had scienter or fraudulent intent for this Claim, which are not elements of a §11 claim. This Claim is based solely on negligence. Securities Act Plaintiffs specifically disclaim any allegation of fraud, scienter, or deliberate recklessness in this §11 claim.

884. Securities Act Plaintiffs repeat and reallege ¶¶12-15, 670-883 by reference.

885. The registration statements for the Notes Offerings were inaccurate and misleading, contained untrue statements of material fact, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

886. The Utility, a subsidiary of PG&E Corporation, is the registrant for the senior notes sold in the Notes Offerings. The Utility and PG&E Corporation would be named as defendants herein for this Claim but for their declaration of bankruptcy and the imposition of the automatic bankruptcy stay under federal law.

887. The Securities Act Defendants named herein were responsible for the contents and dissemination of the registration statements for the Notes Offerings. None of the Securities Act Defendants named herein made a reasonable investigation or possessed reasonable grounds for the

belief that the statements contained in the registration statements for the Notes Offerings were true and without omissions of any material facts and were not misleading.

888. By reason of the conduct alleged herein, each Securities Act Defendant violated, and/or controlled a person who violated, §11 of the Securities Act.

889. Securities Act Plaintiffs acquired PG&E senior notes sold in the Notes Offerings traceable to the registration statements for the Notes Offerings.

890. Securities Act Plaintiffs and the Securities Act Subclass have sustained damages.

891. At the time of their purchases of the PG&E notes sold in the Notes Offerings, Securities Act Plaintiffs and other members of the Securities Act Subclass were without knowledge of the facts concerning the wrongful conduct alleged herein. Less than one year has elapsed from the time that Securities Act Plaintiffs discovered or reasonably could have discovered the facts upon which this Complaint is based to the time that Securities Act Plaintiffs filed their initial complaint on February 22, 2019. Less than three years elapsed between the time that the securities upon which this Count is brought were offered to the public and the time Securities Act Plaintiffs filed their initial complaint.

## FOURTH CLAIM

### For Violation of §15 of the Securities Act
### Against the Securities Act Individual Defendants

892. This Claim is brought pursuant to §15 of the Securities Act, 15 U.S.C. §77o, on behalf of all members of the Securities Act Subclass against the Securities Act Individual Defendants.

893. This Claim does not sound in fraud. Securities Act Plaintiffs do not allege that the Securities Act Individual Defendants had scienter or fraudulent intent, which are not elements of a §15 claim. This Claim is based solely on negligence. Securities Act Plaintiffs specifically disclaim any allegation of fraud, scienter, or deliberate recklessness in this §15 claim.

894. Securities Act Plaintiffs repeat and reallege ¶¶12-15, 670-893 by reference.

895. The Securities Act Defendants, except the Underwriter Defendants, acted as controlling persons of PG&E by virtue of their positions as directors and/or senior officers of

PG&E. The Securities Act Individual Defendants and PG&E oversaw the Notes Offerings, including the preparation and dissemination of the registration statements for the Notes Offerings, and took steps to ensure that the Notes Offerings were successfully completed, including, for example, by signing the registration statements for the Notes Offerings. By reason of such conduct, each of the Defendants except the Underwriter Defendants is liable pursuant to §15 of the Securities Act jointly and severally to Plaintiffs and other members of the Class. By reason of such conduct, each of the Defendants except the Underwriter Defendants is liable pursuant to §15 of the Securities Act jointly and severally to Plaintiffs and other members of the Class.

## XXIV. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against Defendants as follows:

A. Determining that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Lead Plaintiff as the Class representative and the Securities Act Plaintiffs as representatives of the Securities Act Subclass;

B. Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C. Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.

**DEMAND FOR TRIAL BY JURY**

Plaintiffs hereby demand a trial by jury.

DATED: November 14, 2025

*/s/ Thomas G. Hoffman, Jr.*

THOMAS A. DUBBS (*pro hac vice*)
MICHAEL P. CANTY (*pro hac vice*)
THOMAS G. HOFFMAN, JR. (*pro hac vice*)
JEFFREY A. DUBBIN (#287199)
CHARLES WOOD (*pro hac vice*)
CHARLES J. STIENE (*pro hac vice*)
**LABATON KELLER SUCHAROW LLP**
140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
Email: tdubbs@labaton.com
mcanty@labaton.com
thoffman@labaton.com
jdubbin@labaton.com
cwood@labaton.com
cstiene@labaton.com

*Counsel for Lead Plaintiff the Public Employees Retirement Association of New Mexico and Lead Counsel for the Class*

JAMES M. WAGSTAFFE (#95535)
**ADAMSKI, MORISKI, MADDEN, CUMBERLAND & GREEN LLP**
Mailing Address: P.O. Box 3835
San Luis Obispo, CA 93403-3835
Physical Address: 6633 Bay Laurel Place
Avila Beach, CA 93424
Telephone: (805) 543-0990
Facsimile: (805) 543-0980
wagstaffe@kwvbrlaw.com

*Liaison Counsel for PERA and the Proposed Class*

DARREN J. ROBBINS (#168593)
ALEXANDRA S. BERNAY (#211068)
**ROBBINS GELLER RUDMAN & DOWD LLP**
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: (619) 231-1058
Facsimile: (619) 231-7423
darrenr@rgrdlaw.com
xanb@rgrdlaw.com

WILLOW E. RADCLIFFE (#200089)
KENNETH J. BLACK (#291871)
HADIYA K. DESHMUKH (#328118)
HAILEY S. ZANUTTO (#358143)
**ROBBINS GELLER RUDMAN & DOWD LLP**

Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, California 94104
Telephone 415-288-4545
willowr@rgrdlaw.com
kennyb@rgrdlaw.com
hdeshmukh@rgrdlaw.com
hzanutto@rgrdlaw.com

*Additional Counsel for the Securities Act Subclass*

THOMAS C. MICHAUD
**VANOVERBEKE, MICHAUD & TIMMONY, P.C.**
79 Alfred Street
Detroit, MI 48201
Telephone: (313) 578-1200
Facsimile: (313)578-1201
tmichaud@vmtlaw.com

*Additional Counsel for the Securities Act Subclass*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on November 14, 2025, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a Notice of Electronic Filing to all counsel of record.

*/s/ Thomas G. Hoffman, Jr.*
Thomas A. Dubbs