**LABATON KELLER SUCHAROW LLP**
THOMAS A. DUBBS (*pro hac vice*)
MICHAEL P. CANTY (*pro hac vice*)
THOMAS G. HOFFMAN, JR. (*pro hac vice*)
140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
Email: tdubbs@labaton.com
mcanty@labaton.com
thoffman@labaton.com

*Counsel for Lead Plaintiff the Public Employees Retirement Association of New Mexico and Lead Counsel for the Class*

**ADAMSKI, MORISKI, MADDEN, CUMBERLAND & GREEN LLP**
JAMES M. WAGSTAFFE (#95535)
6633 Bay Laurel Place
Avila Beach, CA 93424
Telephone: (805) 543-0990
Facsimile: (805) 543-0980
Email: wagstaffe@ammcglaw.com

*Liaison Counsel for Lead Plaintiff the Public Employees Retirement Association of New Mexico and the Class*

*[Additional counsel appear on signature page]*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

IN RE PG&E CORPORATION SECURITIES LITIGATION

Civil Action No. 5:18-cv-03509-EJD

**LEAD PLAINTIFF'S MOTION FOR FINAL APPROVAL OF PROPOSED CLASS ACTION SETTLEMENT AND PLAN OF ALLOCATION AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**

**Date**: August 25, 2026
**Time**: 9:00 a.m.
**Judge**: Hon. Edward J. Davila
**Courtroom**: 4, 5th Floor

# TABLE OF CONTENTS


Page

NOTICE OF MOTION ..... 1

STATEMENT OF ISSUES TO BE DECIDED ..... 2

MEMORANDUM OF POINTS AND AUTHORITIES ..... 2

PRELIMINARY STATEMENT ..... 2

PRELIMINARY APPROVAL AND THE NOTICE PROGRAM ..... 5

ARGUMENT ..... 7

I. THE SETTLEMENT WARRANTS FINAL APPROVAL ..... 7

A. Standards Governing Approval of Class Action Settlements ..... 7

B. Rule 23(e)(2)(A): The Settlement Class Has Been Adequately Represented ..... 8

C. Rule 23(e)(2)(B): The Settlement Is the Product of Arm's-Length Negotiations Between Experienced Counsel ..... 10

D. Rule 23(e)(2)(C): The Relief Provided by the Settlement Is Adequate ..... 12

1. Rule 23(e)(2)(C)(i): Risks of Continued Litigation ..... 13

2. Rule 23(e)(2)(C)(ii): Effective Process for Distributing Relief to the Settlement Class ..... 21

3. Rule 23(2)(C)(iii): Anticipated Legal Fees and Expenses ..... 22

E. Rule 23(e)(2)(D): Class Members Are Treated Equitably ..... 22

II. THE COURT SHOULD APPROVE THE PLAN OF ALLOCATION ..... 23

III. THE NOTICE PROGRAM AND REACTION OF THE SETTLEMENT CLASS TO DATE ..... 24

CONCLUSION ..... 25

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*In re Banc of Cal. Sec. Litig.*,
2019 WL 6605884 (C.D. Cal. Dec. 4, 2019) ........ 11

*Barnes v. Edison Int'l*,
2021 WL 2325060 (C.D. Cal. Apr. 27, 2021), *aff'd*, 2022 WL 822191 (9th Cir. Mar. 18, 2022) ........ 15

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988) ........ 19, 20

*Bernstein v. Ginkgo Bioworks Holdings, Inc.*,
2024 WL 5112227 (N.D. Cal. Dec. 13, 2024) ........ 24

*Bhangal v. Hawaiian Elect. Indus., Inc.*,
2024 WL 4505465 (N.D. Cal. Oct. 15, 2024) ........ 15

*In re Biolase, Inc. Sec. Litig.*,
2015 WL 12720318 (C.D. Cal. Oct. 13, 2015) ........ 12

*In re Bluetooth Headset Prods. Liab. Litig.*,
654 F.3d 935 (9th Cir. 2011) ........ 11

*In re BofI Holding, Inc. Sec. Litig.*,
2022 WL 9497235 (S.D. Cal. Oct. 14, 2022) ........ 9, 10

*Campbell v. Facebook, Inc.*,
951 F.3d 1106 (9th Cir. 2020) ........ 7

*In re Celera Corp. Sec. Litig.*,
2015 WL 1482303 (N.D. Cal. Mar. 31, 2015) ........ 16

*Churchill Vill., L.L.C. v. Gen. Elec.*,
361 F.3d 566 (9th Cir. 2004) ........ 8, 12

*Class Plaintiffs v. City of Seattle*,
955 F.2d 1268 (9th Cir. 1992) ........ 23

*In re Extreme Networks, Inc. Sec. Litig.*,
2019 WL 3290770 (N.D. Cal. July 22, 2019) ........ 11

*Garner v. State Farm Mut. Auto Ins. Co.*,
2010 WL 1687832 (N.D. Cal. Apr. 22, 2010) ........ 7

*Goldman Sachs Grp., Inc. v. Ark. Tchr Ret. Sys.*,
594 U.S. 113 (2021) ........ 19

*Hanlon v. Chrysler Corp.*,
150 F.3d 1011 (9th Cir. 1998) ........ 8, 10, 12

*Janus Cap. Grp., Inc. v. First Derivative Traders*,
564 U.S. 135 (2011)........ 14

*Jiangchen v. Rentech, Inc.*,
2019 WL 5173771 (C.D. Cal. Oct. 10, 2019)........ 10

*In re LinkedIn User Priv. Litig.*,
309 F.R.D. 573 (N.D. Cal. 2015)........ 20

*Longo v. OSI Sys., Inc.*,
2022 WL 22995096 (C.D. Cal. Aug. 31, 2022)........ 11

*Mineworkers' Pension Scheme v. First Solar Inc.*,
881 F.3d 750 (9th Cir. 2018) ........ 19

*In re Netflix Privacy Litig.*,
2013 WL 1120801 (N.D. Cal. Mar. 18, 2013)........ 11

*In re NVIDIA Corp. Derivative Litig.*,
2008 WL 5382544 (N.D. Cal. Dec. 22, 2008) ........ 10

*Officers for Justice v. Civil Serv. Comm'r*,
688 F.2d 615 (9th Cir. 1982) ........ 7

*In re Omnivision Techs., Inc.*,
559 F. Supp. 2d 1036 (N.D. Cal. 2008) ........ 23

*Pardi v. Tricida, Inc.*,
2025 WL 2988737 (N.D. Cal. Oct. 23, 2025)........ 25

*In re PG&E Corp. Sec. Litig.*,
806 F. Supp. 3d 962 (N.D. Cal. 2025) ........ 12, 14, 15

*Plumbers & Pipefitters Loc. Union #295 Pension Fund v. CareDx, Inc.*,
2025 WL 3546227 (N.D. Cal. Dec. 4, 2025) ........ 13, 24, 25

*In re Snap Inc. Sec. Litig.*,
2021 WL 667590 (C.D. Cal. Feb. 18, 2021)........ 12

*In re Splunk Inc. Sec. Litig.*,
2024 WL 923777 (N.D. Cal. Mar. 4, 2024)........ 13

*In re Stable Rd. Acquisition Corp.*,
2024 WL 3643393 (N.D. Cal. Apr. 23, 2024) ........ 9

*Vataj v. Johnson*,
2021 WL 1550478 (N.D. Cal. Apr. 20, 2021) ........ 23

**Statutes**

15 U.S.C. §78u-4(a)(4) ........ 22

**Rules**

Fed. R. Civ. P. 23 ........ *passim*

Fed. R. Civ. P. 23(a) ........ 5

Fed. R. Civ. P. 23(b)(3) ........ 5

Fed. R. Civ. P. 23(e)(1)(B) ........ 24

Fed. R. Civ. P. 23(e)(2) ........ 1, 2, 7, 8

Fed. R. Civ. P. 23(2)(C)(iii) ........ 22

Fed. R. Civ. P. 23(e)(2)(A) ........ 8, 10

Fed. R. Civ. P. 23(e)(2)(B) ........ 10

Fed. R. Civ. P. 23(e)(2)(C) ........ 12

Fed. R. Civ. P. 23(e)(2)(C)(i) ........ 13

Fed. R. Civ. P. 23(e)(2)(C)(ii) ........ 21

Fed. R. Civ. P. 23(e)(2)(C)(iii) ........ 22

Fed. R. Civ. P. 23(e)(2)(C)(iv) ........ 7

Fed. R. Civ. P. 23(e)(2)(D) ........ 22, 23

Fed. R. Civ. P. 23(e)(3) ........ 7

**NOTICE OF MOTION**

PLEASE TAKE NOTICE that on August 25, 2026, at 9:00 a.m., in Courtroom 4, 5th Floor of the Robert F. Peckham Federal Building & United States Courthouse, 280 South 1st Street, San Jose, CA 95113, before the Honorable Edward J. Davila of the United States District Court, Northern District of California, Lead Plaintiff Public Employees Retirement Association of New Mexico ("Lead Plaintiff" or "PERA"), on behalf of itself and named plaintiff York County on behalf of the County of York Retirement Fund, City of Warren Police and Fire Retirement System, and Defined Benefit Plan of the Mid-Jersey Trucking Industry and Teamsters Local 701 Pension and Annuity Fund (collectively, "Securities Act Plaintiffs," and with Lead Plaintiff, "Plaintiffs"), will move the Court, pursuant to Federal Rule of Civil Procedure 23(e)(2), for entry of a judgment granting final approval of the proposed Settlement and entry of an order granting approval of the proposed Plan of Allocation.[1]

The Motion is supported by the following memorandum of points and authorities, and the accompanying Declaration of Thomas G. Hoffman, Jr. in Support of (I) Lead Plaintiff's Motion for Final Approval of Class Action Settlement and Plan of Allocation and (II) Lead Counsel's Motion for an Award of Attorneys' Fees and Expenses, dated June 18, 2026 ("Hoffman Declaration" or "Hoffman Decl."), with annexed exhibits.[2]

Pursuant to the Court's Preliminary Approval Order (ECF No. 347), any objections to the

---

[1] The terms of the Settlement are set forth in the Stipulation and Agreement of Settlement, dated December 31, 2025 (the "Settlement Agreement" or "Stipulation," ECF No. 332-2). Capitalized terms used herein are defined in the Settlement Agreement and have the same meanings as set forth therein. Unless otherwise noted, citations and internal quotations have been omitted.

[2] All exhibits referenced herein are attached to the Hoffman Declaration. For clarity, citations to exhibits that themselves have attached exhibits will be referenced as "Ex. __ -__." The first numerical reference is to the designation of the entire exhibit attached to the Hoffman Declaration and the second reference is to the exhibit designation within the exhibit itself.

Settlement and/or the Plan of Allocation must be filed by July 6, 2026. A proposed Judgment, negotiated by the Parties, and a proposed order approving the Plan of Allocation will be submitted with Lead Plaintiff's reply submission on or before August 11, 2026, after the deadlines for objecting or seeking exclusion from the Settlement Class have passed.

## STATEMENT OF ISSUES TO BE DECIDED

1. Whether the Court should approve the proposed Settlement as fair, reasonable, and adequate pursuant to Rule 23(e)(2).

2. Whether the Court should finally certify the Settlement Class and appoint Lead Plaintiff as Class Representative and Lead Counsel as Class Counsel, for purposes of settlement only.

3. Whether the Court should approve the proposed Plan of Allocation as fair and reasonable.

4. Whether the notice provided to the Settlement Class satisfied Rule 23 and due process.

## MEMORANDUM OF POINTS AND AUTHORITIES

### PRELIMINARY STATEMENT

Lead Plaintiff, through its counsel, respectfully submits this memorandum, on behalf of Plaintiffs and the proposed Settlement Class, in support of final approval of the proposed Settlement in the amount of $100,000,000, in cash, pursuant to the terms set forth in the Settlement Agreement. The Settlement resolves all claims in the above-captioned Class Action and related claims, including those in the Chapter 11 Cases, against the Officer Defendants, Director Defendants, Underwriter Defendants (collectively, the "District Court Defendants"), and PG&E Corporation and Pacific Gas and Electric Company (collectively, "PG&E," the "Company," "Debtors," and "Reorganized Debtors," and together with the District Court Defendants, the "Released PG&E Parties").

As described below and in the accompanying Hoffman Declaration,[3] the Settlement is a very favorable result for the Settlement Class that brings to a close eight years of contentious litigation in multiple fora. In choosing to settle, Lead Plaintiff and Lead Counsel took into consideration the substantial challenges associated with advancing the claims through trial, as well as the duration and complexity of the legal proceedings that remained ahead. As discussed in detail below, had the Settlement not been reached, there were considerable barriers to a greater recovery, or any recovery at all. The decision to settle was informed by a comprehensive years-long investigation into the claims and defenses, substantive motion practice and discovery, as well as contentious arm's-length negotiations over the span of five years, and with multiple mediators, after consultation with experienced legal counsel.

The claims—which were litigated creatively and aggressively until the agreement to settle—were settled only after Plaintiffs, among other things: (i) conducted an extensive years-long investigation of the claims and defenses at issue; (ii) prepared and filed four separate amended complaints, which expanded the scope of the initial complaint by adding detailed allegations in support of Plaintiffs' claims; (iii) opposed the District Court Defendants' extensive motions to dismiss the Third Amended Complaint through two rounds of briefing; (iv) vigorously represented and advocated on behalf of the Settlement Class with respect to the unusually complex Chapter 11 Cases, including efforts to extend the claims bar date, to protect claimants' procedural rights, to seek certification of a proposed class, object to confirmation of PG&E's plan of reorganization, pursue two appeals to the Ninth Circuit Court of Appeals, and oppose the Reorganized Debtors' securities claims omnibus objections, including their sufficiency objection;

[3] The Hoffman Declaration is an integral part of this submission and, for the sake of brevity in this memorandum, the Court is respectfully referred to it for a detailed description of, *inter alia*: the history of the Action and Plaintiffs' efforts in the Chapter 11 Cases; the nature of the claims asserted; litigation efforts; negotiations leading to the Settlement; and the risks and uncertainties of continued litigation, among other things. Citations to "¶" and "¶¶" in this memorandum refer to paragraphs in the Hoffman Declaration, unless otherwise indicated.

(v) propounded discovery requests on the Reorganized Debtors, and others, and responded to their discovery requests, including defending four depositions of Plaintiffs; (vi) reviewed tens of thousands of documents provided by the Reorganized Debtors and others; (vii) consulted with experts in the fields of, among others, damages, loss causation and market efficiency, ethics and bankruptcy to oppose the motion to stay before the District Court, D&O Insurance, wildfires and vegetation management, and an expert to oppose the Reorganized Debtors' motion to approve the ADR Procedures in the Chapter 11 Cases; and (viii) engaged in vigorous and lengthy mediated settlement discussions over the span of several years and with multiple mediators. *See generally* Hoffman Decl. at §§III.-IV. Additionally, the efforts and views of counsel for the Securities Act Plaintiffs, Robbins Geller Rudman & Dowd LLP ("Robbins Geller"), are provided in the Declaration of Willow E. Radcliffe in Support of Final Approval of Class Action Settlement and an Award of Attorneys' Fees and Expenses ("Radcliffe Decl."), Exhibit 5, filed herewith.

Lead Plaintiff and Lead Counsel believe the $100 million recovery is a very favorable result for the Settlement Class under the circumstances before the Court and in comparison to securities class action industry trends. For example, the Settlement is nearly six times greater than the $17.3 million median recovery, and more than twice the $40 million average settlement value, for securities class actions in 2025. *See* Edward Flores, Svetlana Starykh & Ivelina Velikova, *Recent Trends in Securities Class Action Litigation: 2025 Full-Year Review* (NERA Economic Research Assoc. Jan. 2026), Ex. 6 at 22-24. The Settlement provides a certain result and avoids further risk, delay, and expenses associated with continued litigation.

Plaintiffs were actively involved throughout the litigation, diligently representing the Settlement Class, and have approved the Settlement. *See* Declaration of Anthony V. Montoya on Behalf of Public Employees Retirement Association of New Mexico, dated June 18, 2026 (Exhibit 1, hereto); Declaration of Gregory Bower on Behalf of York County on Behalf of County of York Retirement Fund, dated June 18, 2026 (Exhibit 2, hereto); Declaration of Jennifer Essenmacher on Behalf of City of Warren Police and Fire Retirement System, dated June 18, 2026 (Exhibit 3, hereto); and Declaration of Giancarlo Prezioso on Behalf of Defined Benefit

Plan of the Mid-Jersey Trucking Industry and Teamsters Local 701 Pension and Annuity Fund, dated June 17, 2026 (Exhibit 4, hereto). The Settlement Class's reaction to date similarly reflects approval of the Settlement. Notice was provided to the Settlement Class beginning on March 12, 2026. *See* Declaration of Adam D. Walter Regarding (A) Mailing of the Postcard Notice (B) Publication of the Summary Notice; and (C) Report on Requests for Exclusion and Objections Received to Date, dated June 18, 2026 ("Mailing Decl."), Ex. 8. While the July 6, 2026 deadline to object to the Settlement or request exclusion has not yet passed, to date, no objections have been received by Lead Counsel or docketed and only eight invalid requests for exclusion have been received. Lead Plaintiff respectfully requests that the Court approve the Settlement.

In addition, the Plan of Allocation for the distribution of the proceeds of the Settlement, which was developed by Lead Counsel with the assistance of Lead Plaintiff's damages expert, is a fair and reasonable method for distributing the Net Settlement Fund to eligible claimants and should also be approved by the Court. To date, there have been no objections to the Plan.

Given the foregoing considerations and the factors addressed below, Lead Plaintiff respectfully submits that: (i) the Settlement meets the standards for final approval under Rule 23 and is a fair, reasonable and adequate result for the Settlement Class; (ii) the proposed Settlement Class meets all of the requirements of Rules 23(a) and (b)(3) and is appropriate for certification for purposes of the Settlement; and (iii) the Plan of Allocation is a fair and reasonable method for allocating the Net Settlement Fund to Settlement Class Members who submit valid Claim Forms.

**PRELIMINARY APPROVAL AND THE NOTICE PROGRAM**

On February 26, 2026, the Court entered an order preliminarily approving the Settlement and approving the proposed forms and methods of providing notice to the Settlement Class (the "Preliminary Approval Order," ECF No. 347).[4] Pursuant to and in compliance with the Preliminary Approval Order, beginning on March 12, 2026, the Court-appointed Claims

[4] In the Preliminary Approval Order, the Court provisionally certified the proposed Settlement Class pursuant to Fed. R. Civ. P. 23(a) and (b)(3). Nothing has occurred to alter the propriety of that determination.

Administrator A.B. Data, Ltd. ("A.B. Data"), caused the Postcard Notice to be mailed by first-class mail to all potential Settlement Class Members then identified. *See* Mailing Decl., Ex. 8 at ¶¶2-10. In total, the Claims Administrator provided 513,433 potential Settlement Class Members and their Nominees with copies of the Postcard Notices, pursuant to the instructions set forth in the Preliminary Approval Order. *Id.* at ¶10. On March 26, 2026, the Summary Notice was published in *The Wall Street Journal* and was disseminated over the internet using *PR Newswire*. *Id.* at ¶11 and Exhibits D & E attached thereto. The Claim Form and the long-form Notice, along with other Settlement related documents, were posted on the website maintained for the Settlement, www.PGECorporationSecuritiesLitigation.com. *Id.* at ¶12. In addition to containing the notices and Claim Form, the website provides information concerning the case and important dates and deadlines in connection with the Settlement, as well as access to downloadable copies of relevant documents, including the Fourth Amended Consolidated Class Action Complaint for Violation of the Federal Securities Laws ("Fourth Amended Complaint" or "FAC"), the Settlement Agreement, and the Preliminary Approval Order. *Id.* Copies of these Settlement related documents are also available on Lead Counsel's website, www.labaton.com. ¶128. The website also provides an online claim portal and information about submitting a claim.

The notices describe, *inter alia*, the claims asserted in the Class Action and the Chapter 11 Cases, the contentions of the Parties, the course of the litigation, the terms of the Settlement, the amount of the recovery, maximum amounts that would be sought in attorneys' fees and expenses, the Plan of Allocation, the right to object to the Settlement, and the right to request exclusion from the Settlement Class. *See generally* Ex. 8-A through E. The notices also advised potential Settlement Class Members of the scheduled final approval hearing before this Court. *Id.* To date, the Settlement Class's reaction to the proposed Settlement has been positive. While the deadline (July 6, 2026) for objecting to the Settlement has not yet passed, to date there have been no objections to the proposed Settlement, and no objections to the Plan of Allocation.[5]

---

[5] Should any objections be received, Lead Plaintiff will address them in its reply papers, which are due to be filed with the Court on August 11, 2026.

## ARGUMENT

### I. THE SETTLEMENT WARRANTS FINAL APPROVAL

#### A. Standards Governing Approval of Class Action Settlements

The Ninth Circuit recognizes a "strong judicial policy that favors settlements, particularly where complex class action litigation is concerned." *Campbell v. Facebook, Inc*., 951 F.3d 1106, 1121 (9th Cir. 2020). It is well established in the Ninth Circuit that "voluntary conciliation and settlement are the preferred means of dispute resolution." *Officers for Justice v. Civil Serv. Comm'r*, 688 F.2d 615, 625 (9th Cir. 1982). Settlements of complex cases, such as this one, greatly contribute to the efficient utilization of scarce judicial resources and achieve the speedy resolution of claims. *See, e.g.*, *Garner v. State Farm Mut. Auto Ins. Co.*, 2010 WL 1687832, at *10 (N.D. Cal. Apr. 22, 2010) ("Settlement avoids the complexity, delay, risk and expense of continuing with the litigation and will produce a prompt, certain, and substantial recovery for the Plaintiff class.").

Rule 23(e)(2) provides that a court may approve a proposed class settlement "only after a hearing and only on finding that it is fair, reasonable, and adequate" after considering whether:

> (A) the class representatives and class counsel have adequately represented the class;
> (B) the proposal was negotiated at arm's length;
> (C) the relief provided for the class is adequate, taking into account:
> (i) the costs, risks, and delay of trial and appeal;
> (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;
> (iii) the terms of any proposed award of attorney's fees, including timing of payment; and
> (iv) any agreement required to be identified under Rule 23(e)(3);[6] and

---

[6] Rule 23(e)(2)(C)(iv) requires the disclosure of any agreement between the parties in connection with a proposed settlement. In addition to the Settlement Agreement, on December 31, 2025, the Parties entered into a confidential Supplemental Agreement Regarding Requests for Exclusion and Claims Against the Settlement Fund (the "Supplemental Agreement"). The Supplemental Agreement sets forth the circumstances under which the Reorganized Debtors may terminate the Settlement if a certain threshold of Requests for Exclusion is received or if a certain threshold of claims is not received.

(D) the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2). Rule 23, as amended in December 2018, has not changed the established overall standard for approving a proposed class settlement, *i.e.*, evaluating whether it is fair, adequate, and reasonable. Fed. R. Civ. P. 23(e)(2).

In considering final approval, the Court may also consider the Ninth Circuit's long-standing approval factors, many of which overlap with the Rule 23 considerations: "(1) the strength of the plaintiffs' case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery completed and the stage of the proceedings; (6) the experience and views of counsel; (7) the presence of a governmental participant; and (8) the reaction of the class members of the proposed settlement." *Churchill Vill., L.L.C. v. Gen. Elec*., 361 F.3d 566, 575 (9th Cir. 2004); *see also Hanlon v. Chrysler Corp*., 150 F.3d 1011, 1026 (9th Cir. 1998). The Advisory Committee Notes to the 2018 amendments to Rule 23 explain that the four Rule 23(e)(2) factors are not intended to "displace" any factor previously adopted by the courts, but "rather to focus the court and the lawyers on the core concerns of procedure and substance that should guide the decision whether to approve the proposal." Fed. R. Civ. P. 23 Advisory Committee Notes to 2018 Amendments, Subdivision (e)(2). All of these factors, whether in Rule 23 or Ninth Circuit jurisprudence, favor approval of the Settlement.

**B. Rule 23(e)(2)(A): The Settlement Class Has Been Adequately Represented**

In determining whether to approve a class action settlement, courts consider whether "the class representative and class counsel have adequately represented the class." Fed. R. Civ. P. 23(e)(2)(A). "Resolution of two questions determines legal adequacy: (1) do the named plaintiffs and their counsel have any conflicts of interest with other class members, and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *Hanlon v. Chrysler Corp*.. 150 F.3d at 1027.

Here, Lead Plaintiff's claims are based on the same common course of alleged conduct by PG&E and the District Court Defendants. Thus, Lead Plaintiff's claims are typical of all other

Settlement Class Members, and Lead Plaintiff has no interests antagonistic to the Settlement Class. *See In re Stable Rd. Acquisition Corp.*, 2024 WL 3643393, at *6 (N.D. Cal. Apr. 23, 2024) (finding lead plaintiff adequately represented the class where lead plaintiff's claims are typical of and coextensive with the claims of the settlement class with no antagonistic interests).

Since their appointment, Lead Plaintiff and Lead Counsel have adequately represented the Settlement Class in both their vigorous and creative prosecution of the claims in two forums and in their extensive efforts to negotiate the Settlement. Lead Plaintiff and Lead Counsel developed a deep understanding of the facts of the case and merits of the claims by, *inter alia*: (i) conducting an extensive investigation of the claims and defenses at issue; (ii) preparing and filing four separate amended complaints, which expanded the scope of the initial complaint by adding particularized allegations in support of Plaintiffs' claims; (iii) opposing the District Court Defendants' extensive motions to dismiss the Third Amended Complaint ("TAC") through two rounds of briefing; (iv) advocating on behalf of the Settlement Class with respect to the Chapter 11 Cases, including efforts to extend the claims bar date, to protect claimants' procedural rights, to seek certification of a proposed class, two appeals to the Ninth Circuit Court of Appeals, and opposing the Reorganized Debtors' securities claims omnibus objections, including their sufficiency objection; (v) propounding discovery requests on the Reorganized Debtors; (vi) obtaining and analyzing approximately 8,524,000 documents (approximately 28,846,500 pages) produced by the Reorganized Debtors and third parties in formal discovery; (vii) defending depositions; (viii) consulting with experts in the fields of damages, loss causation and market efficiency, ethics and bankruptcy procedures to oppose the motion to stay before the District Court, and an expert to oppose the Reorganized Debtors' motion to approve the ADR Procedures in the Chapter 11 Cases; and (ix) engaging in vigorous and lengthy mediated settlement discussions over the span of several years and with multiple mediators. *See generally* Hoffman Decl. at §§III.-IV; Radcliffe Decl.; *see also In re BofI Holding, Inc. Sec. Litig.*, 2022 WL 9497235, at *5 (S.D. Cal. Oct. 14, 2022) (finding plaintiff and counsel adequately represented the class by

having "litigated this case through several iterations of the Complaint, numerous motions to dismiss, an appeal to the Ninth Circuit, remand, and discovery before arriving at a settlement").

Lead Plaintiff regularly consulted with Lead Counsel and reviewed material filings in the case, such as the complaints, the briefing on the District Court Defendants' motions to dismiss, and similar motions in the Bankruptcy Court (*e.g.*, Reorganized Debtors' sufficiency objection, akin to a motion to dismiss). Lead Plaintiff also responded to discovery requests, including collecting and producing potentially relevant information and sitting for a deposition. *See* Ex. 1. Furthermore, Lead Plaintiff played an active role in the settlement discussions, including attending the mediation session in February 2022. *See, e.*g., Ex. 1 at ¶4(g). With an informed understanding, Lead Plaintiff agreed to the Settlement.

Likewise, Lead Counsel Labaton Keller Sucharow LLP, a firm that is highly experienced in prosecuting and trying complex class actions, had a clear view of the strengths and challenges in the case and was equipped to make an informed decision regarding the reasonableness of a potential settlement. *See Jiangchen v. Rentech, Inc.,* 2019 WL 5173771, at *5 (C.D. Cal. Oct. 10, 2019) (finding this factor satisfied where counsel "has significant experience in securities class action lawsuits"); *see also* Ex. 12-E (firm profile). Accordingly, the Settlement Class has been, and remains, well represented.

Through their efforts on behalf of the Settlement Class, Lead Counsel and Lead Plaintiff have concluded that the proposed Settlement is fair, reasonable, and adequate. As often observed in this Circuit, "significant weight should be attributed to counsel's belief that settlement is in the best interest of those affected by the settlement." *See In re NVIDIA Corp. Derivative Litig*., 2008 WL 5382544, at *4 (N.D. Cal. Dec. 22, 2008).

### C. Rule 23(e)(2)(B): The Settlement Is the Product of Arm's-Length Negotiations Between Experienced Counsel

Rule 23(e)(2)(B) asks whether "the [settlement] proposal was negotiated at arm's length." This consideration (and Rule 23(e)(2)(A) discussed above) "overlaps with certain *Hanlon* factors,

such as the non-collusive nature[7] of negotiations, the extent of discovery completed, and the stage of proceedings." *In re Extreme Networks, Inc. Sec. Litig*., 2019 WL 3290770, at *7 (N.D. Cal. July 22, 2019). Courts afford "a presumption of fairness and reasonableness" to settlements that were "the product of non-collusive, arms' length negotiations conducted by capable and experienced counsel." *In re Netflix Privacy Litig.*, 2013 WL 1120801, at *4 (N.D. Cal. Mar. 18, 2013). Courts have also reasoned that "one important factor [to consider] is that the parties reached the settlement … with a third-party mediator." *In re Banc of Cal. Sec. Litig.*, 2019 WL 6605884, at *2 (C.D. Cal. Dec. 4, 2019).

As detailed in the Hoffman Declaration, the Settlement was achieved only after four separate formal mediations over the course of six years, which included the exchange of robust mediation materials, and additional negotiations with the assistance of multiple mediators. During the negotiations, PG&E and the District Court Defendants, represented by well-regarded law firms with deep expertise in the defense of securities class actions, forcefully asserted arguments against liability and damages. With the Parties still meaningfully apart in their respective settlement positions after the final formal mediation on October 16, 2025, they agreed to continue negotiations through the mediator. After additional arm's-length negotiations over the course of a few weeks, the Parties agreed, in principle, to a settlement amount of $100 million, subject to the negotiation of a mutually acceptable stipulation of settlement, which was to include other material terms still subject to negotiations. *See* Hoffman Decl. at §IV. These negotiations were at all times adversarial and at arm's-length. *See Longo v. OSI Sys., Inc.*, 2022 WL 22995096, at *4 (C.D. Cal. Aug. 31, 2022) (finding settlement was negotiated at arm's-length where "the parties thoroughly investigated and considered their own and the opposing parties' positions' and had a sound basis for measuring the terms of the settlement").

---

[7] The Settlement has none of the indicia of possible collusion identified by the Ninth Circuit. *See In re Bluetooth Headset Prods. Liab. Litig.,* 654 F.3d 935, 947 (9th Cir. 2011); *see also* Stipulation at ¶14.

**D. Rule 23(e)(2)(C): The Relief Provided by the Settlement Is Adequate**

In determining whether a settlement is "fair, reasonable, and adequate," the Court must consider whether "the relief provided for the class is adequate, taking into account . . . the costs, risks, and delay of trial and appeal." Fed. R. Civ. P. 23(e)(2)(C). This factor overlaps with the Ninth Circuit factors that consider "the strength of the plaintiffs' case," "amount offered in the settlement," and "the risk, expense, complexity, and likely duration of further litigation" and the risk of maintaining class action status[.]" *Churchill*, 361 F.3d at 575; *Hanlon*, 150 F.3d at 1026.

Here, the $100 million Settlement Amount presents a very favorable and certain recovery for the Settlement Class. As discussed below and in the Hoffman Declaration, the Settlement recovers approximately 10% to 35% of the Settlement Class's potential recoverable damages, which totaled approximately $279 million to $1 billion based on various scenarios, as estimated by Lead Plaintiffs' consulting expert, if liability were established with respect to the two loss causation events that survived the MTD Order. ¶¶11, 107, 123; *see also In re PG&E Corp. Sec. Litig.*, 806 F. Supp. 3d 962, 1001 (N.D. Cal. 2025) (dismissing all loss causation events pled in TAC, except for the May 25, 2018 and June 11, 2018 disclosures).[8]

Courts have regularly approved settlements with comparable or lower percentage recoveries than obtained here. *See, e.g.*, *In re Biolase, Inc. Sec. Litig.*, 2015 WL 12720318, at *4 (C.D. Cal. Oct. 13, 2015) (finding settlement recovering 8% of estimated damages "equals or surpasses the recovery in many other securities class actions"); *In re Snap Inc. Sec. Litig.*, 2021 WL 667590, at *1 (C.D. Cal. Feb. 18, 2021) (finding the relief adequate where the settlement amount represents 7.8% of class's maximum potential aggregate damages, which is "similar to the percent recovered in other court-approved securities settlements"). According to NERA's full-year 2025 report, for cases with total NERA-defined investor losses of between $1 billion and $4.9 billion, the median percentage of recovery from 2016 to 2025 was 1.3% of estimated losses. *See* Ex. 6 at 27. For cases with NERA-defined losses of $5 billion to $9.999 billion, the median

---

[8] The Court's September 30, 2025 order granting the District Court Defendants' motions to dismiss the TAC is also herein referred to as the "MTD Order." (ECF No. 315).

percentage of recovery was 0.7%. *Id*. According to Cornerstone Research, "In 2025, the median settlement as a percentage of plaintiff-style damages was 6.5%." *See* Ex. 7 at 7.

Moreover, the $100 million Settlement is approximately six times greater than the $17.3 million median reported recovery, and more than double the $40 million average settlement value, for securities class actions in 2025. *See* Edward Flores, Svetlana Starykh & Ivelina Velikova, *Recent Trends in Securities Class Action Litigation: 2025 Full-Year Review* (NERA Economic Research Assoc. Jan. 2026), Ex. 6 at 22-24 (NERA Report).

While Lead Plaintiff believes its claims are strong and that it would defeat the District Court Defendants' motions to dismiss the FAC, prevail at class certification in this Court, and succeed in opposing anticipated motions for summary judgment and at trial, this certain and near-term recovery should be balanced against the numerous uncertainties in continuing to litigate and proceeding to trial in a case that has been pending for nearly eight years, a discussed below.

**1. Rule 23(e)(2)(C)(i): Risks of Continued Litigation**

It is well-recognized that "[s]ecurities actions in particular are often long, hard-fought, complicated, and extremely difficult to win." *Plumbers & Pipefitters Loc. Union #295 Pension Fund v. CareDx, Inc.*, 2025 WL 3546227, at *6 (N.D. Cal. Dec. 4, 2025) (citing *In re Extreme Networks, Inc. Sec. Litig*., 2019 WL 3290770, at *8). Here, there can be little doubt that the "[d]ifficulties and risks in litigating weigh in favor of approving a class action settlement." *In re Splunk Inc. Sec. Litig*., 2024 WL 923777, at *5 (N.D. Cal. Mar. 4, 2024). Although Lead Plaintiff and Lead Counsel believe that the claims asserted against PG&E and the District Court Defendants are strong, they recognize the significant challenges and risks they would face moving forward, as well as the expense and length of continued litigation through motions to dismiss in the Class Action, class certification in the Class Action, motions for summary judgment, trial, and undoubtedly appeals of even successful verdicts. As set forth below, the benefits conferred on the Settlement Class by the $100 million Settlement far outweigh the costs, risks, and delay of further litigation, and confirm the adequacy of and reasonableness of the Settlement.

<u>**False or Misleading Misstatements:**</u> As an initial matter, the Court granted the District

Court Defendants' motions to dismiss the TAC with leave for Plaintiffs to file the Fourth Amended Complaint, which they filed. With respect to Plaintiffs' Exchange Act claims, the Court found that the TAC did not adequately plead that Defendant Kane was the "maker" of the misstatements attributed to her in accordance with the Supreme Court's decision in *Janus Cap. Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 142–43 (2011) ("[T]he maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it."). *PG&E Corp.*, 806 F. Supp. 3d at 989-92 (finding TAC fails to adequately allege that Kane made Statements 2, 4, 5, 9, and 12-19). Plaintiffs attempted to bolster their allegations regarding the "maker" of the misstatements by pleading information obtained from the Reorganized Debtors during discovery in the Bankruptcy Court. However, the District Court Defendants have already argued that these documents do not demonstrate that any of the Individual Defendants were the "maker" of the misstatements alleged in the FAC. *See* ECF No. 328-2 at 9-14 (arguing the Court should once again reject the FAC's "conclusory" allegations that certain Individual Defendants were required to review and approve the misstatements before they were publicly issued). ¶¶94-95.

In the MTD Order, the Court dismissed fifteen of the nineteen challenged statements in the TAC, holding that the majority were either inactionable puffery or were not adequately alleged to be false when made. ECF No. 315 at 24-33. With respect to puffery, the Court held that statements characterizing PG&E's "progress" and "improvements" in safety were "generalized, optimistic assessment[s] of PG&E's efforts rather than . . . factual assertion[s] capable of objective verification," and therefore not actionable. *Id.* at 32. The Court also found statements about PG&E's "focus" on compliance to be "vague, highly subjective claims as opposed to specific, detailed factual assertions." *Id.* at 30. While Plaintiffs believed these holdings could be overcome with the additional allegations in the FAC, including information obtained through discovery in the Chapter 11 Cases, there was a genuine risk that the Court would reach the same conclusions on the repleaded statements. Indeed, in moving to dismiss the FAC, the Officer Defendants argued that ten of the fourteen statements in the FAC were statements the Court "previously held" to be

"either inactionable puffery or . . . not alleged to be misleading," and that the FAC "adds no allegations sufficient to plead these statements were false." ECF No. 328-2 at 14. ¶96.

The Officer Defendants further relied on *Barnes v. Edison International*, 2021 WL 2325060 (C.D. Cal. Apr. 27, 2021), *aff'd*, 2022 WL 822191 (9th Cir. Mar. 18, 2022) and *Bhangal v. Hawaiian Electric Industries, Inc.*, 2024 WL 4505465 (N.D. Cal. Oct. 15, 2024), in which courts dismissed securities claims by shareholders of utilities whose equipment caused catastrophic wildfires, on the ground that the utilities had adequately disclosed their wildfire risks. ECF No. 284 at 3; ECF No. 328-2 at 30. The Director and Underwriter Defendants similarly argued that PG&E's Offering Documents disclosed the very wildfire risks and safety deficiencies Plaintiffs alleged were concealed—including the risk of wildfires caused by PG&E equipment, and Cal Fire's conclusion that the Butte Fire was caused by PG&E's "failure . . . to identify certain potential hazards during its vegetation management program." ECF No. 286 at 10-14; ECF No. 327 at 21-34; *see also* ECF No. 315 at 45-47 ("Since 2014, PG&E had publicly disclosed instances where its safety violations caused fires, so the investing public knew that risk affected PG&E."). ¶97.

The Court dismissed the Securities Act claims finding that the negligence claims sounded in fraud and that the statements alleged to be materially false and misleading with respect to the Note Offerings were not actionable because, *inter alia*, the allegedly concealed risks were publicly disclosed. *PG&E Corp.*, 806 F. Supp. 3d at 1005-06 (concerning "adequacy of PG&E's disclosure[s]"). The Court also found that standing was not sufficiently pled for certain offerings. *Id*. at 1009-14. ¶101; *see generally* Radcliff Decl.

**<u>Scienter:</u>** While Lead Plaintiff believes the evidence will be sufficient to sustain its fraud claims, scienter (and other elements) may be difficult to prove with documents alone and witnesses may not be able to recall specific evidence or events that occurred nearly a decade ago in 2017 and 2018. ¶100. To that end, the District Court Defendants have raised significant challenges to Plaintiffs' scienter allegations. ¶¶98-100. Although the MTD Order sustained those allegations as to all Officer Defendants except Hogan with respect to the surviving statements, it

did so on the narrow ground of the core operations doctrine, reasoning that it would be "absurd" to suggest that the Officer Defendants "were not acutely aware of the non-compliance data" given PG&E's criminal history and the magnitude of its vegetation management violations. ECF No. 315 at 37. In moving to dismiss the FAC, the Officer Defendants argued that this "absurdity prong" of the core operations doctrine was limited to vegetation management issues and did not extend to the Camp Fire allegations, because "there are no allegations that any Officer Defendant had access to any information, or otherwise had any reason to be concerned about, tower inspection and maintenance, or the establishment or execution of the shutoff protocol." ECF No. 328-2 at 22. The Officer Defendants further argued that the FAC "does not plead any fact as to any Officer Defendant's specific knowledge of compliance violations or individualized motive to deceive." *Id.* at 22-23. Had the Court accepted these arguments, its scienter finding would have been confined to a subset of the surviving claims, further narrowing potential liability. While Plaintiffs believed these arguments were without merit and that the evidence of PG&E's criminal conviction and guilty plea provided a strong basis for scienter as to all claims, the risk that the Court might limit the scienter finding to vegetation management–related statements was real. ¶¶98-99.

The District Court Defendants would likely seek to introduce evidence that they were unaware of the Company's alleged non-compliance with relevant wildfire safety regulations and rules and, thus, they did not act with the requisite fraudulent intent required for the Exchange Act claims. The District Court Defendants would likely argue that they believed PG&E was doing its best to balance wildfire safety with environmental stewardship when trimming or removing trees and vegetation surrounding PG&E equipment. ¶100. Likewise, as to the Securities Act claims, the Officer and Underwriter Defendants would undoubtedly reply on defenses of good faith and due diligence in an effort to avoid liability.

**<u>Loss Causation and Damages:</u>** Loss causation and damages are decidedly challenging elements in even the strongest securities case. Indeed, this Court has noted that in "any securities litigation case, it [is] difficult for [plaintiff] to prove loss causation and damages at trial." *In re*

*Celera Corp. Sec. Litig.*, 2015 WL 1482303, at *5 (N.D. Cal. Mar. 31, 2015). While Lead Plaintiff's consulting damages expert estimated that damages were approximately $279 million to $1 billion—assuming liability were established with respect to the loss causation events that survived the MTD Order—PG&E and the District Court Defendants, along with their experts, would have argued that there were no damages whatsoever based on the remaining misstatements and loss causation events. ¶¶103-10. Specifically, the District Court Defendants will likely argue that the remaining loss causation events are not related to the alleged misstatements and that the prices of PG&E Securities declined for reasons other than those alleged in the FAC. ¶¶106, 108.

For example, the two loss causation events pled in the TAC that were not dismissed in the Court's MTD Order relate solely to the North Bay Fires. Specifically, the May 25, 2018 and June 8, 2018 loss causation events stated, *inter* alia, that (i) Cal Fire's investigation with respect to the North Bay Fires indicated that PG&E had failed to ensure clearance between trees and power lines in violation of relevant regulations; and (ii) due to alleged evidence of state law violations, Cal Fire had referred its investigations for the North Bay Fires to county district attorneys. *See* MTD Order at 39 (dismissing all loss causation events pled in the TAC, except for the May 25, 2018 and June 8, 2018 disclosures). ¶105.

The four misstatements that were found to be actionable by the Court (Misstatement 9, 12-14) were made from October 31, 2017 to June 8, 2018 after the North Bay Fires began in early October 2017. *See* ECF No. 315 at 33 ("Plaintiffs have met this first element as to only Statements 9 and 12-14."). While Plaintiffs believe they have strong arguments in support of their positions, the District Court Defendants will likely argue that Misstatements 9, 12-14 in the TAC—which discuss PG&E's compliance with relevant safety and vegetation requirements— related solely to PG&E's compliance at the time the statements were made, and thus they did not provide investors with any assurances as to PG&E's compliance prior to the alleged misstatements or at the time of the North Bay Fires. Accordingly, the upheld loss causation events cannot be corrective of the alleged misstatements. ¶106.

That said, if liability were established with respect to these two loss causation events, Lead

Plaintiff's consulting damages expert has estimated class-wide maximum aggregate damages recoverable at trial, based on the entire stock price declines on these two disclosure dates, to be approximately $1 billion, without netting out gains on pre-Class Period purchases. (Damages for the Section 11 claims were a fraction of the Exchange Act claims.) Under a more conservative approach using the date of the first misstatement that the Court found to be materially false and misleading as the start date for the Class Period (October 31, 2017, Misstatement 9 in the TAC), Lead Plaintiff's damages expert has estimated that class-wide maximum damages recoverable at trial using the same (entire) stock price declines to be approximately $279 million, without netting of pre-Class Period gains. Accordingly, the Settlement recovers a range of approximately 10% to 35% of these estimated damages. These estimates do not, however, exclude the losses of class members who have already settled their claims and could not recover from a verdict in the Class Action. ¶107.

The damages estimates also assume that Plaintiffs would be able to prove damages based on the full alleged loss causation events and that they would not need to "disaggregate," or parse out, confounding inactionable information on those dates. Had the case proceeded, the Reorganized Debtors and District Court Defendants would have strenuously argued that a significant portion of the stock price declines on the May 25 and June 8, 2018 corrective disclosure dates was attributable to factors unrelated to the falsity of the specific compliance statements, thereby reducing recoverable damages. For example, the Officer Defendants argued that the stock price declines reflected not only the disclosure of PG&E's regulatory violations but also the market's reassessment of PG&E's massive potential financial liability under California's inverse condemnation doctrine—a strict-liability regime that imposed financial responsibility on utilities regardless of whether they complied with safety regulations. ECF No. 315 at 39 (noting that "California follows the inverse condemnation doctrine, which imposes liability on utilities like PG&E even if they followed all safety regulations" and that "the subsequent drop in stock prices reflect that PG&E could be held financial[ly] responsible regardless of whether the Utility had committed any violations"). The Officer Defendants and Reorganized Debtors argued that

the portion of the stock decline caused by the market's reaction to inverse condemnation liability, the sheer number of fires caused by PG&E equipment, the criminal referrals to district attorneys, and the prospect of billions of dollars in tort liability were non-fraud-related components of the price decline that would need to be excluded from any damages calculation. *See* ECF No. 284 at 31-35; ECF No. 328-2 at 26-33. In other words, PG&E and the District Court Defendants would argue that the recoverable damages were limited to only portions of the stock price declines on those two dates, rather than the catastrophic declines associated with the Camp Fire and its aftermath. At summary judgment and trial, the disaggregation of these confounding factors from actionable fraud-related losses would have been the subject of expert testimony and could have resulted in substantial reductions to recoverable damages. ¶108.

While Plaintiffs strongly believed, and continue to believe, that the dismissed loss causation events should have been sustained under the Ninth Circuit's decision in *Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 753-54 (9th Cir. 2018), there was a genuine risk that the Court would again confine loss causation to just two relatively minor events.

**<u>Class Certification:</u>** Even if Lead Plaintiff prevailed with respect to the pending motions to dismiss, there remained hurdles with respect to class certification. ¶¶111-15. For example, in the event that the Court decided to dismiss all of the FAC's misstatements and loss causation events for the Exchange Act Claims, except for those sustained in the MTD Order, the District Court Defendants would undoubtedly have raised a "mismatch" argument under *Goldman Sachs Group, Inc. v. Arkansas Teacher Retirement System*, 594 U.S. 113 (2021). Under *Goldman*, defendants may rebut the presumption of class-wide reliance under *Basic Inc. v. Levinson*, 485 U.S. 224, 242 (1988), by demonstrating that the alleged misrepresentations did not actually maintain inflation in the stock price — and one way to make this showing is to demonstrate a lack of correspondence, or "mismatch," between the content of the alleged front-end misstatements and the content of the back-end corrective disclosures. *Goldman*, 594 U.S. at 124-25. Arguably, the *Goldman* mismatch problem would be acute in this case given the nature of the surviving claims. ¶113.

The upheld misstatements were specific compliance representations — for example, that PG&E "meets or exceeds" vegetation clearance and pole integrity management requirements. ECF No. 315 at 28-30. The upheld corrective disclosures, however, were CalFire press releases that revealed a broad range of information: not only that PG&E had violated specific safety regulations, but also the number of fires PG&E caused, the scale of destruction, referrals of cases to district attorneys, and the magnitude of PG&E's potential financial liability. *Id.* at 39. The District Court Defendants would have argued that the stock price declines on the corrective disclosure dates were driven primarily by this broader, non-matching information — the market's reaction to the sheer scale of PG&E's wildfire liability and the prospect of criminal prosecution. Indeed, some market commentary attributed the stock declines to concerns about PG&E's potential financial liability and its ability to meet the "prudent manager" standard for recovering costs from ratepayers — not to the specific falsity of any compliance statement. *See, e.g.*, FAC at ¶146 (Citigroup analyst observing that it would be "tough to meet" the "prudent manager" standard). Had the Court accepted this argument, the *Basic* presumption of reliance would have been rebutted and class certification denied, precluding any class-wide recovery. ¶114.

While Plaintiffs believe they had strong arguments that the corrective disclosures were closely connected to the misrepresentations — because the CalFire findings directly contradicted the specific compliance assurances that PG&E had made — there was a genuine risk that the Court would find the mismatch sufficient to defeat class certification, particularly given the breadth of non-compliance-related information contained in the corrective disclosures. Even aside from class certification, these matters would likely have continued to be litigated through summary judgment, *in limine* motions, trial, and in post-trial motions and appeals.

In contrast to the above, the Settlement represents a prompt and substantial tangible recovery, without the considerable risk, expense, and delay of summary judgment, trial, and post-trial litigation. *See, e.g.*, *In re LinkedIn User Priv. Litig.*, 309 F.R.D. 573, 587 (N.D. Cal. 2015) ("Generally, unless the settlement is clearly inadequate, its acceptance and approval are preferable to lengthy and expensive litigation with uncertain results."). At each of these stages, there would

be significant risks attendant to the continued prosecution of the Class Action and Chapter 11 Cases, and there was no guarantee that further litigation would have resulted in a higher recovery, or any recovery at all. Accordingly, in light of all the substantial risks of continued litigation, and compared to the certain recovery of $100,000,000, the Settlement is a very favorable result.

**2. Rule 23(e)(2)(C)(ii): Effective Process for Distributing Relief to the Settlement Class**

Rule 23(e)(2)(C)(ii) instructs courts to consider whether the relief provided to the class is adequate in light of the "effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims."

Here, the proceeds of the Settlement will be distributed with the assistance of an experienced claims administrator, A.B. Data, Ltd. The Claims Administrator will employ a well-tested protocol for the processing of claims in a securities class action. Specifically, a Claimant will submit, either by mail or online using the case website, the Court-approved Claim Form. Based on the trade information provided by Claimants, the Claims Administrator will determine each Claimant's eligibility to recover by, among other things, calculating their respective "Recognized Claim" based on the Court-approved Plan of Allocation, and ultimately determine each eligible Claimant's *pro rata* portion of the Net Settlement Fund. ¶135. Plaintiffs' claims will be reviewed in the same manner. Claimants will be notified of any defects or conditions of ineligibility and be given the chance to contest the rejection of their claims. Stipulation at ¶30(d)-(e). Any claim disputes that cannot be resolved will be presented to the Court. *Id.*

After the Settlement reaches its Effective Date (*id.* at ¶42) and the claims process is completed, Authorized Claimants will be issued payments. If there are unclaimed funds after the initial distribution, and it would be feasible and economical to conduct a further distribution, the Claims Administrator will conduct a further distribution of remaining funds (less the estimated expenses for the additional distribution, Taxes, and unpaid Notice and Administration Expenses). Additional distributions will proceed in the same manner until it is no longer economical to conduct further distributions. Thereafter, Lead Plaintiff recommends that any *de minimis* balance that remains in the Net Settlement Fund, after payment of any outstanding Notice and

Administration Expenses, be donated to the Consumer Federation of America ("CFA"), a non-profit, non-sectarian organization, or such other organization approved by the Court.[9] *Id* at ¶27; Ex. 8-B at ¶133.

**3. Rule 23(2)(C)(iii): Anticipated Legal Fees and Expenses**

Rule 23(e)(2)(C)(iii) addresses "the terms of any proposed award of attorneys' fees, including timing of payment." Fed. R. Civ. P. 23(e)(2)(C)(iii). As discussed in Lead Counsel's Motion for an Award of Attorneys' Fees and Payment of Expenses and Memorandum of Points and Authorities in Support Thereof, submitted herewith, Lead Counsel, on behalf of Plaintiffs' Counsel, seeks an award of attorneys' fees of 21% of the Settlement Fund and Litigation Expenses of $4,432,711.53. Lead Counsel's Fee Memorandum also includes a request by Lead Plaintiff for $22,970 in connection with its efforts during the course of the proceedings, pursuant to the PSLRA. Approval of attorneys' fees is entirely separate from approval of the Settlement, is not part of any agreement with the Released PG&E Parties, and the Settlement cannot be terminated based on any ruling on the fees or expenses. *See* Stipulation at ¶19.

**E. Rule 23(e)(2)(D): Class Members Are Treated Equitably**

The Settlement does not improperly grant preferential treatment to Plaintiffs or any segment of the Settlement Class. Rather, all members of the Settlement Class, including Plaintiffs, will receive a distribution from the Net Settlement Fund pursuant to the Plan of Allocation approved by the Court, which is discussed below.[10] All Settlement Class Members that were

---

[9] CFA was established in 1968 to advance consumer interests through research, advocacy, and education. With respect to victims of financial fraud, CFA has an Investor Protection program that works to promote consumer-oriented policies that safeguard investors against fraud. It has been approved as a *cy pres* beneficiary by this Court in *In re Intuitive Surgical Sec. Litig.*, Case No. 13-cv-01920-EJD (N.D. Cal.) and in *In re Ubiquiti Networks, Inc. Sec. Litig.*, No. 12-cv-04677-YGR (N.D. Cal.). Neither the Parties nor their counsel have a relationship with CFA.

[10] Lead Plaintiff's request for reimbursement directly related to its participation in this

allegedly harmed as a result of the alleged violations of the Exchange Act and the Securities Act, and that submit an eligible claim pursuant to the Plan of Allocation, will receive their *pro rata* share of the Net Settlement Fund based on their Recognized Claim under the plan. *See* ¶133; *see also* Stipulation at ¶¶24, 30.

## II. THE COURT SHOULD APPROVE THE PLAN OF ALLOCATION

In addition to seeking final approval of the Settlement, Lead Plaintiff also seeks final approval of the Plan of Allocation. The Plan of Allocation, drafted with the assistance of Lead Plaintiff's damages expert, is a fair, reasonable, and adequate method for allocating the proceeds of the Settlement among eligible claimants and treats all Settlement Class Members equitably, as required by Rule 23(e)(2)(D). Each Authorized Claimant, including Plaintiffs, will receive a distribution pursuant to the Plan, and Plaintiffs will be subject to the same formula for distribution of the Settlement as other class members.

The standard for approval of a plan of allocation in a class action under Rule 23 of the Federal Rules of Civil Procedure is the same as the standard applicable to the settlement as a whole – the plan must be fair, reasonable, and adequate. *See Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1284 (9th Cir. 1992); *see also Vataj v. Johnson*, 2021 WL 1550478, at *10 (N.D. Cal. Apr. 20, 2021); *In re Omnivision Techs., Inc.,* 559 F. Supp. 2d 1036, 1045 (N.D. Cal. 2008) (a plan of allocation "is governed by the same standards of review applicable to approval of the settlement as a whole: the plan must be fair, reasonable and adequate."). An allocation formula need only have a "reasonable, rational basis, particularly if recommended by experienced and competent class counsel." *Vataj*, 2021 WL 1550478, at *10.

Plaintiffs' claims pursuant to Section 10(b) of the Exchange Act and Section 11 of the Securities Act serve as the bases for the calculation of a Recognized Loss Amount, under the Plan, for each properly documented purchase/acquisition of PG&E Securities. Claimants' Recognized Loss Amounts will be calculated using the transactional information provided by Claimants in

---

litigation would not constitute preferential treatment. *See* 15 U.S.C. §78u-4(a)(4) (reimbursement of plaintiffs' costs explicitly contemplated by the PSLRA in addition to *pro rata* recovery).

their Claim Forms. An Authorized Claimant's *pro rata* share of the Net Settlement Fund will be based upon each Authorized Claimant's Recognized Equity Claim and/or Recognized Debt Claim. Overall, PG&E Equity Claims will be allocated at least 83.85% of the Settlement Fund and PG&E Debt Claims will be allocated 16.15% of the Settlement Fund. ¶133. *See CareDx*, 2025 WL 3546227, at *9 ("Courts routinely approve of allocation plans in securities class actions that distribute *pro rata* payments to Authorized Claimants based on the 'recognized loss' for each share during the Class Period.").

Claimants that filed a Rescission or Damage Claim in the Chapter 11 Cases will have their overall Recognized Claim increased by 25%, in recognition of their preservation of claims against the Reorganized Debtors. Claimants with Recognized Loss Amounts under Section 11 will have those loss amounts increased by 25%, in recognition of the fact that proving scienter is not an element of those claims. ¶134. "[A] plan of allocation . . . fairly treats class members by awarding a *pro rata* share to every Authorized Claimant, even as it sensibly makes interclass distinctions based upon, *inter alia*, the relative strengths and weaknesses of class members' individual claims and the timing of purchases of the securities at issue." *Bernstein v. Ginkgo Bioworks Holdings, Inc.*, 2024 WL 5112227, at *5 (N.D. Cal. Dec. 13, 2024) (citing *Redwen v. Sino Clean Energy, Inc*., 2013 WL 12303367, at *8 (C.D. Cal. July 9, 2013)).

The Plan of Allocation was fully described in the long-form Notice and, to date, there has been no objection to the proposed plan. *See* Ex. 8-B at ¶¶97-135. It is respectfully submitted that the proposed Plan of Allocation will result in a fair distribution of the available proceeds among Settlement Class Members who submit valid claims.

## III. THE NOTICE PROGRAM AND REACTION OF THE SETTLEMENT CLASS TO DATE

Notice of a class action settlement must be directed "in a reasonable manner to all class members who would be bound" by the Settlement. Fed. R. Civ. P. 23(e)(1)(B). In granting preliminary approval of the Settlement, the Court approved Lead Plaintiff's proposed notice plan. *See* ECF No. 347. The notice program's combination of individually mailed Postcard Notices to all Settlement Class Members who could be identified with reasonable effort, supplemented by

the Summary Notice in a widely circulated publication, transmission over a business newswire, and publication on internet websites, satisfied all requirements of Rule 23, due process, the PSLRA, and the Northern District's Guidance. *See, e.g.*, *CareDx*, 2025 WL 3546227, at *8 (finding that mailing or emailing postcard notices, publishing summary notice on *WSJ* and *PR Newswire*, and maintaining a settlement website, a toll-free telephone number, and a dedicated email address for the Settlements was "the best practicable notice to the Class").

As detailed in the Mailing Declaration of A.B. Data, as of June 18, 2026, it has provided 513,433 potential Settlement Class Members and their Nominees with copies of the notice. *See* Ex. 8 at ¶¶2-10. In addition, the Summary Notice was published in *The Wall Street Journal* and transmitted over the *PR Newswire*. *Id*. at ¶11. The Claims Administrator also maintained a dedicated website, www.PGECorporationSecuritiesLitigation.com, to provide potential Settlement Class Members with information concerning the Class Action, the Settlement, and access to copies of the Postcard Notices, long-form Notice, Claim Form, Settlement Agreement, Preliminary Approval Order, and other case-related documents. *Id*. at ¶12. Claim Forms can be submitted to the Claims Administrator by mail or using the case website. *Id*. at ¶13.

While the July 6, 2026 deadline to object to the Settlement or request exclusion has not yet passed, to date, no objections have been received by Lead Counsel or docketed and only eight invalid requests for exclusion have been received. Ex. 8 at ¶17. The reaction to date supports approval of the Settlement and the proposed Plan of Allocation. *See Pardi v. Tricida, Inc.*, 2025 WL 2988737, at *8 (N.D. Cal. Oct. 23, 2025) ("[T]he absence of a large number of objections to a proposed class action settlement raises a strong presumption that the terms of a proposed class settlement action are favorable to the class members."). Lead Plaintiff will address any objections, if any, in its reply submission.

## CONCLUSION

For all the foregoing reasons, Lead Plaintiff respectfully requests that the Court grant final approval of the proposed Settlement and approve the Plan of Allocation for the distribution of the

Net Settlement Fund. Proposed orders will be submitted with Lead Plaintiff's reply papers on August 11, 2026, after the deadline for seeking exclusion and objecting has passed.

Dated: June 19, 2026

Respectfully submitted,

**LABATON KELLER SUCHAROW LLP**

By: /s/ *Thomas G. Hoffman, Jr.*

Thomas A. Dubbs (*pro hac vice*)
Michael P. Canty (*pro hac vice*)
Thomas G. Hoffman, Jr. (*pro hac vice*)
140 Broadway
New York, NY 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
tdubbs@labaton.com
mcanty@labaton.com
thoffman@labaton.com

*Counsel for Lead Plaintiff the Public Employees Retirement Association of New Mexico and Lead Counsel for the Class*

JAMES M. WAGSTAFFE (#95535)
**ADAMSKI, MORISKI, MADDEN, CUMBERLAND & GREEN LLP**
Mailing Address: P.O. Box 3835
San Luis Obispo, CA 93403-3835
Physical Address: 6633 Bay Laurel Place
Avila Beach, CA 93424
Telephone: (805) 543-0990
Facsimile: (805) 543-0980
wagstaffe@ammcglaw.com

*Liaison Counsel for PERA and the Class*

WILLOW E. RADCLIFFE (#200089)
KENNETH J. BLACK (#291871)
HADIYA K. DESHMUKH (#328118)
HAILEY S. ZANUTTO (#358143)
**ROBBINS GELLER RUDMAN & DOWD LLP**
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, California 94104
Telephone 415-288-4545
willowr@rgrdlaw.com
kennyb@rgrdlaw.com
hdeshmukh@rgrdlaw.com

hzanutto@rgrdlaw.com

*Additional Counsel for the Securities Act Subclass*

THOMAS C. MICHAUD
**VANOVERBEKE, MICHAUD & TIMMONY, P.C.**
79 Alfred Street
Detroit, MI 48201
Telephone: (313) 578-1200
Facsimile: (313)578-1201
tmichaud@vmtlaw.com

*Additional Counsel for the Securities Act Subclass*

**CERTIFICATE OF SERVICE**

I hereby certify that on June 19, 2026, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all registered participants only.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on June 19, 2026

/s/ *Thomas G. Hoffman, Jr.*
Thomas G. Hoffman, Jr.